Gregory J. Kuykendall, Bar # 012508
Amy P. Knight, Bar # 031374
KUYKENDALL & ASSOCIATES
531 S Convent Avenue
Tucson, AZ 85701
(520) 792-8033
greg@kuykendall-law.com
amyknight@kuykendall-law.com

*Pro Bono* Attorneys for Defendant Scott Daniel Warren

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | ) |
| | ) No.CR-18-00223-001-TUC-RCC(BPV) |
| Plaintiff, | ) |
| | ) **MOTION TO DISMISS COUNTS 2** |
| vs. | ) **AND 3** |
| | ) |
| SCOTT DANIEL WARREN, | ) |
| | ) |
| Defendant. | ) |
| | ) |

DEFENDANT Scott Daniel Warren, PhD, through his *pro bono* attorneys Gregory J. Kuykendall and Amy P. Knight, hereby moves to dismiss Counts 2 and 3 of the indictment with prejudice because the Religious Freedom Restoration Act of 1993 (RFRA) protects Dr. Warren from being prosecuted for the actions he is alleged to have taken in offering assistance to the migrants. This motion is supported by and specifically incorporates the accompanying memorandum of points and authorities and Dr. Warren requests the Court hold an evidentiary hearing.

MEMORANDUM OF POINTS AND AUTHORITIES

I.      Factual and Legal Background

    a.  Factual Background

Since 2014, Dr. Scott Warren has volunteered with the humanitarian aid group No More Deaths. No More Deaths is a ministry of the Unitarian Universalist Church of Tucson, founded by various religious leaders in Tucson, among them Catholic Bishop Gerald Kicanas, Presbyterian Minister John Fife and leaders of the local Jewish community. No More Deaths embraces faith-based principles; its mission is "to end death and suffering in the Mexico-US borderlands." *See* "About No More Deaths," http://forms.nomoredeaths.org/about-no-more-deaths/. Dr. Warren also works with Ajo Samaritans, a group of "people of faith and conscience who are responding directly, practically, and passionately to the crisis at the US/ Mexico border." *See* "What is Ajo Samaritans," https://ajosamaritans.wordpress.com.

The humanitarian crisis No More Deaths and the Ajo Samaritans address is a well-documented problem, as hundreds of migrants die every year from exposure and injury while crossing through the southern Arizona desert. In 2016, 398 recorded migrant deaths occurred around the U.S. - Mexico border; in 2017, 412 recorded migrant deaths occurred, and between January 1, 2018 and February 6, 2018, 14 have already occurred. *See* International Organization for Migration, "Migrant Deaths Remain High Despite Sharp Fall in US-Mexico Border Crossings in 2017," Feb. 6, 2018, *available at* https://www.iom.int/news/migrant-deaths-remain-high-despite-sharp-fall-us-mexico-border-crossings-2017. Importantly, the 824 deaths mentioned above constitute only the

*known* deaths. Migrants' deaths are not always recorded; Border Patrol agents and humanitarian groups continue to find human remains in remote desert areas. Being intimately aware of this humanitarian crisis, Dr. Warren will, on information and belief, testify that he firmly believes he is morally, ethically, and spiritually bound to offer assistance to human beings in need of basic necessities.

In Ajo, Arizona, a building known as "the Barn", owned by a local resident and used with her permission by various humanitarian groups, including No More Deaths and Ajo Samaritans, serves as a sort of "home base" for their humanitarian operations in the desert. Dr. Warren lives in the small town of Ajo and often visits the Barn to meet other volunteers, assist with cooking for volunteers, and to engage in aid work. This aid work includes driving and/or hiking in remote desert areas to leave water, food, and other supplies, as well as providing emergency first-aid treatment to individuals in distress.

The government's Complaint alleges two migrants, Kristian Perez-Villanueva and Jose Sacaria-Goday (hereinafter "the migrants") found their way to the Barn, where Dr. Warren "met them outside and gave them food and water for approximately three days. Sacaria said that Warren took care of them in 'the Barn' by giving them food, water, beds, and clean clothes." Complaint, Doc. 1, at 1.

According to the sworn testimony of the migrants,[1] they crossed the border on foot the night of January 13, and by the time they arrived at the Barn, they had been walking through the desert for two days and nights. They had been chased by Border Patrol at

---

[1] The migrants were held as material witnesses and were deposed on March 7, 2018. The government has not yet provided copies of the video recording of this testimony. For this reason, the migrants' testimony is described to the best of counsel's recollection.

some point and dropped their backpacks (containing food and water) as they ran. In Why, they got a ride from a stranger to Ajo, and once in Ajo they got a ride from a Hispanic man that one of the migrants knew. He pulled over in front of the Barn property and told the migrants to stay there. No one was at the Barn when they arrived.

Both migrants were very hungry and tired and let themselves into the Barn's unlocked bathroom where they drank from the tap and rested. Dr. Warren discovered them at the Barn some 40 minutes after they arrived. They asked him for food and water and he allowed them to stay there, eat and drink. He never instructed them to hide or to remain inside. In fact, they went inside and outside whenever they wanted to during their approximately two-day stay. Likewise, Dr. Warren came and left multiple times, as did other volunteers. The migrants ate food Dr. Warren prepared for the volunteers at the Barn and the migrants also prepared food themselves. Dr. Warren never offered them a ride or took them anywhere. He likewise never provided them with maps, flashlights or backpacks. They further testified that they were preparing to leave to continue their journey on the afternoon of January 17, 2018, when the Border Patrol and Pima County Sheriffs arrived and conducted what the government characterizes as a "knock and talk."[2]

Border Patrol agents began conducting visual surveillance on the Barn about 2 o'clock p.m. on the afternoon of January 17. An hour and a half later, at 3:33 p.m., they observed Dr. Warren drive onto the Barn property, get out of his car, and go inside the Barn.  About 35 minutes later, at 4:09 p.m., they observed two women leave the Barn, get

---

[2] The defense does not concede that the interaction was properly characterized as a permissible "knock and talk."

into a van registered to the Universalist Unitarian Church in Tucson, and drive away. About 4:48pm, Dr. Warren came outside the Barn with two men "wearing ill-fitting and dirty clothing," whom the Border Patrol Agents somehow concluded were undocumented aliens. The three men stood outside conversing and pointing North in the general direction of the Border Patrol agents.  Five minutes later the three men went inside the Barn. Approximately 30 minutes later, at 5:30 p.m., multiple Border Patrol agents and Pima County Sheriffs drove through the open gate leading to the Barn's driveway, approached the Barn on foot and located both of the migrants in the bathroom. Upon determining that they had no authorization to be in the country, Border Patrol arrested them and Dr. Warren.

Assuming only for the purposes of this motion that Dr. Warren did in fact give the migrants food, water, beds, and clean clothes, as the government alleges, his conduct cannot legally constitute a crime because the government cannot prosecute any individual for exercising his sincerely held religious beliefs in the necessity to provide emergency aid to fellow human beings in need.

b.  <u>Statutory Background</u>

Congress enacted RFRA to ensure that no federal statute either be construed or applied so as to substantially burden the sincere exercise of religion, unless strictly necessary. RFRA provides, the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" except when this is the "least restrictive means of furthering [a] compelling governmental

interest." 42 U.S.C. § 2000bb-1(a)–(b). Congress intentionally chose "the most demanding test known to constitutional law" to protect the exercise of religious beliefs. *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). RFRA extended both the baseline constitutional protections of the Free Exercise Clause and the pre-RFRA statutory limitations on the federal government's ability to burden the constitutionally-protected exercise of religious conscience. *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2761–62 (2014).

In 2000, Congress amended and strengthened RFRA by means of the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc, *et seq*. Importantly, RLUIPA requires that statutory protections on religious exercise like RFRA, "shall be construed in favor of broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and by the Constitution." 42 U.S.C. § 2000cc-3(g).

RFRA unquestionably applies to 8 U.S.C. § 1324, as RFRA explicitly applies "to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993." *Id*. § 2000bb-3(a). RFRA's application is thus "universal" across all federal law. *City of Boerne*, 521 U.S. at 516. Multiple circuits, including the Ninth Circuit, have described RFRA as an amendment to the entire U.S. Code. *See, e.g., Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1120 (9th Cir. 2000) ("Courts have interpreted RFRA as an amendment of existing federal statutes."); *Rweyemamu v. Cote*, 520 F.3d 198, 202 (2d

Cir. 2008) ("RFRA is unusual in that it amends the entire United States Code."). RFRA may be raised "as a claim or defense in a judicial proceeding," 42 U.S.C. § 2000bb-1(c).

The federal government may not prosecute a person in contravention of RFRA and courts have enjoined or dismissed such prosecutions. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) (enjoining prosecution that would violate RFRA); *United States v. Christie*, 825 F.3d 1048, 1055 (9th Cir. 2016) (describing how RFRA may be used as a shield against prosecution); *United States v. Bauer*, 84 F.3d 1549, 1559 (9th Cir. 1996) (partially vacating defendants' convictions because the district court had not allowed them to properly raise RFRA defensively). "In other words, RFRA gives each person a statutory right not to have his sincere religious exercise substantially burdened by the government, save for cases expressly denominated "[e]xception[al]." *Id.* § 2000bb-1(b)." *Christie,* 825 F.3d at 1055.

The government, therefore, may not apply §1324 in a manner that substantially burdens a person's sincere religious exercise unless it is the least restrictive means of furthering a compelling government interest. To make a *prima facie* case under RFRA to not be prosecuted, the claimant must show a "substantial burden" on "sincere religious exercise." *See Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008).

Once a claimant makes a *prima facie* case, the burden of "evidence and persuasion" then shifts to the government. 42 U.S.C. § 2000bb-2. First, the government must demonstrate a sufficiently compelling interest that is furthered by placing a burden on the particular religious person under the specific circumstances of the case. § 2000bb-1; *O Centro*, 546 U.S. at 430-34. Assuming it meets that burden, the government then

must demonstrate that it has no "other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties in these cases." *Hobby Lobby*, 134 S. Ct. at 2780. Thus, if by prosecuting a claimant the government places a substantial burden on that claimant's sincere religious exercise, and prosecuting the claimant is not the least-restrictive means of furthering a compelling government interest, RFRA unequivocally requires dismissal.

## II.   Applying § 1324(a)(1)(A)(iii) to Dr. Warren's Alleged Conduct Violates RFRA.

The government has charged Dr. Warren with felony crimes punishable by ten years in prison for allegedly providing food, water, and shelter to two individuals for two days, actions compelled by a sincerely-held religious belief. This case does not satisfy RFRA's demanding requirement than a person may not be federally criminally prosecuted for sincere religious exercise unless this prosecution is the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000bb-1(a)–(b). Dr. Warren maintains a sincere belief in the duty to help fellow human beings – regardless of race or nationality – in distress. Indeed, this practice of charity and mercy is core to his spiritual values. Criminally prosecuting him for the actions alleged would substantially burden his ability to practice his faith. Under the particularized, case-by-case approach mandated by RFRA, prosecuting Dr. Warren for refusing to turn away two exhausted, hungry strangers in the middle of a forbidding desert is not the least restrictive means of furthering any compelling government interest. Both the relevant statutory framework and facts of this case seen in the light most favorable to the government

demonstrate that prosecuting Dr. Warren does not further any compelling government interest, and that a feasible less restrictive means exists for the government to pursue its goals. This Court should therefore dismiss the charges against Dr. Warren under 8 U.S.C. § 1324(a)(1)(A)(iii).

      a.  <u>Dr. Warren Holds a Sincere Religious Belief in a Duty to Provide Care to Fellow Human Beings in Distress.</u>

Religious practice is protected by RFRA based on the intensity and sincerity of an individual's beliefs, not the specific words used or any association with an organized faith tradition. RFRA applies to "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7). Courts may not question the plausibility or reasonableness of a religious person's beliefs. *Hobby Lobby*, 132 S. Ct. at 2778–79. And the Supreme Court has rejected any inquiry into "what [the claimant's] belief was and what the religious basis of his belief was." *Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 714-15 (1981). To the contrary, it has cautioned that "[c]ourts should not undertake to dissect religious beliefs because the believer admits that he is struggling with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *Id.* (internal quotation marks omitted).

The "religious beliefs" protected by RFRA include any moral, ethical, or religious beliefs about what is right and wrong that are sincerely held with the strength of traditional religious convictions. In *Callahan v. Woods*, 658 F.2d 679, 683 (9th Cir. 1981), and *United States v. Ward*, 989 F.2d 1015, 1018 (9th Cir. 1992), the Ninth Circuit

adopted the definition of "religion" given by the Supreme Court in *United States v. Seeger*, 380 U.S. 163, 185 (1965), and *Welsh v. United States*, 398 U.S. 333, 339 (1970).[3] The Supreme Court ruled that religion should be defined in light of "the richness and variety of spiritual life in our country." *Seeger*, 380 U.S. 163, 174. In both *Welsh* and *Seeger* the Supreme Court granted conscientious objector status to persons who objected to war on grounds that did not involve belief in a supernatural God or a Supreme Being.[4] Under the standard established in these cases and adopted by the Ninth Circuit, "[t]he task is to decide whether the beliefs professed . . . are, in [the person's] own scheme of things, religious." *United States v. Ward*, 989 F.2d 1015, 1018 (9th Cir. 1992). "Religious beliefs . . . are those that stem from a person's 'moral, ethical, or religious beliefs about what is right and wrong' and are 'held with the strength of traditional religious convictions.'" *Id.* (quoting *Welsh*, 398 U.S. at 340); *see also Callahan*, 658 F.2d at 687.

In *Seeger*, one of the conscientious objectors had a profound "ethical belief in intellectual and moral integrity 'without belief in God, except in the remotest sense.'" *Seeger*, 380 U.S. at 166 (1965). Another objector defined religion as "the consciousness

---

[3] The Ninth Circuit and this district have repeatedly defined the concept of "religion" in RFRA and RLUIPA according to its jurisprudence in the constitutional Free Exercise context. *United States v. Zimmerman*, 514 F.3d 851, 853–54 (9th Cir. 2007) (importing definition of religion in a Free Exercise case, *Callahan*, into the context of RFRA); *see also Isbell v. Ryan*, 2011 WL 6050337, at *5 (D. Ariz. Dec. 6, 2011) (quoting the definition in *Ward*); *Guillen v. Thompson*, 2008 WL 5331915, at *3 (D. Ariz. Dec. 19, 2008) (same).

[4] *Seeger* and *Welsh* were statutory interpretation cases, but were constitutionally motivated and the Ninth Circuit is among the courts that have applied them to the constitutional definition of religion. *Ward*, 989 F.2d at 1018 n. 2 ("Courts regularly use the *Welsh* test to determine whether belief is 'religious' for First Amendment free exercise purposes.").

of some power manifest in nature which helps man in the ordering of his life in harmony with its demands . . .; it is the supreme expression of human nature; it is man thinking his highest, feeling his deepest, and living his best." *Id.* at 169 (citations and brackets removed). And as to his belief in a Supreme Being, he "stated that he supposed 'you could call that a belief in the Supreme Being or God. These just do not happen to be the words I use.'" *Id.* In *Ward*, the defendant "[did] not describe his beliefs in terms ordinarily used in discussions of theology or cosmology" and even "at one point use[d] the term 'atheistic[.]'" *Ward*, 989 F.2d at 1018. Nonetheless, given the strength with which Ward held his beliefs and the risks he was willing to shoulder to pursue them, the court held that his beliefs were religious. *Id.* at 1019.

Dr. Warren holds this belief with the strength of traditional religious convictions, and exercises it through work with a ministry of a local church, in which he has engaged for years.[5] It is central to how he lives his faith. It is why he chose to pursue his career in

---

[5] Dr. Warren's sincere spiritual belief in the inherent worth of every human being and the corresponding duty to provide life-saving care to fellow human beings in distress is a common core belief in a number of well-known religions including Christianity, Judaism, Mormonism and Islam and, as such, is precisely the type of belief RFRA mandates be protected. *See, e.g.* Mathew 25: 37-41 "Then the righteous will answer him, 'Lord, when was it that we saw you hungry and gave you food, or thirsty and gave you something to drink? And when was it that we saw you a stranger and welcomed you, or naked and gave you clothing? And when was it that we saw you sick or in prison and visited you?' And the king will answer them, 'Truly I tell you, just as you did it to one of the least of these who are members of my family, you did it to me.'" Luke 3:11 "In reply he said to them, 'Whoever has two coats must share with anyone who has none; and whoever has food must do likewise.'" Leviticus 19: 33-34 "When a foreigner resides among you in your land, do not mistreat them. The foreigner residing among you must be treated as your native-born. Love them as yourself, for you were foreigners in Egypt. I am the Lord your God." Deuteronomy 10:18-19 "He defends the cause of the fatherless and the widow, and loves the foreigner residing among you, giving them food and

geography, and why he has made his home in Ajo. Moreover, like the defendant in *Ward*, Dr. Warren's beliefs run so deep that he has shouldered substantial risks to his safety and livelihood to remain faithful to them. Thus, in the deadly border region in which at least 412 individuals died in 2017 alone, Dr. Warren could not, consistent with his conscience, turn away two exhausted, injured men seeking food, water, and shelter.

Courts have recognized actions similar to Dr. Warren's as religious practice. The Second Circuit, for example, has recognized that providing a temporary place to sleep for individuals in need was constitutionally protected religious exercise, even absent the additional protections of RFRA. *Fifth Ave. Presbyterian Church v. City of N.Y.*, 293 F.3d 570, 574–75 (2d Cir. 2002) ("[T]he Church has demonstrated a likelihood of success in establishing that its provision of outdoor sleeping space for the homeless effectuates a sincerely held religious belief and therefore is protected under the Free Exercise Clause."). Given Dr. Warren's assertion that his actions in providing emergency assistance to the migrants were an expression of his spiritual beliefs in the inherent worth of all people, this Court must accept his actions as an exercise of a sincerely held religious belief.

---

clothing.  And you are to love those who are foreigners, for you yourselves were foreigners in Egypt." Mosiah 4:19 "For behold, are we not all beggars? Do we not all depend upon the same Being, even God, for all the substance which we have, for both food and raiment, and for gold, and for silver, and for all the riches which we have of every kind?" Al-Baqarah 2:177 "Righteousness is not that you turn your faces toward the east or the west, but [true] righteousness is [in] one who believes in Allah, the Last Day, the angels, the Book, and the prophets and gives wealth, in spite of love for it, to relatives, orphans, the needy, the traveler, those who ask [for help], and for freeing slaves; . . . . Those are the ones who have been true, and it is those who are the righteous."

b. Criminally Prosecuting Dr. Warren Would Substantially Burden his
Practice of His Faith

By prosecuting Dr. Warren under a criminal statute, the government has clearly placed a substantial burden on Dr. Warren's exercise of religion. The Ninth Circuit has recognized that a substantial burden exists where a person is "coerce[d] . . . into a Catch-22 situation: exercise of their religion under fear of civil or criminal sanction." *Snoqualmie Indian Tribe v. F.E.R.C.*, 545 F.3d 1207, 1214 (9th Cir. 2008); *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1069–70 (9th Cir. 2008) (stating that, *inter alia,* a substantial burden exists where an individual is "coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions"). Notably, Trump Administration Department of Justice guidance underscores that "[e]xcept in the narrowest circumstances, no one should be forced to choose between living out his or her faith and complying with the law." Office of the Attorney General, *Federal Law Protections for Religious Liberty*, Oct. 6, 2017 [hereinafter "DOJ Guidance"] at 1.

Indeed, in *Wisconsin v. Yoder,* the mere threat of a five-dollar criminal fine constituted a substantial burden. 406 U.S. 205, 218 (1972); *see also O Centro*, 546 U.S. 418, 426 (noting that the government conceded that the threat of prosecution would constitute a substantial burden). Each charge under § 1324 carries the possibility not of a mere five-dollar fine, but of five years imprisonment, 42 U.S.C. § 1324(a)(1)(B)(ii). Dr. Warren's two choices were to turn out two migrants in dire need, in violation of his moral and spiritual beliefs, or face felony prosecution. This dilemma plainly constitutes a substantial burden on his ability to exercise his faith.

c.  The Government Cannot Meet Its Burden of Showing this Prosecution Furthers a Particularized Compelling Interest.

Once the claimant establishes a substantial burden on his sincere free exercise of religion, the burden shifts to the government to demonstrate "that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Hobby Lobby,* 134 S. Ct. at 2754.

To establish a compelling interest under RFRA, the government must demonstrate a particularized interest with respect to the particular claimant in the specific circumstances of the case *and* it must show that this interest is sufficiently compelling. At the compelling interest stage, "courts must rigorously examine whether the government's assertion of a compelling interest is sufficient." *Holt v. Hobbs*, 135 S. Ct. 853, 864 (2015). To qualify as compelling, the interest may not be marginal, but rather must be what the Supreme Court has described as an "an interest of the highest order." *O Centro*, 546 U.S. at 433 (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)); *see also* DOJ Guidance at 5 ("Only those interests of the highest order can outweigh legitimate claims to the free exercise of religion[.]") Here, the government cannot establish that prosecuting Dr. Warren *in particular* furthers any compelling government interest.

i.  *The Compelling Interest Must Be Defined on a Particularized, Case-by-Case Basis.*

14

Any compelling interest must be defined with respect to the specific person and the particular facts of the case. "RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Hobby Lobby*, 134 S. Ct. at 2779. Courts must look to the government's "marginal interest" in enforcing the law in question against the *specific* individual. *Id.* This is true even in areas where the government interest is "paramount," as with establishing drug laws or providing for the education of children. *O Centro,* 546 U.S. at 431.

To show such a particularized interest, the government bears the burden of submitting "additional proof that the *specific* RFRA claimants' *particular* activities" would result in a compelling interest being "meaningfully compromised." *Christie*, 825 F.3d at 1057 (emphasis added). This is an "onerous burden." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,* 282 F. Supp. 2d 1236, 1262 (D.N.M. 2002), aff'd 389 F.3d 973 (10th Cir. 2004) (en banc), aff'd and remanded, *O Centro*, 546 U.S. 418.

It is well established that assertions of *general* government interest are insufficient to satisfy this analysis. In *O Centro*, a religious organization argued that the government did not have a compelling interest in prosecuting its members under the Controlled Substances Act (CSA) for the use of a Schedule 1 hallucinogen, hoasca, in their religious rituals. The government asserted a general interest in uniformity of enforcement, arguing that the CSA established "a 'closed' system that prohibits all use of controlled substances

except as authorized by the Act itself [and] cannot function with its necessary rigor and comprehensiveness if subjected to judicial exemptions." *O Centro*, 546 U.S. at 430. The Court unambiguously rejected this argument. *Id.* In rejecting such a generalized government interest, it held that the government may not speculate about other possible RFRA claims to justify denying an individual's claim. *Id.* at 435–36 (rejecting the government's "slippery-slope" argument that "echoe[d] the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions"); *see also United States v. Christie*, 825 F.3d 1048, 1060-61 (9th Cir. 2016) ("The government may well be right that granting an exception to the Christies would invite a flood of RFRA claims . . . But that objection is insufficient for it is nothing more than a slippery-slope concern that could be invoked in response to any RFRA claim."). Thus, the government cannot simply assert that it needs to enforce immigration laws, apprehend persons without authorization to be in the country, or dissuade border crossers generally; the asserted compelling interest must be highly specific to this situation. Here, the government must demonstrate that prosecuting Dr. Warren for his specific actions, rather than prosecuting people for harboring generally, furthers a compelling government interest, and that the inability to prosecute Dr. Warren specifically would "meaningfully compromise" that interest.

> ii. *The Government Cannot Demonstrate that Prosecuting Dr. Warren for Providing Short-Term Care to Two Individuals Furthers any Interest of the Highest Order.*

Importantly, particularized interests are not the same as compelling interests; to satisfy RFRA, an interest must be both. Compelling interests are interests of the highest

order. *O Centro*, 546 U.S. at 433; *Yoder*, 406 U.S. 215 ("[O]nly those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion."). Marginal or incremental improvements in the advancement of the government's goals do not constitute compelling interests. *See Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 803 n.9 (2011) ("[T]he government does not have a compelling interest in each marginal percentage point by which its goals are advanced."). Under RFRA, the government must show that prosecuting Dr. Warren under the specific circumstances of this case furthers an interest of the highest order.

Criminally prosecuting Dr. Warren for allegedly allowing access to food, water, clothes, and shelter for two nights to two undocumented persons in distress does not further a governmental interest of the highest order. RFRA requires the Court to assess the government's interest not generally, but as implicated in this particular circumstance. Consequently, the government cannot prevail by asserting an interest in stringent or uniform application of its immigration laws, or in apprehending any and all unauthorized border crossers.[6] *See O Centro*, 546 U.S. at 430. Since the government plainly lacks any interest in these two individuals remaining dehydrated, hypothermic or famished,[7] the

---

[6] Any asserted interest in "deterring others" from harboring illegal aliens is just another version of stringent application of the immigration laws. Moreover, prosecuting individuals motivated by their deeply held religious beliefs is grossly unlikely to deter individuals motivated by money or other concerns.

[7] As an agency whose mission on the border includes rescuing the lives of migrants at risk of losing their lives in the desert, Customs and Border Protection does not have a compelling interest in undocumented persons being dehydrated or famished. *See* Associated Press, *Arizona group: Border Patrol agents have emptied water bottles left for migrants*, Jan. 22, 2018 (quoting CBP spokesman that "Border Patrol agents are directed by our leadership to not tamper with humanitarian aid . . . The U.S. Border

only interest this prosecution conceivably serves is the government's marginal interest in apprehending these two particular migrants.

As an initial matter, the government's interest in apprehending two particular individuals, when it apprehended 303,916 border crossers during fiscal year 2017,[8] is necessarily incremental, and therefore, far from compelling. *See Brown*, 564 U.S. at 803 n.9 ("[T]he government does not have a compelling interest in each marginal percentage point by which its goals are advanced."); *see also O Centro*, 546 U.S. at 437 (expressing skepticism at the government's argument that it had a compelling interest in criminalizing the use of "one drop" of hoasca "once a year").

But even if such an incremental interest were compelling, to satisfy RFRA's "onerous" and "rigorous" burden, the government would have to prove that Dr. Warren's alleged actions compromised that compelling interest to "a meaningful degree." *Christie*, 825 F.3d at 1056. Yet the facts make it impossible for the government to prove its interest

---

Patrol is committed to enforcing federal laws to secure our nation's borders while ensuring the safety and security of all individuals."), Nancy Montoya, *Human Rights Group: Border Patrol Vandalizing Water Stations*, Arizona Public Media, Jan. 18, 2018 (quoting CBP spokesman that "a majority of agents" will go out into the harsh conditions of the desert "to rescue people that they don't even know"); Rafeal Carranza, *Border Patrol accused of vandalizing water aid stations in the desert*, Az. Central, Jan. 17, 2018, https://www.azcentral.com/story/news/politics/border-issues/2018/01/17/border-patrol-accused-vandalizing-water-aid-stations-desert/1041532001/ ("The Border Patrol said that in addition to enforcing the nation's immigration laws, they are also committed to protecting human life."). Customs and Border Protection, *Border Patrol's Tucson Sector Prosecuting First-Time Offenders*, Jul. 13, 2017, https://www.cbp.gov/newsroom/local-media-release/us-border-patrol-s-tucson-sector-prosecuting-first-time-offenders (stating that "Arizona's desert shows no mercy for those unprepared for its remote, harsh terrain and unpredictable weather" and describing agents who "rescued" border-crossers).
[8] *See* Bloomberg Politics, "Here's What We Know About Trump's Mexico Wall," Feb. 13, 2017, https://www.bloomberg.com/graphics/2017-trump-mexico-wall/how-many-people-currently-cross/.

was meaningfully compromised. First, the government successfully apprehended the migrants despite (or perhaps because of) Dr. Warren's actions; its ability to apprehend migrants was not meaningfully compromised. Furthermore, both migrants have testified under oath that Dr. Warren neither advised them not to go outside nor prevented them from leaving the Barn, which they did repeatedly; indeed, Border Patrol agents easily observed their presence. In addition, both migrants testified that they were planning on leaving that very day. Once they left, the Border Patrol could easily have located and apprehended them. Thus, at worst, Dr. Warren's alleged aid delayed the migrants' apprehension by approximately three days while assuring the migrants' safety from the elements, hardly a "meaningful" impact on the government's goals. Finally, turning distressed migrants back into the desert or denying them food and water would have almost certainly raised the likelihood of the migrants being harmed, which would actually undercut the Border Patrol's stated interest in *protecting* human life.[9] Under the "onerous" and "rigorous" standard, the government simply cannot meet its burden to establish a compelling interest in the circumstances of this case.

> iii.   *Section 1324 Cannot Be Regarded as Protecting an Interest of the Highest Order Since It Leaves Analogous Conduct Unprohibited.*

The Supreme Court has made clear that "a law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *O Centro*, 546 U.S. at 433–34. In *O Centro,* for example, the existence of a statutory exemption to the Controlled Substances Act for the religious use

---

[9] See *supra* note 5.

of peyote by Native Americans "fatally undermine[d]" the government's contention that it had a compelling interest against creating a similar exception for hoasca. *Id.* at 430.

Like the CSA's religious exemption for peyote, § 1324 contains an exemption to, *inter alia*, the charges here for certain forms of religious activity. 8 U.S.C. § 1324(a)(1)(C). Under this statutory exemption, it is *not* a violation of subsection (a)(1)(A)(iii) for a religious non-profit to provide "room, board, travel, medical assistance, and other basic living expenses" to an undocumented volunteer working as a minister or missionary, so long as the undocumented volunteer has been a member of the denomination for at least one year. *Id.* This exception, just like the peyote exception in *O Centro*, demonstrates the absence of an interest of the highest order, since the government tolerates the statutory inability to apprehend certain undocumented individuals.  Accordingly, it cannot claim a compelling interest in criminally prosecuting persons of faith for any marginal increase in the ease of apprehending every single undocumented person. It would be implausible to claim that the government maintains an immigration-related interest of the highest order in prosecuting a religiously-motivated provider of shelter to undocumented individuals for two nights, while at the same time saying that if those undocumented individuals were *missionaries*, then the government would tolerate room, board, and even travel expenses being provided *indefinitely*.

Because § 1324 leaves unpunished significantly greater assistance to an entire class of undocumented people in its exemption for missionaries and ministers, the government cannot successfully claim an interest of the highest order in criminally prosecuting Dr. Warren for allegedly doing much less.

d. <u>The Government Cannot Meet Its Burden of Showing that Prosecuting Dr. Warren is the Least Restrictive Means of Furthering Any Compelling Interest.</u>

Even if the government were able to carry its burden of demonstrating an interest of the highest order, it would still have to prove that prosecuting Dr. Warren was the *least restrictive means* of furthering any such interest. This standard is "exceptionally demanding" by design. *Hobby Lobby*, 134 S. Ct. at 2780. The government must show that it has no "other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties in these cases." *Id.* (emphasizing the particularized nature of the least-restrictive-means inquiry). And "[i]f a less restrictive means is available for the Government to achieve its goals, the Government *must* use it." *Holt v. Hobbs*, 135 S. Ct. 853, 864 (2015) (emphasis added).

i. *The Facts of this Case Demonstrate that Less Restrictive Means Were Available and Actually Employed.*

Clearly a means of furthering any particularized government interest in enforcing immigration law exists without seeking to imprison Dr. Warren, since it is beyond dispute that the government successfully apprehended the two migrants. The fact that Dr. Warren did not turn away the two migrants from the Barn did not prevent Border Patrol from finding and arresting them.[10] This fact conclusively demonstrates that it was possible for the government to achieve its interest without burdening Dr. Warren's exercise of religion.

---

[10] The defense does not concede that the Border Patrol's actions at the Barn were legal or consistent with the Fourth Amendment. However, legal alternatives clearly existed, as discussed below.

Moreover, various less restrictive means than prosecuting Dr. Warren are available. Border Patrol agents could, as was done here, conduct surveillance to locate migrants who are receiving temporary emergency shelter. Agents can obtain search warrants for a property if they have probable cause to believe there are undocumented individuals inside. Or agents could wait for the migrants to leave, as the migrants here were planning to do later that very day, and apprehend them. These approaches and many others could accomplish the government's immigration enforcement objectives without criminalizing Dr. Warren's sincere exercise of conscience.

ii.     *To Protect Religious Freedom, RFRA Can Require the Government to Bear Increased Operating Costs*

Even if these alternatives might theoretically slightly increase the government's operating costs, such incremental increases do not justify denying a RFRA claim. Congress understood that protecting liberty of conscience would at times require increased administrative costs and was willing to accept this result. 42 U.S.C. § 2000cc-3(c) ("This chapter may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise."); *Hobby Lobby,* 134 S. Ct. at 2781 ("both RFRA and its sister statute, RLUIPA, may in some circumstances require the Government to expend additional funds to accommodate citizens' religious beliefs"). And as Attorney General Sessions recently explained, "[i]n the United States, the free exercise of religion is not a mere policy preference to be traded against other policy preferences." DOJ Guidance at 1.

22

Recent Supreme Court decisions confirm that increased operating costs do not justify denial of an exemption under RFRA. In *Holt*, the Court granted an exemption for a Muslim inmate to grow a longer beard than allowed under the prison regulations, even if this meant the adoption of a new policy regarding more frequent photographing of inmates. *Holt*, 135 S. Ct. 853 at 865. And in *Hobby Lobby*, plaintiff employers challenged a regulatory mandate that they provide various forms of contraceptive coverage for their employees. The Court identified a "straightforward" less restrictive means: the Government could simply "assume the cost of providing the four contraceptives at issue to any women who are unable to obtain them under their health-insurance policies due to their employers' religious objections." *Hobby Lobby,* 134 S. Ct. at 2780. The Department of Health and Human Services objected to the burden of developing this program. Yet "when compared with the overall cost of ACA," the Court noted, these expenses would be "minor." *Id.* at 2780–81. Not only that, but the government's aversion to incremental increases in cost belied its claim that it was pursuing a "compelling" interest. *Id.* at 2781 ("If, as HHS tells us, providing all women with cost-free access to all FDA-approved methods of contraception is a Government interest of the highest order, it is hard to understand HHS's argument that it cannot be required under RFRA to pay *anything* in order to achieve this important goal.") (emphasis in original). The Department of Justice, in its own guidance, confirms that a less restrictive means may involve "expenditure of additional funds" or "creation of a new program." DOJ Guidance at 5. Thus, even if the government proved that surveillance, search warrants, work place raids, or waiting for

migrants to reappear in public was more costly than prosecuting humanitarian volunteers
– a proposition that defies belief – under RFRA, the government must bear this cost.

> iii.    *The Existing Exception to § 1324 Makes Clear that Not Prosecuting Dr.*
>         *Warren is a Feasible Less Restrictive Alternative*

In *Hobby Lobby*, it was decisive to the Court's holding mandating a RFRA
exemption that a regulatory exemption to the contraceptive mandate already existed for
religious nonprofits. *Hobby Lobby,* 134 S. Ct. at 2784 (holding that through this
exemption, "the government has demonstrated that it has at its disposal an approach that
is less restrictive than requiring employers to fund contraceptive methods that violate
their religious beliefs"). Indeed, this case is much simpler than *Hobby Lobby*, since the
existing exception in § 1324 covers significantly more assistance than what Dr. Warren is
accused of providing here.

Similarly, in *Holt*, the prison allowed inmates to grow ¼-inch beards for medical
reasons, but not ½-inch beards for religious reasons. *Holt*, 135 S. Ct. at 865. The Court
found that there was no material difference with respect to the government interests
asserted, and granted an exception for ½-beards under RFRA—even though the religious
exemption was broader, might increase administrative costs, and would likely cover a
significantly larger number of inmates. *Id.* at 866. Since 8 U.S.C. 1324(a)(1)(C) covers
"analogous conduct" to Dr. Warren's, prosecution is clearly not *necessary* to serve the
government's interests. *Holt*, 135 S. Ct. at 865; *see also* DOJ Guidance at 5 (stating that
the less-restrictive means may include "modification of existing exemptions"). Therefore,
"this is not a case where it can be established that it is difficult to accommodate the

government's interest, and in fact the mechanism for doing so is already in place." *Hobby Lobby*, 134 S. Ct. at 2786 (Kennedy, J., concurring in judgment).

Because the government cannot establish that no less restrictive means exist, prosecuting Dr. Warren is incompatible with RFRA and Court should dismiss Counts 2 and 3 of the indictment.

**Conclusion**

Because Dr. Warren could not, consistent with his conscience and spiritual beliefs, turn away two migrants in the harsh climate of the Sonoran Desert, his actions as alleged by the government were federally *protected* under RFRA. The government's attempts to criminalize religious charity in these circumstances impose a clear substantial burden on Dr. Warren's sincere religious belief. Because prosecuting Dr. Warren does not further any compelling government interest, and because feasible less restrictive means of achieving the government's goals are available, the prosecution doubly violates RFRA. For both independent reasons, this Court should dismiss the charges against Dr. Warren under 8 U.S.C. § 1324(a)(1)(A)(iii).

RESPECTFULLY SUBMITTED this 30th day of March, 2018.

By /s/ Amy P. Knight
    Gregory J. Kuykendall
    Amy P. Knight
    531 S Convent Avenue
    Tucson, AZ 85701
    Attorneys for Defendant Scott
    Daniel Warren

CERTIFICATE OF SERVICE

I certify that on March 30th, 2018, I electronically transmitted a PDF version of this document to the Clerk of Court using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Nathaniel J. Walters, Esq. (email: Nathaniel.walters@usdoj.gov)
Anna R. Wright, Esq. (email: anna.wright@usdoj.gov)
United States Attorney's Office
405 W. Congress, Suite 4800
Tucson, AZ 85701