1

2                    UNITED STATES DISTRICT COURT

3                       DISTRICT OF ARIZONA

4    United States of America,     )
                                   )
5               Plaintiff,         )   CR 18-00223-RCC(BPV)
                                   )
6          vs.                     )
                                   )   Tucson, Arizona
7    Scott Daniel Warren,          )   June 14, 2018
                                   )   1:47 p.m.
8               Defendant.         )
     _____)

9

10

11                  TRANSCRIPT OF PROCEEDINGS
                         MOTION HEARING

12

13

14

15          BEFORE THE HONORABLE BERNARDO P. VELASCO
               UNITED STATES MAGISTRATE JUDGE
16                   405 W. CONGRESS STREET
                   TUCSON, ARIZONA 85701

17

18

19

20            Cindy J. Shearman, RDR, CRR, CRC
             405 W. Congress Street, Suite 1500
21                   Tucson, AZ 85701
                      520-205-4286

22

23       Proceedings Reported by Realtime Court Reporter
         Transcript prepared by computer-aided transcription

24

25

1                         A P P E A R A N C E S

2

     For the Plaintiff:
3
     Nathaniel J. Walters
4    Anna R. Wright
     Assistant U.S. Attorneys
5    405 W. Congress Street, Suite 4800
     Tucson, Arizona 85701
6

7    For the Defendant:

8    Gregory J. Kuykendall
     Amy P. Knight
9    Kuykendall & Associates
     531 S. Convent Avenue
10   Tucson, Arizona 85701

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    UNITED  STATES  DISTRICT  COURT

1

I N D E X

2

<u>WITNESS</u>                                                          <u>PAGE</u>

3

<u>CAROL ANN JOHNSON</u>

4

Direct examination by Mr. Kuykendall                        6
Cross-examination by Ms. Wright                            15

5

Redirect examination by Mr. Kuykendall                     26
Follow-up examination by Mr. Kuykendall                    29

6

<u>SCOTT DANIEL WARREN</u>

7

Direct examination by Mr. Kuykendall                       31

8

Cross-examination by Mr. Walters                           56
Redirect examination by Mr. Kuykendall                     82

9

<u>JOHN MARQUEZ</u>

10

Direct examination by Mr. Walters                          85

11

Cross-examination by Mr. Kuykendall                       104

12

13

E X H I B I T S

14

<u>IDENTIFIED</u>                    <u>OFFERED</u>              <u>ADMITTED</u>

15

Gov 72                              83                    83

16

Gov 75                              86                    86
Gov 75A                             94                    94

17

Gov 76                              95                    96
Def 101                             83                    84

18

Def 102                             83                    84
Def 103                             83                    84

19

Def 105                             83                    84
Def 106                             83                    84

20

Def 107                             83                    84
Def 108                             83                    84

21

Def 109                             83                    84
Def 121                             83                    83

22

23

24

25

```
 1                    P R O C E E D I N G S

 2            (Call to order of court, 1:47 p.m.)

 3            CLERK:  In criminal matter 18-223, United States of

 4   America versus Scott Daniel Warren, on for motion hearing.

 5        Counsel, please state your appearances.

 6            MR. WALTERS:  Good afternoon, Your Honor.  Nate

 7   Walters and Anna Wright on behalf of the United States.

 8            MR. KUYKENDALL:  Afternoon, Judge.  Greg Kuykendall

 9   and Amy Knight appearing on behalf of Dr. Scott Warren, who's

10   present out of custody.

11            THE COURT:  Okay.  Thank you.  You may proceed.

12            MR. KUYKENDALL:  Judge, I'm sure you've had a chance

13   to look at the motions.  My intention is at this point to,

14   number one, invoke the rule and then, secondly, after I have,

15   I'm going to call two witnesses relative to Dr. Warren's

16   standing and then afterwards move on to the legality of the

17   government's search and arrests.

18            THE COURT:  Okay.  If the witnesses would come

19   forward.

20            MR. WALTERS:  Your Honor, while the witnesses are

21   coming in, I'd like to make a record in terms of the defense

22   invoking the rule of exclusion.  The defense earlier gave us a

23   copy of a preliminary witness list but the government's

24   position is that not only would the rule of exclusion include

25   those people but at this point anybody that the defense could
```

1  foresee calling not only for this hearing but for trial as

2  well.

3         MR. KUYKENDALL:  I don't think that's appropriate

4  relative to any trial testimony.  I've never heard of that

5  before.

6         THE COURT:  Yes, sir.

7         MR. WALTERS:  Go ahead, Your Honor.

8         THE COURT:  No, no, you stood up.

9         MR. WALTERS:  I was going to say that it does, in

10  fact.  I think it has a bearing on trial testimony because the

11  agents who are testifying are also fact witnesses that are

12  going to be used at trial and it wouldn't be appropriate for

13  the defense witnesses to hear that testimony ahead of trial.

14         THE COURT:  Bring up the witnesses for this hearing.

15              FOUR WITNESSES WERE SWORN.

16         THE COURT:  All right.  The rule's been invoked which

17  means you can't be in the courtroom unless you're on the

18  witness stand or until you're released from the rule.  You're

19  not to talk to anybody about your testimony.

20    Do you understand?

21    (Witnesses who were sworn answered in the affirmative

22  except for Dr. Johnson.)

23         THE COURT:  All right.  Do you?

24         DR. JOHNSON:  Yes, sir.

25         THE COURT:  All right.  You may step out of the

```
 1   courtroom.

 2            MR. KUYKENDALL:  And I was planning on calling

 3   Dr. Johnson right now.

 4            THE COURT:  All right.  Would you please take the

 5   witness stand?

 6         CAROL ANN JOHNSON, WITNESS, WAS PREVIOUSLY SWORN.

 7            THE COURT:  You may proceed.

 8                       DIRECT EXAMINATION

 9   BY MR. KUYKENDALL:

10   Q.  Will you tell the court your whole name?

11   A.  Dr. Carol Ann Johnson.

12   Q.  And is it J-o-h-n-s-o-n?

13   A.  That is correct.

14   Q.  And you're a doctor of what, Dr. Johnson?

15   A.  I'm a doctor of osteopathy and board certified or was in

16   family practice.

17   Q.  Did you -- do you live in Ajo currently?

18   A.  Yes, I do.

19   Q.  And for how long have you lived there?

20   A.  Since 2004.

21   Q.  You were the town doctor there for a while?

22   A.  For almost nine and a half years.

23   Q.  Currently you're retired and doing what?

24   A.  Currently I'm working with garden groups, I'm doing

25   gardening; I am working with humanitarian aid groups; and I'm
```

1   the director of religious education for our local Catholic

2   church.

3   Q.  And, Dr. Johnson, do you own property at 1401 West Snyder?

4   A.  Yes, I do.

5   Q.  And you're aware that that's also known as The Barn?

6   A.  Yes, sir.

7   Q.  And how long have you owned that property at 1401 West

8   Snyder?

9   A.  I don't remember the exact year I bought it but it's been

10  about 10 years.

11          MR. KUYKENDALL:  Judge, it's been a little while since

12  I've used the Elmo.  Do I need to do anything besides push

13  power?

14          THE COURT:  I've never used one so I'm the wrong

15  person to ask.

16  BY MR. KUYKENDALL:

17  Q.  And while they're getting that squared away, do you see

18  anything yet on your screen?

19  A.  No.

20  Q.  Okay.  I'm going to show you some pictures in a few minutes

21  but I did want to ask you about your -- your relationship to

22  Scott Warren.  Do you know Dr. Warren?

23  A.  Yes, I do.

24  Q.  And how is it that you know Dr. Warren?

25  A.  He's been involved with the Samaritans and the No More

DIRECT EXAMINATION - CAROL ANN JOHNSON                    8

1   Deaths group that have used The Barn.  He's the liaison person

2   that makes sure that all the rules are obeyed, stays -- just

3   supervises especially the young people who are using The Barn

4   for me.

5   Q.  Okay.  I didn't mean to cut you off.  Go ahead.

6   A.  No, that's all.

7   Q.  The Barn belongs to you, that's correct, right?

8   A.  That is correct.

9   Q.  Have you given Dr. Warren a set of keys to open the doors

10  of The Barn?

11  A.  Yes, I have.

12  Q.  And have you given him specific permission to use The Barn?

13  A.  Yes.

14  Q.  Do you know what he uses The Barn for?

15  A.  He uses it for -- as -- for the humanitarian aid groups

16  that are working at preventing deaths in the desert.

17  Q.  Do you work with humanitarian aid groups yourself?

18  A.  Yes, I do.  I'm involved with the Ajo Samaritans.

19  Q.  Do you know whether Dr. Warren has your permission to spend

20  the night at The Barn?

21  A.  Of course he does.  If he's got groups that he's

22  supervising, he may need to spend the night.

23  Q.  And you've used the word "supervising" a couple of times.

24  Do you -- is it your intention to have Dr. Warren actually

25  supervise the folks that are at The Barn?

DIRECT EXAMINATION - CAROL ANN JOHNSON

1   A.  At least some of the young people don't understand that

2   places need maintenance or treated as property that needs

3   maintenance instead of just a place to spend the night, and I

4   prefer to have someone there who has my interests in mind as

5   well.

6   Q.  Okay.  Speaking of maintenance, are you aware of whether

7   Dr. Warren personally maintains The Barn?

8   A.  He certainly does some of the maintenance work that needs

9   to be done and when he spots something, he fixes it.

10   Q.  Are you aware of whether Dr. Warren pays for utilities at

11   The Barn?

12   A.  He pays for -- I give Dr. Warren the electric bill for The

13   Barn and he writes me a check.  I believe it's No More Deaths

14   that pays, actually pays for it but I don't know that.

15   Q.  You get a check from Dr. Warren?

16   A.  I get a check from Dr. Warren.

17   Q.  And that check pays for the utility bills that go to you?

18   A.  For the electricity.  I pay for the water because I also

19   have a minor orchard there which needs to be watered.

20   Q.  Do you know -- in your mind, have you given Dr. Warren

21   authority to allow people to come onto the property?

22   A.  Yes.  He can allow people to come onto the property if he

23   wished.

24   Q.  And, likewise, have you given Dr. Warren authority to tell

25   people to not come on the property?

1  A.  Well, that follows, yes, it does.

2  Q.  Let me see if I can get the Elmo to work here for a second.

3  A.  I see something that says United States District Court,

4  District of Arizona, the seal.

5  Q.  Okay.  Do you see something that looks like a map now?

6  A.  Well, I see -- I see something that says Exhibit 101 and

7  the map is gone up on the -- up on the screen.  It needs to

8  come down.

9  Q.  Okay.  So you're looking at Exhibit 101 right now, correct?

10  A.  Uh-huh, and your fingers.

11  Q.  And I'm going to pull this down.

12  A.  Okay.

13  Q.  And now ask if you can identify what appears to be at the

14  top or the center of Exhibit 101?

15  A.  That appears to be The Barn, yes.

16  Q.  Like an overhead shot, a satellite shot?

17  A.  Yes.  I've never seen an overhead shot but that's what it

18  would look like, and I see the garden pens and, yes, that would

19  be The Barn.

20  Q.  So looking at the screen, if you were to assume that the

21  top of the screen is north, the Snyder Road runs north of The

22  Barn, right?

23  A.  That's correct.

24  Q.  And the orchards and the gardens are to the right of The

25  Barn or east of The Barn, right?

1            MS. WRIGHT:  Objection, leading, Your Honor.

2            THE WITNESS:  But that's accurate.

3            THE COURT:  Overruled.

4            THE WITNESS:  I'm sorry.

5            THE COURT:  You may answer.

6            THE WITNESS:  That would be correct.  They're on the

7    right-hand side of The Barn from this view.

8    BY MR. KUYKENDALL:

9    Q.  And, likewise, to the left of The Barn from this view is a

10   circular driveway?

11   A.  Yes, sir.

12   Q.  And can you identify on 101 where the gate from Snyder to

13   the property is?

14   A.  Okay.  So this would be -- up here would be the gate.

15   Q.  All right.  I'm going to remove that and show you another

16   exhibit that's been marked as Exhibit 109.  Do you see that?

17   A.  Uh-huh.

18   Q.  Can you identify Exhibit 109?

19   A.  That's -- that's the gate to The Barn.

20   Q.  And if you watch --

21   A.  It opens in.

22   Q.  Pardon me?

23   A.  It opens in.

24   Q.  So to the left of that photograph is Snyder Road?

25   A.  Snyder Road runs across this way.

DIRECT EXAMINATION - CAROL ANN JOHNSON                    12

1   Q.  Go ahead and touch the screen if you'd like.

2   A.  Okay.  This is Snyder Road across here.

3   Q.  Okay.  And then The Barn would be to the far right of the

4   picture?

5   A.  The Barn would be over here, yes, to the far right.

6   Q.  Does that -- does that gate close?

7   A.  Yes, it does close but it's normally left open.

8   Q.  And it looks -- is that a chain on it?

9   A.  Yes, sir.

10  Q.  When it's closed, you can lock it, too?

11  A.  Yes.

12  Q.  And I'm now going to show you a picture marked Exhibit 106.

13  Do you see that?

14  A.  Yes, sir.

15  Q.  Can you tell the court what 106 is?

16  A.  That's the gates that go -- that close the breezeway off.

17  On the right-hand side the door goes into the main living

18  quarters, on the left-hand side you don't see the door but that

19  goes to the bathroom.  There is a breezeway between the two --

20  two structures.

21  Q.  And I'm going to put Exhibit 101 back and ask you to tell

22  the judge where that -- that doorway with the security gates on

23  Exhibit 106 that you just identified, where that is on

24  Exhibit 101?

25  A.  Okay.  That would be right there.  This is the bathroom

```
 1   here.  This up here is the main building.  So the security gate
 2   is in that little alcove.
 3   Q.  Okay.  So the east side of the property where your orchards
 4   are --
 5   A.  Uh-huh.
 6   Q.  -- is also where the entrance to the -- the structure is;
 7   is that correct?
 8   A.  That's correct.
 9   Q.  And I'm going to show you Exhibit 103.
10   A.  Yes.
11   Q.  And ask what that is.
12   A.  That's a picture of The Barn, the part that faces West
13   Snyder.
14   Q.  Does that face Snyder?
15   A.  No, that doesn't -- no, that faces the driveway.  This part
16   over here faces Snyder.
17   Q.  Okay.  Where you just drew a red line on the left side --
18   A.  That faces Snyder.  This here faces the driveways.
19   Q.  So, again, looking at Exhibit 101, the portion of -- and
20   I'm going to put back 103.  103 has a green portion above what
21   looks like a doorway; is that right?
22   A.  That's correct.
23   Q.  And looking at 101, that green-sided doorway would be on
24   the west side of the building, correct?
25   A.  Right, about there.  It's over here.
```

1  Q.  I think that you referenced earlier that one of the things

2  that -- one of the reasons that you give Scott responsibility

3  and gave him a set of keys was because he makes sure that

4  people follow certain rules?

5  A.  Yes.  And if there is a problem, even the neighbors will

6  come and tell him:  Oh, the young people put their tents on my

7  property.  And he'll take care of any issues, any trash

8  blowing.  I need somebody there to make sure the rules are

9  followed.

10 Q.  And are there any other issues, like clean-up or septic

11 tank or other issues that you're aware of that Scott routinely

12 takes care of?

13 A.  Well, there are -- I'm sure he tells people the septic tank

14 rules, which is basically don't put anything down the septic

15 tank that kills the bacteria so it doesn't work.

16 Q.  And is it --

17 A.  And trash they need to keep behind the security gates so

18 that the javelina don't dump it and let it go all over the

19 countryside.

20 Q.  And are you aware of whether Scott keeps any of his

21 personal property there at The Barn?

22 A.  I think he does, but I don't know that for certain.

23 Q.  If he does, is it with your authority?

24       MS. WRIGHT:  Objection, calls for speculation.  She

25 hasn't testified that he keeps anything there.

1      THE COURT:  Rephrase it.

2  BY MR. KUYKENDALL:

3  Q.  Would you give him authority to keep his things there?

4  A.  Yes.

5  Q.  Thank you.  That's all my questions.

6      THE COURT:  Cross?

7      MS. WRIGHT:  Yes, Your Honor, thank you.

8                      CROSS-EXAMINATION

9  BY MS. WRIGHT:

10  Q.  Dr. Johnson, you've volunteered in the past with Ajo

11  Samaritans, correct?

12  A.  Yes, I have.

13  Q.  And you've done this for many, many years, correct?

14  A.  Since it started in Ajo.

15  Q.  And when would that have been?

16  A.  I am not sure of the exact year but it's been, I would

17  guess, at least six, seven, eight years.  I don't remember when

18  we started.

19  Q.  And you still volunteer with the Samaritans, correct?

20  A.  Yes, I do.

21  Q.  And it would be fair to say, right, that you don't agree

22  with the immigration laws enforced in the United States?

23      MR. KUYKENDALL:  Objection, relevance.

24      MS. WRIGHT:  Your Honor, goes to bias.

25      THE COURT:  Overruled.  You may answer.

CROSS-EXAMINATION - CAROL ANN JOHNSON

1          MR. KUYKENDALL:  I'd object to foundation then.  It's

2   not specific enough as to which specific immigration rules she

3   may disagree with.

4          THE COURT:  That will be sustained.

5   BY MS. WRIGHT:

6   Q.  Dr. Johnson, you object and don't agree with the laws

7   pertaining to deporting people who are in the United States

8   without the correct documents, right?

9   A.  I don't like the immigration laws but I support the

10  government's right to make that kind of law.

11  Q.  And you also disagree with the United States' policy of

12  enforcing the border, correct?

13         MR. KUYKENDALL:  Objection, it's far too broad.

14         THE COURT:  Overruled.

15         THE WITNESS:  I can't answer that with yes or -- a yes

16  or no.  The United States has a right to enforce the border but

17  I do object to -- as a physician and as a Catholic, I object to

18  the fact that people are dying in the desert, and I think it is

19  the obligation of people to try to make sure that does not

20  happen.

21  BY MS. WRIGHT:

22  Q.  And you would agree with me that you think that the current

23  way of enforcing the border makes it more likely that people

24  will die in the desert?

25  A.  Forcing the border -- forcing crossing into more

1  inhospitable territory does mean that more people will die in

2  the desert than if they didn't ever cross the desert, yes.

3  Q.  So that's a yes, you agree that that's what you think?

4  A.  Yes.

5  Q.  You also are -- have had these disagreements or

6  disagreements with immigration law and immigration enforcement

7  policy for years; this isn't new for you, is it?

8  A.  May I tell you an experience from many years ago to

9  illustrate?

10  Q.  Let me rephrase my question.

11      You have disagreed with immigration law and policy, as I've

12  asked you about it, for several years, correct?

13          MR. KUYKENDALL:  I'm going to object again on the

14  foundational basis.  It's far too broad of a question.

15          THE COURT:  Why don't you let her tell me what she

16  thinks so we can move on.

17  BY MS. WRIGHT:

18  Q.  You can answer.

19  A.  A number of years ago, like maybe 30 years ago, I had -- I

20  had taken -- with my husband had taken my children to San Diego

21  and we had crossed to Tijuana.  When we came back on

22  Interstate 5, we were stopped by federal agents just asking if

23  we were citizens.  And since I was from the north, I was

24  completely shocked at that.  It did not seem to me to be

25  something that I would have expected as an American citizen,

```
 1   that people would be stopping people to ask for citizenship

 2   status.

 3   Q.  So that's a yes, you've disagreed with policy and

 4   enforcement for years, right?

 5   A.  I didn't even know about it at that time.  But since I have

 6   moved to Arizona and discovered that I cannot leave my town

 7   without going through a checkpoint, yes, I'm not happy with

 8   that.

 9   Q.  And that's been several years, correct?

10   A.  Yes.

11   Q.  Now, it would also be fair to say that you're no fan of

12   Border Patrol, right?

13           MR. KUYKENDALL:  I'm going to object.  It's too broad

14   of a question.

15           THE COURT:  Sustained.

16   BY MS. WRIGHT:

17   Q.  It would be fair to say that you think that Border Patrol

18   is responsible for pushing people further into the desert and

19   risking their lives?

20   A.  The Border Patrol is not responsible for making the laws

21   that do that, they are simply responsible for attempting to

22   enforce laws.  And Border Patrol does a fair amount of rescue.

23   I really have nothing against the Border Patrol.  I think

24   they're trying to do a very difficult job.

25   Q.  But you think that the nature of their job is to put
```

CROSS-EXAMINATION - CAROL ANN JOHNSON

1    people's lives at risk, that that's the result, correct?

2    A.  No, I don't think that's the -- that is what their -- what

3    the intention of their job is.  That is the -- probably the

4    unintended consequence of border policy, border laws,

5    immigration -- the way that the border -- the border laws are

6    written.

7        The Border Patrol would make -- as far as I understand,

8    will make efforts to rescue people if they know they're out

9    there.  And certainly if they -- if they apprehend people, they

10   take them -- they take them somewhere where there's water.

11   Q.  So that's a yes, you believe that the consequences of

12   Border Patrol's actions is to put people's lives at risk?

13          MR. KUYKENDALL:  I'm going to object.  That's not at

14   all what she said.

15          THE WITNESS:  I don't think that.

16          THE COURT:  She's already answered.

17          MS. WRIGHT:  I'll move on, Your Honor.

18   BY MS. WRIGHT:

19   Q.  Now, you've known the defendant for many years, haven't

20   you?

21   A.  Probably four or five years.

22   Q.  And you know his girlfriend as well?

23   A.  Yes.

24   Q.  And you've known her for four or five years?

25   A.  Since she's moved to Ajo, yes.

1    Q.  So that's four or five years?

2    A.  I don't remember how long it's been since she's moved to

3    Ajo but, yes.

4    Q.  And you've known the defendant's family for several years

5    as well, right?

6    A.  No, I have not.

7    Q.  You've been friends with the defendant for four or five

8    years, correct?

9    A.  Yes.

10   Q.  And you know that the defendant has an apartment in Ajo

11   where he lives, right?

12   A.  That is correct.

13   Q.  Now, you've testified that you are the owner of 1401 West

14   Snyder Road, right?

15   A.  That's correct.

16   Q.  And people refer to that as The Barn, right?

17   A.  That's correct.

18   Q.  And you allow the Ajo Samaritans, No More Deaths, and other

19   humanitarian groups to use The Barn, right?

20   A.  That is correct.

21   Q.  And you don't charge the groups who use The Barn rent to

22   use it, do you?

23   A.  No, I do not.

24   Q.  And you don't charge them a user fee to use it, do you?

25   A.  No, I do not.

CROSS-EXAMINATION - CAROL ANN JOHNSON

1   Q.   And you've testified -- let me back this up.

2        The permission you give is for groups to use it, correct?

3   A.   Yes, groups, I give groups permission to use it.

4   Q.   So you aren't giving permission to use this space

5   individual by individual, are you?

6   A.   I don't need to, although I have asked Scott to make sure

7   that things are going all right there when his groups are

8   there.

9   Q.   And the permission you've granted is for these groups to

10  use The Barn as a base for water and supply distribution in the

11  surrounding desert, right?

12  A.   That's correct, as a base camp.

13  Q.   And you've also given them the permission to store clothing

14  and supplies for illegal aliens there, correct?

15  A.   Food, shoes, yes.

16  Q.   So that's a yes, you've given them permission to store

17  supplies for illegal aliens there?

18  A.   Yes.

19  Q.   And you've also given them permission to allow illegal

20  aliens to stay there, right?

21  A.   I need to quantify that.  If they have come across someone

22  who is in medical need and they have called medical control and

23  been told that this person needs treatment, then that person

24  may stay there until that condition has been cleared up enough

25  that they can continue.

 1  Q.  So the permission -- you have given permission for illegal

 2  aliens in need of medical care to stay there, correct?

 3  A.  If they -- if they follow the protocols, yes.

 4  Q.  And when you say "call medical control", you mean call 911,

 5  right?

 6  A.  No.  There is a physician that they call and ask advice

 7  from.

 8  Q.  And that physician is not in Ajo, correct?

 9  A.  That is correct.

10  Q.  And that physician is not someone who can do any type of

11  video conferencing, correct?

12  A.  That probably can't be done from the desert.

13  Q.  Okay.  And that person is an OB-GYN, correct?

14  A.  I have -- I have not heard that, no.

15  Q.  So you don't know the qualifications of the person they're

16  supposed to call, do you?

17  A.  I know that the person they call is a physician who would

18  be able to give some idea about whether or not a person needs

19  an ambulance or whether with a sprained ankle or severe

20  blisters they simply need to be off their feet until they can

21  walk again.

22  Q.  And so you know that when somebody arrives and the medical

23  protocols are followed, it's -- the group -- the people at your

24  place may or may not call law enforcement, right?

25          MR. KUYKENDALL:  I'm going to object at this point,

 1    Judge, it's well beyond the scope of direct.  It's got nothing

 2    at all to do with the standing issue.  It's irrelevant.

 3            MS. WRIGHT:  Your Honor, it goes to her knowledge of

 4    what happens at The Barn and her familiarity with that, which

 5    goes to her credibility about what she testified to earlier.

 6            THE COURT:  Well, it actually goes to the extent of

 7    the authority she has granted anyone to use her facility.  So

 8    your objection's overruled.

 9        You may proceed.

10    BY MS. WRIGHT:

11    Q.  And you can answer the question.

12    A.  Would you repeat the question, please?

13    Q.  I can.

14        So you know that when someone arrives at The Barn and the

15    medical protocols are followed, that law enforcement will not

16    be called as a result of that?

17    A.  That's correct.

18    Q.  Now, you knew also that the defendant had housed aliens,

19    illegal aliens, at The Barn before, didn't you?

20    A.  I am aware that that has happened rarely but that it has

21    happened.  But the only time that I am aware that that has

22    happened is when somebody has had a medical issue.  The Barn

23    has not ever been -- is not to have been used just for people

24    who do not have medical issues.  That's -- it's not a way

25    station.

1   Q.  Now, on January 17th of 2018, these groups that we've been

2   talking about, Ajo Samaritans and No More Deaths, they had

3   permission to use The Barn, right?

4   A.  Yes, they have.

5   Q.  And they have permission to do the things that we've been

6   talking about, right?

7   A.  Yes, ma'am.

8   Q.  And at that time, you weren't charging them rent or user

9   fees either, were you?

10  A.  No, other than the utilities.

11  Q.  And it's your understanding those utilities were paid by

12  the groups themselves, correct?

13  A.  Yes.

14  Q.  Now -- and on January 17th of 2018, the defendant was

15  allowed to use The Barn on that date?

16  A.  Yes.

17  Q.  And you were aware that prior to January 17th that two

18  aliens had come to The Barn, right?

19  A.  No.

20  Q.  You were not aware that there were two aliens at The Barn?

21  A.  No, I was not.

22  Q.  Were you aware that there were two aliens at The Barn that

23  did not need medical aid?

24  A.  I did not know --

25              MR. KUYKENDALL:  I'm going to object to the question

1    because it lacks foundation.  It's also irrelevant to the issue

2    of standing.

3              THE COURT:  Sustained.

4              MS. WRIGHT:  If I could have one moment, Your Honor?

5              THE COURT:  You may.

6    BY MS. WRIGHT:

7    Q.  Dr. Johnson, I want to talk to you a little bit about the

8    defendant's role at The Barn.  And you testified a little bit

9    about that.  You would agree with me that he makes sure that

10   The Barn is kept clean, right?

11   A.  With the assistance of the Samaritans, yes.

12   Q.  And you would agree with me that he supervises other people

13   that are using The Barn, right?

14   A.  That's correct.

15   Q.  And you would agree with me that he makes sure the trash is

16   disposed of correctly?

17   A.  With the assistance of the other -- of other folks, yes, he

18   does.

19   Q.  And you would agree with me that he also fixes problems

20   when he sees them?

21   A.  Yes.

22   Q.  And so you would agree with me that his role there is as a

23   caretaker of The Barn, right?

24   A.  I would say he was my representative at The Barn.

25   Q.  And so, as your representative at The Barn, he's making

1    sure The Barn is being used the way you want it to be used,

2    right?

3    A.  Yes.

4    Q.  And so, as part of making sure it's being used the way you

5    want it to be used, he's taking care of The Barn while he's

6    there, right?

7    A.  Yes.

8    Q.  Okay.

9            MS. WRIGHT:  Those are all my questions.  Thank you.

10                       REDIRECT EXAMINATION

11   BY MR. KUYKENDALL:

12   Q.  To be clear, Dr. Johnson, the permission that you've given

13   to Scott to use The Barn is special permission as compared to

14   permission that you've given anyone else; is that fair?

15   A.  Yes, it is.

16   Q.  And do you want law enforcement on your property?

17   A.  Not unless they're called.

18   Q.  So would you agree with Scott -- Scott's actions on the

19   17th --

20           MS. WRIGHT:  Objection, relevance, Your Honor.

21   Whether or not this particular witness wants law enforcement

22   there has nothing to do with the issues in the motion, Your

23   Honor.

24           MR. KUYKENDALL:  Well, that's already been testified

25   to.  What I asked her was whether she agreed with --

1          THE COURT:  Overruled.

2   BY MR. KUYKENDALL:

3   Q.  So you can answer.  Would you agree with Dr. Warren's

4   actions on the 17th of January of invoking his rights to not

5   have Border Patrol on that property?

6          MS. WRIGHT:  Objection, lack of foundation, Your

7   Honor.  There's no evidence this witness knows anything about

8   those events.

9          THE COURT:  I assume it's a question in general.

10  BY MR. KUYKENDALL:

11  Q.  So you can go ahead and answer.

12  A.  In general, I support Dr. Warren's ability to ask anybody

13  to leave who does not -- is not a member of one of the groups

14  or some of the people that he knows are allowed there.  If he

15  is in charge -- in charge, he has the right to ask anybody to

16  leave.

17  Q.  And are you aware of him asking others to leave in the

18  past?

19  A.  I am not.

20  Q.  But you would support --

21  A.  I would support that.

22  Q.  And that's because you trust Scott to use his judgment to

23  protect your property?

24          MS. WRIGHT:  Objection, leading, Your Honor.  Defense

25  counsel is testifying.

REDIRECT EXAMINATION - CAROL ANN JOHNSON

```
 1              THE COURT:  Overruled.

 2   BY MR. KUYKENDALL:

 3   Q.  You can answer it.

 4   A.  Yes.

 5              MR. KUYKENDALL:  That's all my questions.  Thank you.

 6              THE COURT:  Do you have any signs on the property

 7   about no trespassing?

 8              THE WITNESS:  No, there are not.

 9              THE COURT:  I looked at photograph Exhibit 109, which

10   is the gate to The Barn area.

11              THE WITNESS:  Uh-huh.

12              THE COURT:  I see a chain.  Do you see a padlock of

13   any kind?

14              MS. WRIGHT:  Your Honor, I don't believe she has the

15   exhibit in front of her.

16              THE COURT:  Okay.

17              MR. KUYKENDALL:  I could put it in front of her,

18   Judge.

19              THE COURT:  Okay.  Thank you.

20              MR. KUYKENDALL:  This is 109.  And is that in focus

21   for you?

22              THE WITNESS:  I don't see a padlock there but there

23   certainly has been a padlock in the past that belongs to that

24   gate.

25              THE COURT:  Is it your padlock?
```

 1            THE WITNESS:  Yes, sir.

 2            THE COURT:  But you don't know where it is?

 3            THE WITNESS:  No, I don't.  I certainly don't see it

 4   in that picture.

 5            THE COURT:  Okay.  And with respect to The Barn

 6   itself, the residential area and the gates that you testified,

 7   are those doors ever locked?

 8            THE WITNESS:  With the --

 9            THE COURT:  The doors to The Barn and the door to the

10   gate at the breezeway.

11            THE WITNESS:  The door to the gate to the breezeway

12   has not been locked because I am out there taking care of the

13   gardens and I want to be able to use the bathroom.

14       The gate -- the doors to The Barn, to the living quarters

15   are kept locked whenever there is not someone there.

16            THE COURT:  Okay.  I don't have anything else.

17            MR. KUYKENDALL:  May I follow up on that last

18   question, Judge?

19            THE COURT:  Sure.

20                      FOLLOW-UP EXAMINATION

21   BY MR. KUYKENDALL:

22   Q.  Dr. Johnson, I'm going to show you what you previously

23   identified as Exhibit 106 --

24   A.  Uh-huh.

25   Q.  -- as the security doors to The Barn.

1    A.  Yes.

2    Q.  And can you tell the judge if you go to the right after

3    entering the security doors, what does that access?

4    A.  To the right ac -- this accesses the living quarters of the

5    -- of the building and those are always kept locked.

6    Q.  And that's a key that you gave to Scott?

7    A.  Yes, sir.

8    Q.  And if you go to the left after going through the security

9    doors, what's that?

10   A.  That's the bathroom.

11   Q.  And that's a door that's left unlocked?

12   A.  That's left unlocked so that I can use it if I need to.

13   Q.  In order for someone to actually knock on one of those

14   doors, they have to first go through the security gate into

15   that breezeway; is that right?

16   A.  That's correct.

17          MS. WRIGHT:  Objection, leading, Your Honor.

18          THE COURT:  Overruled.

19          MR. KUYKENDALL:  That's all my questions.

20          THE COURT:  All right.  You may step down.

21          MR. KUYKENDALL:  My next witness is Dr. Warren.  And,

22   Judge -- did you need to swear him?

23          CLERK:  I need to swear him in.

24       SCOTT DANIEL WARREN, THE DEFENDANT, WAS SWORN.

25          MR. KUYKENDALL:  Judge, my intention would be, with

```
 1   your permission, to ask Dr. Warren questions currently about --

 2   that have to do with standing and then, while he's still on the

 3   stand, go forward with asking him questions about his

 4   impressions on the day of the actual raid.  In other words, not

 5   recall him for a -- for a second purpose beyond standing.

 6              THE COURT:  Oh, okay.

 7                        DIRECT EXAMINATION

 8   BY MR. KUYKENDALL:

 9   Q.  Will you say your whole name?

10   A.  Scott Daniel Warren.

11   Q.  And you're the defendant in this case?

12   A.  Correct.

13   Q.  Dr. Warren, I want to ask you some questions about your

14   permission to be using The Barn at 1401 West Snyder.  Did you

15   obtain personal permission from Dr. Carol Johnson separate from

16   a general invitation to use that?

17   A.  Yes, I did obtain special permission, yeah.

18   Q.  Can you tell Judge Velasco how it is that you got that

19   permission?

20   A.  I talked with Dr. Johnson about four years ago about that

21   space being used by various out-of-town humanitarian aid groups

22   such as No More Deaths, Aguilas del Desierto, Armadillos del

23   Desierto.

24   Q.  Keep going.  If you remember the question.  Keep --

25   A.  Yeah, so I had a specific conversation with her about the
```

1   space being used that way.  We were both in agreement that it

2   would be a good use for the space.  And then I took on the role

3   as a liaison of the space kind of between Dr. Johnson and the

4   visiting groups.

5   Q.  The visiting groups that you described, Aguilas Del

6   Desierto and Samaritans, and did you -- and No More Deaths, was

7   there another group?

8   A.  Yeah.  Other groups have used that space.  Armadillos del

9   Desierto --

10  Q.  Armadillos del Desierto?

11  A.  Uh-huh.

12  Q.  And those groups come from several hours away from Ajo, I'm

13  presuming?

14  A.  Correct, yeah, Tucson, Phoenix, Flagstaff, San Diego.

15  Q.  When those groups use The Barn, what obligations do you

16  have in relation to them and The Barn?

17  A.  There are many.  Oftentimes I'll let them in, I'll welcome

18  them to the space, prepare the space for them, make sure that

19  things are organized, that they have supplies available.

20  Usually I go out beforehand and I'll stay afterwards to make

21  sure that things are flowing smoothly at The Barn.

22  Q.  Before I forget, did Dr. Johnson provide you with a key?

23  A.  She did.

24  Q.  And, to your knowledge, has she provided other people with

25  keys?

 1          MR. WALTERS:  Objection, Your Honor, calls for

 2  speculation.

 3          MR. KUYKENDALL:  I'll withdraw the -- I'll withdraw

 4  the question.

 5  BY MR. KUYKENDALL:

 6  Q.  The key that she gave to you you used in order to access

 7  the building obviously, right?

 8  A.  That's correct.

 9  Q.  And did -- were you aware of there being other keys on the

10  property to other locks?

11          MR. WALTERS:  Objection, Your Honor, foundation, and

12  it calls for speculation.

13          THE COURT:  Overruled.

14          THE WITNESS:  Yeah.  There were -- there was a key for

15  the what we call the barnlet, which is a smaller structure.

16  There was a key for the bathroom.  So, yes.

17  BY MR. KUYKENDALL:

18  Q.  Were you aware of any padlocks that would be used on the --

19  on the gate that went out to Snyder?

20  A.  Yeah.  There were padlocks available in The Barn.  They, at

21  different times, could be used on the gate.

22  Q.  And have you used them on the gate?

23  A.  I haven't used the padlocks on the gate.

24  Q.  Have you closed the gate?

25  A.  I have, yeah.

1   Q.  Have you chained the gate?

2   A.  I have.

3   Q.  And why -- why do you close the gate and chain the gate?

4   In the past why have you?

5   A.  I'll oftentimes do that at night.  We'll have volunteers

6   who are using that space, they're staying there for weeks at a

7   time.  So just to provide some privacy in the evening.

8   Q.  Do you see yourself as responsible for providing a safe

9   space for the volunteers?

10  A.  Yeah, I do think of that as being one of my roles.

11  Q.  And why do you feel that -- what dangers are there in your

12  mind that these volunteers need a safe space from?

13          MR. WALTERS:  Objection, Your Honor, relevance.

14          THE COURT:  Sustained.

15  BY MR. KUYKENDALL:

16  Q.  Have you -- explain why you've had occasion in the past to

17  lock the gates and provide a safe space.

18          MR. WALTERS:  Objection, Your Honor.  I think it's

19  getting to the same answer so my objection to relevance still

20  stands.

21          THE COURT:  Excuse me.  Have you ever locked the gate

22  with a padlock?

23          THE WITNESS:  I have not, Your Honor.

24          THE COURT:  Okay.

25

1    BY MR. KUYKENDALL:

2    Q.  I misspoke.  Why have you closed the gate in the past in

3    order to provide a safe space to the volunteers?

4    A.  It's to provide privacy for the volunteers that are staying

5    there and it's within the context of doing humanitarian aid

6    work in the borderlands.  So it's entirely within the context

7    of that particular place, which is a very tense place with a

8    lot of different actors, different government agencies, other

9    kinds of people who are in the desert.

10        And so for us to do what we can, we call it making safer

11   spaces, acknowledging that humanitarian aid work always carries

12   risk with it and we can never provide a 100 percent safe space

13   but we do everything we can to make those spaces as safe as

14   possible.

15   Q.  And is -- in your mind, is law enforcement welcome within

16   -- within those gates of The Barn?

17   A.  Generally, no, not uninvited.

18   Q.  And why -- why do you not generally want uninvited law

19   enforcement within the gates of The Barn?

20   A.  This all falls within the purview of us being humanitarian

21   aid workers, us maintaining a neutral position, and maintaining

22   a really professional relationship with law enforcement, one

23   that is both de-escalatory and in asserting our rights to be

24   able to do that work and to have our privacy in doing that

25   work.  So it's within a larger context of training within No

1  More Deaths and I'm sure other groups that do it as well as to

2  how we interact with uniformed law enforcement agents and

3  others.

4  Q.  Have you had occasion in the past to ask uninvited people

5  to leave The Barn space?

6  A.  I have, yeah.

7  Q.  And have they always been law enforcement that you've told

8  that they need to leave?

9  A.  No, no.  I've asked various people to leave.  Because

10  volunteers use it as a space where they're staying for a month

11  at a time, we want to maintain their privacy so there's been

12  other Ajo residents, even members of Ajo Samaritans, who have

13  come by unannounced and I've asked them, you know, to please

14  leave and make arrangements in the future.

15  Q.  Speaking of presence, how would you describe in terms of

16  the number of hours you typically spend there, say in a week,

17  what's your presence at The Barn?

18  A.  Some weeks I'm there 24/7.  Other weeks I have less

19  presence but you could fairly say that it averages out to like

20  a full time schedule, 40 hours a week probably.

21  Q.  You're at The Barn 40 hours a week on average?

22  A.  On average that's fair, yeah.

23  Q.  Do you spend the night at The Barn?

24  A.  I do.

25  Q.  Do you spend the night inside The Barn sometimes?

DIRECT EXAMINATION - SCOTT DANIEL WARREN                    37

1   A.  I do.

2   Q.  Do you spend the night outside The Barn sometimes?

3   A.  I do.

4   Q.  Do you keep any personal property at The Barn?

5   A.  I do, yeah.

6   Q.  And can you describe that property?

7   A.  Yeah.  I keep a sleeping bag there and sleeping pad and a

8   cot for when I spend the night there.  My guitar is there, boom

9   box, laptop computer, one of my coffee mugs is there.  I have a

10  toiletries bag that I keep overnight supplies there so this

11  would be toothbrush, toothpaste, floss, contact solution,

12  things like that.  That stays in the bathroom.

13  Q.  Do you have any particular medical conditions which require

14  you to have stuff that you keep there?

15  A.  Yeah.  I have psoriasis, hands, elbows, knees, and feet,

16  and so I have lotion there that I use for that.

17  Q.  You keep that at The Barn?

18  A.  I do, yeah.

19  Q.  You probably heard Dr. Johnson testify that you pay the

20  electric bill in the summertime at least; is that accurate?

21  A.  Yeah, Dr. Johnson gives -- shows me the bill and I cut her

22  a check.

23  Q.  And you cut her a check out of your personal funds?

24  A.  It does come out of my personal funds.  Occasionally I get

25  reimbursed for that, occasionally I don't.

1    Q.  What type of maintenance projects do you do, if any, at The

2    Barn?

3    A.  I have fixed the toilet, I've worked on the washing

4    machine, I've worked on the air-conditioning and the

5    air-conditioning ducts, I've taken down and put up new

6    insulation in The Barn on the walls and on the ceiling, done a

7    lot of different cleaning projects, hauled several loads of old

8    construction materials to the dump from The Barn.

9    Q.  The supplies that you've had to purchase in order to do

10   some of those tasks that you just mentioned, do you purchase

11   that with your own money?

12   A.  I do.

13   Q.  Do you always get reimbursement from Dr. Johnson?

14   A.  I don't always get reimbursed for those things, no.

15   Q.  Did you say "I do"?

16   A.  I do not always get reimbursed.

17   Q.  I know that legally the place belongs to Dr. Johnson but do

18   you have any sense of ownership?

19   A.  Absolutely, yes.

20   Q.  And describe that for the court.

21   A.  Much of that 40 hours that I spend a week at The Barn is

22   spent cleaning and organizing and taking care of the space and

23   making sure it's running properly.  So I have an enormous sense

24   of ownership over it, making sure that that space functions

25   properly.  And people might be surprised to hear this but I do

1    get upset when folks aren't taking care of it and they aren't

2    putting in the time and effort to keep it up.

3    Q.  And when they're not taking or putting in the time and

4    effort to keep it up, does that mean it falls to you to keep it

5    up?

6    A.  Often it does, yes.

7    Q.  Excuse me one second.  I want to grab some exhibits.

8        Just to be clear, let me ask you before I show you the

9    exhibits, do you have -- in your mind, do you have a

10   relationship to the place beyond that of a caretaker?

11   A.  I feel that I do, yes.

12   Q.  Why?

13   A.  Because of the time that I've spent there and because

14   perhaps more than just the time in terms of physical

15   maintenance of things that are broken, the work I've done to

16   build that as a space, a safe space to be used by humanitarian

17   groups.

18   Q.  And do you feel that you can stay there as long as you want

19   and spend the night whenever you feel like it?

20   A.  I do.

21   Q.  And how often would you say on average you do spend the

22   night there?

23   A.  I would say I -- on average, at least once a week I'm

24   spending the night there.

25   Q.  And the reason that you're spending the night is why?

1   A.  Oftentimes I'll spend the night when volunteers are coming,

2   when they're there to sort of help maintain the space, to help

3   organize those groups.

4   Q.  Are you required to be there early in the morning?

5   A.  Sometimes, yes.

6   Q.  I mean, do the groups go out before the crack of dawn?

7   A.  Occasionally they do, yeah.

8   Q.  Is part of your responsibility to organize and feed them?

9   A.  Yes.

10  Q.  I'm going to show you what's been marked and identified as

11  Exhibit 101.  You know what that is, right?

12  A.  I do, yes.

13  Q.  Can you describe for the judge what, if anything, is

14  missing from this aerial photo?

15  A.  Yeah, the main thing that's missing is -- so right here,

16  that's where the barnlet is located now.  That went up in about

17  December of 2016.

18  Q.  Showing you what's been marked as Exhibit 102, what's that?

19  A.  That would be the barnlet, as we call it.

20  Q.  So do people stay in the barnlet?

21  A.  Occasionally they do, uh-huh.

22  Q.  What else is the barnlet used for?

23  A.  Usually it's used as a storage space so there's many

24  different supplies there, kept in there.

25  Q.  Do you keep any of your own personal supplies in the

1    barnlet?

2    A.  Yep.  Often my sleeping bag and cot and things like that

3    will be in there.

4    Q.  Next I'm going to show you what's been marked as

5    Exhibit 105 and ask if you can identify that.

6    A.  Yep, that would be the barnlet on the left and then the

7    main barn structure in the back on the right.

8    Q.  And what's here on the foreground?

9    A.  This is the campfire circle.

10   Q.  And, likewise, if you can identify Exhibit 107.

11   A.  This is the breezeway entrance to both the main barn

12   structure and the bathroom that's located on the east side of

13   the building.

14   Q.  So what's to the left there of the picture?

15   A.  To the left through that window is the bathroom.

16   Q.  And to the right is the main house?

17   A.  That's correct, yeah.

18   Q.  All right.  And showing you Exhibit 108, what is -- what do

19   we see in there?

20   A.  This would be the west face of The Barn.

21   Q.  So to the left would be what faces the north?

22   A.  Correct.

23   Q.  All right.

24           MR. KUYKENDALL:  Could I have one second, Judge?

25           THE COURT:  Certainly.

1   BY MR. KUYKENDALL:

2   Q.  Let me ask you a couple of questions, Dr. Warren, about

3   January 17, 2018, okay?  In the afternoon of January 17, were

4   you at The Barn?

5   A.  Yes, I was.

6   Q.  And if you can, taking a look at Exhibit 101, can you

7   describe to Judge Velasco approximately where you were and what

8   you were doing when you became aware that there were -- that

9   there were government vehicles coming towards The Barn?

10  A.  Yeah.  So I was in this area over here, which is where the

11  campfire circle is.  And I had just built a fire, campfire,

12  because we had a group of 15 high school students and their

13  teachers from the Flagstaff Arts and Leadership Academy who

14  were arriving imminently to volunteer.

15  Q.  When -- what direction did you look to become aware of

16  Border Patrol vehicles or law enforcement vehicles?

17  A.  I was standing by the fire, which is where the X is, and so

18  I could see the various law enforcement vehicles, marked and

19  unmarked, that were coming in that direction.

20  Q.  So you saw vehicles traveling west on Snyder Road; is that

21  right?

22  A.  That's correct.

23  Q.  And then showing you Exhibit 105, is that the fire pit that

24  you were standing at when you saw law enforcement coming?

25  A.  That's correct, yeah.

DIRECT EXAMINATION - SCOTT DANIEL WARREN                    43

1    Q.  So would law enforcement have been coming from over by this

2    -- over by it looks like a telephone pole in the far right-hand

3    corner?

4    A.  Yeah.  You're looking at saguaros over here so they'd be

5    coming down the road there.

6    Q.  So using Exhibit 105 to describe it, can you say what you

7    did when you saw law enforcement vehicles beginning to turn

8    into the driveway of -- of The Barn property?

9    A.  Sure.  I walked from here into the driveway, which is going

10   to be to the left of the barnlet structure there.

11   Q.  So showing you what's been marked as Exhibit 102, I know

12   there's not a fire pit showing in this photograph but where

13   would the fire pit have been?

14   A.  The fire pit is to the right of this, which is an old sink.

15   Q.  So what would you -- oh, and let me just move this picture

16   a little bit.  Can you point out on Exhibit 102 where the

17   vehicles came in?

18   A.  Yep.  So the vehicles turned in right here, which is that

19   gate onto Snyder Road.

20   Q.  And how many vehicles did you observe coming in?

21   A.  From where I was, it seemed as though there were about half

22   a dozen, at least six vehicles both unmarked and marked that

23   came down Snyder Road and then started to turn in that gate.

24   Q.  Do you know how many vehicles actually turned in the gate

25   and came into the driveway area?

 1   A.   There was the unmarked vehicle in front which was like a

 2   older model Dodge Stratus or something, purple, and then behind

 3   it there were a number of law enforcement vehicles that were

 4   marked, including sheriff's deputies' cars, so pulling into

 5   that driveway, it was at least four that came in.

 6   Q.   Again showing you Exhibit 101, can you draw where the

 7   vehicles pulled up to -- where they came to a stop, where the

 8   lead vehicle came to a stop at least?

 9   A.   Yeah, absolutely.   So I was standing right here, which is

10   in this sort of turnaround area in the driveway.   And the

11   vehicles came up this way and then the unmarked vehicle was in

12   the lead and it came and parked basically right at my feet in

13   front of me.

14   Q.   What happened next?

15   A.   Plainclothesed Border Patrol agents got out of that lead

16   car and in cars behind other people got out.   Some were in

17   uniforms, some were plainclothesed, some were, as it turned

18   out, Border Patrol agents, some were Pima County sheriff's

19   deputies.   And the agents in that lead car introduced

20   themselves as Border Patrol agents and I immediately told them

21   that they were on private property, that they did not have

22   permission to be on private property, and that they needed to

23   leave that private property.

24   Q.   So you immediately said those three things:   that they were

25   on private property, they did not have permission to be on

DIRECT EXAMINATION - SCOTT DANIEL WARREN                    45

1    private property, and that they were to leave the property.

2        Is that right?

3    A.  Yeah.  They did not have permission to be on this private

4    property and they needed to leave the property right away.

5    Q.  And how did you make sure that they heard you?

6    A.  I was aware that there was a line of cars so I was very

7    clear to speak down the line of officers and agents as they

8    were getting out.  And I said that, and I know that it

9    resonated because there was a pause, and several of the agents

10   and officers sort of looked around and looked at one another.

11   Q.  Looked at one another after you had announced that it was

12   private property, they didn't have the right to be on private

13   property, and you wanted them to leave?

14   A.  That's correct.  In my opinion, they were somewhat

15   surprised to be --

16          MR. WALTERS:  Objection, Your Honor.  Move to strike

17   that last answer.  Calls for speculation.

18          THE COURT:  Sustained.

19   BY MR. KUYKENDALL:

20   Q.  Was there a pause by the line of officers after you told

21   them to leave?

22   A.  Yeah, there was a pause, and there was a change in tone of

23   the encounter.

24   Q.  That seems kind of unusual and brave to confront a line of

25   police officers in that manner.  Where did you learn to do

1   that?

2   A.   Living in the borderland as a resident, I've had hundreds

3   of encounters with Border Patrol agents.  We can't leave our

4   community without going through checkpoints.  Being a

5   humanitarian aid volunteer, I've had many encounters with

6   Border Patrol agents in the field that run the gamut from

7   everything from friendly and cordial, particularly with agents

8   that I know or might be my neighbors in Ajo, all the way to

9   hostile.

10       So, as a humanitarian aid worker, as I mentioned before, we

11  sort of operate with two things, one is to sort of de-escalate

12  potentially tense and fraught situations and the other one is

13  to sort of assert our rights.

14       So, in speaking to the Border Patrol agents and sheriff's

15  deputies who were there that day, it was a reflection of my

16  training as a humanitarian aid volunteer know your rights

17  training.  We've been taught our rights and taught how to

18  articulate our rights as well.

19  Q.   Do you know the names of any of the people that have taught

20  you to articulate your rights as you articulated them on

21  January 17?

22  A.   Sure.  We have received training from Margo Cowan, who is

23  one of our No More Deaths organization attorneys; from Billy

24  Peard at the American Civil Liberties Union in Tucson; and

25  really many others as well.

DIRECT EXAMINATION - SCOTT DANIEL WARREN

1  Q.  So, to be clear, you raised your voice, you enunciated as

2  clearly and as loudly as you could that you did not want Border

3  Patrol on your property at that time; is that correct?

4  A.  That's correct.

5  Q.  And after that explicit order to leave, what happened?

6  A.  There was a hesitation in the column of Border Patrol

7  agents and sheriff's deputies.  And then one who I assume was a

8  Border Patrol agent, plainclothesed, started walking around the

9  north side of the building and he said, sort of in a what to me

10  seemed very unusual because it was not a really direct

11  statement but he kind of said:  This is just a public driveway,

12  anybody can be here.  And he continued to walk around the north

13  side of the building.

14  Q.  Showing you Exhibit 103, can you draw a line to demonstrate

15  the path of that agent who said, "This is just a public

16  driveway, anybody can be here", and began making his way to the

17  north side of the building?

18  A.  Yeah.  He would have gone just sort of this way around the

19  north side there.

20  Q.  And you were observing him from the right and the

21  foreground of this photograph Exhibit 103; is that right?

22  A.  Correct.  It would have been just off to the right of this

23  area here.

24  Q.  After that agent began walking around the north side, did

25  you have any further discussions with the agents that you were

1    face to face with?

2    A.  Yeah, I did.

3    Q.  Describe those.

4    A.  There was one particular agent and he asked me a couple

5    more questions.  He asked:  Are you the owner of this property?

6    To which I told him I wasn't going to answer any further

7    questions.  He asked me if I knew the who the owner of the

8    property was and I said:  Like I said, I'm not answering

9    further questions.  And then he said:  Well, I'm going to walk

10   around to the door on the other side of the building there and

11   I'm going to knock on it.  And I said:  Well, then I'm going to

12   come with you.

13   Q.  Were you consenting to the agents being on the property

14   when you said, "I'm going to go with you"?

15   A.  Absolutely not.  In my opinion, they had already sort of

16   defied my request to leave.  It was clear that they weren't

17   going to leave, so I was going to accompany that agent.

18   Q.  And is that consistent with the legal training that you've

19   received from Margo Cowan and the ACLU?

20   A.  Absolutely.

21   Q.  So you walked around to the east side of the property; is

22   that correct?

23   A.  That's correct.

24   Q.  So showing you Exhibit 105, does that -- can you show the

25   judge where you walked from using that photograph?

1    A.  Sure.  We were in the parking lot, which would be just off

2    screen to the left here and we walked down this way, there's a

3    little bit of a walkway, past the barnlet, sort of past this

4    open area in here where there's some orchard trees, and we came

5    around the corner of the bathroom here and then walked around

6    the bathroom, and then to that entryway, which is going to be

7    between -- you can't see it in this picture but between the

8    bathroom and the main barn there.

9    Q.  Showing you Exhibit 107, does that help you describe to the

10   judge where you walked?

11   A.  Sure.  So we would have come around again from off -- off

12   frame there to the left and then walked around here to this

13   open entryway.

14   Q.  And what -- what did you see when you got to that open

15   entryway?

16   A.  When I got to that open entryway, both doors were open to

17   the -- so this metal grate door was open, the door was open

18   into the main building, and the door was open into the

19   bathroom.  And Mr. --

20   Q.  I'm sorry.  Before you go on, when you had last seen the

21   gate, the -- those metal grated doors, were they both open or

22   were they closed?

23   A.  The door into the living area and the bathroom were closed.

24   The metal grate, I don't recall whether that was open or

25   closed.

DIRECT EXAMINATION - SCOTT DANIEL WARREN                    50

1    Q.  So when you got to the opening --

2    A.  Uh-huh.

3    Q.  -- accompanied by the agents, were the metal grated doors

4    open like they are in this photograph?

5    A.  They were open, yes.

6    Q.  And what about the door to the right to the living area?

7    A.  That door was open as well.

8    Q.  What about the door to the left to the bathroom?

9    A.  That was open.

10   Q.  Did you see other agents there?

11   A.  Yes, I did.

12   Q.  Describe to Judge Velasco what you saw.

13   A.  Well, I was accompanying one agent as we sort of came

14   around the turn there and then we stood right there and then

15   there was sitting on the step, Mr. Perez-Villanueva, and the

16   agent who was with me then did, I think they describe it as an

17   immigration check, he asked him, you know:  What country are

18   you from?  And Mr. Perez-Villanueva said:  El Salvador.  And

19   then he said, "You're under arrest" to Mr. Perez-Villanueva and

20   then he had me turn around and put my hands on this area here

21   and he told me that I was under arrest for harboring illegal

22   aliens as he said.

23   Q.  Did he put handcuffs on you at that time?

24   A.  He did, correct.

25   Q.  So he had you put your hands up and he frisked you, is that

1    what happened?

2    A.  He did.

3    Q.  And then put your hands behind you and he put his handcuffs

4    on you?

5    A.  Correct, yeah.

6         THE COURT:  Excuse me, counsel.  I need to take a

7    break.  Let's take 15 minutes.

8         MR. KUYKENDALL:  All right.

9    (A break was taken.)

10   BY MR. KUYKENDALL:

11   Q.  Dr. Warren, I wanted to ask you about the number of agents

12   that you saw when you confronted them in the driveway.  You

13   testified that you saw a number of cars.  Do you remember the

14   number you'd seen?

15   A.  Yeah, it was at least six.

16   Q.  And did you see at least one agent get out of each car?

17   A.  Yes, I did.

18   Q.  Do you know the exact number of agents that you saw in the

19   driveway?

20   A.  I don't know the exact number, no, but every car seemed to

21   have agents in it.

22   Q.  Were you aware of additional cars just beyond the

23   curtilage, just beyond on Snyder Road?

24   A.  Yeah.  And in particular I recall what was like a Border

25   Patrol van that was toward the back.  I don't recall if it was

1    within the property or if it was on Snyder Road.

2    Q.   The agents that you saw, were all of them armed?

3    A.   They were, yes.

4    Q.   And do you know how each of them arrived on the property?

5    In other words, did some of them arrive on foot and others

6    arrived by car or do you know?

7    A.   That, I can't say for sure.   Certainly many arrived by car.

8    Some may have arrived on foot but I can't say for sure.

9    Q.   Specifically speaking of the agent that was kind of near

10   the back of the line closest to Snyder that you described

11   earlier as saying "this is a public driveway" and then

12   disobeying your direct order to leave the property, that agent,

13   how was he dressed, do you recall?

14   A.   He was a plainclothes agent.

15   Q.   Border Patrol agent in plainclothes?

16   A.   Yeah, I would assume he was Border Patrol.   I couldn't see

17   identification but he was plainclothesed, yeah.

18   Q.   Okay.   And do you know how he arrived on the site?

19   A.   I honestly can't say for sure.   I became aware of his

20   presence as he started to walk to the north side.

21   Q.   The details that you have testified to about having a clear

22   recollection, why -- if you can, why do you have such a clear

23   recollection of those details?

24   A.   In my line of work, that's extremely important and to sort

25   of be aware of my surroundings, observant of the scene at hand.

1  It's something that I've learned and developed through my Ph.D.

2  work and research and being a humanitarian and aid worker on

3  the border, and also my training as a wilderness first

4  responder, my medical training.

5  Q.  When you say "in my line of work", were you describing your

6  work as an associate professor?

7  A.  I've had various job positions.  Most recently I was

8  faculty associate at Arizona State University.

9  Q.  And I want to go back just for a moment to your earlier

10  descriptions about your relationship to the property itself.

11  You said that you were trying to create a safe space for the

12  volunteers but was it just for the volunteers?

13  A.  The volunteers are certainly central in my mind in many

14  ways but to me sort of creating that space, that safe space, is

15  really about creating a, I guess you could say like a community

16  or like a home for volunteers, for organizations, for myself

17  and all the time that I spend there.  It's really that kind of

18  mix of everybody and being in that space and interacting with

19  it that is first and foremost on my mind.

20  Q.  And the time that you spend there, are you just being a

21  custodian of the place while you're there or what are you doing

22  while you're there?

23  A.  I'm certainly doing at times custodial things but my role

24  there is also in facilitating groups through the humanitarian

25  aid experience and in that community building experience

1   really.  And this would be -- they could be volunteers from

2   anywhere, college students or high school students, or older

3   volunteers.  They come in to that place, Ajo, in the desert, in

4   the border zone, where tensions are really heightened, and it's

5   about working to create that safer space and about working to

6   create a home, really, for all of us in that contested zone.

7   Q.  And when you say "a home", do you consider The Barn to be a

8   home of yours?

9   A.  I do think of it that way, yeah.

10  Q.  Explain to Judge Velasco why you perceive it as a home of

11  yours, not just a place that you're being a custodian of but an

12  actual home for you.

13          MR. WALTERS:  Objection, Your Honor.  Object to

14  relevance grounds.  His subjective belief about whether it was

15  a home to him are irrelevant.  The standard is an objective

16  standard on whether he has standing or not.  So, again, I would

17  object on relevance ground.

18          THE COURT:  Sustained.

19  BY MR. KUYKENDALL:

20  Q.  You've testified that you perceive it as a -- as a home.

21  Can you explain to the judge any objective grounds for you

22  treating it as a home?

23  A.  Absolutely.

24          MR. WALTERS:  Your Honor, I'm not sure how that

25  changes anything.  He still -- from an objective standard, from

```
 1    his mind, I would still object on relevance ground.

 2              THE COURT:  Sustained.

 3    BY MR. KUYKENDALL:

 4    Q.  What sort of things do you do objectively to treat the

 5    place as your own home?

 6              MR. WALTERS:  Objection, Your Honor, same objection.

 7              MR. KUYKENDALL:  Judge, it has to do with the

 8    objective nature of a home and --

 9              THE COURT:  Is there anything you've left out that you

10    do at that place?  Have you told me everything you do at that

11    place?

12              THE WITNESS:  Your Honor, certainly in terms of

13    material types of things.  I think maybe what's being suggested

14    is for me in my research, my academic research, and my personal

15    understanding, home is about much more than simply a physical

16    location in which a person might sleep or eat a meal.

17              THE COURT:  Okay.  So the answer is you've told me

18    everything you've done and now you want to tell me everything

19    you feel?

20              THE WITNESS:  I would like to share with you some of

21    my experience there that sort of informs my feeling of that

22    being a home.

23              THE COURT:  Sustained.

24    BY MR. KUYKENDALL:

25    Q.  Do you expect it to be private?
```

DIRECT/CROSS-EXAMINATION - SCOTT DANIEL WARREN                 56

1    A.  Yes, I do.

2    Q.  Why do you expect it to be private?

3    A.  Because I feel as though it's my home.

4    Q.  So you have a reasonable expectation of privacy about that

5    place the same way you would with your home?

6           MR. WALTERS:  I'm sorry.  Objection, calls for a legal

7    conclusion.

8           THE COURT:  Sustained.

9    BY MR. KUYKENDALL:

10   Q.  But you personally expect it to be private, right?

11          MR. WALTERS:  Objection, Your Honor.

12          MR. KUYKENDALL:  He already said yes.

13          THE COURT:  Yes, I understand it.  He can say it one

14   more time.

15          THE WITNESS:  Yes.

16          MR. KUYKENDALL:  Thank you, that's all my questions.

17                       CROSS-EXAMINATION

18   BY MR. WALTERS:

19   Q.  Dr. Warren, let's talk about your permission from

20   Ms. Johnson, okay?

21   A.  Okay.

22   Q.  Your testimony was that Ms. Johnson gave you permission to

23   be at The Barn, right?

24   A.  Dr. Johnson did give me permission, yes.

25   Q.  Okay.  You can come and go as you pleased?

1    A.   Yes.

2    Q.   You consider Ms. -- Dr. Johnson to be a friend of yours?

3    A.   I do.

4    Q.   You have similar ideologies?

5    A.   I would not say that.

6    Q.   Okay.  You don't spend every second together, right?

7    A.   We don't spend every second together, no.

8    Q.   You don't spend every day together?

9    A.   No, we don't see each other every day.

10   Q.   You don't spend every week together?

11   A.   No, I would say we don't but perhaps I think what you're

12   getting at is on average we might, you know, spend that kind of

13   time together but I don't see her every week, no.

14   Q.   So it's fair to say that you don't spend every second of

15   every day of every week with her, right, on average?

16   A.   I do not spend every second of every day of every week with

17   her, no.

18   Q.   It's possible that there are times where she is at The Barn

19   and you are not, right?

20   A.   Yes, I think so.

21   Q.   And there are times when you are at The Barn and she is not

22   there?

23   A.   I know that to be true.

24   Q.   Is it safe to assume that she has no idea what your

25   day-to-day schedule is?

CROSS-EXAMINATION - SCOTT DANIEL WARREN

1   A.   No, it's not safe to assume that.

2   Q.   She knows what your day-to-day schedule is?

3   A.   Nope.  Oftentimes I will see her at The Barn so we have a

4   lot of communication but in terms of me, for instance, like

5   showing her my planner, something, you know, I don't think so.

6   Q.   Okay.  So, again, she has no idea what your day-to-day

7   schedule is, right?

8   A.   She doesn't know my day-to-day schedule is how I would put

9   it.

10  Q.   Is it safe to assume that most of the time she doesn't know

11  where you are or what you're doing, right?

12  A.   Would you be willing to rephrase that question?

13  Q.   Do you text her every day and tell her what you're doing?

14  A.   I don't text Dr. Johnson every day.

15  Q.   Do you call her every day and tell her what you're doing?

16  A.   I don't call her every day.

17  Q.   Do you email her every day and tell her what you're doing?

18  A.   I don't email Dr. Johnson every day.

19  Q.   I want to talk about your conversation with Agent Burns,

20  okay, and specifically Agent Burns is the agent that you spoke

21  with in the driveway or one of the agents, okay?

22  A.   If you say so.

23  Q.   Okay.  You spoke to several agents that day, right?

24  A.   There were several agents on the property and I didn't get

25  their names.

1  Q.  Okay.  So that's a yes, you spoke to several agents that

2  day?

3  A.  Certainly in the context of being taken into custody, I

4  remember like several agents coming into my cell and I think

5  being on the property, I'm aware of definitely interaction with

6  agents that came out of that unmarked vehicle and then others

7  and, of course, when I spoke, you know, when I said you're on

8  private property, please leave, that was directed to all the

9  agents that were there.

10  Q.  While you were at The Barn, you spoke to several law

11  enforcement agents, correct?

12  A.  Yes, in the context of what I just put it, that would be

13  accurate.

14  Q.  Okay.  I didn't ask you about context.  That conversation

15  took place in the driveway initially, right?

16  A.  Yes, the first place where I had a verbal engagement was in

17  the driveway, that's correct.

18  Q.  And Agent Burns repeatedly told you that he wanted to speak

19  to the owner of the property, right?

20  A.  No.

21  Q.  He didn't tell you that he wanted to speak to the owner?

22  A.  He asked me if I was the owner.

23  Q.  He didn't say that he was looking for the owner of the

24  property?

25  A.  He said:  Do you know the owner?

CROSS-EXAMINATION - SCOTT DANIEL WARREN                    60

1   Q.  Okay.  And, again, but you're not the owner, right?

2   A.  I'm not the owner.

3   Q.  You didn't try to call Ms. Johnson or Dr. Johnson at that

4   point, right?

5   A.  Certainly not in that context, no.

6   Q.  You didn't try to text her?

7            MR. KUYKENDALL:  I would ask that the witness be

8   allowed to answer; he's being cut off by the prosecutor.

9            THE COURT:  Please let him answer.

10  BY MR. WALTERS:

11  Q.  You didn't try to call Dr. Johnson, right?

12  A.  I did not call Dr. Johnson that day.

13  Q.  You didn't try to text Dr. Johnson?

14  A.  I did not text Dr. Johnson that day.

15  Q.  You didn't give the agents Dr. Johnson's phone number so

16  they could call her, correct?

17  A.  No, I certainly did not give them that information.

18  Q.  You didn't indicate whether Dr. Johnson at that point was

19  even present at The Barn, correct?

20  A.  You're referring to when I told them I didn't want to

21  answer any further questions or --

22  Q.  I'm asking you -- I'm telling you, you didn't tell them

23  that Dr. Johnson was in The Barn, correct?

24  A.  I'm sorry?

25  Q.  Because she wasn't?

1   A.  I'm sorry.  Was that a question or were you --

2   Q.  I'm asking you a question.

3   A.  Okay.

4   Q.  Did you tell the agents that Dr. Johnson was in The Barn

5   when they asked to speak to the owner?

6   A.  I certainly didn't say that.

7   Q.  Okay.  And that's because she wasn't there, right?

8   A.  She was not there.

9   Q.  And Agent Burns told you that he was going to go knock on

10  the door, correct?

11  A.  Yes.

12  Q.  That he was going to go try to make contact with the owner

13  of the property, correct?

14  A.  You know, I don't recall if he used those words but he was

15  going to knock on the door.

16  Q.  And you previously testified that details are important to

17  you, right?

18  A.  Yes.

19  Q.  And that the things that happened today or that happened

20  that day on January 17th, they stick out in your mind because

21  details are important to you, correct?

22  A.  Yeah, but to me details are really critical so I feel that

23  I have a pretty good sense of what I witnessed.

24  Q.  But you don't remember the detail about Agent Burns asking

25  you to go see the owner or talk to the owner?

1  A.  I -- so, like I said, if that was, in fact, Border Patrol

2  Agent -- Agent Burns, as you said, again, I didn't catch his

3  name, he said:  Are you the owner?  And:  Do you know the

4  owner?  And then the next thing he said to me, to my

5  recollection, was:  I'm going to go around the -- I'm going to

6  go over there and knock on the door.

7  Q.  He specifically said that he was going to go around to the

8  door to make contact with the owner of the property, correct?

9  A.  No.  Like I said, I cannot specifically -- I can't verify

10 the specific words.  All I can do is share with you what I

11 remember from that interaction.

12 Q.  So just to be clear, are you saying you don't remember

13 whether he said that or he didn't say that?

14 A.  So I cannot sit here and tell you that it absolutely did

15 not happen.  I don't remember those specific words being said.

16 What I've told you that I remember being said is what I

17 remember.

18 Q.  Okay.  Let's talk about The Barn, okay?

19 A.  Sure.

20 Q.  You don't live there?

21 A.  It's not a primary residence, no.

22 Q.  You don't -- but you live in Ajo, right?

23 A.  Correct, in the town center.

24 Q.  And Ajo isn't a big town, right?

25 A.  Technically, it's not a town, it's an unincorporated

1  community, but where I live is considered the old town center

2  and so there's really two different areas but I live in the old

3  town center, yeah.

4  Q.  But it's a relatively small population, correct, is that

5  fair?

6  A.  It's about -- probably year-round population is around

7  3,000.

8  Q.  Okay.  So is it safe to assume -- I'm not asking you for

9  actual address -- is it safe to assume that you live relatively

10  close to The Barn?

11  A.  No, not in the context of Ajo, no.

12  Q.  Okay.  You don't sleep at The Barn regularly, correct?

13  A.  I sleep at The Barn, you know, like on average maybe once a

14  week when it's averaged out.

15  Q.  Do you consider once a week to be regular?

16  A.  I do consider that regular usage, yeah.

17  Q.  You weren't sleeping at The Barn either the day you were

18  arrested or the days leading up to your arrest, correct?

19  A.  When you say "days leading up", how many days are you

20  referring to?

21  Q.  Two or three.

22  A.  No.  In those particular days, I was not sleeping at The

23  Barn.

24  Q.  And just to be clear, the illegal aliens that you were

25  harboring were there for two or three days, right?

1          MR. KUYKENDALL:  Object.  This is far, far afield.

2          THE COURT:  Sustained.

3          MR. KUYKENDALL:  Improper foundation.

4    BY MR. WALTERS:

5    Q.  The illegal aliens that were at The Barn were there for two

6    or three days before your arrest, correct?

7          MR. KUYKENDALL:  I'm going to object again.  This goes

8    beyond the scope; it's irrelevant to standing.

9          THE COURT:  Can I see counsel over here?

10        (A sidebar conference was held.)

11        THE COURT:  The question really is the extent of the

12   permission he has so he's going to be allowed to ask some of

13   these questions.

14        MR. WALTERS:  And, Your Honor, while we're up here,

15   just so I'm clear, I wasn't differentiating between standing

16   and the incident itself because Dr. Warren testified about all

17   of that on direct.  So, admittedly, I was urging them but I

18   thought I would be able to do that since he testified to all of

19   it at once.

20        THE COURT:  Go ahead.

21        (Sidebar conference was concluded.)

22   BY MR. WALTERS:

23   Q.  Again, my question was:  Illegal aliens who were staying at

24   The Barn had been there for two or three days before your

25   arrest, correct?

1    A.  To clarify, when you say "illegal aliens", are you

2    referring to Mr. Perez-Villanueva and Mr. Sacaria-Goday.

3    Q.  Yes, sir.

4    A.  Both those gentlemen, I believe, were at The Barn, yes.

5    Q.  So the only times that you were not staying at The Barn in

6    the two or three days leading up to your arrest were when

7    illegal aliens were there; is that fair?

8            MR. KUYKENDALL:  I'm going to object to "staying at

9    The Barn".  If he's going talk about spending the night, then

10   that's what we need to specify but "staying" doesn't accurately

11   describe anything.

12           MR. WALTERS:  Fair enough.

13           THE COURT:  Okay.

14   BY MR. WALTERS:

15   Q.  In the two or three days leading up to your arrest when

16   illegal aliens were there, you were not sleeping there,

17   correct?

18   A.  Yeah, in those two to three days, I was not sleeping at The

19   Barn.

20   Q.  During those two to three days, you would go to The Barn

21   though, right?

22   A.  Yeah.

23   Q.  And you would leave?

24   A.  Yes.

25   Q.  And you would come back either later that night or the next

1    morning?

2    A.  Yeah.  As I recall, I was coming and going.

3    Q.  You do not own The Barn, right?

4    A.  Yeah, again, I don't own The Barn.

5           MR. KUYKENDALL:  Objection, asked and answered.

6    BY MR. WALTERS:

7    Q.  You do not pay rent there?

8    A.  I don't live there and I don't pay rent there.

9    Q.  Your mail is not delivered to The Barn, correct?

10   A.  No.

11   Q.  And in terms of utilities, you stated that sometimes you

12   cut Dr. Johnson a personal check, right?

13   A.  Correct.

14   Q.  And that sometimes you get reimbursed?

15   A.  Correct.

16   Q.  Sometimes you don't?

17   A.  Yeah, correct.

18   Q.  So the expectation is that you will get reimbursed for that

19   check, correct?

20   A.  I think certainly groups would reimburse me for that, raise

21   funds for that reimbursement.

22   Q.  You testified that you keep personal property at The Barn,

23   correct?

24   A.  That's correct.

25   Q.  Because you keep personal property there, you are, let's

1  say, generally familiar with at least some of the items kept in

2  The Barn, right?

3  A.  You're referring to my personal items at The Barn or --

4  Q.  I'm saying in general because you keep personal items

5  there, you are at least aware of some of the items that are

6  kept there because they're yours, right?

7  A.  I'm absolutely aware of my personal items that are there,

8  yes.

9  Q.  Do you recall previously testifying in this case?

10  A.  Are you referring to the RFRA --

11  Q.  Yes, sir.

12  A.  -- argument that we did?

13  Q.  Yes, sir.

14  A.  I do recall that day.  I do recall that, yeah.

15  Q.  And I was there, right?

16  A.  You were there.

17  Q.  Ms. Wright was there?

18  A.  Absolutely.

19  Q.  Your attorneys were there?

20  A.  Yes.

21  Q.  Judge Velasco was there?

22  A.  Yes.

23  Q.  And we were in a courtroom that looked very similar to

24  this, right?

25  A.  A bit larger but yes.

1    Q.  And on that day you took an oath?

2    A.  I did.

3    Q.  An oath to tell the truth?

4    A.  Yes, I took the standard oath.

5    Q.  Okay.  To tell the whole truth?

6    A.  I don't recall the contents of what the oath says but I'm

7    sure that that's a part of it, yes.

8    Q.  But you took an oath to tell the truth that day, right?

9    A.  Correct.

10   Q.  And as you recall, Ms. Wright questioned you that day,

11   right?

12   A.  That's correct.

13   Q.  Do you recall if she specifically asked you about items

14   that were kept in The Barn?

15   A.  Yes, I do recall that.

16   Q.  And you said that that was not accurate, that you weren't

17   aware of that --

18           MR. KUYKENDALL:  Do you have a page?

19           MR. WALTERS:  I do.  Page 77 of the transcript.

20           THE WITNESS:  I think -- if what you're asking is -- I

21   recall that question being asked.  That question to me was do

22   you know the contents of what was in The Barn.  That's what I

23   recall specifically being asked about.

24   BY MR. WALTERS:

25   Q.  Okay.  But it's fair to say you knew some of the items that

UNITED STATES DISTRICT COURT

1  were in The Barn because they were yours?

2  A.  Some of them.

3  Q.  So your answer was not the truth?

4  A.  I would not put it that way.

5  Q.  Or was very misleading at best?

6  A.  I would not put it that way.

7  Q.  You testified that you have a regular presence at The Barn,

8  right?

9  A.  Yes.

10  Q.  And, again, you recall testifying in this case about a

11  little more than a month ago?

12  A.  Correct.

13  Q.  And despite now saying that you have a regular presence at

14  The Barn, on May 11th, just over a month ago, you testified

15  that you didn't even know the street address of The Barn?

16       MR. KUYKENDALL:  I'm going to object.  This is

17  improper impeachment.  If he's got a line and a number, then he

18  needs to repeat it properly but this is just allegations.

19       MR. WALTERS:  Your Honor, I don't have to give him an

20  page number until he actually answers the question and then I

21  can give him the page.

22       THE COURT:  Okay.  Answer that if you can.

23       THE WITNESS:  You're asking me now if I know the

24  street address or a month ago?

25

CROSS-EXAMINATION - SCOTT DANIEL WARREN                                70

1    BY MR. WALTERS:

2    Q.  On May 11th you testified that you didn't even know that it

3    had a street address?

4    A.  That's correct.

5    Q.  You didn't know the street address?

6    A.  Yeah -- well, I'm not sure that -- I don't know what the

7    question was specifically but, in general, no, I didn't know

8    the street address.

9    Q.  Isn't it true that you testified that you had never known

10   it to have an address?

11   A.  Before I had seen the address of The Barn in various court

12   documents, in the law enforcement complaint against me, I did

13   not know the address to The Barn and I hadn't seen it painted

14   on the barn.  I was not aware of it.  There was no mailbox

15   there.

16   Q.  Do you recall at the previous hearing Ms. Wright showing

17   you some photographs of The Barn?

18   A.  I do.

19   Q.  She specifically asked you, according to those pictures, if

20   that is how The Barn is -- I think she said if that is how The

21   Barn looked.

22       Do you remember that?

23   A.  Are you referring to contents or the outside, exterior of

24   the barn?

25   Q.  I'm referring to just the pictures that she showed you.

UNITED STATES DISTRICT COURT

 1   She asked you if those pictures looked familiar.

 2        Do you remember that?

 3   A.  I remember a line of questions associated with the pictures

 4   and questions that you're referring to, yeah.

 5             MR. KUYKENDALL:  Again, this is improper impeachment

 6   Judge.  If he's got a line and an exhibit to discuss with the

 7   defendant, that's the appropriate way to impeach.

 8             THE COURT:  I don't understand the question yet so --

 9   BY MR. WALTERS:

10   Q.  Well, Mr. Warren, as you stated now, despite having a

11   regular presence, at the time of the hearing about a month ago,

12   you stated that you couldn't recognize any of the items inside

13   of The Barn, correct?

14   A.  You know, I don't recall specifically what the question was

15   or what going on, sir.

16   Q.  Okay.  Would it refresh your recollection to look at the

17   transcript of that hearing?

18   A.  It would be very helpful.

19   Q.  Sure.

20             MR. WALTERS:  May I approach, Your Honor?

21             THE COURT:  Yeah.

22             MR. WALTERS:  And for the record, I'm showing the

23   defendant what's been previously identified as Exhibit 72.

24   BY MR. WALTERS:

25   Q.  If you could just read that to yourself and then look up

CROSS-EXAMINATION - SCOTT DANIEL WARREN

1   when you're done.

2   A.  You're asking me to read the page here, the whole page?

3   Q.  The whole page.

4   A.  Okay.  Yeah, I recall this line of questioning.

5   Q.  Okay.  So is it safe to say that your recollection is

6   refreshed now about your testimony after reading that?

7   A.  Certainly the questions here, questions about the cabinet

8   and the like, the furniture and that sort of thing, I remember

9   those questions.

10  Q.  Okay.  She asked you if, according to those pictures, if

11  that's the way The Barn looked, right?

12  A.  So I see a question here.  May I read it?

13  Q.  It's okay with the judge.

14          THE COURT:  Sure.

15          THE WITNESS:  Question:  I'm asking in your

16  experience, when you've been at The Barn, do these pictures

17  accurately generally depict how The Barn looks?

18  BY MR. WALTERS:

19  Q.  Sure.  And despite your regular presence there, you said

20  that you couldn't accurately answer that question because The

21  Barn is constantly changing, right?

22  A.  Would you like me to read my answer?

23  Q.  I'm asking you if you remember making that answer.  If you

24  don't, you're more than welcome to refresh your recollection.

25  A.  Sure.  Well, my answer is -- it says:  Well, these are

1    pictures of The Barn.  I would say that The Barn is constantly

2    changing with different groups that organize it in different

3    ways for their purpose.

4    Q.  So despite having a regular presence there, despite being

5    there on a regular basis, despite sleeping there on average for

6    one night a week, you couldn't answer simple questions about

7    whether that is how The Barn accurately looks; is that fair?

8            MR. KUYKENDALL:  I'm going to object.

9            THE WITNESS:  That's not fair -- that's not fair.

10           THE COURT:  Well, I get to answer that question

11   actually.

12           THE WITNESS:  I'm sorry.

13           THE COURT:  Sustained.

14   BY MR. WALTERS:

15   Q.  Ms. Wright also asked you about the sheds on the property,

16   correct?  Do you recall that?

17   A.  Yes, specifically the barnlet.

18   Q.  And you stated that, again, despite your regular presence,

19   that you're not familiar with the items in the shed, correct?

20   A.  I remember there being specific questions perhaps about

21   technical versus nontechnical, clothing, things like that.  So

22   as I recall, I was answering a question about more sort of

23   specific items that may have been there.

24   Q.  I agree with you.  And then she followed up and asked you

25   if you were more generally familiar with the items that are

1    kept in The Barn, correct?

2    A.  You know, I don't remember that particular question but it

3    sounds like a question that would have been asked, yes.

4    Q.  Would it refresh your recollection to look at the

5    transcript?

6    A.  Sure.

7    Q.  If you could look at page 77, read that page, and then look

8    up when you're done.

9    A.  Sure.  Sure, yeah.

10   Q.  Has your recollection been refreshed, Dr. Warren?

11   A.  Yeah, certainly about that conversation, yeah.

12   Q.  Okay.  Do you recall Ms. Wright asking you if you were

13   generally familiar with the items kept in The Barn --

14   A.  Would you like me --

15   Q.  -- or the shed?  My apologies.

16   A.  Sure, the barnlet, yeah.

17   Q.  And you said that you were not generally familiar?

18   A.  I frankly don't see that here.

19   Q.  Okay.

20   A.  Can you direct me to where you're reading that?

21   Q.  Still page 77.

22   A.  Perhaps a line?

23        MR. WALTERS:  May I approach?

24        THE WITNESS:  Yes.

25        MR. WALTERS:  May I approach, Judge?

 1              THE COURT:  Yes.

 2              MR. WALTERS:  Your Honor, may I publish?

 3              THE COURT:  Sure.

 4    BY MR. WALTERS:

 5    Q.  Do you see on line 13 where Ms. Wright asks you:  But

 6    you're generally familiar with what's kept in there -- meaning

 7    the shed -- correct?

 8    A.  I see that question, yes.

 9    Q.  And you said:  That's not accurate?

10    A.  Yeah, and then there's -- of course, I provide some context

11    for why I say that's not necessarily accurate.

12    Q.  Fine.  But the fact of the matter is, you were not even

13    generally familiar with what's kept in the barnlet, correct?

14    A.  Well, I think what you see here is from my perspective a

15    general understanding of how that space is used.  But in terms

16    of the particular items, you know, there could be -- it could

17    be anything in there.

18              MR. KUYKENDALL:  I would ask that under the rule of

19    completeness 106, the prosecutor read the rest of that answer

20    on page 77.

21              THE COURT:  Sure.

22    BY MR. WALTERS:

23    Q.  Because different groups are bringing different things all

24    the time.  Now, perhaps in a general sense of humanitarian aid

25    supplies absolutely, but more specific than that, I'm not.

1        So you have no idea what's in there specifically?

2   A.  So I certainly stand by the answer that you just read.

3   Q.  Okay.

4            THE COURT:  Well --

5   BY MR. WALTERS:

6   Q.  She asked you about the clothing in the shed, right?

7   A.  I recall that, yes.

8   Q.  She asked you if whether the clothing was sorted by size,

9   correct?

10  A.  Yeah, I seem to recall there being a question about that.

11  Q.  And, again, despite your regular presence, you had no idea

12  that it was sorted by size or whether it was sorted by size?

13  A.  The -- based on the question that counsel was asking, yeah,

14  I didn't know if it was sorted by size.

15  Q.  She asked you if underwear was kept in the shed, correct?

16  A.  I do recall that question being asked specifically.

17  Q.  Okay.  And you answered that you had no idea whether there

18  was underwear in the shed?

19  A.  Again, if that's in the transcript, I certainly would have

20  said that, yeah.

21  Q.  Again, to be complete, that you couldn't -- you couldn't

22  speak specifically about whether underwear is kept in there,

23  right?

24  A.  Yeah, I mean that comports with how I would answer that

25  question, yeah.

1    Q.  Sorry.  So despite having a regular presence, in spite of

2    being the person charged with maintaining the property, with

3    keeping it clean, you have no idea what the specifics are about

4    anything regarding the property, right?

5            MR. KUYKENDALL:  I would object.  That's not at all

6    his answer.  This is a gross misstatement of the testimony thus

7    far.

8            MR. WALTERS:  I was just asking a question.

9            THE COURT:  Overruled.

10           MR. WALTERS:  Thank you.

11           THE WITNESS:  Can you repeat that question?

12    BY MR. WALTERS:

13    Q.  Sure.  Despite your regular presence there, despite being

14    charged with cleaning and maintaining The Barn, you have no

15    idea what the specifics of The Barn are, what's there, what's

16    not there?

17    A.  It might be helpful to offer some more understanding of my

18    role there as a bottom liner of that space.  And that I might

19    ask somebody to organize supplies or I might ask somebody to do

20    some cleaning but I'm not necessarily the one that is like

21    organizing things or cataloging the sizes.

22        So I certainly stand by that answer that, you know, there's

23    humanitarian supplies there, there certainly could be underwear

24    there, there certainly could be clothing that's sized.  I don't

25    recall at that particular time, January 17th, whether the

1    clothing was sized or stacked to the wall haphazardly or what.

2    Q.  You previously testified that part of your jobs in

3    maintaining the property is to maximize the privacy to the

4    people there, correct?

5    A.  I would say that my role in that is working with the people

6    there to create -- to create a safe space in the ways that we

7    define it, yeah, and privacy is often part of that.

8    Q.  But part of your earlier testimony was also discussing

9    physical privacy, physical safety, right?

10   A.  Sure.

11   Q.  Okay.  There are no signs, at least no no trespassing signs

12   on the property, correct?

13   A.  So that's interesting.  There's a -- when you come in the

14   gate, there's actually these two red -- they're like kind of

15   concrete, small cones and they say "stop" on them.  And I

16   wouldn't expect people to see that because they've kind of

17   faded and in some ways they've kind of grown over but so that's

18   the only thing that if somebody were to notice that, they would

19   see a sign that says "stop" but, otherwise, you're correct,

20   there are no no trespassing signs or anything like that.

21   Q.  Okay.  There are also no padlocks on the gate, or there

22   were no padlocks on the gate at the time of your arrest, right?

23   A.  I don't think that there were, no.

24   Q.  So in terms of maximizing the illegal aliens' privacy and

25   physical safety and despite there being padlocks in The Barn,

CROSS-EXAMINATION - SCOTT DANIEL WARREN

1   you did not lock the gate with a padlock that night, correct,

2   or that morning, excuse me?

3   A.  Can you say that question very clearly so I can understand

4   what you're asking?

5   Q.  Sure.  You did not padlock the gate the morning that you

6   were arrested, correct?

7   A.  I did not padlock the gate the morning I was arrested.

8   Q.  So in terms of maximizing the illegal aliens' privacy,

9   their physical safety, you did not padlock the gate, correct?

10  A.  I would not say that I did anything in terms of maximizing

11  the illegal aliens', as you put it, safety and security.  I did

12  not padlock the gate that day.

13  Q.  Okay.  You would agree, though, that you testified that

14  your job -- that one of your roles in maintaining The Barn was

15  to provide safety and security for everyone who's there,

16  correct?

17  A.  My role as a volunteer is to maintain that as a safe space

18  and as a private space, yeah.

19  Q.  So is that a yes?

20  A.  It could be for anybody that's there.

21  Q.  Including illegal aliens?

22  A.  It would include anybody that's there, volunteers,

23  patients, or anybody who had an expectation of privacy.

24  Q.  Does that include illegal aliens?

25  A.  Frankly, that's not a word that I use.

1    Q.  It doesn't matter.  Does it include people who are not

2    legally allowed to be in the country?

3    A.  It could -- it could include somebody who doesn't have the

4    proper documentation to be in the country.

5    Q.  And despite there being padlocks inside The Barn, you did

6    not padlock or even close the gate the morning that you were

7    arrested, correct?

8            MR. KUYKENDALL:  I'm going to object to the relevance

9    of this whole line of questioning.  There's no requirement to

10   padlock, to -- any kind of curtilage prior to a warrantless

11   entry.  It's irrelevant.

12           THE COURT:  Well, the fact is, it wasn't locked,

13   right?

14           MR. WALTERS:  Correct.

15           THE WITNESS:  Correct, Your Honor.  It wasn't locked.

16           THE COURT:  Ask another one.

17           MR. WALTERS:  Thank you, Your Honor.

18   BY MR. WALTERS:

19   Q.  In terms of the personal property that you keep at The

20   Barn, is it just floating out in the space for anyone to see or

21   touch?

22           MR. KUYKENDALL:  I'm going to object to the vagueness

23   of that question.

24           THE COURT:  Sustained.

25

BY MR. WALTERS:

Q.  Let's take your guitar, for example.  Is it locked away?

A.  It's generally not locked, no.

Q.  Is any of your personal property stored in a safe, for

example?

A.  No.

Q.  Okay.  In terms of the north side of the building, there's

a path that runs along the north side of the building, correct?

A.  Yeah, you could say that.

Q.  And it's a -- in your opinion, would it be a clearly

visible path that leads in front of the north side of the

building?

A.  There's a sort of open space that goes over to the gardens

that Dr. Johnson maintains.

Q.  Have you encountered people walking in that path before?

A.  That's a good question.  Rarely.

Q.  Okay.  But people have traveled on that path, correct?

A.  Yeah, I'm sure people have traveled that.

        MR. WALTERS:  May I have a minute, Your Honor?

        THE COURT:  Sure.

        MR. WALTERS:  Just a couple of brief questions, Your

Honor.

BY MR. WALTERS:

Q.  And just to clarify, your personal property, does anyone

who is at The Barn have access to your personal property

1   whether you're there or not?

2   A.  Because nothing's locked, yeah, theoretically somebody

3   could access it.

4           MR. WALTERS:  Thank you, Your Honor.  I have nothing

5   further.

6           THE COURT:  Anything further?

7           MR. KUYKENDALL:  Just one final question, Judge.

8                       REDIRECT EXAMINATION

9   BY MR. KUYKENDALL:

10  Q.  Dr. Warren, in addition to the things you have testified

11  that you did while at The Barn, did you go there to relax?

12  A.  Yeah, I did.

13  Q.  And do you have friends there?

14  A.  When there's volunteers there, I consider those people my

15  friends and, yeah, I do have friends there.

16  Q.  Okay.  Thank you.

17          MR. KUYKENDALL:  That's all I've got.

18          THE COURT:  You may step down.

19      Anything else?

20          MR. KUYKENDALL:  I have one other thing.  I don't have

21  another witness.  I was going to briefly read something into

22  the record.  Page 50 of Exhibit 121, which is the video

23  deposition of Jose Arnaldo Sacaria-Goday.  At page 50, I asked:

24  You two decided to hide in the bathroom when you realized that

25  Border Patrol was outside, correct?

1      Yes was the answer.

2      And you locked the door to the bathroom, right?

3      Answer:  Yes.

4      Question:  And a Border Patrolman told you to open the

5  door?

6      Answer:  Yes.

7      Question:  He didn't ask politely to please open the door,

8  he told you directly to open the door, right?

9      Answer:  Yes.

10      So that was page 50 of -- lines 7 through 17 of what's been

11  marked as Exhibit 121.

12          MR. WALTERS:  And, Your Honor, I would just ask that

13  we admit both Exhibit 121, which is the transcript of one of

14  the material witnesses, and also Exhibit No. 72, which is the

15  transcript from -- of Scott Warren from the May 11th hearing.

16          MR. KUYKENDALL:  I don't have any objection to that.

17          THE COURT:  So ordered.

18          MR. KUYKENDALL:  I'd also ask to admit Exhibits 101,

19  102, 103, 105, 106, 107, 108, 109, and 110 as well as the

20  transcript, which was 121.

21          MR. WALTERS:  Just first to clarify, No. 110 is an

22  interview report?  Sorry.  Ours aren't numbered so I don't

23  know.

24          MR. KUYKENDALL:  Oops, sorry.  I said 110 and I didn't

25  mean to.  I withdraw 110.

1          MR. WALTERS:  In any event, Your Honor, Exhibits 1

2    through 9 the government would object on the grounds that

3    sufficient foundation wasn't laid.  The defense never

4    specifically asked the witness if that was a fair and accurate

5    representation of The Barn on the date in question.

6          MR. KUYKENDALL:  And I would tell you that all of the

7    witnesses testified that --

8          THE COURT:  They'll be admitted.

9          MR. KUYKENDALL:  Okay.  Thank you.

10        At this point, Judge, I would tell you that the defense has

11   put on sufficient information for the court to rule that

12   Dr. Warren indeed does have standing to contest this illegal

13   search and, because it's warrantless, the burden shifts to the

14   government to establish that some exception obtains to allow

15   the warrantless search to be valid.  Otherwise, it should be

16   ruled invalid at this moment.

17         THE COURT:  Anything you want to present?

18         MR. WALTERS:  Very briefly, Your Honor.

19         THE COURT:  In terms of witnesses?

20         MR. WALTERS:  Excuse me?

21         THE COURT:  Are you going to call witnesses?

22         MR. WALTERS:  Sure.  I thought I was going to make

23   arguments as to standing but I can call my first witness.

24         THE COURT:  And that will be who?

25         MR. WALTERS:  That will be Border Patrol Agent John

1   Marquez, Your Honor.

2           JOHN MARQUEZ, WITNESS, WAS PREVIOUSLY SWORN.

3           THE COURT:  Good afternoon.  You realize you're under

4   oath?

5           THE WITNESS:  Yes.

6           THE COURT:  Okay.  You may proceed.

7                       DIRECT EXAMINATION

8   BY MR. WALTERS:

9   Q.  Good afternoon, Agent Marquez.

10  A.  Hello.

11  Q.  Can you please introduce yourself to the court?

12  A.  My name's Agent John Marquez.

13  Q.  Where do you work, sir?

14  A.  I work at the Ajo Border Patrol Station.

15  Q.  How long have you worked for Border Patrol?

16  A.  A little bit over eight and a half years.

17  Q.  What is your current assignment with the United States

18  Border Patrol?

19  A.  I'm assigned to the Ajo targeting enforcement unit.

20  Q.  And can you just briefly explain what you do as part of

21  that assignment?

22  A.  We specifically target individuals or aliens that may be

23  involved in illegal narcotics smuggling or human smuggling.

24  Q.  How long have you been on that assignment?

25  A.  Almost like a year and a half.

 1   Q.  Let's first talk about The Barn and specifically the

 2   surrounding area, okay?

 3   A.  Okay.

 4   Q.  Okay?  I'm showing you what's been previously marked for

 5   identification purposes as Government Exhibit 75.

 6       Agent Marquez, do you recognize this area?

 7   A.  Yes, I do.

 8   Q.  And what is the area?

 9   A.  It would be 1401 West Snyder, also known as The Barn.

10   Q.  Do you believe this to be an accurate representation of The

11   Barn and surrounding area on the date in question, January 17th

12   of 2018?

13   A.  Yes.

14          MR. WALTERS:  Your Honor, at this time the government

15   would move to admit Exhibit 75.

16          MR. KUYKENDALL:  No objection.

17          THE COURT:  It will be admitted.

18   BY MR. WALTERS:

19   Q.  Agent Marquez, if you could, what is to the north of the

20   property?

21   A.  It would be Bureau of Land Management.

22   Q.  Are there any structures out there?

23   A.  No.

24   Q.  Is it mostly desert?

25   A.  It is mostly desert.

DIRECT EXAMINATION - JOHN MARQUEZ

1   Q.  What about to the west of the property?

2   A.  To the west of the property there are some houses but,

3   again, mostly desert.

4   Q.  What about to the east?

5   A.  To the east you start getting into the residential area of

6   Ajo.

7   Q.  And to the south?

8   A.  Again, residential area of Ajo.

9   Q.  Let's talk about January 17, 2018, when you were conducting

10  surveillance, okay?

11  A.  Okay.

12  Q.  Who or what were you surveilling?

13  A.  I was surveilling the property as shown at 1401 West

14  Snyder.

15  Q.  Prior to your surveillance, did you know who the owner of

16  The Barn was?

17  A.  Yes, it was Dr. Carol Johnson.

18  Q.  And did -- did you perform any additional investigation on

19  the specifics of The Barn prior to your surveillance?

20  A.  We did know that she owned it but it was listed as

21  uninhabitable; nobody lived there.

22  Q.  In all the research that you did on The Barn prior to your

23  surveillance, did you ever see the defendant's name attached to

24  any of those public records?

25  A.  No.

 1    Q.  Where were you when you began conducting surveillance on

 2    The Barn?

 3    A.  I was located just north of the property next to a large

 4    wash.

 5    Q.  About what time did you begin conducting surveillance?

 6    A.  I want to say early afternoon.

 7    Q.  Would it refresh your recollection to look at your report

 8    to get the exact time?

 9    A.  Yes.

10         MR. KUYKENDALL:  I'll stipulate it was 1400 hours if

11    you want to move it along.

12         MR. WALTERS:  That's fine.  Thank you.

13    BY MR. WALTERS:

14    Q.  So does 2:00 p.m. sound about right?

15    A.  Yes, it does.

16    Q.  Okay.  When did -- why did you choose the location that you

17    did to conduct your surveillance?

18    A.  It gave us a good view of the north entrance to the

19    property.  We could see vehicle traffic, pedestrian traffic.

20    Q.  Approximately how far away were you from The Barn when you

21    were conducting surveillance?

22    A.  Maybe a tenth of a mile.

23    Q.  Okay.  So my math is shaky but is that roughly 500 feet?

24    A.  Sure.

25    Q.  Okay.  Did you use any equipment to assist you in getting a

 1   better look while you were conducting surveillance?

 2   A.  We just used a spotting scope.

 3   Q.  And is that something that is -- what is that, I mean, in

 4   layman's terms?

 5   A.  It is a -- like a large binocular.

 6   Q.  Okay.  So they're binoculars?

 7   A.  Yeah, but with one eye.

 8   Q.  At one point, did you see the defendant exit The Barn with

 9   two individuals?

10   A.  Yes, I did.

11   Q.  Approximately what time did you observe those three people

12   come out of The Barn?

13   A.  I want to say -- I don't remember.

14   Q.  And, again, if I can just get leeway from the defense, does

15   4:38 sound about right?

16   A.  Yes, yes.

17   Q.  And that was p.m., correct?

18   A.  Yes.

19   Q.  Did you recognize these individuals and, if so, who were

20   they?

21   A.  Did not recognize the individuals but we suspected that

22   they were subjects that had somewhat -- we had reports prior

23   that subjects were in Ajo walking around.

24   Q.  Did you know who Scott Warren was at this point?

25   A.  Yes.

 1  Q.  Did you recognize him as one of the individuals standing

 2  outside The Barn?

 3  A.  Yes.

 4  Q.  But are you saying that you didn't know who the other two

 5  individuals were?

 6  A.  I did not know.

 7  Q.  Okay.  So a total of three.  Were there any more that you

 8  saw?

 9  A.  At that time with Scott, no, it was just the three of them

10  together.

11  Q.  Okay.  The other two individuals, did you suspect them of

12  being illegal aliens?

13  A.  Yes.

14  Q.  Why?

15  A.  They wore ill-fitting clothing, they appeared to be

16  extremely anxious and nervous, they looked out of place, they

17  were at heightened alert, they were looking around constantly.

18  Q.  When you observed these individuals, what was the defendant

19  doing?

20  A.  We believe that he was pointing out landmarks around us in

21  an attempt to talk to them how to make further entry north.

22  Q.  Based on the gestures the defendant was making, why -- and

23  based on your training and experience, why did you believe that

24  he was gesturing towards -- gesturing and telling the aliens

25  where to go?

1    A.  Just through my experience of tracking and apprehending

2    groups in the surrounding area, I knew from just looking around

3    us what I could think that what he was pointing at.

4    Q.  The area that he was pointing at, is that a place where you

5    have encountered illegal aliens in the past?

6    A.  Yes, it is.

7    Q.  After that, did you observe anything else?

8    A.  They both went back inside, or all three of them went back

9    inside.

10   Q.  Okay.  Once that happened, what did you decide to do?

11   A.  We decided to coordinate and do a knock-and-talk.

12   Q.  And when you say "we", you mean you and who else?

13   A.  My partner, Brandon Burns.

14   Q.  Is he also a Border Patrol agent?

15   A.  Yes.

16   Q.  Did you call for back-up before conducting the

17   knock-and-talk?

18   A.  Yes.

19   Q.  Why did you do that?

20   A.  It's part of policy.  When we conduct a knock-and-talk,

21   we're supposed to secure the perimeter, make sure that no one

22   can come in or come out.  It's policy.

23   Q.  Why is that important?

24   A.  Just different circumstances of the risk of escape or

25   people trying to gain access into the property.

1    Q.  Is there an officer safety component to calling for back-up

2    in those situations?

3    A.  Yes, of course.  There's tons of unknown risks you could

4    say about doing a knock-and-talk with unknown subjects.

5    Q.  Let's talk about when you got -- when you got to the

6    property and your initial entry into the property, okay?

7    A.  Okay.

8    Q.  First, how did you get to the property?

9    A.  We did it by foot, we ran to Snyder Road from our position.

10   Q.  Where did you first make entry into the property?

11   A.  At the front gate.

12   Q.  And is that the front gate that borders Snyder Road?

13   A.  Yes.

14   Q.  Was that gate open or closed?

15   A.  It was open.

16   Q.  Did you observe any padlocks on the gate when you were

17   there?

18   A.  No.

19   Q.  Did you observe any no trespassing signs while you were

20   there?

21   A.  No.

22   Q.  When you went onto the property, were there any other

23   Border Patrol agents also on the property?

24   A.  Agent Sandoval and his partner had already entered the

25   property in a Border Patrol vehicle.

 1   Q.  Was Agent Burns already on the property or was he with you?

 2   A.  Oh, yes, and Agent Burns.

 3   Q.  Okay.  Were you with anybody when you were on the property

 4   or were you alone?

 5   A.  Well, when we entered the property, I split from Agent

 6   Burns and made my way --

 7   Q.  Okay.  And so when Agent Burns split from you, where did he

 8   go?

 9   A.  He proceeded south with the -- Agent Sandoval.

10   Q.  Do you -- do you recall where exactly they were standing on

11   the property?

12   A.  I just knew it was to the south, somewhere west of the main

13   structure.

14   Q.  Okay.  Were they on the driveway or were they on another

15   part of the property?

16   A.  They were on the driveway.

17   Q.  Okay.  When you initially came onto the property, were

18   there any paths that you walked on personally?

19   A.  Yes.

20   Q.  And where were those paths?

21   A.  The path was around the east side of the house.

22   Q.  And if you could, you can take your finger and you can

23   actually mark on that picture.  Show -- if you could show the

24   court exactly what path you took when you entered the property.

25   A.  Okay.

1    Q.  Okay.  So now, is that a fair and accurate representation

2    of the path you took you believe?

3    A.  Yes.

4              MR. WALTERS:  Your Honor, we would move to admit -- I

5    guess that would be Exhibit 75 and we can label it as A.

6              THE COURT:  All right.

7              MR. KUYKENDALL:  No objection.

8    BY MR. WALTERS:

9    Q.  Specifically looking at the north side of the structure,

10   The Barn, was there a path that you could walk on?

11   A.  Yes.

12   Q.  And what about that made you believe that it was a path

13   that you could walk on?

14   A.  Just clearing it and it also appeared that they had plants

15   that a gardener or somebody had taken care of.

16   Q.  Okay.  Were they -- were they plants that were bordering

17   the path or something else?

18   A.  Yeah, plants close by as well as there's a door on the

19   north side.

20   Q.  Okay.  While you were on this path, could you see a window

21   on the front of The Barn?

22   A.  Yes.

23   Q.  Approximately how far away were you from the window when

24   you -- from where you were standing on the path?

25   A.  Oh, maybe five yards.

1    Q.  Okay.  I'm now showing you what's been marked as

2    Government's Exhibit No. 76.

3              MR. KUYKENDALL:  No objection.

4              THE COURT:  Thank you.

5    BY MR. WALTERS:

6    Q.  I think there's a little button, actually, on your screen

7    that allows you to clear that line from before.

8         Where was the window on the front of The Barn that you were

9    just talking about?

10   A.  Excuse me?

11   Q.  Where was the window that you were just talking about on

12   the front of The Barn?

13   A.  It's going to be here.

14   Q.  Now, do you recognize this diagram?  I should have got this

15   first.

16   A.  Yes, I believe this is the layout of The Barn.

17   Q.  Do you believe it to be an -- at some point, did you enter

18   The Barn that day?

19   A.  Yes, I did.

20   Q.  And is this a fair and accurate representation of The Barn?

21   I understand it's not drawn to scale but a fair and accurate

22   representation of the layout of The Barn as you remember it

23   that day?

24   A.  Yes.

25             MR. WALTERS:  Your Honor, we'd move to admit

DIRECT EXAMINATION - JOHN MARQUEZ

1    Exhibit 76 into evidence.

2            MR. KUYKENDALL:  No objection.

3            THE COURT:  Admitted.

4    BY MR. WALTERS:

5    Q.  What direction does that window face, Agent Marquez?

6    A.  That window faces north towards the road.

7    Q.  Towards what road?

8    A.  Snyder Road, I'm sorry.

9    Q.  Okay.  Would you consider that side of The Barn to be the

10   front of The Barn or something else?

11   A.  I would consider it to be the main front, yes, the front of

12   The Barn.

13   Q.  When you -- when you looked in that window, what did you

14   see?

15   A.  I saw one of the same subjects I had observed earlier

16   during our observation with Scott Warren outside, I saw him run

17   south to the kitchen.

18   Q.  What facts let you to believe that it was the same

19   individual?

20   A.  The same blue hoodie sweatshirt.

21   Q.  When you saw the individual running through the house, were

22   you still on the path in front of the house or were you

23   somewhere else?

24   A.  I was still on the path in front of the house.

25   Q.  So let's talk about more what you saw in the window, okay?

DIRECT EXAMINATION - JOHN MARQUEZ

1    So you saw an individual running.  Anything else about what he

2    was wearing or any other facts that made you believe it was the

3    same individual?

4    A.  Just the blue sweatshirt I recognized and him, I assumed he

5    was trying to escape.

6    Q.  What did you do next when you saw him running?

7    A.  I moved to the -- I ran to the east side of the house to

8    try to apprehend him.

9    Q.  And why did you decide to run to the east side of the house

10   in an effort to apprehend that subject?

11   A.  To escape him -- to prevent him from escaping.

12   Q.  In looking at this exhibit, Agent Marquez, what side is the

13   east side of the property?

14   A.  Can I just mark it?

15   Q.  Yes.

16   A.  Okay.

17   Q.  What, if anything, did you hear or observe when you got to

18   the east side of the property?

19   A.  I heard the door slam, doors slamming, excuse me.

20   Q.  Did you see a door slam or just hear it?

21   A.  I saw the door to the bathroom/laundry room slam.

22   Q.  Okay.  When you approached the east side of the property,

23   did you observe a gate in that little breezeway area?

24   A.  No.

25   Q.  Do you recall if a gate was open or closed or you don't

DIRECT EXAMINATION - JOHN MARQUEZ

1  recall a gate period?

2  A.  I don't recall a gate period.

3  Q.  Okay.  So you run to the east side of the property because

4  you believe the suspect is escaping.  You hear a door slam

5  shut, you see a door slam shut.  What do you do next?

6  A.  I concluded it was the only logical place for him to go.  I

7  had a clear view to the south.  I assumed that he was in there.

8  I knocked on the door and announced myself as a United States

9  Border Patrol agent.

10 Q.  And when you say announced as a Border Patrol agent, as a

11 United States Border Patrol agent, do you recall the exact

12 words that you used?

13 A.  United States Border Patrol.

14 Q.  Okay.  Did you ask or order the subject to open the door?

15 A.  Yes.

16 Q.  Which one was it, ask or ordered?

17 A.  Asked.

18 Q.  Okay.  When the individual -- did the individual open the

19 door or did he stay hidden?

20 A.  He opened the door.

21 Q.  And then what happened?

22 A.  I looked at him.  I told him to show me his hands.  He did.

23 I told him to sit down.

24 Q.  Why did you ask him to show you his hands?

25 A.  Officer safety.  I didn't know -- him already running and

 1   being a flight risk, I didn't know he could have ran to that

 2   room and grabbed a weapon.

 3   Q.  Is that something that you would do in every situation?

 4   A.  Yes.

 5   Q.  Okay.  Did you place the individual in handcuffs at that

 6   point?

 7   A.  No.

 8   Q.  Why not?

 9   A.  We hadn't -- we hadn't proven that he was an alien.  We

10   hadn't done an immigration inspection.

11   Q.  At that point, did you believe you had probable cause to

12   arrest?

13   A.  No.

14   Q.  Okay.  Was that individual later arrested?

15   A.  Yes.

16   Q.  At what point was that individual arrested?

17   A.  Scott Warren walked in with Agent Burns.  Agent Burns

18   conducted an immigration inspection in front of Scott Warren.

19   The alien admitted to being illegally present without any sort

20   of documents.

21   Q.  Was it you or Agent Burns that actually handcuffed and

22   arrested the illegal alien?

23   A.  I don't remember.

24   Q.  Okay.  Did you encounter other individuals on the property

25   that day?

DIRECT EXAMINATION - JOHN MARQUEZ

1  A.  Later on we did.

2  Q.  Okay.  And describe that -- those circumstances.

3  A.  We approached two individuals on the property.  They both

4  refused to answer any questions.

5  Q.  Did you encounter anyone else on the property that day, any

6  other civilians?

7  A.  Two others were encountered but they were outside the

8  property.

9  Q.  Okay.  Were those individuals arrested?

10  A.  No.

11  Q.  Why not?

12  A.  We never saw those individuals with any aliens.

13  Q.  Okay.  So I don't want to put words in your mouth but is it

14  safe to assume you didn't believe you had probable cause to

15  arrest those individuals?

16  A.  Yes.

17  Q.  At one point, was the defendant arrested?

18  A.  The defendant was arrested right after the immigration

19  inspection on the first subject.

20  Q.  When you made the decision to run to the east side of the

21  property, were you aware of what was going on with Agent Burns,

22  Agent Sandoval, and the defendant?

23  A.  No.

24  Q.  Could you hear what they were saying?

25  A.  When Scott Warren approached, he -- I couldn't really make

1    out, something about not having the right to be here.

2    Q.  And when he approached where?

3    A.  About here.

4    Q.  Okay.  So but prior to that point when you observed the

5    agents standing with the defendant in the driveway as you

6    testified earlier, could you hear what they were saying?

7    A.  No.

8    Q.  Could you hear -- was there any screaming that you could

9    tell?

10   A.  No.

11   Q.  Okay.  Let's talk about what you did after the defendant's

12   arrest, okay?

13   A.  Okay.

14   Q.  Did you ever make entry into The Barn?

15   A.  Yes, I did.

16   Q.  Why is that?

17   A.  Officer safety reasons, make sure there weren't any

18   additional suspects or anyone in need of law enforcement help,

19   maybe the situation could escalate.

20   Q.  Is there an officer safety purpose for conducting a -- for

21   going into the property at that point?

22   A.  Yeah, only as a protective sweep.

23   Q.  And describe what the purpose of a protective sweep is.

24   A.  Make sure there aren't any additional subjects hiding, make

25   sure that there's no one in need of law enforcement help.

1   Q.  Did you have any concerns at that point about officer

2   safety specifically?

3   A.  Yes.

4   Q.  And what were those specifics?

5   A.  Additional subjects hiding inside.

6   Q.  And why would an additional suspect hiding inside a

7   structure create an officer safety situation?

8   A.  It could escalate into something else if there were other

9   people in there, it could -- they -- we just didn't know what

10  could happen.  It could turn into maybe even a hostage

11  situation.  There's just -- there's tons of unknowns.

12  Q.  Is that a possibility that someone in there could use a

13  weapon against agents?

14  A.  Yes.

15          MR. WALTERS:  May I have a moment, Your Honor?

16  BY MR. WALTERS:

17  Q.  When you say that your prior research showed that the

18  property was listed as uninhabitable, what did you mean?

19  A.  That nobody was -- was shown as having that -- was living

20  there.

21  Q.  Okay.  So it doesn't necessarily mean that the conditions

22  were so poor that no one could live there?

23  A.  Yeah, right, just nobody currently resided there --

24  Q.  Gotcha.

25  A.  -- I should say.

 1  Q.  When you -- when you were surveilling The Barn and you saw

 2  the defendant pointing out things and gesturing with his hands,

 3  could you tell whether he was pointing out any landmarks, in

 4  your opinion?

 5  A.  Yes.

 6  Q.  What landmarks are you familiar with that you believe the

 7  defendant was pointing at?

 8  A.  Childs Mountain, which is directly to the northwest of the

 9  structure.

10  Q.  Why is Childs Mountain significant to you as a Border

11  Patrol agent?

12  A.  It has a giant antenna on top of it.  Alien smugglers use

13  it to guide off of at night; it has a red light.  They use it

14  to guide off of at night to the east or west of it.

15  Q.  And just to be clear, they guide off what at night?

16  A.  There's an antenna with a light on top of it.

17  Q.  Is this antenna kind of like a golf ball?

18  A.  Yes.

19  Q.  Okay.  And have you encountered aliens in that area of

20  Childs Mountain in your career?

21  A.  Yes.

22  Q.  How soon after your split from Agent Burns did you see the

23  illegal alien through the window?

24  A.  Seconds.

25  Q.  Okay.  Are we talking less than five seconds or more than

DIRECT/CROSS-EXAMINATION - JOHN MARQUEZ

1  five seconds?

2  A.  I would say about five seconds.

3  Q.  Okay.  And in terms of the protective sweep that you

4  testified, what can happen if you don't find a person hiding

5  right away?

6  A.  If we don't find a person hiding right away, walking

7  through a structure like that, we could have been ambushed

8  maybe, which would be bad all the way around.

9  Q.  Is that -- is that concern of an ambush, does that present

10 itself to agents when they're inside the structure?

11 A.  Both inside and outside.

12 Q.  Okay.

13      MR. WALTERS:  I have nothing further, Your Honor.

14 Thank you.

15      THE COURT:  Go ahead.

16      MR. KUYKENDALL:  Thank you.

17                    CROSS-EXAMINATION

18 BY MR. KUYKENDALL:

19 Q.  Agent Marquez, how many reports did you write in this case?

20 A.  Including the arrest?

21 Q.  Yeah, from the date of the arrest forward, how many reports

22 did you write?

23 A.  I want to say four off the top of my head.

24 Q.  And you're saying from January 17 beyond you wrote four?

25 A.  Oh, I'm sorry.  I didn't understand the question.  From the

1    day of the arrest forward?

2    Q.  Right.

3    A.  The arrest report, I helped put together a timeline.

4    That's all I remember.

5    Q.  Okay.  So you wrote one report on the 17th, I believe, and

6    one report on February 1, correct?

7    A.  Yes.

8    Q.  Okay.  And you wrote several reports prior to that as well?

9    A.  Yes.

10   Q.  And in those reports you attempt to document the important

11   things that you did, fair?

12   A.  Yes.

13   Q.  I mean, whenever you write a report, you try to put in the

14   important things and leave out the unimportant things, right?

15   A.  No.

16   Q.  Oh, no?  What do you put in a report, unimportant things?

17   A.  Everything that's relevant.

18   Q.  Okay.  So every single thing that's relevant you put in a

19   report, is that what you're telling us?

20   A.  Yes.

21   Q.  Okay.  And you learned that by going to the academy as well

22   as by your field training once you got to the Ajo Station,

23   right?

24   A.  Yes.

25   Q.  So, in addition to the reports that you've authored in this

1   case, did you send out any texts or emails about this case?

2   A.  Excuse me?

3   Q.  Did you send out any texts or emails about this case?

4   A.  Prior to the arrest?

5   Q.  Before or after the case -- after the arrest.

6   A.  Yes.

7   Q.  Okay.  And what are those?  'Cause I don't have them.  How

8   do I get those?

9   A.  I believe some were given to you.  I did submit texts to --

10  I did submit texts for evidence.

11  Q.  You texted on the date of the arrest?

12  A.  Yes.

13  Q.  And did you text regarding this case since the arrest?

14  A.  No.

15  Q.  Did you text regarding this case before the arrest?

16  A.  Yes.

17  Q.  And have you sent emails about this case before the arrest?

18  A.  Yes.

19  Q.  And have you sent emails about this case since the arrest?

20  A.  Yes.

21  Q.  All right.

22       MR. KUYKENDALL:  Your Honor, I don't have any emails

23  about this case and I'm entitled to them under Jencks.  And I

24  don't have any texts about this case since the arrest, which I

25  believe he's testified to as well, and I'm entitled to those

1    under Jencks.  So if I don't get them now, I would request that

2    this officer's testimony be struck.

3           MR. WALTERS:  Your Honor, in terms of the text

4    messages that I believe Agent Marquez was talking about, and

5    further questioning would need to be done, but those were

6    questions done between Agent Marquez and two officers from Fish

7    & Wildlife.  Those were disclosed to the defense a long time

8    ago, and they've had those for several months now.

9      In terms of any emails that have been sent since then, the

10   government has complied with its obligations under Jencks,

11   Giglio, and Brady and none of any emails that I've exchanged or

12   Ms. Wright has exchanged with Agent Marquez have any bearing or

13   relevance as to the specifics of the case but were only more

14   merely procedurally in nature and those don't implicate Jencks,

15   Giglio, or Brady.

16          THE COURT:  Okay.

17          MR. KUYKENDALL:  I would ask for an in camera review

18   of those emails and I would agree I have some texts from before

19   this but I don't have any texts since this arrest.

20          THE COURT:  I'll look at the procedural emails.

21          MR. KUYKENDALL:  Okay.  May I continue then with the

22   reservation that if there's emails that I receive that I can

23   reopen --

24          THE COURT:  Sure.

25          MR. KUYKENDALL:  -- at a later date?

1          THE COURT:  Sure.

2     BY MR. KUYKENDALL:

3     Q.   The -- I believe you testified that you include all

4     relevant data in your memorandums of investigation; is that

5     correct?

6     A.   Yes.

7     Q.   Let's talk about the report that you authored on the 17th,

8     the date of the arrest.  Have you reviewed that recently?

9     A.   Yes.

10    Q.   And is it fair to say that nowhere in that report do you

11    mention going inside The Barn?

12    A.   I did write an addendum to that --

13    Q.   That's not my question.  My question is:  In your report,

14    your five-page, single-spaced report of January 17, is there

15    any mention whatsoever of you having entered The Barn?

16    A.   No.

17    Q.   In addition, I'd like you to explain to the judge whether

18    there is any mention whatsoever in this five-page,

19    single-spaced report of January 17 of you having taken pictures

20    while you're inside The Barn.

21    A.   Say that one more time.

22    Q.   I would like you to explain to the judge whether there is

23    anyplace in this five-page, single-spaced report dated

24    January 17, 2018, where you describe taking pictures while

25    inside The Barn.

1    A.  Why there is not?

2    Q.  I'd like you to explain whether there is.

3    A.  No, there is not.

4    Q.  You took pictures while you were inside The Barn ostensibly

5    doing a protective sweep; is that true?

6    A.  Yes.

7    Q.  And you didn't put it anywhere in the report that you

8    authored the same day as the arrest, correct?

9    A.  Yes.

10   Q.  I'd also like to talk with you a little bit about your

11   observations of Dr. Warren outside in the afternoon of the --

12   of the 17th of January.  You testified just now that you

13   suspected that the folks that you saw with Dr. Warren, you

14   suspected that they were in the country without authorization

15   because they wore ill-fitting clothes, they appeared to be

16   anxious, they appeared out of place, they were on high alert,

17   and they were looking around constantly.

18        Do you remember testifying to that a few minutes ago?

19   A.  Yes.

20   Q.  I would like you to explain whether anywhere in your

21   five-page, single-spaced report of January 17, 2018, you said

22   anything about those people with Dr. Warren besides that they

23   were wearing ill-fitting clothes?

24   A.  I don't -- I don't have any answer to that.

25   Q.  Well, why don't you answer it that you didn't put anything

1    in your report about that?

2    A.  I didn't put it in my report.

3    Q.  You -- you came up with that description sometime between

4    the time that you arrested Dr. Warren and the time that you

5    came here to testify, correct?

6    A.  Yes.

7    Q.  And when did you come up with that description of the folks

8    that you saw outside with Dr. Warren?

9    A.  The day I arrested Dr. Warren.

10   Q.  You came up with it but you didn't put it into your

11   five-page, single-spaced report?

12   A.  Correct.

13   Q.  You also testified a few minutes ago that there is a

14   policy -- there's a policy to secure the perimeter whenever you

15   guys, you Border Patrol agents, conduct a knock-and-talk; is

16   that correct?

17   A.  Yes.

18   Q.  That's correct insofar as that's what you testified to,

19   right?

20   A.  I would assume -- excuse me.  Yes, it is a station policy.

21   Q.  Okay.  And where is that policy written?

22   A.  I don't know.

23   Q.  Do you know if it's written down?

24   A.  I don't know.

25   Q.  Did somebody tell you to tell the judge that that was a

 1   policy?

 2         MR. WALTERS:  Objection, Your Honor.  I think

 3   Mr. Kuykendall needs to have a little more evidence if he's

 4   going throw around accusations that the government or somebody

 5   else is coercing him to lie.

 6         THE COURT:  Sustained.

 7   BY MR. KUYKENDALL:

 8   Q.  If there is a policy, has the government disclosed to us

 9   that policy that you're aware of?

10   A.  I don't know.

11   Q.  And you don't even know if it's a written policy?

12   A.  It is a written policy.

13   Q.  How many knock-and-talks have you conducted in your

14   eight-and-a-half-year career at Border Patrol?

15   A.  Maybe with Scott Warren it would be my third.

16   Q.  So you've done three knock-and-talks in eight and a half

17   years?

18   A.  Yes.

19   Q.  Two of them before you did this to Dr. Warren?

20   A.  Yes.

21   Q.  Let's talk a little bit more about your observations of the

22   two people that were outside with Dr. Warren.  You -- you

23   testified that you had some information that the previous day,

24   January 16th, a migrant had been found somewhere in Ajo and

25   that the two fellas that you saw with Dr. Warren matched his

CROSS-EXAMINATION - JOHN MARQUEZ                    112

1   description, right?

2   A.  Yes.

3   Q.  So -- and, in fact, you even wrote in your report that

4   those two guys matched the description given by the migrant

5   that had been captured the day before in Ajo, right?

6   A.  Yes, I did write that.

7   Q.  But the truth is, you didn't know anything about the

8   characteristics of those two people that were supposedly with

9   the migrant captured the day before; is that true?

10  A.  I don't understand.

11  Q.  Did you know whether they were young?

12  A.  No.

13  Q.  Did you know whether they were old?

14  A.  No.

15  Q.  Did you know whether they were tall?

16  A.  No.

17  Q.  Did you know whether they were short?

18  A.  No.

19  Q.  Did you know whether they had facial hair?

20  A.  No.

21  Q.  Did you know whether they had long hair?

22  A.  No.

23  Q.  Did you know whether they were brown?

24  A.  No.

25  Q.  Black?

1    A.  No.

2    Q.  White?

3    A.  No.

4    Q.  Male?

5    A.  I assumed male.

6    Q.  You assumed it?

7    A.  Uh-huh.

8    Q.  But what you wrote in your report is that they matched the

9    description that you'd received the day before, and that's a

10   lie, isn't it?

11   A.  No.

12   Q.  How did these people who were possibly tall, short, bald,

13   hairy, bearded, old, young, how did they match the description

14   of the two guys that you saw with Dr. Warren?

15   A.  Through my experience as being a Border Patrol agent --

16   Q.  Uh-huh.

17   A.  -- we knew that they were Central Americans.

18   Q.  You could tell from a distance of a quarter mile through

19   your scope that they were Central Americans?

20   A.  I didn't say a quarter mile.

21   Q.  Okay.  You could tell by looking through your telescope or

22   your binoculars, your spotting scope, that they were Central

23   Americans?

24   A.  Through my experience being a Border Patrol agent, yes, I

25   assumed they were Central Americans.

CROSS-EXAMINATION - JOHN MARQUEZ                    114

1    Q.  How about this guy over here, is he Central American?

2    A.  The one in the black jacket?

3    Q.  Yeah.

4    A.  He could be.

5    Q.  Yeah.  You see any Central Americans out here in your

6    experience that might be Central Americans just 'cause of your

7    experience as a Border Patrolman?

8    A.  I don't know.

9    Q.  Let's talk some more about these photographs that you took

10   while you were inside ostensibly doing a protective sweep.  How

11   many did you take?

12   A.  I don't remember.

13   Q.  Did you have your gun out in one hand and your camera out

14   in another while you were doing your protective sweep?

15   A.  No.

16   Q.  Did you fear for your safety while you were taking pictures

17   and after that warrantless entry into The Barn?

18   A.  No.

19   Q.  Who did you share the pictures with after you'd gone inside

20   The Barn and taken pictures?

21   A.  I disclosed it.

22   Q.  To them, to the prosecutors?

23   A.  Yes.

24   Q.  When?

25   A.  I don't recall.

1    Q.   The same day you took the pictures?

2    A.   No.

3    Q.   Did Agent Burns tell you not to go into the building?

4    A.   No.

5    Q.   Did Agent Burns go in and do a protective sweep and come

6    out with one of the migrants?

7    A.   I don't know.

8    Q.   Did you?

9    A.   No.

10   Q.   Well, there's two migrants that were arrested in this case.

11   How did the other one get out?

12   A.   I don't know who arrested the other migrant.

13   Q.   Was that 'cause you were inside taking pictures?

14   A.   No, I believe it was because I was walking Scott Warren to

15   the Border Patrol vehicle.

16   Q.   So it was such a desperately dangerous situation that one

17   of you walked Warren to the Border Patrol vehicle while

18   somebody else, you don't even know who, went inside; is that

19   right?

20   A.   Where the second migrant was apprehended was the bathroom.

21   Q.   Okay.  So you walked Dr. Warren to the Border Patrol

22   vehicle, you put him in there, and then you go back to The Barn

23   and start taking pictures?

24   A.   We regrouped, went inside, did a protective sweep, made

25   sure it was clear, then I took photos.

1   Q.  Excuse me, but this was after you'd already -- somebody in

2   your team had already gotten two migrants out of there, right?

3   A.  Yeah, I believe the migrant was found in the bathroom.  We

4   did not clear the main structure.

5   Q.  Where -- how come you don't know how many photos you took

6   while you were in there?  Did you not disclose all of them to

7   the prosecution?

8   A.  Yes, I did.

9   Q.  Well, two weeks later, February 1, you wrote a report where

10  you say:  I, Border Patrol Agent John Marquez, while conducting

11  a protective sweep of The Barn, observed several items which

12  were immediately apparent to me to be associated with alien

13  smuggling.  I quickly took photographs of these items, which

14  included a cell phone and other books or miscellaneous objects,

15  two white boards containing the words "trip ideas slash to

16  do's", and January 2018 calendar, a camouflage backpack of the

17  type used by illegal aliens as they make entry into the United

18  States, and two handheld radios.  One white board contained

19  what appeared to be a schedule for persons associated with The

20  Barn.  I found this significant because the schedule listed a

21  Scott present at The Barn from January 14 to January 16.

22      Is that what you wrote?

23  A.  Yes.

24  Q.  And what prompted you, two weeks after the fact, to

25  disclose that you had been inside The Barn, number one, and,

CROSS-EXAMINATION - JOHN MARQUEZ

1   number two, that you were in there taking pictures?

2   A.  I don't know.

3   Q.  Did one of these prosecutors tell you, "You better disclose

4   it, buddy.  That's going to come out"?

5   A.  No, we disclosed it.

6   Q.  Who's "we"?

7   A.  Well, excuse me, I disclosed it.

8   Q.  Did you have like a pang of conscience and say:  Jeez, I

9   shouldn't have been inside that house doing a warrant -- I

10  didn't have a warrant.  I'm in there taking pictures.

11      Is that what prompted you to write this two weeks later?

12  A.  No.

13  Q.  Did one of your supervisors say, "Hey, you better write --

14  you'd better -- you've got to do something about this.  This is

15  improper conduct"?

16  A.  No.

17  Q.  Nobody said that?

18  A.  No.

19  Q.  What happened?  What is it -- I mean, you're a busy guy.

20  Why do you wait two weeks?  What happened in two weeks to make

21  you write this report and disclose that you were out -- that

22  you'd been inside warrantlessly taking pictures?

23  A.  I don't know.

24  Q.  Let's talk for a minute about some of this research that

25  you did on The Barn prior to deciding that -- that it

1    ultimately belonged to Dr. Johnson.  Describe that research.

2    A.  I interviewed local Ajo residents about The Barn.

3    Q.  Did you ever go, say, to the recorder's office and find out

4    who owned The Barn?

5    A.  We did it through the Pima County Assessor's Office.

6    Q.  Did you do that online?

7    A.  Yes.

8    Q.  By the seat of the pants you can find out who owns the

9    place, right?

10   A.  Yes.

11   Q.  Okay.  Did you go talk to Dr. Johnson?

12   A.  No.

13   Q.  Did you find out from Dr. Johnson in any way, shape, or

14   form what the extent of her relationship was to Dr. Warren?

15   A.  No.

16   Q.  Didn't even attempt to do that, did you?

17   A.  No.

18   Q.  You started this investigation in April 2017, right?

19   A.  Yes.

20   Q.  So from April to January your research consisted of on the

21   seat of your pants going to the Pima County Recorder's Office

22   or the Assessor's Office online and finding out that she owned

23   it and that's all of your research?

24   A.  In terms of who owned the property, yes.

25   Q.  Uh-huh.  How did you get on -- how did you get past the --

UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - JOHN MARQUEZ

1   get past the gate at The Barn?

2   A.  The gate was not secured, it was open.  I didn't know there

3   was an actual gate until we did the search warrant.

4   Q.  That meant -- my question is:  When you actually walked in

5   or drove in, how did you do it?

6   A.  I walked in.

7   Q.  Okay.  So you walked up Snyder, right?

8   A.  Yes.

9   Q.  You walked past some -- some fencing?

10  A.  Yes.

11  Q.  And the fencing is to the east of the gate?

12  A.  To the east -- well, if there's an entrance, the gate was

13  open.

14  Q.  Yeah.  You go in all open gates, by the way?

15  A.  Yes.

16  Q.  Oh, you just -- I mean, to you, unless there's a padlock on

17  it, it means you can just walk in there?

18  A.  It was a driveway.

19  Q.  And that means in your head it's open season, I can walk in

20  any open driveway?

21  A.  Yes.

22  Q.  Okay.  So you walked into the -- into the gate on foot

23  after having walked past the fence, right?

24  A.  I made entry, yes.

25  Q.  And there were a number of vehicles parked to the south of

1    you as you walked in, correct?

2    A.  I couldn't tell you how many vehicles.

3    Q.  I didn't ask you how many, I said there were a number.

4    A.  Yes.

5    Q.  Was there more than one vehicle parked in front of you?

6    A.  Yes.

7    Q.  More than three?

8    A.  I don't know.

9    Q.  So there's at least two vehicles parked in front of you and

10   agents, by the time you walk across the gate curtilage, agents

11   are already outside of their car, aren't they?

12   A.  I -- I don't know.

13   Q.  You testified earlier that you were aware that this could

14   maybe even turn into a hostage situation, right?

15   A.  Yes.

16   Q.  You were on your toes, right?

17   A.  Yes.

18   Q.  You were alert?

19   A.  Yes.

20   Q.  You saw tall, skinny Dr. Warren standing at the south end

21   of the driveway, right?

22   A.  I don't remember.

23   Q.  You weren't that alert?

24   A.  I don't recall.

25   Q.  So what did you do, just run over to the -- run over to The

CROSS-EXAMINATION - JOHN MARQUEZ                          121

1   Barn as soon as you crossed in?

2   A.  Yeah, yes.  I walked -- I started making my way to the east

3   side of the structure.

4   Q.  You walked, did you?

5   A.  Well, fast, yes.

6   Q.  And it's your testimony today, despite everything else that

7   you've told us, you're testifying that you didn't hear anything

8   that Dr. Warren was saying to all of the other law enforcement

9   agents present about get off this property?

10  A.  No, I don't remember.

11  Q.  You didn't put it in your report?

12  A.  No.  I don't remember him talking with the other agents

13  when I made my way to the east side of the house.

14          THE COURT:  All right.  We're going to take a break

15  and reset this matter.  Why don't you talk to Sarah and find

16  out when we can have the witnesses back.

17      You may step down, sir.

18          THE WITNESS:  Okay.

19          THE COURT:  We'll stand at recess.

20      (Whereupon, the matter was adjourned at 4:47 p.m.)

21

22

23

24

25

UNITED STATES DISTRICT COURT

1              C E R T I F I C A T E

2

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6     __/s Cindy J. Shearman_____          June 18, 2018_
      CINDY J. SHEARMAN, RDR, CRR, CRC        DATE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25