1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF ARIZONA

3    United States of America,      )
                                    )
4              Plaintiff,           )
                                    )   CR-18-0223-TUC-RCC(BPV)
5         vs.                       )
                                    )   Tucson, Arizona
6    Scott Daniel Warren,           )   July 13, 2018
                                    )   9:33 a.m.
7              Defendant.           )
     _____ )

8

9            REPORTER'S TRANSCRIPT OF PROCEEDINGS

10               CONTINUED MOTION TO SUPPRESS

11       BEFORE:  THE HONORABLE BERNARDO P. VELASCO
                  UNITED STATES MAGISTRATE JUDGE

12

13   APPEARANCES

14   For the Government:
          U.S. Attorney's Office
15        By:  NATHANIEL WALTERS, ESQ.
               ANNA WRIGHT, ESQ.
16        405 West Congress Street, Suite 4800
          Tucson, Arizona 85701-4050

17

     For the Defendant:
18        Kuykendall & Associates
          By:  AMY PICKERING KNIGHT, ESQ.
19             GREGORY J. KUYKENDALL, ESQ.
          531 South Convent Avenue
20        Tucson, Arizona 85701-2612

21

     Cheryl L. Cummings, RDR-CRR-RMR
22   Official Court Reporter
     Evo A. DeConcini U.S. Courthouse
23   405 West Congress, Suite 1500
     Tucson, Arizona 85701
24   (520)205-4290

25   Proceedings Reported by Stenographic Court Reporter
     Transcript Prepared by Computer-Aided Transcription

```
 1                              INDEX
 2  WITNESSES CALLED ON BEHALF OF THE GOVERNMENT
 3  JOHN MARQUEZ
 4       CROSS BY MR. KUYKENDALL                        4
 5       REDIRECT BY MR. WALTERS                        40
 6       RECROSS BY MR. KUYKENDALL                      50
 7
    BRENDAN BURNS
 8       DIRECT BY MR. WALTERS                          52
 9       CROSS BY MR. KUYKENDALL                        79
10       REDIRECT BY MS. WRIGHT                        104
11
12
13  CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT      110
14  CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT       129
15
16
17
18
19
20
21
22
23
24
25
```

1                          P R O C E E D I N G S

2          (Proceedings commenced at 9:33 a.m., as follows:)

3                 THE CLERK:  Calling case CR-18-223, United States of

4     America vs. Scott Daniel Warren, on for motion hearing.

5                 Counsel, please state your appearances.

6                 MR. WALTERS:  Good morning, your Honor.  Nate

7     Walters and Anna Wright on behalf of the United States.

8                 MR. KUYKENDALL:  Good morning, Judge.  Greg

9     Kuykendall and Amy Knight on behalf of behalf of Scott Warren

10    who is present, out of custody.

11                THE COURT:  Good morning.  You may proceed.

12                You realize you're still under oath, sir?

13                THE WITNESS:  Yes, sir.

14                THE COURT:  Thank you.  Go ahead.

15          JOHN MARQUEZ, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

16                           CROSS-EXAMINATION

17    BY MR. KUYKENDALL:

18    Q.   Agent Marquez, have you had an opportunity to review your

19    testimony that you provided on June 14th?

20    A.   The transcript, yes.

21    Q.   So you did review the transcript?

22    A.   Yes.

23    Q.   And since that time, have you continued to work with

24    Agents Burns and Sandoval?

25    A.   They're both at my station.

1    Q.   Are you partners with Burns?

2    A.   No.  He's not on my unit.

3    Q.   Have you spoken with either Burns or Sandoval about your

4    testimony on the 14th?

5    A.   No, I didn't give any details to my testimony.

6    Q.   And my question isn't whether you gave details, but did

7    you discuss it whatsoever?

8    A.   Just being nervous.

9    Q.   That's fair.  So did you discuss with them something

10   about your testimony here on the 14th?

11   A.   Yes.

12   Q.   And did you also discuss something about the underlying

13   case on the 14th?

14   A.   No.

15   Q.   So what did you say to them about your testimony here,

16   when you last provided it on the 14th?

17   A.   Just being nervous, the audience, the crowd.

18   Q.   Did you say that to both Burns and to Agent Sandoval?

19   A.   Yes.

20   Q.   And approximately when was that?

21   A.   I don't know.

22        MR. KUYKENDALL:  Your Honor, I would move to strike

23   this agent's testimony.  He's in violation of the admonition

24   that the Court gave.

25        THE COURT:  It will be denied.

1    BY MR. KUYKENDALL:

2    Q.   Sir, in reviewing your testimony, you reviewed the

3    printed-out transcript that was prepared on the 14th of June;

4    is that right?

5    A.   Yes.

6    Q.   And who gave you that -- who gave you that transcript?

7    A.   I believe it came from the Tucson prosecution's agent,

8    Sam Calvillo.

9    Q.   I'm sorry, say that again?

10   A.   Sam Calvillo.

11   Q.   Sam Calvillo?

12   A.   Yes.

13   Q.   Is that C-a-l-v-i-l-l-o?

14   A.   I believe so, yes.

15   Q.   I'm going to show you a page.  It's going to show up on

16   your ELMO.  I'm going to show you a page, page 100, when the

17   prosecutor was asking you questions.  And if you look,

18   beginning at page -- I'm sorry, beginning at line 17, take a

19   moment and read that, would you?

20   A.   "At what point was the defendant arrested?"

21   Q.   I just meant read it to yourself if you want.

22   A.   Okay.  I'm sorry.

23        (Pause.)

24   Q.   Did you finish that?

25   A.   Not yet, I'm sorry.

1      (Pause.)

2      Okay.  I'm done.

3  Q.   And this continues on to page 101.  In total, you said

4  when the question was, "Could you hear what they were saying?"

5      And your answer on page 100 was, "When Scott Warren

6  approached, he -- I couldn't really make out, something about

7  not having the right to be here."

8      Right?

9  A.   Right.

10  Q.   That was your testimony, that you overheard Scott Warren

11  say something to the effect of:  You don't have the right to

12  be here.

13      Right?

14  A.   Right.

15  Q.   And just to be clear, taking a look at Prosecutor's

16  Exhibit 75-A, if this is north -- I'm sorry, if this top part

17  is north --

18  A.   Yes.

19  Q.   -- what you did was you came along this road, Snyder

20  Road?

21  A.   Yes.

22  Q.   Walking; correct?

23  A.   Maybe a jog.

24  Q.   And agents in vehicles turned in to the driveway area;

25  right?

MARQUEZ - CROSS

```
1   A.    Yes.

2   Q.    And likewise, you on foot turned in to the driveway area?

3   A.    Yes, along the red path.

4   Q.    And this red mark is the mark that you drew about what

5   your path was?

6   A.    Yes.

7   Q.    So you approached, and at some point in time before you

8   turned east to get onto the east side of the property, you

9   heard, according to your own testimony, Dr. Warren say to the

10  agents on the driveway, quote, Something about not having the

11  right to be here.

12  A.    Yes, I said that.

13  Q.    Well, you said it right here in the testimony; right?

14  A.    Yes.

15  Q.    And you were under oath when you said that?

16  A.    Yes.

17  Q.    The prosecutor was asking you the question when you said

18  that?

19  A.    Yes.

20  Q.    You understood the prosecutor's question?

21  A.    Yes.

22  Q.    You gave a truthful response?

23  A.    Yes.

24  Q.    So is the truth that when you were somewhere between this

25  point and this point, you overheard Dr. Warren say something
```

1  about not having the right to be there?

2  A.   It wasn't between those two points; it was actually where

3  the red line ends.  On the very south tip is where I heard

4  Scott Warren, when he approached with Border Patrol Agent

5  Burns, make that statement.

6  Q.   Let me refer you to the prosecutor's questions

7  on page 100.  And the prosecutor asked you:

8       QUESTION:  When you made the decision to run to the

9  east side of the property, were you aware of what was going on

10  with Agent Burns, Agent Sandoval, and the defendant?

11       ANSWER:  No.

12       QUESTION:  When Scott Warren approached, he -- I

13  couldn't really make out, something about not having the right

14  to be here.

15  A.   Yeah, I'm sorry, if I could clarify.  When he approached

16  to my position on the east side of house, when I was with

17  Perez-Villanueva.

18  Q.   Well, what actually happened, sir, is that Scott Warren

19  approached the agents as they drove in to the property; right?

20  A.   Yes.

21  Q.   And what you testified to is when you made the decision

22  to run to the east side of the property, which would have put

23  you on the west side of the property when you made the

24  decision to run to the east side of the property; right?

25  A.   Yes.  I made a decision to run to the east side of the

 1   property.

 2   Q.   You made the decision while you were on the west side of

 3   the property to run to the east side of the property,

 4   obviously; right?

 5   A.   Yes.

 6   Q.   And the question that you answered under oath was:  "When

 7   you made the decision to run to the east side of the property,

 8   were you aware of what was going on with Agent Burns,

 9   Sandoval, and the defendant?"  And you answered, "No."

10        Correct?

11   A.   Correct.

12   Q.   And then he asked, "Could you hear what they," "they"

13   being Agent Burns, Agent Sandoval, and the defendant, "Could

14   you hear what they were saying?"

15        And you answered, When Scott approached, I couldn't

16   really make it out, something about not having the right to be

17   here?

18   A.   Yes.

19   Q.   Now, you're not suddenly claiming that when Scott

20   approached with Agent Burns, that Scott said something about

21   not having the right to be here, are you?

22   A.   I guess I was confused.

23   Q.   You were confused when you testified under oath that you

24   heard Scott Warren say to the agents something about not

25   having the right to be here.  Is that when you were confused?

1    A.    I understood it as when Scott Warren approached me where

2    I was on the east side of the house, with Agent Burns.

3    Q.    Well, that's not what happened, is it?

4    A.    That's what I understand.

5    Q.    Well, that's not what you put in your report, that

6    Dr. Warren was saying anything about not having the right to

7    be there while he approached with Agent Burns, is it?

8    A.    I don't remember.

9    Q.    You don't remember because that's not what you put in

10   your report; correct?

11   A.    I don't remember.

12   Q.    Well, let's take a look at your report.  You wrote a

13   report on the 17th of January; right?

14   A.    Yes.

15   Q.    And have you reviewed the report?

16   A.    Yes.

17   Q.    And what you wrote was, Because -- I'm showing you your

18   report here.

19   A.    Okay.

20   Q.    Because he ran from me, I ordered him to show his hands

21   and then instructed him to sit down.  Shortly thereafter, BPA

22   Burns arrived accompanied by Warren.  I witnessed BPA Burns

23   conduct an immigration on the subject in the blue hooded

24   sweater.  But you don't say anything in there whatsoever about

25   Dr. Warren, at any point in time there, as he approaches with

1  Agent Burns saying the words or anything to the effect of:

2  You don't have the right to be here?

3  A.    I don't.

4  Q.    You didn't write that in your report, did you?

5  A.    No, I did not.

6  Q.    And what you testified to on the 14th is that you

7  overheard Dr. Warren say something about the agents not having

8  the right to be there when you were on the east side -- I'm

9  sorry, the west side of the property before ran to the east

10  side; correct?

11  A.    Can you say that again?  I'm sorry.

12  Q.    What you testified to on the 14th of June was that when

13  you were here on the west side of the property, before you ran

14  to the east side of the property, you overheard Dr. Warren say

15  something to the effect of the agents not having the right to

16  be on the property?

17          MR. WALTERS:  Objection, your Honor; asked and

18  answered.  He's already testified that he heard that on the

19  east side of the property.

20          MR. KUYKENDALL:  That's not at all what he's

21  answered.

22          THE COURT:  Overruled.

23          MR. KUYKENDALL:  He's said several things and I have

24  a right to clarify.

25          THE COURT:  Overruled.

1    BY MR. KUYKENDALL:

2    Q.    So what you testified to on the 14th of June was that

3    when you were here, where my finger is, on the west side of

4    the property, you overheard Dr. Warren tell the agents that

5    were further south something to the effect of this was private

6    property and they needed to leave?

7    A.    Did I say that?

8    Q.    Did you testify under oath to that on the 14th of June?

9    A.    Yes, I did say that.

10   Q.    Were you lying?

11   A.    No.

12   Q.    You also testified on the 14th of June that you were

13   following a knock and talk procedure that was issued by the

14   Border Patrol; right?

15   A.    Yes.

16   Q.    In fact, what you testified to was that there was a

17   station-specific policy about knock and talk, not just the

18   Border Patrol general policy about knock and talk; right?

19   A.    Right.

20   Q.    And it turns out that that's not true.  That there is no

21   station-specific policy; correct?

22   A.    No, I guess it's not.

23   Q.    You guess I'm right, that there is no station-specific

24   policy?

25   A.    No, I've never seen any station-specific policy.

1    Q.   But you testified on the 14th of June that there was a

2    station-specific policy; right?

3    A.   Yes.

4    Q.   And in fact, what there is, is there's a Border Patrol

5    general policy that is Exhibit 122 that I'm showing you.  Have

6    you seen this general policy issued by Former Chief David

7    Aguilar?

8    A.   Yes.

9    Q.   And are you aware of Procedure 6.7 in particular that

10   says:  When conducting a knock and talk, Border Patrol agents

11   will obtain the consent of an adult occupant who is or appears

12   to be in control of the residential dwelling or private

13   business premises.  However, if one occupant voluntarily

14   consents to entry or search but a co-occupant objects or

15   otherwise refuses consent, then Border Patrol agents shall not

16   proceed with the knock and talk and will immediately leave the

17   premises.

18        Are you familiar with Procedure 6.7?

19   A.   Yes.

20   Q.   What, if anything, did you do prior to getting on to the

21   property of the barn to determine what legal right Dr. Warren

22   had to be on those premises?

23   A.   Can you restate the question, please?

24   Q.   What, if anything, did you do prior to going onto the

25   property of the barn on January 17 to determine what legal

```
 1   right Dr. Warren had to be on that property?

 2   A.    I just knew that he didn't live there.

 3   Q.    You knew that he showed up there; right?

 4   A.    Yes.

 5   Q.    You had observed that he drove his vehicle onto that

 6   property; right?

 7   A.    Yes.

 8   Q.    You observed that he parked and walked around the

 9   property; right?

10   A.    Yes.

11   Q.    You saw that he walked inside the property; right?

12   A.    Yes.

13   Q.    You saw he came -- by "property," I mean the actual

14   dwelling.

15   A.    Yes.

16   Q.    You saw him go in to the dwelling?

17   A.    Yes.

18   Q.    You saw him come out of the dwelling?

19   A.    Yes.

20   Q.    You didn't see anything to indicate that he was

21   trespassing; correct?

22   A.    No.

23   Q.    And you made no effort to interview Dr. Carol Johnson,

24   the legal owner of the property; correct?

25   A.    No.
```

1    Q.    Correct?

2    A.    Correct.  I never made any effort to talk to Dr. Carol

3    Johnson.

4    Q.    Let me show you Exhibit 122 again, which is the knock and

5    talk policy, the revised knock and talk policy issued by Chief

6    David Aguilar; is that correct?

7    A.    Yes.

8    Q.    And I'd like you to read out loud what the definitions of

9    "occupant" and "co-occupant" are per the knock and talk

10   policy.

11   A.    4, occupant:  A person who resides in a dwelling and

12   exercises dominion and control over it.  4.4, co-occupant:  A

13   person who resides in a dwelling or has the right to use and

14   enjoy the dwelling as if he or she were the sole owner.

15   Q.    And I believe you testified, but correct me if I'm wrong,

16   that you were aware of this knock and talk policy before you

17   engaged in this, quote, unquote, knock and talk on January 17;

18   right?

19   A.    Yes.

20            MR. KUYKENDALL:  Move for the admission of 122.

21            MR. WALTERS:  We would object, your Honor, in that

22   it is not a public document, which is why it has been redacted

23   in it's disclosure to the defense.

24            MR. KUYKENDALL:  If it's been redacted, then it

25   should be admitted.

1          THE COURT:  It will be admitted under seal.

2          (Exhibit 122 entered into evidence.)

3    BY MR. KUYKENDALL:

4    Q.   Let's talk a little bit more about the knock and talk

5    procedure.

6          One of the things that the knock and talk procedure --

7    that you needed to follow as a Border Patrol agent was to

8    secure the perimeter; is that right?

9    A.   Yes.

10   Q.   And you do that in order to make sure that nobody can

11   escape?

12   A.   One of the reasons, yes.

13   Q.   What are the other reasons?

14   A.   Make sure no one else comes in.

15   Q.   And in this instance, you and/or Agent Burns, while you

16   were across the street using the spotting scope, while you

17   guys were over there you called in and got a number of agents

18   to arrive on the premises; right?

19   A.   I did not call.

20   Q.   Did you ask Agent Burns to?

21   A.   Yes.

22   Q.   And you're aware that Agent Burns did?

23   A.   Yes.

24   Q.   And were you aware that Agent Burns was also sending out

25   texts?

MARQUEZ - CROSS

1   A.   Yes.

2   Q.   And do you know why he was sending out texts instead of

3   just using the radio?

4   A.   Because it wasn't feasible to update our supervisor about

5   what was going on.

6   Q.   You couldn't get to the supervisor via radio.  You had to

7   use texts, is that what you're saying?

8   A.   Yes.

9   Q.   So you knew that Agent Burns was sending texts to -- is

10  it Vargas?  Is that the name the supervisor?

11  A.   Yes, it's Vargas.

12  Q.   Is that Desi or Desiree?

13  A.   He goes by either/or.

14  Q.   Pardon?

15  A.   Either one.

16  Q.   So Desi Vargas is the name of the supervisor that

17  Agent Burns contacted via text; right?

18  A.   Yes.

19  Q.   And the reason that he was contacting him was in order to

20  get Agent Vargas -- Supervisor Vargas to make sure there were

21  additional officers on site?

22  A.   Just to run it up the chain of command, yes.

23  Q.   And by that do you mean that you needed Supervisor Vargas

24  to go above him, up the chain of command to get permission to

25  do a knock and talk?

1  A.   Yes.

2  Q.   So that was the purpose of Burns contacting Vargas;

3  right?

4  A.   Yes.

5  Q.   And then an additional purpose of Burns contacting Vargas

6  was so that Vargas would get additional agents to come to the

7  site; right?

8  A.   I believe so.

9  Q.   And you believe part -- well, tell me this:  Is part of

10  the reason you believe that is because it's policy?  It's part

11  of the Exhibit 122 Border Patrol policy relative to knock and

12  talks to have additional agents on-site?

13  A.   Yes, to help secure the perimeter.

14  Q.   I mean, otherwise just you and Burns might have walked

15  over and done the knock and talk by yourself; right?

16  A.   Probably not.

17  Q.   And why wouldn't you probably not have done that?

18  A.   We needed more agents to secure the perimeter.

19  Q.   So again, taking a look at Exhibit 75-A, sorry, you and

20  Burns walked along, came in to beyond the gate here, as well

21  as several other cars with agents that pulled in to this

22  region; is that right?

23  A.   I'm sorry, can you restate that, please?

24  Q.   You and Agent Burns walked in to the -- beyond the gate

25  at the barn, south of the gate; right?

1   A.   Yes.

2   Q.   And several other law enforcement vehicles drove in to

3   the gate -- I'm sorry, drove in south of the gate; right?

4   A.   Yes.

5   Q.   And the reason that they were there was to provide

6   security; correct?

7   A.   Yes.

8   Q.   Because you don't do a knock and talk without security?

9   A.   Correct.

10   Q.   You need to have a plan; correct?

11   A.   Yes.

12   Q.   I mean, the plan needs to be something to the effect of

13   somebody will be here, another person will be here, another

14   person will be here.  But we don't just run in; we have a

15   plan?

16   A.   Yes.

17   Q.   And that's why all of you initially approached, and

18   that's why you were able to hear Dr. Warren say something to

19   the effect of:  All of you, this is private property.  I don't

20   want you here; correct?

21   A.   No, I don't understand.

22   Q.   The reason you were able to overhear Dr. Warren tell them

23   something to the effect that this is private property, get

24   out, is you approached along with the others as part of a mass

25   of officers there for security purposes?

1    A.   No, I did not go with the other officers to make contact

2    with Mr. Warren at first when we made entry onto the property.

3    Q.   Are you aware of Procedure 6.6 of Border Patrol policy

4    relative to knock and talks?

5    A.   If you could put it back up on the screen, please.

6    Q.   (Complied.)

7    A.   Thank you.

8    Q.   And 6.6 says that Border Patrol agents are not required

9    to obtain written consent to enter or search residential

10   dwellings or private business premises, but there will be at

11   least one other Border Patrol agent or law enforcement officer

12   present as a witness to the granting of consent and to ensure

13   officer safety; right?

14   A.   Right.

15   Q.   Were there any additional law enforcement officers that

16   came in to the property behind you so they would have been

17   north of you at the time that Dr. Warren said something to the

18   effect of, This is private property?

19             MR. WALTERS:   Objection, your Honor; form of the

20   question.   It's a lot of facts in there, and he'll have the

21   defense counsel articulate which facts he's specifically

22   asking Mr. Marquez about.

23             THE COURT:   Sustained.

24   BY MR. KUYKENDALL:

25   Q.   When you entered the property and heard Dr. Warren say

MARQUEZ - CROSS

 1    something to the effect of, This is private property, at that

 2    moment were there officers on foot north of you?

 3    A.    North of me?

 4    Q.    Right.

 5    A.    When I heard him say this?

 6    Q.    Right.

 7    A.    I was on the east side of the house when he said that.

 8    Q.    Well, what you testified to earlier was that you were on

 9    the west side of the house.  So assuming that's actually the

10    truth, could you answer the question and say whether there

11    were any officers north of you at that moment?

12    A.    I don't remember any officers being north of me.

13    Q.    And let's go back to when you were on the east side of

14    the house.  You heard a door open and another door slam; is

15    that right?

16    A.    Yes.

17    Q.    And you ran to the furthest southern door; is that right?

18    A.    I made my way over there, yes.

19    Q.    Did you waddle over, did you walk over?  What do you

20    mean?  Did you not run?

21    A.    I don't remember.

22    Q.    You don't remember whether you ran?

23    A.    No.

24    Q.    So how long did it take you to get from the northeast

25    corner of the barn to the entrance to the barn?

```
 1   A.    I don't remember.

 2   Q.    Was it like five minutes?  Five seconds?

 3   A.    Maybe closer to five seconds.

 4   Q.    Were you in a hurry?

 5   A.    Yes.

 6   Q.    So however -- however long it took to you get over there,

 7   did you then beat on the door?

 8   A.    Yes, I did.

 9   Q.    And did you tell the person that you thought was inside

10   to come out?

11   A.    I announced myself and identified myself as a United

12   States Border Patrol agent.

13   Q.    And then did you tell them to come out?

14   A.    I don't remember.

15   Q.    Do you want to take a look at your report and see what

16   you said in your report?  Would that help refresh your

17   recollection?

18   A.    Okay.

19   Q.    Well, actually, as I look at it I'm not sure it will

20   reflect your recollection because you didn't put it in there.

21   Do you realize that?

22   A.    I do now.

23   Q.    So you may have told him to come out, you may have asked

24   him to come out.  You just don't know?

25   A.    I don't remember.
```

1   Q.   And he ultimately opened the door and came out; right?

2   A.   He opened the door and I just told him to sit down where

3   he was.

4   Q.   Actually, what you did was you said, Show me your hands;

5   right?

6   A.   Yes.

7   Q.   Did you say that in Spanish or English?

8   A.   Both.

9   Q.   And did he comply?

10  A.   Yes.

11  Q.   And then you told him to sit down; right?

12  A.   Yes.

13  Q.   And that was the extent of your talk?

14  A.   Yes.

15  Q.   So your knock and talk consisted of you knocking and then

16  you doing all the talking; right?

17  A.   Yes.

18  Q.   Now, after you told him to sit down and he complied, was

19  he free to leave?

20  A.   I suppose if he wanted to.

21  Q.   You mean if he had said, I'm not following your orders,

22  I'm actually going to run west from here, what would you have

23  done?

24          MR. WALTERS:   Objection, your Honor; relevance.

25          THE COURT:   Overruled.

1            THE WITNESS:  I don't know.

2    BY MR. KUYKENDALL:

3    Q.    Do you realize you're under oath?

4    A.    Yes.

5    Q.    And you don't know what you would have done if a person

6    you suspected of being an illegal alien ran away from you?

7    A.    I suppose try to detain him.

8    Q.    Well, if you suppose that and that's the truth, you're

9    obligated to say it because you're under oath, Agent Marquez.

10   A.    Yes, sir.

11   Q.    So what's your testimony if the agent -- I'm sorry, if

12   the migrant had run away from you after you told him to sit

13   down and show his hands, what would you have done?

14   A.    Followed him.

15   Q.    So he wasn't free to leave, was he?

16   A.    I don't know.

17   Q.    He was detained, wasn't he?

18   A.    Yes.

19   Q.    I want to back up for a moment when you're across the

20   street using the spotting scope.

21        You are the only person that supposedly saw Dr. Warren

22   pointing to the north; is that correct?

23   A.    I don't know if Agent Burns also saw him pointing north.

24   Q.    You were looking through the scope when you say that you

25   saw him pointing to the north; right?

```
 1    A.    Yes.

 2    Q.    And did you stay looking through the scope?

 3    A.    I let Agent Burns take a look as well and then I resumed

 4    my surveillance.

 5    Q.    So do you know whether Agent Burns saw anybody -- I'm

 6    sorry, saw Dr. Warren pointing north?

 7    A.    I don't know what he saw.

 8    Q.    Have you reviewed Agent Burns' report?

 9    A.    I don't think so.  It's been a while.

10    Q.    What's the answer, yes or no?

11    A.    Yes, at one point.

12    Q.    You haven't reviewed it lately, but you did review

13    Agent Burns' report?

14    A.    Yes.

15    Q.    Are you aware nowhere in Agent Burns' report does he

16    mention personally seeing Dr. Warren point to the north?

17    A.    I didn't know that.

18    Q.    I want to go back for a moment to the period of time

19    after you had detained the first migrant and after Agent Burns

20    has come around the side of the barn -- the south side of the

21    barn with Dr. Warren, okay.  That's the period of time I'm

22    talking about.

23    A.    Okay.  So can you say that again, please?

24    Q.    So I want to have you focus on this period of time after

25    you told the migrant to sit there and show his hands and after
```

1    Agent Burns has arrived at that scene with Dr. Warren.  Okay?

2    A.   Okay.  So Dr. Warren is on scene and I'm with the first

3    migrant; correct?

4    Q.   Right.  At that moment, is it just the four of you --

5    you, Agent Burns, Dr. Warren, and a seated migrant?

6    A.   I believe another migrant -- after the fact, in

7    hindsight, I believe another migrant was in the bathroom

8    behind the first migrant, and I believe there were at least

9    one other agent nearby, if not two.

10   Q.   Okay.  At that moment before Agent Burns made entry into

11   the barn, you put Dr. Warren under arrest; right?

12   A.   Before Agent Burns went into the barn?

13   Q.   Yes.

14   A.   Yes, I put Dr. Warren under arrest.

15   Q.   And did you put handcuffs on him at that moment?

16   A.   Yes.

17   Q.   And did you keep him there on -- at that scene, there on

18   the east side of the barn?

19   A.   No.

20   Q.   You put handcuffs on him and you walked him back to a law

21   enforcement vehicle; right?

22   A.   Yes.

23   Q.   Do you know what happened while you -- do you know what

24   happened with Agent Burns while you walked Dr. Warren around

25   to the west side of the barn?

```
 1   A.    No.

 2   Q.    How long were you away from the east side, the entrance

 3   to the barn?

 4   A.    Maybe -- I couldn't tell you.  Maybe a minute or two.

 5   Q.    You wanted to get back to the east side of the barn;

 6   right?

 7   A.    Yes.

 8   Q.    So you put Dr. Warren in the police vehicle, and then you

 9   immediately walked back to the east side of the barn where the

10   entrance is to the barn?

11   A.    I put Mr. Warren inside the vehicle.  I put his personal

12   effects on the front seat where he could see them clearly --

13   after the pat-down, of course, being sure he didn't have any

14   weapons or anything like that on him.  I then informed another

15   agent to make sure he stood close by to keep an eye on things

16   while I made myself -- I made my way back to the east side of

17   the building.

18   Q.    And once you got back to the east side of the building

19   did you see Agent Burns?

20   A.    Yes.

21   Q.    And what was he doing at that moment when you got back to

22   the east side of the building?

23   A.    I think they were -- I think they were getting the other

24   illegal alien in custody and getting all that -- searching the

25   other suspects and getting all that situated.
```

1   Q.   So you knew by that point in time, you knew that

2   Agent Burns and another officer had already been inside the

3   barn; right?

4   A.   Only into the add-on bathroom.

5   Q.   Okay.  And did Agent Burns advise you at that moment not

6   to go into the barn?

7            MR. WALTERS:  Objection, your Honor; hearsay.

8            THE COURT:  Overruled.

9            THE WITNESS:  No.

10  BY MR. KUYKENDALL:

11  Q.   So if Agent Burns writes in his report that he loudly

12  advised all of the agents to not go in to the barn, that's not

13  true?

14  A.   I don't remember.

15  Q.   You don't remember what?

16  A.   I don't know what he wrote in his report.

17  Q.   You just know as a fact that Agent Burns didn't tell

18  anybody to not go back in the barn?

19  A.   I don't -- after the add-on bathroom, we went into the

20  barn, into the main structure to do a protective sweep.

21  Q.   Who is "we?"

22  A.   Myself and Agent Burns.  When we came out, I believe

23  that's when he told agents not to go back in to the barn.

24  Q.   Now, when you went in to the barn with Agent Burns, was

25  it just the two of you?

1   A.   I think there was another agent there.

2   Q.   Who?

3   A.   I think it might have been Agent Barbosa.

4   Q.   And were the three of you -- did you have your guns

5   drawn?

6   A.   At first, yes.

7   Q.   And then when did the cameras come out?

8   A.   After the protective sweep.

9   Q.   Who took pictures besides you?

10          MR. WALTERS:  Objection, your Honor; this line of

11   questioning has been asked and answered at the last hearing.

12          MR. KUYKENDALL:  Has not been answered.

13          THE COURT:  It's been answered as to him.  Was

14   somebody else taking pictures?  You can ask about that.

15   BY MR. KUYKENDALL:

16   Q.   Besides you, did anybody take pictures?

17   A.   No.

18   Q.   And did the others know that you were taking pictures?

19   A.   I don't know.

20   Q.   Well, did you take the pictures at the same time they

21   were in the barn with you?

22   A.   Yes.

23   Q.   How could they not know you were in there taking

24   pictures?

25   A.   I don't know.

1    Q.   I mean, realistically they had to have known that you

2    were taking pictures because you're in there with them; right?

3              MR. WALTERS:  Objection, your Honor; argumentative.

4              THE COURT:  Sustained.

5    BY MR. KUYKENDALL:

6    Q.   Well, were you surreptitiously taking pictures?

7    A.   Excuse me?

8    Q.   Do you know what "surreptitiously" means?

9    A.   Secretly taking photos.

10   Q.   Yes.

11   A.   No, I was not.

12   Q.   You weren't secretly taking pictures of things you deemed

13   to being evidentiarily relevant?

14   A.   No, I was not hiding it.

15   Q.   Okay.  And you framed up some pictures, didn't you, and

16   snapped them; right?

17             MR. WALTERS:  Objection, your Honor.

18             THE WITNESS:  Yes.

19             MR. WALTERS:  This entire line of questioning has

20   already been asked and answered.

21             THE COURT:  Sustained.

22   BY MR. KUYKENDALL:

23   Q.   Let me show you -- let me show you what's been marked as

24   Exhibit 114, ask you to identify that.  What is it?

25   A.   Excuse me?

1    Q.   Identify Exhibit 114.  Tell us what it is.

2    A.   This would be a memorandum of investigation.

3    Q.   This is one that you wrote about two weeks after your

4    original report?

5    A.   Yes.

6    Q.   And I believe you testified at the last hearing that you

7    just have no explanation for why you waited two weeks to write

8    this report; is that right?

9    A.   Yes.

10   Q.   You couldn't say one way or another what prompted you two

11   weeks later to write this report?

12            MR. WALTERS:  Objection, your Honor; asked and

13   answered.

14            THE COURT:  Sustained.

15   BY MR. KUYKENDALL:

16   Q.   All right.  I'm going to show you, this is the

17   first page of photographs attached to your report.  Do you

18   recognize that?

19   A.   Yes.

20   Q.   And what is that?

21   A.   It says "trip ideas."

22   Q.   What is it?

23   A.   Trip ideas.  To do's.

24   Q.   I mean, this is when you're in the barn supposedly doing

25   your protective search, you took a picture of this item.

1   What's the item?

2   A.   Of a white board.

3   Q.   So this is a white board that was attached to a wall?

4   A.   Yes.

5   Q.   And then you took another picture.  And is that part of

6   the same white board that's attached to the wall?

7   A.   It appears to be a separate section, but yes.

8   Q.   And then you took a picture of this?

9   A.   Yes.

10  Q.   And then you took a picture of this?

11  A.   Yes.

12  Q.   And then you took a picture of this?

13  A.   Yes.

14  Q.   Besides those five photos, did you take any other

15  pictures?

16  A.   No.

17  Q.   And how is it that the rest of the federal government,

18  whether it be the prosecutors or your supervisors or whoever,

19  how is it that anybody else became aware of the existence of

20  these photos?

21           MR. WALTERS:  Objection, your Honor; asked and

22  answered.

23           MR. KUYKENDALL:  It hasn't been answered,

24  your Honor.

25           THE COURT:  Overruled.

1                THE WITNESS:  Can you restate the question, please?

2   BY MR. KUYKENDALL:

3   Q.   How is it that the rest of the federal government,

4   whether it's your supervisors or whether it's the prosecutors

5   or whoever, how is it that other people became aware of these

6   five photographs that you took inside the barn without a

7   warrant?

8   A.   How did they become aware?

9   Q.   Right.

10  A.   I don't understand what you're trying to ask me.

11  Q.   Well, you waited for two weeks before you even wrote

12  about them; right?

13               MR. WALTERS:  Objection, your Honor; asked and

14  answered.

15               THE COURT:  We know he waited two weeks, so --

16               MR. KUYKENDALL:  I'm just trying to lay some

17  predicate for trying to understand how it is that these became

18  disclosed.

19  BY MR. KUYKENDALL:

20  Q.   So you didn't give them to the prosecutor the day you

21  took them, did you?

22               MR. WALTERS:  Objection, your Honor; asked and

23  answered and relevance at this point.

24               MR. KUYKENDALL:  I'm just trying to get him to

25  answer the question.

1          THE COURT:  I understand you want him to answer the

2   question.  The question is why are you asking him, what's the

3   relevance of it?

4          MR. KUYKENDALL:  The relevance is I need to

5   understand how it is his photographs taken on a -- presumably

6   a phone came into the possession of the prosecution two weeks

7   after this -- after the rest of the evidence had been

8   disclosed.

9          THE COURT:  Do you have an answer for that?

10          THE WITNESS:  Can you say that again?

11   BY MR. KUYKENDALL:

12   Q.   How is it that the photographs on your phone got into the

13   possession of others?

14   A.   I don't understand.

15   Q.   Do you know how to send a picture to somebody by phone?

16   A.   Yes.

17   Q.   Did you do that in this case?

18   A.   No.

19   Q.   Did you tell anybody that you had taken pictures?

20   A.   Yes.

21   Q.   Who?

22   A.   Agent Burns, my supervisor, the prosecutors.

23   Q.   And when did you tell Agent Burns?

24   A.   I don't remember.

25   Q.   Did you tell him within two weeks of having taken the

1  pictures?

2  A.    No.

3  Q.    No?

4  A.    No.

5  Q.    You wrote your report two weeks after.  You wrote your

6  report without telling Agent Burns you had taken pictures?

7  A.    No, I believe I told him.

8  Q.    So which is it, either you did tell him or didn't tell

9  him about taking the pictures?

10 A.    I told him -- I'm sorry, can you say that again?  I don't

11 understand what you're trying to ask me.

12 Q.    What I'm trying to ask you is can you tell us when you

13 told Agent Burns about having taken the pictures.  You've

14 testified that you don't know, you've also told us that it was

15 within two weeks.  Which one is it?

16 A.    I can't give you a date.  I don't know.  I don't know

17 exactly when I told him.

18 Q.    Can you tell us when you told the prosecutors that you

19 had taken those pictures?

20 A.    No.  I don't recall the date I told the prosecutors.

21 Q.    Can you say whether it was before or after you told

22 Agent Burns?

23 A.    Probably after Agent Burns.

24 Q.    And can you say when you told your supervisor, Desi

25 Vargas?

1   A.   Excuse me?

2   Q.   Didn't you testify that you told your supervisor, Desi

3   Vargas?

4   A.   Yeah, yes.

5   Q.   So when did you tell him you had taken pictures in the

6   barn?

7   A.   I don't remember the date that I told Supervisor Vargas.

8   Q.   Are you aware of any policy that allows you to take

9   pictures, any Border Patrol policy that allows you to take

10  pictures while you're doing a protective sweep?

11  A.   No, I'm not aware of any policy.

12  Q.   Are you aware of any policy that dictates what you're

13  supposed to do during a protective sweep?

14  A.   No.

15  Q.   Are you aware that the Fourth Amendment says that you

16  don't go inside a home without a warrant unless there's

17  exceptional circumstances?

18          MR. WALTERS:  Objection, your Honor; calls for a

19  legal conclusion.

20          THE COURT:  Sustained.

21  BY MR. KUYKENDALL:

22  Q.   Are you aware of the Fourth Amendment?

23  A.   Yes.

24  Q.   Are you aware that you can't go inside a house without a

25  warrant?

1   A.   Yes.

2   Q.   And are you aware that under certain circumstances an

3   officer can?

4   A.   Yes.

5   Q.   Let's talk about those circumstances.

6        In this instance, what do you consider to be an exigent

7   circumstance that allows you to go inside this house without a

8   warrant?

9   A.   A fleeing suspect or felon, life or death, preservation

10  of life.  What else?  That's all I can think of right now.

11  Q.   Do you know how to get a warrant by making a telephone

12  call?

13  A.   A telephonic warrant?

14  Q.   Right.

15  A.   I've never done one.

16  Q.   Are you aware of how to do one?

17  A.   No, I've never done one.

18  Q.   Are you aware if Agent Burns has ever obtained a

19  telephonic search warrant?

20  A.   I don't know if Agent Burns has ever done a telephonic

21  warrant.

22  Q.   When you decided to go inside the house without a

23  warrant, at that point in time there were at least 10 officers

24  on-site; is that fair?

25  A.   Within the housing, I would say maybe around 10.

1    Q.   So there's at least 10 or approximately 10 inside the

2    gate?

3    A.   No, not all came withinside the gate.

4    Q.   And there were others that were outside the gate?

5    A.   Yes.

6    Q.   And all of those officers were armed; right?

7    A.   Yes.

8    Q.   All of them had radios?

9    A.   Yes.

10   Q.   All of them are in communication or at least could be in

11   communication with one another?

12   A.   Yes.

13   Q.   All of them are trained on how to set up a secure

14   perimeter?

15   A.   Yes.

16   Q.   Did you have any information whatsoever that anybody in

17   the barn was armed?

18   A.   We had no information.

19   Q.   Did you have any information whatsoever that anybody

20   inside or outside of the barn besides Border Patrol agents had

21   a history of violence?

22   A.   I had no information about any subjects having a history

23   of violence.

24   Q.   And apart from the evidence there might be a migrant

25   inside that doesn't have permission to be in the United

1  States, apart from that, did you know of any other evidence

2  that was inside the house that you feared might be destroyed?

3  A.   Excuse me?

4  Q.   Apart from there being a migrant in the house that could

5  be evidence himself, did you know of any evidence inside the

6  house that might be destroyed?

7  A.   I didn't know of any evidence inside the house.

8           MR. KUYKENDALL:  Can I have one minute, your Honor?

9           THE COURT:  Sure.  That's all.

10          MR. KUYKENDALL:  That's all my questions,

11  your Honor.  Thank you.

12          THE COURT:  Any redirect.

13          MR. WALTERS:  Yes, your Honor.  Thank you.

14                    REDIRECT EXAMINATION

15  BY MR. WALTERS:

16  Q.   Agent Marquez, in your career as a Border Patrol agent

17  have you written supplements or addendums before?

18  A.   Yes.

19  Q.   What is the purpose of a supplement or an addendum?

20  A.   The purpose would be to add on additional information

21  that might have come in hindsight or after the fact.

22  Q.   During this incident, did you have a notepad or were you

23  taking notes in any Way.

24  A.   During this incident?

25  Q.   Yes.

1  A.   No.

2  Q.   So when you wrote your report, is it fair to say that you

3  were writing your report based on your memory and your memory

4  alone?

5  A.   Yes.

6  Q.   Have you ever thought of something, say, two weeks after

7  an incident and thought, that should have been in my original

8  report and then wrote a supplement about it?

9  A.   Yes.

10 Q.   Is that something that is routinely done in your

11 profession?

12 A.   Yes.

13 Q.   Do you recall defense counsel asking you if you had

14 spoken to Dr. Johnson prior to conducting your surveillance?

15 A.   I'm sorry, could you say that again?

16 Q.   Sure.  Do you recall defense counsel, I believe it was at

17 the last hearing and I think he touched on it on this hearing

18 as well, about the fact that you did not speak with

19 Dr. Johnson prior to your surveillance on the date of the

20 defendant's arrests?

21 A.   Yes, I remember him asking that.

22 Q.   Is there a reason why you wouldn't speak to a potential

23 suspect or a target of an investigation while there's an

24 ongoing investigation?

25 A.   Yes.

1  Q.   What are those reasons why?

2  A.   Not to -- pretty much preserve what's going on.  You

3  don't want to tip your hand to any suspects in an

4  investigation.

5  Q.   Is it possible that the target or the suspect could tip

6  off other suspects or targets?

7  A.   Yes.

8  Q.   Is it possible that the suspects or target suspects or

9  targets could cease the criminal behavior and stop what

10  they're doing prior to you building enough probable cause for

11  an arrest or an Indictment?

12  A.   Yes.

13  Q.   Is it possible that the suspects or targets could move

14  their operation to another location?

15  A.   Yes.

16  Q.   Do you recall the defense counsel asking you if you

17  believe that an open gate gave you a free pass to enter a

18  driveway?

19  A.   Something to that effect, yes.

20  Q.   And you said yes.  Do you recall that?

21  A.   Yes.

22  Q.   Why do you believe that you have the right as a law

23  enforcement officer to walk through an open gate on to a

24  driveway?

25  A.   To get to the front door of any building.

1    Q.   And why would you use the driveway to get to the front

2    door?

3    A.   It's the only entrance to get to the front door.

4    Q.   Did you believe when you made entry on to the barn that

5    going into the driveway was where the public would go in order

6    to get to the front of the barn?

7    A.   Yes.

8    Q.   When you first made entry on to the property, so right

9    inside the gate, did you hear the defendant yelling or

10   screaming anything?

11   A.   When I first came over, no.

12   Q.   Okay.  Did he yell anything like, Get off my property,

13   you're not allowed to be here, anything like that?

14   A.   When I first came on, no.

15   Q.   Before you reached the east side of the property, the

16   entrance, did you hear the defendant say anything at all?

17   A.   Before I reached the east side, no.

18   Q.   Okay.  In terms of the number of cars that you remember

19   being inside the gate of the property, how many total cars do

20   you recall seeing?  And that would include both law

21   enforcement and civilian cars.

22   A.   When we first made entrance?

23   Q.   Correct.

24   A.   Maybe three.  At least two.

25   Q.   And out of that two or three, how many were civilian

1  cars?

2  A.   We only had one Border Patrol vehicle when we made entry

3  so any additional ones would be civilian vehicles.

4  Q.   And just to clarify, when you say you saw one Border

5  Patrol vehicle when you made entry, do you know if other

6  vehicles made entry after you decided to go to the east side

7  of the property?

8  A.   I don't know.

9  Q.   Okay.  But all you knew is when you went to the property,

10  there was one car in the driveway; right?

11  A.   Border Patrol?

12  Q.   Any car.

13  A.   Yeah.

14  Q.   Okay.  Now, I want to talk a little bit about your prior

15  investigation related to the barn.  Okay?

16  A.   Okay.

17  Q.   What information prior to your surveillance on the day of

18  the defendant's arrest did you have that the barn was

19  potentially being used to stash or harbor illegal aliens?

20      MR. KUYKENDALL:  I object as to the relevance.  The

21  claim is this is a knock and talk which is consensual and has

22  nothing to do with probable cause.

23      MR. WALTERS:  Your Honor, may I be heard?

24      THE COURT:  Yes.

25      MR. WALTERS:  Probable cause goes to the exigency.

 1   Just because an agent has a exigent circumstances doesn't

 2   necessarily allow entry without the accompanying probable

 3   cause.  The last hearing when the defense counsel was asking

 4   Agent Marquez about what other facts he had that related to

 5   whether he knew the illegal aliens were in fact illegal, the

 6   Government's opinion is that was the defense counsel getting

 7   to the idea of probable cause.  So it is absolutely relevant

 8   to the issue of a knock and talk.

 9             THE COURT:  Overruled.

10             MR. KUYKENDALL:  One thing I should point out, your

11   Honor.  My questioning him relative to the migrants and what

12   he observed didn't have to do -- didn't go to probable cause.

13   It had to do with his capacity to tell the truth or not.  It

14   wasn't -- it was -- it had to do with bias and prejudice but

15   not relative probable cause.  Probable cause has nothing to do

16   with a knock and talk, and I would reurge the motions.

17             THE COURT:  Overruled.  You may proceed.

18   BY MR. WALTERS:

19   Q.   Do you need me to repeat the question?

20   A.   Yes.

21   Q.   Prior to your surveillance on the date the defendant was

22   arrested, did you have any information that the barn was being

23   used to stash or harbor illegal aliens?

24   A.   Yes.

25   Q.   And could you tell Judge Velasco some of that information

1    that you knew prior to your surveillance?

2    A.    We had information from residents within the town of Ajo

3    that they suspect --

4            MR. KUYKENDALL:  I'm going to make an objection as

5    to -- excuse me, I stood up again.  Make an objection as to

6    hearsay, and I'd like a continuing objection relative to

7    probable cause.

8            THE COURT:  The objection is overruled.  The

9    continued objection is granted.

10   BY MR. WALTERS:

11   Q.    You can answer.

12   A.    Okay.  I had interviews with local Ajo residents that

13   were concerned that the barn in question was being used to

14   harbor illegal aliens.

15   Q.    And what specifics did those individuals give you about

16   why they believed the barn was being used to stash or harbor

17   illegal aliens?

18   A.    They said they noticed an increase in trash associated

19   with subjects, illegal aliens such as black water jugs and

20   carpet booties.

21   Q.    What are carpet booties?

22   A.    Carpet booties slip on to your shoes.  They're made out

23   of carpet on the bottom.  They're used to mask the tracks left

24   behind of any person walking throughout sand.  It's used to

25   mask their tracks so that as law enforcement officers, we

MARQUEZ - REDIRECT

1    can't follow them.

2    Q.   And by tracks you mean footprints?

3    A.   Yes.

4    Q.   Have you encountered illegal aliens in your experience as

5    a Border Patrol agent that had black water jugs?

6    A.   Yes.

7              THE COURT:  Excuse me, I don't hear that word.  It

8    must be my hearing.  Black?

9              THE WITNESS:  Black water jugs, is that what you're

10   asking?

11             THE COURT:  Black water jugs.

12             MR. WALTERS:  Sorry, your Honor.

13             THE WITNESS:  Yes.

14   BY MR. WALTERS:

15   Q.   And in your experience as a Border Patrol agent, have you

16   come across illegal aliens who were wearing carpet booties or

17   had carpet booties in their possession?

18   A.   Yes.

19   Q.   I just wanted to clarify something about your

20   cross-examination.  Do you recall how many time passed between

21   the time you first made entry on to the property through the

22   gate to when you ended up on the east side of the property?

23   A.   How much time had elapsed?

24   Q.   Correct.

25   A.   I don't know.

MARQUEZ - REDIRECT

1   Q.    Okay.  Would you say it was more or less than a minute if

2   you had to guess?

3   A.    Less than a minute.

4   Q.    Less than 30 seconds or more?

5   A.    Less than 30 seconds.

6   Q.    Is it safe to say it happened very quickly?

7   A.    Yes.

8   Q.    Why did you -- when you made -- when you got to the east

9   side of the property and Mr. Perez-Villanueva opened the door,

10  why did you order him to put his hands up and sit down?

11  A.    To clear his hands, make sure he had no weapons in his

12  possession.

13  Q.    Was there anything about Mr. Perez-Villanueva's decision

14  to run to the back of the house that influenced your decision

15  to have him sit down or keep his hands where you could see

16  them?

17  A.    Yes.  He was attempting to abscond or conceal himself.

18  Q.    And as a Border Patrol agent, does that make you more

19  concerned that a suspect may lead to -- may attack you or use

20  a weapon of some kind of?

21  A.    Yes.

22  Q.    And why is that?

23  A.    In my experience, going after suspects attempting to flee

24  or abscond, they sometimes are resistant.

25  Q.    And finally, I just wanted to clarify again, when you

1   heard Dr. Warren or the defendant say he could -- or, that you

2   guys could not be there or that you had to leave or whatever

3   he said, where were you standing when that statement was made?

4   A.   I was standing on the east side of the building.

5   Q.   So was that before or after you ordered

6   Mr. Perez-Villanueva to put his hands up?

7   A.   That was after I ordered the subject to sit down.

8              MR. WALTERS:  May I have a moment?

9              THE COURT:  Okay.

10  BY MR. WALTERS:

11  Q.   Agent Marquez, why are black water jugs significant based

12  on your training and experience and what you've seen in your

13  service?

14  A.   Black water jugs are used in lieu of transparent or clear

15  ones.  Black water jugs don't refract light, they're harder to

16  see.

17  Q.   So in other words, if an illegal alien is using a black

18  water jug, it might not create a reflection that would allow

19  law enforcement to see them crossing through the desert, is

20  that what you're saying?

21  A.   Yes.

22             MR. WALTERS:  That's all I have, your Honor.  Thank

23  you.

24             THE COURT:  You may step down.

25             THE WITNESS:  Thank you.

1          MR. KUYKENDALL:  I'm sorry, Judge, can I have one

2   redirect (sic)?

3          THE COURT:  Sure.  He's going to ask you one

4   question.  Listen carefully.

5                          RECROSS-EXAMINATION

6   BY MR. KUYKENDALL:

7   Q.   You testified relative to having reviewed Agent Burns'

8   report, and I want to ask you if this portion of Agent Burns'

9   report corresponds with your recollection.

10         At approximately 1735 hours, I walked up the driveway

11  while BPA Marquez walked to the main door of the structure

12  located on the east side.  In the driveway near the south side

13  of the structure I encountered Warren.  My badge was clearly

14  displayed on a chain around my neck, and I immediately

15  identified myself as a Border Patrol agent.  I informed Warren

16  I was there to investigate illegal alien activity on the

17  property.  Warren stated the property was a humanitarian

18  organization and private property.  He then asked me how I was

19  able to be on private property, to which I replied, Like any

20  other person, I am lawfully permitted to approach a residence

21  for the purpose of knocking on the door to engage the owners

22  in a consensual encounter.  I then asked Warren if he was the

23  owner of the property, to which he replied that he did not

24  wish to answer any questions.  I knew from previous research

25  that Warren was not the owner of the property.  Warren then

 1   stated that he wanted us to leave.  I again asked Warren if he

 2   was the owner of or responsible for the property.  He again

 3   stated he did not wish to answer.  I advised Warren that I

 4   wanted to knock on the door of the structure in attempt to

 5   speak with the owner.  Warren then stated, "I'll go with you."

 6   I then walked with Warren to the east side of the structure

 7   where I observed BPA Marquez had already detained one of the

 8   male subjects.

 9        Is that what I just read of Agent Marquez -- I'm sorry,

10   of Agent Burns' report, does that correspond with your

11   recollection of having read Agent Burns' report?

12             MR. WALTERS:  Objection, your Honor; calls for

13   speculation, foundation, hearsay.

14             THE COURT:  Overruled.

15             MR. WALTERS:  He can decide.

16             MR. KUYKENDALL:  It doesn't call for anything.

17             THE WITNESS:  Say that again?

18   BY MR. KUYKENDALL:

19   Q.   Does that correspond with your recollection of what

20   Agent Burns wrote in his report on January 18?

21   A.   My recollection of reading his report, yes.  I suppose.

22             MR. KUYKENDALL:  That was my single question,

23   your Honor.  Thank you.

24             THE COURT:  Good.  You may step down, sir.

25             THE WITNESS:  Thank you, sir.

1          MS. WRIGHT:  Oh, I'm sorry.  Your Honor, the

2   Government calls Border Patrol agent Brendan Burns.

3          And, your Honor, I believe the agent has already

4   been sworn.

5          THE COURT:  Yes.  You may retake the stand.  You

6   realize under oath, sir?

7          THE WITNESS:  Yes, your Honor.

8          THE COURT:  Thank you.

9        BRENDAN BURNS, GOVERNMENT WITNESS, PREVIOUSLY SWORN

10                      DIRECT EXAMINATION

11  BY MS. WRIGHT:

12  Q.   Agent Burns, please introduce yourself to the Court.

13  Tell Judge Velasco what it is you do and where you do it.

14  A.   My name is Brendan Burns.  I am a U.S. Border Patrol

15  agent currently assigned to the Ajo Border Patrol station, and

16  currently I'm assigned to uniform patrol operation on swing

17  shift.

18  Q.   Agent Burns, how long have you been stationed in Ajo?

19  A.   For seven years and four months, now.

20  Q.   Not keeping count?

21  A.   Yes.

22  Q.   And is that the entire time you've been a Border Patrol

23  agent?

24  A.   Yes, ma'am.

25  Q.   Now, back in January -- on January 17th of 2018, you were

```
 1   still a Border Patrol agent then?
 2   A.   Yes.
 3   Q.   Stationed in Ajo?
 4   A.   Yes.
 5   Q.   At that time, what was your assignment?
 6   A.   I was assigned to the Disrupt Unit.
 7   Q.   What does the Disrupt Unit do?
 8   A.   It's a plainclothes enforcement unit.
 9   Q.   How long had you been with Disrupt at that time?
10   A.   About a year and nine months.
11   Q.   And on January 17th, were you working with the Disrupt
12   Unit?
13   A.   Yes, ma'am.
14   Q.   And you were on duty that day?
15   A.   Yes.
16   Q.   And on that day, what shift were you working?
17   A.   I was working a noon shift.
18   Q.   Now, on that date did you happen to conduct surveillance
19   on a location known as the barn in Ajo?
20   A.   Yes.
21   Q.   Where is the barn located?
22   A.   In on west Snyder Road.
23   Q.   And can you tell us what else is near the barn?
24   A.   Just a couple of other residences.
25   Q.   Is there also open desert near the barn?
```

```
1  A.   Yes.

2  Q.   And who else did surveillance with you?

3  A.   Agent John Marquez.

4  Q.   When did you start surveillance?

5  A.   At approximately 2:00.

6  Q.   And where did you surveil from in relation to the barn?

7  A.   North of the barn, northeast through the desert area.

8  Q.   About how far away were you?

9  A.   Approximately, 2-- to 300 yards.

10  Q.   Why did you choose that spot?

11  A.   Because it was public land and it offered the most

12  concealment for us.

13  Q.   From that spot did you have to use any equipment to see

14  what was happening at the barn?

15  A.   Yes.

16  Q.   What did you use?

17  A.   I used a magnified spotting scope affixed to a tripod.

18  Q.   And for lay people who don't get to use that equipment,

19  what does that look like?

20  A.   It looks like half a set of binoculars.

21  Q.   And if you weren't using the spotting scope, could you

22  still see what was going on?

23  A.   Yes.

24  Q.   And would it be fair to say you used the spotting scope

25  to see detail?
```

1   A.   Yes.

2   Q.   Now, from your position that 2-- to 300 yards northeast

3   of the barn, what portion of the barn and the property could

4   you see?

5   A.   I could see the north side of the building and I could

6   see the eastern part of the property.

7   Q.   Could you see the west of the building at all?

8   A.   No.

9   Q.   Now, prior to starting surveillance on January 17th, did

10  you know anything about the barn?

11  A.   Very little.

12  Q.   What did you know?

13  A.   I knew that it was used by various groups that place

14  water in the desert.  That was about it.

15  Q.   After setting up surveillance on the barn on that day,

16  did you eventually see the defendant exit the barn with two

17  other men?

18  A.   I did.

19  Q.   And how long after surveillance did this happen?  Or how

20  long after you started the surveillance did this happen?

21  A.   Approximately, an hour to an hour and a half afterward.

22  Q.   Can you describe --

23  A.   Excuse me, that's incorrect.  We started at about 2:00,

24  and I saw the defendant exit the barn shortly after 4:30.

25  Q.   And when you saw the defendant and the two men walk out

1   of the barn, can you please describe for us what it is that

2   they did when they came outside?

3   A.   I saw the defendant standing in the open area to the east

4   of the building with the two male subjects, and what I could

5   see was the defendant pointing toward the north desert area

6   into some of the landmarks in that area.  And I could see the

7   two males that were with him looking in the direction that he

8   was pointing.

9   Q.   Let's talk a little bit about what you saw the defendant

10  bring out.  First, were you using the spotting scope at the

11  time or were you not using it?

12  A.   Agent Marquez was using it when he first exited the

13  building, and then I took a look after Agent Marquez informed

14  me that he had seen defendant exit the structure.

15  Q.   You saw the defendant pointing north and pointing to

16  landmarks.  Did you see that through the spotting scope?

17  A.   I did.

18  Q.   Now, let's talk about the landmarks to the north.  What

19  landmarks do you believe were being pointed out?

20  A.   The most prominent is Child's Mountain.  It's a large

21  mountain with some -- some sort of Air Force antennae

22  equipment on the top.  It's a big golf ball looking thing that

23  you can see for miles a way.  There's also a flashing light on

24  top of that.  There's also crater range and several passes

25  through there and the Batamote Mountains to the northeast.

1  Q.   Can you say the last mountains?

2  A.   Batamote.

3  Q.   Thank you.  And is there anything significant to you

4  about those landmarks?

5  A.   Yes.  I worked in that area quite a bit, both on patrol

6  operations and on another specialty unit that worked that

7  area.  We know that those landmarks are often used by illegal

8  alien groups to guide off of as they're proceeding northbound

9  in the United States.

10  Q.   And further north of where the barn is situated, is there

11  also a Border Patrol checkpoint?

12  A.   Yes, ma'am.

13  Q.   And is that situated between the town of Ajo and the next

14  major highway?

15  A.   It's on State Route 85 between Ajo and Gila Bend or I-8.

16  Q.   The two men who came out of the barn with the defendant,

17  could you tell what kind of clothes they were wearing?

18  A.   I could tell they were wearing like baggy sweater.  I

19  remember was blue.  I don't remember the color of the other

20  one.

21  Q.   Was there anything significant to you about the way that

22  they were dressed?

23  A.   It just appeared it was like baggy, kind of loose-fitting

24  clothing, ill-fitting.

25  Q.   Now, at some point in your surveillance, did you decide

1   to approach the barn?

2   A.   Yes, ma'am.

3   Q.   And why did you do that?

4   A.   Based on what I was seeing, specifically the defendant

5   pointing to the areas to the north and based on what

6   Agent Marquez had told me about his investigation to that

7   point, we believed that those persons could possibly be

8   illegal aliens.

9   Q.   And when you decided to approach the barn, what did you

10  expect to accomplish?

11  A.   I expected to knock on the door and try to make contact

12  with the owner, try to gain consensual entry into the building

13  or access to the two portions to conduct immigration

14  inspections.

15  Q.   Before you approached the barn, did you coordinate with

16  other law enforcement officers in the area?

17  A.   Yes.

18  Q.   And did you use a group text to coordinate that

19  conversation?

20  A.   Yes.

21  Q.   And why did you need to coordinate with others?

22  A.   Well, first per policy, I needed to get my supervisor's

23  approval and notify him that we're going to attempt to do

24  what's called a knock and talk on the structure.

25  Q.   Did you have a lot of time to make this plan?

1   A.   No.

2   Q.   And why was that?

3   A.   Because we believed that if they were indeed illegal

4   aliens, we didn't know how long they would be there or if they

5   would try to escape if we approached.

6   Q.   And I think you told us one of the reasons you needed to

7   coordinate was per policy.  Were there other reasons that you

8   needed to coordinate?

9   A.   We needed more people.  We couldn't do it with just the

10  two of us, to effectively secure the site.

11  Q.   Now, when you were texting with this group of agents,

12  what was your mind-set at that time?

13  A.   That we wanted to get there as quickly as we can.  If in

14  fact they were illegal aliens, it was likely that they were

15  going to try to escape, and we just wanted -- and we didn't

16  know how long they would be there.

17  Q.   Now, when you're texting with the other agents, are you

18  writing out long formal sentences and paragraphs?

19  A.   No.

20  Q.   Why not?

21  A.   We just didn't have time for that.

22  Q.   Did you also have concerns about the time of day?

23  A.   Yes.

24  Q.   What were those concerns?

25  A.   We wanted to get there before it got dark.  It's just

1   easier for people to escape from us in the dark.

2   Q.   Now, during that text conversation did you use the phrase

3   TONCs, T-O-N-C-s?

4   A.   Yes.

5   Q.   And what does that phrase mean to you?

6   A.   It's been defined to me as an acronym for somebody who is

7   either temporarily out of the native country or traveling out

8   of native country.

9   Q.   Is that a phrase who applies to people who might look

10  Hispanic?

11  A.   Not at all.

12  Q.   Who can the phrase apply to?

13  A.   To any person from anywhere who is unlawfully present in

14  the United States.

15  Q.   So would it be fair to say that that phrase references

16  immigration status, not race or ethnicity?

17  A.   Only immigration status.

18  Q.   Now, when you used that phrase in the group text

19  conversation, what did you mean it -- what did you use it to

20  mean?

21  A.   As persons suspected of being in the country unlawfully.

22  Q.   And were you trying to use that to reference the race or

23  ethnicity of the people you were observing?

24  A.   Not at all.

25  Q.   Now, during the text conversation did you also type,

1   "We're going to take everyone in regardless"?

2   A.   I did.

3   Q.   What did you type that in response to?

4   A.   That was in reference to the previous exchange with

5   Agent Chris Smith who is currently assigned to ICE's Homeland

6   Security Investigations.  And what I meant by that was we're

7   going take into custody any person whom we had good PC to

8   arrest regardless of the fact if HSI wanted to present that

9   for prosecution for us or if we needed to go through Border

10  Patrol channels to present that for prosecution.

11  Q.   Now, you shared a little bit about Chris Smith being with

12  the prosecutions unit.  You, as a Disrupt agent in Ajo, are

13  there various means you have to present cases to the U.S.

14  attorney's office?

15  A.   Yes.

16  Q.   Could you just describe those briefly for the judge?

17  A.   Yes.  HSI, Homeland Security Investigations, is part of

18  ICE.  They have an alien smuggling group that works out of

19  Sells.  One of our procedures was when we had an alien

20  smuggling event, we would present that case to Homeland

21  Security investigations first to see if, as special agents,

22  they want to present that case for prosecution.  They can

23  either accept and present it themselves, or they can decline

24  it in which time we contact Tucson prosecutions who, in turn,

25  presents that case to the U.S. attorney's office for

1  prosecution.

2  Q.   And just to clarify, if HSI declines to present a case

3  that you've presented to them, then you said Tucson

4  prosecutions is who you present it to?

5  A.   Correct.

6  Q.   And is Tucson prosecutions, is that Border Patrol --

7  A.   Yes.

8  Q.   -- unit?

9       Okay.  Now, when you typed out that sentence, did you

10 mean that regardless of any information you learned, that you

11 were going to arrest everyone at the barn?

12 A.   No.

13 Q.   What did you mean?

14 A.   I meant regardless of whether or not HSI wanted to

15 present that for prosecution, we're going to arrest anybody

16 who we had good PC, good probable cause to believe committed a

17 crime within our law enforcement jurisdiction.

18 Q.   Now, having made plans with your fellow agents at the end

19 of that text conversation, et cetera, did you and Agent

20 Marquez then attempt to make contact with the occupants at the

21 barn?

22 A.   We did.

23 Q.   About what time did this happen?

24 A.   About 5:35 p.m.

25 Q.   I'd like to talk with you a little bit more in detail

1   later about what all happened that day, but first I'd like to

2   give the Court an idea of the lay the land.  And the judge has

3   already seen some of this, but are you generally familiar with

4   the boundaries of the lot that the barn sits on?

5   A.   Yes.

6   Q.   And are you familiar with the buildings and the other

7   features on that lot?

8   A.   Yes.

9   Q.   And let me show you what has already been admitted as

10  Government's Exhibit 75.  Do you recognize, Agent Burns,

11  what's depicted in Government's Exhibit 75?

12  A.   Yes.

13  Q.   What is that?

14  A.   That is the barn.

15  Q.   And can you just kind of describe north, south, east,

16  west as we're looking at this?

17  A.   Sure.  North is at the top of the picture where west

18  Snyder Road is.  West would be to the left as you're looking

19  at it.  East is to the right and south to the bottom.

20  Q.   And the various building there, can you just identify

21  what those are?

22  A.   Yeah.  The main structure with what looks like a tin

23  roof, the largest structure, that is the barn.  The smaller

24  structure just to the left of that is a shed.

25  Q.   Okay.  Now, we'll leave this up here, and if you need to

```
 1    mark on it you can.  But what I'd like for you to do is

 2    explain to the Court how it is that you approached the barn.

 3    A.   I approached the barn by walking up the driveway.

 4    Q.   Okay.  And can you see on here where your position was

 5    for surveillance at all or is it off --

 6    A.   It's not on the picture.

 7    Q.   Okay.  So you approached by walking up the driveway?

 8    A.   Yes.

 9    Q.   And was that through a gate?

10    A.   There was a gate but it was open.

11    Q.   Were there any signs posted on the gate at all?

12    A.   No.

13    Q.   How long did it take you to get from your surveillance

14    position to the gate?

15    A.   Just a couple of minutes.  I don't remember exactly.

16    Q.   Less than five?

17    A.   Yes.

18    Q.   Less than two?

19    A.   Maybe.

20    Q.   Okay.  So maybe somewhere between two and three minutes?

21    A.   Sure.

22    Q.   Now, once you crossed on to the property through the

23    gate, what did you do next?

24    A.   I was -- I had walked up the driveway where I saw

25    Agent Sandoval and Agent Barbosa standing on the south side of
```

1  the structure, on the west side with the defendant, and I

2  approached the defendant there.

3  Q.   So can you please put an X on Government's Exhibit 75

4  where it is you first encountered the defendant or where you

5  first saw him with Agent Sandoval and Barbosa?

6  A.   I don't remember exactly where it was.

7  Q.   Do you remember exactly where it was when you first

8  encountered him and spoke to him?

9  A.   I was in the driveway somewhere on the west side of the

10 structure, but in relation to that shed I just don't remember

11 exactly where it was.

12 Q.   Okay.  So would it be fair to say that it was to the west

13 of the shed?

14 A.   Either to the west or to the north.

15 Q.   Okay.  And when you approached the defendant, did

16 Agent Marquez go with you?

17 A.   No.

18 Q.   What did he do?

19 A.   Agent Marquez proceed directly to what we thought was the

20 front door of the house on the north side.

21 Q.   Okay.  And before Agent Marquez broke off and went his

22 own direction, did you hear the defendant say anything?

23 A.   No.

24 Q.   Did you see anyone else on the property at that time

25 aside from whom you've already told us about?

1  A.    No.

2  Q.    Now, once you reached Agents Barbosa and Sandoval and the

3  defendant, did you engage the defendant in any conversation?

4  A.    I did.

5  Q.    Do you remember that conversation absolutely verbatim

6  today?

7  A.    No.

8  Q.    To the best of your recollection, what did you say to the

9  defendant?

10  A.    I approached the defendant.  I did have my badge on a

11  chain around my neck, and I identified myself verbally as a

12  Border Patrol agent.  I told him I was there to investigate a

13  report of illegal aliens on the property.  At that time the

14  defendant told me that -- I don't remember the exact words,

15  but it was a humanitarian organization or operation.  I'm not

16  sure which words.

17       At that time I asked the defendant if he owned the

18  property, at which time he told me he didn't wish to answer

19  any questions.  He then told me that it was private property

20  and asked me how I could be on private property.  I told him

21  that I, like anybody else, could walk up a driveway and

22  attempt to knock on a door to talk to somebody just as a

23  consensual encounter.

24       At that time the defendant told me he wanted me to leave,

25  and again I asked him if he owned the property.  He again told

1   me he didn't wish to answer any questions.  I then told the

2   defendant that I wanted to go and knock on the door and try to

3   make contact with the owner, at which time the defendant told

4   me, "I'll go with you."

5   Q.   Now, about how long did this conversation last?

6   A.   It was brief.  I would say a minute, no more than

7   two minutes.

8   Q.   And you told us you had your badge visible?  Were you in

9   plainclothes that day?

10  A.   Yes.

11  Q.   Were your armed?

12  A.   Yes.

13  Q.   Was it a service weapon or something else?

14  A.   A service pistol.

15  Q.   You said pistol, so that's a handgun?

16  A.   Yes.

17  Q.   When you're on duty except for maybe if you're ever

18  undercover, are you always armed?

19  A.   Yes.

20  Q.   Why is that?

21  A.   That's policy.

22  Q.   Do you have any safety concerns if you were to try to do

23  your job without being armed?

24  A.   Oh, yes.

25  Q.   What would those be?

1   A.   You never know who else is armed.

2   Q.   And do you know of any other law enforcement agents that

3   ever go on duty aside from being an --

4           MR. KUYKENDALL:  Objection; relevance.

5           MS. WRIGHT:  Your Honor, the defense has, in their

6   briefs, made mention of the agents being armed, and that that

7   was one of the factors they believe went to the constitutional

8   argument.  So I'm just putting out --

9           THE COURT:  Are you required to wear a firearm while

10   you're on duty?

11           THE WITNESS:  Yes, sir.

12           THE COURT:  Go ahead.

13           MS. WRIGHT:  Thank you, your Honor.

14   BY MS. WRIGHT:

15   Q.   Now, can you describe for us the tone of the

16   conversation?

17   A.   It was a casual conversation, like we're speaking now in

18   regular volume.

19   Q.   Would it be fair to call it polite?

20   A.   I believe so.

21   Q.   Now, when you were speaking to the defendant, which

22   direction were you facing?

23   A.   I was facing to the south and maybe a little bit to the

24   southeast.

25   Q.   And which direction was he facing?

1  A.    To the north or to the northwest.

2  Q.    And do you remember where Agents Barbosa and Sandoval

3  were standing?

4  A.    I knew they were there when I approached the defendant,

5  but I don't remember exactly where they were standing, if they

6  were still right next to me while I was speaking with him.

7  Q.    And once you finished up that conversation, what happened

8  next?

9  A.    We began walking to the door on the east side of the

10  property where I encountered Agent Marquez and one of the

11  subjects who we had seen standing with the defendant on the

12  west side of the property.

13  Q.    Okay.  And let's break that down a little bit.  You said

14  you walked to a door on the east side?

15  A.    Correct.

16  Q.    When you were doing your surveillance earlier in the day,

17  did you know that door existed?

18  A.    No.

19  Q.    Why did you decide to go up to the east side of the

20  building?

21  A.    I just walked with the defendant.

22  Q.    Okay.  So did the defendant lead you to the east side?

23  A.    When he said, "I'll go with you," that's where he started

24  walking to and I just walked with him.

25  Q.    About how long did it take you to walk from where you

1  were conversing to where Agent Marquez was?

2  A.   Just a few seconds.  It was a short walk.

3  Q.   And you said when you got there, you saw him with I

4  believe one of the subjects you had earlier seen in

5  surveillance?

6  A.   Correct.

7  Q.   How did you know that was the same person?

8  A.   I just could see he was wearing a blue sweatshirt.

9  Q.   Was that person later identified as Christian

10  Perez-Villanueva?

11  A.   Yes.

12  Q.   Now, what happened once you got to Agent Marquez was?

13  A.   When I got there I could see Agent Marquez standing and

14  Mr. Perez-Villanueva sitting in an open doorway, at which time

15  I conducted an immigration inspection on Mr. Perez-Villanueva.

16  Q.   And for folks who aren't familiar, what does that consist

17  of.

18  A.   I asked him what country he's a citizen, and I asked him

19  if he had documents allowing him to be lawfully present in the

20  United States.

21  Q.   Did you do that in English or in Spanish?

22  A.   I attempted to do it in English at first, but then he

23  responded with just the word "Spanish."

24  Q.   So then did you switch over to Spanish?

25  A.   Yes.

1  Q.   And did he answer your questions?

2  A.   Yes.

3  Q.   And what did he tell you?

4  A.   He told me that he was a citizen of El Salvador and that

5  he didn't have any documents allowing him to be lawfully

6  present in the United States.

7  Q.   Now, let's kind of back up a little bit to when you were

8  speaking with the defendant over near the shed with, Barbosa

9  and Sandoval there before you approached Agent Marquez.  Were

10  aware of what Agent Marquez was doing over away from you?

11  A.   No.

12  Q.   Were you able to be in radio communication with him at

13  that time?

14  A.   No.

15  Q.   And why weren't you able to be in radio communication?

16  A.   I don't know -- I think between the two of us, when we

17  were doing our surveillance, we only had one handheld radio

18  with us.

19  Q.   Would it be fair to say that during that conversation,

20  your attention was on the defendant?

21  A.   Yes.

22  Q.   Now, once you determined that -- and we're going forward

23  in time again.  Once you determined that Perez-Villanueva was

24  in the United States illegally, what happened next?

25  A.   I took him into custody.

1   Q.   How did that happen exactly?

2   A.   I just told him to stand up and turn around and I placed

3   handcuffs on him.

4   Q.   All right.  And then what happened with him?

5   A.   I gave him to one of the other agents there.  I'm not

6   exactly sure who it was.  I'm not exactly sure who it was.

7   Q.   That's okay.

8   A.   I transferred custody of him to another agent.

9   Q.   And do you know what that agent did with him?

10  A.   I didn't see, but later on that subject was in a

11  transport vehicle, so I assumed he walked him away from the

12  barn.

13  Q.   Now, once you hand off Mr. Perez-Villanueva to the other

14  agent what happened next?

15  A.   At that time because that door was open, myself and Agent

16  Barbosa conducted a protective sweep of that room, of the

17  doorway he was sitting.

18  Q.   Before you conducted a protective sweep, did anybody

19  arrest the defendant?

20  A.   Yes.  Agent Marquez placed the defendant in custody

21  immediately after I took Mr. Perez-Villanueva into custody.

22  Q.   Okay.  And then once Agent Marquez took the defendant

23  into custody, did he stay right there with you or did he go

24  somewhere else?

25  A.   I believe he walked the defendant away from the barn.

1   Q.   Okay.   Now, you said you did a protective sweep of the

2   room that Perez-Villanueva was sitting in the doorway of?

3   A.   Yes.

4   Q.   Was Agent Marquez there when you did that sweep?

5   A.   Not of that room, I don't believe so.

6   Q.   Please describe for us -- well, first, did anybody else

7   do the sweep with you?

8   A.   Yes.

9   Q.   Do you know who was with you?

10  A.   It was Agent Barbosa.

11  Q.   And how did you conduct that sweep?

12  A.   I announced myself into the open doorway as a Border

13  Patrol agent, and then I entered that room searching for

14  additional persons.

15  Q.   And could you tell what kind of room that was?

16  A.   It was a small bathroom and laundry room.

17  Q.   And when you announced yourself, did anybody voluntarily

18  come out of that bathroom?

19  A.   No.

20  Q.   Did you have to go into the bathroom?

21  A.   Yes.

22  Q.   And did you ever find anybody in there?

23  A.   I did.

24  Q.   Who did you find?

25  A.   Another subject who we had seen standing out front

1    earlier with the defendant.  His name was Mr. Sacaria-Godoy.

2    Q.    Where did you find him?

3    A.    He was attempting to hide in a stand-up shower.

4    Q.    Now, in your training and experience, can bad things

5    happen if you don't immediately conduct a protective sweep

6    after an arrest?

7    A.    Yes.

8    Q.    What sorts of things can happen?

9    A.    Anybody who believes that they're about to be taken into

10   custody can always be unpredictable.

11   Q.    So when you do an arrest, you always know who else might

12   be behind a closed door?

13   A.    No.

14   Q.    Have you ever personally been attacked by somebody who

15   didn't want to be arrested?

16   A.    Yes.

17   Q.    And would it be fair to say that that's something that

18   you do as a matter of routine?

19   A.    As a matter of routine, officer safety, yes.

20   Q.    All right.  Now, once you encountered Mr. Sacaria-Godoy,

21   did you conduct an immigration inspection?

22   A.    I don't remember if I did that.

23   Q.    Do you know if one was done?

24   A.    Yes.

25   Q.    Do you know what the results of that were?

1    A.    He was a citizen of Honduras, and he was unlawfully

2    present in the United States.

3    Q.    And once the immigration inspection was done, was he

4    taken into custody?

5    A.    Yes.

6    Q.    And what happened with him next?

7    A.    He was also walked out of the structure and brought over

8    to a transport vehicle, I believe.

9    Q.    Okay.  Did you walk him over to the transport vehicle?

10   A.    I did not, no.

11   Q.    What did you do next?

12   A.    From there I conducted a protective sweep of the second

13   room.

14   Q.    And why did you feel it was necessary to conduct a

15   protective sweep of the next room?

16   A.    That doorway was also open, and agents were still working

17   on the property, and we didn't know if any other persons could

18   be hiding inside that room as well.

19   Q.    Well, I mean, you had already taken the defendant into

20   custody, and you had taken the two aliens into custody.  Why

21   did you think there could possibly be anybody else in that

22   building?

23   A.    Who knows.  Who knows if we had seen them all.  I didn't

24   know if we had accounted for everybody or who else would be in

25   there.

1  Q.   And you said you went in another open door.  Where was

2  that in relation to the bathroom door you went into?

3  A.   It was just adjacent to it.

4  Q.   And did anybody else do that sweep with you?

5  A.   Yes.

6  Q.   Who did that with you, if you remember?

7  A.   Agent -- I'm not sure if it was Agent Barbosa, but Agent

8  Marquez was there as well and at least one other Border Patrol

9  agent.

10 Q.   So it was more than just two of you at this time?

11 A.   Yes.

12 Q.   And how did you conduct that sweep?

13 A.   We entered that room in the same way.  That first room

14 was a kitchen and then there's a door that led to a bedroom.

15 Q.   Okay.  And during the time that you conducted that sweep,

16 were you ever separated from the agents who were with you?

17 A.   From John Marquez, yes.

18 Q.   You were.  And when you conducted that sweep, did you

19 have your guns drawn?

20 A.   Yes.

21 Q.   Now, once you did that full protective sweep, did you

22 enter the barn again that day?

23 A.   No.

24 Q.   Did you arrest anyone else other than the defendant and

25 the two -- Mr. Perez-Villanueva and Sacaria-Godoy?

1    A.    No.

2    Q.    Were there other people present on the property?

3    A.    Yes.

4    Q.    Other civilians?

5    A.    Yes.

6    Q.    And you didn't arrest any of those people?

7    A.    No.

8    Q.    Did you enter any other structures on the property that

9    day?

10   A.    No.

11   Q.    And did you leave -- that property later that same day?

12   A.    Yes.

13   Q.    Now --

14         MS. WRIGHT:  Actually, your Honor, if I could have

15   just a moment?

16   BY MS. WRIGHT:

17   Q.    Now, when you were -- I'm going to roll back time again.

18   When you were talking to the defendant by the shed with

19   Agents Barbosa and Sandoval, that first conversation before

20   you went over to Agent Marquez, clear on the time line?

21   A.    Yes.

22   Q.    Okay.  When you were having that conversation, did you

23   ever yell or scream at the defendant?

24   A.    No.

25   Q.    Did the defendant ever yell or scream?

1   A.   No.

2   Q.   During your entire time on the property, did you ever

3   hear the defendant yell, scream, or raise his voice in any

4   way?

5   A.   No.

6   Q.   Did the defendant ever use something that might be like

7   your command voice?

8   A.   I'm sorry?

9   Q.   Did the defendant ever use a tone of voice like a command

10  voice?

11  A.   Oh, no.

12  Q.   Now, I just want to be clear and I'm not sure that I was.

13  When you did your second protective sweep after

14  Mr. Sacaria-Godoy was arrested, did you believe that somebody

15  else could be in the house -- or, in the barn?

16  A.   I thought it was reasonable to believe that there were

17  other persons in there.

18  Q.   And did you think that if -- would it have been possible

19  for those people to pose a danger to you?

20  A.   It could be, yes.

21            MS. WRIGHT:   Okay.   If I could have one more moment,

22  your Honor.

23            That's all I have for right now, your Honor.

24            THE COURT:   When you say there were other people

25  there, do you mean other agents or people that weren't agents?

1           THE WITNESS:  There were other agents and other

2   civilian there as well.

3           THE COURT:  Okay.  Where were they?

4           THE WITNESS:  I encountered those other two

5   civilians near the shed after every person was taken into

6   custody.

7           THE COURT:  Thank you.

8           Go ahead.

9                        CROSS-EXAMINATION

10  BY MR. KUYKENDALL:

11  Q.   Agent Burns, before coming here today, have you reviewed

12  your report?

13  A.   Yes.

14  Q.   Have you reviewed any other reports?

15  A.   No.

16  Q.   Did you review any transcript of the last hearing?

17  A.   No.

18  Q.   Did you talk with Agent Marquez?

19  A.   I've spoken with him since then, yes.

20  Q.   Did he tell you anything about testifying here on

21  June 14th?

22  A.   No.

23  Q.   Nothing?

24  A.   No.

25  Q.   Nothing at all?

1  A.   No, sir.

2  Q.   Did you know he testified that he told you that -- he

3  testified just moments ago that he talked to you about some

4  aspect of his testimony, about what he felt like?

5          MS. WRIGHT:  Objection; calls for the witness to

6  comment on another person's testimony, your Honor.

7          THE COURT:  Sustained.

8  BY MR. KUYKENDALL:

9  Q.   Are you aware that the defendant -- that Agent Marquez

10  testified contrary to what you're testifying right now?

11          MS. WRIGHT:  Same objection.

12          THE COURT:  Same ruling.

13  BY MR. KUYKENDALL:

14  Q.   But you had nothing to do with -- in terms of talking to

15  Agent Marquez, never said anything to him whatsoever, he never

16  said anything to you whatsoever about his testimony?

17          MS. WRIGHT:  Objection; asked and answered,

18  your Honor.

19          MR. KUYKENDALL:  It's not been answered.

20          THE COURT:  Well, he would say -- what was the

21  question?

22          MR. KUYKENDALL:  I asked whether -- now I've

23  forgotten exactly how I asked it.

24  BY MR. KUYKENDALL:

25  Q.   But my question was, is it your testimony that when you

 1   spoke with Agent Marquez since his June 14th testimony, he has

 2   never said anything to you about his testimony or what it was

 3   like to be testifying?

 4   A.   No.  He did tell me, you know, it wasn't an enjoyable

 5   experience, but he didn't get into the details of his

 6   testimony.  I'm sorry, I thought that's what you were asking.

 7   Q.   And have you sent any e-mails about this case to anyone?

 8   A.   Yes.

 9   Q.   To whom?

10   A.   Just during the -- shortly after arrest, to John -- to

11   Agent Marquez, to intel or whoever I was copied to on those

12   e-mails.

13   Q.   You sent e-mails to Agent Marquez?

14          MS. WRIGHT:  Objection, your Honor.

15   BY MR. KUYKENDALL:

16   Q.   Is that what your testimony is?

17          MS. WRIGHT:  This is the subject of the in-camera

18   submission.

19          THE COURT:  He sent e-mails.  There's nothing about

20   them that you need to explore.

21   BY MR. KUYKENDALL:

22   Q.   Besides e-mails to Agent Marquez, who else did you send

23   e-mails to?

24   A.   Nobody that I can remember.

25   Q.   And we have been provided with some of your texts.  And

```
 1   are you aware of what's been provided to us?

 2   A.   I'm aware of what I provided.

 3   Q.   Okay.  I'm going to show you what's been marked -- I'm

 4   sorry, let me show you, it's been marked as Exhibit 112.  And

 5   this is one, two, three four, five, six, seven, eight,

 6   nine pages of texts, and I'm going to ask you about some of

 7   them.  All right?

 8   A.   Yes, sir.

 9   Q.   Fair to assume the ones that say Brendan Burns are you?

10   A.   Yes, sir.

11   Q.   And you are using a cell phone of some nature to

12   communicate with your supervisor; is that right?

13   A.   Yes, sir.

14   Q.   Were you trying to communicate with anybody else by cell

15   phone or just to try to communicate with Agent Vargas?

16   A.   Just the agents on the Disrupt Unit that are in this

17   group.

18   Q.   And on this first page, you advise it looks like about

19   4:38 p.m., "TONCs at the barn;" right?

20   A.   Yes, sir.

21   Q.   And when you wrote "TONCs at the barn," did you -- what

22   you did you intend to mean by that?

23   A.   That we believed there were illegal aliens at the barn.

24   Q.   And the reason that you believe that there were illegal

25   aliens at the barn is why?
```

1    A.   Based on the actions I had seen, the defendant pointing

2    out things north of the property, based on the way the persons

3    were dressed, and based on what Agent Marquez had told me

4    about his investigation up to that point, I believed it was

5    reasonable to suspect that those persons were illegal aliens.

6    Q.   And in fact, what you wrote in your report was the people

7    that you saw with agent -- I'm sorry, that you saw with

8    Dr. Warren, their description was consistent with that

9    description of two migrants from the day before that you heard

10   about being in Ajo the day before?

11   A.   That their description, excuse me, their description

12   would be consistent with two illegal aliens who had been at a

13   house overnight, yes.

14   Q.   You wrote, quote:  These subjects were Hispanic and

15   appeared to be wearing ill-fitting, secondhand clothing.

16   Their appearance was consistent with the descriptions of two

17   suspected illegal aliens who we had been searching for in Ajo

18   the previous day.

19        Is that correct?

20   A.   Yes, sir.

21   Q.   Now, the two that you had been searching for the previous

22   day, what did you know about them?

23   A.   I just knew from the -- from a report that I received

24   that day, the day of the arrest, that there were two subjects

25   that another subject described as Honduran nationals,

1  unlawfully present in Ajo.

2  Q.   Okay.  Honduran nationals unlawfully present in Ajo,

3  that's all you knew about them; right?

4  A.   As far as I know.

5  Q.   You didn't talk to the undocumented migrant that was

6  arrested the day before, did you?

7  A.   I did not.

8  Q.   You didn't talk to either the agent that arrested him or

9  the agent that interviewed him at the station, did you?

10 A.   No.

11 Q.   When did you get the reports that they authored?

12 A.   That day, January 17th.

13 Q.   And in those reports, there's nothing about the

14 description of the two Hondurans other than they're two

15 Hondurans; correct?

16 A.   Correct.

17 Q.   You don't know whether they're male or female?

18 A.   I believe they were male.  I might have heard that if

19 it's not in the report.  But I was under the impression that

20 they were male.

21 Q.   Do you know whether they were old?

22 A.   I did not.

23 Q.   Tall?

24 A.   No.

25 Q.   Fat?

```
1   A.    No.

2   Q.    Short?

3   A.    No, sir.

4   Q.    Handsome?

5   A.    No, sir.

6   Q.    So as you're, what, 500 feet away or so looking through

7   the scope, you see two people; right?

8   A.    Yes, sir.

9   Q.    And Dr. Warren?

10  A.    Yes, sir.

11  Q.    And are these two people brown?

12  A.    They are Hispanic, sir.

13  Q.    They're Spanish?

14  A.    Hispanic, sir.

15  Q.    Hispanic.  Do you use the terminology TONCs to refer to

16  Canadians?

17  A.    We could, sir, yes.

18  Q.    Do you?

19  A.    If I had arrested a Canadian who was unlawfully present

20  in the United States, that would be appropriate.

21  Q.    That's not my question.  Have you ever called a Canadian

22  a TONC?

23  A.    I believe so.  I can't remember a specific instance, but

24  sure.

25  Q.    Have you ever called a German a TONC?
```

BURNS - CROSS

1  A.   I could, sir.

2  Q.   You did or you could?

3  A.   I don't remember specifically the nationalities of the

4  persons I have arrested and used that term to refer to.

5  Q.   What else does TONC refer to besides temporarily

6  origin -- whatever you said.

7  A.   I've heard it defined as temporarily out of native

8  country, true origin not known as spelled differently,

9  traveling out of native country, and most recently I've heard

10 it defined as the sound it makes when somebody is struck with

11 a flashlight.

12 Q.   Do you consider it a derogatory term?

13 A.   No, sir.  I believe that is a misuse of the term.

14 Q.   Have you ever applied it to anybody besides a

15 brown-skinned person?

16 A.   You don't remember, sir.

17 Q.   You recall applying it to brown-skinned people; right?

18 A.   Yes, sir.

19 Q.   But you --

20 A.   Hispanic persons.

21 Q.   But you can't recall applying it to anybody other than

22 somebody that has brown skin?

23 A.   I do -- I know it's come up before and we've said, you

24 know, is this person -- is he TONC?  He's not Hispanic, but I

25 can remember an instance of arresting somebody using that term

1  specifically who is not Hispanic.

2  Q.   Are you familiar with the policy on the -- the Border

3  Patrol policy on knock and talks?

4  A.   Yes, sir.

5  Q.   And part of that policy has to do with making sure that

6  there's multiple agents or multiple persons from law

7  enforcement available; is that correct?

8  A.   Yes, sir.

9  Q.   And that's because you want to be able to create a secure

10  perimeter around wherever you're knocking and talking;

11  correct?

12  A.   Correct.

13  Q.   That's why you contacted Agent Vargas, was to get extra

14  people; right?

15  A.   It was to get his approval.

16  Q.   He gave you his approval and sent extra people?

17  A.   Correct.

18  Q.   Because really, you could have just walked up there and

19  knocked and talked yourself if you weren't following policy

20  and procedure; right?

21  A.   That would be out of policy.

22  Q.   It would be out of policy to not set a perimeter before

23  you knock and talk; correct?

24  A.   If it's possible to set a perimeter, it should be done.

25  I don't know if it's necessary as far as the policy goes.

1   Q.   And that's why in the first place you had all the guys

2   show up with you, is to set a perimeter?

3   A.   Yes, partly.

4   Q.   Scott -- regardless of precisely you remember he said,

5   Scott Warren made clear to you he didn't want you on the

6   property; right?

7   A.   That's correct.

8   Q.   He said it not just to you, but to the other agents that

9   were on the property; right?

10  A.   I don't know.

11  Q.   Well, could they have overheard him?

12          MS. WRIGHT:  Objection; calls for speculation.

13          THE COURT:  Sustained.

14  BY MR. KUYKENDALL:

15  Q.   How close were the other agents standing next to you when

16  Dr. Warren made it clear he wanted you to leave the property?

17          MS. WRIGHT:  Objection, your Honor; the question is

18  vague.  Which agents are we talking about here?

19          THE COURT:  Overruled.

20  BY MR. KUYKENDALL:

21  Q.   That means answer.

22  A.   What was the question one more time?

23  Q.   How close were the other agents standing to you at the

24  time that Dr. Warren made clear to you that he wanted you to

25  leave the property?

1   A.   When I approached Mr. Warren, those two other agents,

2   Agent Sandoval and Agent Barbosa, were standing with

3   Mr. Warren.  They were within just a few feet of him.  But

4   when I was speaking to the defendant, I don't know if they

5   were standing right behind me still or if they were nearby.

6   Q.   When you approached Dr. Warren, Agents Barbosa and

7   Sandoval were right next to him; right?

8   A.   Yes, sir.

9   Q.   And I believe you said this but I want to make sure, the

10  intention when you got there on the driveway was for the

11  Agents to spread out and create a perimeter?

12  A.   I didn't coordinate that.  The other agents coordinated

13  the perimeter.  I was focused on speaking with Mr. Warren.

14  Q.   And after he told you that he wanted you to leave the

15  property, did you?

16  A.   No.

17  Q.   I'm going to show you what's been marked as Exhibit 122

18  and ask you if you've seen this before.

19  A.   I have.

20  Q.   And this has been marked and admitted, and it's the

21  Border Patrol policy on knock and talk; right?

22  A.   Yes, sir.

23  Q.   And specifically, Procedure 6.7 says:  If one occupant

24  voluntarily consents to entry or search but a co-occupant

25  objects or otherwise refuses consent, then Border Patrol

 1   agents shall not proceed with the knock and talk and will

 2   immediately leave the premises.

 3        Are you aware -- were you aware on January 17 of that

 4   policy?

 5   A.   Yes.

 6             MS. WRIGHT:  Your Honor, if we could not have

 7   exhibits up that are not presently being used.

 8             THE COURT:  Sure.

 9   BY MR. KUYKENDALL:

10   Q.   Now, when you were corresponding with your supervisor,

11   you indicated to your supervisor prior to actually arriving on

12   the scene, quote, We're going to take everyone in regardless;

13   right?

14   A.   Correct.

15   Q.   And by take everyone in, that means detain them; right?

16   A.   Correct.

17   Q.   Put handcuffs on them; right?

18   A.   Correct.

19   Q.   And take them to the station; right?

20   A.   Yes, sir.

21   Q.   And by everyone, you mean -- you meant everyone present

22   at the property known as the barn?

23   A.   That's not correct.

24   Q.   Who's everyone?

25   A.   Everyone on whom I had good probable cause to arrest.

1   Q.   But you weren't going in with probable cause; right?

2   A.   No.

3   Q.   You were going in to conduct a knock and talk.

4   A.   Correct.

5   Q.   And you indicated that you were going to take everyone in

6   supposedly after the knock and talk that you developed

7   probable cause to take in; right?

8   A.   I was going to take in anyone at any time if I believed

9   that I had good probable cause to believe that they were

10  engaged in criminal activity.

11  Q.   And why did you need to write that?  Isn't that your job,

12  to arrest people with probable cause?

13  A.   Yes, sir, that's my job.

14  Q.   I mean, isn't this pretty redundant to say I'm going take

15  everyone in regardless?

16  A.   No, because I was being clear to refer to the

17  conversation with Agent Smith.

18  Q.   And can you show us in this text stream where Agent Smith

19  appears and creates this thing you're talking about?

20  A.   He's not on this page.

21  Q.   All right.  I just turned the page.  Is it on that page?

22  A.   No, sir.

23  Q.   All right.  There's a Chris Smith on the next page.

24  A.   You'll see where I specifically say Smitty, something

25  along the lines of look over at your side for prosecution.

1   Q.   And whether Smitty says he's going to look at it for

2   prosecution or not, you are going to take everyone in

3   regardless?

4   A.   I'm going to take everyone in regardless of his side --

5   it's this page here, sir -- whether his side wants to accept

6   prosecution or whether we need to do it through Border Patrol

7   channels.

8   Q.   So Smith says, "I believe Nogales has an investigation on

9   the organization."  Is that what you're referring to?

10  A.   No.  I'm referring to this here (indicating).

11  Q.   I'm sorry, you're referring to what?

12  A.   Where I say, "Smitty, just run it by your side regarding

13  prosecution for these guys, for 1324, harboring and conspiracy

14  for the U.S.C's," and I'm referring to the U.S. citizens.

15  Q.   Sorry, I got lost.  So after you say something to Smitty,

16  then you say we're going to take everyone in regardless;

17  right?

18  A.   Yes, sir.

19  Q.   But well before that, you said, "We'd like to get guys in

20  position to get up and knock it fast before they can bolt"?

21  A.   Yes, sir.

22  Q.   And that meant that you wanted to get guys into a secure

23  surrounding, whatever you want to call that, a secure

24  perimeter around the house to prevent anybody from bolting?

25  A.   To prevent anybody from escaping, yes, sir.

1   Q.   And that's why you went on to the property en masse with

2   all the agents?

3   A.   No, sir.  When I went on the property, the other

4   agents on the property were Sandoval, Barbosa, and Marquez.

5   The other agents set up a perimeter around the property.

6   Q.   And was the intention for you, Barbosa, Sandoval, and

7   Marquez to create a perimeter around the actual structure of

8   the barn?

9   A.   No, my intervention was just to knock on the door, try to

10  make contact with the owner, try to gain access with the two

11  people that I had seen standing with the defendant to do

12  immigration inspections.

13  Q.   And one Scott told you to -- made it clear that he wanted

14  you to leave the property, you did not leave the property at

15  that point?

16  A.   No, sir.

17  Q.   Instead, you went around the corner to the east side of

18  the property, and that's where you ran into the detained

19  migrant seated outside of the barn; right?

20  A.   Yes, sir.

21  Q.   Now, did you personally frisk that migrant?

22  A.   I don't remember, sir.

23          MS. WRIGHT:  Your Honor, if we could not have

24  exhibits up that are not being used.  We're back to that

25  same page.

1                THE COURT:  Okay.  Thank you.

2    BY MR. KUYKENDALL:

3    Q.   Somebody frisked the migrant?

4    A.   Yes, sir.

5    Q.   Somebody determined that he had no weapons; right?

6    A.   I believe so, sir.

7    Q.   You personally observed no weapons; right?

8    A.   I did not.

9    Q.   During that entire time that you were across Snyder

10   looking through the scope, you never saw any evidence of

11   weapons; right?

12   A.   No, sir.

13   Q.   And in your discussions with Burns, he didn't tell you

14   that his investigation had revealed it was a violent

15   organization or anything like that that he was investigating?

16   A.   I am Burns.

17   Q.   I'm sorry.

18   A.   With Mr. Marquez?

19   Q.   With Agent Marquez.  So let me repeat it.

20        In your discussions with Marquez before conducting this

21   knock and talk, you didn't learn anything from Marquez to

22   suggest that it was a violent organization?

23   A.   No, sir.

24   Q.   You had no information at all that there were weapons or

25   anybody was violent; is that fair?

1    A.    That's fair.

2    Q.    You also, by that point in time, by the time you're

3    putting the handcuffs on that migrant, by that point in time

4    you know that there are several law enforcement agents out on

5    Snyder to prevent anybody from getting away?

6    A.    I didn't see them there, but I knew they were on their

7    way or there.

8    Q.    Likewise, you got four agents, at a minimum four

9    agents -- you, Sandoval, Burns -- I'm sorry, you, Sandoval,

10   Marquez, and Barbosa -- right there on scene?

11   A.    Correct.

12   Q.    So when you testified to the prosecution's questions

13   about there being a danger, that's just a generalized danger

14   that you have in the back of your mind in all of these kinds

15   of situations; right?

16   A.    That's correct.

17   Q.    Nothing specific to this situation?

18   A.    No, sir.

19   Q.    Were you aware while Agent -- tell me this:  Are you

20   aware that Agent Marquez took photographs inside the barn?

21   A.    I am.

22   Q.    When did you become aware of that?

23   A.    Sometime later that afternoon.

24   Q.    Was that something that you directed him to do?

25   A.    No, sir.

1    Q.   Was that something you were surprised he had done?

2    A.   I wasn't surprised.

3    Q.   And why weren't you surprised?

4    A.   I just didn't have an opinion about it.

5    Q.   Do you have -- are you aware of any policy that allows

6    for photography during a protective sweep?

7              MS. WRIGHT:  Objection; misstates the testimony.

8              MR. KUYKENDALL:  Didn't misstate anything.

9              THE COURT:  Overruled.

10   BY MR. KUYKENDALL:

11   Q.   Go ahead and answer.

12   A.   I'm not aware of any policy.

13   Q.   Are you aware of any policy at all relative to protective

14   sweeps?

15   A.   No.

16   Q.   Were you ever trained about how to -- what circumstances

17   justify a warrantless entry to do a protective sweep?

18   A.   Yes.

19   Q.   And where were you trained about that?

20   A.   At the Disrupt academy.

21   Q.   And at the Disrupt academy, did they say anything at all

22   about the need to get in and get out?

23   A.   They said the purpose of a protective sweep was to enter

24   and search for any persons who may pose a threat and that's

25   just about it.  That's it.

1  Q.   The purpose of a protective sweep is not to go in and

2  look for evidence, is it?

3  A.   Right.

4  Q.   You didn't have any information whatsoever that there was

5  any evidence inside the barn that might be destroyed, did you?

6  A.   Not at that time.

7  Q.   You wanted to go in and see if there's another person in

8  there; right?

9  A.   Correct.

10  Q.   Are you aware of how to make a telephonic application for

11  a search warrant?

12  A.   No, sir, I'm not.

13  Q.   They didn't teach you that at the academy?

14  A.   No, sir.

15  Q.   Did they teach you that at that thing you just mentioned?

16  A.   I know that -- at the Disrupt academy?

17  Q.   Right.

18  A.   I know that, like, state and local agencies use those,

19  but in my experience I've never seen a Border Patrol warrant

20  done that way.

21  Q.   Well, in your report, you mention, When I entered -- I'm

22  sorry, "When I encountered no other persons, I immediately

23  exited the house and informed other agents who were present

24  that they were not to reenter the structure"?

25  A.   That's correct.

1   Q.   Why did you do that?

2   A.   Because, to my understanding, the purpose of a protective

3   sweep is to search for persons or threats, not to search for

4   evidence.

5   Q.   You testified when the prosecution was asking you

6   questions that at some point in time when you, Barbosa, and

7   Marquez had warrantlessly entered the barn to do a protective

8   sweep, that Marquez became separated from you?

9   A.   Correct.

10   Q.   Is it your understanding that when you're doing a

11   protective sweep that you're to stay together?

12   A.   That would be good policy, good practice.

13   Q.   Well, why?

14   A.   Mr. Marquez entered before me.  And I think when I

15   entered, I entered with Barbosa, and I wasn't exactly sure

16   where Mr. Marquez was at that point.

17   Q.   Are you saying that Agent Marquez entered to do a

18   protective sweep by himself?

19   A.   I don't know if he was with somebody else, but when I

20   encountered him, he was alone there.

21   Q.   Where did you encounter him inside the barn?

22   A.   In the bedroom.

23   Q.   Was he taking pictures at that point?

24   A.   I didn't see him take any pictures, no.

25   Q.   Did you remember whether his gun was unholstered?

1    A.    I don't remember.

2    Q.    What was he doing in the bedroom?

3    A.    I just knocked on the door and announced myself to the

4    door to the bedroom, and I heard his voice and entered that

5    bedroom.

6    Q.    That's pretty dangerous, isn't it?

7    A.    I don't know that it's dangerous.

8    Q.    Well, did you --

9    A.    I communicated with him.

10   Q.    So you went into the barn not knowing whether there

11   was -- I mean, not aware that there was a federal agent

12   inside?

13   A.    Right.   That's correct.

14   Q.    Strikes me as dangerous.   Doesn't it strike you as

15   dangerous?

16   A.    Strikes me as -- I don't know if it's dangerous, but it

17   was -- it could have been planned better.   We could have

18   communicated better.

19   Q.    And you don't know what he was doing inside the barn?

20   A.    No.

21   Q.    Do you know how long he had been inside the barn?

22   A.    No, sir.

23   Q.    No other migrants were found in that portion, that

24   residential portion of the barn; right?

25   A.    No, sir.

1  Q.   The only migrants that were discovered had been

2  discovered, the two guys that you pulled out of the bathroom

3  area?

4  A.   That's correct.  One out of the bathroom area and one out

5  of the doorway outside the bathroom area.

6  Q.   How long have you worked with Marquez?

7  A.   Since I joined the Disrupt -- excuse me, since he joined

8  the Disrupt Unit in the fall of 2016.

9  Q.   Did you -- I'm sorry, I know you told me this, but when

10  did you become aware he had taken pictures?

11  A.   I don't know if it was sometime later that afternoon,

12  back at the station, but I didn't see him take any pictures

13  there.

14  Q.   Did you review -- did he show you pictures on his phone

15  that he had taken?

16  A.   Yeah, later that day.

17  Q.   Did he show you those pictures before you wrote your

18  report?

19  A.   I don't remember if it was while I was writing my report

20  or sometime that afternoon.

21  Q.   Okay.  Well, you wrote your report the next day, didn't

22  you?

23  A.   I wrote my report as soon as I got back.  But I didn't

24  finish it -- we worked into the night.

25  Q.   Okay.  The date on your report is January 18th; right?

1    A.    Yes, sir.

2    Q.    But you're saying that on January 17th, Agent Marquez and

3    you looked at Marquez's phone and you saw the pictures?

4    A.    I believe it was that day, yes, sir.  I'm not sure

5    exactly when.

6    Q.    Is this a fair statement:  You saw the pictures on

7    Agent Marquez's phone before you finished writing your report?

8    A.    I don't remember, sir.

9    Q.    Well, you said that you wrote -- you finished writing

10    your report on the 18th.

11    A.    Correct.

12    Q.    And you testified that you saw the pictures on the phone

13    on the 17th.

14    A.    I believe so.  I'm just not exactly sure.

15    Q.    And nowhere in your report do you mention the fact that

16    you were aware of Marquez having taken pictures inside the

17    structure during the supposed protective sweep; right?

18    A.    I don't remember exactly where I was writing my report

19    when I saw those photos.

20    Q.    And my question is, is there anywhere in your report of

21    January 18th where you document the fact that you were aware

22    of Marquez taking photographs inside the structure?

23    A.    No, sir.

24    Q.    You understand how to write a report, don't you?

25    A.    I do, sir.

1  Q.   It's one of the first things they teach you at the

2  academy; right?

3  A.   They teach that at the academy, sir.

4  Q.   And what you're supposed to put in the report are the

5  important things in a report; right?

6  A.   The important things that I have seen or done, yes, sir.

7  Q.   And you recognize now that it's pretty important that he

8  was inside there taking pictures; right?

9  A.   I believe Agent Marquez wrote that in one of his reports.

10 Q.   My question is you now recognize that that is an

11 important fact?

12 A.   I don't know, sir.

13 Q.   Why did agent -- if you know, why did Agent Marquez write

14 that report two weeks later?

15         MS. WRIGHT:  Objection; calls for speculation.

16         MR. KUYKENDALL:  If he knows.

17         THE COURT:  Well, did Marquez tell you why he wrote

18 a supplemental?

19         THE WITNESS:  No, sir.  No, your Honor.

20         THE COURT:  That's fine.

21         MR. KUYKENDALL:  Can I have one minute?

22         THE COURT:  Sure.

23 BY MR. KUYKENDALL:

24 Q.   I wanted to ask you another couple questions with this

25 Exhibit 122, the policy.

1     You testified you're familiar with this policy; right?

2  A.   Yes, sir.

3  Q.   And you're familiar with the definitions; is that right?

4  A.   I am now.

5  Q.   You are now?  Were you aware of it before you conducted

6  this knock and talk?

7  A.   I know I had seen the policy before and I know I read the

8  policy before, but I don't believe I had those exact

9  definitions committed to memory.

10  Q.   Were you aware that a person who resides in a dwelling or

11  has the right to use and enjoy a dwelling as if she -- he or

12  she were the sole owner, that that person is identified as a

13  co-occupant?

14  A.   I didn't know that co-occupant was exactly defined that

15  way, but that does make sense to me.

16  Q.   At the time that you were questioning -- were -- well,

17  let me start over.

18     At the time of your first interaction with Dr. Warren,

19  were you aware that he did not need to be an owner in order to

20  validly tell you to get off the property?

21          MS. WRIGHT:  Objection; relevance.

22          THE COURT:  Well, it's more of a legal question.

23  Sustained.

24  BY MR. KUYKENDALL:

25  Q.   Were you aware of Dr. Warren's status as a co-occupant?

1  A.   No, I wasn't.

2  Q.   And you're familiar with No. 5.5, that Border Patrol

3  agents are responsible for adhering to this policy and for

4  being cognizant of all applicable laws, rules, regulations,

5  and policies governing consensual entries, consensual

6  questions, and consent searches when conducting knock and talk

7  operations under this directive?

8  A.   I am.

9  Q.   So you agree that you have a responsibility to be aware

10  of this policy whether you were aware of it or not; right?

11  A.   Yes.

12  Q.   And you were also aware that knock and talk requires the

13  consent of the occupant or the owner?

14        MS. WRIGHT:  Objection, your Honor; it's more a

15  legal question, calls for speculation and relevance.

16        THE COURT:  It's a legal question.  Sustained.

17        MR. KUYKENDALL:  That's all my questions.  Thanks.

18        Oh, I'm sorry, I have one more question.

19     (Pause.)

20        MR. KUYKENDALL:  That's all my questions, Judge.

21        THE COURT:  Thank you.

22                    REDIRECT EXAMINATION

23  BY MS. WRIGHT:

24  Q.   Agent Burns, I'd like to go over two areas with you.

25        First, I'd like to talk about your experience with

```
 1    apprehending individuals that you might not have a prolonged

 2    investigation into.

 3         So over your seven years as a Border Patrol agent, can

 4    you give us an approximation of how many people you have

 5    arrested?

 6    A.   Hundreds.

 7    Q.   Would it be fair to say thousands?

 8    A.   It would be fair.

 9    Q.   Okay.  Now, during your years as a Border Patrol agent,

10    have you ever encountered someone who had a weapon, fled, or

11    resisted arrest?

12    A.   Yes.

13    Q.   Let's talk first about the people who have had weapons.

14    Of those people that you encountered that had weapons, did you

15    have prior information that they had weapons?

16    A.   No.

17    Q.   Can people sometimes hide weapons on their person?

18    A.   Yes.

19    Q.   Can they hide weapons nearby that you might not be able

20    to see?

21    A.   Yes.

22    Q.   Are these weapons just as dangerous as the ones you can

23    see?

24    A.   Yes.

25    Q.   Now, let's talk about people who resist arrest.
```

1           MR. KUYKENDALL:  I'm going to object to relevance,

2    Judge.  The Ninth Circuit law is clear that they need to have

3    specific, articulable information relative to a person inside

4    the structure, not just general knowledge.  So this is

5    irrelevant to the issue at hand.

6           THE COURT:  Let's hear it.  Overruled.

7    BY MS. WRIGHT:

8    Q.   So let's talk about resisting arrest.

9           In your experience, do you always know by looking at

10   someone whether or not they're going to fight you when you try

11   to arrest them?

12   A.   No.

13   Q.   Have you at times been surprised that somebody decided to

14   fight you?

15   A.   Yes.

16          MR. KUYKENDALL:  Objection; relevance.

17          THE COURT:  Overruled.

18   BY MS. WRIGHT:

19   Q.   Have those fights ever been dangerous or caused injuries?

20   A.   Yes.

21   Q.   Now, let's talk about the barn in this case.

22          You testified about who you saw come out of the barn that

23   day.  When you approached the barn and walked to that gate,

24   did you know for certain who all was in the barn?

25   A.   No.

1  Q.   Did you have any information that more than three people

2  might be associated with the barn?

3  A.   No.

4  Q.   Did you have any information that multiple people might

5  use the barn on any one day?

6  A.   No specific information.

7  Q.   Okay.  Let's move on now to the last thing that

8  Mr. Kuykendall covered with you about occupant versus

9  co-occupants.

10       Now, in your conversation or prior to entering, crossing

11  through that gate that day, did you have any information about

12  the defendant's use or relationship with the barn?

13  A.   The only thing I knew about the defendant was that he was

14  affiliated with one of the groups that sometimes used that

15  property.

16  Q.   And after speaking with the defendant or at any point,

17  did he indicate to you that he had permission to be there?

18  A.   No.

19  Q.   Did he ever indicate to you that he had status as an

20  occupant there?

21  A.   No.

22  Q.   Did he ever indicate to you that he slept there?

23  A.   No.

24            MR. KUYKENDALL:  I'm going to object to relevance.

25  The legal status of Dr. Warren's relationship to the property

1   is what's relevant, not this officer's knowledge of it.

2           MS. WRIGHT:  And, your Honor, Mr. Kuykendall --

3           THE COURT:  Overruled.

4           MS. WRIGHT:  Thank you, your Honor.  I've only got

5   two more here anyhow.

6   BY MS. WRIGHT:

7   Q.   Did you have -- the defendant indicate to you that he was

8   living there?

9   A.   No.

10  Q.   And did he indicate to you that he was sleeping there?

11  A.   No.

12  Q.   And at any time prior to the entry into the barn or going

13  over to the east side of the barn where Agent Marquez was, did

14  you have any indication that the defendant was any more than a

15  person who used the barn?

16  A.   No.

17          MS. WRIGHT:  Those are all my questions, your Honor.

18          THE COURT:  Okay.  You may step down.

19          Anything further?

20          MS. WRIGHT:  Your Honor, we do have one more

21  witness, but I was going to suggest now might be a good time

22  to take a break.

23          THE COURT:  Well, we're going to have to do more

24  than that.  How much longer do you think this is going to

25  take?

1          MS. WRIGHT:  I think our next witness will probably

2    be a bit shorter than Agent Burns was, but I hate to put

3    numbers out there because it seems to jinx me.

4          THE COURT:  I was thinking half a day, a day,

5    two days.

6          MS. WRIGHT:  Oh, gosh, no, your Honor, an hour,

7    maybe two at the worst.

8          THE COURT:  Are you going to have anything else?

9          MR. KUYKENDALL:  No.

10          THE COURT:  All right.  Let's get half a day from

11    Charlotte.  Tell Charlotte what dates you're available.

12          MR. KUYKENDALL:  I'm sorry, Judge, we had this set

13    for all day, and I traveled from the east coast specifically

14    to be here all day.

15          THE COURT:  Well, then we'll start this afternoon.

16    When am I done?  At 2?

17          THE CLERK:  You don't have anything else.

18          THE COURT:  Oh, I don't?

19          THE CLERK:  No, this is it.

20          THE COURT:  Oh, okay.  We'll come back at 1:30.  I

21    thought I had other matters.

22      (Luncheon recess.)

23      (Proceedings commenced at 1:34 p.m., as follows:)

24          THE CLERK:  We're back on the record in criminal

25    matter 18-223, United States of America vs. Scott Daniel

 1  Warren.

 2          All parties are present.

 3          THE COURT:  All right.  Does the Government have

 4  anything?

 5          MR. WALTERS:  Your Honor, the Government has no

 6  further witnesses.

 7          THE COURT:  All right.  Thank you.

 8          Defense?

 9          MR. KUYKENDALL:  Judge, we don't have any more

10  witnesses.  I'd just request the opportunity to make brief

11  argument.

12          THE COURT:  Okay.  Go ahead.

13          MR. KUYKENDALL:  But to be fair, I do -- not that I

14  want to be fair, but I will be this once.  The prosecution

15  told me they wanted you decide whether I go first or they go

16  first.

17          THE COURT:  You're only going to get to go once, so

18  you decide whether you want to respond or start.

19          MR. KUYKENDALL:  Okay.  I'll respond.

20          THE COURT:  Okay.

21          CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT

22          MR. WALTERS:  Your Honor, whenever there's a

23  warrantless search or seizure of any person or property, the

24  burden shifts at that point to the Government show that the

25  search or seizure was a lawful one under the Fourth Amendment

1    or the Constitution of the United States.  But before that

2    point, we have to make -- the defense has to make a threshold

3    showing of standing.  And the defense has to show that the

4    defendant had a legitimate expectation of privacy, and I think

5    what's important to note is that the defendant had a

6    legitimate expectation of privacy in the place to be searched

7    at the time of the search.

8          And furthermore, the search -- the legitimate

9    expectation of privacy is one that has to be recognized --

10   that society is ready to recognize as reasonable and it is a

11   totality-of-the-circumstances test.  And in this case,

12   your Honor, the defendant has simply failed to meet its burden

13   of showing that the defendant has standing to challenge any

14   constitutional violations that took place at the barn.

15         I'll first start by pointing out we are not in an

16   overnight guest situation in this case because, as you recall,

17   the defendant testified that at the time of the search, he was

18   not staying at the barn, he was not sleeping at the barn, but

19   that he had come and gone in the two to three days prior to

20   his arrest.  There was no evidence, like I said, that he was

21   sleeping at the barn or that he was paying any rent at the

22   barn.

23         There was some testimony that he paid for utilities

24   on occasion, and that he occasionally paid for supplies to fix

25   various things around the barn.  However, it's important to

1  note that the defendant testified that he doesn't pay these --

2  well, he testified that he expects reimbursement or the

3  various groups, organizations that use the barn to reimburse

4  him for those costs.  So he's not paying the utilities or

5  buying supplies out of some sense of ownership of the barn

6  because he expects to get paid in return.

7         Based on the testimony that your Honor heard from

8  the defendant as well as Dr. Johnson, the defendant -- the

9  defendant is nothing more than a caretaker of the barn.  There

10 was evidence that his responsibilities there were to keep it

11 clean, that he is to supervise people who are there, to take

12 the trash out when it's needed, and to perform maintenance on

13 minor jobs around the barn.

14        And finally, your Honor, as it relates to standing,

15 the defendant is just not credible in any way whatsoever.

16 Frankly, the defense seems to change its testimony or its

17 theory of the case depending on what motion is before the

18 Court.  Specifically, in looking at the RFRA motion, and I

19 believe the transcript of that motion was admitted back in

20 June when we had the first part of this hearing, in that

21 situation -- in that hearing the defendant testified that he

22 doesn't know the street address of the barn.  He didn't know

23 it had an address.  In that testimony he was shown pictures of

24 the barn by Ms. Wright and couldn't articulate anything

25 specific because he stated that the barn is constantly

changing because of the various organizations that come in and

reorganize or change the appearance of the barn based on what

their actions or their -- what their missions or anything like

that were.

And the same was true with the shed or the barnlet,

as the defendant testified, but it's important to note that he

couldn't given any specifics about what was in the barnlet

either.  He could only testify about general things that were

located in the shed.

However, for this hearing, for this motion, the

defendant got up and testified that he spends 40 hours per

week on average at the barn.  That some days he's there 24-7.

That on average he sleeps there one time per week.  And that

he spends a lot of his time cleaning and organizing the barn.

The Government would submit to the Court that for someone who

is now saying he spends 40 hours per week, sometimes 24 hours

a day, seven days a week, for him to not be able to articulate

any specifics about what's in the barn, whether it be the

clothing in the shed or the specifics of what is in the barn

including his own personal property, which was not something

that he brought up at the RFRA motion hearing, shows that he

is not credible and again is just frankly just changing his

theory and changing his association to the barn depending on

what motion is before the Court.

Your Honor, the defendant in his reply gave four

1   reasons why he believes that he has standing in this case.

2   The first one was that he has permission from the owner,

3   Dr. Johnson.  And the Government would also submit that

4   Dr. Johnson is also not credible because she has a clear and

5   demonstrable bias in favor of the defendant.  And disagrees

6   with how the border is enforced.  She testified to that.  And

7   to her, illegal aliens are always welcome on her property as

8   long as, she said, I'm paraphrasing, that they were in some

9   type of distress.  What the defendant is alleged to have done

10  in this case falls squarely within what her ideologies are and

11  what she believes should be the enforcement around the border.

12  And as such, there is a clear bias and she is not credible.

13          Even if she is credible, it even seems that in this

14  case the defendant exceeded Dr. Johnson's permission to be on

15  the barn.  She stated that only aliens in distress are allowed

16  to be at the barn, and that can be found at the transcript of

17  her testimony, page 23, line 20.  The Government's position is

18  that these aliens were not in distress.  And you look at the

19  video depositions and the transcripts, these illegal aliens

20  had food, they had water, and there are photographs that show

21  them with food and water prior to getting to the barn; so they

22  were not in distress.  But in any event it's reasonable to

23  infer that based on what Dr. Johnson said in terms of -- no

24  one is allowed to have illegal aliens there unless there are

25  in distress, if these aliens were not in distress, then they

1   should not have been there.  And therefore, the defendant

2   would have exceeded her permission anyway.

3          Frankly, your Honor, all that is irrelevant based on

4   Ninth Circuit precedent.  There is Ninth Circuit precedent

5   where a defendant or a party to a lawsuit had free access to a

6   property with a key, and the Ninth Circuit still ruled there

7   was no standing in that case.  There are several places where

8   any person could be with permission where that person would

9   not have standing.  I could be at my parents' house for

10  example, my siblings' house, it doesn't mean I have standing

11  to allege any constitutional violations at any of those

12  locations.

13         And frankly, your Honor, in looking at the currency

14  case that was cited in the Government's response, in that case

15  the Ninth Circuit ruled where the party, the daughter, did not

16  have a legitimate expectation of privacy even though she had a

17  key to that property, even though it was her parents' house,

18  even though she kept personal property there.  The Ninth

19  Circuit still ruled that that was not enough to demonstrate a

20  legitimate expectation of privacy.

21         THE COURT:  What case was that?

22         MR. WALTERS:  That was the -- it was the U.S. v.

23  40,955 in U.S. Currency.  I was trying to abbreviate just to

24  keep it simple.

25         THE COURT:  That's all right.

1        MR. WALTERS:  It's United States v. $40,955 in U.S.

2  Currency, 554 F.3d 752.

3        Your Honor, I'm going jump a little bit.  The third

4  reason that the defendant gives to demonstrate that he has

5  standing is that he performs a variety of activities at the

6  barn.  His testimony was that he cleans the barn, he

7  organizations the barn, he performs maintenance at the barn,

8  he supervisors people at the barn, et cetera.  And the

9  Government would submit that all of that testimony is

10  irrelevant because it doesn't -- just because you perform

11  activities at a location or various activities at a location

12  doesn't necessarily mean you have standing to allege a

13  constitutional violation.

14        If you analogize that logic to, say, a friend's

15  house where one night I could play poker with them, one night

16  I could watch a movie, one night I could watch a football

17  game, any number of different activities, but I'm coming and

18  going to a friend's house, it doesn't mean that I have

19  standing to assert a constitutional violation.  And that is

20  exactly an analogous logic to what the defendant is arguing in

21  this case.

22        The second and the fourth reasons, your Honor, why

23  the defendant claims he has standing is he has regular

24  presence at the barn and that he has significant personal

25  property.  And significant is a little ambiguous.  I wasn't

1  clear whether he meant significant in terms of quality or

2  significant in terms of quantity, but in any event I do think

3  that those go hand in hand.  And as I pointed out earlier, the

4  defendant seems to change his testimony depending on what

5  motion was before the Court.

6        Specifically, he made statements regarding his

7  personal property and the regular presence for this hearing

8  that were completely contradictory to what one would expect a

9  person to testify at when he testified back in May in the RFRA

10  case, in the RFRA motion.  But again, your Honor, even if he

11  had personal property there or regular presence, again the

12  currency case that I just cited would seem to be a dispositive

13  holding to the defendant's argument.

14        Again, the third -- the daughter in that case had

15  free access to the property just like the defendant.  She had

16  a key to the property just like the defendant.  She had, in

17  that case, -- in that case she had personal property at the

18  house just like the defendant.  Arguably, she had more of an

19  argument for standing because it was her parents' house.  I

20  mean, she would presumably have a relationship with her

21  parents if she kept personal property at their house, but in

22  any event this is not the defendant's parents' house.  It is

23  somewhere where he doesn't even live.  He lives in Ajo

24  some minutes away from the barn.

25        I would like to point out that this case is

1    different from cases like <u>United States v. Davis</u> where in that

2    case the defendant had a key.  He had free access to the

3    property.  However, the distinguishing factors where the Ninth

4    Circuit in that case ruled that the defendant did have

5    standing was the defendant in <u>Davis</u> paid rent, which is not

6    something the defendant was doing, and I think one of the

7    critical pieces of information for the Ninth Circuit in that

8    case was that the defendant, Mr. Davis, kept personal property

9    in a locked safe while at that property.

10          Here, I specifically asked the defendant if he kept

11   his personal property locked in a safe, and he said that, no,

12   anybody was free to take it, use it, possess it, whatever it

13   may be, and for all we know that actually happened.  So,

14   again, all of those -- the fact that he had personal -- the

15   fact that he had personal property or a regular presence there

16   is irrelevant under Ninth Circuit precedent.

17          All in all, the defendant has shown he has minimal,

18   frankly surface-level ties to the barn in this case.  The law

19   does not support the defendant has standing in this case to

20   allege a constitutional violation.  Specifically, the law does

21   not support the proposition the defendant had a reasonable

22   expectation of privacy in the barn, and thus the defendant has

23   not met his burden.

24          Your Honor, even if the Court finds the defendant

25   did have standing, there are exigent circumstances in this

1   case that allowed entry into the barn.  And I first want to

2   just be clear in distinguish between two groups of Border

3   Patrol agents that day at the barn.  The first group was the

4   group of agents that spoke to the defendant.  According to

5   testimony that was Agent Burns, Agent Barbosa, and

6   Agent Sandoval.  And they were located in the driveway of the

7   property which is, frankly, any place that a member of the

8   public could go.  If you look at the pictures that were

9   admitted, if you look at the overheads, the entire property,

10  at least the front, the north side of the property is covered

11  by or is protected by a fence.  The only way to enter the

12  property whether you're law enforcement or whether you're a

13  civilian, a member of the public, is to go through the gate.

14  And if you go through the gate, it puts you in the driveway.

15  There is simply no other place to go, so the agents were more

16  than lawfully able to go onto the driveway.

17          And that first group did not move from that location

18  initially.  They asked the defendant several times,

19  specifically Agent Burns asked the defendant several times if

20  he was the owner of the property.  Mr. Warren repeatedly said

21  he didn't want to answer any questions.  He didn't say -- he

22  didn't ever tell Agent Burns at that point that he was the

23  owner, that he wasn't the owner, that he was sleeping there,

24  not sleeping there, had personal property there.  Nothing to

25  that effect came out in terms of anything that would give

1   Agent Burns, Agent Sandoval, or Agent Barbosa any inclination

2   whatsoever that he is a co-occupant, a occupant, or the owner

3   of the barn.  Frankly, at the very at least, Agent Burns and

4   Agent Marquez knew that Dr. Johnson was the owner of the barn

5   and Dr. -- and the defendant was not the owner.

6        At the end of their conversation there in the

7   driveway, they asked the defendant one more time if he was the

8   owner.  He again refused to answer any questions.  And

9   Agent Burns told him, I'm going to go knock and not door and

10  attempt to speak with the owner.  And then you heard

11  Agent Burns' testimony that it was the defendant who started

12  walking toward that path on the south side of the property

13  which led to the east side of the property where the illegal

14  aliens were arrested that day.

15       The second group, your Honor, is just one, one

16  agent, but it's Agent Marquez.  And in this case, there was an

17  exigent circumstance that allowed him to enter the barn.

18  Specifically, Ninth Circuit case law, specifically the Ojeda

19  case supports the idea that escape is an exigent circumstance.

20  And we were -- you listen to Agent Marquez's testimony, you

21  find out that where he was initially when he saw the illegal

22  alien running through the property was on a path that was just

23  north of the residence, and he looked through a window on the

24  front of the residence.  It was not like he was standing up to

25  the window and putting his face on the glass and looking in.

1   He was standing on a path where it was reasonable to believe

2   that any member of the public could have stood in order to

3   walk up to the entrance.

4        I also think what's important to note about the

5   entrance to the barn is that apparently the true entrance is

6   on the east side of the structure.  There is a door on the

7   north side of the structure, and apparently it is an

8   inoperable door; however, there is a security gate.

9        MR. KUYKENDALL:  I'm going to object to this being

10  outside of the record.

11       MR. WALTERS:  It's in photos, your Honor.

12       THE COURT:  There's photographs of that.  Go ahead.

13       MR. WALTERS:  In any event, it is very -- it was

14  very reasonable for him to infer that that was a place where

15  the public would go to try to knock on the door to make

16  contact with the owner.

17       But even assuming Agent Marquez's intent was to

18  secure the perimeter of the structure prior to conducting a

19  knock and talk, No. 1, that is Border Patrol policy that they

20  are required in order to prevent the escape of a fleeing

21  suspect or to prevent any dangers that may present themselves

22  to agents at the scene, but that they are required to set a

23  perimeter.

24       Regardless of what his intent was, when he actually

25  saw the illegal alien he was standing on a path where any

1    member of the public could be.  The defendant himself

2    testified that he is -- there is a traveled path north of the

3    property where people have walked before.  And, again, that's

4    where Agent Marquez saw the illegal alien through the house

5    start to run toward the southern part of the property.  It's

6    reasonable to walk on a path directly in front of the barn if

7    you are a member of the public, but it's important in this

8    case because the exigency created itself while Agent Marquez

9    was standing on a path where any member of the public could

10   be, and thus there was no constitutional violation that

11   occurred.

12            And also in looking at Kentucky v. King, I believe

13   it is, there was not a situation because of Agent Marquez

14   being in a situation or being in a place where he was not

15   allowed to be that he somehow created the exigency.  And I

16   think that's important to note too, because had he been in a

17   place where he was not allowed to be, had he actually entered

18   the house prior to an exigent circumstance creating itself and

19   then saw the illegal alien running through the house, that

20   would be a situation where the exigency was created by the law

21   enforcement officer's unlawful entry.  But that's not what we

22   have here.  We have a lawful presence on a path where the

23   exigency created itself.

24            And frankly, your Honor, it was reasonable for

25   Agent Marquez to believe that the illegal alien was escaping.

1   I don't know how else to interpret seeing somebody through a

2   window running toward the back of a property when you know

3   there is nothing but desert to the south of the property.  And

4   he also had probable cause to believe that both of these men

5   in the house were illegal aliens.  They have the information

6   about two illegal aliens being in Ajo relatively close to the

7   defendant's arrest.  They had dirty clothing.  They had baggy

8   clothing.  The defendant's action are perhaps the most telling

9   of the probable cause analysis on whether these individuals

10  were illegal aliens because if the defendant is pointing to

11  areas where the Border Patrol agents have experience in

12  arresting illegal aliens and drug traffickers, that would

13  give -- that would give arguably in and of itself enough

14  probable cause to believe those two individuals were in the

15  country illegally.

16          We also have the illegal aliens' demeanor as

17  Agent Marquez testified to.  He testified they were scanning

18  the horizon.  They appeared nervous.  And Agent Marquez also

19  testified about the previous information that he had from

20  other residents in Ajo that the barn was being used to harbor

21  or stash illegal aliens.  So in looking at the totality of the

22  circumstances and all that have information together,

23  Agent Marquez absolutely had probable cause to effectuate an

24  arrest on the two illegal aliens in this case.

25          And that probable cause, coupled with the exigent

1   circumstances of escape allowed him entry into the barn.  I
2   know that there was some testimony with Agent Marquez as well
3   as the material witness depositions on whether Agent Marquez
4   ordered them out of the bathroom or ordered
5   Mr. Perez-Villanueva out of the bathroom or whether he just
6   announced himself as a Border Patrol agent and the illegal
7   alien opened the door, frankly it doesn't matter.  It's
8   completely irrelevant because the exigent circumstances
9   allowed Agent Marquez to enter the structure to arrest
10  Mr. Perez-Villanueva.
11          Finally, your Honor, in terms of the protective
12  sweep, there were aliens or citizens in the bar that could
13  have posed a risk to the agents.  After Mr. Perez-Villanueva
14  was arrested, the Agents had a very good reason to believe
15  that there was at least one other person inside the barn.  And
16  coupled with the information that they had, knowing that the
17  barn had likely been used as a stash house or a place to
18  harbor illegal aliens, it wasn't unreasonable for them to
19  conclude that there could have been additional illegal aliens
20  in the structure.  And that's why a protective sweep was
21  allowed -- or, was lawful in this case.
22          I think it's important to note, too, there was a lot
23  of testimony about Agent Marquez taking pictures inside of the
24  barn.  In his testimony, Agent Marquez specifically noted that
25  he completed the protective sweep and then took pictures of

1    what was inside the barn.  But frankly, it doesn't matter when

2    he took pictures because what the defense tries to exclude in

3    this case, specifically the illegal aliens and their

4    testimonies subsequent to their arrest, those happened as a

5    result of completely lawful entries into the barn and

6    completely lawful arrests after that.

7            In conclusion, your Honor, none of the agents'

8    actions in this case violated the Fourth Amendment.  But

9    before you get to that point, the defendant has not made his

10   threshold standing -- or, showing of standing in order to

11   allege a constitutional violation at the barn.  In terms of

12   the agents' actions, of course they were in the curtilage of

13   the barn.  However, they were in the public areas of that

14   curtilage, meaning where any member of the public could have

15   gone.  That's the only place where they were, and that was the

16   case until the exigency of escape created itself when

17   Agent Burns looked through the window from the path.

18           Again, even if the defendant has standing,

19   your Honor, exigent circumstances with probable cause allowed

20   for a lawful entry and then a subsequent lawful protective

21   sweep.  And in conclusion, the defendant has no standing and

22   the arguments for suppression are without merit.  The

23   Government would respectfully ask the Court deny the motion to

24   suppress.

25           THE COURT:  Let me ask you something.

1          MR. WALTERS:  Sure.

2          THE COURT:  I think they're objecting to the photos.

3    I think they're objecting to the maps that were in the

4    structure -- photos taken of the structure, maps located

5    within the structure, signs that were also on the wall

6    somewhere in the testimony.  That's what they're seeking to

7    suppress.  Would you agree with that?

8          MR. WALTERS:  I do agree with that.  If I could have

9    a minute -- their motion says, Moves this Court to suppress

10   all evidence obtained as a result of a search that violated

11   Dr. Warren's rights under the Fourth Amendment, specifically

12   including two undocumented migrants found inside the barn.  So

13   they are attempting to exclude all of those things.  But I

14   would I agree -- in addition to the items the Court listed, I

15   would agree the defense also seeks to exclude those items.

16         THE COURT:  And you're not aware of anything else

17   you're going introduce?

18         MR. WALTERS:  If I can have a moment, your Honor?

19         THE COURT:  Sure.

20         MR. WALTERS:  Your Honor, just to be clear, in terms

21   of the maps, the signs, the photos, those things that were

22   taken as part of the search warrant, I don't believe the

23   defense is requesting that those be excluded, although I'm

24   sure Mr. Kuykendall can give the Court a better understanding

25   that.  We do plan to introduce some of those items at trial.

1   But in terms of -- I understood photos to mean the photos that

2   Agent Marquez took inside the barn after his protective sweep

3   was completed.  But I just want to be clear which items the

4   Court is talking about.

5           THE COURT:  So there were photos taken by Marquez

6   and photos taken pursuant to the warrant?

7           MR. WALTERS:  Correct, your Honor.

8           THE COURT:  Okay.  And Marquez didn't take the

9   warrant photos?

10          MR. WALTERS:  He did not, your Honor.

11          THE COURT:  Okay.  What, if any, concern should I

12   have about the Border Patrol knock and talk policy?

13          MR. WALTERS:  Your Honor, I don't know -- I don't

14   know enough about -- at this point without further researching

15   whether, for example, setting up a perimeter on the property

16   would be an issue in terms of an illegal search or seizure.

17   However, in looking at this case they followed policy, but

18   that still allowed them -- the exigency allowed them to enter

19   the house, first and foremost.  The exigency along with the

20   probable cause allowed them to enter the house.  So in terms

21   of any concern, that would be the only thing.

22          THE COURT:  What you're saying is, is that Marquez's

23   observations north of the barn by his view through the window

24   of an occupant running away from the window heading south

25   within the barn eliminated the requirement to follow procedure

1   of knock and talk?

2           MR. WALTERS:  Well, I think at that point,

3   your Honor, once the exigency created itself, namely the

4   illegal alien appearing to Agent Marquez that he was going to

5   escape through the south end of the property, at that point

6   the exigency was created.  And Agent Marquez was perfectly

7   well within the bounds of the Fourth Amendment to then enter

8   the structure to arrest or detain Mr. Perez-Villanueva.

9           And correct me if I'm wrong, I don't want to put

10  words in the Court's mouth, but it sounds like the Court is

11  getting more to what Agent Marquez's subjective intent was.

12          THE COURT:  No.  No.  You've got two actors.

13          MR. WALTERS:  Correct.

14          THE COURT:  One is right next to the defendant with

15  witnesses, one is at a distance.  Both are going to accomplish

16  a knock and talk.  Only one of them is aware -- Marquez is

17  aware of the flight.

18          MR. WALTERS:  Correct.

19          THE COURT:  So his circumstance is different than

20  what Burns is doing.

21          MR. WALTERS:  Correct.

22          THE COURT:  Okay.  Anything you want to say.

23          MR. WALTERS:  No, your Honor, unless you have

24  questions.

25          THE COURT:  No.

1           MR. WALTERS:  Thank you.

2           CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

3           MR. KUYKENDALL:  Judge, in terms of the standing

4    issue, I'll rely on the Court to take a look at the transcript

5    and remember precisely what was testified to as opposed to

6    using the prosecution's version of what was testified to.  But

7    in short, it was clear that Dr. Warren testified that he had a

8    reasonable expectation of privacy in the confines of the barn.

9    He had a number of personal items there.  He routinely spent a

10   great deal of time there, 40 hours a week, oftentimes spending

11   the night.  He was not only in charge of the barn, but he kept

12   personal things at the barn.

13           It was also clear from Dr. Johnson's testimony that

14   he had full permission to be there.  In fact, he falls

15   squarely under the Border Patrol's own definition of what

16   would be call a co-occupant.  And it's also important to bear

17   in mind that the Border Patrol's ignorance of his status as a

18   co-occupant has nothing to do with this case.  They run the

19   risk of violating the Constitution by running roughshod over a

20   person and deciding that they don't have enough information

21   from that person because he invokes his rights to not talk

22   with the police, they run the risk of conducting an

23   unconstitutional search because they don't have enough

24   information to determine whether he has standing.  That

25   doesn't mean he doesn't have standing just because they don't

1    have the information, and he's not obligated to provide them

2    with the information.

3           The fact is he had a reasonable expectation of

4    privacy, and they didn't do enough background work to know

5    that.  So they operated under the assumption that they could

6    go inside a home without a warrant, and that he didn't have

7    standing to prevent them from doing so.  And that's not so.

8    Whether they knew that he had standing or not is irrelevant to

9    the Court's analysis.  What's relevant is whether he did have

10   standing independent of their knowledge of his standing.  And

11   he clearly did have standing based on what Dr. Johnson

12   testified to as well as what Dr. Warren testified to.

13          So consequently --

14          THE COURT:  But didn't they try to discern his

15   standing?

16          MR. KUYKENDALL:  They may have tried to discern his

17   standing right there on the spot by asking him to speak to

18   police officers, but he has a absolute right not to speak to

19   police officers.  And we can't trump that right of not

20   speaking --

21          THE COURT:  Wrong time to be using that word.

22          MR. KUYKENDALL:  It normally doesn't leave my lips,

23   and I apologize for it and move to strike my own use of it.

24          THE COURT:  Granted.

25          MR. KUYKENDALL:  But one cannot -- let's call it --

1  I started to say boviate -- but obviate the use of one right

2  over another.

3          Dr. Warren and everybody else in this country is

4  under no obligation to explain to Border Patrol what their

5  rights are or what their -- and to waive a right in order to

6  assert a right.  And that's my point about the Border Patrol's

7  ignorance of his actual standing to assert his rights on that

8  property.  They could have done some research.  They could

9  have done all manner of things.  And if things popped up that

10  inhibited them from doing that, so be it.  Get a warrant.

11  That's what this is all about.  They have the opportunity at

12  every juncture to get a warrant.  And the Fourth Amendment

13  presumes that a search of a home is unreasonable unless

14  there's a warrant.  There's a few exceptions.

15          THE COURT:  No, the house, in and of itself, doesn't

16  have a right not to be searched.

17          MR. KUYKENDALL:  I agree.  But they have a

18  obligation to determine without violating my client's rights

19  whether he has standing.  And, you know, if they don't want to

20  do that, then they don't have to do that, but they run the

21  risk of having the motion to suppress granted.  That's the

22  problem.

23          THE COURT:  To obtain a warrant, do they need to

24  show that he has standing?  They just need to know that a

25  crime is being committed.

1          MR. KUYKENDALL:  Right.  They have to demonstrate

2     there's a reasonable probability that a crime is being

3     committed and the fruits of that crime are inside that house.

4     Doesn't matter who has standing, but you or some other

5     independent third party magistrate makes the decision as

6     opposed to an executive making the decision.  That's what

7     we're here all about.

8          And when they made the decision to not seek a

9     warrant or to not just secure the perimeter, but instead to

10    charge in there and do a warrantless search, that's the risk

11    they ran and now they're paying the piper.  So it's irrelevant

12    whether they had some level of difficulty in devining whether

13    Dr. Warren had standing or not when they decided to go in

14    there without a warrant.  He did have standing.  It's clear

15    from the testimony of both him and Dr. Warren that he had

16    standing.  And I won't give you my version of the facts.  I

17    hope that the Court the looks at the transcript of Dr. Warren

18    and Dr. Johnson's testimony relative to that.

19         I'm going to skip ahead and note that it's important

20    to notice this is the first time that the Government is

21    arguing that the agent did have probable cause.  They're

22    shifting their theory in midstream.  They've always gone under

23    the theory that this was a knock and talk, and there was some

24    level of complied consent given because they have to argue

25    that if there's going to be a knock and talk.  But now they're

1    saying that the exigency which created itself, which is a

2    phrase I'm not familiar with, but the exigency which was

3    created by Agent Marquez when he looked inside a window and

4    the migrant ran in the other direction, they're saying that

5    that exigency gave him probable cause.

6           Agent Marquez testified himself that he did not have

7    probable cause or he did not believe that he had probable

8    cause.  He testified to that when the prosecutor asked him

9    that precise question.  He very clearly said, I didn't believe

10   I had probable cause to arrest.  He was still conducting his

11   version of a knock and talk.  So that's critical to bear in

12   mind.

13          It's also critical to bear in mind that when we're

14   talking about complied consent and whether consent was

15   withdrawn -- not withdrawn but whether consent was not given,

16   it's super clear that Dr. Warren said to the agents on the

17   driveway, You have no permission to be here.  I want you out.

18   In other words, the opposite of consent.  And under the

19   doctrine of collective knowledge, those agents that heard him

20   say that, their knowledge is imputed to Marquez.  And that's

21   Ninth Circuit law.  That's u.S. Supreme Court law, Illinois v.

22   Andreas, 463 U.S. 765.

23          THE COURT:  Is there a sequential factor to that,

24   though?

25          MR. KUYKENDALL:  A sequential factor?

1          THE COURT:  In the sense that he may have been

2    making that statement when they had already -- when Marquez

3    had already arrested one guy when that conversation is still

4    taking place.

5          MR. KUYKENDALL:  Well, in terms of whether that's

6    the sequence that occurred, that's what the Government would

7    like to you believe, but it clearly did not occur in that way.

8          The agents testified that they all came on to the

9    property and with good reason.  They're following -- to a

10   certain extent, at least, they're following their policies and

11   procedures of trying to set up a perimeter, trying to take

12   into account officer safety, and that's why they've got five

13   or six officers inside the curtilage.  And it makes no sense

14   that one of them is just going to tear off as fast as he can

15   outside of the view, apparently without even a radio, go risk

16   life and limb when the other agents are there.  And that's not

17   what happened according to what Dr. Warren very clearly

18   testified to, and it doesn't make sense that's what would have

19   happened.

20         They all came in.  He addressed them all.  He didn't

21   yell at them.  Nobody said that he was yelling.  That's the

22   prosecution saying that.  But he said in a voice that was loud

23   enough for the line of officers to hear, This is private

24   property.  I don't want you here.  You must leave.  In other

25   words, the opposite of consent.  And that knowledge of the

1  absence of consent falls under the doctrine, like I said, of

2  collective knowledge.

3        And it's been used for years in terms of Fourth

4  Amendment with the court holding that officers involved,

5  working in close concert with the each other and knowledge of

6  them, the knowledge of one of them was the knowledge of all.

7  That's just how it works.  So those officers who -- even if

8  you believe, for instance, that Marquez, even though he

9  testified to the opposite, even if you believe that Marquez

10  did not hear Dr. Warren say that you have no consent, the

11  knowledge of the officers that he had no consent and the

12  requirement that they immediately leave the property, that's

13  imputed to Marquez.

14        But there's also no reason to believe that Marquez

15  didn't hear it.  He testified that he heard it.  He also

16  testified -- I'm sorry, Burns testified that the statement to

17  leave the property was made on the west side of the -- west

18  side of the barn where everybody was, not where Burns would

19  have heard it over on the east side of the barn after

20  Dr. Warren and -- I said Burns, I met Marquez, not where

21  Marquez would have heard it when Burns and Dr. Warren came up

22  to him after he detained one of the migrants.  He heard

23  Dr. Warren say something to the effect of, You must leave the

24  property, and the only place he could have heard that was over

25  on west side of the property when he first came in, precisely

1    as Dr. Warren testified as to what occurred.

2         It's also important to point out that the -- again,

3    if there was probable cause as the prosecution's now arguing,

4    then get a warrant.  There's no reason they can't get a

5    warrant.  The property is surrounded.  Nobody is going to be

6    leaving without them aware of it.  If it's getting dark, they

7    could get klieg lights out there.  They can do any number of

8    things to secure the property while they call in a warrant.

9    Whether they know how to do it or not, somebody in the Border

10   Patrol knows how to call in a warrant.  And even if they don't

11   know how to do it, it's irrelevant.  They're supposed to get a

12   warrant.  The Fourth Amendment -- trying not to use the "T"

13   word, but the Fourth Amendment is the operative principle, not

14   whether the agents have the knowledge of how to obtain a

15   warrant.

16        And finally, in terms of talking about -- in terms

17   of talking about the protective sweep, I'm sorry, I didn't --

18   I said finally and I didn't mean to.

19        THE COURT:  I didn't believe it.

20        MR. KUYKENDALL:  I should get rid of that word, too.

21        A protective sweep is not legal unless the

22   Government proves that the officer possessed a reasonable

23   belief based on specific and articulable facts which, taken

24   together with the rational inferences from those facts,

25   reasonably warranted the officer in believing that the area

 1   swept harbored an individual that posed a danger to the

 2   officer and others.  That's Maryland v. Buie, B-u-i-e, Supreme

 3   Court 1990 case.

 4        It's very clear that an officer's generalized fear

 5   of somebody maybe having a gun, or somebody maybe being a

 6   threat or there might be something inside, generalized fear,

 7   even if based on one's experience of generalities and fear

 8   that they've had in the past, that doesn't count for a basis

 9   to warrantlessly enter a place.  Again, we turn back to the

10   standard, the gold standard and the standard which obtains in

11   these United States, is get a warrant.  And if you -- and if

12   you don't have an immediate exigent circumstance which is

13   articulable, then you run the risk of having the defendant's

14   suppression motion granted because it's very clear that one

15   has to have a warrant.  And calling it a protective sweep

16   doesn't somehow sprinkle fairy dust on it and make it all

17   okay.  It's a warrantless entry into the home.

18        So even if you were -- even if you were to say that

19   somehow the arrest of the first migrant comported with either

20   the knock and talk as the Government has asserted up until

21   maybe 10 minutes ago or a probable cause arrest, even if you

22   say that, there's no basis, there's no valid constitutional

23   basis for the agents to then enter the bathroom area or enter

24   into the main house area.  At that moment in time they need to

25   get a warrant or they need to at least be able to do

 1   articulate a specific fear that's based in realty of that

 2   specific locus, not their general fear of getting ambushed

 3   some day.

 4          So unless the Court's got some questions for me,

 5   I'll stop.

 6          THE COURT:  Yes.  I'm going to give you some

 7   characteristics, titles, you tell me which one approaches

 8   client's position.

 9          MR. KUYKENDALL:  Did you say characteristics?

10          THE COURT:  I'm going use some words.  Occupant,

11   handyman, caretaker, tenant, guest, resident, other, what's

12   your definition of what your client is in relation to that

13   property?

14          MR. KUYKENDALL:  I would say he's an occupant.  He's

15   an occupant.  He's the primary person that is on that property

16   routinely.

17          And it is also important, I know this isn't the

18   question that you asked --

19          THE COURT:  It's okay.  It's the answer I'm going to

20   get.

21          MR. KUYKENDALL:  It's like talking to the media.

22   I've got an answer regardless of your question.

23          But we're not just talking about dwelling spaces.

24   The Ninth Circuit has cases full of issue -- full of cases

25   where office spaces, people have a reasonable expectation of

1   privacy within their office.  So we don't have to limit

2   ourselves to deciding whether Scott lived there or what

3   Scott's -- what Scott's overnight-type relationship was to the

4   place.  He kept his stuff there.  He routinely stayed there

5   and spent the night.  He did things to help fix it up.  He

6   took an owner's interest in it.  He had the owner's interest

7   in it.  She encouraged him to treat it like his own, and he

8   did treat it like his own.  So that's where I don't think it

9   needs to be labeled particularly as either a handyman or a

10  occupant or even a co-occupant.

11          What's meaningful is his expectation of privacy and

12  whether in the scheme of things and in the scheme of our

13  jurisprudence it's reasonable regardless of whether we call

14  him a tailor, baker, or shoemaker.

15          THE COURT:  Well, I asked this because I have my own

16  chambers, and I have an expectation of privacy; with limits,

17  but I do.  But I can use any courtroom in this building and

18  people see me use it.  That doesn't mean I have an expectation

19  of privacy.  And I take care of it.  I don't mess up

20  Judge Collins' courtroom.

21          MR. KUYKENDALL:  This is Jorgenson's.  Don't mess up

22  Judge Jorgenson's in particular.

23          THE COURT:  So what I'm asking you, even though I

24  use it, I don't try to harm it.  And I use a lot of the

25  courtrooms.

1            MR. KUYKENDALL:  Well, I don't think that that
2    analogy is especially helpful to this situation because we're
3    not just talking about Scott periodically going to this place
4    and then another time going to this other place and then
5    another time going to this other place as you, an itinerant
6    magistrate judge, are required to do at times.

7            We're talking about two places he has that one could
8    say he reasonably has an expectation of privacy.  One is his
9    home, indisputably.  He lives there, has lived there, keeps
10   all his stuff there.  That is one place.  But another you
11   could define as your chambers.  I mean, if you're going to
12   draw an analogy, that would be the metaphor, the applicable
13   metaphor, a place where he goes to work and he goes there
14   often.  Unlike you, he sleeps there.  He keeps a bunch of his
15   personal gear there.  And, obviously, at some point these
16   metaphors spin out of control and stop making sense, but
17   he's -- his relationship to the barn is one that approximates
18   a second home as much time as he's spending there.

19           But the relationship is not so much important as is
20   the reasonableness of his expectation of privacy, whether this
21   is an apartment or whether it's a bedroom within an apartment.
22   That's what's meaningful is the reasonableness of his
23   expectation of privacy.  I could have an expectation of
24   privacy in some bag that I left in the men's room earlier, and
25   you would have to say if somebody discovered that, could they

1    open it and take a look around?  Sure, because my expectation

2    of privacy in that bag is not reasonable.  But Scott's

3    expectation of privacy in the contents of the barn is

4    reasonable because of his relationship to those consents and

5    to the barn.

6              THE COURT:  Okay.  Thank you.

7              MR. KUYKENDALL:  Thank you.

8              THE COURT:  All right.  All exhibits that have been

9    mentioned in the hearing will be admitted.  Any other

10   housekeeping matters.

11             MR. WALTERS:  Nothing from the Government,

12   your Honor.

13             MR. KUYKENDALL:  No, your Honor.

14             THE COURT:  All right.  Thank you.  We'll stand at

15   recess.

16        (Proceedings concluded at 2:26 p.m.)

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3              I, Cheryl L. Cummings, certify that the

4    foregoing is a correct transcript from the record of

5    proceedings in the above-entitled matter.

6

7                        Dated this 27th day of July, 2018.

8                        /s/Cheryl L. Cummings

9                        Cheryl L. Cummings, RDR-CRR-RMR-CRC-CRI
                         Federal Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25