IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | ) | |
|---|---|---|
| | ) | NO.   CR 18-00223-TUC-RCC(BPV) |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS** |
| | ) | |
| Scott Daniel Warren, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

On April 19, 2018, Defendant filed a Motion to Suppress Evidence Found as a Result of Illegal Search [Doc. 53] and on May 3, 2018, the Government filed its Response [Doc. 63]. Defendant filed his Reply [Doc. 73] on May 17, 2018.

The Court held an Evidentiary Hearing on the matter on June 14, 2018, and July 13, 2018. The Defendant called as witnesses Dr. Carol Johnson and Defendant Scott Daniel Warren. The Government called as witnesses Border Patrol Agents John Marquez and Brendan Burns.

The Court, having considered the briefing, arguments, and evidence presented, recommends that the District Judge, after his independent review and consideration, enter an order **DENYING** Defendant's Motion to Suppress [Doc. 53].

**FACTS**

The Barn is a property located in Ajo, Arizona. The owner is Dr. Carol Ann Johnson, who uses the land for her orchard. The buildings on the property include a residence (the Barn) and a storage shed referred to as the Barnlet.

Dr. Johnson is conflicted by the current immigration policy and its enforcement by the Border Patrol. She is sympathetic to the plight of undocumented migrants in their trek through the desert into the United States. She, consequently, makes her property available as a base camp for any group that has as one of its goals assisting people traversing the desert. This means groups may use the property, including sleeping at the property, in the performance of their humanitarian objectives in locales away from her property.

Dr. Johnson, however, is concerned that her property not be damaged by the activities of these well-meaning groups. Dr. Johnson has allowed Defendant Scott Daniel Warren, Ph.D., use of the property, provided he serve as a liaison/caretaker/handyman whenever he or volunteer groups are using the property. Dr. Johnson requires, through Defendant Warren, the various groups using the property to pay the electric bill. Defendant Warren pays Dr. Johnson, who, more often than not, is reimbursed by No More Deaths (NMD).

Dr. Johnson will allow undocumented persons to stay on the premises if they appear to be in medical distress and if the person granting permission to the undocumented persons calls the on-call doctor for his/her opinion, presumably for a determination that the person is in distress. The Court assumes the on-call doctor would prescribe the method of treatment and duration of recovery time at the Barn.

If the medical distress protocol is not utilized, permission to use the premises is not authorized by Dr. Johnson. In this case, there is no evidence the protocol was used by Defendant Warren.

The Barnlet appears to be secured at all times from entry. The Court so finds because Defendant Warren keeps his sleeping bag and other personal items in that location until he is on the property and intends to remain overnight.

The material witnesses in this case were already at the Barn when they first met Defendant Warren on the first day of their stay. The material witness Zacarias Godoy said he was taken to the Barn and told to wait for someone to arrive. Defendant Warren arrived on the scene and gave them access to the house. The entry door and bathroom were unlocked at the time of the material witnesses' arrival. Defendant Warren did not ask any questions

1  about the two men's medical needs.  They either asked him if they could stay one to two days
2  or told him they would leave in two days.  They were there three days and two nights.

3      Once all three were together, they all used the property without a care in the world
4  until the third day.  On that day, Border Patrol Agents Marquez and Burns set up surveillance
5  north of the property.

6      When the agents set up their surveillance, they had already determined that the Barn
7  belonged to Dr. Carol Johnson.  They had set up at the location because of information from
8  at least one local resident that there were a few "illegals" from Central America in the Ajo
9  area.  The Court concludes the agents believed the Barn was a good place to start an
10 investigation.

11     From their vantage point, the agents observed three men outside the Barn.  The taller
12 man was pointing in the direction of various locations north of the Barn.  In the agents'
13 opinions, based upon their observation of two shorter men in shabbier clothing, these men
14 were the persons previously identified as being illegally in the country.  They also surmised
15 that the directional gestures suggested the two smaller men were leaving the area.  The agents
16 decided to investigate the matter before the suspects left the area.

17     At that point, they decided to conduct a Knock & Talk at the Barn.  They used a radio
18 to call in for back-up support.  As Agents Burns and Marquez were walking towards the
19 Barn, other agents arrived on the scene.  Some marked vehicles were stationed on Snyder
20 Road near the entrance to the Barn.  At least three vehicles entered the property and drove
21 down the driveway towards the residence.  Two of the agents who drove onto the property
22 were named Barbosa and Sandoval.  They met Defendant Warren west of the residence near
23 the Barnlet.

24     By this time, Agents Burns and Marquez had reached the residence.  Agent Marquez
25 had peeled off to the east, away from the driveway and to the far side of the house.  As Agent
26 Marquez was walking to his left, he observed a man inside the house at a north-facing
27 window, rapidly moving away from the window.  Agent Marquez continued east and turned
28 south at the corner of the house.  By the time Agent Marquez was at the south end of the

1   house, Agent Burns was with Defendant Warren and either Barbosa or Sandoval on the
2   southwest side of the Barn.

3   Agent Burns told Defendant Warren that he was there to investigate a report (of illegal
4   aliens) and that he wanted to speak to the owner. Defendant Warren interrupted the two
5   statements, asserting he was engaged in a humanitarian operation.

6   When Agent Burns asked if the owner was present, Defendant Warren responded he
7   was not going to answer and that Burns (and company) had no right to be there. Agent Burns
8   asserted he wanted to talk to the owner and had a right to walk up and ask. Defendant
9   Warren did not respond, to which Agent Burns said he was going to talk to the owner.
10  Defendant Warren responded, "I will go with you." According to Defendant Warren, he told
11  Agent Burns that 1) they were on private property; 2) they did not have permission to be on
12  private property; and 3) they needed to leave that private property. Defendant Warren does
13  recall being asked if he was the owner and if the owner was on the property. He informed
14  them he was not going to answer any further questions. He also told the agent that he would
15  accompany him to the residence.

16  While this was going on, Agent Marquez had heard a bathroom door slam shut and
17  told the occupant to come out. One man came out and admitted he was illegally in the U.S.
18  Agent Marquez had the man sit in the breezeway between the bathroom and the house.
19  Agent Burns arrived, handcuffed Mr. Perez-Villanueva, who he turned over to another agent
20  to transport to an agency vehicle.

21  At this point, Defendant Warren was arrested and handcuffed by Agent Marquez.
22  Once the Defendant was secured, Agent Marquez did a protective sweep of the residence
23  with a firearm in one hand and a phone camera in the other. While doing the sweep, Agent
24  Marquez somehow had time to take photographs of the interior. Shortly after Agent
25  Marquez, Agents Burns and Barbosa entered the premises to conduct their own sweep.
26  Neither of the two took photographs. Agents Burns and Barbosa eventually entered the
27  bathroom and found Mr. Zacarias Godoy in the shower. He also was arrested for illegal
28  entry.

Following the protective sweep and the arrest of Mr. Godoy, the agents were instructed not to enter the Barn. No one did, presumably until a search warrant was obtained. None of the agents who testified were conversant with telephonic search warrant applications nor with the official Border Patrol Knock & Talk policy.

As a result of the Border Patrol's efforts, the Government acquired at least the following:

1) Two live witnesses illegally in the United States;
2) Printed instructions in English and Spanish on how to react to law enforcement encounters at the residence;
3) Hand-drawn maps of the area;
4) Replacement clothing for migrants;
5) Cell phone photographs from the material witnesses; and
6) Photographs of items 2, 3, and 4, as well as of the interior spaces of the Barn.

## **DISCUSSION**

The residential property at 1401 Snyder Road, Ajo, Arizona, is known as the Barn. The Barn is not a continuously occupied residence.

The Barn is akin to something like a humanitarian aid group community center with a storage structure or a barracks without secured foot lockers. Everything located within the property is available to anyone who has access to the property. Anyone is defined as those who participate in humanitarian group assistance for undocumented migrants. Persons who wish to provide this assistance coordinate with and are given access to the Barn by Warren.

Warren's relationship to the Barn is as follows:

1) Liaison to the various visiting aid groups, to include paying the electric bill for them, subject to reimbursement;
2) Caretaker to prevent misuse by the aid group visitors. He may spend the night when aid groups are in residence;
3) Handyman to perform routine repairs or maintenance as the need arises; and
4) Medical protocol host to undocumented migrants provided Warren complies

with the conditions precedent required by Dr. Johnson.

In this case, Warren did not comply with the medical protocol required by Dr. Johnson. As such, he had no authority to permit the material witnesses to remain on the premises. By his inaction, he exceeded the authority granted him with respect to the property. His conduct converted the Barn into a way station, which is exactly contrary to the owner's expectations and instructions. Whatever relationship, right, or authority Warren had with the property, his conduct converted the migrants into trespassers and exceeded the grant given him by Dr. Johnson. Warren is like a real estate agent, he may show the place, but cannot allow anyone to temporarily reside there as he wishes.

In Warren's roles as a liaison or caretaker, he had no role to perform because there were no groups present for him to exercise his authority over or perform his duties. He did have some visitors, but they had no contact with the migrants, performed no services for them, and did not spend the night. Put another way, they did nothing, other than visit Warren.

As a handyman, there was no evidence presented that Warren was performing any such duties. In fact, a migrant testified he did not spend very much time at the Barn.

From an objective view, the Border Patrol agents knew that Dr. Carol Johnson owned the property. They suspected there were Central Americans illegally in the United States and that at least two of them may be at the Barn. They suspected that a man apparently familiar with the area was giving them directions towards the north. They further suspected that, because of the directional gestures, the two would soon be leaving the area.

In the process, prior to any questioning of the target suspects, Agent Marquez observed a man at the north window in the residence make a rapid withdrawal into the interior. Agent Marquez no doubt suspected this person was illegally in the United States. This assumption was enhanced by the bathroom door slamming closed.

At no time did Warren claim any derivative authority from the owner, Dr. Johnson, to order the agents' departure. Warren claims his rights, pursuant to the Fourth Amendment, were violated when the Border Patrol entered the Barn and found the evidence it intends to

1   submit at trial. He asserts that if one is charged with harboring, then it must follow that he
2   has a privacy interest in the property used to commit the offense.
3       In deciding what rights Defendant Warren has, the Court needs to determine what
4   Warren is or is not at the Barn.
5       Defendant Warren is:
6       1)   A liaison;
7       2)   A caretaker;
8       3)   A handyman;
9       4)   An agent with restricted authority from the owner;
10      5)   Someone who keeps his personal property locked away in the Barnlet until he
11           needs access to it; and
12      6)   A guest with limited access to the property.
13      Defendant Warren is not:
14      1)   An owner;
15      2)   A tenant/occupant;
16      3)   An unrestricted agent of the owner;
17      4)   A possessor or user of a private space under his exclusive control; and
18      5)   Someone who expressed that he possessed the owner's authority to grant or
19           deny access to the property.
20      Housekeepers for hire have keys to many houses and can access them all. A hotel
21  desk clerk has keys and access to many rooms. Caretakers and handymen have keys and
22  access to various properties. None of the various roles or titles ascribed to Defendant Warren
23  give him anything more than access. The most private space he has is the Barnlet and he has
24  to share that with any humanitarian that wants clothing for undocumented migrants. Under
25  these circumstances, Defendant Warren has no expectation of privacy and no standing to
26  challenge the warrantless entry into the Johnson property on Snyder Road in Ajo, Arizona.
27      From the evidence presented, the U.S. Border Patrol, by the time they reached the
28  entrance to the property, had at least a reasonable suspicion that criminal activity was afoot

1 at the Barn. The Border Patrol Knock & Talk procedure does not provide the Defendant any
2 rights in addition to those granted by the U.S. Constitution.

3 Assuming Defendant Warren has standing and an expectation of privacy in the Barn,
4 the Border Patrol agents had a reasonable suspicion to enter the property and approach the
5 residence.

6 When Agent Burns was talking to Defendant Warren about talking to the owner,
7 Agent Marquez observed a man within the residence flee from the window further into the
8 house. By the time Agent Marquez was rounding the corner and approaching the entry door,
9 he heard the bathroom door slam shut. This observed behavior created probable cause to
10 believe that criminal activity was occurring when considered in conjunction with their prior
11 knowledge. The migrants' furtive behavior supported an exigent circumstance to believe an
12 escape by the migrants was possible. Agent Marquez's order for the migrant to come out of
13 the bathroom was lawful. The migrant's compliance with the order to come out was beyond
14 Defendant Warren's expectation of privacy. By the time Defendant Warren and Agent Burns
15 arrived at the entrance to the house, one migrant was under arrest for illegal entry.

16 Because the agents suspected via observation that the Barn had two migrants, a
17 protective sweep of the property was also lawful, as was the arrest of the second migrant.
18 Subsequent to the arrest of the two migrants and Defendant Warren, the other evidence was
19 lawfully acquired and/or subject to inevitable discovery.

20 As an aside, the Court notes that, while body cameras may be used during a protective
21 sweep, a handheld camera is not a recommended technique.

## **CONCLUSION**

23 It is the recommendation of this Court that the District Judge, after his independent
24 review and consideration, enter an Order **DENYING** Defendant's Motion to Suppress [Doc.
25 53].

26 Pursuant to 28 U.S.C. §636(b)(1)(B), the parties have fourteen (14) days from the date
27 of this Report and Recommendation to file written objections to these findings and
28 recommendations with the District Court. Any objections and Responses to objections filed

should be filed as CR 18-00223-TUC-RCC. No Replies shall be filed unless leave is granted from the District Court.

DATED this 6th day of August, 2018.

_____
Bernardo P. Velasco
United States Magistrate Judge