Gregory J. Kuykendall, Bar # 012508
Amy P. Knight, Bar # 031374
KUYKENDALL & ASSOCIATES
531 S Convent Avenue
Tucson, AZ 85701
(520) 792-8033
greg@kuykendall-law.com
amyknight@kuykendall-law.com
*Pro Bono* Attorneys for Defendant Scott Daniel Warren

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| United States of America, | ) | No.CR-18-00223-001-TUC-RCC(BPV) |
|---|---|---|
| Plaintiff, | ) | |
| | ) | **MOTION TO DISMISS INDICTMENT** |
| vs. | ) | **FOR VIOLATION OF** |
| | ) | **INTERNATIONAL LAW** |
| SCOTT DANIEL WARREN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Defendant Scott Daniel Warren, through pro bono counsel, moves this Court to dismiss the felony indictment under Federal Rule of Criminal Procedure 12(b)(3)(v) for failure to state an offense, as well as under the Due Process Clause of the Fifth Amendment to the United States Constitution, and in support thereof states:

## I.    INTRODUCTION

On February 14, 2018, the Defendant, Scott Daniel Warren, was indicted on one count of Conspiracy to Transport and Harbor Illegal Aliens, in violation of  8 U.S.C. §1324(a)(l)(A)(v)(I), 8 U.S.C. § 1324(a)(l)(A)(ii) and 8 U.S.C. § 1324(a)(l)(A)(iii), as well as two counts of Harboring Illegal Aliens, in violation of 8 U.S.C. § 1324(a)(l)(A)(iii).

All of the charges stem from Defendant's activities as a humanitarian aid worker volunteering with No More Deaths (NMD). NMD is a coalition of religious organizations, human rights advocates and individuals who provide food, water and medical assistance to migrants crossing the Arizona desert from Mexico. The Ninth Circuit has recognized that No More Deaths is "an organization that provides humanitarian aid to migrants." *United States v. Millis,* 621 F.3d 914 (9th Cir. 2010).

The Complaint (Doc. 1), filed January 18, 2018, alleges that Dr. Warren "took care of" two migrants for three days "by giving them food, water, beds, and clean clothes." Since then, the Government has produced no evidence that Dr. Warren conspired with anyone to transport and harbor the two migrants, let alone that the alleged offense was committed for financial gain or to further a criminal enterprise. The Government has likewise produced no evidence that Dr. Warren was attempting to conceal the two undocumented migrants from apprehension by U.S. authorities, or was in any way assisting them in avoiding apprehension. Instead, the weight of evidence indicates that the Government is prosecuting Defendant solely for undertaking humanitarian aid efforts for migrants traveling primarily on foot through the often deadly Sonoran desert.

As set out below, this prosecution is inconsistent with the United States's binding treaty obligations, which dictate that aid to migrants be criminal only when committed for financial or other material benefit and specifically require cooperation with non-governmental organizations to ensure their humane treatment. This internationally unlawful conduct further warrants dismissal because it "shocks the conscience" and violates the "decencies of civilized conduct." *County of Sacramento v. Lewis*, 523 U.S.

833, 846 (1998). At a minimum, these prosecutorial transgressions warrant dismissal of the indictment under the court's supervisory powers.

## II.   STATEMENT OF FACTS

Much of the lifesaving work of No More Deaths volunteers must of necessity be carried out in the Cabeza Prieta National Wildlife Refuge, a vast and remote stretch of land near Ajo, Arizona that shares 56 miles with the U.S.–Mexico border. As the government's own description points out, the terrain "is big and wild and can be incredibly hostile to those that need water to survive,"  while its "56-mile border with Sonora, Mexico, might well be the loneliest international boundary on the continent."[1] Many desperate individuals attempt to cross the U.S.–Mexico border through this lethally dangerous corridor, which can take anywhere from four days to several weeks to traverse. The area has virtually no natural water sources, and summertime temperatures can top 120 degrees Fahrenheit. There are no towns in this remote desert wilderness and only one publicly accessible road, known as the Devil's Highway. Over the past several years, the bodies of scores of people who died after crossing the border have been recovered in the refuge. In 2017 alone, some thirty-two sets of human remains were found just in Cabeza Prieta, according to the Pima County Office of the Medical Examiner.[2]

---

[1]  U.S. Fish and Wildlife Service, *Cabeza Prieta: Wildlife and Habitat*, at https://www.fws.gov/refuge/Cabeza_Prieta/wildlife_and_habitat/index.html.

[2]  Rory Caroll, *Eight activists helping migrants cross brutal desert charged by U.S. government,* THE GUARDIAN, Jan. 24, 2018, at https://www.theguardian.com/us-news/2018/jan/24/us-immigration-activists-arizona-no-more-deaths-charged.

Dr. Warren works with No More Deaths to prevent migrants from dying during their journey. Often, this work takes the form of venturing into remote desert areas to place emergency water and food in areas migrants frequently traverse, as well as searching for migrants, both living and dead, in the desert. On this occasion, Dr. Warren arrived at "The Barn," a home base used by No More Deaths, to find two migrants who had arrived in Ajo after walking many miles through the desert. The migrants have testified that they were cold and exhausted, had been forced to discard what little food and water they were carrying, were extremely hungry, and were in pain,[3] and asked for food and water, and a place to rest. According to the Complaint the Government filed, Dr. Warren gave them that aid, and those actions are the basis for this prosecution.

## II.    THE COURT MUST DISMISS THE INDICTMENT FOR FAILURE TO STATE AN OFFENSE BECAUSE THE UNITED STATES'S TREATY OBLIGATIONS RENDER DR. WARREN'S CONDUCT NON-CRIMINAL.

### A.    The Migrant Smuggling Protocol provides that humanitarian aid to migrants is not criminal.

In 2005, the United States ratified the Protocol Against Smuggling of Migrants by Land, Sea and Air (the "Migrant Smuggling Protocol"), Nov. 15, 2000, T.I.A.S. 13127, 2241 U.N.T.S. 507.[4] *See* Exhibit 1, Text of the Migrant Smuggling Protocol. Notably, the U.S. Senate's consent to ratification of the Migrant Protocol attached no reservations that

---

[3] Even seemingly minor injuries such as blisters can be life-threatening to migrants crossing the desert, as they may cause individuals to be left behind or be unable to move quickly enough to reach safety before succumbing to exposure or dehydration.

[4] At present, 146 nations are parties to the Migrant Smuggling Protocol. *See* United Nations Treaty Collection, at: https://treaties.un.org/Pages/ViewDetails.aspx?src=IND&mtdsg_no=XVIII-12-b&chapter=18&lang=en.

4

would limit the scope or application of these provisions under domestic law.[5] Under its provisions, the Government is committed "to the protection of the rights" of migrants who have been smuggled.[6]  All such migrants must be provided with "humane treatment" and the "full protection of their rights."[7]  By ratifying the Migrant  Smuggling Protocol, the United States committed to taking "all appropriate measures"  to "preserve and protect the rights" of smuggled migrants, including "in particular the right to life" and "the right not to be subjected to. . .cruel, inhuman or degrading treatment."[8]

As relevant here, the treaty accomplishes these goals through two specific requirements: criminalization requirements and cooperation requirements. In Article 6, the treaty dictates the scope of migrant-related criminal offenses: parties commit to forbidding the smuggling of migrants "when committed intentionally and in order to obtain, directly or indirectly, a financial or other material benefit."[9] This motivation-based limitation applies to several sub-categories of crime, including crimes related to fraudulent documents and, crucially, "Enabling a person who is not a national or a permanent resident to remain in the State concerned without complying with the necessary requirements for legally remaining in the State" by any illegal means.[10]

---

[5] *See* Resolution of Ratification: Senate Consideration of Treaty Document 108-16 (Oct. 7, 2005), at: https://www.congress.gov/treaty-document/108th-congress/16/all-info#resolution.

[6] Migrant Smuggling Protocol, Article 4.

[7] *Id.* Preamble.

[8] *Id.* Article 16.

[9] *Id.* Article 6(1)(a).

[10] *Id.* Article 6(1)(c). Notably, this provision by its terms applies to all people not authorized to be in the country, regardless of the method by which they entered.

The requirement that these actions be criminalized only when undertaken for financial or other material benefit is a clear reflection of the treaty's overall purpose of *protecting* the human rights of migrants, including the right to life, and obviously exempts actions taken for humanitarian reasons. To read the criminalization requirements otherwise would be inconsistent with the stated purpose of the treaty. Indeed, the *Travaux Préparatoires* for the treaty—the international law equivalent of legislative history—confirms this in an interpretive note, explaining that the material benefit requirement was included specifically "to exclude the activities of those who provided support to migrants for humanitarian reasons," and the protocol does *not* provide for criminalization of actions by "support groups such as religious or non-governmental organizations."[11] The Supreme Court has explicitly recognized the interpretive value of such pronouncements. *See Zicherman v. Korean Airlines,* 516 U.S. 217, 226 (1996) ("Because a treaty ratified by the United States is not only the law of this land, see U.S. Const., Art. II, § 2, but also an agreement among sovereign powers, we have traditionally considered as aids to its interpretation the negotiating and drafting history (*travaux préparatoires*) and the postratification understanding of the contracting parties.").

Lest there be any doubt that the treaty does not permit parties to criminalize humanitarian aid to migrants, it specifically requires the opposite: that the authorities "shall cooperate with each other and with competent international organizations, non-

---

[11]  United Nations Office on Drugs and Crime, *Travaux Préparatoires of the Negotiations for the Elaboration of the United Nations Convention against Transnational Organized Crime*, interpretative notes on art. 3, p. 469), *available at* https://www.unodc.org/pdf/ctoccop_2006/04-60074_ebook-e.pdf.

governmental organizations, other relevant organizations and other elements of civil society" in protecting and preserving the human rights of smuggled migrants.[12] Criminalizing and prosecuting such groups' work is obviously inconsistent with this explicit cooperation obligation.

Further confirming this fact, judicial interpretation of treaty requirements by the other signatories is given "considerable weight.'" *Air France* v. *Saks,* 470 U. S. 392, 404 (1985). Addressing the application of the Migrant Smuggling Protocol, the Supreme Court of Canada recently held that a federal statute making it an offence to organize, induce, aid or abet the entry of undocumented migrants "is unconstitutional insofar as it permits prosecution for humanitarian aid to undocumented entrants."[13] The Court found that "it would depart from the balance struck in the Smuggling Protocol to allow prosecution for humanitarian aid." 3 S.C.R. 754 at 775. An exemption for humanitarian assistance was therefore required to ensure that the statute governing illegal entry "reflects the values and principles of customary and conventional international law." *Id.* at 774. The U.S. Supreme Court has agreed that if there is any ambiguity, a treaty should be interpreted as "enlarging [] rights which may be claimed under it." *Bacardi Corp. of America* v. *Domenech,* 311 U. S. 150, 163 (1940) (citations omitted); *see also Factor v. Laubenheimer*, 290 U.S. 276, 293 (1933) ("In choosing between conflicting interpretations of a treaty obligation, a narrow and restricted construction is to be avoided

---

[12] Migrant Smuggling Protocol Article 14(2).

[13] *R.* v. *Appulonappa*, [2015] 3 S.C.R. 754, available at https://scc-csc.lexum.com/scc-csc/scc-csc/en/item/15648/index.do.

as not consonant with the principles deemed controlling in the interpretation of international agreements."). Thus, multiple rules of construction all indicate that the treaty exempts humanitarian aid to migrants from criminalization.

The government's decision to apply its laws criminalizing assistance to migrants to Dr. Warren, who was providing humanitarian aid in conjunction with a non-governmental organization, conflicts with its responsibilities under Articles 3(a) and 6(1) of the Migrant Smuggling Protocol, which limit criminalization of migrant smuggling to those acts "committed intentionally and in order to obtain, directly or indirectly, a financial or other material benefit," as well as Article 14(2), which requires cooperation with non-governmental organizations. The government has not even alleged, let alone offered any evidence of, a financial or material benefit to Dr. Warren. His sole purpose in rendering assistance to migrants in distress was to alleviate their suffering. Moreover, the Government has never disputed that Dr. Warren was working with the aid organization No More Deaths—with whom they are treaty-bound to cooperate. Accordingly, this prosecution is inconsistent with the United States' obligations under the Migrant Smuggling Protocol.

**B.     The Migrant Smuggling Protocol supersedes any earlier statutory provisions that conflict with it.**

It is long-settled law that a treaty such as the Migrant Smuggling Protocol stands on par with a federal statute. "By the Constitution a treaty is placed on the same footing, and made of like obligation, with an act of legislation." *Whitney v. Robertson*, 124 U.S. 190, 194 (1888).   The Migrant Smuggling Protocol may provide the rule of decision in a case

where its provisions are implicated, because a treaty "is a law of the land as an act of congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined." *Edye v. Robertson*, 112 U.S. 580, 598 (1884). When such rights "are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute." *Id*. at 599.

If a treaty and a federal statute conflict, "the one last in date will control the other." *Id. See also Breard v. Greene*, 523 U.S. 371, 376 (1998) (reaffirming applicability of last-in-time rule to treaties and statutes). The statutory provisions under which the Defendant was charged were enacted in 1952. *United States v. Acosta de Evans*, 531 F. 2d 428, 430 (9th Cir. 1976) ("In 1952 Congress amended the section, adding penalties for concealing, harboring, or shielding from detection."). More than half a century later, the United States deposited its instrument of ratification for the Migrant Smuggling Protocol on November 3, 2005,[14] whereupon it became part of the "supreme Law of the Land" under Article VI of the U.S. Constitution. Thus, the treaty is the more recent law, and to the extent of any conflict between U.S.C. §1324(a)(l) and the Migrant Smuggling Protocol, the treaty must prevail.

In sum, a 1952 statute criminalized harboring migrants, without regard for any financial or material motivation, and without exemption for humanitarian aid. A 2005 treaty limits criminalization of aid to migrants to those who have financial or material

---

[14] See the ratification table in the United Nations Treaty Collection, at: https://treaties.un.org/Pages/ViewDetails.aspx?src=IND&mtdsg_no=XVIII-12-b&chapter=18&lang=en.

motivations, and mandates an exemption for humanitarian aid. The treaty terms thus prevail, and render non-criminal the provision of humanitarian aid to migrants, regardless of what the inconsistent earlier statute may have provided. Accordingly, the charges against Dr. Warren—which do not allege financial or material gain, and arise from humanitarian aid rendered in conjunction with a humanitarian organization—do not state an offense, and the Court must dismiss the indictment pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v).

This necessity is not novel; Courts have repeatedly recognized that treaty provisions constrain the Government's ability to prosecute and punish. *See, e.g., United States v. Rauscher*, 119 U.S. 407 (1886) (dismissing criminal indictment that breached extradition treaty); *Caplan v. Vokes*, 649 F. 2d 1336, 1342 (9th Cir. 1981) (denying extradition where prosecution failed to meet limitations provision of treaty); *Cook v. United States*, 288 U.S. 102, 120 (1933) (voiding criminal fines that violated treaty requirements). This Court must likewise give effect to the requirements of the Migrant Smuggling Protocol and dismiss this indictment.

## III.   THE COURT MUST DISMISS THE INDICTMENT UNDER THE DUE PROCESS CLAUSE.

### A. Outrageous government conduct that violates substantive due process warrants dismissal.

The Ninth Circuit has repeatedly affirmed that "a defendant may raise a due process-based outrageous government conduct defense to a criminal indictment." *United States v. Bogart*, 783 F.2d 1428, 1433 (9th Cir. 1986), *vacated on other grounds, United States v. Wingender*, 790 F.2d 802 (9th Cir. 1986) (citing cases). *See also United States v. Simpson*,

813 F.2d 1462, 1465 (9th Cir. 1987), *cert. denied*, 484 U.S. 898 (1987) ("Our circuit has continued to entertain complaints by defendants that their outrageous treatment by law enforcement officers warrants dismissal of their indictment."). Due process requirements warrant dismissal of an indictment where "the government's conduct is so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Ramirez,* 710 F.2d 535, 539 (9th Cir.1983). Outrageous conduct is not confined to cases of police brutality or the government directing and engineering a criminal enterprise. Rather, "[d]ue process of law, as a historic and generative principle, precludes defining, and thereby confining, these standards of conduct more precisely than to say that convictions cannot be brought about by methods that offend 'a sense of justice.'" *Rochin v. California*, 342 U.S. 165, 173 (1952); *see also Bogart*, 783 F.2d at 1435 (noting that "the precise parameters of such concepts as 'fundamental fairness' and 'universal sense of justice' are probably indefinable.").

Courts in this Circuit have recognized official misconduct rising to a substantive due process violation in a wide range of circumstances. *See, e.g., United States v. Marshank*, 777 F.Supp. 1507, 1523-24 (N.D. Cal. 1991) (government's collaboration with defendant's attorney to build a case against him was "so outrageous that it shocked the universal sense of justice"); *Cooper v. Dupnik*, 963 F.2d 1220,1237 (9th Cir. 1992) (en banc) (egregious and systematic violation of *Miranda* safeguards "unquestionably shocks the conscience, and thus violates substantive due process."). Dismissal for outrageous conduct may also be based on cumulative factors that, taken individually, would not necessarily warrant a remedy; instead, "it is the combination [of factors] which is

important." *Green v. United States*, 454 F.2d 783, 787 (9th Cir. 1971); *cf. United States v. Tobias*, 662 F.2d 381, 387 (5th Cir. 1981) (whether outrageous government conduct exists "turns upon the totality of the circumstances with no single factor controlling.").

**B. The Government's conduct in bringing this prosecution in disregard of its international obligations merits dismissal.**

In bringing this case, the Government has flagrantly disregarded its obligations in truly outrageous ways. Common decency requires that a government do what it can to prevent unnecessary death and suffering inside its borders. To actively thwart efforts of its citizens to assist those in need through the provision of the most basic necessities—food, water, and shelter—is cruel and shameful behavior. And to threaten to imprison a citizen for providing food, water, and shelter to strangers in need—generous, humane actions the Government should encourage and applaud—is unconscionable. It violates the universal sense of justice.

Beyond basic human decency, it is truly outrageous for the Government to display such open disregard for its international obligations. As explained above, the Migrant Smuggling Protocol obligates the United States Government to protect the rights of migrants who have been smuggled, and to ensure their humane treatment. It further requires the Government to actively cooperate with organizations like No More Deaths to protect migrants' basic human rights. Rather than working to ensure the survival of migrants and encouraging and cooperating with groups doing the same, the Government is actively interfering with humanitarian efforts to safeguard the physical wellbeing of migrants. In maintaining this prosecution, the Government is doing precisely the opposite of what it has

promised the world it would do. Mere indifference to the peril faced by migrants crossing the Sonoran desert would itself be alarming; active interference with charitable efforts to preserve life and health is truly shocking. And criminal punishment for doing something with which the Government is legally bound to cooperate is beyond the pale.

This is especially so in light of the Government's more general international obligations. In addition to the Migrant Smuggling Protocol, the United States is a party to the International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171; T.I.A.S.[hereinafter the ICCPR]. Article 6 of the ICCPR provides that "[e]very human being has the inherent right to life," that this right "shall be protected by law" and that no one "shall be arbitrarily deprived of his life." This right applies to all people—migrants included. So essential is the protection of this right that, under Article 4, no derogation is permitted from it even in time of public emergency which threatens the life of the nation. Furthermore, Article 7 of the ICCPR forbids all forms of cruel, inhuman or degrading treatment. The foundational obligation to protect the right to life and freedom from cruel, inhuman or degrading treatment implicitly includes an obligation to facilitate protection of these rights by others, especially where the State is unable to fully safeguard the right itself. Given that hundreds of migrants continue to die in the desert each year,[15] the Government obviously needs help in protecting the right to life. It is fundamentally inconsistent with the Government's obligations under Articles 6 and 7 of the ICCPR to penalize activities

---

[15] *See* Pima County Office of the Medical Examiner, Annual Report 2017, at 30-32, *available* *at* *i* https://webcms.pima.gov/UserFiles/Servers/Server_6/File/Government/Medical%20Exa miner/Resources/Annual-Report-2017.pdf.

aimed at safeguarding these basic human rights, and downright unconscionable to institute federal felony charges carrying up to 20 years' prison time for working to ensure these basic human rights the United States has agreed to honor.

Additionally, Article 26 of the ICCPR entitles every person within the United States to protection of this fundamental right "without any discrimination." In applying criminal anti-harboring laws to humanitarian aid work, the Government is discriminating against certain people based on their nationality. The way the Government is now attempting to apply its laws, it is a crime to provide basic necessities to some people but not to others. Dr. Warren could not be penalized for providing food, water, and shelter to an American citizen lost in the desert, but according to the Government, he can be imprisoned for doing the same for a Guatemalan and a Salvadoran. Article 26 requires that the Government recognize and protect basic human rights in all people equally. Criminalizing humanitarian aid to some people but not others means people will have differing access to basic necessities depending on their nationality, in violation of this bedrock principle. Thus, the illegality of the Government's decision to prosecute humanitarian aid to migrants is exacerbated by its discriminatory aspect.

This is not a novel or radical interpretation of these obligations. United Nations guidance on the protection of the human rights of migrants, which is based on existing legal norms including Article 6 of the ICCPR and the Migrant Smuggling Protocol, specifically calls on States to "[e]nsure that the organizations and individuals who rescue or provide assistance to migrants are not criminalized or otherwise punished for doing

so."[16] It further explains that States should "[p]rovide, in law and in practice, a safe, accessible and enabling environment for individuals and organizations that work to promote or protect human rights of migrants. Do not criminalize or otherwise penalize the provision of support and assistance to migrants."[17] Instead, States are to "[p]ublicly recognize the important role of human rights defenders and the legitimacy of their work."[18] The actions of the Government here are fundamentally inconsistent with this guidance.

On a basic level, international law safeguards the foundations of universal human morality. *See* Mary Ellen O'Connell, *The Power and Purpose of International Law: Insights from the Theory and Practice of Enforcement* 14 (2008) ("Through international law, diverse cultures can reach consensus about the moral norms that we will commonly live by."). For the Government to institute and maintain a felony prosecution in disregard of its obligations to abide by these norms is shocking to the universal sense of justice, violates substantive due process, and requires dismissal.

## C. The Court is authorized to dismiss Defendant's indictment under its supervisory powers.

The Ninth Circuit has held that even where government misconduct does not rise to the level of a due process violation, "the court may nonetheless dismiss under its supervisory powers." *United States v. Chapman*, 524 F.3d 1073, 1084 (9th Cir. 2008) (citation omitted).  This supervisory power has been applied by the federal courts to dismiss

---

[16] Human Rights Council, *Principles and practical guidance on the protection of the human rights of migrants in vulnerable situations*, U.N. Doc. A/HRC/37/34/Add.1, (Feb. 7 2018), Principle 4(7).
[17] *Id.,* Principle 18(1).
[18] *Id.,* Principle 18(6)

indictments for varying forms of prosecutorial misconduct. *See, e.g.*, *Chapman*, 524 F.3d 1073 at 1085 (dismissing for prosecutor's discovery abuses and affirmative misrepresentations to the court); *United States v. Samango*, 607 F.2d 877, 884 (9th Cir. 1979) (dismissing where cumulative effect of prosecutorial "errors and indiscretions" resulted in biased grand jury); *United States v. Stein*, 495 F. Supp. 2d 390 (S.D.N.Y. 2007) (dismissal because Government threatened to indict defendants' employer if it paid their legal fees).

These powers "may be exercised for three reasons: to remedy a constitutional or statutory violation; to protect judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; or to deter future illegal conduct." *United States v. Barrera-Moreno*, 951 F. 2d 1089, 1091 (9th Cir. 1991).

Each of the reasons identified by the Ninth Circuit applies to justify dismissal here. First, the government violated federal constitutional and statutory requirements by pursuing a conviction that would conflict with binding treaty requirements; dismissal would remedy this. Second, Defendant would likely not be facing prosecution on felony charges at all, but for his volunteer work with No More Deaths and his attempts to ensure the humane treatment of migrants attempting the perilous crossing of the Sonoran Desert. Facilitating such prosecution would threaten judicial integrity. Third, dismissal is warranted "to deter future illegal conduct" by the Government. *Chapman*, 524 F.3d at 1085. Indeed, the Government has already demonstrated its intention to continue to prosecute the provision of humanitarian aid to migrants, as several other federal cases, including a second case against Dr. Warren, are currently pending in this district. *See* No.

4:17-mj-00341-BGM (U.S. v. Warren); No. 4:17-mj-00340-BGM (U.S. v. Deighan *et al.*); No. 4:17-mj-339-BGM (U.S. v. Hoffman *et al.*).

In this regard, the Court should consider whether "any lesser sanction [would be] like endorsing [the government's conduct]." *Chapman,* 524 F.3d at 1088. Declining to dismiss this case would endorse the pernicious notion that the Government may breach this nation's solemn treaty obligations with impunity. Dismissal is the only remedy that can effectively rectify the Government's misconduct in this case and the resulting prejudice to Dr. Warren. *See United States v. Morrison*, 449 U.S. 361, 366 (1981) (dismissal under a court's supervisory powers is appropriate when suppression of evidence cannot remedy prejudice to the defendant).

## CONCLUSION

This case raises the specter of the United States Government using its sovereign power to punish an individual who was only doing what the United States itself has committed to doing: protecting the basic human rights of migrants. The law requires that the Government cooperate in, rather than punish, such aid. Preventing such perversions of justice is precisely why this court is empowered to dismiss this indictment:

> Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. . . .To declare that in the administration of the criminal law the end justifies the means— to declare that the government may commit crimes in order to secure the conviction of a private criminal— would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.

*Olmstead v. United States*, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting). For the reasons stated above, Defendant requests this Court to dismiss his indictment.

RESPECTFULLY SUBMITTED this 27th day of August, 2018.

By /s/ Amy P. Knight
Gregory J. Kuykendall
Amy P. Knight
531 S Convent Avenue
Tucson, AZ 85701
Attorneys for Defendant Scott
Daniel Warren

CERTIFICATE OF SERVICE

I certify that on August 27th, 2018, I electronically transmitted a PDF version of this document to the Clerk of Court using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Nathaniel J. Walters, Esq. (email: Nathaniel.walters@usdoj.gov)
Anna R. Wright, Esq. (email: anna.wright@usdoj.gov)
United States Attorney's Office
405 W. Congress, Suite 4800
Tucson, AZ 85701