ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona
ANNA R. WRIGHT
Colorado State Bar No. 41722
NATHANIEL J. WALTERS
Arizona State Bar No. 029708
Assistant United States Attorneys
United States Courthouse
405 W. Congress, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Email: anna.wright@usdoj.gov
          nathaniel.walters@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | CR-18-00223-001-TUC-RCC (BPV) |
|---|---|
| Plaintiff, | |
| vs. | GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS TO THE REPORT & RECOMMENDATION |
| Scott Daniel Warren, | |
| Defendant. | |

The United States of America, by and through its undersigned attorneys, hereby responds to the defendant's Objection to Report and Recommendation.  Doc. 120.  On August 7, 2018, the Honorable Bernardo P. Velasco, United States Magistrate Judge, issued a Report and Recommendation recommending denial of the defendant's Motion to Suppress Evidence Found as a Result of Illegal Search (Doc. 53).  Doc. 110.  For the reasons discussed below, the Government respectfully requests that the Court adopt the Report and Recommendation in full.[1]

---

[1] The government incorporates by reference the arguments made in its responses to the motions and at oral argument on June 14, 2018 and July 13, 2018.  *See* Docs. 83, 102; *see also* LRCiv 7.1(d)(2) (incorporated by reference by LRCrim 47.1) (permitting

## I. Background

### a. Procedural Posture

The Government charged the defendant by complaint on January 18, 2018, with harboring two illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(iii). Doc. 1. On February 14, 2018, a grand jury charged the defendant in a three-count Indictment with conspiracy to transport or harbor illegal aliens in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I), (a)(1)(A)(ii), and (a)(1)(A)(iii) (Count One), and harboring illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) (Counts Two and Three). Doc. 26. Video depositions of the illegal aliens took place on March 7, 2018. Doc. 32.

On April 19, 2018, the defendant filed a Motion to Suppress Evidence Found as a Result of Illegal Search. Doc. 53. The Government filed its Response on May 3, 2018. Doc. 63. The Court held Part I of a suppression hearing on June 14, 2018, Doc. 83, and Part II on July 13, 2018. Doc. 102. In Part I, the defendant presented the testimony of Dr. Carol Johnson and the defendant, while the Government called United States Border Patrol Agent John Marquez. Doc. 83. In Part II, the defendant continued his cross-examination of Agent Marquez, and the Government called Border Patrol Agent Brendan Burns. Doc. 102. The parties then presented oral arguments on the motion. *Id*. At the close of argument, Magistrate Judge Velasco took the motions under advisement, and the Report and Recommendation recommending denial of the defendant's motion issued on August 7, 2018. Docs. 102, 110.

---

incorporation by reference of "a previous pleading, motion or minute entry.").

Trial is currently set to begin on November 14, 2018. Doc. 117.

### b. Summary of Testimony

On January 17, 2018, Agents Marquez and Burns established surveillance on the Barn. TR 6/14 at 87:9-16. Before the agents established surveillance, local residents complained to law enforcement agents of finding paraphernalia associated with illegal activity, such as black water jugs and carpet booties, in the immediate vicinity of the Barn. TR 7/13 at 43:17-46:6. Before the agents established surveillance, they also determined that the Barn was owned by Dr. Carol Johnson and listed as uninhabitable. TR 6/14 at 87:15-21.

At some point after establishing surveillance on January 17, the agents observed the defendant and two men standing outside the Barn. TR 6/14 at 89:8-10. They appeared to be engaging in conversation. *Id.* at 90:18-21. Although the agents could not hear the conversation between the defendant and the two men, it seemed to the agents that the defendant was giving the two men directions on how to travel further north into the United States. *Id.* at 90:18-91:6. Specifically, the agents saw the defendant pointing out landmarks to the north commonly used by illegal aliens to avoid a Border Patrol checkpoint and navigate north to a major highway. *Id.* at 90:18-91:6; 103:1-21; TR 7/13 at 55:9-56:15. Agent Marquez testified that the two men wore "ill-fitting clothing," they "appeared to be extremely anxious and nervous, they looked out of place, they were at heightened alert," and they were constantly looking around the area. TR 6/14 at 90:15-17. Based on their observations, the agents believed that the two men were illegal aliens. *Id.* at 90:11-17.

Shortly after seeing the defendant give northbound directions to the two suspected illegal aliens, the agents approached the Barn. *Id.* at 92:8-11. As Agents Marquez and Burns approached the Barn, which is on a large lot near open desert, Agent Burns made contact with the defendant in the driveway of the property. TR 6/14 at 86:19-87:8; TR 7/13 at 64:7-11. Agent Burns informed the defendant that he was there to investigate illegal alien activity on the property. TR 7/13 at 65:12-13. Agent Burns asked the defendant if he was the owner of the property, a question the defendant refused to answer. *Id.* at 65:17-19. Agent Burns then advised the defendant he was going to approach the Barn to speak with the owner. *Id.* at 66:1-3. The defendant responded to Agent Burns by stating he would follow him to the Barn. TR 6/14 at 48:11-12; 66:3-4.

While Agent Burns spoke with the defendant, Agent Marquez continued towards the Barn along a well-worn path to a door later identified as the main entrance to the Barn. *Id.* at 93:5-6. As he approached the Barn and while still on the path, he saw one of the men he previously saw with the defendant, later identified as Kristian Perez-Villanueva, through a window on the north side of the Barn. *Id.* at 93:17-96:24. Through the window, Agent Marquez observed Perez-Villanueva fleeing to the south side of the property through the structure. *Id.* at 96:15-17. Agent Marquez pursued Perez-Villanueva to the east side of the property as he believed Perez-Villanueva was attempting to escape. *Id.* at 97:7-11. When Agent Marquez arrived at the east side of the property he saw and heard a door slam shut. *Id.* at 97:17-21. Agent Marquez then knocked on the door and announced himself as a United States Border Patrol Agent. *Id.* at 98:8-9. Agent Marquez then asked Perez-

Villanueva to open the door, and instructed Perez-Villanueva to show him his hands and sit down, which Perez-Villanueva did. *Id.* at 98:14-23.

Within seconds, Agent Burns and the defendant also came around the corner of the Barn and saw Perez-Villanueva sitting in the open doorway. TR 7/13 at 69:3-15. Agent Burns then determined that Perez-Villanueva was an alien illegally present in the United States. *Id.* at 70:4-6. Agents then arrested Perez-Villanueva and the defendant. TR 6/14 at 100:17-19.

After Perez-Villanueva's and the defendant's arrests, Agent Burns entered the Barn and located the second man previously seen with the defendant, later identified as Jose Arnaldo Sacaria-Godoy, hiding in the shower. TR 7/13 at 73:3. Agents later determined that he also was an alien illegally present in the United States and arrested him. *Id.* at 74:1-2.

Based on these events, the defendant was charged by complaint on January 18, 2018. Doc. 1. During later evidentiary hearings, the defendant presented testimony regarding his activities at and knowledge of the Barn. Specifically, on June 14, 2018, at an evidentiary hearing regarding the instant motion, Dr. Carol Johnson testified that she purchased the Barn approximately ten years ago, and that the defendant was "the liaison person that makes sure that all the rules are obeyed, stays – just supervises especially the young people who are using the Barn for me." TR 6/14 at 7:9-10, 8:1-4. She also testified that the defendant sometimes spends the night, performs maintenance, pays the electric bill, and has permission to allow or exclude people from the property. *Id.* at 8:19-21; 9:8-

9; 9:18; 9:20-10:1. The defendant testified that Johnson shows him the electric bill and he pays out of his pocket, but he expects to be reimbursed. *Id.* at 37:19-25, 66:18-21.

At that same hearing, the defendant testified that he did not live at the Barn and that his primary residence is in the "town center" of Ajo, Arizona. *Id.* 6/14 at 62:20-23. The defendant testified that in his role at the Barn as a liaison, he would welcome groups of volunteers to the Barn, and those volunteers would sometimes stay at the Barn for weeks. *Id.* at 32:17-21, 34:5-7. He further testified that even though he was aware of and had access to various locks for the property, he had never locked the gate to the property. *Id.* at 33:14-21, 34:21-23. Dr. Johnson testified that the door to the bathroom is never locked, but that the door to the living quarters "are kept locked whenever there is not someone there."

The defendant also testified that, on average, he spends about 40 hours a week at the Barn, and he spends much of that time "cleaning and organizing and taking care of the space and making sure it's running properly."[2] *Id.* 6/14 at 36:18-22, 38:21-23. He also testified that he sometimes spends the night at the Barn in order to "organize and feed" the groups of volunteers that use the Barn, and that he did not sleep at the Barn in the two or

---

[2] Contrary to the defendant's claims, he previously testified that on the date of his arrest, he did not know the Barn's address and had never known the Barn to have an address. *See* TR 6/13 at 70:9-15; TR 5/11 at 56:23-57:4. In addition, the defendant also previously testified that he was not was not "generally familiar" with the contents of the sheds on the property and could not say whether certain photographs were accurate depictions of the Barn because "The Barn is constantly changing with different groups that organize it in different ways for their purposes." TR 74:20-25, 77:8-17.

- 6 -

three days prior to his arrest. *Id.* at 36:23-37:16, 40:4-9, 63:17-23. The defendant further testified that he keeps some personal property at the Barn; however, anyone who has access to the Barn could have access to his personal property because he does not lock it away or place it in a safe. *Id.* at 37:6-16, 40:25-41:3, 81:2-6, 81:24-82:3.

## II.   Discussion

### a.   The defendant does not have standing to challenge any constitutional violation at the Barn.

The defendant "has no expectation of privacy and no standing to challenge the warrantless entry into" the Barn. Doc. 110 at 7:25-26. To establish standing to seek suppression of unlawfully seized evidence, the defendant is required to demonstrate that he had a legitimate expectation of privacy in the place searched at the time of the search. *Minnesota v. Olson*, 495 U.S. 91, 95-96 (1990); *Rakas v. Illinois*, 439 U.S. 128, 143 & n.12 (1978); *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980); *see also United States v. Padilla*, 508 U.S. 77, 82 (1993). A defendant has a legitimate expectation of privacy if (1) he has a subjective expectation of privacy, and (2) society is prepared to recognize that expectation as reasonable. *See Smith v. Maryland*, 442 U.S. 735, 740 (1979) (citing *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)). Whether an expectation of privacy is reasonable depends on the totality of the circumstances, *see Rawlings*, 448 U.S. at 104, and receives more weight than the defendant's subjective expectation of privacy, *see Hudson v. Palmer*, 468 U.S. 517, 525 n.7 (1984).

In this case, as noted by Magistrate Judge Velasco, the totality of the circumstances makes clear that the defendant is merely a caretaker at the Barn who must share his "most

private space" at the property "with any humanitarian that wants clothing for undocumented migrants." T/R 6/14 at 7:3-26.  The evidence demonstrates that the Barn is not a home, that the defendant's residence is elsewhere in the small town of Ajo, and that his role at the Barn is to supervise the groups of volunteers who pass through and to protect the interests of the actual owner of the property. The defendant is not the owner, tenant or occupant of the Barn. *See* Doc. 110 at 7:13-19.  Rather, he was a guest and agent with limited authority from the owner who shared the space with visiting groups of volunteers and illegal aliens. Doc. 110 at 7:13-19.This is insufficient to establish an expectation of privacy that society is prepared to recognize as reasonable.

That the defendant does not have standing in this case is supported by the Ninth Circuit's analysis of similar facts in *United States v. $40,955.00 in U.S. Currency*, 554 F.3d 752 (9th Cir. 2009). In that case, the Ninth Circuit held that, although an adult daughter had a key and free access to her parent's house where she kept some personal property, she did not have standing to challenge the search of her parents' home because she did not own the home or live there at the time of the search. *Id*. at 757-58.  Like the adult daughter in *$40,955.00 in U.S. Currency*, the defendant did not live at or own the Barn, and although he stored some personal items there, the storage alone does not confer a Fourth Amendment interest in the area searched.  *See id.*; *see also United States v. Reyes-Bosque*, 463 F.Supp.2d 1138 (S.D. Cal. 2006) (even though the stash house/apartment was "technically a residence" the defendant did not have standing to challenge its search because he was

merely a caretaker, and that his use of the stash house "was purely commercial in nature" and "he was supervising the merchandise.").

The holding in *United States v. Byrd*, 138 S.Ct. 1518 (2018), does not require a different result. In *Byrd*, the Supreme Court held only that "the mere fact that a driver in lawful possession or control of a rental car is not listed on the rental agreement will not defeat his or her otherwise reasonable expectation of privacy." 138 S.Ct. at 1531. As the Court noted, the right to exclude is but one factor in the totality of circumstances to determine whether a person has a reasonable expectation of privacy, and the right to exclude does not equate to an expectation of privacy.  For example, a gas station attendant may exclude unruly people from the gas station; the person collecting tickets at a sporting event may exclude someone from the stadium without a ticket; and a hospital patient may exclude someone from her room, but none of those individuals would have an expectation of privacy in the location to which they hold the authority to exclude. *See* Doc. 110 at 7:20-23.  In this case, although the defendant may have had some authority to exclude, other factors demonstrate the defendant did not have an expectation of privacy.

As discussed above, the totality of the circumstances demonstrates that the defendant was a mere caretaker of the Barn and, as such, did not have a reasonable expectation of privacy in the Barn during the events of January 17.  Accordingly, the Report and Recommendation should be adopted regarding this issue.

*///*

**b. No Fourth Amendment violation occurred during the events at the Barn on January 17, 2018.**

Even if the defendant did has standing, the agents' actions on January 17 were lawful. The agents were not required to obtain a warrant to enter the property or to search the Barn, because while they were engaged in a knock-and-talk, exigent circumstances and probable cause to believe that a crime was occurring arose such that the agents were justified in entering the Barn to locate Perez-Villanueva and Sacaria-Godoy.

As an initial matter, "no Fourth Amendment violation occurs when an officer, without a warrant, crosses the curtilage to knock on the front door to ask questions of the resident." *United States v. Hammett*, 236 F.3d 1054, 1059 (9th Cir. 2001); *see also United States v. Lundin*, 817 F.3d 1151, 1160 (2016); *United States v. Perea-Rey*, 680 F.3d 1179, 1187 (9th Cir. 2012). In this case, the agents acted as any member of the public would by passing through the open gate and walking toward the Barn. *See* TR 6/14 at 93:17-96:24.

Second, exigent circumstances and probable cause to search arose almost immediately and while the agents' were still in areas open to members of the public. Specifically, while walking on a path that led towards the Barn, Agent Marquez saw Perez-Villanueva run away from him towards the south side of the Barn. *Id.* at 93:17-96:24. When Perez-Villanueva bolted for the rear of the house, this created an exigent circumstance because agents were compelled to give chase and secure Perez-Villanueva before he had an opportunity to escape into the open desert or the residential neighborhoods adjacent to the Barn. *See Randolph*, 126 S.Ct. at 1525; *Struckman*, 603 F.3d at 743. In addition, based on the agents' prior knowledge of the Barn, their observations while conducting

- 10 -

surveillance that day, and Perez-Villanueva's flight, the agents also had probable cause to believe that a crime was being committed in the Barn. *See District of Columbia v. Wesby*, 138 S.Ct. 577, 587 (2018) (citing *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000) (unprovoked flight upon noticing the police is certainly suggestive of wrongdoing and can be treated as suspicious behavior that factors into the totality of circumstances); *Sibron v. New York*, 392 U.S. 40, 66 (1968) ("deliberately furtive actions and flight at the approach of…law officers are strong indicia of *mens rea*."); *see also United States v. Struckman*, 603 F.3d 731, 739-40 (9th Cir. 2010).

Nevertheless, the defendant argues that, because there were several agents on site, Perez-Villanueva's escape was unlikely and did not create exigent circumstances. Doc. 120 at 9:16-10:13. The defendant's argument is contrary to the holding in *United States v. Ojeda*, 276 F.3d 486, 487 (9th Cir. 2002). In *Ojeda*, the Ninth Circuit found no Fourth Amendment violation when agents entered a garage without a warrant to prevent the escape of additional suspects in the garage, even though multiple officers were present for the execution of another warrant on a residence at the same property. *Id*. at 488-89.

The defendant's argument that no exigency existed because agents could have obtained a warrant is similarly without merit. Relying on *United States v. Manfredi*, 722 F.2d 519 (9th Cir. 1983), the defendant argues that no exigent circumstances existed because the government could have "easily guarded the building with the migrant inside while they obtained a warrant." Doc. 120 at 10. However, this argument is contrary to the undisputed testimony of Agents Marquez and Burns. Agent Marquez testified that a

significant amount of area around the Barn is open desert. TR 6/14 at 86:19-87:8. If Perez-Villanueva had escaped the Barn, it would have been difficult for the agents to track him in the desert. More importantly, Agent Marquez also testified about the residential neighborhoods adjacent to the Barn, which presented a dangerous situation were Perez-Villanueva to attempt to enter one of the residences to elude capture. *Id.* Finally, Agent Burns testified that the agents approached the Barn at approximately 5:35 p.m.. and that he was concerned that it would be dark soon.  TR 7/13 at 54:15-24, 58:25-59:1, 61:18-24.  As Agent Marquez testified, he had concerns about any illegal aliens running into the surrounding desert, because "It's just easier for people to escape from us in the dark." *Id.* at 58:25-59:1. Based on these factors, immediate action to prevent Perez-Villanueva's escape was imperative.

Third, the agents' entry into the Barn's bathroom to locate Sacaria-Godoy was a search incident to arrest and a reasonable protective sweep.  In this case, agents searched and found Sacaria-Godoy in the bathroom, which immediately adjoined the area of Perez-Villanueva's arrest.  *See United States v. Lemus*, 582 F.3d 958, 962-64 (9th Cir. 2009); *see also United States* v. Murphy, 516 F.3d 1117, 1120-21 (9th Cir. 2008) (protective sweep of storage unit valid because storage unit renter, who had outstanding arrest warrant, unaccounted for at time of arrest), abrogated on other grounds by *Fernandez v. Cal.*, 134 S. Ct. 1126, 1134 (2014).  In addition, agents had reason to fear for their safety because they knew there was at least one more person hiding in the Barn.  *See Maryland v. Buie*, 494 U.S. 325, 335 (1990).

Based on the totality of the circumstances, the Court correctly found that the exigent circumstance of escape coupled with probable cause allowed entry into the Barn. The later search to locate Sacaria-Godoy was a search incident to arrest and a reasonable protective sweep. Accordingly, the Report and Recommendation should be adopted regarding these issues.

### III.    Conclusion

For the reasons discussed above, the defendant's Motions to Suppress Evidence Found as a Result of Illegal Search is meritless.  Accordingly, the Government respectfully requests that the Court adopt the Report and Recommendation in full.

Respectfully submitted this 4th day of September 2018.

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*/s/ Anna R. Wright*

ANNA R. WRIGHT
Assistant U.S. Attorney

*/s/ Nathaniel J. Walters*

NATHANIEL J. WALTERS
Assistant U.S. Attorney

Copy of the foregoing served electronically or by other means this 4th day of September 2018, to:

All ECF participants

- 13 -