Gregory J. Kuykendall, Bar # 012508
Amy P. Knight, Bar # 031374
KUYKENDALL & ASSOCIATES
531 S Convent Avenue
Tucson, AZ 85701
(520) 792-8033
greg@kuykendall-law.com
amyknight@kuykendall-law.com
*Pro Bono* Attorneys for Defendant Scott Daniel Warren

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America, | ) |
| Plaintiff, | ) No.CR-18-00223-001-TUC-RCC(BPV) ) |
| vs. | ) **REPLY TO GOVERNMENT'S** ) **RESPONSE TO MOTION FOR** ) **DISCOVERY INTO SELECTIVE** |
| SCOTT DANIEL WARREN, | ) **ENFORCEMENT** ) |
| Defendant. | ) ) |

  The Government never denies that No More Deaths released a highly critical report on the morning of the day Dr. Warren was arrested, nor that the Border Patrol knew about the report when agents decided to establish surveillance on a No More Deaths facility and arrest Dr. Warren. It never denies agents knew Dr. Warren was a volunteer and sometimes-spokesman for the same organization that had just posted its critiques along with an embarrassing video that was quickly spreading on the internet. Instead, the Government quibbles with the appropriate discovery standard and urges technical distinctions in an unavailing attempt to avoid the inevitable conclusion that Border Patrol has previously observed highly similar conduct and, when that conduct was not immediately preceded by this protected First Amendment activity, never arrested the volunteers.

The Government correctly acknowledges that the United States Supreme Court has not addressed the discovery standard for selective enforcement claims. Nevertheless, relying solely on two decisions out of the Tenth and Eighth Circuits, it urges this Court to apply the rigorous discovery standard for selective prosecution claims established in *United States v. Armstrong*, 517 U.S. 456 (1996). (Response at 7-8). However, only one of those cases, *United States v. Alcaraz-Arellano,* 441 F.3d 1252 (10th Cir. 2006), involved a selective enforcement claim, while the other case involved a selective prosecution claim and does not support the Government's position. *See United States v. Deering*, 179 F.3d 592, 594 (8th Cir. 1999) ("Before his trial, Deering made a motion to dismiss the indictment 'on the grounds of selective prosecution.'").

The Government has failed to offer any persuasive reason why *Armstrong* should apply here. Contrary to the Government's assertion, law enforcement agencies are not entitled to the same "presumption of regularity" afforded to prosecutors. *See United States v. Davis*, 793 F.3d 712, 720-721 (7th Cir. 2015); *see also Armstrong,* 517 U.S. at 464 (recognizing the source of the protection for prosecution decisions in statutes governing duties of Attorney General and United States Attorneys). Furthermore, as recognized by numerous courts, the *Armstrong* standard is often impossible to meet in selective enforcement cases, "effectively den[ying] [defendants] any ability to discover or prove such a claim." *United States v. Mesa-Roche*, 288 F. Supp. 2d 1172, 1187 (D. Kan. 2003). *See* Motion for Discovery at 14-15. But even if this Court applies *Armstrong*, Defendant has met its standard by presenting "some evidence" of discriminatory effect and intent. 517 U.S. at 468.

### 1. Defendant has presented "some evidence" of discriminatory effect even under the *Armstrong* standard.

The Government's entire argument on *Armstrong*'s first prong relies on an incorrect interpretation of the "similarly situated" requirement—namely, that the similarly situated group must have engaged in the exact same conduct under the exact same circumstances as the defendant. (Response at 8-9) ("When considering the details of the charges against the defendant, it is clear that none of the volunteers with No More Deaths or similar organizations in southern Arizona offered up by the defendant were similarly situated."). Under *Armstrong*, the correct inquiry is whether there are individuals who are not members of the protected class who "could have been" arrested or charged for the same offense. 517 U.S. at 470. No requirement exists that the similarly situated individuals engaged in the exact same conduct as the defendant. Such a requirement would be impossible to meet in most, if not all, cases.

In *United States v. Mumphrey*, 193 F. Supp. 3d 1040, 1042 (N.D. Cal. 2016), the defendants claimed they were arrested and charged with drug trafficking offenses because they were black. The government claimed the defendants were arrested as part of program designed "to aggressively prosecute drug dealers around schools and playgrounds in the Tenderloin district" of San Francisco. 193 F. Supp. 3d at 1042. While ultimately finding it unnecessary under *United States v. Davis*, 793 F.3d 712 (7th Cir. 2015), the court found the defendants satisfied the similarly-situated requirement based on data showing that a significant number of individuals who were not black "could have been charged" with drug-trafficking near a school or playground in the Tenderloin, but were not. *Mumphrey*,

193 F. Supp. 3d at 1061. The government argued these individuals were not similarly situated to the defendants because they did not involve "the same basic crime" committed "in substantially the same manner." *Id.* at 1062. Specifically, while the charged defendants engaged in hand-to-hand drug deals, not all the non-black individuals who were not charged made hand-to-hand deals. The court found this difference irrelevant, because the "manner of sales make[s] [no] difference from the viewpoint of the objective" to target drug transactions near schools and playgrounds in the Tenderloin. *Id.*[1] Thus, "[a] court should take 'care[] not to define the [similarly situated] requirement too narrowly.'" *Mumphrey*, 193 F. Supp. 3d at 1061; *see also Fedorov v. United States*, 600 A.2d 370, 380-81 (D.C. 1991) (*en banc*) (protesters' unlawful entry convictions reversed where trial court erroneously concluded "that the appropriate comparison group for selective prosecution analysis was all persons who had participated *the same night* in the demonstration on behalf of the homeless at *the same place*[.]") (emphasis in original). Focusing solely on persons whose conduct was exactly the same "defeat[s] any meaningful comparison for selective prosecution [or enforcement] purposes." *Fedorov*, 600 A.2d at 380.

Dr. Warren has identified a group of similarly situated individuals who could have been arrested on suspicion of harboring under similar circumstances: the volunteers who were present when Border Patrol raided a different No More Deaths facility in June, 2017.

---

[1] Although not argued here, the court also rejected the government's argument that the defendants were properly targeted because there was "strong evidence" of their crimes in the form of video recordings. "The question for selective enforcement is whether law enforcement was improperly targeting African Americans in the first place." *Mumphrey*, 193 F. Supp. 3d at 1061-1062.

4

*See* Motion for Discovery at 17. The Government ignores this obvious example, perhaps because it cannot reasonably distinguish it. To be sure, Dr. Warren "is charged with harboring illegal aliens to avoid their detection by immigration authorities, not just providing 'necessities to an undocumented migrant.'" Response at 8. But the factual basis of the criminal complaint states only that Dr. Warren "took care" of the migrants for three days "by giving them food, water, beds, and clean clothes," (Doc. 1), and the Government has never produced any evidence of anything else.[2] No material differences exist between the conduct of those NMD volunteers and the alleged conduct of Dr. Warren—except that Dr. Warren's conduct occurred *after* the publication of the NMD report. *See Mumphrey*, 193 F. Supp. 2d at 1062 ("the question is whether [any] difference was material for the similarly saturated analysis"). And of course, a relevant difference would have to be in the conduct, not in exactly how the Government elects to define the charges. Who is to say that volunteers in the June, 2017 incident could not have been charged the same way? Indeed, if the Government had the power to render a case dissimilar simply by changing its precise allegations, it could fully insulate itself from all selective enforcement and selective prosecution claims through careful pleading. That is obviously not the law. Accordingly, Dr. Warren has made an initial showing of discriminatory effect. *Mumphrey*, 193 F. Supp. 2d at 1062 ("One similarly situated example is arguably all Defendants need to show

---

[2] Indeed, the Government's own witnesses—the two migrants who have already been deposed—both testified Dr. Warren had *not* given them any instruction to hide, and that they walked around outdoors in plain view. Nor is the allegation that the migrants had stayed there two nights significant; in the Arivaca incident, agents had also observed migrants staying overnight in the facility. *See* Paul Ingram, "Border Patrol raids No More Deaths camp, arrest migrants seeking medical care," *Tucson Sentinel,* June 15, 2017.

5

discriminatory effect.") (citing *United States v. Alabi*, 597 Fed. Appx. 991, 996 (10th Cir. 2015) (recognizing "the identification of *a similarly situated individual* who could have been, but was not, stopped or arrested" as sufficient) (emphasis added)).

### 2. Defendant has presented "some evidence" of discriminatory intent.

The Government accuses Defendant of "ignor[ing] the timeline of events and explanations for the agents' actions offered during their earlier testimony." Response at 9-10. But Defendant's expressly stated position is that even if this Court credits the agents' testimony that they had reasons for surveiling The Barn unrelated to the report, this would not defeat discriminatory intent. Motion for Discovery at 22-23. *See United States v. Turner*, 104 F.3d 1180, 1184 (9th Cir. 1997) (defendant must demonstrate only that the government was motivated "at least in part because of" its adverse effects upon a particular group or person) (internal citations omitted). The required showing can be based entirely on circumstantial evidence. *Alcaraz-Arellano,* 441 F.3d at 1264.

The Government also mischaracterizes Defendant's argument regarding the agents' alleged search for the two migrants believed to be around Ajo. As an initial matter, Ajo is only about 40 miles from the border, and migrants arrive there routinely. The Government has never suggested that the "information" they had about hiding migrants was out of the ordinary. Looking for migrants is what these agents do every day, and the suggestion that a tip that there might be two of them somewhere in Ajo somehow changed the circumstances and explains their choice to target The Barn is implausible.

Defendant never suggested the agents had not been told two migrants might be hiding in Ajo, as the Government claims. Response at 9-10. Rather, Defendant questioned

6

whether this was their true motivation in surveilling the Barn that day, given that they had no idea what the two individuals they were allegedly searching for looked like—even whether they were men or women. Motion for Discovery at 7, 22. Testimony that they were searching for two particular individuals is simply not credible when they had not bothered to gather even the most rudimentary information about them. And even if they were actually searching for two specific people that day, the Government has identified no non-discriminatory reason why the agents would have thought these two particular individuals were, of all places, at the Barn. The testimony the Government relies on for this choice shows only that Agent Marquez had identified the owner, that he had first researched the property in April, 2017, and that some unidentified local residents were "concerned" that the building "was being used to harbor illegal aliens." Tr. 7/13 at 45. How this general, unsubstantiated "concern" reported at some unknown time between April and January gave agents any plausible reason to believe two particular individuals would be there on January 17, 2018, the Government never says.

The Government further accuses Defendant of mispresenting the testimony at the suppression hearing regarding Agent Burns' text message about "tak[ing] everyone in regardless." Response at 11. But the fact that Border Patrol could initiate a prosecution does not explain the agent's expressed unqualified intention to make arrests. He may have subsequently said, when confronted with potentially damaging messages, that he *meant* they were only going to do it if they legitimately determined that a crime was being committed, but that is not what he texted to his colleagues at the time. The point is simply

that the agent's expressed enthusiasm for making arrests at the Barn provides some circumstantial evidence of discriminatory intent.

Considering all the relevant circumstances, including the timing of Dr. Warren's arrest in relation to the publication of the report, Dr. Warren has demonstrated "some evidence" of discriminatory intent. Because the Government has failed to rebut this showing, Defendant is entitled to discovery under the flexible standards adopted by the Seventh and Third Circuits, as well as the higher standard established in *Armstrong*.

### 3. **Defendant's discovery requests are necessary and appropriate.**

The Government argues that requests 1, 3-5, and 7 "have no bearing on his selective enforcement claim." Response at 12. The first request, for communications regarding Border Patrol's decision to surveil The Barn, is indisputably relevant to a selective enforcement claim, as it could reveal the underlying reasons for initiating the surveillance. Additionally, if agents previously surveilled The Barn and suspected illegal activity there but did not make any arrests, this would be further evidence of discriminatory effect. The fourth demand—regarding investigations of any other humanitarian aid workers in Southern Arizona—could also reveal that Border Patrol was aware of other individuals engaging in similar conduct, but did not take enforcement action. The fifth demand—Border Patrol's internal policies and procedures for interacting with humanitarian aid workers—could also illuminate whether Dr. Warren's arrest was consistent with the agency's normal practices. *See Davis*, 793 F.3d at 723 ("Analysis of the targeting criteria (and whether agents followed those rules in practice) could shed light on whether an initial suspicion of race discrimination in this case is justified.").The third demand, for

information related to Border Patrol's communications with any other law enforcement agency regarding the decision to charge Dr. Warren and refer his case for prosecution, is relevant because it could reveal that Border Patrol encouraged other agencies to pursue Dr. Warren for improper reasons, and could help establish discriminatory intent.

The Government argues Defendant's seventh demand—for data on charging practices—is not relevant because "[t]he decision whether to bring charges in any given case is a matter of prosecutorial discretion, not selective enforcement." Response at 12. But the cases hold that data on prosecutions (or lack of prosecutions) for the same offenses under similar circumstances are relevant to discriminatory effect, even when the claim is one of selective enforcement. *Davis*, 793 F.3d at 722 ("The racial disproportion in stash-house *prosecutions* remains troubling, however, and it is a legitimate reason for discovery provided that the district court does not transgress *Armstrong* or an applicable privilege.") (emphasis added); *United States v. Washington*, 869 F.3d 193, 214 (3d Cir. 2017) (evidence of discriminatory effect "may be based in part on patterns of prosecutorial decisions (as was the case in *Davis*) *even if* the underlying challenge is to law enforcement decision"); *Mumphrey*, 193 F. Supp. 2d at 1062 ("some evidence" of discriminatory effect established, in part, by charging data on similar offenses in state court).

The Government also states that charging data is publicly available, citing a footnote in Defendant's motion listing harboring cases found on Lexis. Response at 13. However, Lexis does not include information on cases resolved prior to trial without substantive court orders or decisions that would be reported in a legal search engine, or cases in which the U.S. Attorney's Office brought charges but subsequently declined to prosecute.

The Government further complains that Defendant's demands are overly burdensome because the time frame for the requested materials is open-ended. Response at 12. If that is of concern, the Court may order discovery in "measured steps," *Davis*, 793 F.3d at 722, for example, by first ordering disclosure of relevant materials from the past five years. If further discovery is warranted following a review of these materials, the Court could then extend its order.

Additionally, the Government avers it should not be required to disclose "oral communications" that have not been reduced to writing and are not within its custody and control. Response at 12. But this type of information could expose Border Patrol's motivations for targeting The Barn and Dr. Warren (Requests 1 and 2), and could reveal whether the agency has any informal, unwritten policies regarding the treatment of humanitarian aid workers that were not followed in this case (Request 5). The Court may inquire into these matters through means other than by written discovery, such as by taking "affidavits or testimony of the case agents, to determine whether forbidden selectivity occurred or plausibly could have occurred." *Davis*, 793 F.3d at 723.

Moreover, Defendant's requests for relevant information from "any law enforcement agency" (Requests 1-4) are not overbroad. The Government's disclosure duties typically extend to materials "in the possession, custody or control of any federal agency participating in the same investigation of the defendant." *United States v. Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989).

Finally, to the extent the Government claims any of the requested materials are privileged or protected as work product (Response at 12), these concerns are outweighed

by Dr. Warren's compelling need for the materials to establish his selective enforcement claim. *See Doubleday v. Ruh*, 149 F.R.D. 601, 608-610 (E.D. Cal. 1993) (attorney's mental impressions and official government information may be disclosed "if the needs of the case are 'substantial" and even 'compelling'"). Denying Defendant access to these materials would "effectively den[y] [him] any ability to discover or prove such a claim." *Mesa-Roche*, 288 F. Supp. 2d at 1187. If necessary, this Court could review the materials *in camera* to assess whether the Government may properly assert any privileges, and "weigh the potential benefits of the disclosure against the potential disadvantages." *Id*. at 609 (internal citations omitted). *See United States v. Aguilar*, 883 F.2d 662, 708 n.49 (9th Cir. 1989) (district court reviewed documents related to decision to prosecute under seal); *Davis*, 793 F.3d at 723 (court may review law enforcement's targeting criteria *in camera*).

## CONCLUSION

For the foregoing reasons and those previously presented in Defendant's Motion for Discovery Into Selective Enforcement, Defendant requests this Court to issue an order requiring the Government to disclose any and all information related to his selective enforcement claim, including but not limited to Items (1) through (7) listed above.

RESPECTFULLY SUBMITTED this 13th day of September, 2018.

By /s/ Amy P. Knight
Gregory J. Kuykendall
Amy P. Knight
531 S Convent Avenue
Tucson, AZ 85701
Attorneys for Defendant Scott
Daniel Warren


## CERTIFICATE OF SERVICE

I certify that on September 13th, 2018, I electronically transmitted a PDF version of this document to the Clerk of Court using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Nathaniel J. Walters, Esq. (email: Nathaniel.walters@usdoj.gov)
Anna R. Wright, Esq. (email: anna.wright@usdoj.gov)
United States Attorney's Office
405 W. Congress, Suite 4800
Tucson, AZ 85701