Gregory J. Kuykendall, Bar # 012508
Amy P. Knight, Bar # 031374
KUYKENDALL & ASSOCIATES
531 S Convent Avenue
Tucson, AZ 85701
(520) 792-8033
greg@kuykendall-law.com
amyknight@kuykendall-law.com
*Pro Bono* Attorneys for Defendant Scott Daniel Warren

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America, | ) |
| Plaintiff, | ) No.CR-18-00223-001-TUC-RCC |
| vs. | ) **OBJECTION TO MAGISTRATE'S REPORT AND RECOMMENDATION RE MOTION TO DISMISS INDICTMENT FOR VIOLATION OF INTERNATIONAL LAW** |
| SCOTT DANIEL WARREN, | ) |
| Defendant. | ) |

Defendant Scott Daniel Warren, through his pro bono attorneys, objects to the Report and Recommendation (R&R) (Doc. 134) recommending denial of his motion to dismiss in its entirety. The Government is prosecuting Dr. Warren under a statute that broadly forbids assisting undocumented individuals in coming to and remaining in the United States. The Magistrate wrongly determined that it could do so despite its international commitment in the Protocol Against Smuggling of Migrants by Land, Sea and Air (the "Migrant Smuggling Protocol") to protect the human rights of migrants. This Court, in its de novo review of this question of statutory interpretation, must give effect to America's promise that, while maintaining its right to prosecute migrants for immigration offenses, it would work to ensure that their human rights are protected.

1. <u>The R&R Fundamentally Misunderstands the Legal Basis for the Claim.</u>

The R&R notes in its statement of facts that "Article 20 of the Treaty, which provides the enforcement mechanisms for violations of the Treaty, was not adopted." Doc. 132 at 2. Subsequently, it states "the Defendant conceded he did not have a private right action [sic] pursuant to the Treaty." Doc. 134 at 3. These observations are irrelevant to the claim presented here. Dr. Warren has not claimed that the treaty itself provides him with some sort of legal claim, and is not asking this Court to settle a dispute between parties to the treaty. Rather, he asserts that as a matter of domestic law, which includes the effect of ratified treaties, his alleged conduct is excluded from the definition of harboring. In other words, the question before the Court is whether, taking into account any changes worked by the Migrant Smuggling Protocol upon its ratification in 2005,[1] 8 U.S.C. § 1324 forbids the alleged conduct. Dr. Warren maintains that in light of the treaty, which was ratified after and thus prevails over the statute, his alleged conduct is not prohibited under United States law. The legal basis for relief is thus not the treaty, but Federal Rule of Criminal Procedure 12(b)(3)(B)(v), which provides for dismissal when an indictment fails to state an offense, and this Court's task is interpreting § 1324. *See Cabrera-Alvarez v. Gonzales,* 423 F.3d 1006, 1009 (9th Cir. 2005) (interpreting immigration statute in light of United Nations Convention on the Rights of the Child).

Under Article VI of the United States Constitution, ratified treaties are the supreme law of the land in this country, regardless of the mechanisms they may or may not provide

---

[1] The R&R states that "In the year 2000, the United States became a member of the Protocol Against the Smuggling of Migrants by Land, Sea, and Air." Doc. 134 at 2. The United States did sign the protocol on December 13, 2000 at Palermo, Italy, but it was not ratified by the Senate until October 7, 2005.

2

for the settlement of a dispute between two nations. A ratified treaty's terms apply in the United States just as federal statutes do. Thus, in a domestic court proceeding in this country, a ratified treaty is one source of governing law, alongside the Constitution, statutes, and common law. This Court has been asked simply to determine the application of some of those laws to this case. *See, e.g., United States v. Smiskin,* 487 F.3d 1260 (9th Cir. 2007) (affirming dismissal of indictment because treaty exempted alleged conduct); *Nuru v. Gonzales,* 404 F.3d 1207, 1217-23 (9th Cir. 2005) (interpreting Convention Against Torture to require withholding of removal in immigration proceeding). There is nothing unusual about considering the effect of treaties on the federal statutes under which the government brings a legal action.

To be sure, the Migrant Smuggling Protocol does provide, as many treaties do, that if a dispute arises between two *countries* who are both party to the treaty, they may, after completing arbitration, submit the dispute to the International Court of Justice (ICJ). Art. 20(2). But the settlement of disputes between nations about what a country must do to comply is an entirely different question from the application of a ratified treaty's requirements domestically. Indeed, domestic courts' application *vel non* of a treaty's required protections can itself be the basis of the type of international dispute contemplated by remedy provisions like Article 20. *See, e.g., Avena and Other Mexican Nationals* (Mex. V. U.S.), 2004 I.C.J. 12 (Judgment of March 31).[2] In other words, in the realm of

---

[2] In *Avena,* Mexico filed an application to institute proceedings in the ICJ, alleging that the United States had violated the terms of the Vienna Convention on Consular Relations "in arresting, detaining, trying, convicting, and sentencing" 54 specifically identified Mexican nationals. Para. 12(1). Thus, the complained-of actions were in part those of domestic courts in neglecting the treaty's requirements in criminal proceedings. The ICJ ruled, among other things, that in some cases, the United States breached treaty obligations "by not permitting the review and reconsideration, in light of the rights set forth in the

3

international obligations, domestic courts are among the actors charged with carrying out the obligations, not the ultimate arbiters of their meaning.

And of course, opting out of a treaty's inter-country dispute resolution mechanism in no way limits the obligations of a State Party to act in compliance with its terms. If that were the case, ratification of a treaty without submitting to a particular enforcement mechanism would be a meaningless act. But the treaty itself explicitly provides States Party with the option of exempting themselves from ICJ dispute resolution, *see* Art. 20(3), as the United States has done. Thus, this treaty's drafters clearly recognized that it would serve to constrain parties' actions regardless of participation in the ICJ dispute resolution mechanism.

2. The Treaty's Preservation of Domestic Law Was Intended Only to Prevent Wholesale Exemption of Migrants From All Liability.

Article 6(4) of the Migrant Smuggling Protocol provides, "Nothing in this Protocol shall prevent a State Party from taking measures against a person whose conduct constitutes an offence under its domestic law." The Magistrate takes this to mean that unlike the rest of the treaties to which the United States is party, this one automatically subjugates itself to any earlier-enacted law that is in any way inconsistent. This is error.

First, the provision's drafting history makes clear that its purpose was to clarify that although parties could not criminalize migrants simply for being the victims of organized smuggling, it *could* still punish migrants for regular, pre-existing immigration offenses, so long as their punishments were not *enhanced* for their victimization by the criminal

---

convention, of the conviction and sentences" of certain defendants. Para. 153(8). It was thus in part the actions of courts in the United States that violated the treaty.

4

smuggling operation. The Supreme Court directs courts to consider the negotiating and drafting history of treaties in interpreting its terms. *Zicherman v. Korean Airlines,* 516 U.S. 217, 226 (1996). The initial draft of the provision provided that "A person whose illegal entry and/or illegal residence is procured or intended by the smuggling of migrants shall not become punishable under this Protocol." *Travaux Préperatoires*[3] at 478. However, "several delegations were apprehensive about the possibility of the protocol granting immunity to illegal migrants, especially if they had committed a crime, including the smuggling of other illegal migrants." *Id.* at 482 n. 20. The Notes by the Secretariat explain that "there was consensus that migrants were victims and should therefore not be criminalized. It was also agreed, however, that migrants should not be given full immunity." *Id.* at 483. At one point, a coalition of seven countries including the United States suggested the language "Nothing in this Protocol shall be interpreted as requiring States Parties to take measures against a migrant for the mere fact of having been smuggled." *Id.* at 484. Ultimately, the drafters settled on the adopted language to accomplish their objective of preventing the wholesale immunization of migrants from any criminal sanction.

Crucially, at the same time, and in the same discussions, the drafters were refining the language of Article 6, paragraph 1, the provision that provides for criminalization of various actions "when committed intentionally and in order to obtain, directly or indirectly, a financial or other material benefit." As detailed in the briefing on this motion, the drafters

---

[3] United Nations Office on Drugs and Crime, Travaux Préparatoires of the Negotiations for the Elaboration of the United Nations Convention against Transnational Organized Crime, available at https://www.unodc.org/pdf/ctoccop_2006/04-60074_ebook-e.pdf.

5

Case 4:18-cr-00223-RCC-BPV   Document 136   Filed 11/21/18   Page 6 of 10

were explicitly concerned with ensuring that humanitarian support was *not* criminalized. *See* Doc. 115 at 6; Doc. 128 at 7. Thus, the drafters of Article 6 had a coherent vision about what would and would not be criminalized under the Migrant Smuggling Protocol: smuggling for profit and activities taken in support of that enterprise would be criminal; being victimized by for-profit smuggling would not be criminal; humanitarian support by NGOs, churches, and family members would not be criminal; and immigration and other offenses by smuggling victims would be unaffected.

Second, as a matter of U.S. law, a treaty's provisions *do* prevail over the terms of an earlier-passed statute. In *Whitney v. Robertson*, 124 U.S. 190 (1888), merchants complained that the imposition of a tax on goods they brought into New York violated a treaty with the Dominican Republic. The Court explained that the tax applied, treaty notwithstanding, because the statute imposing it "was passed after the treaty with the Dominican Republic, and, if there be any conflict between the stipulations of the treaty and the requirements of the law, the latter must control. . . . if the two are inconsistent, *the one last in date will control the other*." *Id.* at 194 (emphasis added); *see also Breard v. Greene*, 523 U.S. 371, 376 (1998) (holding that an international treaty providing an individual right to assistance cannot be enforced in postconviction proceedings where a later-enacted federal statute limits availability of relief). The Migrant Smuggling Protocol's provision limiting the immunity of migrants to charges stemming from their victimization cannot overcome this bedrock principle.

   3. <u>The Treaty Adds Protection of the Human Rights of Migrants to Existing Human Rights Obligations.</u>

The R&R characterizes Article 19 of the Migrant Smuggling Protocol as a "[d]ecision not to expand any humanitarian rights that existed prior to the Protocol's authorization." This is an odd reading of a self-identified "Saving clause," which was clearly intended to prevent any interpretation of the Smuggling Protocol that would limit or otherwise override existing human rights obligations. The provision serves to clarify that the Smuggling Protocol's requirements are *in addition to*, not instead of, existing international human rights obligations; it says nothing about whether the protocol itself creates rights and obligations. Indeed, the protocol explicitly includes among is stated purposes "protecting the rights of smuggled migrants," Art. 2, and notes in its preamble that it responds, in part, to a concern "that the smuggling of migrants can endanger the lives or security of the migrants involved." It is thus nonsensical to suggest that the inclusion of a saving clause somehow means the treaty does not create any human rights obligations.

4. <u>This Interpretation of the Harboring Statute is Simply an Application of Existing Laws.</u>

Applying the Migrant Smuggling Protocol's provisions consistently with our co-signatories and the guidance of the United Nations does not constitute "creating the laws of this country." Doc. 134 at 2. In so characterizing the proffered interpretation of § 1324 in conjunction with the Migrant Smuggling Protocol, the R&R treats a binding, ratified treaty as though it were not already the law in this country. This is a grave error. The law already exists. This Court need only determine what, in light of the ratification of the Migrant Smuggling Protocol, § 1324 can legally punish.

The opinion of the Supreme Court of Canada in *R. v. Appulonappa*, 2015 SCC 59,[4] perfectly illustrates this. In *Appolunappa*, a group of Sri Lankan migrants was apprehended off the coast of Vancouver Island. Four of the migrants were charged under a Canadian statute stating "No person shall organize, induce, aid or abet the coming into Canada of one or more persons knowing that, or being reckless as to whether, their coming into Canada is or would be in contravention of this Act." This statute bears obvious similarities to 8 U.S.C. § 1324. The Canadian Supreme Court ruled that "insofar as [the statute] permits prosecution for humanitarian aid to undocumented entrants. . . it is unconstitutional." Para. 5. Canada, like the United States, maintains a presumption that legislation complies with its international obligations. Para. 40. The Court thus looked to the Migrant Smuggling Protocol, which Canada had ratified, and, recognizing the "material benefit" limitation in Article 6 and the saving clause preserving existing humanitarian obligations, explained that "It would depart from the balance struck in the *Smuggling Protocol* to allow prosecution for mutual assistance among refugees, family support and reunification, and humanitarian aid." Para. 44. This analysis did not entail the creation of any new law; it merely examined an existing statute in light of Canada's international obligations, including the same Migrant Smuggling Protocol at issue here, and determined that it could not extend as far as the prosecutors wished to stretch it. That is precisely what this Court must do.

The R&R includes a four-point list of what it presents as a "fair reading of the Treaty." Doc. 132 at 2. In assembling this incomplete list, the Magistrate fails to address the considerations the Supreme Court has repeatedly identified as relevant to the

---

[4] *Available at* https://scc-csc.lexum.com/scc-csc/scc-csc/en/item/15648/index.do.

8

interpretation of a treaty. The analysis fails to consider:

- The negotiating and drafting history (*travaux préparatoires*), *Zicherman v. Korean Airlines,* 516 U.S. 217, 226 (1996)
- The Senate's statements and actions regarding the Treaty, *United States v. Stuart,* 489 U.S. 353, 368 (1989)
- The "great weight" afforded the views of fellow signatories, *Air France v. Saks*, 470 U. S. 392, 404 (1985)
- The views of the United Nations, *INS v. Cardoza- Fonseca*, 480 U.S. 421, 452 (1987)

Thus, the R&R's reading neglects significant evidence that reveals the intent of the parties in agreeing to the Migrant Smuggling Protocol.

The United States seeks, here, to criminally punish a volunteer for the provision of humanitarian aid because the recipients of that aid did not have legal authorization to be in this country. But these prosecutors are agents of the same government that has committed to the protection of the human rights of migrants and agreed to a protocol that exempts such actions from punishment. Accordingly, it cannot maintain this prosecution.

RESPECTFULLY SUBMITTED this 21st day of November, 2018.

By /s/ Amy P. Knight
Gregory J. Kuykendall
Amy P. Knight
531 S Convent Avenue
Tucson, AZ 85701
Attorneys for Defendant Scott
Daniel Warren

9

## CERTIFICATE OF SERVICE

I certify that on November 21st, 2018, I electronically transmitted a PDF version of this document to the Clerk of Court using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Nathaniel J. Walters, Esq. (email: Nathaniel.walters@usdoj.gov)
Anna R. Wright, Esq. (email: anna.wright@usdoj.gov)
United States Attorney's Office
405 W. Congress, Suite 4800

Tucson, AZ 85701