Gregory J. Kuykendall, Bar # 012508
Amy P. Knight, Bar # 031374
KUYKENDALL & ASSOCIATES
531 S Convent Avenue
Tucson, AZ 85701
(520) 792-8033
greg@kuykendall-law.com
amyknight@kuykendall-law.com
*Pro Bono* Attorneys for Defendant Scott Daniel Warren

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | ) |
| | ) No.CR-18-00223-001-TUC-RCC |
| Plaintiff, | ) |
| | ) **MOTION FOR SANCTIONS DUE** |
| vs. | ) **TO SERIOUS ETHICAL** |
| | ) **VIOLATIONS** |
| SCOTT DANIEL WARREN, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

Defendant Scott Daniel Warren, through his pro bono attorneys Gregory J.

Kuykendall and Amy P. Knight, hereby moves this Court to impose sanctions on

Assistant United States Attorneys Anna Wright and Nathaniel Walters for their

improper, unethical, and prejudicial conduct in engaging in ex parte

communications with Magistrate Judge Velasco. Specifically, he requests that the

Court dismiss the indictment or, at the very least, disqualify the U.S. Attorney's

Office for the District of Arizona. In support thereof, he states as follows:

## I.    Introduction

The Supreme Court directs that "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486 U.S. 153, 160 (1988). It has also long recognized that "[t]he United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). In combination, these principles demand that federal prosecutors scrupulously observe the rules of ethics, not only for the sake of defendants, but also for the sake of the criminal justice system.

Here, the Assistant U.S. Attorneys undeniably broke a basic ethical rule: they approached the judge ex parte and pitched their argument for relief from a prior ruling that favored the defense. The judge gave them that relief. Only after this exchange was complete did the defense learn that it had occurred, and only a week after that was the defense informed of the *content* of the ex parte communications, not by the prosecutors who had improperly initiated them, but by the judge who received—and relied upon—them. Especially because this misconduct occurred in the context of a claim that government agents had acted illegally in targeting Dr. Warren for arrest—something prosecutors would have an

obvious motive to cover up—this case cannot proceed with the fact and appearance of strict impartiality necessary to maintain public confidence in our justice system.

II.   Factual Background

On January 17, 2018, No More Deaths, a local humanitarian organization, issued a report entitled "Death & Disappearance on the US-Mexico Border: Interference with Humanitarian Aid." The report, along with accompanying video footage, was highly critical of the Border Patrol's actions in destroying emergency supplies left in the desert for travelers in distress. The organization held a press conference that morning, distributed the report and videos widely, and emailed a copy of the report directly to a Border Patrol official, who forwarded it to the agent in charge at the Ajo station. That same morning, the Ajo agent forwarded it to the Pima County Sheriff's Office and the National Park Service. Doc. 131-2.

Around 2:00 that afternoon, Border Patrol agents set up surveillance on a No More Deaths facility in Ajo known as The Barn. When defendant Scott Warren arrived there later that afternoon, the agents immediately recognized him. They continued to watch the property, apparently with the goal of trying to catch No More Deaths volunteers doing something illegal, and when they eventually saw two men they assumed were undocumented, they assembled a large convoy and entered the property. Dr. Warren asked them to leave, but they proceeded toward the door anyway, where they located and arrested two migrants. They then arrested Dr. Warren, who was charged by complaint the following day with harboring

(Doc. 1). The Government subsequently obtained an indictment for two counts of harboring and one count of conspiracy to transport and harbor (Doc. 26).

On August 23, 2018, Dr. Warren filed a Motion for Discovery into Selective Enforcement (Doc. 113), outlining his claim that the Border Patrol surveilled and arrested him in retaliation for protected First Amendment speech and association. In addition to the unavoidable inference from the timing of his arrest in relation to the report, he pointed to the Government's failure ever to prosecute anyone else for harboring based solely on provision of food, water, and shelter for humanitarian reasons. He highlighted an incident approximately six months earlier when Border Patrol agents raided a camp where volunteers were providing medical care to migrants; in that incident, which did not follow the release of a scathing report, four migrants were arrested, but Border Patrol did not arrest the volunteers who were providing food, water, shelter, and medical care. In other words, Dr. Warren had evidence that similarly situated individuals were not arrested when they had not just vocally criticized the government.

The Government responded on September 6, 2018 (Doc. 123), and Dr. Warren replied on September 13, 2018 (Doc. 126). Judge Velasco held oral argument on October 16, 2018 (Doc. 130). Dr. Warren filed a Notice of Supplemental Authority the following day, alerting the Court to the Ninth Circuit's new opinion clarifying that the heightened selective *prosecution* discovery standard does not apply to claims of selective *enforcement* (Doc. 131). Judge

Velasco issued an Order on November 7, 2018, finding that Dr. Warren's "suspicion should be explored," and directing "that the Government disclose any emails or texts sent to the two agents surveilling The Barn from 8:00 a.m. until these two agents went off duty on January 17, 2018" (Doc. 135).

Defense counsel contacted the prosecutors two days later, on January 19, inquiring about their plans for compliance with the Court's order. AUSA Anna Wright responded that "I am working to identify and gather responsive materials, and I hope to have a timeline for disclosure sometime next week." *See* Doc. 138-1. That week passed with no response, as did the following week. On November 27, 2018—nearly three weeks after the order and 18 days after their first inquiry— defense counsel again emailed the prosecutors, asking "Could you please provide us with the promised timeline for this compliance as soon as possible?" *Id.* The prosecutors did not answer, but they did send an email asking for an extension on their response to an unrelated motion. Defense counsel responded to that request immediately and again requested information about the ordered disclosure. Having received no response by December 3, and certainly no notification of the prosecutors' plan to secretly object to the magistrate's order, the defense filed a motion to compel (Doc. 138).

The following day, the prosecutors nearly simultaneously filed a response to the motion to compel (Doc. 139) and notified the defense that disclosure was available for pickup. The response stated that the Government "provided all of the

responsive materials to the Court *in camera* with a plan for disclosure," and that the Court then "issued a letter approving of the government's disclosure plan," and the government provided disclosure in accordance with that plan. Doc. 139, para. 8. The prosecutors neither included their private correspondence with Judge Velasco in their response nor otherwise provided defense counsel with a copy of what they had secretly argued to Judge Velasco. The defense filed a reply on December 6, 2018 (Doc. 138), objecting strenuously to the apparent ex parte communications between the prosecutors and Judge Velasco concerning what subset of the ordered materials they would disclose, and explaining, based on the materials that were disclosed, that additional responsive documents had to exist. The defense explained that if the Government believed the order was too broad, it should have filed—and served on the defense—a motion for reconsideration.

Judge Velasco denied the motion to compel on December 12, 2018 (Doc. 144), insisting that the Government had complied with the November 7 disclosure order because it had disclosed "the information the Court determined was in compliance with the Court's Order," and that "[t]he defendant's suggestion that he is being denied discoverable evidence is unfounded," because the Government's in camera submission was broad, and "[t]he Court reviewed it and found nothing helpful to the Defendant's case or theories of the case." Judge Velasco attached to the order his ex parte correspondence with the prosecutors.

This ex parte correspondence, disclosed for the first time over a week after it occurred, consists of a two-page letter from the prosecutors to Judge Velasco, dated December 3, 2018 (the same day defense counsel filed their motion to compel), and a one-line response from Judge Velasco the following day. The prosecutors' letter explicitly recognized that the Court's order was broad, and then argued that "upon further review, many of the texts and emails sent or received during the relevant time period do not fall within the government's disclosure obligations." Doc. 144 at 3. The prosecutors asked Judge Velasco for "permission to disclose only those materials that implicate the government's disclosure obligations under Federal Rules of Criminal Procedure 16 and 26.2, Federal Rules of Evidence 404(b) and 609, 18 U.S.C. § 3500 (Jencks Act), *Brady v. Maryland,* or *Giglio v. United States*" (citations omitted). *Id.* In other words, the prosecutors asked, in private, for the Court to rescind its order requiring additional disclosure for the selective enforcement claim not covered by pre-existing disclosure obligations. The prosecutors then outlined 18 categories of documents apparently provided to the Court in camera with the letter, and delineated which ones they would be disclosing. Crucially, under the heading "Materials Not Subject to Disclosure," they listed materials that "relate to other unrelated criminal investigations," as well as materials that "relate to this matter but do not implicate the government's disclosure obligations." The prosecutors then repeated their argument that they should only be required to produce materials covered by other

pre-existing disclosure obligations. Judge Velasco's written response said only that he would "confirm your proposed disclosure as being in compliance with [his] previous Order." Doc. 144 at 2.

### III. Governing Law

Attorneys practicing before this Court must abide by the Arizona Rules of Professional Conduct. LRCiv 83.2(e); *see also Roosevelt Irrigation Dist. V. Salt River Project Agric. Improvement & Power Dist.,* 810 F.Supp.2d 929 (D. Ariz. 2011). Other sources confirm that the Assistant U.S. Attorneys must follow the rules of ethical conduct that apply in this Court. For instance, the Justice Manual requires, in Section 1-4.010, that "Department attorneys also must comply with applicable rules of professional conduct." Regulations also confirm this obligation: "A government attorney shall, in all cases, comply with the rules of ethical conduct of the court before which a particular case is pending." 28 C.F.R. 77.4.

Ethical Rule 3.5 provides, in relevant part, that "A lawyer shall not. . . communicate ex parte with [a judge] during the proceeding unless authorized to do so by law or court order." The Comments also note that many forms of improper influence "are specified in the ABA Model Code of Judicial Conduct, with which an advocate should be familiar. A lawyer is required to avoid contributing to a violation of such provisions." (Cmt. 1). The comments further provide: "During a proceeding a lawyer may not communicate ex parte with persons serving in an official capacity in the proceeding, such as judges. . . unless authorized to do so by

law or court order. Lawyers should refer to the Code of Judicial Conduct, Rule 2.9 for authorized ex parte communications."

The Code of Conduct for United States Judges provides, in Cannon 3(4):

> A judge should accord to every person who has a legal interest in a proceeding, and that person's lawyer, the full right to be heard according to law. Except as set out below, a judge should not initiate, permit, or consider ex parte communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers. If a judge receives an unauthorized ex parte communication bearing on the substance of a matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested."

Attorneys have an ethical obligation to refrain from facilitating violations of these judicial obligations, in addition to committing ethical violations themselves.

Formal Ethics Opinions by the Arizona State Bar provide further guidance about the very limited circumstances in which attorneys may engage in ex parte communications with a judge. Opinion 87-02 observes that in addition to ER 3.5(b), "the provisions of ER 8.4(d) define professional misconduct to include conduct that is prejudicial to the administration of justice. Finally, ER 8.4(f) states that it is professional misconduct for a lawyer to 'knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct. . . .'" The State Bar then explained it was unethical for lawyers to engage in ex parte communications *even if they were initiated by the judge*. Later that year, the State Bar issued Opinion 87-17, again interpreting ER 3.5(b). A lawyer had

inquired about the propriety of ex parte communications "for purposes of resolving procedural matters, so long as the merits of any case are not discussed." The State Bar determined that even administrative matters may not be addressed ex parte, although for a purely procedural matter, a judge could "apprise the other party of any ex parte communication, allowing the other party time to be heard, and thus lifting the communication out of the realm of ex parte communications." The State Bar emphasized that this exception only applied to purely logistical discussions.

IV.    The Prosecutors Engaged in Impermissible Ex Parte Communications with Judge Velasco

A. The Prosecutors Argued to the Court Ex Parte Regarding Disclosure Obligations, and the Defense Was Not Given Notice or Any Opportunity to Respond Before the Judge Decided the Issue.

No dispute exists that the prosecutors sent a letter to the magistrate judge about their disclosure obligations without copying defense counsel. Indeed, the prosecutors admitted this in their response to Defendant's motion to compel: "On December 4. . . the government provided all of the responsive materials to the Court *in camera* with a plan for disclosure." Doc. 139 at 2. Crucially, the correspondence was only filed *as an attachment to* the order denying the motion to compel—meaning that by the time the defense was informed of the substance of the arguments, Judge Velasco had already made a decision about the extent to which he was going to enforce his November 7 order. Defense counsel thus had no

opportunity to respond to the prosecutors' ex parte submission while the judge was still considering the issue.

B. <u>The Prosecutors' Ex Parte Communication Presented a Substantive Legal Argument.</u>

The prosecutors' ex parte communications were not merely administrative. The ex parte communications constituted an argument for reconsideration. In their ex parte letter, they acknowledged what the Court's order required—"disclosure of <u>all</u> texts or emails"—and argued that they should not have to abide by those terms. Doc. 144 at 3. Specifically, they asked for permission to limit their disclosure to "only those materials that implicate the government's disclosure obligations under Federal Rules of Criminal Procedure 16 and 26.2, Federal Rules of Evidence 404(b) and 609, 18 U.S.C. § 3500 (Jencks Act), *Brady v. Maryland*, 373 U.S. 83 (1963), or *Giglio v. United States,* 405 U.S. 150 (1972). In other words, the prosecutors asked the Judge to *revoke* his order that they disclose materials pursuant to a different obligation: to provide discovery for a selective enforcement claim upon a threshold showing, pursuant to *United States v. Armstrong,* 517 U.S. 456 (1996) and *United States v. Sellers,* 906 F.3d 848 (9th Cir. 2018).

In so doing, the prosecutors were arguing a substantive position on the law: that despite the Court's order after full briefing and argument that they provide materials specifically relevant to selective enforcement, they were actually only required to disclose information that was covered by some other separate pre-

existing disclosure obligation. They argued, in essence, that the Court had been wrong to order any *additional* disclosure, despite its finding that Dr. Warren had met the threshold showing required by *Sellers*, and they therefore should not have to comply. The letter was thus not even arguably administrative or procedural in nature; it took issue with the fundamental premise of the Court's existing order, and asked to be relieved of an obligation based on a legal argument, and a demonstrably wrong argument, at that. That is precisely the type of communication—one that seeks to influence the Court's decision on a substantive issue—that absolutely may not be made ex parte.

C. Any Security or Other Concerns Cannot Justify Exclusion of the Defense from these Communications.

To be sure, situations exist where a party—often the Government—has compelling reasons for keeping certain narrow pieces of information secret. Thus, the Ninth Circuit has recognized that an ex parte proceeding may be necessary "[i]n a case involving classified documents" where the government "explained the specific damage to national defense if information were disclosed." *United States v. Klimavicius-Viloria,* 144 F.3d 1249, 1261 (9th Cir. 1998). The prosecutors here made no argument that disclosure of the ordered materials would be harmful to the public interest. And where their redactions are concerned, they provided no explanation at all—they simply stated that "the government will redact certain information." Doc. 144 at 4. The absence of any articulated concern about the

effect of disclosing the ordered documents confirms that the prosecutors had no purpose that was even arguably proper; they simply did not want to disclose the documents, and rather than arguing the point in open court, they convinced the judge in private. This is flatly contrary to the requirements of ER 3.5(b).

In any event, where real concerns about the disclosure of harmful information in criminal proceedings exist, the law provides narrow exceptions to the general ban on ex parte submissions. For instance, in the Classified Information Procedures Act, Congress provided a procedure for federal prosecutors to obtain judicial approval to withhold certain classified information from defendants on an ex parte basis. *See* 18 USC Appx § 4 ("The court, upon a sufficient showing, may authorize the United States to delete specified items of classified information from documents to be made available to the defendant. . . The court may permit the United States to make a request for such authorization in the form of a written statement to be inspected by the court alone. . . ."). This prosecution implicates no classified information and these prosecutors do not even purport to be proceeding under this authorization. Likewise, Fed. R. Crim. P. 16(d)(1) contemplates that a party may secure some restriction on required disclosure "for good cause" based on a written statement submitted ex parte.[1] But again, these prosecutors'

---

[1]The advisory committee notes explain that this provision does not entitle parties to simply approach the court in private. Rather, "if a party requests a protective or modifying order and asks to make its showing ex parte, the court has two separate determinations to make. First, it must determine whether an ex parte proceeding is appropriate, bearing in mind that ex parte proceedings are disfavored and not to be encouraged. . . . Second, it must determine whether a protective or modifying order shall issue." This very clearly contemplates an

communication did not invoke this provision or make a "good cause" showing; it simply argued they were not obligated to disclose all the ordered materials.

The fact that the law specifically carves out situations where attorneys *may* make ex parte submissions confirms that they otherwise *may not*. ER 3.5 accounts for this reality by exempting communications that are "authorized. . . by law or court order." The prosecutors here invoked no legal authorization for their private correspondence with the judge, nor can they now. Accordingly, neither the law nor ER 3.5 permits what anything approximating what they did.

If the Government had good cause to withhold some of the information it was ordered to produce, the appropriate and ethical action would have been to file a motion to reconsider the disclosure order or a motion for a protective or modifying order under Rule 16(d)(1), along with a request to make its good cause showing in an ex parte written statement. By instead addressing the judge in private with a legally unsupportable proposal for disclosure far narrower than what had properly been ordered, the prosecutors gained an unfair advantage: the ability to present their specious legal argument without opposition. That is blatantly unethical.

D. <u>Disclosure Pertaining to Selective Enforcement is an Essential Component of a Substantive Constitutional Claim.</u>

Lest there be any doubt the prosecutors' ex parte letter was substantive in nature, this was no run-of-the-mill discovery dispute. This is a claim of selective

_____

open, public request for the protective or modifying order, with an accompanying request to make the required good cause showing ex parte.

enforcement—a claim that government agents exerted their power in an improper and unconstitutional manner, in violation of the defendant's equal protection and due process rights. The Ninth Circuit recently articulated the obvious concern that makes selective enforcement so pernicious: defendants are "unlikely to meet this demanding standard without information that only the government has." *Sellers,* 906 F.3d at 850. Indeed, the Court noted that "[a]sking a defendant claiming selective enforcement to prove who *could* have been targeted" by law enforcement but was not, "is asking him to prove a negative; there is simply no statistical record for a defendant to point to." *Id.* at 853. Thus, selective enforcement is serious government misconduct, but the government controls the information necessary to prove it. Without court intervention, government agents could consistently get away with illegal discriminatory and retaliatory practices simply by refusing to hand over the information a defendant would need to prove what occurred. For this reason, when a defendant makes a credible showing based on information he *can* access, courts must order the government to provide the necessary information to investigate and prove the claim. Selective enforcement, if proven, can yield dismissal of charges. *See United States v. Mumphrey*, 193 F. Supp. 3d 1040, 1059 (N.D. Cal. 2016). Thus, selective enforcement discovery motions have high stakes.

These prosecutors' resistance to disclosing information about the agents' actions, and the fact that their attempts to limit what they must disclose were made in secret, is deeply troubling. The defense has raised a credible claim that Border

Patrol agents targeted Dr. Warren in direct retaliation for his exercising his First Amendment rights; the Court agreed that they had sufficiently established a claim that disclosure was necessary. Rather than comply with the Order, the prosecutors then secretly convinced the judge to let them withhold information they exclusively control that would have allowed full exploration of the claim that agents acted improperly. That casts a pall of impropriety over this prosecution and the U.S. Attorney's Office, and if allowed to go unpunished, over the U.S. District Court for the District of Arizona.

## V. This Court Must Fashion an Appropriate Sanction.

This Court may use its inherent supervisory powers as "an appropriate means of policing ethical misconduct by prosecutors." *United States v. Lopez,* 4 F.3d 1455, 1463 (9th Cir. 1993). The Arizona Supreme Court regards attempted ex parte communications with judicial officers following an adverse ruling to be a very serious matter. *See In re Bemis,* 189 Ariz. 119, 122 (1997) (imposing formal censure and one year of supervised probation on attorney for *negligently attempting* to contact judges ex parte following adverse rulings). It has relied on a leading treatise on legal ethics:

> The purpose of the prohibition against ex parte communications is to prevent the communicating side from gaining an unfair advantage in the litigation. The advantage is created, of course, because the communication may influence the judge on an important decision without the absent party being able to rebut or qualify the communication as it is being made and with knowledge of the exact form in which it is made. Such contacts violate the right of every party

to a fair hearing, a corollary of which is the right to hear all evidence and argument offered by an adversary. The violation is particularly acute because the calculated secretiveness of such communications strongly suggests their inaccuracy.

*In re Evans,* 162 Ariz. 197, 204-05 (quoting C. Wolfram, *Modern Legal Ethics,* at 604 (1986). Here, too, the secret argument ignored the governing law.

A. <u>This Court Should Dismiss the Indictment.</u>

Prosecutors, even more than other attorneys, are required to "stay[] well within the rules." *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993). In *United States v. Lopez*, 4 F.3d 1455 (9th Cir. 1993), an Assistant United States Attorney negotiated directly with defendant, bypassing his attorney, in violation of ethical rules. The Court explained, "We have no doubt but that federal courts are empowered to deal with such threats to the integrity of the judicial process," which, in appropriate cases, could extend to the dismissal of an indictment. *Id.* at 1464. The Ninth Circuit has actually reversed criminal convictions where prosecutors acted unethically. For instance, in *Koyjayan,* 8 F.3d 1315, the Court overturned a conviction where the prosecutor did not give the defense all the information it had about one of his witnesses whose testimony he presented by way of hearsay, rather than live. It explained the basis for its outrage at the prosecutor's behavior: "The government has never articulated why it withheld this information, saying only that 'the government . . . is not required to be defendant's investigator.' Such hard-bitten litigation tactics are unbecoming a prosecutor." *Id.* at 1323 (citing

Monroe H. Freedman, *Understanding Lawyers' Ethics* (1990)). The Court then explained that the District Court would be well within its rights, on remand, to forbid the Government from retrying the defendant, explaining, "[q]uite as important as assuring a fair trial to the defendants now before us is assuring that the circumstances that gave rise to the misconduct won't be repeated in other cases." *Id.* at 1324. The Court explained that serious sanctions were necessary because "[m]uch of what the United States Attorney's Office does isn't open to public scrutiny or judicial review. It is therefore particularly important that the government discharge its responsibilities fairly, consistent with due process." *Id.* The Court was especially concerned about "the great danger in 'untrained lawyers wielding public power.' . . . What we find most troubling about this case is not [the prosecutor's] initial transgression, but that he seemed to be totally unaware he'd done anything at all wrong, and that there was no one in the United States Attorney's office to set him straight." *Id.* The Ninth Circuit saw its role as making sure that "this kind of thing won't happen again." *Id.*

Dismissal is warranted because the ethical violation was blatant and intentional, and the prosecutors apparently saw nothing wrong with having argued their position privately to the judge. Indeed, they relied on their having submitted this private letter as a reason why they should *not* be sanctioned. Doc. 139. Now that they have been caught, they do not argue that they had some legal basis for arguing their opposition ex parte; rather, they attempt to redirect the Court's

attention to the propriety of in camera review in certain circumstances. Doc. 152-1. They either have not grasped the fundamental wrongness of their behavior, as they were not trained by their office to avoid this kind of lapse, or they are attempting to create a smoke screen with their irrelevant argument about the propriety of in camera review in order to avoid repercussions. Only a serious sanction can ensure that the U.S. Attorney's Office grasps the importance of ensuring their prosecutors behave fairly and ethically when wielding governmental power.

Significantly, the prosecutors' ethical violations have caused substantial prejudice to Dr. Warren in multiple ways. First, because of their successful ex parte lobbying of the magistrate judge, Dr. Warren is now unable *a priori* to establish either his right to additional discovery vis-à-vis his selective enforcement claim, or his right to have the case dismissed because of selective enforcement. In other words, the prosecutors' actions have prevented him from discovering the information to which he is entitled and consequently put him in the untenable position of being unable to establish the prejudicial impact of their actions. (How can he prove that the withheld material would have helped him if it remains withheld?) Second, the prosecutors' blithe refusal to acknowledge that they have done anything wrong creates an environment in which Dr. Warren cannot reasonably rely on them to follow any of the myriad disclosure requirements — *Brady*, *Giglio*, *Jenks*, *Sellers*, *Armstrong*, to name a few — for which the government and the government alone is aware of its compliance. And finally, the

abject obviousness of the impropriety that has occurred, combined with both the prosecution's and the magistrate's refusal to even acknowledge that the ex parte communication was wrong, creates a litigation environment of the absurd, where impartiality cannot be perceived or achieved. Following these violations, he no longer stands on equal footing with the Government before an impartial decisionmaker.

Finally, the prosecutors and the judge having communicated privately about a crucial substantive issue—and one concerning disclosure of evidence pertaining to potential government misconduct, at that—these proceedings no longer maintain any appearance of the strict impartiality necessary for the integrity and proper functioning of our judicial system. To allow this tainted case to proceed would undermine public confidence in the fairness of criminal proceedings.

B. At the Very Least, the Court Must Disqualify the U.S. Attorney's Office.

Courts have also recognized that "[t]he disqualification of counsel because of an ethical violation is a discretionary exercise of the trial court's inherent powers." *Crenshaw v. Mony Life Ins. Co.*, 318 F. Supp. 2d 1015, 1020 (S.D. Cal. 2004) (citing *United States v. Wunsch*, 84 F.3d 1110, 1114 (9th Cir. 1996). In this case, disqualification is necessary both to protect the integrity of the judicial process and to deter further prosecutorial misconduct.

This misconduct is not the type of slip that can occur in the heat of a moment, as when a prosecutor makes an improper comment in court. This ethical

lapse involved actively ignoring defense counsel's request for updates over the course of several weeks, reviewing and sorting out 18 distinct categories of documents, implementing redactions, drafting a two-page letter, and hand-delivering it to a judge. It was obviously deliberate, it was unethical, and it resulted in the prosecutors obtaining the relief they sought by successfully convincing the magistrate judge to walk back a previous order that was both legally correct and favorable to the defense. This Court must not allow attorneys who have openly flouted such a basic ethical rule to continue to wield the sovereign power of our federal government in prosecuting this defendant.

Nor can these prosecutors' actions be attributed to youthful inexperience; according to the State Bar, both were educated in Arizona and admitted to the bar here in 2012; Ms. Wright was previously admitted in another state in 2010. They should thus both be very familiar with the ethical rules. And of course, the prohibition on ex parte communications is not an oddity of Arizona practice or an obscure rule that is easily overlooked; it is the foundational principle of our adversary system.

In assessing these ethical violations, this Court should note that this is not the first instance of untrustworthy behavior by these prosecutors in this case. As the Court may recall, early in the case, the Government scheduled video depositions of its two material witnesses. In their initial disclosure, the prosecutors provided video recordings of interviews of those two witnesses by Border Patrol

agents. Less than a week later, and more than two weeks before the scheduled depositions, defense counsel made a specific request for "any and all additional material witness interview recordings that may exist." *See* Emergency Motion to Postpone Depositions (Doc. 30) at 2. After a four-day delay, AUSA Anna Wright averred in writing that no additional recordings existed.

That assurance was not true—an additional, undisclosed video recording of approximately 25 minutes of further interview with one of the two witnesses did exist. After intensive work by defense counsel to prove it must exist, the prosecutors finally produced it, despite the fact that they had previously denied having any such video.[2] *Id.* The withheld video turned out to include discussion of issues central to the Government's accusations, including how the two migrants got to The Barn. If the defense had relied on the prosecutor's word, as the ethical rules ought to permit them to do, they never would have received this crucial evidence. The prosecutors' denial that the video existed, when the reports generated by their own agents demonstrated that it did, violates ER 3.4(a) (Fairness to Opposing Party and Counsel), which forbids attorneys from concealing material

---

[2] Prosecutors cannot excuse nondisclosure or misrepresentations about the evidence simply by claiming they personally did not know about it. A prosecutor is "deemed to have knowledge of and access to anything in the custody or control of any federal agency participating in the same investigation of the defendant." *United States v. Zuno-Arce*, 44 F.3d 1420, 1427 (9th Cir. 1995). And in any event, the documents the defense ultimately used to force the prosecutors to acknowledge the existence of the additional video were obviously in the prosecutors' possession, as they were the ones who provided them to the defense. If AUSA Wright was unsure about the number of separate video recordings, she had an obligation to look into it before averring to defense counsel that no more existed.

with potential evidentiary value. It also implicates ER 8.4(c) and (d), which forbid dishonesty, fraud, deceit, or misrepresentation, and conduct prejudicial to the administration of justice.

Moreover, this withholding of selected portions of crucial evidence was not confined to a single incident. Just over two weeks before the scheduled depositions, the prosecutors disclosed video surveillance footage from two gas stations where the material witnesses had been, consisting of multiple camera angles from each station. Then, at 3:40 pm the afternoon before the scheduled depositions, they provided additional disclosure, including an updated version of the report of the agent who had reviewed the surveillance footage. *See* Doc. 30 at 3. The report explained that the agent had seen the material witnesses on five different camera angles—none of which were among those the prosecutors had provided to the defense.[3] *Id.* In other words, the prosecutors had many more camera angles than they disclosed—and the ones they withheld were those where the material witnesses primarily appeared. Having discovered that the prosecutors had made a deeply misleading disclosure, the defense was forced to file an emergency motion to postpone the depositions—a motion which this Court

---

[3] The first batch of videos disclosed included cameras labeled "Register 1" through "Register 7." It was thus not obvious that anything had been omitted. The complete footage the Government had collected, however, included "Register 1" all the way up through "Register 19." The provision of incomplete information in this fashion is far more dangerous and misleading than disclosing non-consecutive numbers, or starting somewhere other than one, because it was not readily apparent to the defense that they had been given fewer than half of the videos the Government had.

granted. The prosecutors eventually produced the additional surveillance video footage—but again only after defense counsel meticulously compared the disclosure to the written reports and identified solid proof that the prosecutors must have had materials they had withheld. It is difficult to imagine how, through simple coincidence or negligence, the prosecutors would have excluded from their disclosure the particular camera angles that actually depicted their witnesses.

Finally, the Office of the U.S. Attorney appears to be complicit in these prosecutors' approach to this case and three others involving humanitarian aid volunteers. Revealingly, undersigned counsel understands that when a large number of community members began calling the U.S. Attorney's Office to express their views about prosecutions of humanitarian aid volunteers, the office set up a special voice mailbox to receive those comments; that line played a recorded message referring to "United States vs. No More Deaths." Neither this case nor any of the three misdemeanor matters currently pending before Judge Velasco (17-mj-339, 17-mj-340, and 17-mj-341) is a prosecution of the organization; they are separate cases brought against individuals for particular actions. But the phone message the U.S. Attorney's Office recorded betrayed the viewpoint of that office on an institutional level that it is pursuing not particular individuals it believes it can readily prove have violated the law, but an organization—one whose views it does not like. Because these troubling attitudes and actions are not confined to these two individual prosecutors, this Court must

either put an end to the prosecution, or at the very least require that an entirely different office take over.

Finally, counsel undersigned do not level these accusations of misconduct without proof or without misgivings. But this is not a situation of bumping into a judge at a social event or on a street corner and responding to the judge's inquiry about the case. The record is unmistakably clear that the government prosecutors intentionally engaged in written ex parte communication expressly to argue for reconsideration of an order that did not benefit their litigation strategy. Dismissal of the indictment not only provides the appropriate remedy to this aggrieved defendant, it sends an appropriate message that this District will not tolerate grievous executive conduct.

RESPECTFULLY SUBMITTED this 9th day of January, 2019.

By /s/ Gregory J. Kuykendall
Gregory J. Kuykendall
Amy P. Knight
531 S Convent Avenue
Tucson, AZ 85701
Attorneys for Defendant Scott
Daniel Warren

CERTIFICATE OF SERVICE

I certify that on January 9th, 2019, I electronically transmitted a PDF version of this document to the Clerk of Court using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Nathaniel J. Walters, Esq. (email: Nathaniel.walters@usdoj.gov)
Anna R. Wright, Esq. (email: anna.wright@usdoj.gov)

25

United States Attorney's Office
405 W. Congress, Suite 4800
Tucson, AZ 85701