1        IN THE UNITED STATES DISTRICT COURT

2              DISTRICT OF ARIZONA

3   United States of America          CR-18-223-TUC-RCC(BPV)

4   vs.

5   Scott Daniel Warren,                    January 14, 2019
                                                 10:00 a.m.
6        Defendant.                        Tucson, Arizona
    _____

7

8      REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS

9                  MOTION HEARING

10      BEFORE THE HONORABLE RANER C. COLLINS
           UNITED STATES DISTRICT JUDGE

11

12            A P P E A R A N C E S

13  For the Government:

14       Anna Roberta Wright
         Nathaniel Jacob Walters
15       United States Attorney's Office
         405 West Congress
16       Tucson, Arizona 85701

17  For the Defendant:

18       Amy Pickering Knight
         Gregory John Kuykendall
19       Kuykendall & Associates
         531 South Convent Avenue
20       Tucson, Arizona 85701

21

22  Court Reporter:        Erica R. McQuillen, RDR, CRR
                           Official Court Reporter
23                         405 W. Congress Street
                           Tucson, Arizona 85701
24                         (520)205-4267

25       Proceedings Reported by Stenographic Court Reporter
         Transcript Prepared by Computer-Aided Transcription

```
 1                    P R O C E E D I N G S
 2          THE CLERK:  In Criminal Matter 18-223, United States
 3   vs. Scott Daniel Warren, on for a motion hearing.
 4          Counsel, please state your appearances.
 5          MS. WRIGHT:  Good morning, Your Honor.  Anna Wright
 6   and Nathaniel Walters on behalf of the United States.
 7          THE COURT:  Good morning.
 8          MR. WALTERS:  Good morning.
 9          MR. KUYKENDALL:  Good morning.  Greg Kuykendall and
10   Amy Knight on behalf of Dr. Scott Warren, who is present, out
11   of custody.
12          THE COURT:  Good morning.  Your motion.  You may
13   proceed.
14          MR. KUYKENDALL:  Judge, I think it's important to
15   backtrack just a hair and explain why we originally filed a
16   motion regarding selective enforcement and seeking discovery
17   on that claim.
18          The law is pretty clear that, absent discovery, I
19   can't -- I can't simply make a selective enforcement motion to
20   dismiss.  I need to obtain discovery, and that discovery, just
21   by virtue of its nature, is going to always be controlled by
22   the prosecution.
23          Consequently, we made a motion for disclosure and
24   sought a number of things, and Judge Velasco gave us a very
25   limited portion in his order of what we were seeking.  And
```

1    it's also important to understand that, in the context of this

2    motion, Border Patrol apparently was aware that the location

3    known as the Barn out in Ajo had been used by No More Deaths

4    volunteers for a period of time as a staging area, a staging

5    area to provide humanitarian aid to allow volunteers to sleep

6    there and to hold literally pallets of water and pallets of

7    food that the No More Deaths volunteers and other

8    organizations would take out on known trails and leave for

9    migrants in the desert.  That's what Border Patrol knew of

10   prior to this time.

11         Also, apparently Border Patrol had word that a

12   migrant or perhaps two migrants were in the Ajo area, which

13   frankly is not at all unusual, but they had no information

14   whatsoever that there were any migrants at the Barn.  And as

15   the Court well knows, Ajo is not a teeming metropolis, but

16   it's several thousand homes.  It's a huge square mileage area.

17   It does not at all create a logical choice to focus on the

18   Barn simply because of the knowledge that there's a couple of

19   migrants in Ajo somewhere.  So that's the context in which we

20   made our motion for selective enforcement.

21         The other thing that's critical to understand is, on

22   the very day that Border Patrol set up their surveillance

23   across the street from the Barn, earlier that day, No More

24   Deaths had distributed very widely a press packet and a study,

25   as well as really explosive video that showed Border Patrol

1    agents intentionally vandalizing water that had been left out

2    for migrants.

3              And in addition to that, the Border Patrol folks in

4    Tucson sent it to the Border Patrol, the head of the Border

5    Patrol in Ajo, on the morning of, for the first time ever,

6    surveillance that gets set up at the Barn.

7              So that's the context in which we made the motion

8    seeking some disclosure relative to selective enforcement so

9    that we could make our claim, so that we could properly file a

10   motion to dismiss for selective enforcement.

11             Judge Velasco ordered that the two agents, Burns and

12   Marquez, all of the texts that they had -- or emails that they

13   had received or sent -- and now I'm mistaken.  I think it was

14   only either sent or received.  But either way, either sent or

15   received on the day of the decision to not only arrest

16   Dr. Warren, but to set up surveillance of the Barn for the

17   first time, he ordered that all of that be provided to defense

18   counsel so that defense counsel could properly investigate and

19   make a selective enforcement claim.

20             Subsequent to that, Ms. Knight and I constantly were

21   contacting the prosecution saying, where's our information?

22   When are you going to make that disclosure?  And rather than

23   be straight with us and tell us that they weren't going to

24   make the disclosure to us, what they did was they sent a

25   letter to Judge Velasco on December 3.

1           And in the letter, rather than simply make it a

2    transmittal letter of saying, here's some -- here's some

3    disclosure for your in camera review, they argued their case

4    again.  And they said, quote, "While the Court's order

5    required disclosure of all texts or emails, upon further

6    review, many of the texts and emails sent or received during

7    the relevant time period" -- which is a single day -- "do not

8    fall within Government's disclosure obligations, and for the

9    reasons discussed below," where they go on to argue their

10   motion ex parte that's essentially a motion for

11   reconsideration, "the Government respectfully seeks to

12   disclose only those materials that implicate the disclosure

13   obligations under Federal Rules of Procedure 16, 26.2, Federal

14   Rules of Evidence 404(b), 609, Brady, Giglio," these things

15   that they're obligated to provide in the first place, even if

16   we haven't made a Sellers motion, even if we haven't -- or an

17   Armstrong motion, even if we haven't claimed selective

18   prosecution or selective enforcement.

19           So clearly what the Government did, rather than

20   simply seek in camera review, is they argued a motion for

21   reconsideration in an ex parte manner, and we only found out

22   about it because Judge Velasco, when he denied our motion for

23   reconsideration, rather our motion to compel that disclosure

24   be provided, he gave it to us.

25           So -- and in response to the motions that we filed

1   that have precipitated today's hearing, rather than actually

2   explain why they decided to ex parte a federal judge, rather

3   than deal with their ex parte behavior whatsoever, they say,

4   oh, oh, it's a -- Sellers has approved in camera review.

5          Well, that has nothing to do with it.  That's like

6   saying, you know, the FDA has approved Cheerios for breakfast

7   independent of whether I shoplifted the Cheerios, you know

8   ignore that, because this is what they've done.  They've

9   ex-parte'd a federal judge.  They have reargued their motion.

10  They've effectively asked for reconsideration of it.  And they

11  have never even acknowledged in these pleadings that they did

12  anything wrong.

13         And that gives me pause, and that's why, if they

14  don't even recognize that this is something really

15  significantly improper to do in a federal court proceeding,

16  any court proceeding, this is basic, if they don't recognize

17  that, and frankly if Judge Velasco doesn't recognize that,

18  then we are in a terribly precipitous position to litigate

19  further with them and in front of Judge Velasco.

20         And that's why we've asked this Court to reconsider

21  the order relative to compelling the disclosure, give us all

22  of what he ordered, what he originally ordered, and likewise

23  keep the rest of the pretrial litigation in this case here in

24  this District Court for you, personally, to decide.

25         Because there's not just an appearance of

1   impropriety, not just an appearance of impropriety in this

2   case, but there's a pall of impropriety on the District of

3   Arizona if this is allowed to go on.

4          And I finally just want to point out that it's not

5   just one paragraph in here where the -- where the Government

6   is arguing its case to the judge.  We've also got on a second

7   page they indicate, "In addition, Exhibits P through R relate

8   to this matter but do not implicate the Government's

9   disclosure obligations".

10          So once again they're arguing.  This should have

11  been just a transmittal letter, if they were going to do it at

12  all, but they should have notified us if they were going to do

13  it, and it certainly shouldn't be ex-parte'ing the federal

14  magistrate, and that's why we're seeking the relief that we

15  are seeking.

16          THE COURT:  Thank you.

17          Ms. Wright?

18          MS. WRIGHT:  Thank you, Your Honor.

19          The in camera submission in this case that we

20  submitted to Judge Velasco is approved across many contexts,

21  including Sellers.  There is no requirement in in camera

22  submissions that the defense be consulted.

23          First, there is no requirement that we set out good

24  cause in a letter, submission letter, to the Court.  The

25  Government was trying to comply with Judge Velasco's order by

1   submitting these materials to him.  Judge Velasco obviously

2   was aware of the governing law and of his own order.  He's the

3   one who issued the order.  That is all that we were doing, was

4   seeking to comply with his order.

5        There is not -- defense has in its motions alleged

6   that this is part of an ongoing pattern of misbehavior.  There

7   are no facts to support that, and I'm happy to go into those

8   prior instances if the Court wants, but there is no support

9   that there's a pattern of misconduct, that there was

10  misconduct here in the situation.  In camera submissions are

11  common to deal with disclosure issues.  That is all that the

12  Government did in this case.

13        I just wanted to note, as a procedural matter, Your

14  Honor, that this hearing was set on the defense's motion to

15  reconsider, but they have since also filed a motion for

16  sanctions based essentially on the same allegations.  The

17  Government's time to respond has not expired yet, and if it

18  would be helpful to the Court, we will respond in writing, but

19  I'm also happy to address the Court's concerns today.

20        Your Honor --

21        THE COURT:  I'd prefer to hear everything today if

22  we can.

23        MS. WRIGHT:  Absolutely, and I thought, since the

24  matters overlapped, I would take that on, but I didn't want to

25  if the Court didn't want to hear about that.

1        So just to discuss the two additional quote/unquote

2   instances of misconduct that are in the latest filing

3   regarding the disclosure prior to the video depositions, there

4   is an allegation that the Government withheld a portion of a

5   material witness interview on purpose.

6        There is no facts to support that.  We disclosed the

7   reports that had the substance of the interviews.  I received

8   a nonspecific request from defense counsel for all of the

9   interviews.  I reviewed my file, I saw that everything that

10  was in my file as to that issue had been disclosed to defense

11  counsel, and so I took no further steps.  Once she gave me a

12  specific request saying, this is what I think I am missing, I

13  got it as soon as I could.

14       The same sort of situation with the gas station

15  security cameras that were at issue.  The Government disclosed

16  its first report.  The report is a one-page report Bates

17  stamped 101 on February 8th.  We received another copy of that

18  just before the video depositions which were scheduled for

19  March 2nd.  We disclosed that on March 1st.

20       The only difference between those two reports is

21  there's a signature at the bottom of one and there's a

22  different date.  Otherwise, they are verbatim the same.

23       And so defense counsel looked at the report that was

24  given on March 1st and found they were missing some gas

25  station surveillance cameras, and then they asked us for that

1  information.  I looked in my file the morning I received that

2  motion, which was 7:30 a.m. the morning of the depositions,

3  saw that I had given over everything I had.  As it turned out

4  later, the station had not given to the case agent one

5  additional portion of the security camera surveillance.

6           And I think it's worth noting that, during the video

7  depositions, no mention was made by the defense of the

8  surveillance camera footage.  It did not play a crucial part

9  in what was their actual -- their actual work at the video

10 depositions.

11          Finally, I'd just like to address the serious

12 allegation that somehow the entire United States Attorney's

13 Office is prejudiced against this defendant by virtue of the

14 words in an outgoing voicemail message set up to receive calls

15 from a call-in campaign organized by No More Deaths.  The box

16 was directed to the United States vs. No More Deaths.

17          Your Honor, it is No More Deaths and the defense who

18 have characterized these prosecutions as being targeted

19 against No More Deaths.  Almost every filing in all of the

20 cases references the status of the defendant as a No More

21 Deaths volunteer, and they often include the No More Deaths

22 history and mission in their fact and analysis section.

23          The entire defense is based around the status as a

24 No More Deaths volunteer, and No More Deaths has mounted a

25 significant public relations campaign where they often

1    reference all of the related defendants as a whole, and in

2    fact, the script that they put out into the public for this

3    call-in campaign again references the defendants as a whole as

4    No More Deaths defendants.

5          So the outgoing message was a reasonable way to let

6    the public who was calling in know what voicemail box they had

7    reached, that they had gotten to the right place.  And it's

8    worth noting that, of the callers who called in, many did not

9    know the names of the defendants they were calling about or

10   the case numbers.  All that some of these people knew when

11   they called in was that the defendants they were calling about

12   were related to No More Deaths.  So that was the most

13   efficient way to let them know, because that was the common

14   denominator.

15         Your Honor, I've set out the legal standard to

16   disqualify a judge in my written response to the motion to

17   reconsider.  That's a very high standard.  There's no evidence

18   that Judge Velasco should be disqualified.  In addition -- and

19   the cites are all in our response to the motion to dismiss

20   based on international law where, again, there was the specter

21   of misconduct raised because we had filed an indictment.

22         That standard is in that motion, and it's a very

23   high standard to disqualify or dismiss for misconduct a

24   prosecutor, and that standard's not met here because there's

25   simply no evidence of misconduct or a pattern of misconduct.

1           Your Honor, unless you have questions, that's all I

2    have.

3           THE COURT:  When Judge Velasco ordered the

4    disclosure in the case, did he ask it to be submitted in

5    camera?

6           MS. WRIGHT:  He did not, Your Honor.  That was a

7    choice that my office made --

8           THE COURT:  Why?

9           MS. WRIGHT:  -- or that I made.

10           THE COURT:  Why?

11           MS. WRIGHT:  Because the order, there was a line

12    directly preceding the, "It is ordered."  What we received,

13    parts of it were privileged in terms of being law enforcement

14    sensitive.  Parts of it were completely unrelated to anything

15    to do with this case.

16           And we had concerns that, even though there was a

17    protective order in place, that some of those things would be

18    -- we were concerned about letting things that were not

19    related to the case, to disclosing those, and so we submitted

20    in camera.

21           THE COURT:  Why not let Mr. Kuykendall know that you

22    were doing that?

23           MS. WRIGHT:  Your Honor, there's no requirement that

24    we do.

25           THE COURT:  I understand there's no requirement.  My

1   question was only, why didn't you let him know?

2           MS. WRIGHT:  I was concerned with getting things

3   moving quickly, Your Honor.  It took me some time to gather

4   everything.

5           THE COURT:  The way Mr. Kuykendall plays it, he's on

6   the phone every day trying to get stuff from you guys, so

7   you'd have probably had your normal daily contact with him.

8           MS. WRIGHT:  And that may be, Your Honor, and

9   perhaps in hindsight that would have been a good step to take,

10  but because it wasn't required, I went ahead and submitted to

11  Judge Velasco.  This is the same sort of process I've followed

12  in the past with other types of materials that get submitted

13  in camera.  I do not give defense a heads up.  It was not

14  particular to this case, my process.

15          THE COURT:  Don't you think that, if there was an

16  order entered that said you should disclose something, that

17  absent some change in that order, that's what you should have

18  done?

19          MS. WRIGHT:  And Your Honor, we were seeking to make

20  sure we were complying with the order.  I appreciate that, in

21  hindsight, maybe a different process would have been

22  appropriate, but we were seeking -- that was our intention,

23  was to comply with the order and give the defense what they

24  needed to mount their defense.  That was always our intention.

25          THE COURT:  All right.  Last words, Mr. Kuykendall?

1     MR. KUYKENDALL:  I think, Judge, it's important to
2  consider the prosecution has still not explained why they
3  argued their case to Judge Velasco.  I mean, it's one thing to
4  send a transmittal letter because you think that's what should
5  be done.  It's one thing to not trust me and Ms. Knight
6  because you don't think we should have sensitive information.
7  But there's not even anything in the letter where they argued
8  their case to Judge Velasco about it being law enforcement
9  sensitive.
10     I mean, there's no -- this isn't like a -- I just
11  forgot the name, the Court that takes all these ex parte
12  things up in Washington, the FISA --
13     THE COURT:  The Foreign Intelligent Surveillance
14  Court?
15     MR. KUYKENDALL:  Right.  This isn't the Foreign
16  Intelligent Surveillance Court.  This is -- this is a basic
17  harboring case.  The difference is, we have alleged with very
18  good reason that this is in retaliation for him exercising his
19  constitutional rights to be part of No More Deaths and for No
20  More Deaths to exercise its constitutional rights to point out
21  what's going on on the border.  And it's in retaliation, and
22  the only way that we can get the information is by taking the
23  appropriate steps, which we've taken every step of the way.
24     And now we find out that the Government is not only
25  a sore loser but goes to the judge in secret and reargues its

1   case.  This isn't a close call.  It says it doesn't -- that

2   the judge's disclosure order doesn't comport with the

3   Government's disclosure obligations.  Well, of course.  It's a

4   selective enforcement claim.  It's distinct under Armstrong

5   and Sellers.  The U.S. Supreme Court is clear about that in

6   Armstrong.  It's a distinctive claim which implicates quite

7   distinctive disclosure obligations on the part of the

8   Government, which is why we had to file it in the first place.

9           It's nonsensical to go in and make a specious

10  argument of this nature to a judge, and particularly in an ex

11  parte proceeding, and say, oh, we don't have to give -- you

12  know, you made this order, but we don't have to give it up

13  because it doesn't comport with all of our other obligations.

14          The other obligations were there to begin with.

15  Kuykendall & Knight wouldn't have filed this motion in the

16  first place if it had been standard obligations.  So it's --

17  and it really is concerning to me as a lawyer practicing in

18  this district that the Government still doesn't address the ex

19  parte nature of it or the argument -- the argumentative nature

20  of it.  They don't see that they did anything wrong.

21          And from a parental perspective, if a child doesn't

22  see that they've even done anything wrong, then there's

23  something wrong with the disciplinary aspect of the

24  parent/child relationship.  I mean, right now the Government

25  is still sitting on its haunches and saying, Sellers says we

1   can have in camera review, which is beside the point.

2          And that really is a concerning issue, and I didn't

3   come prepared today to argue the motion for sanctions.  I'm

4   not sure if the Court's remark earlier meant that we should be

5   arguing that today, but if you want, I can argue it today.

6          THE COURT:  Go ahead.  Argue it today.  Let's --

7   we're all here.  I've read your motion.

8          MR. KUYKENDALL:  I think the law is clear that it's

9   certainly within this Court's discretion to dismiss the

10  indictment under these -- under what has occurred in this case

11  so far, and it's likewise in the Court's discretion to have a

12  lesser sanction of disqualifying the U.S. Attorney's Office

13  for the District of Arizona from this case.

14          Again, it's not a close call.  We claimed -- and I

15  think what's important to understand is, our claim in the

16  first place of retaliatory -- selective enforcement, which is

17  essentially a retaliation against Dr. Warren, is that the

18  Government was misconducting itself, the Government agents

19  were misconducting itself, and now the Government prosecutors

20  are misconducting themselves in order to prevent us from

21  obtaining disclosure that we are entitled to under the

22  magistrate's order after a fair fight so that we can actually

23  document and prove that the Government's been misconducting

24  itself.

25          THE COURT:  Something was ultimately disclosed to

1   you; correct?

2          MR. KUYKENDALL:  Something, yeah, something that

3   tipped us off that they hadn't disclosed everything.

4          THE COURT:  Well --

5          MR. KUYKENDALL:  But we did get something.

6          THE COURT:  You got something pursuant to Judge

7   Velasco's order?

8          MR. KUYKENDALL:  We -- yeah.  That's right.  We did

9   get something.

10          THE COURT:  And then, as I understand it, he did the

11   in camera review and said, none of this other stuff matters;

12   correct?

13          MR. KUYKENDALL:  Basically that's what he said, and

14   I don't -- I think it's important to understand that Judge

15   Velasco is clearly not me, is clearly not a defense lawyer,

16   doesn't know --

17          THE COURT:  You do know that's how he began his

18   practice?

19          MR. KUYKENDALL:  I do know.

20          THE COURT:  For many years.

21          MR. KUYKENDALL:  I'm no spring chicken and neither

22   is he.

23          THE COURT:  He's quite proud of that.  He's quite

24   proud of the fact that he began as a defense lawyer, and he

25   holds all defense lawyers to high standards.

1    MR. KUYKENDALL:  He's held me to high standards.

2    I've known him as long as I've known you, Judge, and I respect

3    both of you.  I think that something significantly egregious

4    occurred here.  I'm not -- I'm not here to paint Judge Velasco

5    in a bad light or claim that he's anti defense lawyer or that

6    he's anti me or anything else.  I have known both of you since

7    being on the Superior Court, well, 30 years ago is when I

8    started, and both of you were quite kind to me.  I've

9    practiced in front of you since then.

10    But the fact is, substantive ex parte communication

11    occurred between the prosecution and Judge Velasco.  I

12    mean, this isn't like running into each other at a cocktail

13    party or riding the elevator up together.  This was an

14    intentional motion for reconsideration which was ex parte, and

15    it's because of that, it's because of that intention, within

16    the context of a governmental misconduct claim to begin with,

17    that continues to hide evidence from us, it's because of that

18    intention that I believe the Court should dismiss the

19    indictment, or at a minimum, take the U.S. Attorney's Office

20    for the District of Arizona off of this case.

21    THE COURT:  Okay.  At the outset, what I'm going to

22    do is, I'm going to order that Judge Velasco's order initially

23    disclosing the matter to you, the texts, whatever they were,

24    the emails, that they be provided to me, those that the

25    prosecutors thought were relevant and those they thought were

 1   irrelevant, and I will do an in camera inspection.  The rest

 2   of the case I'm going to take under advisement.

 3              When is the next hearing set in this case?  I think

 4   there's a trial date sometime in the ether.

 5              MS. WRIGHT:  Your Honor, the trial date is today.

 6              THE COURT:  Today is the trial date.  Are we ready

 7   to go?

 8              MS. WRIGHT:  Your Honor, I believe -- I believe it

 9   was Ms. Knight had moved, and with our concurrence, obviously,

10   to have a status/scheduling conference today so we could get

11   some realistic dates on the calendar.

12              THE COURT:  Sure.  That makes sense.

13              MS. WRIGHT:  And I don't know that we've had an

14   opportunity to talk about those.  I can tell the Court that at

15   least as far as Mr. Walters and I are concerned, we have

16   several more of these cases to try.  I think the last one's in

17   March.  And so sometime after March would work for us, but

18   I'll take my seat.

19              THE COURT:  Mr. Kuykendall?

20              MR. KUYKENDALL:  I'm sorry.  I had --

21              THE COURT:  I was thinking about a potential trial

22   date, and she was saying sometime after March.

23              MR. KUYKENDALL:  I think that's reasonable.

24              THE COURT:  There is a lot after March.  When?  You

25   know, it's April, May, June, July.  There's a lot after March.

1           MR. KUYKENDALL:  Well, I don't want it -- I don't
2    want it to be hot when we do the trial.

3           One thing I did want to clear up, Judge, though, in
4    terms of this Court doing an in camera review, I think it's
5    important to understand and for us to be able to argue what
6    the standard of review is for the Court's in camera review,
7    because from my perspective the appropriate standard of review
8    is, does it comport with Judge Velasco's order, which was,
9    turn it over, in other words, not a relevancy review, not a
10   secrecy review, not can we trust Kuykendall review, but do
11   what Judge Velasco said in the first place, and if you can
12   review all of the documentation that the Government provided
13   and say, does this comport with what Velasco said in the first
14   place, then yes, give it all to us.

15          But I don't think it's appropriate for the Court to
16   put itself in the place of a defense lawyer, partly because
17   this Court was never a defense lawyer.

18          THE COURT:  That's true, at least not in a criminal
19   case.

20          MR. KUYKENDALL:  Anyhow, I don't think that that's
21   appropriate, for there to be some new standard of review, but
22   rather does it comport with Judge Velasco's original order.  I
23   think that would be the appropriate review.

24          In terms of a trial date, I think April, is that --
25   April would work.

1              THE COURT:  April is out for me.

2              MR. KUYKENDALL:  What month are we talking about?

3              THE COURT:  Any time except April and March.

4              MR. KUYKENDALL:  How about May?

5              THE COURT:  May works.

6              MR. KUYKENDALL:  Let me just double triple verify

7    here.

8              May works for me too.

9              THE COURT:  Wait, wait, wait.  Just one second.

10             How long do you think the trial's going to take if

11   it goes to trial?  Three, four weeks?  That's the impression

12   I'm getting today.

13             MR. KUYKENDALL:  I think it's two weeks.

14             MS. WRIGHT:  And, Your Honor, the Government's case,

15   tops two days, in terms of its case in chief, so that may be a

16   question better answered with motions in limine, and I was

17   going to ask the Court to set some motions deadlines so that

18   we stay on track for whatever trial date the Court sets.

19             THE COURT:  From --

20             MR. KUYKENDALL:  And if the Court's making a "six of

21   one, half a dozen of the other" sort of decision, late May is

22   better for my client.

23             THE COURT:  I'm looking at May 28.  That's pretty

24   darn late.

25             MR. KUYKENDALL:  So -- and would the Court have the

1  week beginning June 3 too?

2            THE COURT:  Yes.  I'd have that week available also.

3            MR. KUYKENDALL:  That works for the defense.

4            THE COURT:  Let's set the trial date for the --

5  let's make it the 29th, because the 28th is going to be like

6  our law and motion day.  So we'll start on the 29th.

7            Any motions need to be filed by -- how about March

8  15th?

9            MR. KUYKENDALL:  Okay.

10           THE COURT:  That'll give us time to hear them once

11 they're filed.  All right?  May 29th work for a trial date?

12           MS. WRIGHT:  Yes, Your Honor.  It does.

13           And Your Honor, as far as the Court reviewing the

14 materials that Judge Velasco saw, I have the same exact packet

15 here, if I can provide it to the clerk once we're done here

16 today.

17           THE COURT:  Please do.

18           MR. KUYKENDALL:  Judge, that motions deadline, that

19 doesn't apply to motions in limine, does it?

20           THE COURT:  It does not.

21           MR. KUYKENDALL:  Okay.

22           THE COURT:  Does your client waive time?

23           MR. KUYKENDALL:  Yes.

24           THE COURT:  All right.  I'll see you on May 29th, if

25 not before.  I have a feeling I'll see you before.

1        MS. WRIGHT:  Thank you, Judge.

2        THE COURT:  Ms. Wright, if you'll give me that

3  packet, please.

4        MS. WRIGHT:  Yes, sir.

5        THE COURT:  Thank you.

6        (Proceedings conclude as to this matter at

7        10:32 a.m.)

1                    C E R T I F I C A T E

2

3          I, Erica R. McQuillen, Federal Official Realtime

4    Reporter, in and for the United States District Court for the

5    District of Arizona, do hereby certify that, pursuant to

6    Section 753, Title 28, United States Code, the foregoing is a

7    true and correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the regulations

10   of the Judicial Conference of the United States.

11          Dated this 8th day of February, 2019.

12

13                        s/Erica R. McQuillen
                     Erica R. McQuillen, RDR, CRR
14                   Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25