Gregory J. Kuykendall, Bar # 012508
Amy P. Knight, Bar # 031374
KUYKENDALL & ASSOCIATES
531 S Convent Avenue
Tucson, AZ 85701
(520) 792-8033
greg@kuykendall-law.com
amyknight@kuykendall-law.com
*Pro Bono* Attorneys for Defendant Scott Daniel Warren

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br>        Plaintiff,<br>vs.<br>SCOTT DANIEL WARREN,<br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. CR-18-00223-001-TUC-RCC(BPV)

**MOTION TO DISMISS INDICTMENT DUE TO SELECTIVE ENFORCEMENT**

Defendant Scott Daniel Warren moves this to dismiss this indictment because it arose from selective enforcement of the laws by the Border Patrol, in violation of the Fifth Amendment's equal protection guarantee. In the alternative, he moves for disclosure on the specific question of discriminatory effect, as identified in the Appendix to this motion.

The Supreme Court recognizes "the possibility that a good-faith critic of the government will be penalized for his criticism. . . strikes at the very center of the constitutionally protected area of free expression." *New York Times Co. v. Sullivan,* 376 U.S. 254 (1964). No More Deaths (NMD) regularly publishes reports criticizing the Border Patrol for practices they view as unjust. Beginning with 2008's "Crossing the Line: Human

Rights Abuses of Migrants in Short-Term Custody on the Arizona/Sonora Border," NMD

has highlighted abusive conditions in custody, the agency's failure to return confiscated

money and possessions prior to deportation, and apprehension methods that put migrant

lives in danger.[1] For years, NMD has been discussing these abuses in the press. For

instance, a 2013 article in the *Phoenix New Times* opened: "When U.S. Border Patrol

Agents are not shooting each other or unarmed teenagers, they like to destroy water jugs and

steal supplies left in the desert for crossing migrants. That's the charge of the Tucson-based

group No More Deaths, which has captured the Border Patrol's finest with hidden cameras

vandalizing and ripping off goods left by NMD."[2] These statements constitute the epitome

of First-Amendment-protected expression.

Dr. Warren is an active, vocal, and highly visible—especially in the small town of

Ajo—member of NMD. Prior to his arrest, he was frequently quoted in the media as an

NMD member.[3] Law enforcement agents in Ajo—including Fish and Wildlife Service

(FWS) officers and Border Patrol agents—certainly knew who he was. *See* Exh. 1 at 5 (July

31, 2017 text message conversation between FWS employee and Border Patrol agent

---

[1] All of NMD's reports are available at http://forms.nomoredeaths.org/abuse-documentation/
[2] Stephen Lemons, "Border Patrol Agents Steals Blankets, Provisions Meant for Migrants, Says No More Deaths," *Phoenix New Times,* Jan. 17, 2013, https://www.phoenixnewtimes.com/news/facing-scrutiny-grand-canyon-university-worked-with-governors-office-11227950.
[3] *See, e.g.,* Daniel González, "In crushing heat wave, Border Patrol ready to rescue migrants," *The Republic,* June 22, 2017, https://www.azcentral.com/story/news/politics/border-issues/2017/06/22/migrant-rescues-arizona-desert-border-heat-wave/421781001/ (identifying Dr. Warren as NMD volunteer and quoting him about border crossing in extreme heat); Andrea Jaramillo Valencia, "As border wall prototype construction starts, Arizona geographer speaks up," *Cronkite News,* Sept. 28, 2017, https://cronkitenews.azpbs.org/2017/09/28/border-lecture/ (describing Dr. Warren's public lecture on "Social and Environmental Costs of the Border Wall"); Rory Carroll, "Arizona's Organ Pipe park is a 'paradise' for tourists but a death trap for migrants," *The Guardian,* Oct. 15, 2015, https://www.theguardian.com/us-news/2015/oct/15/organ-pipe-national-monument-migrants-mexico (with photo captioned "Scott Warren, an academic and activist with No More Deaths, stops for a water break.").

discussing Dr. Warren); Exh. 2 at 5-6 (text messages between BP agent and different FWS officer exchanging Dr. Warren's home address and current location); Exh. 3 at 3 (BP agent's report after arrest describing prior knowledge of Dr. Warren's activities).

On January 17, 2018, shortly before 8:30 in the morning, NMD published a new report criticizing the BP (*see* Exh. 4), including video footage of agents behaving cruelly and unprofessionally that was viewed hundreds of thousands of times that day alone. The 22-page report, posted along with a "Press Kit,"[4] makes specific accusations, including:

- [BP] agents . . . routinely intimidate, harass, and surveil humanitarian-aid volunteers, thus impeding the administration of humanitarian aid. These actions call into question the Border Patrol's own claims to be humanitarian. (p. 2)
- . . . [BP] agents engage in regular and widespread destruction of water supplies with little or no apparent consequence. The de facto state sanctioning of the destruction of humanitarian-aid supplies devalues the lives of border crossers and encourages other actors in the region to do the same. (p. 11)
- [BP]'s own enforcement strategies are responsible for the crisis of death and disappearance of border crosses; the Border Patrol cannot adequately respond to this same crisis, only exacerbate it. (p. 15)

That afternoon, the BP decided to surveil an NMD facility and provided a patently pretextual explanation for this choice. Agents then swiftly arrested Dr. Warren for harboring, without evidence that he had done anything illegal and despite their professed belief that he had no control over the facility. Based on these facts, on August 23, 2018, Defendant moved for Discovery Into Selective Enforcement (Doc. 113). On November 7, 2018, the Court ordered a limited subset of the requested information disclosed (Doc. 135). The Government disclosed a still smaller subset of what was ordered. Based on (1) the facts supporting the prior motion, (2) additional facts uncovered by investigation over the last six

---

[4] The report, video, and press kit are available at a dedicated website the group set up for this project: http://www.thedisappearedreport.org.

months and (3) information from the disclosure provided under the November 7 order, Dr. Warren now asks for dismissal because he has established he was targeted for investigation, surveillance, and arrest in violation of his equal protection rights. Alternatively, he asks seeks additional disclosure to allow him to more fully prove selective enforcement.

I.   Selective Enforcement of the Criminal Laws Violates the Requirement of Equal Protection Guaranteed by the Fifth Amendment.

Selective enforcement claims are judged "according to ordinary equal protection standards," which "require petitioner to show both that the [government action] had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (citing *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979); *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977); *Washington v. Davis*, 426 U.S. 229 (1976)).

In this circuit a defendant "is entitled to an acquittal if his evidence proved that the authorities purposefully discriminated against those who chose to exercise their First Amendment rights." *United States v. Steele*, 461 F.2d 1148, 1151 (9th Cir. 1972); *see also United States v. Mumphrey,* 193 F.Supp.3d 1040, 1055-59 (N.D. Cal. 2016) (discussing authority supporting dismissal where selective enforcement is proven).

A.   Impermissible Bases for Differential Treatment

Government action violates equal protection where it is "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification," *Oyler v. Boles*, 368 U.S. 448, 456 (1962), which includes "the exercise of protected statutory and constitutional rights." *Wayte*, 470 U.S. at 608. In *Wayte,* the Petitioner claimed the government prosecuted him for failure to register for the selective service "*because of* his

protest activities." *Id.* at 609 (emphasis original); *see also United States v. Falk*, 479 F.2d 616, 620 (7th Cir. 1973) (*en banc*) ("[J]ust as discrimination on the basis of religion or race is forbidden by the Constitution, so is discrimination on the basis of the exercise of protected First Amendment activities."). The government is similarly prohibited from punishing individuals more harshly simply for being "a member of a group unpopular with the government." *Falk*, 479 F.2d at 620 (remanding for hearing on selective prosecution for allegedly targeting defendant as a member of Chicago Area Draft Resisters).

    B. <u>Discriminatory Intent</u>

    A defendant need not present an explicit admission of impermissible discrimination, or a "smoking gun," to succeed on an equal protection claim; circumstantial evidence of intent can suffice. *See, e.g., Diaz v. San Jose United School Dist.*, 733 F.2d 660, 662 (9th Cir. 1984) ("Ordinarily, only circumstantial evidence is available to establish segregative intent"). Officials normally do not put illegal motivations in writing. In *Arlington Heights*, which the Supreme Court relied on discussing selective enforcement in *Wayte,* the Court explained, "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." 429 U.S. at 266. Examples of circumstantial evidence that might prove discriminatory intent are:

- "The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." *Id.* at 267.
- "The specific sequence of events leading up to the challenged decision may also shed some light on the decisionmaker's purposes." *Id.* at 267 (noting it would be highly relevant if an authority's position "suddenly was changed" when it learned of the information it is alleged of using discriminatorily).
- "Departures from the normal procedural sequence" and "Substantive departures" could "afford evidence that improper purposes are playing a role." *Id.* at 267.

The Court has also recognized "mere temporal proximity" between the actor's "knowledge of protected activity" and its adverse action may constitute "sufficient evidence of causality to establish a prima facie case" if "the temporal proximity [is] 'very close.'" *Clark County Sch. Dist. V. Breeden,* 532 U.S. 268, 273-74 (2001). Thus, "causation can be inferred from timing alone" if the challenged action "follows on the heels of protected activity." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002).

In addition, "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000); *see also Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 993 (9th Cir. 2007) ("[I]n an equal protection claim based on selective enforcement of the law, a plaintiff can show that a defendant's alleged rational basis for his acts is a pretext for an impermissible motive.").

Even a spur-of-the-moment decision by a single officer – as opposed to a formal policy – can violate equal protection if made with discriminatory intent. *See, e.g., Chavez,* 251 F.3d at 645 (claim that "individual ISP officers utilized impermissible racial classifications in determining whom to stop, detain, and search," if proven, "would amount to a violation of the Equal Protection Clause of the Fourteenth Amendment.").

Finally, a defendant need not prove that the improper purpose was the *only* reason for the challenged action. The challenged action need only be "at least in part 'because of' not merely 'in spite of,' its adverse effects on an identifiable group." *Wayte* at 610 (citing *Feeney,* 442 U.S. at 279). In *Arlington Heights,* the Court elaborated, explaining that it was rare to find "a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." 429 U.S. at 265. Thus, the discriminatory

purpose need only have "been a motivating factor in the decision." *Id.* at 266.

C. <u>Discriminatory Effect</u>

Selective enforcement requires proof that "similarly situated individuals of a different race or classification were not prosecuted, arrested, or otherwise investigated." *United States v. Washington,* 869 F.3d 193, 214 (3d Cir. 2017) (cited with approval in *United States v. Sellers,* 906 F.3d 848 (9th Cir. 2018)). What "similarly situated" means necessarily varies between contexts. Thus, in a typical selective *prosecution* case, the comparison group would be people who had committed the same crime but were not prosecuted. *See United States v. Aguilar,* 883 F.2d 662, 706 (9th Cir. 1989). But where the challenged action is instead investigation, that concept is a poor fit, *Sellers,* 906 F.3d 848, largely because when agents make the discriminatory decision to investigate, by definition they do not yet know whether the targets have committed any crimes. One consideration in assessing the Government's selection of targets for investigation should be "the goals of the program." *United States v. Mumphrey,* 193 F. Supp. 3d 1040, 1061 (N.D. Cal. 2016).

The Government *cannot* rely on the strength of the evidence it has against certain individuals to justify its behavior when part of the challenged action is its development of that evidence in the first place. *Mumphrey*, 193 F.Supp.3d at 1062 Nor can officials justify differential treatment merely by identifying distinguishing factors; distinctions must be *pertinent* to the challenged decisions. Thus, in *Chavez*, officers claimed a motorist they did not stop was not similarly situated to one they did "because she was female, drove a different color car with a non-California plate, did not have the same items visible in her car, and did not receive a warning ticket." 251 F.3d at 637-38. The Court rejected these distinctions because nothing in the record suggested any of them actually bore on their

decision as to which motorists to stop; indeed, one of the factors (the items visible in the car) was not known to the officers until *after* the stop. *Id.* The other motorist was similarly situated in all respects that mattered in terms of choosing whom to pull over.

A defendant need not produce dozens of examples to prove selective enforcement. Indeed, "[o]ne similarly situated example is arguably all Defendants need to show discriminatory effect." *Mumphrey*, 193 F. Supp. 3d at 1062. Federal courts have "recognized three possible methods of proving discriminatory effect in a selective-enforcement case: statistical evidence; the identification of *a similarly situated individual* who could have been, but was not, stopped or arrested; and, in certain circumstances, anecdotal evidence establishing an officer's pattern of similar discriminatory behavior. *United States v. Alabi*, 597 F. App'x 991, 996 (10th Cir. 2015) (emphasis added); *see also Chavez,* 251 F.3d at 637 ("The relevant inquiry is whether *a similarly situated individual* was treated differently than the plaintiff.") (emphasis added); *Jones v. Wal-Mart Stores, Inc.,* 2009 U.S. Dist. LEXIS 67197, at *27 (D. Ariz. 2009) (single similarly situated individual constituted "the requisite degree of proof necessary to establish a prima facie case that other employees with similar qualifications were treated more favorably."); *Brock v. Langford,* 2017 U.S. Dist. LEXIS 200090 at *6 (C.D. Cal. 2017) (noting equal protection claim requires evidence that party "was intentionally treated differently form [sic] *a similarly situated individual*") (emphasis added); *Williams v. County of Alameda,* 26 F. Supp. 3d 925 (N.D. Cal. 2014) (declining to dismiss selective enforcement claim where plaintiff identified one similarly situated individual not arrested).

D. <u>If the Court decides the evidence of discriminatory effect falls short of requiring dismissal, the Court must at the very least order disclosure of the information necessary to establish that component of the claim.</u>

*Sellers* held that the heightened discovery standard for challenging the decisions of prosecutors announced in *United States v. Armstrong*, 517 U.S. 456 (1996), does *not* apply where the challenged conduct is in the investigative activities of police. 906 F.3d 848. Unlike in selective prosecution cases, where it is often possible to identify people who had committed certain crimes but never been prosecuted (for instance by identifying those arrested but never charged), such information simply does not exist for selective enforcement: "Asking a defendant claiming selective enforcement to prove who could have been targeted by an informant, but was not. . . is asking him to prove a negative; there is simply no statistical record for a defendant to point to." *Id.* at 853. The resulting standard, the Court announced, is:

> While a defendant must have something more than mere speculation to be entitled to discovery, what that something looks like will vary from case to case. The district court should use its discretion—as it does for all discovery matters—to allow limited or broad discovery based on the reliability and strength of the defendant's showing.

*Sellers*, 906 F.3d at 855. This means that "evidence of discriminatory intent may be enough to warrant discovery." *Id.* at 856.

The disclosure this Court ordered in November—of texts and emails sent to the two agents establishing the surveillance on the day in question—was focused almost exclusively on discriminatory intent.[5] But the part that is more difficult to prove without discovery is discriminatory *effect*. *See Sellers,* 906 F.3d at 853-54 (recognizing that *Armstrong* standard

---

[5] The Court's November 7 order wrongly represents Defendant's position. The Order claims "Defendant asserts the surveillance agents must have been directed to arrest the suspected Barn migrants and Defendant Warren." Doc. 135 at 3. Although this was a possibility, it is certainly not the only possible scenario for selective enforcement. The particular agents who set up and participated in this surveillance and arrest could have decided to target the Barn for retaliatory reasons themselves, without being so directed. It does not matter whether a superior agent directed surveillance for discriminatory reasons, or whether the line agents made the discriminatory decision themselves; both are equally illegal.

cannot apply to claims about investigation because while "the Supreme Court concluded that requiring evidence about similarly situated defendants would not 'make a selective-prosecution claim impossible to prove,' [t]hat is not the case here."). Accordingly, more information unquestionably exists that might assist with this other portion of the claim not addressed by this Court's prior order. *See* Appendix.

II.  The Border Patrol Established Surveillance and Arrested Dr. Warren With Discriminatory Intent.

The Border Patrol has repeatedly demonstrated its hostility toward NMD and its members, particularly in connection with their abuse documentation work. Evidence shows BP was motivated in significant part by a desire to retaliate against NMD for its criticism of the agency, a core protected First Amendment activity.

A.  Historical Evidence

The BP has had what the *New York Times* calls "a history of tense relations with No More Deaths."[6] For instance, compiled video footage captured over several years shows Border Patrol agents intentionally destroying supplies the group left in the desert for the use of imperiled migrants.[7] Crucially, the agents in these videos are not simply removing items from the desert (and indeed, the BP is not the agency charged with maintaining public lands); they are destroying them, sometimes violently, and in some cases, leaving the destroyed supplies behind. These actions serve no conceivable purpose other than to interfere with humanitarian aid and express hostility toward the humanitarian workers.

---

[6] Fernanda Santos, "Border Patrol Raids Humanitarian Aid Group Camp in Arizona," *New York Times,* June 16, 2017, https://www.nytimes.com/2017/06/16/us/border-patrol-immigration-no-more-deaths.html.
[7] This video can be viewed at https://youtu.be/eqaslbj5Th8.

On June 15, 2017, agents raided a medical camp run by NMD in Arivaca, Arizona.[8] Documents associated with the search warrant obtained strongly suggest the BP had had the camp under surveillance; one journalist noted,"[t]he arrests two days after the sensor took photos of the men raised questions as to why the agents didn't arrest them before they arrived at the camp or after they left."[9] Video footage of the raid[10] shows at least a dozen vehicles, a helicopter, and dozens of armed agents, with military-style rifles—all to arrest four individuals who were receiving emergency medical care. This grossly excessive show of force again reflects the agency's hostility, as well as its intent to intimidate NMD. Following this raid, NMD issued a statement, reported in national and international press, calling the BP's raid "a shameful reflection of the current administration's disregard for the lives of migrants and refugees."[11]

A few days later, Dr. Robin Reineke, a human rights expert who teaches at the University of Arizona and runs a nonprofit that works closely with the Pima County Medical Examiner, had a previously scheduled meeting with two Tucson Sector BP agents. Dr. Reineke reported that at this meeting, she "expressed [her] anger and dismay that agents would raid a humanitarian aid station in the desert during a heatwave." Exh. 5 at ¶ 9. Agent Mario Agundez "was defensive and angry in explaining why the Border Patrol had raided

---

[8] *See* Fernanda Santos, "Border Patrol Raids Humanitarian Aid Group Camp in Arizona," *The New York Times,* June 16, 2017, https://www.nytimes.com/2017/06/16/us/border-patrol-immigration-no-more-deaths.html.

[9] Curt Prendergast, "Arrests at Arivaca migrant aid camp don't signal a policy shift, Border Patrol says," *Arizona Daily Star,* June 16, 2017, https://tucson.com/news/local/border/arrests-at-arivaca-migrant-aid-camp-don-t-signal-a/article_c2d8e7e6-8136-503b-8c92-0b69bc3e309a.html.

[10] This video can be viewed at https://youtu.be/gIhltQo5rjM.

[11] *See, e.g.,* Tom Dart, "'Shameful' raid on aid camp at US-Mexico border puts lives at risk, volunteers say," *The Guardian,* June 16, 2017, https://www.theguardian.com/us-news/2017/jun/16/us-mexico-border-aid-camp-raid.

the medical facility. He referred to negative press against the Border Patrol generated by No More Deaths and said they had 'gone too far,' that, 'they have messed with the wrong guy.'" *Id.* Agent Agundez also told Dr. Reineke the BP intended "to shut them down." *Id.* This report constitutes direct evidence that the BP intended to retaliate against NMD for their public criticism, and that part of that intent was to chill their protected activity.

B. <u>Following Agent Agundez's Outburst, Agent Marquez Initiated Text Message Contact With FWS Officials to Keep Tabs on NMD and Dr. Warren.</u>

The following month, Agent John Marquez had a text exchange with Margot Bissel, a FWS employee in the office of the Cabeza Prieta National Wildlife Refuge in Ajo, where NMD volunteers had recently been active. Apparently following up on a prior conversation, Bissel gave Marquez information "about new volunteers with membership with No More Deaths/No Mas Muertes," and the name of a leader they believed to be with the Unitarian Universalist Church. Exh. 1 at 1. Marquez noted that NMD operates under that church to explain why he found this significant. *Id.* Thus, he collected information about this person *specifically* because he believed him to be connected to NMD.

On July 28, 2017, the two had another conversation about NMD, exchanging information about the group's level of activity following attempts by FWS to put a stop to their activities. *Id.* at 7-8. Three days later, Marquez asked Bissel to "Let [him] know of anymore [sic] bean droppers come around." *Id.* at 4. Bissel complied, and on Marquez's suggestion that he would "figure out who they are," she provided him with two names of individuals who had applied for permits to enter the refuge. *Id.* at 4-5.

A few months later, on October 13, 2017, Bissel again texted Marquez, as he had requested, to tell him there had been "A ton of No More Deaths last two days in here getting

permits." *Id.* at 6. Marquez's response was "Sweet." *Id.* Thus, he was apparently happy about the opportunity to collect more information about the group and its members. He then asked Bissel for "any new info or names." *Id.*

Although the messages provided are obviously excerpts from a longer exchange, they establish that Marquez was actively tracking NMD members, and, based on the tone of the exchanges, was doing so with a kind of relish not reflective of proper motives. Notably, the activities he was discussing with Bissel involved placement of food and water in the desert; there was no mention of anything to do with conduct that might violate immigration laws, and thus be of relevance to any *proper* purpose Marquez may have had.

On December 20, 2017, Marquez met with Donald Ebann, a FWS Officer with law enforcement duties working in the Cabeza Prieta refuge. Exh. 6. During this meeting, Ebann apparently told Marquez that The Barn, which is near Ebann's home, was used by NMD volunteers, and that a black Nissan Xterra like one owned by Dr. Warren was frequently there. *Id.* That same day, Marquez established text message contact with Ebann. Exh. 2.

On Wednesday, January 3, 2018, Ebann sent Marquez a photo of a permit for entry on the Cabeza Prieta National Wildlife Refuge. The two then worked together to determine that the vehicle identified in the permit was currently parked at The Barn, which Marquez by then knew was a" base of operations" for humanitarian work. *Id.* at 1. Thus, Marquez was again using FWS personnel to collect information about the comings and goings of NMD members in the course of their work supplying emergency aid supplies in remote areas.

That Saturday, Ebann alerted Marquez that "The barn is active this morning." Exh. 2 at 4. The following Monday, Ebann indicated, apparently in response to some other conversation the two had had outside of the text message string, that he was "trying to get

me a female's subjects [sic] name related to No More Deaths/No Mas Muertes." *Id.* at 1.

Marquez then provided Scott Warren's home address to Ebann (why he knew it, he does not say). The two exchanged information about vehicles Ebann had observed at The Barn, which included some he referred to as "the NMD vehicles." Ebann even told Marquez that "Warrens POV [privately owned vehicle] is there as well," to which Marquez responded "Oh nice." *Id.* at 7-8. The two law enforcement officers thus kept track not only of where Scott Warren lived, but also what type of car he drove, and his whereabouts. This exchange makes clear that Marquez had his sights set on NMD, and Scott Warren specifically, although he never stated any reason to suspect them of doing anything illegal.

Marquez created no official report about any of these text message exchanges until May 21, 2018, approximately four months into this litigation, after the defense requested that the Government provide more details about disclosed messages. In his after-the-fact reports, Marquez refers to Ebann as "concerned citizen Donald EBANN," Exh. 2 at 1, although the messages the two exchanged relied on information that Ebann obtained in his capacity as a government officer, and included Marquez providing information for Ebann and his colleagues to use in carrying out their official duties. This disingenuous attempt to pretend he was simply communicating with a citizen making a report suggests that Marquez realized his unofficial inter-agency collaboration to track group members may not have been entirely permissible. He also described Ebann's contact with him as "notif[ying] me of suspicious activity near his place of residence in Ajo, Arizona." *Id*. But nothing in the messages, or Marquez's description of them, suggests anything other than members of NMD being present at The Barn. If Marquez was being truthful in his report, then he apparently regarded the simple fact of a group of NMD members' presence at The Barn to be "suspicious." That

is strong evidence that Marquez's actions were motivated by his feelings about the group and its activities, rather than by legitimate law enforcement interests. He also referred to "concerned citizen Margot BISSEL, who notified me of suspicious activity near his place of residence in Ajo, Arizona." Exh. 1 at 1. Marquez apparently forgot to change this from his report about the Ebann messages, and did not otherwise provide any explanation for his exchanges with a federal employee who was giving him information she had gleaned in the performance of her duties, nor did he indicate anywhere else in the report what any of the group members he was tracking had allegedly done wrong.

Thus, during the approximately six-month period following the raid on the Arivaca camp and Agent Agundez's expression of the Border Patrol's anger at the group over bad press and intention to shut them down, Agent Marquez actively collected information on group members and tracked their activities, without ever documenting any connection to real or even suspected *criminal* activity. Why he paid such extensive attention to work he only ever described as "humanitarian," he never says. This was the state of the Border Patrol's stance toward NMD when NMD issued its report video on January 17, 2018—a context crucial for understanding that the agents, upon learning of the new report, decided to target NMD for surveillance in hopes of finding some excuse to arrest its leaders.

D. The Events of January 17, 2018

In addition to widely sharing the report online and with media contacts, an NMD representative emailed a copy directly to Steven Passament, a Tucson Sector BP official, at 8:23 am on January 17, 2018. Exh. 7. Although the Government has not produced any additional communications concerning the transmission of this report within the BP, and Customs and Border Protection has failed to respond to various FOIA requests, the Pima

County Sheriff's Office (PCSO) did respond to a FOIA request, producing an email received by Robert Koumal, the PCSO chief of operations in Ajo, from BP Agent Fernando Grijalva, Agent in Charge of Ajo Border Patrol Station. Exh. 8. In that email, sent at 10:34 am, Agent Grijalva was forwarding a message he had received (the disclosed materials do not say when or from whom) summarizing the NMD report and planned NMD activities, and attaching a PDF copy of the report. The anonymous author of the original email to Agent Grijalva notes, in an update dated "0900 hrs 01/17,2018," "I have saved it as a PDF and attached it for your convenience and dissemination." Thus, obviously, prior to 10:34 that morning, agents at the Ajo station had received news of the report.

Early that afternoon, Agent Marquez, again texting Ebann, stated at 12:59 pm, that he and his "partner Brendan are gonna set up for a few hours to watch the barn." Exh. 9 at 1. Crucially, he did not say they were setting up surveillance to locate undocumented individuals, nor ask Ebann if perhaps he had seen particular subjects he was looking for; he stated they were going to "watch the barn." Ebann then told Marquez, "NMD is going to be on news channel 4 tonight at 10 pm talking about vandalism to their water drop sites." *Id.* at 2. Marquez responded, "Oh wow. That's awesome. Wonder who they are gonnablame [sic]. Ebann said "BP mainly," and Marquez agreed "Yeah. Prolly." *Id* at 3.  Although not explicitly referencing the report circulated that morning, it does clearly suggest an awareness on both mens' part that NMD had issued that criticism and was widely publicizing it in the news media, and that the report did indeed blame the Border Patrol. And Ebann, at least, linked that topic to Marquez's plan to "watch the barn."

One hour later, Marquez and his partner, Brendan Burns, "set up a LP/OP within the Bureau of Land Management (BLM) area near the town of Ajo." Exh. 3 at 3. Approximately

half an hour after that, another agent, Alberto Ballesteros,[12] sent a text message to Burns and Marquez. Exh. 10 at 1. Ballesteros appears to have had a view of the Cabeza Prieta refuge parking lot just off of Highway 85, about a mile to the south of Snyder Road (where The Barn is). Over the next two hours or so (the individual messages were provided without time stamps), the three exchanged information about the comings and goings at The Barn:

> Ballesteros: I am in place. Anything good going on?
> Marquez: No. Just walking around. Making calls
> Marquez: Looks like they bought supplies and unloaded it
> Marquez: One male two females so far
> Ballesteros: Cool cool

*Id.* at 1-2.

At approximately 3:33, Burns spotted the Nissan Xterra that Marquez believed belonged to Scott Warren arriving at The Barn. Exh. 3 at 3. Marquez relayed this to Ballesteros, along with a description of what Warren was wearing. Exh 10 at 2-5.

Marquez then sent Ballesteros the description of another person, who "was seen unloading water" from a truck and was driving away from The Barn in a "Small White Toyota pickup" with a California license plate. *Id.* at 5-6. Ballesteros caught sight of the vehicle, confirmed it had the same plate, and reported that it had arrived at the Cabeza office lot. *Id.* at 7. Subsequently, Burns described the departure of another truck from The Barn containing "2 females." *Id.* at 8. Ballesteros identified it by license plate. Burns reported that the first truck, the white Toyota, was back at The Barn. *Id.* at 10. Somewhere in this timeframe, Marquez texted Ebann again, asking if the individual meeting the description he'd given Ballesteros, driving the white Toyota, had turned up at the Cabeza office. Exh. 9 at 3-4.

---

[12] The other agents generally refer to this agent as "Balls."

Thus, during these two or so hours, the three agents were collecting information about NMD vehicles and tracking the members. Notably, in his report about this incident, Ballesteros says nothing about any participation prior to responding to a call for assistance with a "knock and talk" at 5:30 pm. Exh. 11. These activities do, however, match up with Marquez's earlier statement to Ebann that what he and Agent Burns intended to do was to "watch the barn." Moreover, Ballesteros's question about "anything good" suggests excitement at the idea of catching people from NMD doing something wrong.

At 4:38 pm, Marquez reports, he saw Dr. Warren step outside at The Barn with two individuals he believed to be undocumented. Exh. 3 at 4. At this point, Burns sent two text messages—one to Marquez and Ballesteros, and one to a larger group of agents he had apparently nicknamed "Los Perros Bravos part 3."[13]

In the message to Ballesteros and Marquez, Burns says, "2 toncs at the house." Exh. 10 at 11. Ballesteros responds, "What!?!?!?!?!?! Nice!" *Id*. This is surely not the reaction of a professional BP Agent every time he locates an undocumented individual. Nor is it the reaction of a BP Agent who had a reasonable suspicion in the first place that the surveillance of the Barn was going to reveal the presence of undocumented aliens. Rather, it evidences Agent Ballesteros's excitement at the idea of "busting" NMD.

Around this time, Burns texted the Perros Bravos group, "Toncs at the barn." Exh. 12 at 1. Marquez also received a text from Ebann: "Is that you on childs." Exh. 9 at 5. Marquez said "Yup. We are gonna be live soon. Ha." *Id.* This "Ha" is very telling, suggesting an

---

[13] The participants in this group message included Albert Ballesteros, Desi Vargas (the supervisor), Alex Sandoval, Chris Smith, Anthony Martinez, and Marquez, who is listed as "John Rambo Marquez."

agent not simply enforcing the law, but relishing the chance to make this particular arrest.

Burns and Marquez then report seeing Dr. Warren and the two suspected undocumented individuals "conversing with each other," and Dr. Warren "pointing out the mountains and other landmarks." Exh. 3 at 4; Exh. 13 at 1. At this point, agent Burns reports that he "notified Supervisory Border Patrol Agent (SBPA) Desiderio Vargas that we believed WARREN to be harboring illegal aliens at the property, and that we intended to conduct a 'knock and talk' at the structure." Exh. 13 at 1. This is apparently a reference to the fact that the "Perros Bravos" group he texted about the "Toncs at the barn" included Vargas; Burns then texted, "We'd like to get guys in position to get up and knock it fast before they can bolt," and Vargas replied, "Ok." Exh. 12 at 1.

At this point, the agents entered the property. Notably, Burns has testified that at the time they entered, he did not believe they had probable cause to arrest anyone. Exh. 14 at 4. Burns approached Dr. Warren in the driveway and Dr. Warren stated that he was on private property. Exh. 13 at 2. Burns said he had the right to walk up to the front door and knock, as a consensual encounter, and Dr. Warren asked the agents to leave. *Id.* Burns already knew that Warren was not the owner of the property, but asked him anyway if he was; Warren declined to answer, and Burns then insisted that he could go to the front door in search of the owner, over Dr. Warren's asserted objection. *Id.*

Marquez then saw one of the men through the window of the house, and went around the house to the door, locating and detaining him. Exh. 1 at 4. Burns arrived and determined his immigration status, then placed him under arrest, Exh. 13 at 2, and, "based on [their] observations of activity on the property [Marquez] placed WARREN under arrest and informed him that he was being charged with 8 USC 1324, harboring aliens." Exh. 3 at 4.

This arrest was an additional act of discriminatory retaliation. The only evidence agents had when they entered the property was their assumption that due to "ill-fitting clothing," the two men were undocumented, and their glimpse of Dr. Warren standing with the men, pointing somewhere to the North. They knew multiple people were there at the property, having watched it all afternoon, and that Dr. Warren did not own it, and, at least in their view, did not have the authority to exclude people (such as the agents themselves) from it. As discussed above, they had concluded, correctly, that that was insufficient evidence to conclude that any particular individual had "harbored, concealed, or shielded from detection" any individual. 8 U.S.C. § 1324(a)(1)(A)(iii).

The only things that had changed by the time they arrested Dr. Warren were that they had confirmed that one of the men was undocumented, and that Dr. Warren had asserted his Fourth Amendment right to refuse consent for the agents to enter. They *still* had no reason to believe that Dr. Warren himself had done anything to conceal the two individuals, that he had any authority over The Barn such that he could have "provided" them shelter there, or that he, rather than anyone else who was present, was in any way responsible for allowing them to be or remain there.[14] What agents *did* know—as reflected in their reports—is that Dr. Warren was "an active volunteer for NMD who organizes and recruits college students," that he "speaks publicly on immigration issues," as reflected in the news media, Exh. 3 at 3, and that he had refused to answer questions and asserted his Fourth Amendment right to

---

[14] The agents' assertion that they saw Dr. Warren pointing out landmarks is irrelevant for two reasons. First, pointing out landmarks, even if that did occur, and even if it was done for the purpose of assisting the migrants in traveling further into the country, both of which Dr. Warren disputes, is not prohibited by the harboring statute, which only addresses concealing, harboring, or shielding from detection, and contains no element of intending to further a migrant's journey. Second, they have acknowledged that they lacked probable cause even after seeing the pointing by Dr. Warren.

demand that the Border Patrol agents leave the property Exh. 13 at 2.

Given that they did not arrest anyone they did not recognize as a leader and vocal proponent of the group, despite the fact that anyone else there, as far as the agents knew, had just as much responsibility for the two migrants as Dr. Warren, and the fact that they handcuffed and arrested Dr. Warren without probable cause when they could have waited until after they'd interviewed the migrants they'd arrested to determine if Dr. Warren had actually had any significant involvement, the conclusion is inescapable that they arrested Dr. Warren because they perceived him as a leader of the group that had criticized them, and because he had nearly derailed their raid by asserting his constitutional rights. Such a retaliatory arrest lacking probable cause is strong evidence of selective enforcement.

Moreover, the contrast between the Arivaca raid seven months earlier and this one, which followed public criticism of how the Arivaca raid was handled and came mere hours after the release of the newest critical report, is very telling.[15] Prior to the latest round of criticism, when agents suspected undocumented individuals were in an NMD facility, they took photographs, obtained a search warrant, and arrested the undocumented individuals. Immediately following the criticism, they entered without making any attempt to obtain a warrant, ignored a volunteer's proper assertion of his Fourth Amendment right to refuse consent to their entry, and swiftly arrested not only the undocumented individuals, but also the volunteer they perceived as a vocal NMD leader. These are precisely the type of "[d]epartures from the normal procedural sequence" the *Arlington Heights* Court recognized

---

[15] This is not to say that the Arivaca raid was appropriate or conducted for a proper purpose, but merely to highlight the escalation of tactics immediately following the most recent round of public criticism.

could "afford evidence that improper purposes are playing a role." 429 U.S. at 267.

C. <u>The Border Patrol's Explanation for its Decision to Surveil Is Pretextual.</u>

The "official story" for why the agents set up their surveillance was:

> "The day prior, on January 16, I was informed that an illegal alien was apprehended in the town of Ajo near the Immaculate Conception Catholic Church. . . The illegal alien stated that he had been travelling with two other subjects from Central America. He stated that prior to his apprehension, the other two subjects said that they were going go [sic] their separate ways and were going to get picked up in the town of Ajo by an unknown subject and smuggled north towards Phoenix." Exh. 3 at 3.

Burns wrote essentially the same thing. Exh. 13 at 1. These explanations are abjectly false; even a cursory examination of the details reveals that this was not the true reason for the Border Patrol's actions in setting up surveillance.

For one thing, although Marquez stated in his report that the two men he saw with Dr. Warren "matched the description of the two illegal aliens who evaded capture from the day prior," Exh. 3 at 4, his later testimony revealed that in fact he never obtained *any* description of what the allegedly missing individuals looked like:

> Q: But the truth is, you didn't know anything about the characteristics of those two people that were supposedly with the migrant captured the day before; is that true?
> A: I don't understand.
> Q: Did you know whether they were young?
> A: No.
> Q: Did you know whether they were old?
> A: No.
> Q: Did you know whether they were tall?
> A: No.
> Q: Did you know whether they were short?
> A: No.
> Q: Did you know whether they had facial hair?
> A: No.
> Q: Did you know whether they had long hair?
> A: No.
> Q: Did you know whether they were brown?
> A: No.

Q: Black?
A: No.
Q: White?
A: No.
Q: Male?
A: I assumed male.

Exh. 15 at 4-5. If Marquez had *actually* gone to The Barn to look for two particular individuals, surely he would have obtained at least a general description first. His failure to learn even the most basic information about the people he claims to have been looking for strongly supports the notion that the asserted reason was pretextual.

Even the paltry information Marquez did have about the alleged objects of his search was largely inaccurate. The government disclosed documentation regarding the arrest of Mario Sauceda, a man from Honduras coincidentally arrested in Ajo on January 16, and Marquez's story matches it only in the most superficial way. For one thing, Marquez got the location wrong; Sauceda was arrested not at the Immaculate Conception Catholic Church, but at the Calvary Baptist Church. Exh. 16 at 1. This mistake suggests that Marquez was not actually involved in the investigation into this group and did not undertake to learn about it at all or even read the interview summary before setting up surveillance, as would be expected if he was actually attempting to locate and apprehend the two missing companions. Moreover, Sauceda was interviewed at 1:28 pm. *Id.* If this was an active search for two individuals believed to have been in the area very recently, but who were intending to leave, why would the agents wait until the next afternoon to look for them?

Additionally, in choosing a cover story, the agents neglected to pay attention to the timing. Although the interviewing agent's report confirms that Sauceda was indeed arrested and interviewed on January 16, the day before Burns and Marquez set up surveillance, it

also states that he entered the country on January 9—a full week before he was apprehended. *Id.* at 2. Marquez's version, in his report, is that the two missing subjects had separated from Sauceda "prior to his apprehension," but the interview report is more specific: "Once in AJO, SAUCEDA looked for work and the other two individuals left him since they had a ride from there." *Id.* at 1. Ajo is only about 40 miles from the border; thus, even if it took them three days of walking to get there, the two companions would have already been gone for several days, having received a pre-arranged ride.[16] The fact that Sauceda told the interviewer he had been looking for work in Ajo confirms that he had likely been there for days—without his companions—by the time he was arrested. The upshot of this discrepancy is that the arrest of Sauceda provided no reason to believe that his two companions were anywhere in Ajo on January 17, eight days after they crossed the border. If the agents were *actually* looking for them, they certainly would have realized this.

Other agents' reactions to the surprise spotting of two Hispanic-looking people at The Barn confirm that nobody was actually expecting to find these two particular men from Honduras there. If this were really a routine surveillance operation to find the two individuals who had been with Mr. Sauceda, Ballesteros's reaction to finding two men there would not have been "What!?!?!?!?!?!" Exh. 10 at 11.

Finally, Burns and Marquez both revealed in their reports that they were interested not in finding the individuals, but in pursuing NMD. Burns wrote, in his introductory paragraph describing "The Barn," that it "is known to be used by self-described 'humanitarian groups' to provide aid and assistance to illegal aliens in furtherance of their unlawful entry into the

---

[16] The two migrants eventually arrested at The Barn were not Sauceda's companions.

United States." Exh. 13 at 1. If the Border Patrol agents were looking for undocumented individuals, and believed The Barn was a good place to look because they believed it to be used by various groups "to provide aid and assistance to illegal aliens," that was all they needed to know, or to say; it wouldn't matter which group was using it at any given time. But Burns did not stop there; he went on to state, "One of these groups is called 'No More Deaths/No Mas Muertes." *Id*. That information is irrelevant to the asserted *legitimate* purpose—following up on the possibility that, because *various* groups conducted aid there, The Barn was a possible location for finding undocumented individuals. But Burns continued, stating Marquez had confirmed the man he saw fit the description of Dr. Warren, whom Marquez knew was part of NMD. *Id*. Again, Warren's affiliation with that particular group was irrelevant if the agents were simply looking for the migrants; the fact that he was present at the humanitarian facility and was seen in the company of two people the agents believed to be undocumented was the relevant part. Burns's repeated mentions of Dr. Warren's connection to the group that had criticized the Border Patrol that morning thus belies the position that the surveillance had nothing to do with the report.

Marquez's report similarly reveals his bias. In addition to unnecessarily stating, as Burns did, that one of several organizations using The Barn for aid work was NMD, he also specifically identified Scott Warren as "an active volunteer for NMD who organizes and recruits college students to aid in supply drops, and speaks publicly on immigration issues. This is documented on various online college newspapers such as Northern Arizona University's 'The Lumberjack' and local news websites describing his participation in humanitarian efforts with NMD." Exh. 3 at 3. Again, if, as they stated, the agents were operating on information that The Barn was used by various groups for the provision of aid

to migrants, the particular affiliation would not have mattered. Nor, of course, could the fact that Dr. Warren "speaks publicly on immigration issues" properly bear on the agents' decision to watch him or arrest him. Indeed, Dr. Warren is also an active member of Ajo Samaritans, another organization that provides humanitarian aid to migrants and sometimes uses The Barn; if the true purpose was finding people providing aid to migrants that the Border Patrol viewed as violating the law, this affiliation would have been equally relevant. But the Samaritans are not outspoken critics of the Border Patrol; it was thus the NMD affiliation that mattered to the agents. Marquez's decision to include the group affiliation and Dr. Warren's history of speaking publicly about immigration in his official report confirms that he was targeting Warren not because he had reliable information about activities at The Barn, but because Warren was a vocal member of the particular organization that had just released the critical report.

All of the above evidence clearly establishes that the BP was at least partially motivated by a desire to retaliate against NMD for its report. Crucially, the impermissible motive need not be the sole motivating factor; even if the BP was legitimately attempting to stop what it viewed as harboring and to locate undocumented individuals, if it was *also* undertaking these actions to punish the people who had criticized and embarrassed them, that violates the Fifth Amendment, and requires dismissal of the indictment. The provision of a clearly pretextual explanation, the agents' expressions of excitement and glee at the arrests, a fellow agent's history of threatening the group in response to bad press they had generated, and the other evidence identified above forcefully demonstrate that animus toward NMD was "a motivating factor in the decision." *Arlington Heights,* 429 U.S. at 266.

III.    Similarly Situated Locations Not Associated With NMD Were Not Targeted for

<u>Surveillance.</u>

The discriminatory effect of this surveillance can be established in two ways. First, the agents chose a facility primarily used by NMD,[17] even though there were other places in Ajo not associated with NMD that would have been just as reasonable, if not more reasonable, places to look for migrants believed to be hiding in the town, based on information Border Patrol agents had collected. These other locations, about which they had also received tips or information as possible aid sites, are thus similarly situated to The Barn.

Specifically, just over a week before he decided to target The Barn, Marquez reported receiving information about several other locations in Ajo where migrants may have been receiving assistance. Although declining to name his sources, Marquez reported information about a "suspected illegal alien" found in Ajo who had asked for "Mimi" and "said that he wanted to go to the 'escuela.'" Exh. 17. Marquez understood the "escuela" to be a reference to the Curley School building in Ajo, a residential building. Exh.18 at 3. If he was looking for places where, based on his prior investigation, migrants might be staying, the Curley School would have been a reasonable choice, and was similarly situated to The Barn in that he had nonspecific, hearsay information that it might have been a site for aid to migrants.

Marquez also reported receiving information on January 8, 2018 that "an older couple" who lived on Rosedale Avenue brought a van and arranged help for an injured migrant. Exh. 17. The agents could certainly have watched for suspected migrants there; although they lacked a specific address, they knew the street and that the potential harborers had a large

---

[17] As mentioned above, in explaining their choice to surveil The Barn, both agents emphasized that it was known to be used by NMD. Thus, although the facility is used by other groups, which Marquez knew, both he and Burns specifically relied on its role as an NMD facility without mentioning any of the other organizations. Exh. 3 at 3; Exh. 13 at 1.

white van; a brief drive up Rosedale Avenue could thus have revealed a specific location. And Marquez's information included yet another possibility: a woman involved in aiding a lost migrant who "resides in Ajo in the area of Cholla or Arroyo Avenues, on the east side of the railroad tracks." Exh. 17. These two neighboring streets are each only two blocks long, and are in a dead-end area. Thus, two or three agents (such as Marquez, Burns, and Ballesteros) could easily have set up to watch all the comings and goings from that location. If "similarly situated" locations are places in Ajo where the BP had heard tell of aid to migrants, the Curley School, a house on Rosedale Avenue with a large white van, and Cholla and Arroyo Avenues are all similarly situated areas *not* associated with NMD where the BP could have looked for allegedly missing individuals, but did not.

Other possible locations include buildings used by other humanitarian groups the BP had identified as involved in possible aid to migrants in and around Ajo. For instance, Marquez reported interviewing another anonymous individual who stated that Mimi Philips was involved in harboring; Philips was believed to be affiliated with the International Sonoran Desert Alliance (ISDA), described by Marquez as one of the "self-described 'humanitarian' organizations. . .". Exh 19. The ISDA has a headquarters building in Ajo the agents could easily have located and surveilled instead of choosing the facility largely used by NMD. Likewise, an informer identified Philips as a supporter of Ajo Samaritans, Exh. 17, and Marquez certainly thought Ajo Samaritans were involved in the alleged crimes he claimed to be investigating; he titled his timeline of the investigation "Ajo Samaritans/No More Deaths Organization Timeline." Exh. 18 at 1. The Samaritans are known to meet regularly at the Ajo Federated Church, yet the agents did not set up their surveillance there.

Second, to the extent that the BP justifies its choice of The Barn by the fact that it had

received anonymous information that that particular property was used for harboring, Marquez reports receiving that information as early as April 24, 2017. Exh. 18 at 1. Thus, throughout the remainder of 2017 and the first two weeks of 2018, The Barn itself was a similarly situated facility not targeted for surveillance—and the relevant comparison can be made between the facility under usual circumstances, when the Border Patrol had suspicions about what went on there but the group most strongly associated with it had not just released an inflammatory critical report, and that same facility when its primary users had just exercised their First Amendment rights.

Finally, concerning the retaliatory arrest following the illegally motivated surveillance, two incidents provide examples of similarly situated individuals not arrested. Marquez himself identified the first group of individuals in his report when he brought up the warrant executed at NMD's "humanitarian station near Arivaca, Arizona." Exh. 3 at 3. He noted that there, too, NMD volunteers "would provide illegal aliens with food and water along with showers and new clothes to wear," *id.*, and that several undocumented individuals were arrested there. But on that occasion, which predated the January 17 report (and obviously predated the negative press surrounding the Arivaca raid itself), the Border Patrol did not arrest any of the volunteers who were present, whether or not they interacted with the undocumented individuals. The volunteers present on that day thus represent similarly situated individuals in all relevant respects, who had not just undertaken protected First Amendment activity, and were not arrested.

Second, on the day they arrested Dr. Warren, the agents reported the presence of several other individuals at The Barn whom the agents did *not* recognize as NMD leaders or people who speak publicly on immigration issues. Marquez reported that while the arrests was

occurring, "the white dodge that was seen earlier leaving the property returned with the two female subjects," whom Marquez did not recognize. Exh. 3 at 5. Marquez and Ballesteros attempted to question them, but like Dr. Warren, they refused to answer any questions; after checking their records, the agents released them. *Id.*

Burns similarly reported that after Dr. Warren was arrested, he approached two other individuals whom he "had earlier observed on the property via the spotting scope." Exh. 13 at 2. Burns did not recognize them either, and they, also like Dr. Warren, "refused to answer any questions regarding their involvement at the property." *Id.* Burns reported that he released them, instead of treating them as he had Dr. Warren, because the agents "did not observe either of them interacting with the aliens." *Id.* But again, *interacting* with the migrants has nothing to do with concealing them or affording them shelter. In the agents' view of things, nobody other than the owner had the right to kick anyone—including them—off the property, and thus, at least as far as the agents were or should have been concerned, nobody there could afford or deny shelter to the migrants. They certainly had no reason to believe any particular individual they saw at The Barn had more or less authority over who could stay there than anyone else. The four individuals also at The Barn whom agents approached after arresting Dr. Warren were situated, in every regard relevant for the *actual* elements of harboring, exactly as Dr. Warren was—merely present at the property owned by someone else. The only difference is that the agents did not recognize them as leaders of the group who spoke out publicly. All four thus constitute similarly situated individuals who were *not* arrested.

## CONCLUSION

The Government may not target some people over others even in part on the basis of

the exercise of fundamental rights. The First Amendment right to free speech—which incudes at its core the right to criticize the government—is among these rights, and the evidence is strong that the Border Patrol decided to engage in law enforcement activities at The Barn and against Dr. Warren at least in part because of his public association with NMD, who had that very morning taken a strong, public, critical stance. The evidence also shows that the Border Patrol did *not* similarly take action at other places and against other people about which it had similar information, but who had not just issued withering criticisms of the agency. Accordingly, this Court must dismiss the indictment, or at the very least, order the disclosure of evidence necessary to establish more examples of similarly situated places and individuals not targeted for enforcement as identified in the Appendix.

RESPECTFULLY SUBMITTED this 15th day of March, 2019.

By /s/ Amy P. Knight
Gregory J. Kuykendall
Amy P. Knight
531 S Convent Avenue
Tucson, AZ 85701
Attorneys for Defendant Scott
Daniel Warren

CERTIFICATE OF SERVICE

I certify that on March 15th, 2019, I electronically transmitted a PDF version of this document to the Clerk of Court using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Nathaniel J. Walters, Esq. (email: Nathaniel.walters@usdoj.gov)
Anna R. Wright, Esq. (email: anna.wright@usdoj.gov)
United States Attorney's Office
405 W. Congress, Suite 4800
Tucson, AZ 85701