ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona
ANNA R. WRIGHT
NATHANIEL J. WALTERS
Arizona State Bar No. 029708
Assistant U.S. Attorneys
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Email: anna.wright@usdoj.gov
       nathaniel.walters@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>  vs.<br><br>Scott Daniel Warren,<br><br>    Defendant. | 18-CR-00223-TUC-RCC-DTF<br><br>GOVERNMENT'S RESPONSE: MOTION TO DISMISS INDICTMENT DUE TO SELECTIVE ENFORCEMENT<br><br>(Doc. 186) |

The United States of America, by and through its undersigned attorneys, hereby responds to the defendant's Motion to Dismiss Indictment Due to Selective Enforcement. The defendant entirely fails to show either a discriminatory effect or a discriminatory intent. As such, the defendant has not demonstrated that the United States Border Patrol selectively enforced any laws against him. Accordingly, for the reasons discussed below, the United States respectfully asks this Court to deny the defendant's Motion to Dismiss.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. BACKGROUND**

 **a. Factual Summary**

On June 1, 2017, the defendant committed several misdemeanor offenses involving giving aid to illegal aliens crossing through the Cabeza Prieta National Wildlife Refuge. *See United States of America vs. Scott Daniel Warren, 17-00341-RCC-JR*. On December

6, 2017, the government filed an Information related to these offenses and the Court issued a summons to the defendant. *Id.* at Docs. 1, 5. At a meeting on December 12, 2017, United States Fish and Wildlife (FWS) Officer Donnie Ebann told United States Border Patrol Agent (BPA) John Marquez that he had been looking for the defendant to issue a summons. *See Defendant's Exhibit 8*. On January 8, 2018, BPA Marquez and FWS Officer Ebann exchanged text messages regarding the defendant and his current address so FWS could serve the defendant with the summons, and BPA Marquez specifically asked if the FWS Officer was going to "serve the summons" that day.

On January 17, 2018, in Ajo, Arizona, BPA Marquez texted FWS Officer Ebann at 12:59 p.m. stating that he and his partner, BPA Brendan Burns, were to going to establish surveillance on a building known as the "Barn." The Barn is a structure that Border Patrol believed various non-government organizations, including No More Deaths, used to harbor illegal aliens. Sometime between 12:59 p.m. and 3:50 p.m. that same day FWS Officer Ebann texted BPA Marquez and informed him that No More Deaths was going to be on the news at 10:00 p.m. discussing vandalism to sites where the group had left water and food for illegal aliens crossing through the desert. BPA Marquez responded, saying, "Oh wow. That's awesome. Wonder who they are gonnablame (sic)." FWS Officer Ebann responded, "BP mainly," and BPA Marquez stated, "Yeah. Prolly. (sic)."

During the surveillance on the Barn that same day, agents saw the defendant standing outside the Barn with two men, apparently engaged in conversation. Although the agents could not hear the conversation between the defendant and the two men, it appeared to the agents that the defendant was giving directions to the two men based on the defendant's hand gestures and the direction the men were facing.

Shortly after that, the agents approached the Barn on foot where they encountered the defendant, who told the agents to leave. The agents then conducted a knock-and-talk at the Barn. There they found the two men previously seen speaking with the defendant and identified them as Kristian Perez-Villanueva and Jose Arnaldo Sacaria-Goday. The agents also determined that Perez-Villanueva and Sacaria-Goday were illegally present in the

United States. The agents subsequently arrested the defendant on suspicion of violations of 8 U.S.C. § 1324, and detained Perez-Villanueva and Sacaria-Goday as material witnesses.

Agents later obtained a search warrant for the Barn, which Border Patrol executed on January 22, 2018. During their search of the Barn, agents found two hand-drawn maps that identified Border Patrol checkpoints to the north and south of Ajo, as well as signs in English and Spanish posted in a common area advising the occupants of the Barn how to respond if immigration authorities came to the Barn.

During their video depositions on March 7, 2018, Perez-Villanueva and Sacaria-Goday testified that they crossed into the United States from Mexico on January 13, 2018, and walked from the international border to Ajo, Arizona, on January 14, 2018. They further testified that they stopped at two gas stations in the United States before reaching the Barn. They further testified that at the second gas station, a few hours before they arrived at the Barn, they bought burritos and PowerAde with money given to them by a stranger. Sacaria-Goday testified that he did not finish his burrito because he did not like the beans; Perez-Villanueva finished what was left of Sacaria-Goday's burrito.

Perez-Villanueva and Sacaria-Goday testified that they got a ride in a van from a stranger to the Barn. Once at the Barn, they hid in the bathroom until the defendant found them. They also testified that the defendant allowed them to stay at the Barn from January 14, 2018, until their arrest on January 17, 2018. During that time, he gave them a place to sleep, a change of clothes, food, and water. During that time, he did not ask if they needed medical attention and did not provide medical attention of any kind.

Perez-Villanueva also testified that he carried a cell phone with him from the time he crossed into the United States from Mexico on January 13, 2018, until his arrest on January 17, 2018. A consensual forensic search of that cell phone revealed, among other things, photographs taken by Perez-Villanueva and Sacaria-Goday on January 14, 2018, at the two gas stations, along with other photographs taken during their stay at the Barn. Perez-Villanueva and Sacaria-Goday identified these photographs during their video

depositions. Agents also recovered from Perez-Villanueva's cell phone text communications with a phone number associated with Ireneo Mujica related to arranging transportation within the United States on January 14, 2018.

### b. Procedural Posture

The United States charged the defendant by complaint on January 18, 2018, with harboring Perez-Villanueva and Sacaria-Goday in violation of 8 U.S.C. § 1324(a)(1)(A)(iii). Doc. 1. On February 14, 2018, a grand jury charged the defendant in a three-count Indictment with conspiracy to transport or harbor illegal aliens in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I), (a)(1)(A)(ii), and (a)(1)(A)(iii) (Count One), and harboring illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) (Counts Two and Three). Doc. 26.

The defendant filed a Motion to Dismiss Indictment Due to Selective Enforcement on March 15, 2019. Doc. 179. Trial is currently scheduled for May 28, 2019.

## II.     Summary of Relevant Law

Subject to constitutional constraints, the government has broad discretion in enforcing criminal laws. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996). To this end, under the equal protection component of the Fifth Amendment Due Process Clause, the government may not base a decision to enforce the law on "an unjustifiable standard." *Id.* Whether the alleged equal protection violation is selective enforcement of the law against a particular group or selective prosecution of defendants who are members of a particular group, the elements of the claim are the same. *See id.* at 465-66; *see also United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006).

To prevail on an equal protection claim, the defendant must demonstrate that enforcement had a discriminatory effect and law enforcement was motivated by a discriminatory purpose. *Rosenbaum v. City & Cnty. Of S.F.*, 484 F.3d 1142, 1152 (9th Cir. 2007) (citing *Wayte v. United States*, 470 U.S. 598, 608 (1985)). A discriminatory purpose could include enforcing the law on someone because of their race, religion, or the exercise of constitutional rights. *Lacey v. Maricopa Cty.*, 693 F.3d 896, 920 (9th Cir. 2012). The

defendant may show enforcement through a variety of actual or threatened arrests, searches and temporary seizures, citations, and other coercive conduct by the police. *See Rosenbaum*, 484 F.3d at 1152-54; *see also United States v. Frazier*, 408 F.3d 1102, 1108 (8th Cir. 2005); *Flowers v. Fiore*, 359 F.3d 24, 34 (1st Cir. 2004); *Cavez v. Ill. State Police*, 251 F.3d 612, 635 (7th Cir. 2001); *United States v. Avery*, 137 F.3d 343, 358 (6th Cir. 1997). To establish a discriminatory effect, the defendant must show that "similarly situated individuals…were not prosecuted." *Armstrong*, 517 U.S. at 464. To establish a discriminatory purpose, the defendant must show that law enforcement was motivated "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group. *Wayte*, 470 U.S. at 610.

### III. Discussion

The defendant is not entitled to a dismissal of the Indictment because he has not met his burden of showing discriminatory effect or discriminatory intent. Since, the defendant cannot meet this burden, he is also not entitled to additional discovery based on a theory of selective enforcement.

#### a. *The defendant has failed to produce any evidence of discriminatory effect.*

In order to prove a discriminatory effect, "the claimant must show that similarly situated individuals…were not prosecuted." *Armstrong*, 517 U.S. at 465; *see also Rosenbaum*, 484 F.3d at 1153-54. The standard for proving a discriminatory effect is a demanding one. *Lacey*, 693 F.3d at 920 (quotations omitted). In order for the defendant to prevail on a selective enforcement claim, he must show either anecdotal or statistical evidence that similarly situated individuals could have been prosecuted but were not. *Id*. If a defendant cannot point to a similarly situated control group, then the decision to enforce the law against a defendant claiming to be exercising their constitutional rights proves nothing. *See United States v. Aguilar*, 883 F.2d 662, 706 (9th Cir. 1989); *see also Attorney General v. Irish People, Inc.*, 684 F.2d 928 (D.C. Cir. 1982), *cert. denied*, 459 U.S. 1172 (1983) ("Discrimination cannot exist in a vacuum; it can be found only in the unequal treatment of people in similar circumstances.").

Here, the defendant argues that he can demonstrate that Border Patrol did not target, or refer for prosecution, similarly situated people, groups, and locations. However, the defendant's anecdotal evidence shows FWS acted lawfully in enforcing the law against the defendant. It also fails to establish that any similarly situated person was not referred for prosecution. The defendant attempts to meet his burden by pointing to other locations in Ajo he thinks were "more reasonable" surveillance targets, to individuals present at a No More Deaths location in Arivaca July 2017, and to other individuals present at the Barn on the day of the defendant's arrest.

Upon information and belief, the defendant has no prior law enforcement training or experience, and it is clear that his view of how a "more reasonable" investigation should have occurred is deeply flawed. Even from the information proffered about other locations, it is impossible to determine whether the other locations presented a viable option for covert surveillance. There is also no information suggesting that the other locations could be stash houses for illegal aliens. In contrast, it is clear that the Barn presented a covert vantage point for the agents, and the agents had objective facts that made the Barn a "more reasonable" place to conduct surveillance with the intent to apprehend illegal aliens. In particular, agents knew that the defendant had been inside the Barn with the illegal aliens, spoke to the illegal aliens, and gave them directions on how to circumvent a Border Patrol checkpoint.

As to the individuals at the Arivaca location in July 2017, Border Patrol did not have probable cause to arrest anyone in relation to that incident. There is nothing to suggest, who, if anyone, at the Arivaca location interacted with the illegal aliens or took any affirmative steps to further the illegal aliens' entry into the United States. Similarly, as to the other people present at the Barn on January 17, 2018, Border Patrol did not have evidence to suggest that those individuals were ever inside the Barn, knew illegal aliens were present inside the Barn, spoke to the illegal aliens, or gave them apparent directions on how to circumvent a Border Patrol checkpoint.

The defendant, in this case, was not similarly situated to the individuals noted in his

motion, and objective facts made the Barn a more reasonable place to conduct surveillance. Therefore, he has not presented any evidence of a discriminatory effect, and his motion must be denied.

### b. The defendant has failed to produce any evidence to demonstrate discriminatory intent.

In addition to completely failing to meet his burden as to discriminatory effect, the defendant also fails to meet his burden as to discriminatory intent. In fact, the only evidence of discriminatory intent offered by the defendant is the fact that the Border Patrol investigated No More Deaths' illegal activities. Contrary to the defendant's argument, the government may investigate an individual or group, even if that investigation impinges upon First Amendment rights if the government can justify the investigation with a legitimate law enforcement purpose and is not "for the purpose of abridging First Amendment freedoms." *United States v. Mayer*, 503 F.3d 740, 751, 753 (9th Cir. 2007). The government is not required to demonstrate a higher level of suspicion than that required for any other investigation. *Id.* at 751.

The agents involved in the surveillance of the Barn were assigned to the "Ajo targeting enforcement unit" that "specifically target[s] individuals or aliens that may be involved with…human smuggling." RT 6/14/18 at 85:19-23. It is clear that Border Patrol chose to surveil the Barn over other locations like the Curley School and a random house on Rosedale Avenue for legitimate law enforcement purposes. When agents executed a search warrant at the Arivaca location in July 2017, they learned that there was evidence to suggest that No More Deaths used the location to further illegal aliens' entry into the United States, although this evidence did not amount to probable cause to charge any one person. Second, on December 12, 2017, BPA Marquez learned from FWS Officer Ebann that there was a lot of trash associated with illegal alien activity near the Barn. This trash included black water jugs used to mask reflections from the sun, and carpet booties used to conceal footprints when crossing illegally through the desert. With this information, it was reasonable to believe illegal aliens *could* have been at the Barn, and BPAs Marquez

and Burns were within the law to conduct surveillance as part of an investigation into potential alien harboring or smuggling.

The defendant's arguments that the Border Patrol investigated No More Deaths in retaliation for No More Deaths' public relations campaign make no sense. First, Border Patrol executed a search warrant at the Arivaca camp in June 2017, but did not establish surveillance on the Barn until approximately 6-7 months later. Had a motivating factor in Border Patrol's decision to investigate illegal alien activity near the Barn been an unlawful retaliation against No More Deaths or the defendant, agents surely would not have waited over half a year to begin surveillance. Second, there is not a single piece of evidence demonstrating BPAs Marquez or Burns had any knowledge of the video before conducting their surveillance.[1] The defendant does not even claim this evidence exists. Instead, he asks the Court to infer that BPAs Marquez and Burns must have known about the video because unknown agents at the Ajo station had received news of the report.

BPAs Marquez and Burns, while doing their job, conducted surveillance after learning about evidence suggesting that potential illegal alien activity near the Barn, a No More Deaths location, and that No More Deaths assisted illegal aliens in their journey north. Their reasons for conducting the investigation were purely to thwart illegal immigration, not to infringe upon the defendant's constitutional rights. The defendant's allegations, taken together or separate, fail to demonstrate that there is any evidence of discriminatory intent in this case. None of the allegations has any tendency to show that the decision to conduct surveillance was motivated by a discriminatory purpose based on an unjustifiable standard. *See Wayte*, 470 U.S. at 608. Therefore, the defendant has failed to meet his burden as to discriminatory intent.

### c. *The defendant is not entitled to additional disclosure.*

Rule 16 requires the government to allow the defendant to "inspect and copy" various items only under certain circumstances, including if those items are "material to

---

[1] The defendant presents no evidence he had any role in creating or disseminating the video.

preparing the defense." Fed. R. Crim. Pro. 16(a)(1)(E)(i); *see also United States v. Armstrong*, 517 U.S. 456, 463 (1996). "Materiality is a necessary prerequisite to discovery." *United States v. USDC, Central Dist. Of Cal., Los Angeles, Cal.*, 717 F.2d 478, 480 (9th Cir. 1983) (citations omitted). Critically, this requirement means that, before discovery may be ordered, a defendant must establish that he has a factual basis for asserting the defense that is the basis of discovery sought, and that the requested documents or tangible items are relevant and helpful to that defense. *United States v. Murdock*, 548 F.2d 599, 600 (5th Cir. 1977) (emphasis added) (cited with approval in *United States v. Ness*, 652 F.2d 890, 892 (9th Cir. 1981)). In this regard, "[n]either a general description of the information sought nor conclusory allegations of materiality suffice." *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990).

Simply put, the defendant has failed to carry his burden of showing discriminatory effect or discriminatory intent. Therefore, his Renewed Motion for Discovery must be denied.

**IV.  CONCLUSION**

In this case, the defendant has failed to proffer any evidence demonstrating discriminatory effect or discriminatory intent. Since the defendant cannot meet his burden as to either element, he is not entitled to a dismissal or further discovery. For these reasons, the United States respectfully asks the Court to deny the defendant's motion in its entirety.

Respectfully submitted this 5th day of April 2019.

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*/s/ Anna R. Wright*

ANNA R. WRIGHT
Assistant U.S. Attorney

*/s/ Nathaniel J. Walters*

NATHANIEL J. WALTERS
Assistant U.S. Attorney

Copy of the foregoing served electronically or by other means this 5th day of April 2019, to:

All ECF Participants