MICHAEL G. BAILEY
United States Attorney
ANNA WRIGHT
Assistant U.S. Attorney
NATHANIEL J. WALTERS
Assistant U.S. Attorney
State Bar No.: 029708
405 West Congress, Suite 4800
Tucson, Arizona 85701-5040
Telephone: (520) 620-7300
E-mail: anna.wright@usdoj.gov
          nathaniel.walters@usdoj.gov
Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>vs.<br><br>Scott Daniel Warren,<br><br>Defendant. | 17-MJ-00341-RCC-JR<br><br>GOVERNMENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW |

At a three-day bench trial in this matter, the government proved beyond a reasonable doubt that the defendant abandoned personal property and drove on a restricted road in the Cabeza Prieta National Wildlife Refuge, and the defendant failed to carry his burden as to his asserted affirmative defenses. As such, the defendant is guilty as charged, and the government respectfully requests that the Court enter a verdict of guilty as to all counts.

Per the Court's Order at the conclusion of evidence, the government offers the following proposed findings of fact and conclusions of law in support of a guilty verdict.

I.     Findings of Fact

1.     Any visitor with a general access permit to the Cabeza Prieta National Wildlife Refuge ("CPNWR") may drive on the eastern portion of Charlie Bell Road as far as Charlie Bell Pass. (RT 5/6/19 at 11:25-12:4, 49:5-17).

2.     Visitors with general access permits may not, however, drive west on Charlie Bell Road past Charlie Bell Pass. (RT 5/6/19 at 12:19-21, 13:4-10). The area to the west of Charlie Bell Pass is a designated wilderness area and, absent certain exceptions, no vehicle travel is allowed within a designated wilderness area. (RT 5/6/19 at 19:2-13, 26:19-27:8; RT 5/7/19 138:23-139:3).

3.     On June 1, 2017, the defendant and twelve others drove out to the CPNWR from Ajo, Arizona, in a white truck, a red truck and a grey SUV. (RT 5/6/19 at 39:16-23; RT-D 5/6/19 at 45:15-16). All three vehicles travelled together from the eastern edge of CPNWR westward on Charlie Bell Road to Charlie Bell Pass. (RT 5/6/19 at 13:4-7, 13:21-14:2, 31:12-16; RT-D 5/6/19 at 47:12-18).

4.     At Charlie Bell Pass, the red truck and grey SUV parked. *Id.*

5.     The defendant, however, drove the white truck past Charlie Bell Pass to Charlie Bell Well, which is one and a half miles to the west of Charlie Bell Pass along Charlie Bell Road. (RT 5/6/19 at 18:24-19:4; RT-D 5/6/19 47:12-48:2).

6.     In so doing, the defendant drove past two clear and unobstructed signs posted on either of Charlie Bell Road at Charlie Bell Pass indicating that the road was closed to public use. (RT 5/6/19 at 13:11-14, 32:10-34:18; RT-D 5/6/19 at 48:3-7, 48:13-14).

7.     At Charlie Bell Well, the defendant left a cache of items, including plastic one-gallon water jugs, green milk crates, cookies, blankets, medical supplies and skin creams, for others to find or distribute. (RT 5/6/19 at 20:8-21:2; RT-D 5/6/19 at 54:9-21).

8.     The defendant then drove the white truck to a spot almost a mile further to the west along Charlie Bell Road, past another clear and obvious sign indicating that the road was closed to public use. (RT 5/6/19 at 21:9-20, 23:19-24, 34:20-35:15; RT-D 5/6/19 at 49:11-50:7). At that point, he was about two and a half miles inside the designated wilderness area. (RT 5/6/19 at 21:16-23).

9.     The defendant then hiked to the south and left caches of one-gallon water jugs and cans of beans in the designated wilderness area for others to find and use as they saw fit. (RT 5/6/19 at 46:8-47:4, 53:6-54:8).

10.     When the defendant returned to the white truck after leaving supplies on the CPNWR, United States Fish and Wildlife Officer Joseluis Valenzuela was waiting for him. (RT 5/6/19 at 22:25-23:7; RT-D 5/6/19 at 58:15-18).

11.     Officer Valenzuela drove down to the white truck after finding plastic one-gallon jugs and cans of beans cached on the Border Patrol rescue beacon at Charlie Bell Pass and the defendant's cache of items at Charlie Bell Well. (RT 5/6/19 at 15:1-22, 17:7-24, 20:8-15). The supplies left on the rescue beacon were similar to those Officer Valenzuela found next to the red truck and grey SUV, as well as the items Officer Valenzuela found at Charlie Bell Well and next to the white truck. (RT 5/6/19 at 22:13-24). The defendant testified that he couldn't "say 100 percent" but was "virtual[y] certain[]" that the items found on the rescue beacon were supplies he brought with him on June 1. (RT-D 5/6/9 at 51:16-25).

12.     When asked by Officer Valenzuela, the defendant presented his general access permit and admitted that he was the driver of the white truck. (RT 5/6/19 at 26:7-27:4, 28:6-14). The defendant also said that he did not know that he was in a wilderness area. (RT 5/6/19 at 28:15-19). When asked if he had permission to drive the white truck in a designated wilderness area, the defendant told Officer Valenzuela that he spoke to the refuge manager and assistant refuge manager. (RT 5/6/19 at 28:20-29:14). Officer Valenzuela took this to mean that the defendant was claiming to have a special use permit to drive in a designated wilderness area but that he did not have it with him. (RT 5/6/19 at 29:15-18).

13.     Officer Valenzuela ultimately learned that the defendant did not have "any special use permit or any verbal permission to be down in the wilderness area." (RT 5/6/19 at 31:6-22). At that point, Officer Valenzuela told the defendant that he might be cited for his actions. (RT 5/6/19 at 31:23-32:4).

14.     The CPNWR records demonstrate that the defendant did not have a special use permit. (RT 5/6/19 at 31:17-22). In addition, the defendant testified that he did not get

a special use permit before driving on the restricted portion of Charlie Bell Road on June 1, 2017. (RT-D 5/6/19 at 50:8-16, 63:23-64:10; RT-D 5/7/19 at 18:8-19:6).

## II. Conclusions of Law

### a. Count 1 - Operating a Motor Vehicle in a Wilderness Area

15. To prove that the defendant is guilty of operating a motor vehicle in a wilderness area in violation of 50 C.F.R. § 35.5, the government must beyond a reasonable doubt that the defendant drove a motor vehicle in a wilderness area designated by federal law in the CPNWR.

16. The Court finds that the government has met its burden of proving these elements. The evidence demonstrates that the defendant drove a vehicle into a wilderness area designated by federal law in the CPNWR without a special use permit or any other authorization.

17. The defendant admitted on June 1, 2017, to Officer Valenzuela and under oath at trial that he was the driver of the white truck. Officer Valenzuela and the defendant both testified Charlie Bell Road and the surrounding areas are designated wilderness areas beginning at Charlie Bell Pass and continuing to the west and south. Officer Valenzuela and Juliette Fernandez also testified that the vast majority of CPNWR is designated wilderness, including the restricted portions of Charlie Bell Road that the defendant drove on that day. (RT 5/6/19 at 19:2-23; RT 5/8/19 at 4:1-13, 11:19-12:14). Finally, the defendant did not have authority to drive in the designated wilderness area as proven by Officer Valenzuela's testimony. There was no record of the defendant having obtained such a permit, and the defendant admitted under oath that he did not get a special use permit before driving on the restricted portion of Charlie Bell Road on June 1, 2017. (RT 5/6/19 at 31:17-22; RT-D 5/6/19 at 50:8-16, 63:23-64:10; RT-D 5/7/19 at 18:8-19:6).

18. Under the regulation, the government does not have to prove that the defendant acted knowingly or intentionally. However, if such proof is required, the evidence proves beyond a reasonable doubt that the defendant knowingly and intentionally operated a motor vehicle in a designated wilderness area.

b.  <u>Count 2 - Abandonment of Property</u>

19.    To prove that the defendant is guilty of abandoning property in violation of 50 C.F.R. § 27.93, the government must prove beyond a reasonable doubt that the defendant abandoned, discarded, or otherwise left his personal property in a national wildlife refuge.

20.    "To interpret a statute, we look first to the plain meaning of the text…When words in a statute are not defined, they will be interpreted as taking their ordinary, contemporary, common meaning." *United States v. Kaplan*, 836 F.3d 1199, 1208 (9th Cir. 2016) (internal citations and quotation marks omitted).

21.    As relevant here, "abandonment" means "[t]o relinquish or give up with the intention of never again reclaiming one's rights or interest in." ABANDON, Black's Law Dictionary (10th ed. 2014).

22.    "Personal property" means "[a]ny movable or intangible thing that is subject to ownership and not classified as real property." PROPERTY, Black's Law Dictionary (10th ed. 2014).

23.    The Court finds that the government met its burden of proving these elements. The evidence demonstrates that the defendant abandoned, discarded, or otherwise left his personal property in the CPNWR.

24.    Officer Valenzuela testified that he found supplies on the rescue beacon at Charlie Bell Pass and at Charlie Bell Well, both of which are within the CPNWR. (RT 5/6/19 at 11:22-24, 14:4-9, 19:2-4, 20:8-21:2). The defendant admitted under oath that he left those supplies on June 1, 2017, with the intent that other individuals take and use those supplies as they saw fit. (RT-D 5/6/19 at 51:7-25). He also testified that he left additional supplies to the south of where he parked off Charlie Bell Road almost a mile beyond Charlie Bell Well that same day with the intent that other individuals also take and use those supplies as they saw fit. (RT-D 5/6/19 at 53:6-54:8). *See United States v. Millis*, 621 F.3d 914, 918 (9th Cir. 2010) (defendant who left similar items on Buenos Aires National Wildlife Refuge "likely could have been charged…[with] abandonment of property.").

25.     The Court finds unconvincing the defendant's claim that he did not abandon anything in the refuge because, on prior occasions, he was able to retrieve some of the supplies left behind on the CPNWR at a later date.

26.     The defendant gave up any right or interest he had in the items he left on the CPNWR when he placed them in a public place with the intention that others take them. While there was testimony that volunteers "typically" or "sometimes" find emptied water jugs at the caches, there was no testimony that any of the other items are ever recovered, and one would not expect to recover supplies like blankets at the sites. (*See* RT-D 5/7/19 at 20:13-21; RT 5/7/19 at 65:22-66:5).

27.     Moreover, even if the defendant's actions on June 1 do not amount to abandonment of the items, they clearly constitute "otherwise leaving" those terms.

28.     The Court rejects the defendant's claim that the items were not "personal property" because they did not belong to him. Plastic one-gallon water jugs, green milk crates, cookies, blankets, medical supplies and skin creams all easily fall within the definition of personal property.  The items are movable things that are subject to ownership and are not real property.

### c.  Affirmative Defenses

#### i.  Notice Under the Due Process Clause of the Fifth Amendment

29.     The Court concludes that the regulations are not unconstitutionally vague.

30.     The "fundamental principles of due process mandate that 'no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited.'" *Millis*, 621 F.3d at 917 (*quoting United States v. Nader*, 542 F.3d 713, 721 (9th Cir. 2008)). However, a criminal law is unconstitutionally vague "only where 'after seizing every thing from which aid can be derived, the Court is left with an ambiguous statute.'" *Nader*, 542 F.3d at 721 (*quoting Smith v. United States*, 508 U.S. 223, 239 (1993)). Here, the regulations at issue are not unconstitutionally vague because they are clear when read for their plain meaning.

31.     As discussed above, the defendant's argument that 50 C.F.R. § 27.93 was unconstitutionally vague as to the conduct is meritless.   "Abandon" and "personal property" have ordinary, contemporary, common meanings.

32.     The defendant's claim regarding changes made to the hold harmless agreement in July 2017 do not make the regulation vague. Any changes to the hold harmless agreement in July 2017 clarified that document only. (RT 5/7/18 at 114:7-10). Nothing in the hold harmless agreement changed the text of the regulation, which was sufficiently clear when read for its plain meaning and available for anyone to read.

33.     Similarly, the language in the hold harmless agreement advising that certain penalties could be imposed if a permit holder violated the terms of a permit did nothing to alter the penalties described in the regulations at issue. Those penalties are also clear when read for their plain meaning and available for anyone to read.

34.     The defendant's reliance on *United States v. True*, 946 F.2d 682 (9th Cir. 1991), and *Grayned v. City of Rockford*, 408 U.S. 104  (1972), for the proposition that the Court may consider the hold harmless agreement in determining whether the defendant was on notice is misplaced. In *True*, the Ninth Circuit analyzed whether agency action could cure a deficient closure order issued under a regulation. In *Grayned*, the Supreme Court included the actions of "those charged with enforcing" a statute as the least of the tools in determining its reach. Neither case stands for or even suggests that the actions of an agency may transform a constitutionally definite regulation into an unconstitutionally vague regulation.

35.     The Court finds the defendant's arguments now that he was unaware are not credible, especially considering the lack of testimony as to any reliance on this portion of the hold harmless agreement. The defendant's claim cannot constitute a legal excuse for his conduct. *See United States v. Int'l Minerals & Chem. Corp.*, 402 U.S. 558, 563 (1971) ("[I]gnorance of the law is no defense.").

ii.  Necessity

36.     The Court concludes that the defendant has not established the defense of

necessity.

37. To establish a necessity defense, the defendant must show under an objective standard "(1) that [they were] faced with a choice of evils and chose the lesser evil; (2) that [they] acted to prevent imminent harm; (3) that [they] reasonably anticipated a causal relation between his conduct and the harm to be avoided; and (4) that there were no other legal alternatives to violating the law." *United States v. Arellano-Rivera*, 244 F.3d 1119, 1125-26 (9th Cir. 2001) (internal quotation marks omitted). Regardless of his subjective beliefs, the defendant "must act reasonably" and the "justification defense must be analyzed objectively." *United States v. Perdomo-Espana*, 522 F.3d 983, 988 (9th Cir. 2008).

38. The Court finds that the defendant has failed meet his burden as to each of the four elements. First, the defendant has not established that he was placed in a position where he had to choose the lesser of two evils. Instead, he intentionally traveled to CPNWR for the sole purpose of leaving personal property at pre-selected locations, including the locations in the designated wilderness areas. (RT-D 5/6/19 at 45:5-46:26). The defendant also testified that his group started its "mission" at 6:00 a.m. that day, and he encountered Officer Valenzuela in the mid-afternoon. (RT-D 5/7/19 at 16:22-17:3). Actions to avoid imminent harm necessarily do not include actions planned in advance with a group and then executed over the course of several hours. *See United States v. Nolan*, 700 F.2d 479, 484-85 (9th Cir. 1993).

39. The defendant also did not establish that he acted to avoid an imminent harm. As the defendant testified, his conduct on June 1 was premised on statistical data and he had no information that the supplies he left on the CPNWR that day would help anyone anytime in the next two weeks or perhaps longer. (RT-D 5/6/19 at 55:24-56:10). In fact, he had no information that anyone was in need of those supplies on that day. (RT-D 5/6/19 at 54:22-3, 56:11-23). Finally, the defendant testified that sometimes, when he returns to a cache up to two weeks later, it is clear that no one has used the supplies left there. (RT-D 5/7/19 at 23:3-9). Thus, there is no evidence that the defendant knew of any particular

person in need of supplies on June 1. He knew it was possible that the supplies might not be used for weeks, if at all. Accordingly, the defendant's actions on June 1 were not aimed at preventing an *imminent* harm within the meaning of the necessity justification. *See United States v. Dorrell*, 758 F.2d 427, 433 (9th Cir. 1985).

40.     The defendant also did not establish a causal relationship between his actions and the harm he wished to avoid. *See United States v. Schoon*, 971 F.2d 193, 198 (9th Cir. 1991). The defendant testified that the harm he wished to avoid was death from dehydration in the West Desert. (RT-D 5/7/19 at 24:17-23). As discussed above, the defendant knew that it was possible the supplies he left might not be used for weeks, if at all. (RT-D 5/6/19 at 55:24-56:10; RT-D 5/7/19 at 23:3-9). In addition, while there was testimony that people may sometimes drink the water left behind by the defendant and others, there is absolutely no evidence that the defendant's actions would have a "significant effect on the harm he sought to remedy[.]" *Dorrell*, 758 F.2d at 433.

41.     The evidence also shows that there were legal alternatives available to the defendant that he chose not to pursue. There are rescue beacons, and designated cooling water stations within the designated wilderness areas on CPNWR, as well as law enforcement agents. Despite these legal alternatives, the defendant chose to place supplies on a rescue beacon and to not provide information to Officer Valenzuela. It is reasonable to infer from these actions that the defendant was motivated by another goal, that is, helping people who might use the supplies avoid contact with law enforcement agents.

42.     The necessity defense applies where a person must make an immediate decision to break the law to avoid a greater, and it is inapplicable here.

### iii.   Religious Freedom Restoration Act

43.     The Religious Freedom Restoration Act (RFRA) offers an affirmative defense to defendants accused of violating generally applicable federal criminal statutes. *See Ruiz-Diaz v. United States*, 703 F.3d 483, 485-86 (9th Cir. 2012). To establish a *prima facie* RFRA claim, the defendant must present evidence that (1) he has a sincerely held religious belief, (2) his activities were an "exercise of religion," and (3) the government

action "substantially burdened" his exercise of religion. 42 U.S.C. § 2000bb-1(a); *Navajo Nation v. United States Forest Serv.*, 535 F.3d 1058, 1068-69 (9th Cir. 2008). To do this he must articulate the scope of his beliefs and then show that the exercise of his sincerely held beliefs is substantially burdened by a government action. *United States v. Zimmerman*, 514 F.3d 851, 853 (9th Cir. 2007). In this case, to establish that a government action constitutes a substantial burden on the defendant's sincerely held religious belief, the defendant must show that he was coerced to act contrary to his sincerely held religious beliefs by the threat of criminal sanctions. *See Snoqualmie Indian Tribe v. F.E.R.C.*, 545 F.3d 1207, 1214 (9th Cir. 2008) (quoting *Navajo Nation*, 535 F.3d at 1070).

44.     Only once a defendant has established a *prima facie* RFRA case does the burden shift to the government to demonstrate that the "substantial burden" posed by the government action is (1) in furtherance of a compelling governmental interest and (2) the least restrictive means of furthering that compelling governmental interest. *Navajo Nation*, 535 F.3d at 1068 (citing 42 U.S.C. § 2000bb–1(b)). The government action is in furtherance of a compelling interest if demanding "unbending compliance" advances its stated interest to a "meaningful degree." *United States v. Christie*, 825 F.3d 1048, 1056 (9th Cir. 2016). If the government identifies a compelling interest with particularity, then it must demonstrate that it cannot accommodate the claimant's belief more without furthering its interest less. *Christie*, 825 F.3d at 1056. To do this, the government must demonstrate that its preferred means are reasonable and that any other proffered options are either not less restrictive or not plausible. *Id.* at 1061.

45.     The Court concludes that the defendant has failed to establish either element of a *prima facie* RFRA case as to either charged offense.

46.     As to the first element of the defendant's *prima facie* case, the Court finds the defendant's testimony regarding the sincerity of his beliefs is insufficient and not credible. The defendant offered no evidence as to the connection between his beliefs and the need to place plastic one-gallon jugs, in particular, or canned beans, cookies, blankets, medical supplies and skin creams on the CPNWR. In addition, the two witnesses offered

by the defendant to corroborate his testimony on this issue failed to do so. (*See* RT-D 5/6/19 at 19:16-20:1; RT 5/7/19 at 87:12-89:9; 148:11-17, 152:6-9).

47.     The Court also finds that the defendant's beliefs are more properly characterized as being political, rather than religious or spiritual, in nature, because the defendant offered extensive testimony about the statistical data and policy decisions made by the organizations he volunteers with to explain his conduct in this case. *See Christie*, 825 F.3d at 1056 (A defendant must show that he "do[es] not simply recite [his beliefs] for the purpose of draping religious garb over [political] activity[.]'")

48.     As to the second element, the Court finds that the enforcement of the regulations at issue in this case do not substantially burden the defendant's beliefs.

49.     At issue in this case is the enforcement of regulations that relate to the management of public lands. The government may regulate and administer its own land in such a way that "decreases the spirituality, the fervor, or the satisfaction with which a believer practices his religion," *Navajo Nation*, 535 F.3d at 1063, even if the government's actions would "virtually destroy" the believer's ability to practice his or her religion. *Lyng*, 485 U.S. at 451. RFRA does not grant each citizen "an individual veto to prohibit the government action solely because it offends his religious beliefs, sensibilities, or tastes, or fails to satisfy his religious desires" and "deprive others of the right to use what is, by definition, land that belongs to everyone." *Navajo Nation*, 535 F.3d at 1063-64. This is especially true where, as here, it is possible to imagine competing and incompatible religious uses for the CPNWR. Accordingly, the government's choice of how to regulate the use of and access to its own land cannot create a substantial burden.

50.     Moreover, none of the defendant's beliefs conflict with the regulations at issue in this case. As the evidence showed, there are many methods for providing aid in the CPNWR, some of which do not violate the rules and regulations. The defendant's preference for one method over another cannot create a substantial burden. *See Oklevueha Native American Church of Hawaii v. Lynch*, 828 F.3d 1012, 1016 (9th Cir. 2016) (finding no substantial burden where claimants could substitute legal substances for marijuana

consistent with beliefs); *Navajo Nation*, 535 F.3d at 1071 ("[D]iminishment of spiritual fulfillment…is not a 'substantial burden' on the free exercise of religion.").

51.     Having found that the defendant did not meet his *prima facie* RFRA burden, the Court need not consider whether the government proved that the enforcement of the regulations in this case furthered of a compelling governmental interest by the least restrictive means possible. However, the Court also finds that the government met its burden.

52.     As part of its overall efforts to further the mission and purpose of the CPNWR, the government has a compelling interest in enforcing the regulations that govern the CPNWR. As Refuge Supervisor Juliette Fernandez testified, as to designated wilderness areas within the CPNWR, the United States Fish and Wildlife Service (USFWS) is required by law to manage the CPNWR for the mission of the USFWS, the purpose the CPNWR was established for, and the CPNWR's wilderness character, including maintaining its untrammeled, natural and undeveloped character while providing visitors with opportunities for solitude, or primitive and unrefined recreation. (RT 5/7/19 at 173:17-179:19). Each of the regulations violated by the defendants serves to further the mission and purpose of the CPNWR. (RT 5/8/19 at 4:14-5:1, 8:20-10:14). The defendant's actions on June 1 negatively impacted the wilderness character of the CPNWR, and nothing less than enforcement of the regulations would allow the government to continue to meet its compelling interest. (RT 5/7/19 at 124:19-128:3; RT 5/8/19 at 19:10-20:21, 21:11-22:13).

53.     The government also has a compelling interest in maintaining the security of its borders and controlling immigration. To that end, Congress chose to impose criminal sanctions on aliens who enter the United States without authorization and those who knowingly assist illegal aliens. 8 U.S.C. §§ 1324-1326. "The proposition that the government has a compelling interest in regulating its border hardly needs testimonial documentation." *United States v. Aguilar*, 883 F.2d 662, 695 (1989). Here, the Court finds that the defendant intended that his actions on June 1 to further the entry of illegal aliens into the United States through the CPNWR by providing supplies for the journey and

lessening the possibility that illegal aliens would come into contact with law enforcement agents. In light of the defendant's testimony on direct examination, as well as the other evidence related to undocumented aliens offered by the defendant, the Court finds that the defendant's testimony that his actions were not directed towards illegal aliens not credible. (*See* RT-D 5/6/19 at 23:19-23, 24:20-25, 26:17-20, 28:22-29:8; RT 5/7/19 at 6:17-7:8, 9:5-10:19, 14:8-20, 21:9-22:9, 42:7-45:18). This conclusion is further supported by the defendant's placement of supplies on a Border Patrol rescue beacon on June 1. (*See* RT 5/6/19 at 22:13-24; RT-D 5/6/9 at 51:16-25).

III.    Verdict

54.    The defendant has failed to establish the facts necessary to support his asserted affirmative defenses. The United States has established his guilt beyond a reasonable doubt, and the Court finds the defendant guilty of the offenses as charged in the Information.

Respectfully submitted this 24th day of May, 2019.

MICHAEL BAILEY
United States Attorney
District of Arizona

*/s/ Anna Wright & Nathaniel Walters*

_____
Anna Wright & Nathaniel J. Walters
Assistant U.S. Attorneys

Copy of the foregoing served electronically or by
other means this 24th day of May, 2019, to:

All ECF participants