Gregory J. Kuykendall, Bar # 012508
Amy P. Knight, Bar # 031374
KUYKENDALL & ASSOCIATES
531 S Convent Avenue
Tucson, AZ 85701
(520) 792-8033
greg@kuykendall-law.com
amyknight@kuykendall-law.com

Attorneys for Defendant Scott Daniel Warren

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | ) No. 18-CR-00223-RCC(DTF) |
| Plaintiff, | ) |
| | ) **DEFENDANT'S MOTION TO** |
| vs. | ) **PRECLUDE IRRELEVANT** |
| | ) **EVIDENCE OF CONSPIRACY** |
| SCOTT DANIEL WARREN, | ) |
| Defendant. | ) |

Dr. Warren moves to preclude all evidence and argument that is not relevant to any element of harboring (8 U.S.C. § 1324(a)(i)(A)(iii))—specifically including, but not limited to: (1) information about the migrants' journey unknown to Dr. Warren at the time of his alleged offenses; (2) any purported intentions of the migrants; and (3) evidence regarding Dr. Warren's and No More Deaths' work in shelters in Mexico. This motion is made pursuant to Federal Rules of Evidence 401, 402, and 403, and the Fifth Amendment to the United States Constitution.

Background

On January 18, 2018, the government filed a complaint against Dr. Warren, alleging that he had harbored Kristian Perez-Villanueva and Jose Arnaldo Sacaria-Goday in violation of 8 U.S.C. § 1324(a)(1)(A)(iii). Doc. 1. On February 15, 2018, Dr. Warren was indicted on those two counts of harboring, and an additional count of conspiracy to transport and harbor,

under 8 U.S.C. § 1324(a)(1)(A)(v)(I). The government refused to identify any alleged co-conspirators, and on April 19, 2018, Magistrate Judge Velasco denied without explanation Dr. Warren's motion for a bill of particulars. Doc. 56. On March 7, 2018, the government conducted video depositions of its two material witnesses.

The defense was then forced to prepare for trial based on its best guess as to what the government was actually alleging regarding the conspiracy. After extensive pretrial litigation, the Court held a seven-day jury trial. The day before trial, the government averred that the co-conspirator was a man named Irineo Mujica, and in its opening statement, the government identified Mr. Mujica to the jury as the co-conspirator. RT 5/29/19 (pm) at 33:23-34:11; 35:5-7. The government then presented extensive evidence and argument about how the migrants arrived at the Barn, including two gas station surveillance videos recorded earlier on the day of their arrival, Border Patrol agent testimony about the content of those videos, the migrants' testimony about their journey, one migrant's history of interactions with Mr. Mujica, and evidence that Dr. Warren and Mr. Mujica had spoken twice by phone several days prior to the migrants' arrival. In closing argument, the government changed its theory and argued that an additional person, Susannah Brown, was also a co-conspirator, something the government had never alleged in the nearly eighteen months between arrest and trial. RT 6/7/19 at 6:23; 26:15-18.

After deliberating three days, the jury announced that it could not come to a unanimous verdict, and the Court declared a mistrial. On July 2, 2019, the government announced that it would re-try Dr. Warren on the two harboring counts only, and the same day moved to dismiss the conspiracy count. Doc. 296. This court granted that motion to dismiss on July 10, 2019. Doc. 307. Retrial is now scheduled for November 12, 2019.

Argument

A. Harboring

The crime of harboring an alien has four requirements: (1) the person was an alien; (2) the person was not lawfully in the United States; (3) the defendant knew or should have known of the person's illegal status; and (4) the defendant concealed, harbored, or shielded

from detection the person with intent to violate the law. *See* 8 U.S.C. § 1324(a)(1)(A)(iii); *United States v. Tydingco,* 909 F.3d 297, 304 (9th Cir. 2018); Ninth Circuit model criminal jury instruction 9.3. In this case, as the government argued during closing, the first three elements were not disputed. RT 6/7/19 at 12:24-13:17. Both migrants admitted to being in the country illegally, and Dr. Warren never argued that he was unaware of that fact.

What *was* in dispute and was the subject of the vast majority of the evidence and argument was Dr. Warren's intention in allowing the two migrants to have food, water, shelter, and medical care. The government argued that "he intended to harbor them from Border Patrol, and he wanted to make sure that Border Patrol could not find them, and he wanted to make sure that they could continue on their trip as soon as they wanted to." RT 6/7/19 at 13:21-24; *see also id.* at 23:17-21 (arguing that "the intention here was to shield from detection from Border Patrol); *id.* at 25:5-8 ("[H]is intention in allowing them to stay there for four days was to break the law, because his intention was to shield them from immigration authorities and to keep them safe out of public view."). In contrast, the defense argued, "There's absolutely no evidence that Scott intended to violate the law. The evidence in this case is precisely the contrary. Scott wanted to alleviate human suffering." 49:4-12, 19-21.

B. Relevance Requirements

"Irrelevant evidence is not admissible." FRE 402. Rule 401 explains that "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Although this definition is broad, it is not unlimited, and courts must, and routinely do, exclude evidence that does not bear on any fact the government must prove to obtain a conviction. *See, e.g., United States v. Hanigan,* 681 F.2d 1127, 1132 (9th Cir. 1982) (affirming under Rule 402 exclusion of photographs of location where victims never shown to have been); *United States v. Ramirez,* 176 F.3d 1179, 1182 (9th Cir. 1999) (error under Rule 402 to admit evidence of actions taken by defendant's sister after defendant's arrest); *United States v. Chang Da Liu,* 538 F.3d 1078, 1085-86 (9th Cir. 2008) (video evidence properly excluded

under Rules 402, 403, and 608).

In particular, evidence of a fact is *not* relevant, and therefore inadmissible, to prove a party's mental state if that party was unaware of the fact at the relevant time. Perhaps the best known application of this principle is in self-defense cases, where the government must prove that the defendant did not hold a reasonable belief that the use of force was necessary. Thus, in *United States v. Saenz,* 179 F.3d 686, 688 (9th Cir. 1999), the Ninth Circuit reversed a conviction where the trial court had precluded the defendant from introducing evidence of his knowledge that the victim had been carrying weapons for the purpose of showing the defendant's state of mind. It explained that "a defendant claiming self defense may show his own state of mind by testifying that he knew of the victim's prior acts of violence." *Id.* at 689. Of course, the acts themselves would not be relevant for this purpose if the defendant did not know about them at the time of the alleged crime. *See, e.g., United States v. Dellinger,* 2013 U.S. Dist. LEXIS 159813, at *5 (D. Ariz. 2013) ("[E]vidence about [the victim]'s criminal or disciplinary record will be relevant only if it was known to Defendants at the time of the events at issue in this case. . .").

This principle applies any time the "fact of consequence in determining the action" is the defendant's purpose or intention. Thus, in *United States v. Robinson,* 258 F.Supp.3d 87 (D.D.C. 2017), the defendant, a physician, was charged with distributing a controlled substance for writing oxycodone prescriptions "outside the usual course of professional practice and not for a legitimate medical purpose." The government sought to introduce testimony from patients that their motivation for going to see the defendant was that they knew he would give them the opioid prescriptions they desired. After determining that the evidence was being offered for a non-hearsay purpose, the court explained that the government had "not articulated any reason why a patient's motivation, to the extent it was not known to the Defendant, is relevant to any issue in this case." 258 F.Supp.3d at 90. The court emphasized, however, that the evidence *would* be relevant to whether the defendant was writing prescriptions in the usual course of his professional practice "to the extent Defendant knew of the patients' motivation before he issued them a prescription." *Id.* In

4

other words, the *fact* of the patients' motivations was irrelevant to the defendant's state of mind, unless the defendant *knew* of the motivations.

Likewise, in *United States v. Mix,* 2013 U.S. Dist. LEXIS 100496, 2013 WL 3804592 (E.D. La 2013), the defendant, a BP engineer, was charged with obstruction of justice for deleting two strings of text messages from his phone on two different dates about ten months apart. That crime requires "the intent to impair the object's integrity or availability for use in an official proceeding." 18 U.S.C. § 1512(c)(1). The government sought to introduce evidence of a civil SEC investigation of BP that had begun before any deletion occurred, claiming it was relevant to the foreseeability of a grand jury investigation and the defendant's state of mind (i.e., whether he anticipated the grand jury investigation and intended to render the texts unavailable). The court explained that "such evidence can qualify as relevant evidence only if defendant knew about the SEC investigation prior to the dates of the criminal activity charged in the superseding indictment." *Mix* at \*5. It ruled that the government could introduce evidence of a subpoena issued prior to the second act of deletion only *"if* at trial the United States lays a proper foundation for that evidence by establishing that defendant was advised by counsel for BP that the SEC had issued that subpoena seeking his communications." *Id.* at \*6 (emphasis in original); *see also United States v. Hurn,* 368 F.3d 1359, 1366 (11th Cir. 2004) (evidence of a defendant's awareness of a fact is a "vital link in the chain that would have made that collateral matter relevant to an element of the charged defense [sic]"); *Wall Data Inc. v. L.A. County Sheriff's Dep't,* 447 F.3d 769, 782-83 (9th Cir. 2006) (where software manufacturer sued user for copyright infringement, evidence of agreement between the user and a middle-man reseller was properly excluded as irrelevant to an estoppel defense because the manufacturer had no knowledge of it). These cases, and many more like them, clarify the crucial distinction, in relevance analysis, between what is true as a factual matter and what a defendant knows or believes, with only the latter being relevant to intention and state of mind.

In addition, even technically relevant evidence must be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice,

confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The Supreme Court has specified how district courts are to conduct this analysis:

> On objection, the court would decide whether a particular item of evidence raised a danger of unfair prejudice. If it did, the judge would go on to evaluate the degrees of probative value and unfair prejudice not only for the item in question but for any actually available substitutes as well. If an alternative were found to have substantially the same or greater probative value but a lower danger of unfair prejudice, sound judicial discretion would discount the value of the item first offered and exclude it if its discounted probative value were substantially outweighed by unfairly prejudicial risk.

*Old Chief v. United States,* 519 U.S. 172, 182-83 (1997); *see also United States v. Johnson,* 820 F.2d 1065, 1069 (9th Cir. 1987) ("The court must consider the degree to which the fact is at issue.").

Unfair prejudice occurs with the risk that "a jury responds negatively to some aspect of the evidence unrelated to its tendency to make a fact in issue more or less probable, 'e.g., that aspect of the evidence which makes conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely from the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged.'" *Johnson,* 820 F.2d at 1069 (quoting *United States v. Bailleaux,* 685 F.2d 1105 (9th Cir. 1982). And of course, the court's time and resources, as well as the risk of confusing the issues, also bear on whether the evidence should be admitted.

In *United States v. Merino-Balderrama,* 146 F.3d 758 (9th Cir. 1998), the defendant was charged with possession of child pornography. Over the defendant's 403 objection, the trial court allowed the government to play for the jury several videos that were found in the defendant's car; the videos also had covers showing pornographic images, the admission of which was not challenged. The only disputed element was scienter. The Ninth Circuit reversed, explaining that the box covers were significantly more probative than the videos themselves, considering that "the government offered no direct or circumstantial evidence that [the defendant] had knowledge of the films' contents." *Id.* at 763. The court further

explained that playing more than ten minutes of video for the jury was more inflammatory than still photographs, and "[c]onfronting a defendant with evidence that he has never seen, sought, or produced offends basic concepts of fairness." *Id.*

C.   This Court Must Exclude Evidence that Does Not Bear On Dr. Warren's Intention.

In this case, the government presented undisputed evidence that both migrants were aliens who had illegally entered the United States. RT 5/29/19 at 96:13-18 (Agent Marquez testifying that Kristian Perez-Villanueva admitted to being illegally present in the United States); RT 5/30/19 at 75:23-25 (Agent Burns testifying that Perez-Villanueva "was a citizen of El Salvador, and he had no documents allowing him to be lawfully present in the United States."); *id.* at 81 (Agent Burns testifying that Jose Sacaria-Goday was "a citizen of Honduras and that he had no legal documents allowing him to be in the United States."); Exhibit 56B at 7 (Perez-Villanueva deposition testimony that he entered the United States without papers and not through an official port of entry); 56C at 7 (Sacaria-Goday testimony that he crossed the border without inspection and had no permission or papers). In addition, Dr. Warren testified that he suspected they were migrants. RT 6/6/19 at 33. Accordingly, none of these facts was in serious dispute. Instead, the primary "fact of consequence" for relevance purposes was whether, in allowing the migrants to stay inside the Barn, Dr. Warren acted "with intent to violate the law."

1.   Evidence of the Migrants' Activities Prior to Their Arrival at the Barn that was Unknown to Dr. Warren at the Time of the Alleged Offenses Is Irrelevant to Whether Dr. Warren Concealed, Harbored, or Shielded Them From Detection With Intent to Violate the Law.

Information unknown to Dr. Warren can have no bearing on what his intentions were in providing the two migrants food, water, shelter, and medical care. The only thing relevant to intent is what Dr. Warren knew and believed—what he observed, what he knew based on his training and experience, what the migrants told him, and what he understood to be the case when the alleged actions occurred.

In the first trial, the government argued, purportedly in support of its claim that Dr. Warren could not have had purely humanitarian intentions, that the two migrants were in

fact not in need of medical care or other humanitarian aid. *See* RT 6-7-19 at 6 (government closing argument: "The defendant claims that he did all of this because these illegal aliens needed medical care, but as the gas station security cameras show you. . . this is simply not true."); *id.* at 19 ("[I]f the illegal aliens are not there to receive medical care, then this whole business about SOAP notes and calling that person, that's all a cover story.").

In particular, the government presented multiple segments of surveillance footage from two gas stations the migrants visited on January 14, 2018, prior to their arrival at the Barn. RT 5/30/19 at 93-105 (Agent Burns testimony about gas stations); 107-115 (videos played for jury with narration by Agent Burns); RT 6-7-19 at 20 (government closing argument: "You have that gas station video, and you have the testimony about what happens when someone has a rib injury. And as you watch the video from the Chevron, you will see Jose, and the injury's supposed to be on the left side, stretch up and over. . . If he were in pain from a rib injury, he wouldn't be doing that."); *id.* ("[T]he very first video from the Why Not, you can see Kristian stroll past the camera to where the bathrooms are and stroll on back. He's not having any trouble walking. He's fine."); *id.* at 65 ("There's a gas station security camera. You'll get to look at those. . . . But Kristian and Jose are fine. Kristian [sic] shows no sign of having a rib injury."); *id.* at 66 ("The objective evidence, the evidence that doesn't lie, shows that Jose has no rib injury.") The government also relied on the migrants' testimony about what occurred prior to their arrival at the Barn to establish that they were not in actual need. *Id.* at 21 ("We have Kristian and Jose's testimony about how they ate and drank within hours of getting there. Here's Jose with that gas station burrito and that PowerAid [sic], and he wasn't hungry enough to eat it entirely. . . . If you're starving, you don't care how good the beans are.").

The migrants' *actual* need—in contrast to what was discernable after they arrived or what they said to Dr. Warren—does not tend to prove Dr. Warren's intent one way or the other. The government has never suggested that Dr. Warren was aware of the content, or even the existence, of the surveillance footage when he acted, nor does any evidence exist that the migrants informed him about any food or beverages they may have obtained that

day. Indeed, even if the two migrants *had* been faking injury, illness, hunger, and thirst to obtain assistance from Dr. Warren, the fact that they were secretly perfectly well would have no bearing on Dr. Warren's state of mind unless there were evidence that he *knew* their complaints were false. Thus, whether or not their complaints were real is irrelevant to the charge of harboring. To assess his intentions, the jury must consider only what Dr. Warren knew—what he was told and was able to observe, and what he understood. The Court must exclude the surveillance videos. It must also restrict the migrants' testimony to only those facts that either the migrants or Dr. Warren testified they told to him. Attached as appendices to this motion are transcripts of both migrants' depositions with the portions that must be excluded highlighted.

Of course, in the previous trial, this evidence did have some possible relevance: it could bear on whether Dr. Warren was part of a plan or agreement for the migrants to be transported from the Chevron station to the Barn, which was of consequence for the conspiracy charge. But in this second trial, the government strategically decided to dismiss that charge, and it must accordingly restrict its evidence to only that which is legally relevant to harboring.

Even if the Court were to find the pre-arrival evidence of which Dr. Warren had no knowledge marginally relevant, it should still be excluded under Rule 403. First, it has the potential to produce unfair prejudice. Illegal immigration is an extremely divisive topic, especially in the border region from which the jury pool will be drawn. Recent events have exposed a violent hostility toward non-citizen Latinos in the United States, and continued conflict over the construction of an expanded border wall—some of which is occurring in areas that are inside this district—has engendered strong feelings. Videos and testimony about two young men who illegally crossed the border hanging around in Arizona gas stations creates a substantial risk of "provok[ing] an emotional response in jurors," including anger, which could "affect adversely from the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged.'" *Johnson,* 820 F.2d at 1069. Thus, jurors may well believe that undocumented immigrants are despicable,

and could easily convict Dr. Warren for offering them aid, regardless of his intent to violate the law. That is the epitome of unfair prejudice.

In addition to this risk of unfair prejudice, the introduction of this evidence risks confusing the jury, who could easily have difficulty separating what the *migrants* did from what *Dr. Warren* did and knew. If presented with this sort of evidence, jurors will understandably think the evidence bears on the case, when in fact, it does not. The distinction between what may be true and what the defendant believed at the time of the alleged offense can be a subtle and difficult one, and the court should not risk confusing the jury on that point by allowing evidence of things he did not know. Further, this evidence consumed an inordinate amount of time at trial; its exclusion will minimize wasted time.

On the other hand, these videos and this testimony have very little probative value. The government can present its evidence about the condition of the migrants once they arrived, including their own testimony and photographs the migrants took of themselves and each other at the Barn after Dr. Warren arrived, alongside the defense evidence of various witness's observations of the migrants upon arrival. Photos and testimony about how the migrants appeared and acted in the presence of Dr. Warren is significantly more probative of his state of mind than evidence of what occurred before he ever encountered them and never saw or was told about. Thus, comparing the challenged evidence to the actually available alternatives under *Old Chief,* the risks of unfair prejudice, confusion, and wasted time far outweigh any limited probative value, and the evidence must be excluded.

   2.  <u>Evidence and Argument About the Migrants' Desires Is Irrelevant to Dr. Warren's Intentions.</u>

In addition to relying on evidence about the migrants' activities of which Dr. Warren was unaware, the government also argued extensively about what the migrants intended to do in an attempt to establish that Dr. Warren was guilty of harboring. But the intent of the migrants who are purportedly harbored is not an element of harboring and does not bear on the *defendant's* intent. Indeed, the government can and does charge individuals with harboring and transporting migrants who are being held and moved against their will, even if all the

migrants want is to go back home; whether the migrants themselves are trying to avoid Border Patrol and further their own journeys has no tendency to prove Dr. Warren's intentions. Indeed, two people in an interaction can and often do have entirely different purposes. One could offer a friend a ride because he had something he wanted to discuss with his passenger during the drive, and the passenger could accept because he planned to use the transportation to commit a crime; proof of why the passenger wanted the ride has no bearing at all on why the driver made the offer. So as here: whatever the migrants may or may not have intended, their intent was independent of Dr. Warren's motivations.

During its closing argument, the government argued repeatedly that what the *migrants* intended somehow proved that Dr. Warren was guilty of harboring:

> And we heard some bits about, well, the defendant didn't tell them they had to stay put, the defendant didn't lock them inside, the defendant didn't tell them to hide. He doesn't have to tell them that. That's the whole point. They know they want to stay inside. They don't need to be told that. They know they don't want to be found.

RT 6/7/19 at 16. This argument about what the *migrants* wanted—in a harboring prosecution, as opposed to a conspiracy prosecution—has no bearing on any element of the charged crime. Similarly, in discussing the orientation assistance Dr. Warren provided, the government attempted to convince the jury that Dr. Warren must have intended to instruct them on how to avoid a checkpoint, based again only on what it claimed the migrants wanted:

> They want to stay out of public view as much as possible, away from the road where people are passing by, including Border Patrol. They want to stay in the hidden areas, the rough areas, where it's harder to find them.

*Id.* at 19. But again, *their* desires fail to establish what Dr. Warren intended. Dr. Warren testified about why he was orienting them to landmarks: "[T]he critical piece of information is understanding that there's only one paved highway in all this desert area, and if you want to rescue yourself, if you have a problem, you need to know where that's located and so you can hike towards it and not away from it." RT 6/6/19 at 64:4-8. But nothing about the *migrants'* desire to hide from Border Patrol, even if the government had introduced evidence

that that was indeed their intention, is incompatible with Dr. Warren's stated intentions. Thus, in the context of a harboring prosecution, the migrants' intentions do not bear on the fact of consequence—what Dr. Warren intended.

As with the gas station evidence, even if the Court finds this argument marginally relevant, it must exclude it under Rule 403, because it, too, risks inflaming the jurors' emotions regarding illegal immigration, which likely already run high, and risks their punishing Dr. Warren out of their anger toward the migrants rather than their judgment about whether he is personally guilty under the law of harboring.

3. The Humanitarian Aid that Dr. Warren and Other Volunteers Provide in Mexico Is Irrelevant to the Harboring Charge.

In the first trial, the defense introduced evidence that Dr. Warren and other volunteers make regular visits to a migrant shelter in Sonoyta, Mexico—just across the border—to do medical assessments and deliver potable water and donated clothing. They also provide education (such as how to contact emergency services and how to maximize chances of being found by rescuers) and harm-reduction kits, containing things like bleach to reduce the deadliness of contaminated water and ointment to prevent blisters. *See, e.g.,* RT 6/5/19 at 12-26 (testimony of Isabella Reis-Newsom); RT 6/6/19 at 78:24-79:9 (testimony of Scott Warren); *id.* at 93:17-94:21 (same). That evidence was relevant to rebut the government's allegations of conspiracy because it explained why Dr. Warren had placed two phone calls to Ireneo Mujica: Mujica ran that shelter, and Dr. Warren was coordinating a humanitarian visit with the group of volunteers he was leading. Without the conspiracy charge, that evidence has no relevance. Dr. Warren will not be introducing it, and the government must not be permitted to do so either. This volunteer work is unrelated to what Dr. Warren intended when he interacted with the two migrants after their arrival at the Barn.

Nor is the fact that one of the migrants apparently stayed in that same shelter weeks prior to crossing relevant. The only evidence of this fact was a video from that migrant's phone, taken several weeks prior to the actions alleged in this case. The government never alleged or presented any evidence that Dr. Warren (a) knew of the video, (b) encountered that

migrant at the shelter, or (c) knew he had been there, and thus, like the gas station evidence presented above, the fact of Dr. Warren's presence there some weeks earlier is irrelevant to harboring.

Once again, even if relevant, this evidence must be excluded under Rule 403. Jurors with hostility toward undocumented immigrants could easily react strongly to the humanitarian assistance provided to migrants prior to crossing, and could believe that such aid is or should be illegal, but that is not part of any crime alleged here. Moreover, drawing in this entire other area of No More Deaths' work would necessitate an extensive exploration of a tangential topic, including the nature of the shelter itself, specific limits on the assistance provided, the concept of harm reduction, the contents of the kits, and the content of the educational materials the volunteers distribute, which will confuse the issues and needlessly consume time. It would also risk linking Dr. Warren to Ireneo Mujica, who, even in the time elapsed since the first trial, has become increasingly well-known, noted for his role in organizing caravans of Central American migrants.[1] Allowing in testimony about Mujica's Sonoyta shelter would open a Pandora's box of unfairly prejudicial and irrelevant information.

D. Basic Fairness Requires Preclusion of Evidence that was Only Part of this Case Because of the Dismissed Conspiracy Charge.

The development of this case reflects a decision by the U.S. Attorney's Office, sometime after Border Patrol agents investigated and arrested Dr. Warren, to add conspiracy to the harboring charges contained in the complaint. The charge contained no limitations as to who

---

[1] *See,* e.g., Daniel Gonzalez, "Why a U.S. citizen helps coordinate the migrant caravans that Trump condemns as invaders," *Arizona Republic,* Nov. 9, 2018, https://www.azcentral.com/story/news/politics/immigration/2018/11/09/irineo-mujica-u-s-citizen-who-helps-coordinate-migrant-caravans/1910712002/; Kate Linthicum *et al.*, "Facing pressure from Trump, Mexico detains two migrant caravan organizers," *Los Angeles Times,* June 6, 2019, https://www.latimes.com/world/mexico-americas/la-fg-mexico-migrant-caravan-20190606-story.html; Rodrigo Cervantes, "Migrant activists accused of human smuggling released in Mexico," AZPM Fronteras Desk, June 13, 2019, https://www.azpm.org/p/home-articles-news/2019/6/13/153219-migrant-activists-accused-of-human-smuggling-released-in-mexico/

allegedly participated in the conspiracy, when it occurred, or what acts may have been a part

of it, instead alleging only the bare elements of the crime:

> From a date unknown to on or about January 17, 2018, at or near Ajo, in the
> District of Arizona, Scott Daniel Warren, did knowingly and intentionally
> combine, conspire, confederate, and agree with various other persons known
> and unknown to the grand jury, to transport and move Kristian Perez-
> Villanueva and Jose Arnaldo Sacaria-Goday, illegal aliens, within the United
> States by means of transportation or otherwise; and to conceal, harbor and
> shield from detection said illegal aliens in an place, including any building or
> any means of transportation to avoid said aliens' detention by immigration
> authorities, all in violation of Title 8, United States Code, Sections
> 1324(a)(1)(A)(v)(I), 1324(a)(1)(A)(ii) and 1324(a)(1)(A)(iii).

Doc. 26. The government refused to narrow this charge. *See* Docs. 35, 46, 48, 56 (Bill of

Particulars briefing and order).

Courts and scholars have long recognized that the addition of a conspiracy charge to

substantive criminal charges can bring prosecutors significant advantages. As one Supreme

Court Justice has observed, conspiracy is an "elastic, sprawling and pervasive offense,"

*Krulewitch v. United States*, 336 U.S. 440, 445-46 (1949) (Jackson, J., concurring), and

cases frequently arise in which "prosecution for the substantive offense is adequate and the

purpose served by adding the conspiracy charge seems chiefly to get procedural advantages

to ease the way to conviction." *Id.* at 457. For close to a century, judges have recognized

that conspiracy charges, which can dramatically increase the penalty for essentially the same

conduct, are often just different forms of pleading the same thing, and constitute the "darling

of the modern prosecutor's nursery." *Harrison v. United States*, 7 F.2d 259, 263 (2d Cir.

1925) (Hand, J.).

Undeniably, conspiracy charges allow prosecutors to introduce wide-ranging

evidence that would not be admissible in a prosecution only for the substantive crime. *See,

e.g., United States v. Apker*, 705 F.2d 293, 298 (8th Cir. 1983) ("A wide variety of items

might be admitted into evidence in a conspiracy trial; the district court has

particularly broad discretion in a conspiracy trial in determining which items will be

admitted into evidence."). The Supreme Court has attempted to constrain this breadth: "Prior

cases in this Court have repeatedly warned that we will view with disfavor attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecutions." *Grunewals v. United States*, 353 U.S. 391, 404 (1957); *see also* Abraham S. Goldstein, Conspiracy to Defraud the United States, 68 Yale L.J. 405, 412 (1959) (noting how the ambiguous nature of a conspiracy makes it difficult for defendants to object to evidence on relevance grounds); Note, Conspiracy and the First Amendment, 79 Yale L.J. 872, 875 (1970)(explaining that the broad contours of conspiracy law yield "chaotic procedures which favor the prosecution's case"); Note, The Objects of Criminal Conspiracy— Inadequacies of State Law, 68 Harv. L. Rev. 1056, 1056 (1955) (noting that conspiracy law allows prosecutors to sidestep certain technical impediments to conviction). And scholars have found that conspiracy charges are often brought precisely *because* of the latitude they afford. *See* Paul Marcus, *Conspiracy: The Criminal Agreement in Theory and in Practice*, 65 Geo. L.J. 925, 942 (1977) (finding that that sixty-three percent of prosecutors brought conspiracy charges in cases in which the object offense had been completed or attempted not because the conspiracy demanded criminal justice, but to obtain evidentiary advantages). One result of this is "a body of law that gives prosecutors such great discretion to charge and prove a conspiracy that unpopular ideas and the speech that expresses them have become ready subjects of prosecution. . .  making it difficult to distinguish between law-abiding protesters and criminal conspirators under the law." Steven R. Morrison, The System of Modern Criminal Conspiracy, 63 Cath. U.L.Rev. 371, 442 (2014).

Here, the government added conspiracy charges to its harboring case, brought the case to trial with a broad swath of evidence not relevant to the substantive charges, and failed to obtain a conviction. It has now elected to drop that charge and re-try the case on the substantive charges only—a choice that has significant strategic implications, especially given the extensive public criticism this case has received. As a matter of basic fairness and fundamental due process, the government must not be allowed to obtain whatever benefits it seeks from publicly dismissing the conspiracy charge while maintaining the evidentiary advantages it obtained by initially adding that charge. Accordingly, the Court must not

permit any evidence or argument that is legally irrelevant to the substantive harboring charges.

Dated this 26th day of August, 2019

KUYKENDALL & ASSOCIATES

By /s/ Amy P. Knight_____
          Gregory J. Kuykendall
          Amy P. Knight
          531 S Convent Avenue
          Tucson, AZ 85701
          Attorneys for Defendant Scott
          Daniel Warren

CERTIFICATE OF SERVICE

I certify that on August 26, 2019, I electronically transmitted a PDF version of this document to the Clerk of Court using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Nathaniel J. Walters, Esq. (email: Nathaniel.walters@usdoj.gov)
Anna R. Wright, Esq. (email: anna.wright@usdoj.gov)
United States Attorney's Office
405 W. Congress, Suite 4800
Tucson, AZ 85701