Gregory J. Kuykendall, Bar # 012508
Amy P. Knight, Bar # 031374
KUYKENDALL & ASSOCIATES
531 S Convent Avenue
Tucson, AZ 85701
(520) 792-8033
greg@kuykendall-law.com
amyknight@kuykendall-law.com

Attorneys for Defendant Scott Daniel Warren

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | ) |
| Plaintiff, | ) No.CR-18-00223-001-TUC-RCC(DTF) |
| vs. | ) **MOTION TO ADMIT EVIDENCE OF POSSIBLE BIAS OR PREJUDICE AFFECTING GOVERNMENT WITNESSES** |
| SCOTT DANIEL WARREN, | ) |
| Defendant. | ) |

Dr. Scott Daniel Warren moves this Court to admit evidence that will allow the jury to fairly and accurately make credibility findings about certain government witnesses employed by the Border Patrol and whether they hold biases or prejudices against No More Deaths in general and Dr. Warren in particular. This motion is made in order the jury be able to fairly consider the witnesses' "interest in the outcome of the case and any bias or prejudice" they may have, pursuant to the Fifth and Fourteenth Amendments and Federal Rules of Evidence 401 and 402, and the Ninth Circuit's Model Criminal Jury Instructions.

### I. Evidence of a Witness's Possible Bias is Always Relevant and a Question for the Jury.

Facts that may influence a witness's motivation to testify one way or another, or to perceive observed events in a particular light, are always relevant. "A successful showing of bias on the part of a witness would have a tendency to make the facts to which he testified less probable in the eyes of the jury than it would be without such testimony." *United States v. Abel,* 469 U.S. 45, 51 (1984). Thus, "jurors [are] entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [a witness's] testimony which provide[s] a 'crucial link in the proof. . . of petitioner's act.'" *Davis v. Alaska,* 415 U.S. 308, 317 (1974). The Court's reference to the "defense theory" confirms that a defendant need not conclusively establish a witness's actual bias to be entitled to admission of evidence; he must be allowed to present evidence that supports a *theory* about why a witness might testify a certain way.

The term "bias" refers to "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest." *Abel,* 469 U.S. at 52. The Supreme Court's recognition that bias may be unconscious is critical, as it means that a defendant must be permitted to introduce evidence of factors that could cause bias even if the witness denies being affected by them. Bias is not limited to truthfulness on the stand, but may include the accuracy of a witness's initial perceptions and reports, which may also be influenced by a witness's pre-existing feelings or beliefs. *See Davis*, 415 U.S. at 317 ("In the instant case, defense counsel sought to show the existence of possible bias and prejudice of Green, causing him to make a faulty initial identification of petitioner, which in turn could have affected his later in-court identification of petitioner.").

  Possible sources of bias are relevant even where they do not immediately concern the facts of a particular case. Thus, in *United States v. Hankey,* 203 F.3d 1160, 1171 (9th Cir. 2000), two co-defendants were tried on drug charges. One testified that the other was not involved in the transactions at issue. The government then called a gang expert to testify that both co-defendants were members of a street gang that enforced a code of silence, and that any member who testified against another member would "be subject to violent retribution." *Id.* at 1166. Although it required extensive testimony about an area not otherwise germane to the case, the Court allowed the gang evidence as "an explanation for why Welch would lie on Hankey's behalf." *Id.* at 1170-71 (citing *United States v. Greenwood,* 769 F.2d 49, 54 (4th Cir. 1986) ("Bias, defined as 'emotional partiality,'. . . is not a collateral issue.").

  Bias need not be personal to an individual to be relevant:

> "[T]hat a witness harbors a general bias against a group or class of which the defendant is a member, or an institution with which the defendant has some past or present association, does not make cross-examination concerning that possible bias irrelevant. . . .Bias of a general or pervasive sort is not, at least necessarily, less dangerous to objectivity than hostility to one individual. . . . Examination for bias and prejudice must be permitted if it is reasonable to assume that animosity to a group might prejudice the witness, either consciously or unconsciously, against a defendant who shares the characteristics of that class."

*Chipman v. Mercer,* 628 F.2d 528, 532 (9th Cir. 1980). In *United States v. Kartman*, 417 F.2d 893 (9th Cir. 1969)*,* a ministry student attended an anti-war and anti-draft protest at an Armed Forces Induction Center. Two deputy U.S. Marshals were "engaged in subduing and arresting a demonstrator," and the defendant kicked one of the deputies. *Id.* at 894. He was charged with assaulting a federal officer. The deputy, who was the sole witness at trial, was a 20-year Marine Corps veteran, and the defendant sought to establish whether "he had any bias or prejudice—any

3

feelings of opposition, anger, or bitterness—toward persons who participated in anti-draft and antiwar demonstrations." *Id.* at 897. The district court sustained the government's objection to that line of questioning, but the Ninth Circuit reversed, noting that "[p]rejudice toward a group of which defendant is a part may be a source of partiality against the defendant," which was especially relevant because the deputy's "testimony was in substantial conflict with that of defendant's witnesses on several critical matters," including "the appearance of the attempted arrest to uninformed bystanders" and "the nature of defendant's intervention." *Id.*

The right to probe the potential bias of witnesses also has a constitutional dimension; defendants have a Sixth Amendment right to confront the witnesses against them, which includes a right to cross-examine them for bias. *Davis,* 415 U.S. 308; *United States v. Jones,* 766 F.2d 412, 414 (9th Cir. 1985). A court may not, consistent with the right to confront witnesses, "keep[] from the jury relevant and important facts bearing on the trustworthiness of crucial testimony." This constitutional grounding does not limit evidence of bias to cross-examination; "the Supreme Court has made clear that under the federal rules of evidence, a party can impeach a witness with extrinsic evidence of bias and that such evidence is directly relevant to a case because it reflects on that witness's credibility." *Kloberdanz v. Arpaio,* 2016 U.S. Dist. LEXIS 189570 at *7 (D. Ariz. 2016).

Finally, evidence of bias need not definitively establish that the proffered factors *did* influence the witness' testimony; a defendant is entitled to present evidence of factors that *could* create such an influence, and the jury must be allowed to decide how to weigh the testimony in light of that information. *See, e.g., Davis,* 415 U.S. at 318 ("Counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately *draw inferences* relating to the reliability of the witness.") (emphasis added); *United States v. McClintock,* 748 F.2d 1278, 1289 (recognizing the "right to show the witness's *possible* bias or self-interest in testifying") (emphasis added); *United States v.*

*Bleckner,* 601 F.2d 382, 385 (9th Cir. 1979) ("The appellant should have been permitted to develop a record from which to argue why Lynch *might have been biased* towards the appellant or otherwise motivated to testify.") (emphasis added). Among many other things, a witness's prior knowledge of a defendant, before he or she observed events of the case, can be relevant. *See Chipman,* 628 F.2d at 532 (witness "claimed to know precisely who the defendant was from having observed him on earlier occasions. Counsel should have been permitted to probe the circumstances in which [the witness] had previously acquired her knowledge of the defendant when it was alleged that those circumstances affected her attitude and motives toward him.").

**II. Agent Bias is Especially Relevant in This Case.**

At the first trial, the government presented seven witnesses: five Border Patrol agents and the two migrants. Two of the five agents, Agents Marquez and Burns, surveilled the Barn and its occupants for several hours, arrested Dr. Warren, then provided trial testimony regarding what they observed and concluded; it is these two agents' testimony Dr. Warren seeks to impeach with evidence of bias.

Harboring requires proof that: (1) the person was an alien; (2) the person was not lawfully in the United States; (3) the defendant knew or should have known of the person's illegal status; and (4) the defendant concealed, harbored, or shielded from detection the person with intent to violate the law. *See* 8 U.S.C. § 1324(a)(1)(A)(iii); *United States v. Tydingco,* 909 F.3d 297, 304 (9th Cir. 2018). As the government argued in closing, the first three elements were not disputed. RT 6/7/19 at 12:24-13:17. What *was* in dispute and was the subject of the vast majority of the evidence and argument was Dr. Warren's intention in allowing the two migrants to have food, water, shelter, and medical care.

The government's evidence on this crucial point consisted virtually exclusively of the testimony of Marquez and Burns. Both agents testified about what they observed on January 17, 2018 and about their interpretations of what they saw

5

and the conclusions they drew. This subjective evidence was essential to the government's case; the jury must accordingly have all of the relevant information about the potential reasons why the agents might perceive Dr. Warren in a negative light and/or shade their testimony against him.

Agent Marquez

Marquez testified that he "observed some pedestrian and vehicle traffic," and then that he "observed the defendant arrive." RT 5/29/19 (PM) at 76. Then, he "kind of milled around the property, and then we saw him go inside the Barn." *Id.* at 77. Eventually, after a "[l]ittle less than an hour," Dr. Warren came back outside "with two other subjects." The prosecutor asked them, "You said that they were scanning the horizon that you could see; correct?" *id.* at 79, and Marquez agreed.[1] He testified that "they were wearing ill-fitting clothing." When asked what the men were doing, Marquez stated that "[t]he defendant had both of them next to him. . . He was making different hand gestures, like, lots of pointing and then, like, this motion to the two other subjects with him." *Id.* at 80. Marquez could *not* hear what they were saying. *Id.* at 80. Then, "[t]hey all went back inside the Barn." *Id.* at 83. Those were his only objective observations of Dr. Warren's interactions with the migrants.

Marquez also provided *subjective* testimony about how he interpreted what he had seen. The prosecutor asked him if the two men "appear[ed] suspicious to you in any way?" *Id.* at 78. Marquez explained that "[t]hey seemed nervous, alert."[2] The prosecutor took care to clarify that Marquez did not "know what they were actually feeling; correct?" and Marquez agreed that he did not. *Id.* at 78-79. The prosecutor then asked him, based on what he observed, "what were your suspicions as a law enforcement officer?" *Id.* at 80. Marquez "suspected these two individuals to be illegal aliens." *Id.* The prosecutor asked Marquez about "some of the areas and some

---

[1] Agent Marquez had not in fact said anything about the men scanning the horizon.
[2] He then stated that "they didn't want to be outside for very long," but the Court sustained a defense objection.

6

of the things that you believed, again, you didn't hear the conversation, but that you believed the defendant was pointing at." *Id.* at 82. Marquez identified Childs Mountain, "a large mountain with an antenna on top." The prosecutor then asked, "as a Border Patrol agent working in the Ajo area of responsibility, is Childs Mountain significant to you in any way?" *Id.* at 82. Marquez testified:

> Yeah, a lot of times the alien smugglers or narcotic smugglers will use Childs Mountain to guide off of since you can see it at night too with the red lights. They can go to the east or – they can go either east or west, sometimes on top of it, as they make their entry north.

*Id.* The prosecutor emphasized again that Marquez's testimony was that he "observed *what you thought to be* the defendant gesturing towards Childs Mountain, at least," and asked, "what were you thinking at that point?" *Id.* at 83 (emphasis added). Marquez responded, "We should alert our supervisor and possibly set up for a knock-and-talk." *Id.* On cross, Marquez confirmed that he had claimed the two men he saw with Dr. Warren "matched the description of two migrants that you'd been looking for from the day before," RT 5/30/19 at 16, but that in reality, all he knew was that "in my mind, those could possibly be them," even though he lacked even a basic physical description of the individuals. *Id.* at 17-18. Thus, crucial portions of Marquez's testimony consisted of his opinions and interpretations—evidence especially vulnerable to bias.

Agent Burns

The government presented similar testimony from Agent Burns. He testified that he saw a green vehicle pull up to the Barn at about 3:22 pm, and that he saw Dr. Warren get out of the vehicle. RT 5/30/19 at 54-55. He then "saw him exit the vehicle and walk toward the Barn," but he did not see Dr. Warren go inside. *Id.* at 56. Marquez later told him that Dr. Warren came out the front of the Barn, but Burns did not see this himself. *Id.* at 57. Burns then looked through the spotting scope and "saw the defendant there with two males." *Id.* at 58. He testified that "[t]hey were standing close together." *Id.* at 59. He then described them: "two Hispanic males.

Both were shorter than the defendant. One was wearing, like, an old blue sweatshirt that appeared to be too large for him." *Id.*[3] He then explained that he "was watching the defendant pointing to the north and moving his hand around to different landmarks to the north of the Barn, and I watched the two Hispanic males that were with him just kind of following around where he was looking, and then they were talking back and forth." *Id.* at 59-60. He described the gestures: "a waive [sic], you know, a hand up to the north and moving to the left and to the right." *Id.* He confirmed that he could not hear them. *Id.* at 60.

Burns also testified about things he presumed or believed. The prosecutor asked whether there was "anything unusual or suspicious about their appearance to you at that time?" *Id.* at 59. Burns responded that it was their actions that he found suspicious. *Id.* He then identified several landmarks that are to the north as those "the defendant was pointing out at that time," although again, he could not hear the conversation. Thus, while he could identify "landmarks in that area and the area that the defendant was pointing toward," and things that are "[i]n that area where his hand was passing," *id.* at 61, it was only supposition that Dr. Warren was actually referring to any of those locations. He then opined about the significance of these landmarks: "Childs Mountain has traditionally been a point of reference that aliens use to navigate while they're walking through the desert, because the antennae on the top are visible during the day, and the light is visible at night." *Id.* at 62. He opined that "Crater Range. . . is often used as a kind of a resting place for aliens transiting the desert," because "it's just a place to hide and to rest;" he said the same about Batamote Peak. *Id.* at 62-63. He also opined that Hat Mountain "is used as a navigational aid by aliens transiting the desert." *Id.* at 64. He stated that he had "encountered illegal aliens or arrested illegal aliens near" these landmarks "dozens

---

[3] The prosecutor asked Agent Burns, "From where you were sitting, could you see the two Hispanic men clearly?" *Id.* at 59. At this point, Agent Burns had made no reference to the race or appearance of the two men he'd seen.

and dozens" of times. *Id.* at 64. He agreed that he "decide[d] to approach the Barn" after he "saw these directions being given." *Id.* at 66. Later, the prosecutor asked him, regarding employees at the gas stations where the two migrants had stopped, whether he or any other agent has "observe[d] those employees giving these illegal aliens directions." *id.* at 130, and whether they had seen the other people on the Barn property "giving these illegal aliens directions north," *id.* at 131, which he said he had not, in apparent contrast to his opinion about Dr. Warren. The claim that directions were being given was Burns's assumption, not his direct observation.

Burns also testified that he did not believe Dr. Warren's assertion that the property was a base for humanitarian operations because "those two aliens, those two persons that I suspected to be aliens, they didn't appear to be in any need of humanitarian aid." *Id.* at 73. This testimony was purely subjective; he never testified about anything he observed that led to that conclusion. He testified at length about his view of the gas station surveillance videos, even though the footage was shown directly to the jury. *Id.* at 98-102. He similarly provided his opinion about whether, in a series of photos that were also shown to the jury, either of the migrants appeared to be injured. *Id.* at 116-120. All of this subjective testimony was readily susceptible to any bias Burns may have harbored.

<u>The Government's Reliance on the Agents' Credibility</u>

The government depended heavily on these agents' subjective impressions and intentions. The prosecutor had barely begun his opening statement when he started describing Marquez's claims about his prior investigation, including that "he was hearing from these concerned citizens that they were seeing illegal aliens walking around the area near the Barn, walking through the yards, by their house, down the road. . . . that they were finding black water jugs in their yard. . . that these people were finding carpet booties in their yards." RT 5/29/19 (PM) at 27-30. He explained that "[i]t's important to keep in mind, neither Agent Marquez nor Agent Burns had any idea that the defendant was going to be there that day. Frankly, they

had no information that any illegal aliens were at the Barn that day. That's why they were conducting their surveillance, just to see." *Id.* at 30. He also specifically alerted the jury that the agents would testify "that they believed" that Dr. Warren was pointing out specific landmarks often used in "attempting to circumvent the Highway 85 Border Patrol checkpoint that is right outside Ajo." *Id.* at 31.

The government continued to dwell on the agents' testimony in closing. The prosecutor argued that Dr. Warren "gave them directions north to help them avoid a Border Patrol checkpoint." RT 6/7/19 at 6. She reiterated that "he walks the illegal aliens out to the front of the property, and he points out the landmarks to the north, and they're significant landmarks, because that's how you navigate around the Border Patrol checkpoint. . . as Agent Marquez testified, he does the motions for around, up, and over. . ." *Id.* at 9. She then discussed the testimony of Marquez and Burns on this point. *Id.* at 17-18. She also specifically argued that the government's version must be true because "the defense witnesses and the defendant, are not credible based on these factors," *id.* at 11, referring to the credibility factors in model instruction 1.7. She returned in her rebuttal to the subject of "Agents Burns and Marquez testifying about how they came to be at the Barn and how they set up surveillance." *Id.* at 54. She argued that "there's nothing incredible about their testimony. They saw what they saw, and it's reasonable in light of their ability to see it and every other explanation." *Id.* at 55. *Cf. Reynoso v. Giurbino,* 462 F.3d 1099, 1118 (9th Cir. 2006) (reversible error to preclude evidence of bias where defendant "would have answered directly the open question that the prosecution's closing argument posed for the jury – what was the witnesses' motive to lie?").

This case was essentially a credibility contest—the agents' interpretation set against the NMD volunteers' explanations for their actions. The government argued that everything the defense had described was a cover-up engineered to avoid criminal liability. RT 6/7/19 at 19. In this context, it is crucial for jurors to understand the various possible reasons the agents may portrayed Dr. Warren as they did.

### III. Specific Evidence Relevant to the Bias of Agents Marquez and Burns

Evidence produced in discovery, as well as testimony at the first trial, demonstrates that Marquez and Burns had reasons to be, and in fact were, biased both against No More Deaths ("NMD") and against Dr. Warren. The defense must be permitted to "expose to the jury the facts from which jurors. . . could appropriately draw inferences relating to the reliability of the witness." *Delaware v. VanArsdall,* 475 U.S. 673, 680 (1986) (citing *Davis,* 415 U.S. at 318) (error to preclude cross-examination about dismissal of a charge even though witness testified outside the presence of the jury that it did not affect his testimony).

*United States v. Govey,* 284 F.Supp.3d 1054 (C.D. Cal. 2018), illustrates this Court's obligation to permit evidence of a law enforcement witness's bias. In *Govey,* the court dismissed the indictment with prejudice because the government had failed to timely disclose evidence "needed to expose the trial witnesses' motive and bias against him. . . ." *Id.* at 1056. The witnesses in question were deputies from the Orange County Sheriff's Department ("OCSD"), and the evidence of bias concerned "the details of his several-year history with the OCSD deputies, including the deputies' involvement in a department-wide scandal involving inmate informants." *Id.* at 1057. The Court recognized an "adversarial history between Defendant and the OCSD deputies": the defendant had been a target of a wide-ranging illegal informant program run by OCSD, the exposure of which had caused "the OCSD, the Orange County District Attorney's office, and individual deputies" to be "criticized, and in some instances, vilified, by the media, politicians, the legal community, and members of the public." *Id.* at 1057-58. The defendant had previously attempted to expose the illegal program, but the District Attorney's office, faced with an order to produce discovery, had dismissed then-pending charges against him. The court recognized that this history of animosity "bears on their credibility as witnesses, specifically their motive, bias, and character for untruthfulness," because it gave the witnesses a reason to overstate the evidence against the defendant. *Id.* at 1059.

Here, the evidence similarly establishes a history of animosity between NMD and the Border Patrol, these particular agents' view of Dr. Warren as a vocal member of NMD, these agents' hostile attitudes toward humanitarian aid work, and the fact that NMD had, that very morning, released a humiliating report and accompanying video footage exposing the Border Patrol's gleeful destruction of humanitarian aid supplies, giving them a specific reason to resent NMD and the people associated with it. The facts concerning the agents' animosity and bias toward NMD and Dr. Warren are spelled out in detail in defendant's pretrial Motion to Dismiss based on Selective Enforcement ("SE Mot") (Doc. 186), specifically on pages 10-26, which are now hereby explicitly incorporated by reference. This evidence bears directly on the agents' attitudes toward Dr. Warren and NMD, which is crucial for the jury to understand in evaluating their testimony.

      A. <u>Evidence that the Agents Disliked and Targeted NMD and Dr. Warren</u>

Available evidence demonstrates that both agents were biased against NMD and Dr. Warren before they established surveillance on January 17, and that this bias influenced their decision to surveil the Barn. This information is crucial to the jury's ability to evaluate their observations and testimony. The relevance of the targeting is two-fold: first, evidence that they set out that afternoon specifically with the intention of targeting NMD and Dr. Warren makes it more likely that they would exaggerate their observations from that afternoon to accomplish this goal. Second, the fact that they even would choose to target NMD and Dr. Warren in the first place is evidence that, as a general matter, the agents wanted to see them punished—which again provides a motive to exaggerate, shade testimony, and outright lie in this case. The government has admitted as much; it explicitly argued during trial that the agents' "research on Dr. Warren before the day he arrested him" was relevant because it "implies that he had a bias against No More Deaths and potentially Mr. Warren." RT 5/30/19 at 26-27.

Marquez testified that he personally decided to surveil the Barn on January 17, 2018. RT 5/29/19 (PM) at 75. He admitted that he was "aware Dr. Warren was a member of No More Deaths," and he "did have an idea of who he was, who he worked for," as he had done "some background on Dr. Warren." RT 5/30/19 at 25. He admitted for the first time during the first trial that he conducted background research on Dr. Warren *before* the surveillance and arrest. *Id.* Marquez's reports confirm his bias; he reported that he knew Dr. Warren to be "an active volunteer for NMD who organizes and recruits college students to aid in supply drops, and speaks publicly on immigration issues." Doc. 313-1 at p. 2.[4] His inclusion of Dr. Warren's role as an organizer and recruiter, as well as a public speaker, exposes bias toward NMD; if his purpose were simply to link Dr. Warren to the group's known aid activities as a legitimate investigative step, he would have had no reason to include the information about Dr. Warren's vocal views. *Id.*

Marquez had done far more than simply conduct research on Dr. Warren; six months before the arrest, he was exchanging texts with an FWS employee about identifying and tracking people they believed to be associated with NMD, whom Marquez referred to as "bean droppers." *See* Exhibit 1 to SE Mot.[5] By October of that year, Marquez was asking the FWS employee for "new info or names," and exclaiming, "Sweet" when she told him NMD personnel had been in the area. *Id.* In December, Marquez began collaborating with an *additional* FWS employee to track NMD members and eventually to trade information about the whereabouts of Dr. Warren specifically. Doc 186, Exh. 2. Nowhere in any of his reports on these interactions did Marquez identify any alleged criminal activities, as would be

---

[4] The defense has previously referred to a number of documents provided by the government in pretrial motions, but was required by this Court to file those documents under seal. After litigation by a coalition of media organizations, this Court ordered the government to publicly file many of those documents. These citations are to the versions the government filed publicly, with the numbers referring to the page of the composite PDF file that contains all of the unsealed documents.
[5] A number of these exhibits were filed under seal due to the protective order.

13

expected if he were conducting a legitimate investigation; indeed, he did not document his longstanding efforts to track NMD and Dr. Warren at all until May 21, 2018—long after his tracking efforts, and after the present charges had been filed. Notably, when he finally documented his many pre-arrest months of tracking Dr. Warren and NMD, he referred to both FWS employees as simply "concerned citizens," despite the fact that he relied on them for information they obtained in their official capacities. This evidence that Marquez undertook repeated efforts to target NMD outside of any official or legitimate investigation is highly relevant to his credibility in testifying against Dr. Warren, and the defense must be permitted to elicit it under Rules 401 and 402 and the Sixth Amendment.

Also relevant to the agents' credibility is a text message string among Marquez, Burns, and a third agent named Ballesteros during the surveillance of the Barn (SE Mot Exh 10). In this string, Marquez continually updates Ballesteros on what he sees from his surveillance post, and Ballesteros, who is apparently parked a little ways down the road, keeps track of the vehicles coming and going; Burns occasionally joins in. Marquez reports the arrival of a green Nissan he recognizes as "Maybe be Scott Wareen" [sic]. *Id.* at 3. Later in the conversation, Burns says there are "2 toncs at the house," and Ballesteros responds "What!?!?!?!?!?! Nice!" *Id.* This conversation puts the surveillance and subsequent arrest in a fundamentally different context from that presented by the government, as it portrays agents enthusiastically hoping to find ways to implicate Dr. Warren and NMD, rather than a legitimate attempt to locate particular undocumented people believed to be in the area, as the government has steadfastly claimed. Dr. Warren must be permitted to question the agents about their participation in this conversation and, if necessary, to allow the jury to examine the messages, so the jury can assess their testimony.

### B. <u>No More Deaths' Harsh Criticism of Border Patrol</u>

In addition to crossing the agents about their reports and communications concerning their targeting of Dr. Warren and NMD, the defense must be permitted

to introduce evidence of a highly salient event that provided the agents with a strong motivation to paint Dr. Warren in a negative light, both in their targeting of him for surveillance and arrest and in their reports and testimony. Evidence that a witness had reason to bear a grudge against the defendant is deeply relevant to credibility. *See, e.g., United States v. Kikumura,* 698 F.Supp. 546, 552 (D. N.J. 1988) (evidence that an officer had a grudge against defendant would be reason to disbelieve his testimony); *United States v. Bishton,* 463 F.2d 887, 894 (D.C. Cir. 1972) (recognizing that defendant's having passed over the witness for promotion could create a "grudge-type bias in the witness"); *Ash v. Reilly,* 443 F.Supp.2d 37, 49 (D. D.C. 2006) (recognizing "the strong possibility of bias or a grudge on the part of the witnesses" undermines reliability of evidence); *United States v. Johnson,* 2016 U.S. Dist. LEXIS 164481 at *12 (M.D.N.C. 2015) (recognizing relevance of "evidence that these witnesses had reason to hold a grudge").

On the morning of January 17, 2018—mere hours before Marquez set up surveillance of the Barn—NMD released a scathing report and accompanying video exposing misconduct by the Border Patrol operating in the Arizona desert. Although available evidence does not show that Marquez or Burns was sent a copy of the report by text message or email on that morning, the circumstantial evidence that they were aware of it is strong, and the jury must be permitted to decide for themselves whether it may have influenced what the agents did and reported on January 17. Moreover, regardless of whether they knew of the report when they established surveillance, they certainly learned of it prior to their testimony; it thus provides a strong motive for them to paint Dr. Warren in a negative light on the stand. The jury needs to know about this when it considers how much weight to give to their testimony.

The known evidence establishes: (1) the Agent in Charge of the Ajo Border Patrol station had a copy of the report before 10:34 am on the 17th, which he shared with colleagues, including the Sheriff's Department (SE Mot Exh. 8); (2) Burns

began his shift that day at noon (RT 5/30/19 at 48);[6] (3) shortly before 1:00 pm, Marquez began texting with one of the FWS employees, who told him "NMD is going to be on news channel 4 tonight at 10 pm talking about vandalism to their water drop sites," and would blame "BP mainly;" Marquez intended to "watch the Barn" (SE Mot Exh 9). Testimony at the hearing on the selective enforcement motion revealed that the report was widely distributed to hundreds of media contacts that morning, and the video was accessed hundreds of thousands of times on that first day alone. In addition, on information and belief, members of the Disrupt Unit meet or "muster" at the beginning of each shift (i.e., noon); jurors could reasonably infer that the report was discussed that afternoon and that it played a role in the agents' immediate actions.

These facts are essential to jurors' ability to evaluate what occurred on January 17 and how much credibility they should assign to the agents testifying about it. Evidence of bias and motivation is almost always necessarily circumstantial; that does not make it irrelevant. Indeed, as the model jury instruction states: "You are to consider both direct and circumstantial evidence. The law permits you to give equal weight to both, but it is for you to decide how much weight to give any evidence." The jury must be permitted to hear about these circumstances and decide for themselves whether they affect the agents' credibility.

## CONCLUSION

Agents Marquez and Burns's testimony is central to the government's case, which depends on proof that Dr. Warren's actions were intended to violate the law. The rules of evidence and the Constitution require that the defense be allowed to provide the jury with evidence regarding their possible bias, including any reasons they may have had to exaggerate or lie. Both their general history of targeting NMD and Dr. Warren and the stinging criticism of the Border Patrol NMD had issued just

---

[6] The defense does not currently know what time Marquez's shift began, but believes it to have been the same shift Burns was working.

hours before their arrest of Dr. Warren provide crucial context for the jury to understand what reasons they may have had for their actions and their testimony.

RESPECTFULLY SUBMITTED this 11th day of September, 2019.

By /s/ Amy P. Knight
Gregory J. Kuykendall
Amy P. Knight
531 S Convent Avenue
Tucson, AZ 85701
Attorneys for Defendant Scott Daniel Warren

CERTIFICATE OF SERVICE

I certify that on September 11th, 2019, I electronically transmitted a PDF version of this document to the Clerk of Court using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Nathaniel J. Walters, Esq. (email: Nathaniel.walters@usdoj.gov)
Anna R. Wright, Esq. (email: anna.wright@usdoj.gov)
United States Attorney's Office
405 W. Congress, Suite 4800
Tucson, AZ 85701