Gregory J. Kuykendall, Bar # 012508
Amy P. Knight, Bar # 031374
KUYKENDALL & ASSOCIATES
531 S Convent Avenue
Tucson, AZ 85701
(520) 792-8033
greg@kuykendall-law.com
amyknight@kuykendall-law.com

Attorneys for Defendant Scott Daniel Warren

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | ) |
| Plaintiff, | ) No. 18-CR-00223-RCC(DTF) ) |
| vs. | ) **DEFENDANT'S REPLY IN SUPPORT** ) **OF MOTION TO PRECLUDE** ) **IRRELEVANT EVIDENCE OF** |
| SCOTT DANIEL WARREN, | ) **CONSPIRACY** ) |
| Defendant. | ) ) |

The government's response further demonstrates why this Court must restrict the evidence to only evidence that is legally relevant to the specific crime with which it has charged Dr. Warren. The government repeatedly attempts to blur the boundaries around the crime it has chosen to charge—harboring—by insisting, without explanation, that a range of unrelated conduct involving migrants is relevant, all the while misrepresenting the facts in the record and ignoring crucial governing legal principles. This court must not permit the government to inundate the jury with evidence about all kinds of *other* immigration-related happenings it claims are somehow vaguely related; rather, the court must restrict the evidence so the jury can properly and fairly evaluate Dr. Warren's conduct in this particular instance, based on what he knew at the time.

1. The Government Ignores the Crucial Distinction Between the *Migrants'* Intentions and *Dr. Warren's* Intentions.

Harboring requires proof that the *defendant* intended to violate the law. Unlike certain other immigration crimes, it does not depend on the intentions of the people alleged to have been harbored. The government never disputes this, nor can it. Thus, the migrants' intentions are legally irrelevant.

Nonetheless, the government argues that the migrants' journey prior to their arrival at the Barn is relevant because it proves *the migrants'* intentions. Gov. Br., Doc. 319, at 3. The government declares that "any evidence that the illegal aliens wanted to travel north, and presumably escape detection by law enforcement, is relevant to show the defendant's intent to violate the law." *Id.* And it claims that "[i]f the illegal aliens in this case wanted to be harbored, concealed, or shielded from detection, the defendant obliged and did precisely that." *Id.* But it never says how, in light of the fact that a person can "harbor" a migrant no matter what the migrant's intentions, this fact could possibly be legally relevant to the charges it has brought against Dr. Warren. It fails to identify any link. It provides no authority or even any argument, rational or otherwise, for this claim of relevance. Simply stating several times that it is relevant without explanation does not satisfy the strictures of Rule 401.

Indeed, the government itself agrees that what the pre-arrival journey evidence proves is "the aliens'. . . motive to continue further into the United States." Gov. Br. at 3. But the migrants' "illegal journey" and "their motive" are not facts "of consequence in determining the action," Fed. R. Evid. 401. The government had both of these migrants in custody for weeks; it had every opportunity to charge them with crimes based on their actions and intentions if it so desired. Having decided to charge only Dr. Warren, it must limit itself to discussion and proof of *his* intentions.

2. The Principle of "Intrinsic Evidence" Does Not Create Relevance.

Perhaps realizing that it cannot articulate any theory for how, specifically, its evidence is legally relevant to harboring, the government falls back on its need to "offer a coherent

and comprehensive story regarding the commission of the crime." Gov. Br. at 2. It claims that what the migrants did before arriving at the Barn should be admitted because it is "intrinsic evidence," which it must present to tell a coherent story about how Dr. Warren allegedly committed a crime. This is a misunderstanding of elementary evidentiary concepts. That doctrine has no application here, and the Court must instead remain guided by Rules 401, 402, and 403—which do not permit the admission of evidence of things a defendant did not know to prove his intentions.

The intrinsic evidence doctrine does not create relevance where none otherwise exists. Rather, it is an exception to Rule 404(b)'s prohibition on other-act evidence. *See United States v. Vizcarra-Martinez,* 66 F.4d 1006, 1013 (9th Cir. 1995) (referring to the government's need "to explain either the circumstances under which particular evidence was obtained or the events surrounding the commission of the crime" as an "exception to Rule 404(b)"). It thus allows prosecutors to introduce evidence of a defendant's other actions that were intertwined with the charged crime when they would otherwise potentially be excluded as impermissible propensity evidence. It does *not* address the admission of evidence of events not involving the defendant, nor does it create a path to admission for evidence that is not otherwise already relevant. 404(b) evidence is, of course, relevant, *United States v. Dorsey,* 677 F.3d 944, 951 (9th Cir. 2012) (explaining that the Rule "limits the general admissibility of relevant evidence"); it is excluded for policy reasons. Thus, nothing about the intrinsic evidence doctrine contemplates the admission of evidence that has no legal relevance to the charged crime.

Because it is rooted in Rule 404(b), the concept of "intrinsic evidence" obviously refers only to actions of the *defendant.* The term "intrinsic" appears in the advisory committee notes to the 1991 amendment to Fed. R. Evid. 404, where it is used to distinguish the defendant's other crimes, wrongs, or acts that are excluded under Rule 404(b) (extrinsic evidence) from the defendant's actions that are intertwined with the charged offense and must be admitted (intrinsic evidence); *see also United States v. Anderson,* 741 F.3d 938, 949 (9th Cir. 2013) (cited in Gov. Br. at 2) (explaining that "'[o]ther act' evidence that is

'inextricably intertwined' with a charged offense" is "exempt from the requirements of Rule 404(b)"); *Dorsey,* 677 F.3d at 951 ("other act evidence [that] may be 'inextricably intertwined' with a charged crime" is "exempted from the requirements of Rule 404(b)"); *Vizcarra-Martinez,* 66 F.3d at 1012 (cited in Gov. Br. at 2) ("[W]hen it is clear that particular *acts of the defendant* are part of, and thus inextricably intertwined with, a single criminal transaction, we have generally held that the admission of evidence regarding those acts does not violate Rule 404(b).") (emphasis added). In all of these cases, the government's proffered evidence was specifically about the defendant—a series of mailings of drugs the defendant had made similar to the one he was charged with (*Williams);* an uncharged sale of unlicensed software in a copyright prosecution (*Anderson)*; two witnesses who saw defendant with a gun prior to the charged shooting (*Dorsey)*; possession of methamphetamine (*Vizcarra-Martinez;* excluded for lack of sufficient connection to charged crime). The doctrine simply does not apply to evidence of *other people's* actions that are not already technically relevant.

Admitting all manner of evidence as "intrinsic" as the government urges not only finds no support in the law, but would allow prosecutors to introduce irrelevant evidence any time they think it might make a better story. A rule like that would entirely eclipse the relevance requirement. Indeed, the Ninth Circuit recognizes that prosecutors continue to be limited by relevance requirements, and where "the prosecution would encounter little difficulty in presenting the evidence relevant to its case against the defendant without it, the evidence is not admissible as being intrinsic to the charged offense." *Anderson,* 741 F.3d at 950. That is precisely the case here. Dr. Warren is charged with harboring, which requires the government to prove that he "concealed, harbored, or shielded from detection" the migrants with intent to violate the law—all of which the government can explain without difficulty beginning with Dr. Warren's arrival at the Barn. If Dr. Warren were once again charged with conspiracy, or with transporting or aiding and abetting an illegal entry, perhaps the government would need to explain how the migrants got to the Barn to "present the evidence relevant to its case against the defendant;" but given that the only charge is

harboring, it simply has no need to present any background of actions that did not involve Dr. Warren.

The government complains that precluding this evidence "would force the jury to decide whether the defendant harbored, concealed, or shielded illegal aliens, and more specifically whether he had any intent to violate the law, without hearing evidence about how the illegal aliens got from the International Border to the Barn." Gov. Br. at 2. That is exactly right—it would quite correctly force the jury to decide the case without hearing evidence of something that forms no part of the charges. If the government thinks it might have trouble telling a coherent story about harboring without this legally irrelevant evidence, then it should rethink the wisdom of this prosecution, rather than advocating the suspension of the rules of evidence.

3. <u>No Evidence in the Record Ties Dr. Warren to These Migrants Prior to Their Arrival.</u>

The government does not dispute the principle that facts unknown to the defendant cannot bear on his state of mind, nor that the evidence must be excluded if the government cannot prove by evidence that the defendant knew of the facts. Instead, it insists, without a single citation to any evidence in the record, that he knew. The facts actually in the record do not support this claim, and this court must not admit evidence based only on the government's unsubstantiated say-so.

First, the government explains that "the defendant and other members of No More Deaths traveled to Irineo Mujica's shelter" to "provide medical care, give water, and provide border crossers with items to assist them on their illegal journey into the United States." Gov. Br. at 3-4. The government provides no factual citations for this, but is apparently referring to their distribution of "harm-reduction kits," which the undisputed evidence shows are small ziplock bags that include information on accessing emergency services, a small vial of chlorine and gauze to treat drinking water, ointment, a bandage, and "a comb, which is for the spines of cacti, to take them, remove them." RT 6/5/19 at 17-26. The government declares that these activities are "relevant to demonstrate the defendant's role in planning

and preparing to harbor illegal aliens." Gov. Br. at 4. But that does not follow, and the government provides no explanation for why it thinks otherwise. Providing migrants at a shelter in Mexico with water and minimal medical necessities is an entirely separate activity from concealing, harboring, or shielding from detection migrants who are in the United States, and engaging in the former in no way implies participation in the latter. This kind of intentional blurring of the boundaries of the conduct actually alleged to be criminal is precisely what this court must not allow.

Next, the government asserts that the "illegal aliens did not find the Barn by chance—they were led there." Gov. Br. at 4. Again the government neglects to cite the record, perhaps because the evidence in fact shows the opposite. It was the prosecutor who elicited a volunteer's testimony that they did *not* provide migrants at the shelter with maps or directions. RT 6/5/19 at 41. Moreover, Mr. Perez-Villanueva, the government's own witness, testified that they were *not* "trying to get to a particular town or a particular place," Perez-Villanueva Depo at 11, and the evidence showed that he used his cell phone to look up a location in Ajo—the Chevron station—but not to search for the Barn or its address, which he surely would have done if he had been told to go there. Trial Exh. 5. The government presented no evidence that either migrant or even Mr. Mujica was at the shelter that afternoon when the volunteers visited. In fact, the only reason the government gives for its leap to conclusions is that the migrants, one of whom had been seen at the shelter weeks earlier, crossed the border the same evening after the volunteers' visit. But that is not probative of anything. For one thing, the recent visit of the volunteers provided a good reason for any migrants there who had plans to cross in the near future no matter what their immediate destination, as the volunteers had brought supplies of drinking water, which is obviously a basic necessity for survival but was often in short supply. And in any event, [c]oincidence in time is insufficient. . . . There must be a sufficient contextual or substantive connection between the proffered evidence and the alleged crime;" even a connection to the subject matter is not enough without actually tying the evidence to the specific charged crime. *Vizcarra-Martinez,* 66 F.3d at 1013 (excluding evidence that a defendant charged

with possession of hydriodic acid with knowledge that it would be used to manufacture methamphetamine possessed a small amount of methamphetamine at the time of his arrest). The proponent of evidence bears the burden of establishing its admissibility, *United States v. Conners,* 825 F.2d 1384, 1390 (9th Cir. 1987), and the government's unsupported speculation falls far short of meeting this burden.

Next the government insists that Dr. Warren must have known the migrants were coming because he called Susannah Brown, who had encountered one of the migrants several weeks before at the shelter, when they arrived, and "there is no evidence that she gave <u>any</u> medical guidance on this call." Gov. Br. at 4 (emphasis original). As an initial matter, the government again fails to offer any explanation for how, specifically, this phone call suggests that Dr. Warren intended to violate the law. It makes only a vague suggestion that this was somehow nefarious, but utterly fails to connect the dots. It has never produced any evidence or even a specific conjecture of any other purpose for the call.

In any event, contrary to what the government implies, the uncontroverted evidence shows that the purpose of the call was arranging a medical evaluation. Nurse Brown testified unrebutted that when Dr. Warren called her on January 14, he told her "that there were two young men in need of medical care at the Barn," and that she "went the next day." RT 6/4/19 at 127. She described it as "a fairly short phone call where he was just, you know, requesting my assistance, you know, and was calling to see if I was available to do a medical assessment." *Id.* at 128. The government never asked her about this call at all, and it is undisputed that she did indeed do an in-person medical assessment the following day. Dr. Warren also testified that his call to Nurse Brown on the 14th was to arrange a medical assessment. The government attempted to suggest that the call may have had some other purpose, but Dr. Warren confirmed multiple times that it did not:

> Q: And after you spoke with them, your first call was to Susannah Brown?
> A: Certainly my first call in terms of medical assessment was to Susannah Brown, yeah.
> Q: Did you make another call before you called Nurse Brown?
> A: I don't know.

> Q: And so to clarify that, the first person that you remember calling the day the illegal aliens showed up to the Barn is the same person that went with you to the shelter where one of the illegal aliens were staying who crossed the same day?
> A: Well, the first person that I called in terms of doing a medical assessment, yeah.

RT 6/6/19 at 104. Dr. Warren also testified, again uncontroverted, that he "had received no communication, no advance notice by any means and from no one else that two migrants would or had arrived at the Barn." RT 6/6/19 at 169. Thus, the government's vague suggestion, without any citation to evidence, that this phone call means the whole thing was planned in advance and therefore renders the migrants' journey and the volunteers' shelter work relevant to his intentions is utterly unfounded. The government cannot manufacture relevance by coming up with a theoretically possible story that has no factual support.

Finally, the government insists that the shelter visit and the migrants' journey must be relevant because "the defendant admitted in his testimony at trial that he arrived within minutes of the illegal aliens arriving at the Barn." Gov. Br. at 4. It provides no citation for this assertion, and Dr. Warren never said that—nor could he have. The migrants were there when he arrived, RT 6/6/19 at 33; *id.* at 104, so he was in no position to say how long they had been there. Indeed, Mr. Sacaria-Goday, the government's witness and the only person who testified on this question, testified that they were there about 40 minutes before Dr. Warren arrived. Sacaria-Goday Depo at 47. And the uncontradicted evidence that *was* presented revealed Dr. Warren's true reason for going to the Barn at that time: to receive and debrief a group of new volunteers who were conducting a search-and-recovery mission, and to cook dinner for them. RT 6/6/19 at 32. Other witnesses corroborated that Dr. Warren was indeed facilitating a volunteer group, they had indeed gone out on a difficult recovery mission, they were expecting dinner to be ready upon their return to the Barn, and Dr. Warren conducted a debrief with them that evening, RT 6/5/19 at 31, 36. It is also

undisputed that Dr. Warren arrived at the Barn straight from the grocery store, with bags of groceries. Although it *argued* that this was not the real reason, the government points to no *evidence* that calls this account into question.

4. <u>The Government Intentionally Muddies the Boundaries of What Conduct Is Actually Alleged to be Criminal. This Must Not Be Allowed.</u>

The government asserts that the shelter evidence is relevant because "[b]y showing the defendant planned and prepared for *any* aliens to enter the United States illegally, the Government will have met one of the elements of the offense charged, that is, that the defendant intended to violate the law in this case." Gov. Br. at 4. This argument confirms that the government is operating on a badly mistaken view of the law.

There are two problems with this argument. First, it conflates migrants entering the United States with the provision of shelter to migrants who are already in the country. Dr. Warren is not charged with any offenses relating to illegal entry (such as "bringing in" under 8 U.S.C. § 1324(a)(1)(A)(i) "encouraging or inducing" under (A)(iv), or aiding and abetting an illegal entry offense under § 1325 or § 1326), and even if he did intend to do things that were illegal with regard to migrants crossing the border—of which the record contains no evidence—that would absolutely *not* establish that he intended anything regarding the provision of food, water, and shelter to two particular migrants within the United States. The charged crime requires that his specific actions—concealing, harboring, or affording shelter to two migrants— were done with intent to violate the law. Having some other unrelated intent to do something else illegal does *not,* as the government argues, meet any element of the offense charged.

Second, the government argues that proving a purported intention to assist *other* migrants in breaking the law would mean that "the Government will have met one of the elements" in *this* case. But again, the government must prove that Dr.

Warren intended to violate the law when he took the particular actions alleged regarding Mr. Perez-Villanueva and Mr. Sacaria-Goday. An intention to violate the law regrading some other person would not satisfy that requirement. The government's insistence that it can convict Dr. Warren by showing he intended to do something *else* illegal at some *other* time is a frankly alarming reflection on its understanding of its powers and responsibilities. Under the strictures of the Due Process protections in the Fifth Amendment, the government can charge people with committing specific actions that violate specific laws. It cannot convict them of generally intending to violate various assorted laws.

5. <u>Evidence of Aid in Shelters in Mexico and Migrants Getting Rides In the United States Risks Unfair Prejudice.</u>

The government attempts to avoid the application of Rule 403 by pretending that the issue is simply "seeing or hearing about illegal aliens." Gov. Br. at 5. But that is not the concern. The concern is that the specific additional information about volunteers doing harm-reduction work in Mexico and about the migrants possibly getting a ride within the United States—conduct which is *not* part of any crime charged here—as well as migrants hanging around in public places like gas stations where jurors may routinely visit in their daily lives, would be especially inflammatory, on top of the already inherently controversial subject matter. Again, it is the government's burden to establish that its evidence is admissible, and it has done nothing whatsoever to address the concern that these particular items of evidence create heightened risk of unfair prejudice and confusing the jury, while adding minimal probative value.

<u>Conclusion</u>

The government's response to this motion consists of claiming that things are relevant to this particular offense because they seem vaguely connected to immigration-related activities generally, without addressing their specific connection to the elements of the only crime it has chosen to charge, and claiming that certain facts render the evidence relevant when the record provides no support for those claimed facts. The law limits admissible

evidence to that which is *relevant* to the elements of the crime charged. That does not mean it has something vaguely to do with the subject matter; it means that it has some identifiable bearing on a fact that is of consequence in determining the action. The party who seeks to admit evidence must establish its relevance, and here, the government has utterly failed to do so.

Dated this 16th day of September, 2019

                                             KUYKENDALL & ASSOCIATES

                                             By /s/ Amy P. Knight_____
                                                 Gregory J. Kuykendall
                                                 Amy P. Knight
                                                 531 S Convent Avenue
                                                 Tucson, AZ 85701
                                                 Attorneys for Defendant Scott
                                                 Daniel Warren

## CERTIFICATE OF SERVICE

I certify that on September 16, 2019, I electronically transmitted a PDF version of this document to the Clerk of Court using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Nathaniel J. Walters, Esq. (email: Nathaniel.walters@usdoj.gov)
Anna R. Wright, Esq. (email: anna.wright@usdoj.gov)
United States Attorney's Office
405 W. Congress, Suite 4800
Tucson, AZ 85701