Gregory J. Kuykendall, Bar # 012508
Amy P. Knight, Bar # 031374
KUYKENDALL & ASSOCIATES
531 S Convent Avenue
Tucson, AZ 85701
(520) 792-8033
greg@kuykendall-law.com
amyknight@kuykendall-law.com

Attorneys for Defendant Scott Daniel Warren

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | ) No.CR-18-00223-001-TUC-RCC(DTF) |
| Plaintiff, | ) |
| | ) **MOTION TO PRECLUDE** |
| vs. | ) **HYPOTHETICAL QUESTIONS** |
| | ) **ABOUT INFORMED CONSENT** |
| SCOTT DANIEL WARREN, | ) |
| Defendant. | ) |

Defendant Dr. Scott Warren moves this Court to preclude hypothetical questions about the outer limits of the concept of "informed consent." This motion is based on Federal Rules of Evidence 401, 402, 403, 701, and 702, as well as the Court's inherent authority to control the evidence at trial. The government may ask fact witnesses about the events in this case, and may ask those who are familiar with the set of protocols Dr. Warren was following about those protocols and the meanings of terms they use, but it may *not* ask witnesses about their hypothetical responses to invented situations that have nothing to do with the facts of this case. Allowing such inquiry would turn this trial into a philosophical exploration of the boundaries of the concept of informed consent, when the facts of this case raise no such issue.  There is no dispute that the two migrants involved in this case

were able to, and in fact did, give consent to whatever treatment they received. Any hypothetical exploration of the concept's application in other cases would be a distraction and a waste of time, and would be irrelevant to the charge the government seeks to prove in this case.

Testimony about the outer limits of the concept of informed consent in invented hypothetical situations consumed an inordinate amount of time at the first trial. Although the evidence about the existence of an informed consent requirement and an explanation of the concept were necessary and relevant to this case, the repeated inquiry into its application in extreme and unlikely situations was not.

Andy Silverman

The No More Deaths protocols contain a requirement that volunteers obtain informed consent from patients before treating them or taking action on their behalf. RT 6/4/19 at 54; 87. Professor Silvemran testified about the meaning of informed consent:

> So informed consent is explaining exactly what an evacuation is, what may occur, you know, et cetera, and so, you know, so they should—so we want to make sure they understand that, and if they're able, to give consent. And what I mean by that is, obviously if they're unconscious, then obviously they could not give consent, or they speak a language that would not, you know, we're not able to talk with them, you know, you know, there may or may not be a problem in that situation.

RT 6/4/19 at 87-88. This testimony properly addressed the meaning of a requirement that appears in the protocols Dr. Warren was following, at the level of generality that the protocol's drafters understood it to apply.

Susannah Brown

Susannah Brown, a nurse who treated the two patients at issue in this case, also testified at trial. The prosecutor asked her about one patient, Jose, who had a rib injury, and she confirmed that she "did not believe that whatever rib injury he may have had required any type of hospitalization." RT 6/4/19 at 164. That testimony was clearly relevant, as it

1  established what occurred in this case.

2       The prosecutor then continued: "[I]f you believe there was something more serious

3  with his ribs, say a cracked or fractured rib, is that something that you would have

4  recommended hospitalization over?" *Id.* This question strayed away from the facts of the

5  case to ask what she *would* have done if things had been different. That question was only

6  marginally relevant, because it had already been established that that was not the case here,

7  although it arguably could help the jury understand how badly injured the patient was in

8  the range of possible injuries.

9       But the prosecutor did not stop there. Brown testified that if someone had significant

10 pain, she "would ask the person if they would wanted [sic] me to call an ambulance to take

11 them to the hospital," *id.* The prosecutor then drilled into this hypothetical situation in a

12 way that went far beyond any possible claim that he was simply establishing how badly

13 injured this patient was: "So even if you thought it was medically necessary to get him to

14 a hospital, you would ask for that person's consent first?" That question had no bearing

15 whatsoever on the condition of the patients in this case. Nor did it ask about what NMD

16 protocols, which governed Dr. Warren's actions, required. It was a hypothetical question

17 posed to a fact witness about what she personally would do in a situation that, as the

18 testimony had clearly established, was not present in this case. The prosecutor then

19 proceeded to ask her a long series of questions about what she would and would not do in

20 that invented situation based not on anything to do with NMD, but on her own personal

21 ethics. *Id.* at 165-66 ("As a nurse, you would put that level of consent over saving that

22 person's life, if you believe hospitalization was necessary?") ("And despite having a

23 potentially life-threatening condition, if he says no, you're going to just do nothing?). The

24 subject of these questions was really the moral and ethical correctness of the doctrine of

25 informed consent itself—obviously not a question properly put to a jury in a criminal trial.

26       Confirming the utter irrelevance of what she would do in a made-up situation,

27 Brown testified that she did "seek and obtain informed consent from Jose and Kristian. . .

28 on the 15th of January." RT 6/4/19 at 189. There was thus no reason to delve into what

would occur if someone had life-threatening injuries and did not consent.

Norma Price

The jury was clearly taken in by this detour; a juror specifically asked the next witness, a medical doctor, about it: "As a physician, if the nausea and vomiting continue and you felt he or she needed more medical attention, i.e. IV therapy or death would happen, would you wait for consent or call 911/Border Patrol if no consent was given?" RT 6/4/19 at 232. Dr. Price responded, "We never call without the patient's consent unless they're unconscious." *Id.* Given the confusion that had arisen during the government's questioning of Susannah Brown, the defense then had Dr. Price explain that in addition to the informed consent requirement that appears in NMD's protocol, as a medical professional, she had an obligation to obtain informed consent before treatment from any patient as long as they were conscious. *Id.* at 235-36.

The prosecutor then returned to the made-up situation that had definitely *not* occurred in this case: "So if a person is so dehydrated that they need to go to the hospital, if they say no, they could potentially die right in that location; correct?" *Id.* at 238. Again, this was not a question about the content of the protocols Dr. Warren was following, nor was it a question about the facts of this case; it was a philosophical question about the outer boundaries of a complex social and medical concept that was not implicated in the case. The prosecutor then continued to follow this line of questioning about the nonexistent hypothetical situation, which yielded from the witness such insights as "Death is not unethical," and "I can't see that situation arising." *Id.* at 239.

Geena Jackson

Ms. Jackson, another NMD volunteer, also testified about the informed consent requirement included in the NMD protocols: "Both in my training as an EMT and as that continues into the Red Cross protocols, our [NMD's] protocols, we only operate on the consent of the patient. So if I run into someone, I'm not going to do something that they don't consent to or ask for based on the information." RT 6/5/19 at 105. Again, this testimony provided the jury with information about the protocols that applied to Dr.

Warren's actions in this case. The prosecutor then asked her some general questions about what the "informed" aspect of "informed consent" really means as used in the protocols. *Id.* at 121-22. This testimony properly sought to clarify the rule that applied to Dr. Warren's conduct in the events of this case.

The jury, however, was apparently still hung up on the detour the government had initiated with Susannah Brown, as a juror asked: "You as a licensed EMT saw a migrant that was near death and needed IV therapy and you did not receive consent. What would you do?" *Id.* at 141. The Court advised the witness, "I think it's a hypothetical question." *Id.* This was *not* a question about the protocols that applied to Dr. Warren, nor about any situation related to this case; it was a difficult moral question about the witness's own ethical beliefs that had no bearing on the events of this case, nor on her truthfulness or credibility. Moreover, it did not even address the issue that had led to the discussion in the first instance—whether to call 911. And as the witness's answer confirmed, she had never known that made-up situation to occur. *Id.*

The prosecutor, however, even after Ms. Jackson's testimony that this was not a realistic situation, returned to the question: "And the question wasn't have you ever. It was what you do if a person needed life-saving IV treatment and they weren't—and they didn't give you consent. They were able to but didn't. What would you do?" *Id.* at 144. But what this witness herself would do in a situation she testified had never occurred that was unrelated to the events of this case was not a proper subject for inquiry. Moreover, the witness noted the utter inapplicability of that particular hypothetical to her: "I don't have my IV certification, so I cannot give an IV." *Id.* Nonetheless, the prosecutor continued to ask about it, over the course of two more transcript pages, in which he was explicit that "we're asking what would you do in a particular hypothetical, not situations that you have been in." *Id.* at 145.

Discussion

This repeated discussion of what, exactly, informed consent requires when patients are in life-threatening situations and withholding consent has nothing to do with Dr.

Warren's actions and intentions on January 14-17, 2018. Although a basic understanding of informed consent, as used in the protocols, assisted the jury in understanding how Dr. Warren did and did not interact with law enforcement during the events of this case, hypothetical questions about particular witness's responses to extreme and unlikely situations said nothing at all about Dr. Warren.

Federal Rule of Evidence 401 explains that evidence is only relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." And Rule 402 provides that "Irrelevant evidence is not admissible." Evidence about what might or might not occur if a patient in life-threatening condition withheld consent is irrelevant, and must be excluded. Even if the Court does find some remote relevance, it must be excluded under Rule 403, because any probative value is substantially outweighed by a danger of confusing the issues and wasting time, as well as undue prejudice.

Moreover, the Rules of Evidence do not permit posing hypothetical questions to fact witnesses. *See* Advisory Committee Notes to 2000 Amendments to Rule 702 (noting that the language "facts or data," which define information on which an *expert* witness may rely, encompasses "hypothetical facts that are supported by the evidence."); Advisory Committee Notes to Rule 703 (recognizing the practice of posing hypotheticals to *expert* witnesses); *United States v. Parker*, 991 F.2d 1493, 1500 (9th Cir. 1993) (Because defense counsel made no effort to qualify Feukes as an expert, the district court properly excluded Feukes' answer to the hypothetical question."); *Certain Underwriters at Lloyd's v. Sinkovich*, 232 F.3d 200, 203 (4th Cir. 2000) ("Unlike a lay witness under Rule 701, an expert can answer hypothetical questions. . . ").

For all these reasons, and to keep this retrial focused on the charged crime, the Court should preclude hypothetical questions about the application of informed consent in other situations.

RESPECTFULLY SUBMITTED this 19th day of September, 2019.

By /s/ Amy P. Knight

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gregory J. Kuykendall
Amy P. Knight
531 S Convent Avenue
Tucson, AZ 85701
Attorneys for Defendant Scott
Daniel Warren

CERTIFICATE OF SERVICE

I certify that on September 19th, 2019, I electronically transmitted a PDF version of this document to the Clerk of Court using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Nathaniel J. Walters, Esq. (email: Nathaniel.walters@usdoj.gov)
Anna R. Wright, Esq. (email: anna.wright@usdoj.gov)
United States Attorney's Office
405 W. Congress, Suite 4800

Tucson, AZ 85701