MICHAEL BAILEY
United States Attorney
ANNA WRIGHT
Assistant U.S. Attorney
NATHANIEL J. WALTERS
Assistant U.S. Attorney
State Bar No.: 029708
405 West Congress, Suite 4800
Tucson, Arizona 85701-5040
Telephone: (520) 620-7300
E-mail: anna.wright@usdoj.gov
          nathaniel.walters@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | 18-CR-223-TUC-RCC (DTF) |
|---|---|
| Plaintiff, | |
| vs. | GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION *IN LIMINE* TO ADMIT EVIDENCE OF POSSIBLE BIAS OR PREJUDICE AFFECTING GOVERNMENT WITNESSES |
| Scott Daniel Warren, | |
| Defendant. | |

The United States of America, by and through its undersigned attorneys, hereby responds to the defendant's Motion *in Limine* to Admit Evidence of Possible Bias or Prejudice Affecting Government Witnesses. Doc. 320. For the reasons discussed below, the government respectfully requests that the Court deny the defendant's motion in its entirety. In the alternative, the government respectfully asks that the Court limit the cross-examination and allow the government an opportunity to rebut any inference of bias.

**I.  Legal Summary**

Evidence of a witness' potential bias is relevant impeachment evidence that may be explored on cross-examination. *United States v. Abel*, 469 U.S. 45, 50-51 (1984); *United States v. Hankey*, 203 F.3d 1160, 1171 (9th Cir. 2000). "Cross-examination for bias or prejudice is generally required only to the extent of exploring the subject with the witness, first in a preliminary way to determine if further inquiry is justified, and then more

extensively of the witness' responses or attitude appear to justify it." *Chipman v. Mercer*, 628 F.2d 528, 532-33 (9th Cir. 1980).

> Bias is a term used…to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest.

*Abel*, 469 U.S. at 52. Bias may be directed personally at a defendant or towards a group a defendant belongs to. *Chipman*, 628 F.2d at 532; *see also United States v. Kartman*, 417 F2d 893, 897 (9th Cir. 1969).

However, such evidence of bias is not automatically admissible, and a trial court retains significant latitude in setting limits on cross-examination. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). A trial court may limit such cross-examination if its probative value is outweighed by undue prejudice, including the dangers of harassment, confusion of the issues, the witness' safety, or questioning that is repetitive or only marginally relevant. *Van Arsdall*, 475 U.S. at 679; *see also Abel*, 469 U.S. at 470; *United States v. Beardslee*, 197 F.3d 378, 384 (9th Cir. 1999); *United States v. James*, 139 F.3d 709, 713 (9th Cir. 1998). Consistent with the Confrontation Clause, a trial court may limit cross-examination regarding a witness' potential bias so long as the jury has "has sufficient information to assess the credibility of the witness." *United States v. Larson*, 495 F.3d 1094, 1103 (9th Cir. 2007). A trial court may also entirely preclude an area of cross-examination where the link between the proffered evidence and any inference of bias is remote or speculative. *James*, 139 F.3d at 713; *see also United States v. McClintock*, 748 F.2d 1278, 1289-90 (9th Cir. 1984); *United States v. Marshall*, 526 F.2d 1349, 1361 (9th Cir. 1975).

Finally, a party may offer extrinsic evidence of a witness's bias, and, if a witness is impeached with extrinsic evidence, the party proffering the witness may offer evidence to rebut the inference of bias. *Abel*, 469 U.S. at 468; *James*, 139 F.3d at 713. A trial court may take the distraction of proving up and rebutting these collateral matters into account in determining whether and to what extent to allow cross-examination regarding a witness'

potential bias. *Lewy v. Southern Pacific Trans. Co.*, 799 F.2d 1281, 1298-99 (9th Cir. 1986); *Marshall*, 526 F.2d at 1361.

## II. Discussion

### a. Prior Investigation of Illegal Activity at the Barn

Prior to the first trial in this matter, the government disclosed materials related to Border Patrol Agent (BPA) Marquez's prior investigation of illegal activity occurring at or near the Barn, including reports, text messages, and other materials. This evidence showed that, prior to setting up surveillance at the Barn on January 17, 2018, BPA Marquez had information that neighbors of the Barn found items associated with illegal alien traffic, including carpet booties and black water jugs, near the Barn, and saw illegal aliens walking in the area. (TR 5/30/19 at 28:12-13).

At trial, the defendant objected to admission of this evidence and argued that the government should not be allowed to introduce any of this evidence because it was anonymous, rank hearsay, (TR 5/29/19 at 58:15-59:7), and created a "significant Confrontation Clause problem." (TR 5/30/19 at 30:22-31:2). The Court precluded the government from eliciting testimony about this topic, but, after the defendant opened the door on cross-examination, allowed the government to ask BPA Marquez limited questions about this topic. (TR 5/30/19 at 32:14-18).

The defendant now argues that he should be allowed to cross-examine BPA Marquez regarding certain text conversations and portions of his initial report related to this prior investigation because they show that BPA Marquez had an impermissible bias that would lead him to exaggerate his observations of the events of January 17, 2018. Doc. 320 at 12-14. However, the documents relied on by the defendant do not support any inference of bias. Beginning with BPA Marquez's initial report, it references the defendant's work with NMD, including his public speaking on immigration issues, in the context of ongoing suspicions that NMD was involved in illegal activity. Doc. 313-1. The report does not characterize or improperly focus on the defendant's views on immigration.

Turning to the first text conversation, it involves a United States Fish and Wildlife (USFWS) employee sending BPA Marquez information about individuals other than the defendant believed to be associated with No More Deaths who applied for permits at the Cabeza Prieta National Wildlife Refuge (CPNWR) and informing BPA Marquez that the defendant will be charged regarding violations of the CPNWR regulations. Doc. 313-2 at 2-9. In response to the text about potential charges against the defendant, BPA Marquez responds, "Yeah I heard about Scott Warren too I think." *Id.* at 6. Nothing about this text conversation suggests that BPA Marquez is improperly targeting NMD or the defendant.

The second text conversation is even more innocuous. In that conversation, among other things, BPA Marquez provided the defendant's address to a USFWS employee for the purpose of serving the summons in the misdemeanor matter. Doc. 313-2 at 11-18. There is nothing in the text conversation to suggest that BPA Marquez or anyone else is attempting to "track" the defendant. *See* Doc. 320 at 14.

As discussed above, there is nothing in BPA Marquez's initial report or text conversations to suggest that he was biased such that he would exaggerate his observations of the events of January 17, 2018. To the extent that these items are even marginally relevant to the issue of bias, there limited probative value is outweighed by the danger of confusing the issues. *See* Fed. R. Evid. 403. In addition, if the defendant is permitted to cross-examine BPA Marquez about these items, then the government will be entitled to introduce the other information that BPA Marquez found as a result of his prior investigation, including the carpet booties and black water jugs, to rebut any inference of bias.

### b. Border Patrol Text Message

The defendant also seeks to cross-examine Border Patrol "agents about their participation in" a group text conversation on January 17, 2018. Doc. 320 at 14. This text conversation involved various agents coordinating surveillance and the knock-and-talk on that day. Doc. 186, Exhibit 10. The government agrees that the defendant may cross-examine agents as to any bias based on their own text messages in this conversation.

1 However, any cross-examination regarding potential bias should not be based on text
2 messages sent by other agents. *See* Jencks Act (18 U.S.C. § 3500). In addition, admission
3 of the text conversation itself into evidence would confuse the issues and cause undue
4 prejudice by placing irrelevant information and out-of-context hearsay statements in front
5 of the jury. *See* Doc. 320 at 14; *see also* Fed. R. Evid. 403.

### c. No More Deaths Public Relations Campaign

7 The defendant also seeks to cross-examine BPAs Marquez and Burns about a press
8 release sent by NMD on the morning of January 17, 2018. Doc. 320 at 15. The defendant
9 has failed to produce any evidence that either agent knew about the press release or
10 accompanying report prior to setting up surveillance. The text messages and emails
11 disclosed by the government show that the agents did not receive a copy of the press release
12 or report at any point during January 17, and that BPA Marquez became aware of the press
13 release only after making arrangements to surveil the Barn. *See* Doc. 186 at Exhibits 8-9.
14 Despite this evidence, the defendant now speculates that the agents heard about the press
15 release and report at muster, *see* Doc. 320 at 16, but provides no evidence or argument as
16 to why these items would merit mention at muster. The defendant also argues that the press
17 release and report could still support an inference of bias if the agents learned about the
18 press release and report prior to their testimony. Doc. 320 at 15. This is pure speculation.
19 Nothing in Border Patrol's response to the press release and report suggests that any agent
20 would bear such a grudge as to commit perjury or fabricate evidence. Accordingly, the
21 press release and report are not relevant to the issue of bias, since any inference of bias
22 would be based on speculation and contrary to the evidence. *See James*, 139 F.3d at 713;
23 *see also McClintock*, 748 F.2d at 1289-90; *Marshall*, 526 F.2d at 1361.

24 Even if the press release and report are marginally relevant to the issue of bias, the
25 defendant's cross-examination on this issue should be limited to asking the agents whether
26 they have ever reviewed the press release and/or report, and, if so, whether it has had any
27 impact on their testimony in this case. *See Chipman* at 532-33. This line of questioning
28 should not be used to get into the particulars of the report, including its allegations and

findings, or to admit the report into evidence. Doing so would confuse the issues by allowing the defendant to use the trial as a platform for debating immigration policy. *See* https://calendar.hope.edu/event/border_program_studies_info_session#.XYlBY8tYaP4 (accessed September 23, 2019) ("Scott and No More Deaths want to use the trial to visiblize [sic] the crisis happening in this area of Arizona…"); *see also* Fed. R. Evid. 403. Doing so would also generate a side-show related to the methodology of the report and the soundness of its conclusions.

### d. Evidence of Intent

Finally, much of the defendant's arguments as to the impeachment value of this evidence rests on the premise that the government's case as to his intent is weak and comes down to a "credibility contest[.]" Doc. 320 at 10. This is not accurate. Throughout this case, BPAs Burns and Marquez have testified consistently with their reports regarding their observations of the defendant and the two illegal aliens on January 17, 2018. In addition, one of the illegal aliens initially admitted that the defendant gave him directions further north, although he recanted this statement during the video depositions, and the defendant admitted that he told the aliens where it was safe to walk and how to navigate using the nearby mountains. *See* TR 6/6/19 at 62-63 ("I told them that the critical piece of information they need to know is that Highway 85 runs between those two mountains. If you are in the desert and you are lost or you have some kind of injury, you have Childs Mountain here, Hat Mountain here, the highway runs between those two. It's absolutely essential, if you're going to self-rescue, that you walk this way…and you don't walk that way..."). It is also uncontested that the two illegal aliens stayed at the Barn for four days, that they were not in danger of death or injury at any point during their stay, and that the defendant gave them permission to stay and provided them with everything necessary for their stay.

### III. Conclusion

For the reasons discussed above, the government respectfully requests that the Court deny the defendant's motion in its entirety. In the alternative, if the Court allows the

defendant to cross-examine regarding the prior investigation, the text conversations, or NMD's press release and report, the government respectfully asks that the Court limit the cross-examination and allow the government an opportunity to rebut any inference of bias.

Respectfully submitted this 25th day of September, 2019.

> MICHAEL BAILEY
> United States Attorney
> District of Arizona
>
> */s/ Anna R. Wright & Nathaniel J. Walters*
>
> ANNA WRIGHT &
> NATHANIEL J. WALTERS
> Assistant U.S. Attorneys

Copy of the foregoing served electronically or by other means this 25th day of September, 2019, to:

All ECF participants