Gregory J. Kuykendall, Bar # 012508
Amy P. Knight, Bar # 031374
KUYKENDALL & ASSOCIATES
531 S Convent Avenue
Tucson, AZ 85701
(520) 792-8033
greg@kuykendall-law.com
amyknight@kuykendall-law.com

Attorneys for Defendant Scott Daniel Warren

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | ) |
| | ) No.CR-18-00223-001-TUC-RCC(DTF) |
| Plaintiff, | ) |
| | ) **REPLY IN SUPPORT OF MOTION** |
| vs. | ) **TO ADMIT EVIDENCE OF** |
| | ) **POSSIBLE BIAS OR PREJUDICE** |
| SCOTT DANIEL WARREN, | ) **AFFECTING GOVERNMENT** |
| | ) **WITNESSES** |
| Defendant. | ) |
| | ) |

The government does not contest the notion that the defense must be allowed to cross-examine its witnesses for bias, nor that the defense can introduce extrinsic evidence of bias. Rather, it argues, by selectively quoting from the evidence, that the items defendant seeks to introduce do not demonstrate bias. If that is the case, then the government has nothing to worry about; the evidence will not damage its witnesses' credibility in the eyes of the jury. But because, as the government has previously admitted and argued before this Court, the evidence allows an *inference* of bias, the defense must be permitted to present it, and the jury can decide.

1. Agent Marquez's Communications

The government first argues that Marquez's report and text messages with

FWS employees "do not support any inference of bias." Resp. (Doc. 326) at 3. Crucially, the government never acknowledges Marquez's admission that he researched Dr. Warren prior to surveilling the Barn—a fact that the prosecutor himself assured this Court "implies that he had a bias against No More Deaths and potentially Mr. Warren." RT 5/30/19 at 26-17. That was the government's earlier strategically argued position—yet now, without explanation, it tells this Court that the exact same information does "not support any inference of bias."

Regarding the report, the government claims that Marquez "does not characterize or improperly focus on the defendant's views on immigration." Resp. at 3. But it fails to acknowledge that Marquez found it important that Dr. Warren "organizes and recruits college students" or appears in "various online college newspapers such as Northern Arizona University's 'The Lumberjack' and local news websites describing his participation in humanitarian efforts with NMD." Nor does it offer any support whatsoever for its claim that Marquez's reference to Dr. Warren's public speaking on immigration issues could not indicate possible bias. Public speaking is not suspicious; to the contrary, it is First Amendment-protected activity. Marquez's inclusion of these observations in a report that was supposed to document the reasons for his arrest of Dr. Warren supports an inference that he disagreed with Dr. Warren's constitutionally-protected views and that disagreement influenced his investigation.

Regarding Marquez's text exchanges with FWS employees, the government acknowledges that one FWS employee was "sending BPA Marquez information about individuals other than the defendant believed to be associated with No More Deaths who applied for permits at the Cabeza Prieta National Wildlife Refuge." Resp. at 4. It then asserts that "[n]othing about this text conversation suggests that BPA is improperly targeting NMD or the defendant." *Id.* But it provides no legitimate reason why Marquez, whose duties involve enforcing immigration laws, was collecting information on people who properly obtained permits to enter a

National Wildlife Refuge. Nor does it attempt to explain why Marquez's tone—for instance, saying "Oh sweet" when told "8 of them showed up last week," and referring to volunteers as "bean droppers"—and the fact that, weeks before the arrest, he was discussing Dr. Warren with others, would not give the jury reason to doubt his objectivity.

Regarding the second text string, the government asserts "[t]here is nothing in the text conversation to suggest that BPA Marquez or anyone else is attempting to 'track' the defendant." The evidence clearly shows otherwise. *See* SE Exh. 2. First, the FWS employee sends Marquez a photo of a permit for refuge entry, including vehicle information; Marquez says "That ford truck is at the barn now I think." His next message is cut off in what the government disclosed, but visible at the bottom of the screen is part of what appears to be a photograph of an object labeled "GPSmap 62s," which is the model number of a type of handheld GPS device. Their next exchange begins when the FWS employee says that the "barn is active this morning," and Marquez says, "I wonder when they came in." *Then* comes the only exchange the government mentions, in which Marquez provides FWS with Dr. Warren's home address (how he got it, he never says) so FWS can serve a summons. The government's version omits the rest of that conversation: the FWS employee tells Marquez about the various vehicles he observes at the Barn, including that "Warrens POV [privately owned vehicle] is there as well," and "the marroon [sic] truck and green truck left loaded ten minutes ago." Again, Marquez's response is cut off in the document the government disclosed; it says "Ok I got an interview in ajo to do and then I'll—" – the government has not provided the rest of the message, presumably indicating what Marquez intended to do with that information. This is the exchange the government characterized as containing nothing to suggest anyone was trying to track the defendant.

Nor does the government acknowledge the fact that Marquez never treated these conversations as part of his official investigation. If he had collected this

3

information as part of any legitimate investigation, surely he would have documented it in investigative reports at the time. He never did; he only reported it months later, after the government had filed felony charges, and even then he falsely reported that his FWS informants were simply "concerned citizens." Because it never acknowledges this fact, the government fails to explain why it thinks that doesn't demonstrate that Marquez was pursuing Dr. Warren and NMD in some way outside of his official, proper duties as a Border Patrol agent.

Border Patrol Text String

The government concedes that Dr. Warren may cross-examine agents about their texts, in particular the Burns/Marquez/Ballesteros string that occurred during their surveillance of the Barn. Resp. at 4. It then claims that the agents may not be cross-examined about anything in the conversation other than the messages they personally sent. Its only support for this is a blanket citation to the Jencks Act, 18 U.S.C. § 3500. But nothing in the Jencks Act even purports to limit permissible cross-examination. Rather, the Jencks Act imposes a requirement on the government to produce any existing statements of its witnesses. And in any event, the government produced this string not under the Jencks Act, but pursuant to this Court's order on a Dr. Warren's motion to compel. It offers no other basis for its proposed limitation.

Isolated statements from within the conversation are not what reveals the bias; it is the nature of the entire exchange, including the type of information they were sharing and the manner in which they were sharing it. Without access to the exchange, the jury will be unable to understand what was actually going on that afternoon, and the individual statements, without the context of the conversation, are practically meaningless. The government describes the conversation as "out-of-context hearsay statements," Gov. Resp. at 5, but context is exactly what introducing the whole exchange necessarily will provide. The jury will have heard the agents' testimony about how they set up the surveillance, and what they were observing;

there is nothing confusing or prejudicial about providing them with a copy of the conversation the agents were contemporaneously having while they were doing the actions they've already described. Nor does it constitute hearsay, as none of the statements are being offered for the truth of the matter asserted, but rather to show what the agents were discussing and how they were discussing it as they surveilled the Barn in preparation for arresting Dr. Warren.

Public Criticism

The government argues that Dr. Warren "has failed to produce any evidence that either agent knew about the press release or accompanying report prior to setting up surveillance." Resp. at 5. This argument discounts the existence of circumstantial evidence. True, the disclosure shows neither agent receiving a copy of the report by email—as Dr. Warren stated in his motion (Doc. 320 at 15). But email is not the only way information travels. The government never acknowledges that the agents' superior definitely knew about the report, nor that Agent Marquez discussed NMD's planned appearance on the news that evening with one of his FWS sources around 1:00 that afternoon, which is before the surveillance began. The government claims to be unable to see why "these items would merit mention at muster," but ignores the fact that the Patrol Agent in Charge found it important enough to send to the Sheriff's Office and the National Park Service "For [their] situational awareness." SE Exh. 8 (Doc. 172-4). That sounds like precisely the sort of thing that would be discussed at muster.

Most importantly, the government has intentionally and, so far, successfully, avoided allowing the agents to testify under oath about whether they were aware of the report, or not. It cannot now argue against allowing circumstantial evidence of the agents' awareness when it has prevented the development of direct evidence of the same.

Nor does the government address the most obvious piece of evidence here: the timing. Per their testimony, the agents had never surveilled the Barn before. Yet

they decided to do it for the first time a few hours after NMD posted its scathing report and video. Timing can be probative of a connection—a fact the government readily acknowledges when insisting that a conspiracy existed. *See, e.g.,* Government Response to Defendant's Motion in Limine, Doc. 319, at 4 (offering as proof of a conspiracy that "members of No More Deaths went to the shelters on the *exact* day the illegal aliens crossed into the United States illegally."); RT 6/4/19 at 119 (government opposing Rule 29 motion based on "a series of actions that are not a coincidence and can reasonably be interred to be the result of a plan" when "[t]he defendant speaks to Mujica for the first time in two weeks, more than two weeks, on January 11th. The next day the material witnesses crossed into the United States."). Thus, when the government says Dr. Warren has produced no evidence, what it really means is that all of the evidence is circumstantial. But that does not make it less probative. The inference is definitely there to be drawn, and the jury must decide whether to draw it.

The government then argues that the report would not provide any reason for the agents to "commit perjury or fabricate evidence." But that is not the standard. Bias need not produce outright lies; rather, it is anything that "might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party." *United States v. Abel,* 469 U.S. 45, 51 (1984). The government never attempts to deny that the report could do that.

This standard also forecloses the government's suggestion that the "cross-examination on this issue should be limited to asking the agents whether they have ever reviewed the press release and/or report, and, if so, whether it has had any impact on their testimony in this case." Resp. at 5. Given that the Supreme Court explicitly recognizes that bias can operate *unconsciously,* simply asking witnesses if they are biased is insufficient. The government cites *Chipman v. Mercer,* 628 F.2d 528, 532-33 (9th Cir. 1980) for its suggestion that the cross be limited to asking the agents if the report impacted their testimony. But *Chipman* itself says that

"[e]xamination for bias and prejudice must be permitted if it is reasonable to assume that animosity to a group might prejudice the witness, *either consciously or unconsciously,* against a defendant who shares the characteristics of that class." *Id.* (emphasis added).

The government expresses concern about getting "into the particulars of the report," and "admit[ting] the report into evidence." Resp. at 5-6. Defendant agrees that would not be necessary; however, a summary may be needed so the jury can understand why agents might react strongly to public accusations that they committed "acts of vandalism—which include slashing, dumping out, and confiscating water bottles," and that "the culture of the US Border Patrol both authorizes and normalizes such acts of cruelty." For example, a copy of the "factsheet" summarizing the content might suffice.[1] The defendant's intent—and focus—would not be on the facts presented, or whether they are true, but rather on the nature and tone of the accusations leveled.[2]

Previous Defense Objection

The government objects to Dr. Warren seeking to use this information now, given his objection to Marquez's testimony about his prior investigation at the first trial. But it concedes that the evidence in fact came in at the first trial, and may well do so again, even if the defense objects; indeed, the government discussed that evidence in its opening statement, before the defense had any opportunity to "open the door." Given the significant risk that this information will be admitted regardless of his objection, it is entirely reasonable for Dr. Warren to seek to rebut it.

Finally, the government tries to divert attention from the fact that both agents gave a large amount of subjective testimony by listing out its other evidence of

---

[1] http://www.thedisappearedreport.org/uploads/8/3/5/1/83515082/factsheet-interference_with_humanitarian_aid__1_.pdf
[2] The government complains about the sue of the trial "as a platform for debating immigration policy," and then provides a non-functional link to an unidentified website that allegedly attributes a motivation to Dr. Warren. The defense has no idea that this is supposed to refer to or how it could possibly be attributed to Dr. Warren.

7

intent. But it never denies that both agents' opinions are important to its case, nor offers to limit their testimony to the objective facts they observed. It clearly has no intention of doing so, and the agents' credibility remains crucial to its case.

RESPECTFULLY SUBMITTED this 30th day of September, 2019.

By /s/ Amy P. Knight
Gregory J. Kuykendall
Amy P. Knight
531 S Convent Avenue
Tucson, AZ 85701
Attorneys for Defendant Scott Daniel Warren

CERTIFICATE OF SERVICE

I certify that on September 30th, 2019, I electronically transmitted a PDF version of this document to the Clerk of Court using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Nathaniel J. Walters, Esq. (email: Nathaniel.walters@usdoj.gov)
Anna R. Wright, Esq. (email: anna.wright@usdoj.gov)
United States Attorney's Office
405 W. Congress, Suite 4800
Tucson, AZ 85701