Gregory J. Kuykendall, Bar # 012508
Amy P. Knight, Bar # 031374
KUYKENDALL & ASSOCIATES
531 S Convent Avenue
Tucson, AZ 85701
(520) 792-8033
greg@kuykendall-law.com
amyknight@kuykendall-law.com

Attorneys for Defendant Scott Daniel Warren

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | ) |
| | ) No.CR-18-00223-001-TUC-RCC(DTF) |
| Plaintiff, | ) |
| | ) **REPLY IN SUPPORT OF MOTION** |
| vs. | ) **IN LIMINE TO PRECLUDE** |
| | ) **HYPOTHETICAL QUESTIONS** |
| SCOTT DANIEL WARREN, | ) **ABOUT INFORMED CONSENT** |
| | ) |
| Defendant. | ) |

    The government argues that this motion "has no basis in law or fact." Response (Doc. 339) at 1. But it arrives at this conclusion by completely ignoring all of the law and most of the facts defendant cited, and glossing over the rest with an inaccurate summary. When the Court examines the actual testimony from the first trial, it is readily apparent that the hypothetical questions must be excluded under Rules 401, 402, and 403, as well as Rules 702 and 703. The government never even tries to explain why these rules do not bar the hypothetical questions.

    The government avers that its questions were "regarding the section of the protocols specifically related to calling 911 for illegal aliens in need of emergency medical care," and that the "testimony showed that volunteers do not follow this

section of the protocols as written and that at least some of the volunteers understand that avoiding immigration authorities is treated as an equal goal with providing medical care." Resp. at 2. For this broad proposition, the government cites two two-page transcript excerpts, without providing any specifics about what they contain how it purportedly supports that conclusion. And it cannot; that was not the testimony.

Both excerpts the government identifies are from the prosecutor's questioning of Geena Jackson; the government ignores the improper questions posed to Susannah Brown and Dr. Norma Price discussed in defendant's motion. And neither excerpt from Ms. Jackson's testimony says what the government claims it does. In the first, the relevant exchange was:

> Q: If a patient asks to turn themselves in to Border Patrol, do you immediately just drop everything and call 911?
> A: If that's – yes.
> Q: You don't try to explain to them what the potential consequences are if they call Border Patrol first?
> A: Part of the information in that full consent would be that one of people's options can be calling 911 or calling Border Patrol, and that would mean detention by the law enforcement agency. So yes, I would give someone that information, but *if that's someone's decision*, then I call 911 and have done that many times.
> Q: And I imagine that you would disagree with me when I say that telling them that they call Border Patrol will lead [sic] to their detention and their likely deportation from the country is not persuasion whatsoever?
> A: No, sir. I don't think that's dissuasion. I think that's full consent.

RT 6/5/19 at 122:7-23 (emphasis added).[1]

First of all, defendant explicitly identified this testimony as proper, and is not seeking to exclude it. *See* Motion at 5:2-4. Thus, to the extent the government is arguing it may ask those questions, defendant agrees. Second, the witness simply

---

[1] It is unclear why the government's citation also includes page 123. The testimony on that page exclusively concerned what occurred in the Barn when it was unsecured after Dr. Warren's arrest.

never said anything remotely like a claim that avoiding immigration authorities is an equal goal with providing medical care. She never said anything at all about avoiding authorities. To the contrary, she made quite clear that the volunteers do not make decisions about whether to call immigration authorities; they provide information, and then assist "if that's someone's decision." Perhaps the government would prefer that people not receive this accurate information before they decide whether to summon help, or would prefer that people have no other way to receive medical care *but* to summon immigration authorities, but disagreeing with such tactics, and providing people with true information, is not a crime. Nor is that question at issue in this case, where everyone agrees there was no need to call 911. It is far afield.

The second excerpt the government identifies bears no relation to the government's alleged summary:

> Q: So you said that it would be, if somebody needed IV treatment, that it would be illogical, right?
> A: So what I said and what I mean is that to give someone a medical assessment and then have them deny medical care is not a situation I've ever been in. For example—
> Q: Well, but again, we're asking what would you do in a particular hypothetical, not situations that you have been in. So again, what would you do?
> A: I operate on the consent of the patient.
> Q: And if that person says no, what would you do?
> A: If that person says no to treatment?
> Q: Let's just call it if the person says no, would you let the person just die?
> A: No, because of the information that I've given that person. So a hypothetical could be like a snakebite. Someone gets bitten by a snake. Then I can do an assessment and tell them, I think the snakebite is poisonous. I think it's a life-threat. I think you will die imminently. And then with that information, ***the patient can then decide what to do next***. But the person will very probably say, I would like to be treated for the snakebite.
> Q: But what if they don't? You're not answering the question. What if they don't? What would you do? Would you let the person die or would you call 911?

3

>A: If the person loses consciousness, then I have implied consent, and I would call 911.
>Q: We're not talking about loss of consciousness.
>THE COURT: Stop, stop, stop. His question is this: Assume the person's oriented, of sound mind. You've given them advice. They still say no. What would you do?
>THE WITNESS: I would operate on the consent of the patient.

RT 6/5/19 at 145:3-146:10 (emphasis added). There is nothing in any of this testimony about the protocol, nor about avoiding immigration authorities. Again, to the extent the government believes this answer indicates a willingness to violate protocol—and as detailed below, it actually indicates the opposite—what this witness would or would not do in a highly unlikely and ethically difficult situation she has never encountered simply does not bear either on Dr. Warren's intentions or on her credibility as a witness.

The government claims its cross-examination was "regarding the section of the protocols specifically related to calling 911 for illegal aliens in need of emergency medical care." Response at 2. The government does not bother to cite anything in the record about the protocol, or to identify what provision it actually means. The Desert Aid Protocol was introduced at trial as Exhibit 203A, and includes nine sections: (I) Standards for No More Deaths Volunteers and Programs; (II) Protocol for encountering patients on the trail, roads, washes, etc.; (III) Protocol for evacuation to emergency care; (IV) Protocol for evacuations to continued medical observation; (V) Definition of persons presenting 'endangered persons criteria"; (VI) Protocol for legally protected persons; (VII) Protocol for interacting with Border Patrol; (VIII) Protocol for encountering human remains; and (IX) Protocol for patients in medical observation. The situation that gave rise to this case is addressed by section IX; that is the protocol Dr. Warren was following.

The government, however, was very focused on particular provisions in an entirely different section that had no application to the migrants who arrived at the Barn, and was particularly obsessed with section III, which addresses life-

threatening illnesses requiring emergency medical services, and includes the following provisions:

- "Patient consent for evacuation must be given unless a medically trained volunteer determines the patient to be incapable of giving consent: Evacuation to emergency medical care is required if the patient is unconscious or unable to give consent due to mental status changes." (p. 6)
- "Having consulted a member of the Medical team or, if phone service is unavailable, physician-advised standing orders, if medical evacuation is advised, obtain informed consent from the patient: Explain that calling 911 will alert Border Patrol and that they will be in custody while receiving treatment at the hospital. After they are released from the hospital they will remain in Border Patrol custody. (p. 7)

The protocol then goes on to detail the logistics of calling 911: when to take a patient to the fire department, when to call 911 for an ambulance, when to call 911 for a helicopter, and what information to have on hand to provide to the 911 operator, information that volunteers obviously would not need if their policy was to avoid immigration authorities at all costs. Thus, even if the testimony *had* shown that volunteers do not follow these directives, it would have nothing to do with the situation at issue in this case. But Ms. Jackson's testimony was in fact perfectly consistent with this protocol, to the letter. The government's repeated badgering about what she would do in an extreme situation thus did not constitute proper impeachment.

In any event, the whole point of the motion is that many of the government's questions did not address the protocol at all. Defendant explicitly identified several questions posed during the first trial that concerned the witness's hypothetical choices in situations not at issue in this case without reference to the protocol. For instance, in questioning Susannah Brown, the prosecutor asked for her opinion of a situation "as a nurse," and asked her not what the protocol required, but what *she*

would do. *See* Motion at 3:9-25. The government never denies that this testimony was about the witness's ethical and moral choices, not about the protocol. Similarly, Dr. Norma Price was asked for her opinion "[a]s a physician," not her understanding of what the protocol requires. Motion at 4:4-5.

The government then avers, with no citations and no explanation, that "the protocols direct volunteers to take steps that will help illegal aliens avoid apprehension by immigration authorities" and "following the protocols can be consistent with intending to violate the law." Response at 2. But it never even suggests what steps it means, or where the protocol directs them, nor what the protocol directs that involves an intent to violate the law. The protocol certainly does direct volunteers providing medical care not to affirmatively alert immigration enforcement without a patient's consent, and perhaps providing a source of unconditional medical care that does not come with apprehension interferes, as a practical matter, with the Border Patrol's enforcement tactic of forcing imperiled people to turn themselves in to avoid dying, but none of that is illegal. As this Court properly instructed the jury, "[t]he law does not impose any general affirmative obligation on citizens to report suspected or known violations of law to authorities." Doc. 273 at 23.

Finally, to the extent that the government's complaint is about "conflating informed medical consent with legal advice," Response at 2, that was entirely the government's doing, and is exactly what defendant now seeks to prevent.

RESPECTFULLY SUBMITTED this 9th day of October, 2019.

By /s/ Amy P. Knight
Gregory J. Kuykendall
Amy P. Knight
531 S Convent Avenue
Tucson, AZ 85701
Attorneys for Defendant Scott Daniel Warren

6

## CERTIFICATE OF SERVICE

 I certify that on October 9, 2019, I electronically transmitted a PDF version of this document to the Clerk of Court using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

 Nathaniel J. Walters, Esq. (email: Nathaniel.walters@usdoj.gov)
 Anna R. Wright, Esq. (email: anna.wright@usdoj.gov)
 United States Attorney's Office
 405 W. Congress, Suite 4800
 Tucson, AZ 85701