Gregory J. Kuykendall, Bar # 012508
Amy P. Knight, Bar # 031374
KUYKENDALL & ASSOCIATES
531 S Convent Avenue
Tucson, AZ 85701
(520) 792-8033
greg@kuykendall-law.com
amyknight@kuykendall-law.com

Attorneys for Defendant Scott Daniel Warren

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | ) |
| Plaintiff, | ) No. 18-CR-00223-RCC(DTF) |
| vs. | ) **DEFENDANT'S REPLY IN SUPPORT OF MOTION IN LIMINE TO PRECLUDE EVIDENCE OR ARGUMENT ABOUT THINGS HE DID NOT SAY** |
| SCOTT DANIEL WARREN, | ) |
| Defendant. | ) |

The government resists this motion on two bases: continuing to insist that *United States v. Beckman*, 298 F.3d 788 (9th Cir. 2002) and *United States v. Oplinger*, 150 F.3d 1061 (9th Cir. 1998), guarantee the government the right to introduce particular evidence, and denying that declining to voluntarily interact with law enforcement implicates the Fourth Amendment. Neither basis has merit.

<u>Fourth Amendment</u>

The government takes an illogically restricted view of the Fourth Amendment, focusing only on when Fourth Amendment rights are *infringed* (which requires a search or seizure), ignoring its function to limit the powers of law enforcement and protect citizens' refusal to interact. Response (Doc. 338) at 4. That is not how constitutional protections work; although their violation does give rise to legal claims, they also substantively limit the government's actions and protect certain citizen's actions, and can be affirmatively asserted

1

*ex ante*. *See, e.g., United States v. Prescott,* 581 F.2d 1343, 1351 (9th Cir. 1978) (recognizing that an occupant admitting officers who arrive without a warrant would constitute "surrender[ing] his Fourth Amendment protection"). It is that affirmative assertion that is at issue here.

Under the government's view, no one could ever "invoke" a constitutional right, because the right has no application unless it has been infringed. *See* Response at 4 ("The Fourth Amendment is not implicated in this situation unless the individual is detained without 'reasonable, objective grounds' consisting of something more than refusal to answer questions."). If this were the case, then a defendant could not invoke a Fifth Amendment right when in custody, because he has not *actually* been compelled to speak. That is obviously not the case; rather, the Fifth Amendment gives him the right to say nothing to begin with—and not to be penalized for that. Likewise, while the Fourth Amendment is violated by an unreasonable search or seizure, it can also be asserted by refusing to consent to a voluntary police encounter.

If the government's view were correct, individuals would have no right to decline to answer questions prior to arrest, but then that right would materialize once they were in custody. That obviously isn't so. Rather, the Fourth Amendment protects refusal to answer officers' questions voluntarily, when the person could walk away; the Fifth Amendment protects refusal to answer when officers could otherwise compel speech, because the person is in custody.

The government asserts that it must prevail because "the Fourth Amendment does not create a right to remain silent independent of the Fifth Amendment." Response at 4. Although that is an unusual way of framing the Fourth Amendment protection, it absolutely does create a right, among other things, not to answer any questions posed by law enforcement when the individual has not been detained. Indeed, the government itself cites *Florida v. Royer*, 460 U.S. 491, 498 (1983), as holding, in part, that when law enforcement officers approach individuals, "the individual may walk away and refuse to answer those questions." Response at 4. That right, as the *Royer* Court recognized, is inherent in the Fourth

Amendment; the reason a person is free "to refuse to answer those questions" is that the Fourth Amendment does not permit law enforcement officers to detain him for so refusing. *Royer,* 460 U.S. at 498. Likewise, it is the Fourth Amendment that forbids law enforcement officers to detain anyone, however briefly, unless they have reasonable suspicion based on articulable facts, and thus permits them to walk away rather than respond. *Terry v. Ohio,* 392 U.S. 1, 27 (1968). And the reason that, when police knock, an occupant "has no obligation to open the door or to speak," and "need not allow the officers to enter the premises and may refuse to answer any questions at any time," is that the Fourth Amendment does not permit them to enter against the occupant's will absent a warrant. *Kentucky v. King,* 563 U.S. 452, 470 (2011). It is precisely because of this Fourth Amendment right that the Supreme Court ruled that police could avail themselves of the exigent circumstances rule even when their presence created the exigency: "Occupants who choose not to stand on their constitutional rights but instead elect to attempt to destroy evidence have only themselves to blame for the warrantless exigent-circumstances search that may ensue." *Id.* It is those very constitutional rights, explicitly relied on by the government in successfully defending police conduct in the Supreme Court, that the government is now claiming do not exist.

Finally, the government represents to this Court that "the defendant's encounter with Agent Burns was consensual. The defendant even volunteered to accompany Agent Burns to the Barn." Response at 4. That is a badly distorted version of the events; Agent Burns himself testified that what Warren said to him, after asking him what basis he had for entering private property, was that "he did not wish to answer any questions," and then "stated that he wanted us to leave." RT 7/13/18 at 49-50. That is not a consensual encounter; that is constitutionally-protected refusal to consent. Only after Agent Burns told Dr. Warren that he was going to approach the Barn anyway did Warren say he would accompany him—presumably to observe and document the agent's actions that were being taken without his consent. The government then tries to use this mischaracterization to establish that "no Fourth Amendment violation occurred." But that is not the question; the question is whether Dr. Warren's failure to voluntarily provide the agent with information constituted an

exercise of his Fourth Amendment rights. It obviously did; asking an agent to leave and refusing to answer questions is the prototypical Fourth Amendment assertion. And the violation comes in using that—the actual assertion and the associated silence that put that assertion into practice—against the defendant.

*Beckman* and *Oplinger*

The government has entirely missed the actual holdings of *Beckman* and *Oplinger*. In both cases, the Court held that the Fifth Amendment did not apply because the defendant was not under any threat of official compulsion to speak—either because the agents questioning him had not detained him (*Beckman*), or because they were not agents at all, and had no conceivable power to compel him to speak (*Oplinger*). The case *Oplinger* relies on, *United States v. Giese,* 597 F.2d 1170, 1196-97 (9th Cir. 1979), also involved evidence of accusations by private individuals, not government agents, but the defendant still attempted, unsuccessfully, to claim Fifth Amendment protection. In other words, these cases merely recognize that the risk of official compulsion against which the Fifth Amendment protects does not generally arise absent arrest.

The government misapprehends defendant's argument. These cases are inapplicable not because *Beckman* took place at a port of entry, which is a different "location" from the Barn, Response at 5, but rather because those cases resolved the attempted assertion of an entirely different constitutional right than the one at issue here. The Fourth Amendment right defendant asserts here was not an option for the defendants in those cases, because of the contexts of those encounters; neither involved government agents approaching a defendant on private property or even in public. Thus, none of those cases had occasion to consider whether the Fourth Amendment might exclude evidence of silence.

Finally, the government cites *Jenkins v. Anderson,* 447 U.S. 231 (1980), for its insistence that "a defendant may be impeached with his pre-arrest, non-custodial silence if he chooses to testify at trial." Response at 2. But the *Jenkins* Court made no such guarantee. For one thing, the claim presented, and resolved, was that the evidence must be excluded by "the fundamental fairness guaranteed by the Fourteenth Amendment." 447 U.S. at 238. The

Fourth Amendment question was not presented. The Court also took great care also to specify that courts should allow such evidence *only* "when prior silence is so inconsistent with present statements that impeachment by reference to such silence is probative," and cited with approval its previous holdings "that prior silence cannot be used for impeachment where silence is not probative of a defendant's credibility and where prejudice to the defendant might result." 447 U.S. at 239. Indeed, the Supreme Court has repeatedly reversed convictions where the government was permitted to cross-examine a defendant about prior silence. *See, e.g., Grunewald v. United States,* 353 U.S. 391, 423 (1957) (reversing conviction where government cross-examined defendant regarding prior assertion of right to silence in light of the "grave constitutional overtones"); *United States v. Hale,* 422 U.S. 171, 178-181 (1975) ("prejudicial error for the trial court to permit cross-examination of respondent concerning his silence during police interrogation," recognizing that "the jury is likely to assign much more weight to the defendant's previous silence than is warranted" given the "many alternative explanations for his pretrial silence" and the risk of "intolerably prejudicial impact"). This Court, too, should recognize the significant risks presented by such questioning, and should forbid the government from introducing evidence of Dr. Warren's silence in exercise of his Fourth Amendment rights.

As in *Hale,* there are many alternative explanations for Dr. Warren's silence, including his wish to assert and preserve his constitutional rights; the No More Deaths protocol directing volunteers that they should not answer Border Patrol questions, but rather should walk away; and his understanding that Border Patrol agents might treat certain things as criminal even when they were not in fact ultimately unlawful. Indeed, the state of the law on harboring has continued to evolve; *United States v. Tydingco,* 909 F.3d 297 (9th Cir. 2018), the case clarifying the required elements, was not decided until ten months after this encounter. Accordingly, even if evidence of silence and argument regarding it were not constitutionally prohibited, they would create an intolerable risk of serious prejudice for no significant evidentiary value, and at the very least, this Court should exclude them as an evidentiary matter in its discretion.

Dated this 9th day of October, 2019

                              KUYKENDALL & ASSOCIATES

                              By /s/ Amy P. Knight_____
                                    Gregory J. Kuykendall
                                    Amy P. Knight
                                    531 S Convent Avenue
                                    Tucson, AZ 85701
                                    Attorneys for Defendant Scott
                                    Daniel Warren

CERTIFICATE OF SERVICE

      I certify that on October 9, 2019, I electronically transmitted a PDF version of this document to the Clerk of Court using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

      Nathaniel J. Walters, Esq. (email: Nathaniel.walters@usdoj.gov)
      Anna R. Wright, Esq. (email: anna.wright@usdoj.gov)
      United States Attorney's Office
      405 W. Congress, Suite 4800
      Tucson, AZ 85701