1          IN THE UNITED STATES DISTRICT COURT

2                  DISTRICT OF ARIZONA

3   United States of America          CR-18-223-TUC-RCC(DTF)

4   vs.

5   Scott Daniel Warren,
                                      November 12, 2019
6          Defendant.                  Tucson, Arizona
    _____

7

8

9

10          PARTIAL TRANSCRIPT OF PROCEEDINGS

11                OPENING STATEMENTS

12      BEFORE THE HONORABLE RANER C. COLLINS
             UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22  Court Reporter:         Erica R. McQuillen, RDR, CRR
                            Official Court Reporter
23                          405 W. Congress Street
                            Tucson, Arizona 85701
24                          (520)205-4267

25    Proceedings Reported by Stenographic Court Reporter
      Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2   For the Government:

 3        Anna Roberta Wright
          Nathaniel Jacob Walters
 4        United States Attorney's Office
          405 West Congress
 5        Tucson, Arizona 85701

 6        Glenn B. McCormick
          United States Attorney's Office
 7        Two Renaissance Square
          40 North Central Avenue
 8        Suite 1800
          Phoenix, Arizona 85004

 9

10   For the Defendant:

11        Gregory John Kuykendall
          Amy Pickering Knight
12        Kuykendall & Associates
          531 South Convent Avenue
13        Tucson, Arizona 85701

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (The following is a partial transcript consisting
 2              only of opening statements of counsel.)
 3         MS. WRIGHT:  Thank you, Your Honor.
 4         Good afternoon, ladies and gentlemen.  This case is
 5    about what the defendant Scott Warren did to help two men,
 6    Kristian and Jose, continue their illegal journey north into
 7    the United States.  This case is about the four days and three
 8    nights that those two men stayed at place called the Barn in
 9    Ajo, Arizona, in January 2018.
10         At the end of the case, you will get to decide for
11    yourselves why those two men stayed at the Barn for four days
12    and three nights.  The evidence will show that these two men
13    stayed there because they had lost their camouflage, they
14    needed directions further north, and they needed a place safe
15    from the watchful eye of Border Patrol.
16         The evidence will also show that the defendant gave
17    them all of this, despite knowing that they had illegally
18    entered the United States and that they intended to continue
19    to go further into the United States illegally.  The evidence
20    will also show that the defendant did this intending to help
21    shelter and shield them from Border Patrol.
22         This, Exhibit 6, is the Barn.  The Barn sits on the
23    north side of Ajo, and I'll show you a map here.  Running
24    through Ajo is State Road 85, to the north is Interstate 8 and
25    then eventually Phoenix, and in between is a Border Patrol
```

1    checkpoint along State Route 85.

2         The evidence will show that the defendant gave

3    Kristian and Jose, these two men, Government's Exhibit Number

4    40, permission to stay.  This is a photo that they took of

5    themselves at an Ajo gas station just hours before arriving at

6    the Barn on January 14th.  They took this selfie along with

7    many others using Kristian's cell phone.

8         Now, during this trial, you may hear the term

9    "illegal alien" used to describe these two men.  That term is

10   just a legal term taken from the immigration statutes.  It

11   describes their legal status in the United States, and what it

12   means is that they entered the United States without first

13   getting permission from the proper authorities.  That's it.

14        Now, Kristian and Jose crossed the international

15   border, Mexico to the United States, just two days before that

16   selfie I showed you, and once they crossed, they walked to a

17   gas station in Why, Arizona.

18        You'll get to hear from Kristian and Jose during

19   this trial.  They gave their testimony on video earlier in

20   this case, and we will play that for you later in the case, so

21   you get to see them testify about what happened.

22        They will testify that, from Why, they hitched a

23   ride to Ajo, specifically to the Ajo Chevron.  And as Jose

24   will testify, at some point a man gave them $40, and they

25   spent that money, at least in part, on a bean burrito and

1    Powerades, but as Jose will tell you, the beans in that

2    burrito, they didn't taste very good, so he let Kristian eat

3    most of it.

4          The men also took a bunch of photos of themselves at

5    the Ajo gas station using Kristian's cell phone, including

6    these two, Exhibits 38 and 39.  Here is Jose.  Here is

7    Kristian.  Hours before arriving at the Barn.

8          In addition to the selfies, you will get to see

9    security camera footage from both gas stations, in Why and

10   Ajo, showing Kristian and Jose walking around those gas

11   stations, and you will get to judge for yourselves how they

12   walked and how they moved on that morning.

13         Now, eventually, Kristian and Jose left that Ajo

14   Chevron and made their way to the Barn.  And the evidence will

15   show that the two men got to the Barn at about 4:30 in the

16   afternoon, and the defendant was the first person they met

17   when they got there.  And as Kristian will tell you, they

18   asked the defendant if he could give them a place to stay

19   because they didn't have the camouflage to be able to continue

20   their trip.

21         The defendant agreed to let them stay.  Jose

22   specifically will testify that, when he told the defendant

23   that they would leave in two days, the defendant said to them,

24   you can stay another day or two if you want or keep going if

25   you want to.

1           After he got to the Barn, Kristian took one more

2   selfie on the afternoon of January 14th, just after he got

3   there.  And this is Government's Exhibit 44, taken just after

4   he got to the Barn on January 14.

5           The next day, and I'm sorry, that night, with the

6   defendant's permission, Kristian and Jose got to stay inside

7   the Barn, safe from Border Patrol's watchful eye, with the

8   defendant's permission.

9           The next day, Monday, January 15th, Kristian and

10  Jose took some more photos of themselves in the Barn's common

11  area.  And these are Exhibits 42, 43, and 45.  Here is

12  Kristian in the Barn's bathroom on January 15th.  Here are

13  Kristian and Jose in the Barn's kitchen on that same day.  And

14  finally, here they are in the common area.

15          Now, that night, for the second night in a row,

16  they, again, with the defendant's permission, got to sleep

17  inside the Barn, safe from Border Patrol.  The next day,

18  Tuesday, Kristian sent a text telling the person on the other

19  side that he planned to continue that evening and make it past

20  the checkpoint, but he and Jose didn't leave that evening.

21  They stayed a third night in a row inside, still safe from

22  Border Patrol.

23          Now, on Wednesday, this is the 17th, two Border

24  Patrol agents decided to watch the Barn from a nearby hill.

25  You will hear from both of them about what they saw and what

they did.  Both of them will tell you that, that afternoon, the defendant walked outside of the Barn with Kristian and Jose, and as they stood on the north side of the Barn, the defendant pointed out landmarks to the north of the Barn.

Illegal aliens use those same landmarks to guide themselves further north into the United States, and they use those landmarks to help them avoid the Border Patrol checkpoint that's on State Route 85.  As you will hear, that checkpoint is a major obstacle for illegal aliens traveling through this area that want to keep going.

Now, after seeing the defendant point out these landmarks, the agents call for backup, and then they approach the Barn to investigate further.  There the agents found the defendant, Kristian and Jose, and once the agents determined that Jose and Kristian were in the United States illegally, they arrested all three men.

Altogether, Kristian and Jose stayed at the Barn for four days and three nights with the defendant's permission. During that time, the evidence will show Kristian and Jose wanted for nothing, most of all, a place that was safe, indoors, to sleep, where Border Patrol could not see them.

The defendant is now charged with harboring Kristian and Jose for those fours day, January 14th through 17th.  As the Court has already instructed you, the Government bears the burden of proving four elements beyond a reasonable doubt, and

1    it's the same four elements for Kristian and for Jose.  Here's
2    the instruction, and you will get to see these instructions
3    again at the end of the case, but they're here now.
4            So first, the Government must prove that Jose and
5    Kristian were aliens, and that just means they're not citizens
6    or nationals of the United States.
7            The Government must also prove that both men were
8    illegally present in the United States.  In this case, that
9    means that they did not have the right documents to enter the
10   United States and that they entered at a place that's not an
11   official port of entry into the United States.
12           The Government must also prove that the defendant
13   knew that Kristian and Jose were in the United States
14   unlawfully, and as they will testify, they told the defendant
15   about their illegal journey into the United States.
16           And fourth, the Government must prove that the
17   defendant harbored, concealed, or shielded from detection
18   Kristian and Jose with intent to violate the law.  One way,
19   but not the only way, the Government can prove this last
20   element is to show that the defendant sought to prevent Border
21   Patrol from detecting Kristian and Jose's presence in the
22   United States.
23           Now, you've also received an instruction from the
24   judge that says that the law does not impose a general
25   affirmative obligation on citizens to report suspected or

1   known violations of the law to authorities.  However, you are

2   entitled to consider what the defendant did and did not do,

3   what he did and did not say before his arrest in considering

4   that fourth element, whether he intentionally, with intent to

5   violate the law, harbored, shielded from detection, or

6   concealed Kristian and Jose.

7          That's the case, ladies and gentlemen.  This case is

8   about what Scott Warren did to help Kristian and Jose continue

9   their illegal journey into the United States over those four

10  days and three nights in January 2018.

11         The judge has instructed you on the law, and again,

12  you'll see those again at the end of the case.  Among those

13  instructions are descriptions of what is and is not evidence,

14  how to weigh the evidence, how to judge credibility, and the

15  elements the Government must prove, what we've just gone over.

16         There may be multiple distractions throughout this

17  case that have nothing to do with the evidence or with the

18  elements.  This case is not about those distractions.  This

19  case is about the law and the evidence.  This case is only

20  about Scott Warren and whether he broke the law when he

21  harbored, concealed, and shielded Kristian and Jose from

22  immigration authorities at the Barn over those four days and

23  three nights.

24         The evidence will show that he did break the law and

25  that he did so intentionally.  Because of that, at the close

 1  of the evidence, we, the United States, will come back and ask

 2  you to render the only verdict consistent with the evidence in

 3  this case, and that is guilty.

 4          Thank you, ladies and gentlemen.

 5          THE COURT:  Mr. Kuykendall, I yield the floor to

 6  you.

 7          MR. KUYKENDALL:  Thank you, Judge.  Thank you,

 8  counsel.  And thank you.

 9          The Government built this felony prosecution against

10  Dr. Scott Warren based on false assumptions, false assumptions

11  about Scott's intent, that he was trying to hide or conceal

12  the two migrants, that he was trying to help them escape from

13  Border Patrol somehow, false assumptions about why Scott helps

14  migrants, helps them, in fact, in a completely intentionally

15  legal way.  He helps them in the most lethal desert

16  environment imaginable.

17          And this case is built on false assumptions about

18  the very nature of legal humanitarian aid.  Those false

19  assumptions led to a series of mistakes, mistakes that have

20  been compounded and are why we are here today.

21          Border Patrol agents repeatedly assumed that Scott's

22  intentions were illegal, were criminal, when, in fact, his

23  intentions were and always have been, quite simply, to legally

24  prevent death and suffering.  He's nothing more nor less than

25  a Good Samaritan.

1          And they, they didn't believe that that was true, so

2    Border Patrol investigated him, Border Patrol arrested him,

3    and he's now being prosecuted because of these false

4    assumptions.  This prosecution is the culmination of those

5    mistakes.  It's a house of cards built on a foundation of

6    faulty assumptions about Scott's intent.

7          Their assumptions are also kind of understandable

8    considering where the agents were coming from.  The agents in

9    this case came from a unit called the Disrupt unit.  They're

10   supposed to investigate smugglers.  That's what they're on the

11   lookout for, is smugglers, so they suspected from the very

12   outset that Scott did what he did because he intended to

13   smuggle.

14          When they saw migrants at the house, at the Barn,

15   they assumed that he was a smuggler.  When they saw him

16   pointing to landmarks, they assumed he was giving them

17   directions around a Border Patrol checkpoint.  And that, those

18   assumptions, are the foundational problem to this case and why

19   we're here today.

20          That misunderstanding of why Scott was doing what he

21   was doing, why groups like No More Deaths, like Armadillos del

22   Desierto, like Aguilas del Desierto, like Samaritans of Ajo,

23   why those folks use the Barn as a humanitarian aid station and

24   the assumptions about them are what has led directly to this

25   trial, a trial based on assumptions.  Assumptions.  Not

1    evidence.

2          Scott knew that providing aid to migrants is

3    completely legal, just like providing aid to anyone else is

4    completely legal.  It only becomes illegal if the aid is

5    provided while intending to commit a crime, while intending to

6    violate the law.  That's what this case is about.

7          The evidence will demonstrate that Scott knew the

8    boundaries of the law, and he stayed well within them.  Scott

9    knew what the judge just told you.  That's the law in this

10   country.  The law in this country is that you don't need to

11   report to the Border Patrol if you know, if you suspect, if

12   you know with all certainty, that a person is in this country

13   illegally.  Not you, not me, not Scott, none of us have an

14   obligation to report that crime of being in the country

15   illegally to the Border Patrol.  Our laws don't require it.

16   It doesn't require it whether it's a kid, it doesn't require

17   it whether it's an adult, it doesn't require it for anybody.

18   And Scott knew that.

19         The evidence of Scott's intentions, not assumptions,

20   but evidence, will require you folks on the jury to understand

21   this all-too-common sequence of events.  If blisters on your

22   feet become bad enough to slow you down, you won't keep up.

23   If you don't keep up on this multiday journey, you'll be

24   abandoned.  And if you don't know where you are, if you're not

25   oriented, if you don't know where you are in this wilderness,

 1   if your companions who abandoned you cannot describe where

 2   they left you, and if you and they don't know where a road is

 3   and how to get out, how to find help, you'll die.  That ugly

 4   and predictable scenario has played out in the desert

 5   surrounding Ajo thousands and thousands of times.

 6        What surrounds Ajo is no ordinary desert.  It's a

 7   multimillion acre desert, bigger than some states, owned by,

 8   almost exclusively, owned almost entirely, by the Federal

 9   Government, with virtually nothing, no towns, no farm houses,

10   no help, anywhere except Ajo.

11        Ajo is here.  The international border is here.

12   Interstate 8 is here, 50 miles north.  Tucson's here.  Yuma's

13   here.  The Cabeza Prieta National Wildlife Refuge is here.

14        THE COURT:  Mr. Kuykendall, let me stop you.

15        (Juror 44 exits the courtroom.)

16        THE COURT:  Let's take a brief break, please.

17        MR. KUYKENDALL:  Would you like me to sit down.

18        THE COURT:  Please.  I'm going to ask everyone to go

19   ahead and -- we'll wait.

20        Can I see counsel for a second?

21        (The following proceedings occurred at sidebar.)

22        THE COURT:  How much more do you think you've got?

23        MR. KUYKENDALL:  About 30 minutes.

24        THE COURT:  Okay.  We'll see what's happening in

25   just a minute, as soon as Sherry comes back in.

```
 1                  (End of sidebar conference.)

 2          THE COURT:  Folks, rather than have you all sit here

 3   and look at me, I'm going to have you go back to the jury room

 4   too, and I think I can open the door for you.

 5                  Oh, go ahead.

 6                  (The jury exits the courtroom.)

 7          THE COURT:  So that the record is clear, show the

 8   absence of the jury, presence of all counsel and the

 9   defendant.  Juror Number 44 made it known to the Court that

10   she may need to quickly leave because she was having a

11   migraine headache, and so that's what we are going to do, take

12   a brief break for her and see if she can continue.  So relax.

13                  (Off the record.)

14          THE COURT:  She's ready to come back in, and we're

15   going to change seats with her and put her closer to the door

16   just in case.

17          And Mr. Kuykendall, it has nothing to do with your

18   argument.

19          MR. KUYKENDALL:  It's an opening, not an argument.

20   Remember that.

21          THE COURT:  That's right.

22          She thinks she can make it.  We'll give it our best

23   shot.

24          MR. KUYKENDALL:  I never made a juror throw up

25   during my opening.
```

1          THE CLERK:  Please rise for the jury.

2          (The jury enters the courtroom.)

3          THE COURT:  Show the jury's returned back to the

4    courtroom, the presence of all counsel and the defendant.

5          Mr. Kuykendall, as you are approaching the podium to

6    finish, please be seated.

7          You may continue.

8          MR. KUYKENDALL:  Thank you.

9          I don't want to repeat myself, but I do want to make

10   sure I say what I need to tell you.  In all that wilderness,

11   down at the bottom, the Organ Pipe National Monument, off to

12   the right, at the bottom a little bit, the Tohono O'odham

13   Nation, upper left, still south of Interstate 8, the Cabeza

14   Prieta National Wildlife Refuge, and above that and to the

15   right is the Barry M. Goldwater bombing range, there's nothing

16   out there.  There's one paved road.  You see the paved road

17   running up from Sonoita to Gila Bend.  That's the one paved

18   road surrounded by lethal empty desert.

19         Scott Warren understands this, and he understands it

20   intimately.  It's what motivates him.  The understanding of

21   the lethal sequence of slowing down, getting abandoned, being

22   lost and dying, that lethal sequence is what explains Scott's

23   intent.  When he legally gives the most basic survival tool

24   that there is, knowing where they are, where they are in this

25   gigantic desert, basic orientation, in other words, when he

```
 1   gives them that, when he gives them water, when he gives them
 2   food, when he gives them a place to recuperate, that
 3   predictable sequence of not keeping up, being abandoned,
 4   dying, that's precisely what Scott is trying to prevent.
 5   That's his -- that is his intent.  It's intentionally legal.
 6           Scott does not interfere whatsoever with the Border
 7   Patrol arresting migrants.  He doesn't hide them.  He doesn't
 8   transport them.  Because he believes in the sanctity of all
 9   life, he keeps them alive, and that's legal.
10           The Pima County Medical Examiner, Dr. Gregory Hess,
11   will testify that his office has identified more than 3,000
12   bodies -- he identifies them as undocumented border
13   crossers -- just in Pima County.  3,000.  And Scott has
14   devoted his life to preventing people from becoming part of
15   this tally, and he does that by offering live-saving aid,
16   legal life-saving aid.
17           Now, this isn't easy work.  Scott's a certified
18   wilderness first responder, and he doesn't usually look like
19   this.  When he's not teaching, he spends hours and hours
20   carrying eight-and-a-half pound jugs of one-gallon jugs of
21   water and cans of beans in a backpack as big as he is across
22   treacherous territory, even in the height of the Arizona
23   desert summer.  And he does it sometimes with Ajo Samaritans,
24   and he does it sometimes with No More Deaths.
25           Now, these are not some kind of secret societies, No
```

 1  More Deaths, Ajo Samaritans.  They publicly hold meetings,

 2  often in churches.  The Unitarian Universalist Church in

 3  Tucson has made No More Deaths a ministry of its church.

 4  These groups put humanitarian aid supplies in this lethal

 5  desert, and they do it not to foil the Border Patrol, but

 6  because of a fundamental truth:  Water will keep you alive

 7  longer.

 8          Scott searches to assist not just the people who are

 9  alive.  He also searches for those who have perished in this

10  vast wilderness, in this vast wilderness, in the predictable

11  scenario.  He and No More Deaths legally work with the Pima

12  County Sheriff's Office to retrieve corpses in the desert.

13  Only the Pima County Sheriff's Office can actually touch or

14  move the bodies -- it's a crime scene -- and take them to the

15  coroner's office, an office that has had to hire extra

16  workers, extra workers just to deal with the flood of bodies,

17  to retrieve thousands of bodies so people who died their

18  lonely deaths in the desert can be acknowledged and honored,

19  so that once the Pima County Medical Examiner has somehow

20  identified them, their families can have some minimal degree

21  of peace, at least knowing what happened to them.

22          Scott carefully records the GPS coordinates of the

23  remains, contacts the sheriff, and then he helps the sheriff's

24  office get out there to find them.  And then later, he and No

25  More Deaths volunteers, they place water along the very trails

1    where they discovered the bodies.

2          Maps -- can you give me the RHR map, please?

3          Maps get made of these human remains every month.

4    No More Deaths volunteer Ed McCullough, a retired University

5    of Arizona professor, he's the former dean of the College of

6    Sciences, he prepares maps showing precisely where the remains

7    are recovered.

8          MS. KNIGHT:  (Providing document to Mr. Kuykendall.)

9          MR. KUYKENDALL:  Thank you.

10         This is an example of one of the maps that

11   Dr. McCullough has made.  Now, mind you, this isn't -- this

12   isn't all of Pima County.  This is just a small portion of

13   that map that I had up there a minute ago.  He prepares maps

14   showing precisely where the remains are recovered, and he uses

15   publicly -- publicly available data that he gets from the Pima

16   County Medical Examiner's Office.

17         And the bodies keep coming.  No More Deaths alerts

18   the Pima County Sheriff's Office whenever they discover

19   bodies, and the Pima County Sheriff's Office retrieves the

20   bodies and takes them to the Medical Examiner's.  The Medical

21   Examiner tries to identify them, and No More Deaths and other

22   groups try to contact the survivors.

23         Now, Scott doesn't discriminate.  He helps people

24   live whether they arrived in the desert legally or illegally.

25   And he knows exactly what his legal duties are and what legal

1    duties he does not have.  His work, as the judge just

2    instructed you, his work does not require him to report

3    migrants to the Border Patrol, and he knows that.  And do you

4    know who told him that?  The Border Patrol.

5            Scott will testify.  Scott will tell you that he

6    attended an academy when they opened the Border Patrol station

7    in Ajo, where they now have between four and five hundred

8    officers stationed, a citizens academy, and the Border Patrol

9    themselves told them that, because that's the law.  It may not

10   be a law that everyone agrees with but it's the law.  Scott

11   has no obligation whatsoever to contact law enforcement simply

12   because he knows of the presence of illegal aliens.

13           Scott doesn't just know that from the Border Patrol.

14   He also knows it because No More Deaths is an organization

15   that has worked to develop protocols, legal protocols, medical

16   protocols, just like any other organization of any size.

17   Caterpillar, the U.S. District Court, any organization has

18   protocols.

19           You'll hear from Professor Andy Silverman, a UA law

20   professor emeritus, taught there for more than 50 years,

21   taught some of these prosecutors, in fact.  You'll hear from

22   Professor Andy Silverman that this is not some kind of legal

23   trickery.  He helped develop the protocols.

24           Informing yourself in the midst of a humanitarian

25   crisis like this, especially, especially in border regions, is

1   simply the responsible thing for anyone who wants to safely,

2   effectively, and legally provide humanitarian aid.  That is

3   why No More Deaths works with highly experienced lawyers to

4   shape their approach and identify their legal duties and their

5   limits.  Scott understood that no legal duty exists in this

6   country to inform Border Patrol about migrants or to help

7   Border Patrol catch them when he helped Jose and Kristian.

8        I hope -- I don't want to offend anyone by just

9   calling them Jose and Kristian.  I know there is a lot of

10  Spanish speakers on this jury, and if I say Jose Sacaria-Goday

11  every time, I'm going to eventually say it wrong.  And

12  Kristian Perez-Villanueva, I will say it wrong.  So forgive me

13  when I just say Jose and Kristian.  But Scott understood he

14  didn't have an obligation to report them when they arrived at

15  the Barn and he discovered them there.

16        Ultimately, you all will have a single issue for

17  each and every one of you to decide:  Did the Government prove

18  that Scott's intent when he helped Jose and Kristian was to

19  break the law?  Was that what motivated him?  Did they prove

20  it with proof beyond a reasonable doubt to convince every

21  single one of you, or was his intent simply to do what he's

22  been doing for years in the desert, attempting to alleviate

23  suffering and avoid death?  This whole prosecution is about

24  intent, specifically about evidence of intent, not

25  assumptions.

1      I want to talk a little bit more about assumptions

2  because the multiple faulty assumptions that Border Patrol

3  made are why we're here.  Importantly, before Border Patrol

4  just happened to set up surveillance at the Barn, they knew

5  who Scott was, and because of what they knew about him, they

6  assumed that Scott's motivations were illegal.  They assumed

7  that what he intended in his help to migrants was simply to

8  interfere, was to make their job harder.  They knew that Scott

9  distributed water and supplies in the desert, and in their

10  minds this was suspicious.  That's what they wrote in their

11  reports.  So they began investigating him.

12      Now, once you understand that that's where they're

13  starting from, starting from a complete misunderstanding of

14  both the nature and the purpose of humanitarian aid, you'll

15  understand how they got this so wrong, how they got it so

16  wrong from the very beginning.

17      Border Patrol's initial foundational mistaken

18  beliefs about Scott's true intent, his intent to keep people

19  from dying in the desert, hardened into unshakeable beliefs,

20  became written in stone on the morning of January 17.  That's

21  the day they arrested Scott.

22      That morning, January 17, a branch of No More Deaths

23  known as the Abuse Documentation Team, a branch operating from

24  Tucson, published a report online.  That report severely

25  criticized the Border Patrol and accused the Border Patrol of

1   intentionally destroying thousands of gallons of one-gallon

2   jugs of water in the desert left by No More Deaths for

3   migrants.  In the report's -- in the report's words, there was

4   intentional vandalism of thousands and thousands of gallons of

5   water.

6          Now, significantly, the report included a video, a

7   video that millions of people watched, a video that went

8   viral.  And the video showed Border Patrol agents

9   intentionally kicking, slashing, and dumping out gallon

10  bottles, gallon jugs of water.  That video went viral.

11         Now, this is the morning of January 17.  Border

12  Patrol knew that Scott worked with No More Deaths.  The

13  evidence will be that they assumed Scott was working against

14  them.  They assumed that the Abuse Documentation Team's super

15  highly extremely critical report spoke for Scott.

16         And with that assumption in their minds, that Scott

17  was intending to interfere with their work, and the Disrupt

18  unit's focus on disrupting smuggling, Border Patrol agents

19  assumed on January 17, when they saw Scott outside with the

20  two migrant men, Jose and Kristian, and they saw Scott point

21  in this direction, and they saw Scott point in this direction,

22  and they knew that he was pointing at two mountains, two

23  landmarks, they made the assumption that Scott was somehow

24  telling them how to avoid a Border Patrol checkpoint.

25         Now, they were set up several hundred feet away,

1   hidden in the scrub.  They couldn't hear what Scott was

2   saying.  They didn't photograph him.  They didn't videotape

3   what they saw for any later analysis by courts or by you.

4   They simply assumed that Scott's intent when he pointed to a

5   mountain over here and a mountain over here was to somehow

6   show those migrants how to avoid a Border Patrol checkpoint.

7           Scott was standing in this general vicinity outside

8   of the Barn.  He pointed to this mountain.  It's called Childs

9   Mountain.  And he pointed to this mountain -- or maybe it's

10  this mountain.  I'm sorry.  It's a bad map -- called Hat

11  Mountain.  Looks like a hat.

12          Scott knew that on that side of Childs Mountain is

13  what's known as the trail of death.  That's where Scott

14  retrieves the bodies, Scott and the others retrieve the

15  bodies.  And Scott knew that, on the other side of Hat

16  Mountain, I'm sorry, on the right side, on the east side of

17  Hat Mountain, is the Barry M. Goldwater bombing range, an

18  active bombing range.  And that's what he pointed out to the

19  two migrants.

20          There's one road, one paved road, in all of that

21  wilderness that runs between the active bombing range and the

22  trail of death.  If you stay between Childs Mountain, if you

23  keep Childs Mountain to your west, and you keep Hat Mountain

24  to your east, if you're facing north, then you've got a

25  chance.  If you get on that side of Hat Mountain or you get on

1   that side of Childs Mountain, you're lost.

2          It's basic orientation.  It's not giving directions.

3   Scott couldn't even see a Border Patrol checkpoint from there.

4   A Border Patrol checkpoint is not anywhere near there.  It's

5   north on the highway, north of those mountains.  Scott doesn't

6   even know how to avoid a Border Patrol checkpoint.  Even if he

7   did, there's no way you can tell anybody how to standing out

8   on the driveway.  That highway, 85, is the only way out.  It's

9   orientation.  It's not directions.  It's a basic survival

10  tool.

11         But the Border Patrol assumed that that's what he

12  was doing, that he was giving directions to illegal aliens, so

13  they came onto the Barn's private property.  The Barn is a

14  humanitarian aid station.  It's a humanitarian aid station

15  that's run by -- that's run with No More Deaths, Aguilas del

16  Desierto, Armadillos del Desierto, Samaritans.  They use this

17  property.  It's just a ramshackle old house on five acres on

18  the outskirts of Ajo.  They use it to get pallets of water,

19  pallets of food that's donated, and that's where they have

20  volunteers come to distribute this water and these life-saving

21  supplies in the desert.

22         So Border Patrol next assumed when they came onto

23  the property in a convoy that Scott's statements to them and

24  that his reactions were because he was worried about these two

25  young migrants getting deported and about Scott being

1 arrested, because that's what they know.  That's their job,

2 their concern.  And we all do that.  We figure other people to

3 some extent must think like we do, must think like we would if

4 we were in their spot.

5         But to Scott's way of thinking, Jose and Kristian

6 getting caught wasn't an issue.  Migrants get detained all the

7 time.  And Scott understands that that's a fact of life.  His

8 only interest is in reducing suffering and in reducing the

9 risk of death.  Jose and Kristian were free agents.  And Scott

10 wasn't concerned that he'd be arrested -- that he would be

11 arrested either.  He knew the kind of aid that he was giving

12 was totally inbounds, was totally legal.

13         Scott's concern, Scott's perspective, what was in

14 his mind, was that a bunch of law enforcement agents were

15 driving a convoy of vehicles onto a humanitarian aid station

16 and that that would make an already tense but working

17 relationship a whole lot worse.  Scott wanted to deescalate

18 the situation as fast as possible by telling the agents that

19 they were on private humanitarian -- that they were on a

20 private humanitarian aid station, a clinic, without a warrant.

21 But Border Patrol wasn't thinking like Scott was.

22         Now, mind you, No More Deaths had not simply issued

23 this report.  That morning it had held a press conference to

24 announce the report to a national and an international

25 audience.  Not only had the report and the video gone viral,

1   Scott knew it.  He was very aware of it.  He knew that it was

2   widespread, and it was probably perceived by Border Patrol as

3   a throwdown.

4          The tension between No More Deaths and Border Patrol

5   had just skyrocketed that morning, and Scott knew it.  So to

6   tamp that down, he quickly but calmly approached the agents

7   getting out of their cars and told Agent Burns two things,

8   just as he'd been trained to do, the legal trainings that he'd

9   received from No More Deaths:  They were on private property,

10  and they were on a humanitarian aid station.  He did that like

11  anyone on a humanitarian aid station would and should.  But

12  Border Patrol was sticking to their mistaken assumption that

13  it was a -- that it was a smuggling operation, so they ignored

14  his request.

15         Understandably, considering that they're Disrupt

16  agents and they're after smugglers, the agents themselves were

17  totally focused on the presence of people that they assumed

18  were migrants, people that they'd seen through their spotting

19  scope, so they assumed Scott must likewise be concerned about

20  them, be concerned about being arrested himself.  The agents

21  were on high alert, alert for their own safety and alert to

22  arrest the people that they'd seen outside.

23         So it was basically a complete disconnection between

24  what Scott was thinking and what they were thinking, and

25  between what they were intending and what Scott was intending,

1   that's the disconnect.  Scott wasn't worried about the

2   migrants being arrested or being arrested himself, but they

3   assumed that he must be.

4          So after arresting Scott and the two migrants, the

5   agents tried to develop some intent, intent that Scott's

6   actions, his intent, was illegal.  To do that, the Government

7   sent off the cell phone of Kristian for analysis.  That's the

8   bulk of the evidence in this case, is the prosecutor is going

9   to repeatedly show you selfies that Kristian took.

10         It turns out Kristian's phone turned out not to

11  contain anything at all along the lines of evidence that Scott

12  did anything illegal.  What Kristian's phone shows you instead

13  is that he's a 23-year-old kid with a phone.  He's glued to

14  it.  And if he's not looking at it, he's posing with it.  He's

15  taking pictures of himself.  He's making himself look good,

16  and he's sending those pictures to his loved ones back home.

17  It's what anybody with a phone under the age of about 40 is

18  doing with their phones.  That's all the phone -- all that

19  Kristian's phone tends to prove.

20         However, Kristian's phone also proves something

21  else, something that the prosecution hasn't told you.  On the

22  16th, the day before Scott -- before they arrested Scott,

23  Kristian sent a -- I'm honestly not sure what it's called.  I

24  think it's called a private Facebook message.  He used

25  Facebook to send a message, and he not only explained that he

was delayed wherever he was going, but he was delayed because

his partner, his traveling partner Jose, had injured himself,

had a rib injury.  Kristian said that himself in a text, or

not a text, a Face, whatever they're called, Facebook message,

said, I'm going to be delayed because my traveling partner

Jose has injured his ribs.

Now, to build a case against Scott, the Government

needed evidence and not just assumptions, so after analyzing

Kristian's phone, the prosecutors offered the migrants a deal.

They offered Jose and Kristian a deal to testify.  The

migrants received two things for testifying.

First of all, they didn't get charged with a crime.

The Federal Government has the power to do that and did that.

They said, if you'll testify, we won't charge you with a

crime, any crime.  That's number one.  And number two, you'll

be released.  Not released in the United States.  You'll be

deported, but you won't have to hang around waiting for Scott

Warren to go to trial.

So the Government made this deal with the two

migrants, Jose and Kristian, their witnesses, to testify, and

that's what you'll see on the videotape.  And frankly, I

recommend you bring a Thermos of coffee when we have that day

on the videotape, because what happens is, they ask a question

in English.  It gets translated into Spanish.  The Spanish --

one of the migrants will answer in Spanish, and that will get

1  translated into English, and it takes forever.

2          But what their witnesses actually testified to is

3  the following.  We arrived at the Barn and nobody was there.

4  We let ourselves in.  Approximately 30-40 minutes, an hour

5  later, 40 minutes is what he says, Dr. Warren arrives.  He

6  seems spooked.  He seems surprised.  He had a bag of

7  groceries.  That's what their witnesses testified to, and not

8  only that, but that Dr. Warren then gave them food, water, and

9  shelter.

10          But he never told them to hide.  He never took any

11  steps whatsoever to conceal them.  He never gave them a ride.

12  He never gave them a phone number.  He never arranged any sort

13  of a contact.  He never did anything remotely illegal.  The

14  Government's own witnesses are going to tell you that.

15          So after the depositions, the Government didn't have

16  any -- didn't have any evidence of Scott, so they went one

17  last place.  I'm sorry.  Scott's illegal intent, something

18  they have to prove.  Just to be clear, when I'm talking about

19  illegal intent, this is what the judge just read you.  This is

20  the law that you have to follow in order to evaluate whether

21  the Government has proven beyond a reasonable doubt that Scott

22  is guilty, that Scott did something wrong.

23          The first three elements, it's a given.  Yeah, they

24  were in the country without authorization, et cetera.  But the

25  fourth is, the defendant harbored and concealed or shielded

1  with intent to violate the law, and that's what the Government

2  needed to prove, so they went one last place:  Scott's iPhone.

3           When they arrested Scott, when they put the

4  handcuffs on Scott, he, like most sub-40-year-olds, he had an

5  iPhone in his back pocket.  They sent his iPhone off for

6  analysis.  14,000 pages of texts and emails and pictures and

7  contacts and whatever else is in an iPhone.  It had his entire

8  life in there.  And there's nothing in 14,000 pages to support

9  the Government's proposition that Scott did anything illegal.

10           Instead, what's in there is evidence that Scott has

11  a lifelong commitment to ending suffering and reducing the

12  risk of death in the desert.  He spends all of his free time,

13  and there's not -- there's a lot of free time, I guess, but

14  spends all of his free time helping migrants through these

15  organizations, Ajo Samaritans and No More Deaths.

16           The phone also shows that, on the day the migrants

17  arrived, January 14, the phone, the phone they seized from

18  Scott, shows that he called a physician here in Tucson, a

19  physician that you'll hear from.  Her name is Dr. Norma Price.

20  She's an award winning doctor.  And he consulted with her.

21  It's proven.

22           He then -- there's also -- it shows that he

23  consulted with a nurse, Nurse Susannah Brown, in Ajo.  He

24  arranged for medical care for these guys.  He knew that these

25  guys, Jose and Kristian, had problems.  They arrived with

blisters all over their feet.  The migrants testify to that in
their depositions:  We arrived with aching feet.  Of course
they arrived with aching feet.  They've been walking across
the desert.

Scott treated their blisters.  He arranged for the
care of medical professionals to come in and treat their
blisters.  He arranged for medical professionals to come in
and treat their dehydration.  He let them recuperate.

The evidence, not the assumptions, is that on the
morning of the 14th, Scott collaborated with the Pima County
Sheriff and No More Deaths volunteers, it's on his phone, to
retrieve the remains of a person who'd been discovered in the
desert.  Scott was on the phone with the Pima County Sheriff
trying to arrange for this to occur.  So he's trying to
arrange for No More Deaths and Pima County Sheriff to retrieve
the remains of a person that had died in the Cabeza Prieta
National Wildlife Refuge.

Later that day he went to the Barn, number one, to
cook for the volunteers that were coming back -- there were
about 10 young volunteers that were using the Barn at that
point -- and secondly, because part of Scott's role as a No
More Deaths volunteer is he conducts structured debriefings to
help the newer volunteers deal with the trauma of finding
bodies in the desert.

So that's why Scott was even there at the Barn, and

1    that's why he discovered Jose and Kristian, and he discovered

2    them already inside.  They tell you that too in their

3    depositions.  They let themselves into the Barn, and Scott

4    found them there.  He did what he was supposed to do.  He told

5    them that no one was protecting them from the Border Patrol,

6    that the humanitarian aid station was not a hideout.  He told

7    them that as part of No More Deaths's protocols and as part of

8    obtaining their informed consent to examine them and treat

9    them.  And that's what he did.

10            They agreed.  So he examined their aching feet.  He

11   documented it on rough SOAP notes, Subjective Objective

12   Assessment Plan, just handwritten notes.  He called the

13   doctor.  He got their vitals.  He noted their coughs and the

14   complaints of Jose's injured rib.  Jose had fallen on a rock.

15   He says so in his deposition.  And then he fed them and he let

16   them rest in the clinic beds in the Barn.  They slept past

17   noon on the first day.  They were completely exhausted.

18            So from the 14th through the 17th, the whole time, a

19   rotating group of No More Deaths volunteers was on hand to

20   help at the Barn, observing and treating Jose and Kristian as

21   patients as they recuperated.  You'll hear from both a long-

22   term volunteer who was there and from one of the less

23   experienced ones, both of whom interacted with Jose and

24   Kristian while Scott -- while Scott was away.

25            Among the volunteers that were at the Barn from the

 1   14th through the 17th was a trained emergency medical

 2   technician and also several -- several folks that were there

 3   that spoke fluent Spanish, a lot better than Scott's Spanish.

 4        Various medical professionals learned of and treated

 5   Jose and Kristian, and they were unanimously adamant that

 6   people -- that people who have blistered feet, people who have

 7   unresolved symptoms of illness, those kind of people should

 8   not set out into the desert unhealed or untreated.

 9        On Monday night, the 15th, one of the volunteers

10   came to Scott, called Scott and went to him distressed,

11   because she was afraid that Jose and Kristian were going to

12   leave before they'd adequately recovered.  She was afraid that

13   Jose and Kristian were so naive, so naive about the danger

14   that they were in, that they'd die on the journey.

15        Scott explained to her that their role within No

16   More Deaths was limited, that they could only provide

17   humanitarian aid, and that it was up to the patients to do

18   what the patients decided to do.  They were free agents.

19        On Tuesday, the 16th of that week, Scott was in

20   Sells all day at his new job.  Scott's a Ph.D. in geography.

21   He was teaching at the Tohono O'odham Community College, and

22   it was his first day teaching at Tohono O'odham College, and

23   that's where he was all day.  He came back, and other

24   experienced No More Deaths volunteers were in charge all that

25   day at the Barn, not Scott.  The evidence will show you all

1   that.  None of this fits with the assumptions that the

2   Government had made.

3          Also, to fairly evaluate Scott's intent, you should

4   know that he's personally been involved in more than a hundred

5   search and rescues, and he's also personally recovered the

6   remains of 18 people who have died in the desert.  When he

7   sees people like Jose and Kristian walking across the desert,

8   he can't get that out of his head, the remains that he's

9   found.

10          His intent is to do what he legally can do to keep

11   that from happening.  That's what the evidence in this case is

12   going to be, that Scott's intimate awareness of the very real

13   risk of death, that's what compelled him to act.  He was aware

14   of the law, and that of course explains his intent when he

15   gave the basic survival tools to Jose and Kristian.  He knew

16   very well what the law does and does not allow.

17          Scott understood that Jose and Kristian were not the

18   only people he wanted to help and that, to help all of them,

19   he had to do so legally.  To continue helping, he had to do it

20   legally, exclusively legally.  He intended to keep the mission

21   of No More Deaths alive, to protect the sanctity of human

22   life, and he knew that the only way that he could do that was

23   to do it legally, every bit of it.

24          Scott understands that he can contact law

25   enforcement, and he often does, but he's got absolutely no

 1   legal obligation do so.  Professor Silverman will explain that

 2   a separation of roles between law enforcement on the one hand

 3   and humanitarian aid workers on the other is necessary.  It's

 4   normal.  It's what goes on around the world.  Humanitarian aid

 5   workers generally don't also serve as law enforcement

 6   informants.  They can't do their job properly if they do.

 7   It's not how the world works.

 8           Understanding Scott's way of thinking, his intent,

 9   is the most critical part of your assessment on this jury.

10   The best and the most obvious way to judge a person's intent

11   is to understand their background and what motivates them, why

12   they do what they do, because to prove Scott guilty, the

13   Government must prove to each and every single one of you that

14   he helped Jose and Kristian while intending to violate the law

15   and prove it beyond a reasonable doubt, the highest standard

16   used in any court.  It cannot prove that based on assumptions.

17   And the evidence is that Scott has been legally helping

18   migrants, human beings, survive in the desert for a very long

19   time.

20           Finally, helping migrants is only a crime if it's

21   done for the wrong reasons.  It's not a crime.  But the

22   reasons that it could be a crime is if it's done for things

23   like profit, something you'll not hear anything about in this

24   case, or intentionally obstructing the operations of the

25   Border Patrol, again, nothing you'll hear in this case.

1        The evidence is Scott had no intention whatsoever

2   like that.  Just the opposite.  Scott helped Jose and Kristian

3   only because he did not want them to become another statistic.

4   He did not want them to become part of that tally, another set

5   of human remains in the desert.

6        Scott's intentions were legal, his actions were

7   legal, and I'm confident that, after considering the evidence,

8   the evidence, not the assumptions, that you will return two

9   verdicts of not guilty.

10       Thank you.

11       THE COURT:  We'll start back tomorrow morning at

12  9:30.  Remember what I said.  We'll try our best to start on

13  time.  I need you to be here and ready to go at 9:30.

14       Don't forget, no research, no investigation, no

15  reading the news, listening on the radio, watching on

16  television.  iPhone, BlackBerry, whatever you've got, do not

17  use it to look up anything about this case or the issues

18  involved in it.  Don't talk about the case.

19       All right.  Have a good evening.  I'll see you

20  tomorrow morning at 9:30.

21       THE CLERK:  Please rise for the jury.

22       (The jury exits the courtroom.)

23       THE COURT:  Show the absence of the jury, presence

24  of all counsel and the defendant.  I'm ear hustling, but I

25  can't hear.

1          Anything else to put on the record at this point?

2          MR. KUYKENDALL:  (Shaking head.)

3          THE COURT:  We'll probably have about an hour and 15

4   minute lunch hour tomorrow because one of the jurors has to

5   leave by 4:30, so we'll accommodate them.

6          MR. KUYKENDALL:  When do we start?

7          THE COURT:  9:30, nine-three-zero.  If you're here

8   by nine-two-eight, we should be all right.

9          MR. KUYKENDALL:  I'll try.

10          THE COURT:  Thank you.

11          MS. WRIGHT:  Thank you, Judge.

12          (Off the record.)

13          (The following proceedings occurred at sidebar.)

14          THE COURT:  Okay.  Juror Number 36 wanted you all to

15   know that he realizes that he is a student at the same school

16   where Dr. Warren teaches, but he does not know Dr. Warren.

17          MS. WRIGHT:  Oh, okay.

18          MR. KUYKENDALL:  I don't think he'll run into him at

19   the trial.

20          THE COURT:  All right.

21          MS. WRIGHT:  Thank you.

22          (End of sidebar conference.)

23          (Proceedings conclude.)

24

25

1                  C E R T I F I C A T E

2

3          I, Erica R. McQuillen, Federal Official Realtime

4   Reporter, in and for the United States District Court for the

5   District of Arizona, do hereby certify that, pursuant to

6   Section 753, Title 28, United States Code, the foregoing is a

7   true and correct transcript of the stenographically reported

8   proceedings held in the above-entitled matter and that the

9   transcript page format is in conformance with the regulations

10  of the Judicial Conference of the United States.

11          Dated this 14th day of November, 2019.

12

13                          s/Erica R. McQuillen
                    Erica R. McQuillen, RDR, CRR
14                  Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25