1          IN THE UNITED STATES DISTRICT COURT

2                  DISTRICT OF ARIZONA

3  United States of America          CR-18-223-TUC-RCC(DTF)

4  vs.

5  Scott Daniel Warren,
                                      November 13, 2019
6          Defendant.                    Tucson, Arizona
   _____

7

8

9

10      REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS

11                  JURY TRIAL DAY 2

12      BEFORE THE HONORABLE RANER C. COLLINS
                UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22  Court Reporter:          Erica R. McQuillen, RDR, CRR
                             Official Court Reporter
23                           405 W. Congress Street
                             Tucson, Arizona 85701
24                           (520)205-4267

25      Proceedings Reported by Stenographic Court Reporter
        Transcript Prepared by Computer-Aided Transcription

1                        A P P E A R A N C E S

2    For the Government:

3          Anna Roberta Wright
           Nathaniel Jacob Walters
4          United States Attorney's Office
           405 West Congress
5          Tucson, Arizona 85701

6          Glenn B. McCormick
           United States Attorney's Office
7          Two Renaissance Square
           40 North Central Avenue
8          Suite 1800
           Phoenix, Arizona 85004

9

10   For the Defendant:

11         Gregory John Kuykendall
           Amy Pickering Knight
12         Kuykendall & Associates
           531 South Convent Avenue
13         Tucson, Arizona 85701

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        EXAMINATION INDEX

 2   WITNESSES FOR THE UNITED STATES OF AMERICA:

 3   JOHN MARQUEZ
           DIRECT BY MR. WALTERS . . . . . . . . . . . . . . 10
 4         CROSS BY MR. KUYKENDALL . . . . . . . . . . . . . 47
           REDIRECT BY MR. WALTERS . . . . . . . . . . . . . 97
 5         FURTHER BY MR. WALTERS . . . . . . . . . . . . . 106
           FURTHER BY MR. KUYKENDALL  . . . . . . . . . . . 107
 6

 7   BRENDAN BURNS
           DIRECT BY MS. WRIGHT  . . . . . . . . . . . . . .111
 8         CROSS BY MR. KUYKENDALL . . . . . . . . . . . . .173
           REDIRECT BY MS. WRIGHT . . . . . . . . . . . . . 202
 9         FURTHER BY MS. WRIGHT . . . . . . . . . . . . . .217

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                     P R O C E E D I N G S
 2              THE CLERK:  Please rise for the jury.
 3              (The jury enters the courtroom.)
 4              THE COURT:  Let the record show the jurors returned
 5     back to the courtroom, the presence of all counsel and the
 6     defendant.
 7              Please be seated.  They're standing because you're
 8     standing.  Let me apologize for late start.  I've been doing
 9     this for over 35 years, and every time I have a short
10     calendar, it takes me longer to do it.  I only had two cases
11     before this one, and it took me until now.
12              Do you want to move to the end?
13              JUROR:  It's okay.  I think I should be okay today.
14              THE COURT:  It's okay.  You know you have that
15     opportunity whenever you want.
16              JUROR:  Okay.  Thank you.
17              THE COURT:  All right?  And don't be embarrassed.
18     We're good.  We're family.
19              JUROR:  Thank you.
20              THE COURT:  You may call your first witness.
21              MR. WALTERS:  Thank you, Your Honor.  United States
22     calls Border Patrol Agent John Marquez.
23              MS. WRIGHT:  Your Honor, could we approach briefly
24     while he's coming in?
25              THE COURT:  Sure.
```

1          MS. WRIGHT:  Thank you.

2          (The following proceedings occurred at sidebar.)

3          THE COURT:  We can't start our morning off without a

4  bench conference.

5          MS. WRIGHT:  I'm so sorry, Judge.  I thought we were

6  still counting heads, not that they would be coming in.

7  Otherwise I would have taken care of this.

8          Two things.  One, there are exhibits that come in

9  through the material witness video depositions to which there

10  have not been any objections.  I want to move to admit those

11  now, and those are Exhibits 5 through 24, excluding 16-A, and

12  34 to 48, excluding 42-A.

13          THE COURT:  Do you have any be problem with that?

14          MR. KUYKENDALL:  Maybe.  I didn't memorize the

15  exhibit numbers.

16          THE COURT:  They're the same exhibits you saw last

17  time.  Something new?

18          MS. WRIGHT:  It's not anything new, but to be fair,

19  I can't remember which number goes with which picture anymore

20  either, so -- and I'm grateful that Ms. Knight is

21  double-checking that.

22          MR. KUYKENDALL:  Did you say 34?

23          MS. WRIGHT:  I said 34 to 48.

24          MR. KUYKENDALL:  34 should be excluded per the

25  motion in limine order.  It was one that was taken in Mexico.

```
 1            MS. WRIGHT:  Was it?  But those, the selfies, came
 2  in because they showed --
 3            THE COURT:  The selfies in Mexico?
 4            MR. KUYKENDALL:  There's one from 12/20/17.
 5            THE COURT:  That shouldn't come in.
 6            MS. WRIGHT:  And Your Honor, the reasoning behind
 7  that is that how a person looks before they begin the journey,
 8  middle, and end, that shows what their condition is.  The
 9  jurors need that for context of how he appears.
10            MR. KUYKENDALL:  And that's three weeks before the
11  journey.
12            THE COURT:  No.
13            MS. WRIGHT:  Okay.  That may takes take us -- I'm
14  going to communicate 34, Your Honor --
15            THE COURT:  Okay.
16            MS. WRIGHT:  -- but it may take us a moment.  We
17  were planning on playing those probably this afternoon, but I
18  need to work with our IT people to get that --
19            THE COURT:  34 is that cell phone thing?
20            MS. WRIGHT:  It's a selfie.  It just needs to be
21  blacked out.  I just need to talk to our tech people.  I'm
22  just giving you a heads-up.
23            THE COURT:  All right.
24            MS. WRIGHT:  I think it should be fine.  I just need
25  to talk to them and work out a solution.
```

```
1              THE COURT:  All right.

2              MR. KUYKENDALL:  And did you indicate that 24 was

3    one of your exhibits?

4              MS. WRIGHT:  I did.

5              MR. KUYKENDALL:  It has never been introduced.

6    During the deposition, it wasn't introduced, and Kristian did

7    not recognize it.  It was never moved into evidence --

8              THE COURT:  Number 24?

9              MR. KUYKENDALL:  -- through either him or through

10   Jose.

11             MS. WRIGHT:  And, Your Honor, I did email Monday, so

12   I was hoping to have this taken care of, so if I can --

13             THE COURT:  What's 24?  Do you know what it is?

14             MS. WRIGHT:  Off the top of my head, no.

15             MR. KUYKENDALL:  It's inside the Barn cupboard, a

16   picture inside the Barn cupboard.

17             THE COURT:  Someone's going to recognize a picture

18   inside the Barn cupboard I'm sure by the time this case is

19   over.

20             MR. KUYKENDALL:  Well, I'm not sure, but that may be

21   one that's got some writing on it.

22             THE COURT:  Writing.  That may have been the one

23   that had the writing on it that --

24             MS. WRIGHT:  It is not.  Those are between 24 and

25   34.  Those came out last time we had moved to admit them.
```

1            THE COURT:  All right.  If it's just a picture of

2   the cupboard with none of the writing on it, it will

3   eventually come in anyway.

4            MS. WRIGHT:  Okay.  I'll double-check before we play

5   it, but I feel confident about that one.

6            THE COURT:  Okay.  All right.

7            MS. WRIGHT:  The other issue I wanted to raise, just

8   to make the record, Your Honor, is that looking out our

9   windows this morning we able to see one of the jurors stop and

10  read the signs from the protesters on the corner.  Just ask

11  the Court to admonish the jurors that they're not --

12            THE COURT:  I didn't tell them they couldn't read

13  the signs.  I told them they couldn't listen to television or

14  radio or --

15            MS. WRIGHT:  I know, and I'm just asking you to

16  include an admonishment about that.

17            THE COURT:  It's just curious.  It's curiosity.  I

18  would have read the signs if I wasn't driving too fast.

19            MS. WRIGHT:  Your Honor, I'm not blaming the juror

20  for doing that.  They're right there at the --

21            THE COURT:  All right.  I'll remind them.

22            MS. WRIGHT:  Thank you.  Just treat them the same as

23  any other thing --

24            THE COURT:  I'll remind them.

25            MS. WRIGHT:  Thanks.  That's all.

1          MR. KUYKENDALL:  I think Sherry's trying to get us.

2          THE CLERK:  It's 5 through 24 but not 16-A?

3          MS. WRIGHT:  Yes.

4          THE CLERK:  34 through 48?

5          THE COURT:  Not 34.  35.

6          THE CLERK:  Not 42-A?

7          THE COURT:  Not 42-A either.

8          THE CLERK:  Got it.  Thank you.

9          THE COURT:  All right.

10         MS. WRIGHT:  Thank you, Sherry.

11         MR. KUYKENDALL:  Did we say not 42-A also?

12         THE COURT:  We said not 42-A.

13         MS. WRIGHT:  We did, because those didn't exist

14  until later.

15         THE COURT:  All right.

16         MR. WALTERS:  24 is not, so 25 --

17         THE COURT:  25, right.

18         THE CLERK:  5 through 23 but not 16-A.  25 through

19  48, not 42-A.

20         MS. WRIGHT:  I'm sorry, Judge --

21         MR. KUYKENDALL:  I think she included 24.

22         THE COURT:  24 is not included.

23         MS. WRIGHT:  24.  Okay.  All right.

24         THE COURT:  All right.

25         (End of sidebar conference.)

 1          THE COURT:  We think we made things go a little but

 2   quicker by having this little conference over here.  We'll

 3   find out.

 4               JOHN MARQUEZ, WITNESS, SWORN

 5          THE CLERK:  Thank you.  Please be seated.

 6          Please speak directly into the microphone.  State

 7   your full name for the record and spell your last name.

 8          THE WITNESS:  Okay.  John Marquez, M-a-r-q-u-e-z.

 9          THE COURT:  Sir, the Rule has been invoked in this

10   case, and that means, except during the time that you're

11   testifying, you must remain outside the courtroom, and it also

12   means you are not allowed to discuss your testimony with

13   anyone except the attorneys involved in the case.

14          Understood?

15          THE WITNESS:  Yes, Your Honor.

16          THE COURT:  You may proceed, Mr. Walters.

17          MR. WALTERS:  Thank you, Your Honor.

18               DIRECT EXAMINATION

19   BY MR. WALTERS:

20   Q.   Good morning, Agent Marquez.

21   A.   Good morning.

22   Q.   Can you please tell the jury where you work, how long

23   you've worked there.

24   A.   I work at the Ajo Border Patrol Station.  I've been a

25   Border Patrol agent for 10 years.

DIRECT EXAMINATION OF JOHN MARQUEZ

1  Q.   What is your current assignment with Border Patrol?

2  A.   Currently I'm a line agent assigned to routine patrol

3  duties at the Ajo Border Patrol station.

4  Q.   Before you became a line agent, what were you doing

5  before, before you became a line agent?

6  A.   Before I was a line agent, I was assigned to the firearms

7  department.  I was a range safety officer.

8  Q.   Okay.  And how long have you been back on the line?

9  A.   About a month and a half.

10  Q.   Okay.  Was that -- was that just a -- was your detail as

11  the range supervisor just a temporary assignment?

12  A.   Yes.  It was a temporary assignment.

13  Q.   Okay.  So you weren't sent back to the line for

14  disciplinary reasons or anything like that?

15  A.   No.  It had a time limit.

16  Q.   Okay.  And what did you do before you were a range

17  supervisor?

18  A.   Before that I was, again, I was just a line agent.

19  Q.   Okay.  And were you part of any special units or groups

20  while you were a line agent at that point?

21  A.   Before that I was.

22  Q.   Okay.  So let's talk about that, any units or groups that

23  you were a part of.

24  A.   Okay.

25  Q.   Go ahead.

DIRECT EXAMINATION OF JOHN MARQUEZ                    12

1  A.   All right.  I was assigned to the Ajo Disrupt unit, also

2  known as the Targeting Enforcement unit.

3  Q.   And was that your assignment back in January of 2018?

4  A.   Yes.

5  Q.   At the time, January 2018, how long had you been a part

6  of the Disrupt unit?

7  A.   Oh, definitely over a year, maybe a year and a half.

8  Q.   And again, is that a term position?

9  A.   Yes.  It's a term position.

10  Q.   Okay.  So at some point you're rotating out of that unit;

11  correct?

12  A.   Yes.

13  Q.   What were your job duties as a Disrupt agent back in

14  January of 2018?

15  A.   Disrupt agents were a plain-clothes investigative-type

16  unit.  We would help augment the regular line patrol agents.

17  Some of our duties included identifying, disrupting,

18  dismantling known or finding new alien smuggling and drug

19  trafficking organizations.

20  Q.   Okay.  And specifically, when it comes to alien smuggling

21  organizations, did Disrupt only go after or target the

22  smugglers of that, of those groups?

23  A.   Typically we would try to target and identify drivers,

24  facilitators, or harborers, scouts, guides, recruiters for

25  drivers and all the previous positions.

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION OF JOHN MARQUEZ

1  Q.   So when you say an alien smuggling organization, you

2  literally mean the entire organization; is that fair?

3  A.   Yes.

4  Q.   And so, if you did come across somebody who was harboring

5  people inside the country illegally, is that something that

6  would have been within your duties as a Disrupt agent?

7  A.   Yes.

8  Q.   Okay.  Do you have to receive any type of training to

9  become a Border Patrol agent?

10  A.   Yes.  Border Patrol agents have to go through what is now

11  a six-month Border Patrol academy.

12  Q.   Okay.  And how long was it when you went through it?

13  A.   They broke it into two different segments.  The first

14  segment was three months, and if you weren't a native speaker

15  in Spanish, you had to attend a two-month Spanish academy.

16  Q.   Do you need additional training to be a member of the

17  Disrupt unit?

18  A.   Yes.  Tucson sector, which is -- Ajo is within the Tucson

19  sector, all Disrupt agents have to go through a two-week

20  Disrupt academy.

21  Q.   Okay.  And in order to get into the Disrupt unit, are you

22  told by supervisors that you have to go to this unit, or is

23  this something that you apply for?

24  A.   It's something that you apply for.

25  Q.   And is it merit based or seniority based?

 1  A.   It's merit based.

 2  Q.   Let's talk about a place called the Barn and the

 3  surrounding area.  Okay?

 4  A.   Okay.

 5  Q.   So I'm showing you --

 6          MR. WALTERS:  And Sherry, these haven't been

 7  admitted.

 8          THE CLERK:  They have not.  Thank you.

 9  BY MR. WALTERS:

10  Q.   I'm showing you Exhibit Number 74.  Can you see it on

11  your screen?

12  A.   Yes.

13  Q.   Okay.  What are we looking at in Exhibit 74?

14  A.   This is a birds-eye or satellite image of 1401 West

15  Snyder Road, also known as the Barn.

16  Q.   Okay.  And is that an accurate depiction of how you

17  remember the area of the Barn on January 17 of 2018?

18          JUROR:  Excuse me.  We can't see the exhibit.

19          MR. WALTERS:  They can't see it, but it'll be

20  admitted soon, so --

21          THE COURT:  That's why you can't see it.  It hasn't

22  been admitted.

23          MR. WALTERS:  It's okay.

24          THE COURT:  You're going to learn as we go along.

25  BY MR. WALTERS:

 1  Q.   So is that an accurate depiction of the area of the Barn

 2  back in January of 2018?

 3  A.   Yes.

 4           MR. WALTERS:  Your Honor, the Government would move

 5  to admit Exhibit 74.

 6           MR. KUYKENDALL:  No objection.

 7           THE COURT:  74 can be admitted, and it can be

 8  published so the jury can see it.

 9           MR. WALTERS:  Thanks, Your Honor.

10  BY MR. WALTERS:

11  Q.   Okay.  So when we look -- is this building right here,

12  what is that?

13  A.   That is the main structure.

14  Q.   Okay.  And main structure, are we talking about the one

15  with the blue roof?

16  A.   Yes.

17  Q.   Okay.  And what is this structure right here with the

18  reddish or red or yellow-looking roof?

19  A.   It's a -- like a storage, storage shed.

20  Q.   Okay.  So this area, is this all -- is this all 1401 West

21  Snyder Road?

22  A.   Yes.

23  Q.   What is to the north of the Barn?

24  A.   That would be open desert belonging to Bureau of Land

25  Management and as well as a few scattered residences.

1   Q.   Okay.  And then what about to the west of the Barn?

2   A.   Again, the same thing.  There's some residences directly

3   to the west and then, again, open desert.

4   Q.   And to the south?

5   A.   Would be open desert at first and then residences.

6   Q.   And finally, to the east?

7   A.   To the east would be residential area of Ajo.

8        MR. WALTERS:  Okay.  And Sherry, if we could go back

9   to just here.  Thank you.

10  BY MR. WALTERS:

11  Q.   I'm showing you what's been marked as Government's

12  Exhibit 75.  Do you recognize this?

13  A.   Yes.

14  Q.   What are we looking at here?

15  A.   You're looking at a basic hand-drawn diagram of the Barn.

16  Q.   Okay.  Is this drawn to scale?

17  A.   No.

18  Q.   Have you been inside of the Barn?

19  A.   Yes.

20  Q.   Is this an accurate layout or an accurate depiction of

21  the layout of the Barn as you remember it back in January of

22  2018?

23  A.   Yes.

24       MR. WALTERS:  Your Honor, we would move to admit

25  Exhibit 75.

```
 1            MR. KUYKENDALL:  No objection.
 2            THE COURT:  75 can be admitted.  It can be
 3   published.
 4            MR. WALTERS:  Thank you, Your Honor.
 5   BY MR. WALTERS:
 6   Q.   So again, this is not to scale; correct?
 7   A.   Correct.
 8   Q.   Okay.  And just to orient the jury, this right here would
 9   be the north side of the Barn; correct?
10   A.   Yes.
11   Q.   Okay.  And over here, we would be talking about the east
12   side then; right?
13   A.   Yes.
14   Q.   And south side?
15   A.   Yes.
16   Q.   Okay.  Now, I want to go through some exhibits with you.
17            MR. WALTERS:  And Ms. Sherry, these have already
18   been admitted.
19   BY MR. WALTERS:
20   Q.   I'm showing you first what's been marked as Exhibit
21   Number 6 -- Number 6.  See if I can get the glare off.
22        What are we looking at here?
23   A.   You are looking at the north side of the Barn.
24   Q.   Okay.  And then over here, is this the shed that you were
25   talking about earlier?
```

DIRECT EXAMINATION OF JOHN MARQUEZ                    18

```
 1   A.   Yes.

 2   Q.   Okay.  So if you're taking this picture, are you standing

 3   on Snyder Road or maybe just in front of Snyder Road?

 4   A.   Yes.  You're standing on Snyder Road facing south.

 5   Q.   Okay.  And what about Exhibit Number 7?

 6   A.   You're south of the Barn facing north.

 7   Q.   Okay.  And again, is this the shed that you were talking

 8   about earlier?

 9   A.   Yes.

10   Q.   And this is the south side of the Barn?

11   A.   Yes.

12   Q.   I'm showing you Exhibit Number 10.  What are we looking

13   at here?

14   A.   It looks like the living room.

15   Q.   Okay.  And right here, is this -- what does that appear

16   to be?

17   A.   The kitchen.

18   Q.   Okay.  Does the living room and the kitchen kind of share

19   the same room?

20   A.   Yes.

21   Q.   Okay.  And Exhibit Number 11.  Is that just a photograph

22   once you step inside of the room and turn slightly to the

23   right?

24   A.   Yes.

25   Q.   And what are we looking at right here, this big thing on
```

DIRECT EXAMINATION OF JOHN MARQUEZ                    19

1    the wall?

2    A.    It appears to be a large map of the Ajo area of

3    responsibility.

4    Q.    Okay.  Is that something -- or something similar that

5    you've seen before?

6    A.    Yes.

7    Q.    And again, is this the kitchen area that we were talking

8    about?

9    A.    Yes.

10   Q.    And Exhibit Number 12, again, is this just going into

11   that room from the last picture and turning even more to the

12   right?

13   A.    Yes.

14   Q.    Okay.  And is this the kitchen area of the Barn?

15   A.    Yes.

16   Q.    I'm showing you Exhibit Number 14.  What are we looking

17   at here?

18   A.    The left corner, like, northwest corner of the living

19   room, and then the entryway into the bedroom.

20   Q.    Okay.  And so to orient the jury, if we were walking into

21   that room, would this be walking in, turning slightly to the

22   left now?

23   A.    Yes.

24   Q.    Okay.  I'm showing you Exhibit 16.  What is this a photo

25   of?

DIRECT EXAMINATION OF JOHN MARQUEZ                    20

 1   A.    Practically standing in the doorway to the bedroom.

 2   Q.    Okay.  And so going back to 14, is this the doorway that

 3   we're talking about now?

 4   A.    Yes.

 5   Q.    Okay.  So again, taking another hard turn left; right?

 6   A.    Yes.

 7   Q.    I'm showing you Exhibit 17.  What are we looking at here?

 8   A.    You're inside the bedroom, facing the doorway that we

 9   just talked about.

10   Q.    Okay.  So to take this picture, you would have walked in

11   that door, did a complete 180, and now you're facing back

12   towards that doorway?

13   A.    Yes.

14   Q.    Exhibit 18.  What are we looking at here?

15   A.    This would be another view of the bedroom.

16   Q.    Okay.  Is this just kind of taken from the other side of

17   the bedroom, facing the other wall?

18   A.    Yes.

19   Q.    And what is -- what is this right here?  Do you know?

20   A.    The blanket on the bed?

21   Q.    Well, it's a bed; right?

22   A.    Yeah.

23   Q.    Okay.  I'm showing you Exhibit 20 now.  What are we

24   looking at here?

25   A.    The laundry room and bathroom.  It's an add-on room.

DIRECT EXAMINATION OF JOHN MARQUEZ

1  Q.   And just to orient the jury, before, the pictures were

2  taken through this door; correct?

3  A.   Yeah.

4  Q.   And then we were talking first about this common room

5  right here; right?

6  A.   Yes.

7  Q.   And then we made a left turn into this room; correct?

8  A.   Yes.

9  Q.   And so now looking at Exhibit 20, are we now coming back

10  out this door and facing into this bath and laundry room?

11  A.   Yes.

12  Q.   Okay.  Exhibit 21.  Is that just walking into that same

13  room and turning to the right?

14  A.   Yes.

15  Q.   Exhibit 22.  Slightly less of a turn to the right?

16  A.   Yes.

17  Q.   And Exhibit 23.  What's that a picture of?

18  A.   The shower in the same room.

19  Q.   Okay.  Let's talk about January 17th, 2018, when you were

20  conducting surveillance on the Barn.  Okay?

21  A.   Okay.

22  Q.   Who or what you were you surveilling that day?

23  A.   That day we were surveilling the property also known as

24  the Barn.

25  Q.   Okay.  Prior to your surveillance, did you know who the

DIRECT EXAMINATION OF JOHN MARQUEZ                    22

1  owner of the Barn was?

2  A.   Yes.

3  Q.   And who was that person?

4  A.   It was Dr. Carol Johnson.

5  Q.   Where were you when you began conducting your

6  surveillance on the Barn?

7  A.   We were stationary approximately a tenth of a mile to the

8  north-northeast of the Barn in BLM land, open desert.

9          MR. WALTERS:  Your Honor, the Government and the

10 defendants have stipulated to the admission of Exhibits 70,

11 71, 121, and 122.

12         MR. KUYKENDALL:  That's right.

13         THE COURT:  They can be admitted.  They can be

14 published whenever you wish.

15 BY MR. WALTERS:

16 Q.   So I'm showing you what's been marked as Government's

17 Exhibit Number 121.

18         MR. WALTERS:  Can you guys see that?

19 BY MR. WALTERS:

20 Q.   What are we looking at here, Agent Marquez?

21 A.   This is roughly about the view we had from our

22 surveillance spot.

23 Q.   Okay.  And so I don't know if you can -- if you can

24 really see it in this picture, but you can kind of see a bush

25 that is kind of outlined a little bit of out of focus in the

DIRECT EXAMINATION OF JOHN MARQUEZ                    23

 1  picture.

 2       Do you see that?

 3  A.   Yes.

 4  Q.   Is that -- were you hiding behind that bush in order to

 5  conduct your surveillance?

 6  A.   Yes.  We were using it as a concealment.

 7  Q.   Okay.  And now I'm going to show you Government's Exhibit

 8  122.  Do you recognize that photo?

 9  A.   Yes.

10  Q.   And what are we looking at here?

11  A.   You're looking at, if you can see on there, you can see a

12  left and right post in the center of the photo.  That's the

13  entranceway onto the property.

14  Q.   Okay.  So you said a right post?

15  A.   Yes.

16  Q.   And a left post?

17  A.   Yes.

18  Q.   And then is this -- what is this structure right here?

19  A.   That is the Barn.

20  Q.   Okay.  Is that the north side of the Barn?

21  A.   Yes.

22  Q.   What time did you begin your surveillance that day?

23  A.   Approximately 2 p.m.

24  Q.   Why did you choose the location, that specific location

25  in Exhibit 121, to conduct your surveillance?

 1  A.   It gave us an outstanding view of both pedestrian and

 2  vehicular traffic on Snyder Road.  It also gave us some

 3  concealment from anyone's view so we could do covert

 4  surveillance.

 5  Q.   When you're conducting surveillance, is it important to

 6  have a good view?  I know that might be an obvious question,

 7  but --

 8  A.   Yes.

 9  Q.   Okay.  Why is it important?

10  A.   So you can freely observe vehicle and pedestrian traffic,

11  so you can see if any illegal activity happens.

12  Q.   Okay.  And then is -- why is the ability to conduct

13  covert surveillance important?

14  A.   For two reasons: So that you can see illegal things

15  happen organically, and then also so you can -- for police

16  safety reasons, so people don't come up and walk in on you as

17  you're conducting surveillance.

18  Q.   When you say to see illegal things organically, does that

19  simply mean, if people know you're there, they won't do

20  illegal things?

21  A.   Yes.

22  Q.   Okay.  Approximately how far away were you from the Barn

23  while conducting your surveillance?

24  A.   Roughly about maybe a tenth of a mile.

25  Q.   So if my math is correct, about 500 feet, give or take?

                    DIRECT EXAMINATION OF JOHN MARQUEZ

1   A.   Give or take.

2   Q.   Okay.  Were you alone or were you with someone else?

3   A.   I was with my partner that day, Agent Brendan Burns.

4   Q.   Okay.  Was he also a member of the Disrupt unit?

5   A.   Yes.

6   Q.   What were you wearing when you were conducting your

7   surveillance?

8   A.   That day I was wearing just khaki cargo pants with a --

9   like a hunting camouflage hoodie.

10  Q.   Okay.  Why were you wearing camouflage?

11  A.   To help conceal myself.

12  Q.   To help hide yourself?

13  A.   Yes.

14  Q.   Who made the decision to surveil the Barn that day?

15  A.   I did.

16  Q.   Did you use any equipment to assist you in getting a

17  better look?

18  A.   We did use a spotting scope.

19  Q.   Okay.  And now going back to Exhibit 122, is that view

20  similar to the view that you had when you were looking through

21  the spotting scope?

22  A.   Yes.

23  Q.   Okay.  Is it fair to say that you could probably see more

24  detail from your spotting scope than you can in this photo?

25  A.   Yes.

```
 1  Q.   While you were conducting your surveillance, did you ever

 2  see anybody at the Barn?

 3  A.   Yes.

 4  Q.   Who did you see?

 5  A.   We saw several subjects kind of milling around the

 6  property at first.

 7  Q.   Did you ever see a person that you later identified as

 8  Scott Warren?

 9  A.   Yes.

10  Q.   Do you see that person in the courtroom today?

11  A.   Yes.

12  Q.   If you could point him out and tell the jury what he's

13  wearing.

14  A.   He's sitting in the middle there in the gray suit and the

15  long hair.

16          MR. WALTERS:  Your Honor, may the record reflect the

17  witness has identified the defendant?

18          THE COURT:  Yes.

19          I was looking at the long hair comment.  Your hair

20  isn't quite that long.

21          MR. KUYKENDALL:  We'll stipulate that's the

22  defendant.

23          MR. WALTERS:  Thank you.

24  BY MR. WALTERS:

25  Q.   When did you first see the defendant -- well, let me ask
```

 1   you this.  How long do you think you were conducting your

 2   surveillance before you first saw the defendant?

 3   A.    I think about an hour and a half.

 4   Q.    Is that an exact time or just your best estimate?

 5   A.    I think we spotted him around 3:30.

 6   Q.    Okay.  When you first saw the defendant, what was he

 7   doing?

 8   A.    He pulled up in his vehicle.  He got out of his vehicle.

 9   He kind of milled around the property, just kind of walked

10   around it.

11   Q.    Okay.  Now, before you saw the defendant for the first

12   time, did you have any idea that he was going to be there that

13   day?

14   A.    No.

15   Q.    Did you have any idea that anybody was going to be there

16   that day?

17   A.    No.

18   Q.    After the defendant you said kind of milled around the

19   property for a little bit, what did he do next?

20   A.    He disappeared from our view.  He walked close to the

21   west side of the Barn, the main structure.  We just assumed he

22   went inside or walked around to the south end of it.

23   Q.    Okay.  And could you -- I'm showing you Exhibit 121.

24   Could you see whether he went inside or not?

25   A.    No.

DIRECT EXAMINATION OF JOHN MARQUEZ                          28

1  Q.   Is that because he went this way around the Barn and you

2  just lost sight of him?

3  A.   Yes.

4  Q.   Okay.  Did you see the defendant another time while you

5  were conducting your surveillance?

6  A.   Maybe an hour later he came back into our view.

7  Q.   Okay.  And when he came back into your view, was he alone

8  or was he with somebody else?

9  A.   He was with two other individuals.

10  Q.   Okay.  When the defendant came out with these two other

11  individuals, where did they go?

12  A.   They walked up to the two posts.

13  Q.   Okay.  And what do you mean by the two posts?

14  A.   The two posts from the previous pictures for the entryway

15  onto the property.

16  Q.   I'm showing you Exhibit 122.  Are these the posts again

17  that you're talking about?

18  A.   Yes.

19  Q.   Okay.  So you see the defendant with these two

20  individuals.  Where exactly were they standing?

21  A.   The defendant was standing to the right post with another

22  individual, and then there was a third -- the third individual

23  was standing maybe in the middle, in between the two posts.

24  Q.   The individual standing with the defendant, was he tall

25  or short?

1    A.   He was tall.

2    Q.   And the other person standing a little bit away from the

3    defendant, was he tall or short?

4    A.   He was short.

5    Q.   What was the shorter male doing when you saw them

6    standing near those posts?

7    A.   He was constantly scanning around his immediate area and

8    the horizon, kind of like a head on a swivel.

9    Q.   When you say head on a swivel, I mean, really, what are

10   you getting at?

11   A.   To me, he seemed, like, hyperaware, nervous, being out in

12   the desert in broad daylight, exposed --

13            MR. KUYKENDALL:  I'm going to object to the

14   speculation at this point of what he seemed like.

15            THE COURT:  Sustained.

16   BY MR. WALTERS:

17   Q.   So without talking about what you thought he was feeling,

18   let's say, or what you thought he was, yeah, feeling at that

19   point, what could you actually see that he was doing, if there

20   was anything else that we haven't talked about?

21   A.   He seemed uninterested in the defendant and the other

22   individual.  He seemed -- yeah, he was uninterested, like --

23   yeah.

24   Q.   So let's talk about the taller one, the taller person

25   that the defendant was standing with.  What was he doing?

```
 1   A.   He was listening to the defendant as the defendant was

 2   talking to him.  He seemed pretty attentive.

 3   Q.   Okay.  So you said that he was -- that the defendant was

 4   talking to him.  How do you know?  You were 500 feet away.

 5   A.   I could see the defendant's mouth moving as if he was

 6   talking, and also he was making various hand gestures.

 7   Q.   Okay.  Are you a lip reader?

 8   A.   No.

 9   Q.   Okay.  Could you hear them?

10   A.   No.

11   Q.   Okay.  So you don't know what they were talking about?

12   A.   No.

13   Q.   And you couldn't hear what they were saying?

14   A.   No.

15   Q.   Okay.  These two men, the tall one and the short one, was

16   there anything that stood out to you about what they were

17   wearing?

18   A.   The taller one had a blue hooded sweatshirt, and the

19   shorter one had a gray hooded sweatshirt.  They both appeared

20   to be, like, ill-fitting, too big for them.  They appeared

21   dirty, but not like walking-in-the-desert dirty, like, bought

22   from a thrift store, like, stained, well-worn clothes.

23   Q.   What was the defendant doing while you were -- while you

24   were watching them near those posts?

25   A.   The defendant was giving various hand gestures.
```

DIRECT EXAMINATION OF JOHN MARQUEZ                    31

1   Q.   Okay.  Like what?  Specifically what was he doing?

2   A.   He was pointing in different directions, as well as he

3   was doing a hand gesture like this, then also one like a

4   snake.

5   Q.   Okay.  So the first one, just so that the record is

6   clear, the first one you had kind of an up and down wavy

7   motion; is that fair?

8   A.   Yes.

9   Q.   Seemingly like you would tell somebody up and down, maybe

10  over a hill, over a mountain; correct?

11  A.   Yes.

12  Q.   And you said like a snake, so your hands are kind of

13  slithering like a snake would?

14  A.   Right.

15  Q.   Okay.  Now, based on seeing the short one's demeanor,

16  their clothing being too baggy, well-worn, as well as seeing

17  the defendant giving directions, did you have any suspicions

18  at that point?

19          MR. KUYKENDALL:  I'd object to that.  There was no

20  testimony that he was giving directions.

21          THE COURT:  Sustained.

22  BY MR. WALTERS:

23  Q.   In your -- what did it appear to you was going on from

24  your position of surveillance?

25  A.   It appeared that the defendant was giving directions to

UNITED STATES DISTRICT COURT

1    the two other individuals.

2    Q.    Okay.  So when it appeared that the defendant was giving

3    directions to the two individuals, based on that, coupled with

4    their clothing, the short one's nervous behavior, did you have

5    any suspicions at that point?

6    A.    Yeah, we suspected that these two individuals were

7    potentially illegal aliens.

8    Q.    Okay.  Did you have any other reason to believe that

9    those two specific people may be in the country illegally?

10   A.    Can you say that one more time?

11   Q.    Sure.  Did you have any other information prior to your

12   surveillance that made you believe that these two individuals

13   may be in the country illegally?

14   A.    We had previous information from the previous day, from

15   the day before, that they had apprehended one individual in

16   the town of Ajo.  They interviewed that subject at the station

17   who claimed that he was traveling with two other individuals

18   in Ajo and that they had already figured out a ride and

19   transportation further north into Phoenix.

20   Q.    And based on your investigation prior to getting to the

21   Barn, without getting into too much detail, did you have other

22   information to believe that that area was a high-traffic area

23   for people illegally present in the United States?

24   A.    Yes.  I had information from other Ajo locals that had

25   said that --

```
 1            MR. KUYKENDALL:  I'm going to object to hearsay.

 2            THE COURT:  Sustained.

 3  BY MR. WALTERS:

 4  Q.   When the defendant was outside, you said pointing;

 5  correct?

 6  A.   Yes.

 7  Q.   Did you have an idea of what he was pointing at?

 8  A.   Yes.

 9  Q.   And what was that?

10  A.   He was -- he was pointing at different large terrain

11  features in our area of responsibility.

12  Q.   Specifically what was he pointing to?

13  A.   He was pointing to the north, northwest, northeast, to

14  include Childs Mountain.

15            MR. WALTERS:  Your Honor, the Government and the

16  defense have stipulated to the admission of Exhibits 119 and

17  120.

18            THE COURT:  They can be admitted.

19            MR. WALTERS:  Thank you, Your Honor.

20  BY MR. WALTERS:

21  Q.   So I'm first showing you Exhibit 119.  What are we

22  looking at here?

23  A.   That's Childs Mountain.

24  Q.   And do you know where this picture is taken from?

25  A.   From Snyder Road in front of the Barn.
```

 1   Q.   Okay.  So if I'm taking this picture, where is the Barn

 2   in relation to me?

 3   A.   To my back.

 4   Q.   Okay.  And how do you know that that's Childs Mountain?

 5   A.   At the top, if you see that big white building, it looks

 6   like a giant golf ball on top of the mountain, it's an

 7   antenna.

 8   Q.   Okay.  Is that something that can be seen from miles and

 9   miles away?

10   A.   Yes, day and night.

11   Q.   Okay.  Well, at night, how do you see it?

12   A.   It's lit with little red lights.

13   Q.   Okay.  Again, can those red lights be seen for miles in

14   the dark?

15   A.   Yes.

16   Q.   I'm showing you Exhibit 120.  What are we looking at

17   here?

18   A.   The tall mountain that has the flat top on top is Hat

19   Mountain.

20   Q.   Okay.  And did it appear to you that the defendant was

21   appointing to both Childs Mountain and Hat Mountain?

22   A.   Yes.

23   Q.   Is Childs Mountain to the northwest of the Barn?

24   A.   Childs Mountain is to the northwest.

25   Q.   Okay.  And is Hat Mountain to the northeast of the Barn?

```
 1  A.    Yes.

 2  Q.    And then Highway 85 runs in between those; correct?

 3  A.    Yes.

 4  Q.    After -- well, what did the defendant and those two

 5  individuals do after they -- after they got the directions and

 6  all of that?

 7  A.    They both walked back towards the west side of the Barn.

 8  Q.    Okay.  Could you tell if they went in?

 9  A.    No.  They just kind of disappeared from view.

10  Q.    Okay.  Is that, again, just because you were limited on

11  what your view was?

12  A.    Yes.

13  Q.    What did you do -- when you had your suspicions, what did

14  you decide to do next?

15  A.    Notified our supervisor, potential -- we wanted to

16  conduct a knock-and-talk.

17  Q.    Okay.  Why?

18  A.    We wanted to perform an immigration inspection on the two

19  individuals.

20  Q.    Okay.  Did you call -- you said you called your

21  supervisor; correct?

22  A.    Yes.

23  Q.    Why did you call your supervisor?

24  A.    We need permission and chain of command.  We have to go

25  up our chain of command.
```

1   Q.   Okay.  So you have to call your supervisor in order to

2   conduct a knock-and-talk; is that fair?

3   A.   Yes.

4   Q.   Did he give you permission to do the knock-and-talk?

5   A.   Yes.

6   Q.   Okay.  Did he have to call further chain of command, or

7   did it stop there?

8   A.   Yeah, he had to run it up to his supervisor.

9   Q.   Okay.  And that would be the watch commander; correct?

10  A.   Yes.

11  Q.   Did you call for backup before you went onto the

12  property?

13  A.   Yes.

14  Q.   Why did you do that?

15  A.   We need -- to conduct knock-and-talks on a -- especially

16  on a property this large, you need manpower to help secure the

17  perimeter.

18  Q.   Okay.  Why is securing the perimeter important with such

19  a large area?

20  A.   For a few reasons.  Officer safety.  If things went bad,

21  like a shooting or a barricaded subject, you'll need manpower

22  to help out.  Also, it confines anyone that's inside the

23  property or the area to stay inside so they can't abscond.

24  And also it doesn't let anyone come in either.

25  Q.   Let's talk about what happened when you initially got to

 1  the property.  Okay?

 2  A.   Okay.

 3  Q.   Where did you first enter the property?

 4  A.   We entered the property through the two poles that we had

 5  seen previously the defendant and the two subjects.

 6          MR. WALTERS:  Your Honor, the Government and the

 7  defense have stipulated to Exhibit 70 and 71 being admitted.

 8          THE COURT:  They can be admitted.

 9          MR. KUYKENDALL:  Right.

10          THE CLERK:  They're already admitted.  70 and 71?

11          MR. WALTERS:  70 and 71.

12          THE CLERK:  They're already admitted.

13          MR. WALTERS:  Oh, even better.

14  BY MR. WALTERS:

15  Q.   Okay.  So I'm showing you Exhibit 70 first.  What are we

16  looking at here?

17  A.   You're looking at the northeast side of the property --

18  Q.   Okay.

19  A.   -- of the Barn.

20  Q.   Just to orient the jury, is this the north side of the

21  Barn?

22  A.   Yes.

23  Q.   Okay.  And then this is the east side of the Barn, going

24  back here?

25  A.   Yes.

1   Q.   Is the east side of the Barn -- is the view of the east

2   side of the Barn obstructed by all of those bushes and trees

3   right there?

4   A.   Yes.

5   Q.   And where are you standing if this picture is taken?

6   A.   You're standing on Snyder Road.

7   Q.   Okay.  And you're standing to the east of the Barn;

8   right?

9   A.   To the east of the Barn looking south.

10   Q.   And you're looking west-southwest?

11   A.   Southwest.

12   Q.   Okay.  So any person coming or traveling west on Snyder

13   Road would not be able to see anything on the east side of the

14   property right here?

15   A.   No.

16   Q.   Okay.  So, now, looking at 71, where -- is that the gate

17   that you entered through?

18   A.   Yes.

19   Q.   Okay.  And is that -- are those the two posts that we've

20   been talking about where the defendant was standing with the

21   two individuals?

22   A.   Yes.

23   Q.   Okay.  When you initially came onto the property, could

24   you see a window on the front side of the Barn?

25   A.   Yes.

```
 1   Q.   Is this the window in Exhibit 71 that we're talking

 2   about?

 3   A.   Yes.

 4   Q.   What direction -- what direction does that window face?

 5   A.   It faces north.

 6   Q.   Approximately how far away were you when you first

 7   noticed that window?

 8   A.   Several yards.

 9   Q.   Okay.  Is there anywhere that you can pinpoint on this

10   picture where you were standing?

11   A.   Between, if you see the bush, just --

12   Q.   Right here?

13   A.   No, not that bush.

14   Q.   This bush?

15   A.   Yes, that bush.

16   Q.   Okay.  Between that bush and what?

17   A.   And the post to the left.

18   Q.   Okay.  So about right here?

19   A.   Yes.

20   Q.   Okay.  So you're directly in front of the window; is that

21   fair?

22   A.   Yes.

23   Q.   When you looked, did you -- did you just happen to look

24   in the window when you were in that location?

25   A.   Yes.
```

DIRECT EXAMINATION OF JOHN MARQUEZ                40

1   Q.   What if anything did you see?

2   A.   I saw one of the subjects I observed earlier in the blue

3   hoodie.

4   Q.   Okay.  Now, we talked about the blue hoodie.  Was that

5   the shorter individual or the taller individual?

6   A.   The taller individual.

7   Q.   Okay.  Did he -- did you guys see each other?

8   A.   Yeah.

9   Q.   What happened when you guys saw each other?

10  A.   He scurried and just bolted through the living room.  He

11  ran south through the room.

12  Q.   Okay.  And you could see all that through the window?

13  A.   Yes.

14  Q.   Okay.  When you saw this person, you know, running

15  towards the south side of the property, or the building,

16  sorry, what did you do next?

17  A.   I immediately started moving along the east corner, the

18  northeast corner along the property.

19  Q.   Okay.  So we're talking about the east corner.  You

20  started here; correct?

21  A.   Yes.

22  Q.   And then you went in this direction?

23  A.   Yes.

24  Q.   Okay.  And is there a little walkway between the building

25  and those trees that we saw earlier that allowed you to run

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION OF JOHN MARQUEZ

1  down that side?

2  A.   I don't remember.

3  Q.   Okay.  But you did run down the east side of the

4  property; correct?

5  A.   Yes.

6  Q.   Why did you do that?

7  A.   I didn't know the intentions of this individual I'd seen.

8  He'd ran.  I didn't know if he was going to come out and come

9  around and confront me or if he was trying to abscond or

10 escape.

11 Q.   Okay.  And just to be clear, if he was going to confront

12 you, why didn't he come out of this door right here?

13 A.   Well, it was later revealed that that's -- it's a false

14 door.

15 Q.   Okay.  So it looks like a door, but really there's

16 nothing behind it; right?

17 A.   There is nothing behind it.

18 Q.   When you see somebody who you believe is going to try and

19 escape, let's say, what would be problematic in the area of

20 the Barn if someone were to flee from Border Patrol?

21 A.   It would be an open foot chase throughout the desert, as

22 well as the Barn is close to other residences, so I mean,

23 potentially have a suspect running through people's backyards

24 or trying to duck into buildings, as well as the paved roads,

25 highways in Ajo, it would be hard for us to track if they're

 1  running on blacktop.

 2  Q.   So you made your way to the east side of the property.

 3  What if anything did you see or hear once you got over there?

 4  A.   I saw a door slam shut.

 5  Q.   So you see a door slam shut.  What did you do next?

 6  A.   Moved to the door.  It was the door to the add-on

 7  bathroom.  Knocked on the door, announced myself as a United

 8  States Border Patrol agent, asked to open the door.

 9  Q.   I'm showing you what's been marked or admitted as Exhibit

10  20.  Is that the door that you saw slam shut?

11  A.   Yes.

12  Q.   Okay.  And so you announce yourself as a Border Patrol

13  agent; right?

14  A.   Yes.

15  Q.   Did the individual open the door?

16  A.   Yes.

17  Q.   What did you do once he opened the door?

18  A.   He opened the door.  I immediately made eye contact with

19  him.  Told me -- instructed him, ordered him, to show me his

20  hands.  He did.  I immediately made sure they were free of any

21  type of weapon.  Then I told him to sit down in the doorway.

22  Q.   Okay.  Why did you tell him to sit down?

23  A.   To put him at a position of disadvantage so that, if he

24  did cue any type of, like, body language to try to run or

25  abscond or try to assault me, he would be lower than I was.

1   Q.   Is that something that you commonly do with individuals

2   that you're detaining?

3   A.   Yes.

4   Q.   Okay.  Let's talk about what happened after you ordered

5   that individual to sit down.  Okay?

6   A.   Okay.

7   Q.   Did anyone else meet you on the east side of the Barn?

8   A.   Yes.

9   Q.   Who was that?

10  A.   That would be my partner, Agent Burns, as well as the

11  defendant and I think several other agents.

12  Q.   Okay.  How soon after you ordered that individual to sit

13  down did the defendant and Agent Burns show up?

14  A.   Maybe seconds.

15  Q.   Okay.  What if anything did Agent Burns do?

16  A.   Agent Burns performed an immigration inspection on the

17  subject in the blue sweater.

18  Q.   What is an immigration inspection?

19  A.   An immigration inspection is a basic line of questions to

20  determine an alien's -- or to determine an alien's immigration

21  status, pretty much asking them if they have a passport or

22  visas to be in the United States legally.

23  Q.   Okay.  Is it also meant to learn where a person is from

24  or what their citizenship status is?

25  A.   Yes.

 1   Q.   Okay.  Why is it important for a Border Patrol agent to

 2   do an immigration inspection?

 3   A.   It's what we do.  It's our --

 4   Q.   That's your job as Border Patrol agent?

 5   A.   It's our job as a Border Patrol agent.

 6   Q.   Okay.  Was that individual later, that you had sit down,

 7   was that later -- that individual later identified as Kristian

 8   Perez-Villanueva?

 9   A.   Yes.

10   Q.   I'm showing you what's been admitted as Exhibit 44.  Is

11   this the person that you were speaking with that you ordered

12   to sit down?

13   A.   Yes.

14   Q.   Did he admit to illegally -- or to being present in the

15   United States illegally?

16   A.   Yes.

17   Q.   What happened next?

18   A.   We arrested the -- we arrested the defendant.

19   Q.   Okay.  Did you place Kristian into custody at that point

20   as well?

21   A.   Yes.  We arrested Kristian as well.

22   Q.   What happened after you placed the defendant under

23   arrest?

24   A.   I searched him.  Then I walked him to an unmarked Border

25   Patrol vehicle, placed him in the back, the back seat of the

1    Border Patrol vehicle, and put all of his property in the

2    front seat and then made my way to meet back up with my

3    partners.

4    Q.   Okay.  Are you aware of a report from No More Deaths,

5    something called "Disappeared," that was pretty critical of

6    the Border Patrol?

7    A.   Yes.

8    Q.   Had you seen that report or had you read that report

9    before you conducted your surveillance that day?

10   A.   No.

11   Q.   Okay.  Did you conduct your surveillance to retaliate

12   against the defendant?

13   A.   No.

14   Q.   Since January 17, 2018 -- well, let me ask you this.

15   When was the first time that you learned about that report and

16   any videos attached to that report?

17   A.   The day we conducted surveillance, as we were conducting

18   surveillance, sitting next to the bush.

19   Q.   So you're out there conducting surveillance.  How long

20   had you been there before you saw those things?

21   A.   I don't remember, but I know we were already situated,

22   had the tripod set up with the spotting scope already

23   observing traffic.

24   Q.   Oftentimes will Border Patrol agents have kind of a

25   meeting before shift start?

 1   A.    Yes.

 2   Q.    They call it muster?

 3   A.    Yes.

 4   Q.    Okay.  Did you guys have muster that day?

 5   A.    No.  Typically Disrupt agents don't attend muster.

 6   Q.    Okay.  So no supervisors or anything like that made you

 7   aware of any report or any videos that were critical of Border

 8   Patrol before you conducted your surveillance?

 9   A.    No.

10            MR. WALTERS:  Okay.  May I have a minute, Your

11   Honor?

12            THE COURT:  You may.

13   BY MR. WALTERS:

14   Q.    Just one short follow-up.

15        First, what's a spotting scope.  I don't think I asked

16   you that.

17   A.    A spotting scope is a portable high-powered telescope,

18   pretty much.

19   Q.    Does it kind of look like half a set of binoculars?

20   A.    Yes.

21   Q.    Okay.  Did you guys have other equipment, or did you just

22   have the spotting scope?

23   A.    For surveillance, no, not that I remember.

24   Q.    Okay.  Is it possible that Agent Burns had other

25   equipment that you didn't know about?

CROSS-EXAMINATION OF JOHN MARQUEZ                    47

1   A.   Yes.

2            MR. WALTERS:  Okay.  That's all I have, Your Honor.

3            THE COURT:  Whenever you're ready.

4            MR. KUYKENDALL:  Thanks.

5                          CROSS-EXAMINATION

6   BY MR. KUYKENDALL:

7   Q.   Good morning, Officer.

8   A.   Hello.

9   Q.   I wanted to ask -- I forgot my pen.  Excuse me.

10       I wanted to ask you specifically about your entry onto

11  the property.  All right?

12  A.   Okay.

13  Q.   You came onto the property.  As soon as you came onto the

14  property, you saw the guy that ultimately turned out to be

15  Kristian Perez-Villanueva, the guy with the hoodie, you saw

16  him through the window?

17  A.   Yes.

18  Q.   He ran and you ran?

19  A.   Yes.

20  Q.   You did it as fast as you could; right?

21  A.   No.

22  Q.   But you ran?

23  A.   Moved.

24  Q.   And you moved because you thought he was escaping?

25  A.   I didn't know what he was going to do.

1  Q.   But are you saying that you did not move quickly, or why

2  do you say you moved instead of ran?

3  A.   Typically in law enforcement, when we're encountering a

4  situation like this, you don't want to just run as hard as you

5  can and buttonhook around.  It would be a great way to get

6  ambushed.  I didn't know -- I knew there was at least one

7  other individual, but I would say, like, moved tactfully --

8  tactically moved into position just in case he did want to

9  attack me or if there was a foot chase.

10 Q.   And just to be succinct, would you agree with me that

11 about 30 seconds passed between the time you came onto the

12 property and the time that you had Kristian sitting down

13 outside?

14 A.   I don't know.

15 Q.   Do you recall testifying in a previous hearing about that

16 amount of time?

17 A.   I don't remember.

18 Q.   Let me refer you to pages 46 and 47 --

19        MR. KUYKENDALL:  Sherry, may I show this just to the

20 agent?

21 BY MR. KUYKENDALL:

22 Q.   And this is when Mr. Walters is asking you questions, and

23 tell me if I read this right.

24     "Okay.  Would you say it was more or less than a minute,

25 if you had to guess?"

1      Answer, "Less than a minute."

2      Question, "Less than 30 seconds or more?"

3      Answer, "Less than 30 seconds."

4      Question, "Is it safe to say it happened very quickly?"

5      Answer, "Yes."

6      Does that refresh your recollection?

7  A.   If you could put up the previous page, please?

8  Q.   This is Mr. Walters asking you questions down here.

9      Question, "Do you recall how many time passed between the

10  time you first made entry on the property through the gate to

11  when you ended up on the east side of the property?"

12      And you answered, "How much time elapsed?"

13      And he answered, "Correct."

14      And you said, "I don't know."

15      And then on the following page, you said, "Less than 30

16  seconds;" right?

17  A.   Okay.  If you could put up the previous page one more

18  time, please.

19      Okay.  So as I entered onto the property and just moved

20  to the east side, not to the door.

21  Q.   Okay.  Well, tell us, then, how much time elapsed between

22  the time you moved to the east side of the property and you

23  actually went to the door.

24  A.   I don't remember.

25  Q.   Five seconds?

 1    A.    I don't know.

 2    Q.    It was quick; is that fair?

 3    A.    Yeah.

 4    Q.    And once you got to the door, he immediately answered

 5    your command to open up the door; right?

 6    A.    Yes.

 7    Q.    And you sat him down, and within seconds of sitting him

 8    down, Agent Burns and Dr. Warren came around the corner;

 9    right?

10    A.    Yes.

11    Q.    And at that time, Agent Burns immediately asked Kristian

12    what his immigration status was or however you call it; right?

13    A.    Yes.

14    Q.    And once he told you that he was in the country without

15    authorization, that's when you put handcuffs on Dr. Warren?

16    A.    Yes.

17    Q.    Fair enough.

18          You just testified a moment ago that you were unaware of

19    the highly critical report that No More Deaths issued before

20    you began surveillance; is that right?

21    A.    Yes.

22    Q.    But you were aware of it while you were surveilling;

23    right?

24    A.    Yes.

25    Q.    You were aware of it while you were surveilling because

1    you were using your phone; right?

2    A.    Yes.

3    Q.    In fact, you texted somebody that you were aware of the

4    report; right?

5    A.    He texted me.

6    Q.    Okay.  He texted you, and you said, "Wonder who they're

7    going to blame;" right?

8    A.    Yes.

9    Q.    And then you said sarcastically, "Probably the Border

10   Patrol;" right?

11   A.    Right.

12   Q.    You were well aware of the report, not just you, but

13   Agent Burns, while you were surveilling Dr. Warren at the

14   Barn.

15         Is that fair?

16   A.    I don't know about Agent Burns.

17   Q.    Well, you were looking at it on your iPad; is that true?

18   A.    My iPhone, yeah.

19   Q.    And you and Agent Burns were by yourselves off in the

20   bushes in those pictures; right?

21   A.    Yes.

22   Q.    And you and Agent Burns were by yourselves for, what, two

23   and a half, three hours?

24   A.    Maybe.

25   Q.    Is it fair to assume that during that time you mentioned

CROSS-EXAMINATION OF JOHN MARQUEZ                    52

 1   to Agent Burns this highly critical report that you were

 2   looking at on your iPhone?

 3   A.   I did mention the video with the report.

 4   Q.   You mentioned that to Agent Burns while you were

 5   surveilling Dr. Warren?

 6   A.   Yes.

 7   Q.   And to be clear, when I say "that," what you mentioned to

 8   him was the video of Border Patrol intentionally destroying

 9   water; right?

10   A.   Yes.  I told him about the video of Border Patrol

11   intentionally destroying water that was maybe dated seven

12   years, eight years prior.

13   Q.   Are you saying that all of the incidents of the Border

14   Patrol that you reviewed were seven or more years prior to the

15   issuance of the video?

16   A.   Could you restate the question, please?

17   Q.   Are you telling this jury that all of the video that you

18   watched of Border Patrol intentionally destroying water, that

19   all of that video was taken seven years before you watched it

20   there on January 17?

21   A.   The videos on the report were videos I had previously

22   seen maybe my first two years, around 2010-2011, of the agents

23   pouring out water.  They were dated.

24   Q.   And I just want to be clear.  Are you telling the jury

25   that all of the videos that you watched, every single one of

 1   them, was seven or eight years old?

 2   A.   To the best of my knowledge, the one that I can still

 3   remember, I don't remember seeing more than one video, but the

 4   one I did see was old.

 5          MR. KUYKENDALL:  Judge, at this time I'd move for

 6   the admission of the video.

 7          MR. WALTERS:  Objection, Your Honor.  There's no

 8   foundation for any of those videos.

 9          THE COURT:  Sustained.

10   BY MR. KUYKENDALL:

11   Q.   In any event, you were watching the video.  How many

12   times did you watch the video of agents intentionally

13   destroying water?

14   A.   Maybe for 10 seconds.  Like I said, I'd seen that video

15   several times before, back in 2010-2011.

16   Q.   Did you ever tell these prosecutors that you had watched

17   that video?

18   A.   Yes.

19   Q.   Now, in addition to watching that video about No More

20   Deaths while you were surveilling the Barn, did you do some

21   additional investigation of Dr. Warren?

22   A.   Yes.

23   Q.   And you did that investigation while you were surveilling

24   the Barn or before you were surveilling the Barn?

25   A.   Before the Barn.

CROSS-EXAMINATION OF JOHN MARQUEZ

1   Q.   Okay.

2   A.   Before surveillance on the Barn.

3   Q.   One of the things that you did, one of the investigative

4   things that you did in relation to Dr. Warren, was you looked

5   at an article published by the NAU -- Northern Arizona

6   University school; right?

7   A.   Yes.

8   Q.   And that was something from a publication called The

9   Lumberjack; right?

10  A.   Yes.

11  Q.   And you found it suspicious what -- you found that there

12  was reason to suspect Dr. Warren because of that article in

13  The Lumberjack; right?

14  A.   Can you restate the question?

15  Q.   You found in your mind that the article in The Lumberjack

16  gave you cause to suspect that Dr. Warren was doing something

17  illegal.

18       Is that fair?

19  A.   No.

20  Q.   Why did you even bother writing in your report that you

21  had reviewed the article from The Lumberjack?

22  A.   If I can remember correctly, the reason I referenced the

23  article in The Lumberjack with the defendant was because it

24  put him -- it put him as a member of No More Deaths or a part

25  of No More Deaths.

 1   Q.   And your understanding of what No More Deaths with

 2   Dr. Warren did, because of that article, was that he put water

 3   in the desert for migrants; right?

 4   A.   Yeah.  Part of it, yeah.

 5   Q.   And you found that significant enough to put into the

 6   report that you wrote the same day that you arrested him;

 7   right?

 8   A.   Yes.

 9   Q.   I'm going to show you what's been marked as Exhibit 259

10   and ask you, is this the article that you reviewed from The

11   Lumberjack about Dr. Warren?

12   A.   From my -- from my memory, yes.

13   Q.   And it's dated Thursday, March 2, 2017; right?

14   A.   Yes.

15   Q.   And as you read this article about Dr. Warren, can you

16   explain what it is about this article that made you find him

17   suspicious.

18   A.   I'd have to read the whole article over again and --

19   Q.   I'm happy to hand it to you.  Would you like me --

20             MR. KUYKENDALL:  May I approach?

21             THE COURT:  Sure.

22             While he's reading it, let's take our morning

23   recess.  Let's make it 15 minutes.

24             THE CLERK:  Please rise for the jury.

25             (The jury exits the courtroom.)

```
 1              THE COURT:  You can be seated.

 2              15 minutes.

 3              MR. KUYKENDALL:  Thank you.

 4              MS. WRIGHT:  Your Honor, I'm sorry, before we go to

 5    break, I wanted to raise something with the Court about the

 6    exhibits we spoke about earlier.

 7              THE COURT:  All right.

 8              MS. WRIGHT:  Exhibit 24, no issue with that.  That

 9    was actually taken out of the depositions earlier, and I

10    missed that.  However, the Court ruled that Exhibit 34 could

11    not come in.  That exhibit was specifically the subject of

12    prior motions about the defendant's motion to eliminate the

13    conspiracy evidence.  The Government filed its proposed

14    redactions with the Court, sought to clarify.  That exhibit

15    came in during the testimony the Court specifically allowed

16    the Government to leave in.

17              THE COURT:  I need to see the exhibit again.

18              MS. WRIGHT:  Okay.  But Your Honor --

19              THE COURT:  I need to see it.

20              MS. WRIGHT:  Your Honor, at this point, if I'm going

21    to have to redact testimony from the depositions, it's going

22    to take me another day because of technical limitations.

23              THE COURT:  Can you show me what we're talking

24    about?

25              MS. WRIGHT:  Yeah, I can.  Thank you.
```

1          MR. KUYKENDALL:  Can I see it too?

2          MS. WRIGHT:  It's in your book, Greg.

3          THE COURT:  It's in my book too?

4          MS. WRIGHT:  Yes, Your Honor.

5          THE COURT:  Which one of the three I've got?

6          MS. WRIGHT:  I didn't hand you the third one.

7    There's one that has our seal with, "Exhibits," and underneath

8    in parens, "Originals."  It'll be at tab 34.

9          THE COURT:  "Originals" instead of "Additional."

10         MS. WRIGHT:  Exactly.

11         MR. WALTERS:  I have it.

12         MS. WRIGHT:  I couldn't think of a better word.

13         THE COURT:  All right.  That's it.

14         MR. WALTERS:  That's it.

15         MS. WRIGHT:  That's it.

16         THE COURT:  All right.  Let me see counsel.

17         (The following proceedings occurred at sidebar.)

18         THE COURT:  Okay.  I said if the exhibit that we

19   were talking about was the one that showed the writing on the

20   wall, that couldn't come in.

21         MS. WRIGHT:  Right.

22         THE COURT:  That one doesn't show the writing on the

23   wall.  It can come in.  All right.

24         MR. KUYKENDALL:  But where is it taken?

25         MS. WRIGHT:  It's taken in Mexico.  That was the

 1   testimony on page 27, and that's what the Court denied your

 2   motion to redact.

 3             MR. KUYKENDALL:  That's the problem, is it was taken

 4   in Mexico.

 5             THE COURT:  No one knows it was taken in Mexico.

 6             MR. KUYKENDALL:  But if there's any suggestion that

 7   this is --

 8             THE COURT:  There's going to be no suggestion.

 9             MS. WRIGHT:  Your Honor, we've already litigated

10   this issue, so this is a little late.

11             THE COURT:  What's your purpose of showing it?

12             MS. WRIGHT:  I'm going to show it to show that's

13   what he looked like three weeks before, that's what he looks

14   like on an average day.

15             THE COURT REPORTER:  Please slow down.

16             MS. WRIGHT:  Sorry.

17             His video testimony is that he was in Mexico.  We

18   don't go into where he is in Mexico, who he's with, any of

19   that stuff.  We already litigated these redactions.  The Court

20   ruled that this could come in.

21             MR. KUYKENDALL:  Well, we litigated the motion in

22   limine, and clearly the basis for the granting of the motion

23   in limine is it has to do with Scott's knowledge of the

24   migrants' physical status at or virtually at the same time as

25   when he met them.  This is three weeks prior to him meeting

1  them.  He doesn't even look the same.  He's got a little

2  beard.

3           It's clearly entered for the purpose of showing that

4  -- what he was doing in Mexico, and that's the -- that's the

5  reason that the Court granted the motion in limine.

6           THE COURT:  This was shown in the deposition to him?

7           MS. WRIGHT:  Your Honor, it was shown in the

8  deposition.  To be clear, we litigated the redactions.  This

9  was part of their proposed redactions in that motion to

10  preclude conspiracy evidence.  The Court denied the motion as

11  to that --

12           THE COURT:  The most recent one that we did.

13           MS. WRIGHT:  The most recent one.  The Court denied

14  the motion as to that and specifically ruled that those

15  portions of the testimony could come in.

16           THE COURT:  All right.  It can come in, but we're

17  not going to dwell on the fact of where it was taken.

18           MS. WRIGHT:  It's just going to play, and he says --

19  here's the page.  He says, "What's in that photo?"

20           "It's myself.  It's kind of like a room."

21           "When did you take that photo?"

22           "I don't recall, but I was in Mexico."

23           THE COURT:  All right.  That's it.

24           MR. KUYKENDALL:  And I think the important thing is

25  for the Court to issue an order about whether she dwells on

1    it.

2            THE COURT:  No one's going to dwell on it.

3            MR. KUYKENDALL:  I mean in argument.

4            THE COURT:  We'll get to that later.

5            MR. KUYKENDALL:  All right.

6            THE COURT:  You know, I have a feeling between now

7    and closing argument a lot of stuff is going to happen.

8            MR. KUYKENDALL:  Me too.

9            THE CLERK:  This is 34?

10           MS. WRIGHT:  34, yes.

11           Sorry, Erica.

12           (Off the record.)

13           THE CLERK:  Please rise for the jury.

14           THE COURT:  Let the record show the jurors returning

15   to the courtroom, the presence of all counsel and the

16   defendant.

17           You may continue, Mr. Kuykendall.

18           MR. KUYKENDALL:  Thank you.

19   BY MR. KUYKENDALL:

20   Q.   Agent, during the break, I had asked you to take a look

21   at The Lumberjack article about Scott, which is Exhibit Number

22   259.

23       Have you had a chance to review that?

24   A.   Yes.

25   Q.   And did you find in there what it was you found

 1   suspicious about Scott?

 2             MR. WALTERS:  Objection, Your Honor.  The witness

 3   never said that he was suspicious of the defendant because of

 4   that article.

 5             THE COURT:  Objection's overruled.

 6   BY MR. KUYKENDALL:

 7   A.   What I found reading the article was that it kind of gave

 8   me three things.  It refers to the defendant as the de facto

 9   leader of No More Deaths, so he has some sort of leadership

10   role in the humanitarian organization.  He's a leader of

11   sorts.

12        The other thing I saw also in there was how reckless he

13   is as that leader.  He took high school students into what's

14   referred to as an extremely dangerous area of the Growler

15   Valley while Border Patrol agents were searching for a group

16   that they gave food and water to before maybe their

17   apprehension, or they got away, I don't know.

18        But those three things I think all kind of told me about

19   the defendant.

20   Q.   I'm sorry.  I wrote down two things.  What was the third

21   thing you found?

22   A.   Oh, it says in the article that the defendant along with

23   some high school students came across two migrants and gave

24   them food and water as the Border Patrol helicopter was flying

25   around, probably actively searching for the two subjects that

 1    they were giving food and water to.

 2        So that and being with high school students in what they

 3    say is an extremely dangerous part of our area of

 4    responsibility I would say is pretty reckless.

 5            MR. KUYKENDALL:  Judge, at this time I'd move for

 6    the admission of Exhibit 259.

 7            MR. WALTERS:  Objection, Your Honor.  Relevance to

 8    the actual article itself.

 9            THE COURT:  Sustained.

10    BY MR. KUYKENDALL:

11    Q.   Well, Agent, what it in fact says in this article is

12    that, "Warren explained to the students," and I'm looking at

13    page two, "'We've been finding a lot of remains out in this

14    valley in the past couple of months, eight or nine sets of

15    human remains that we've found in this valley here,' Warren

16    said;" right?

17    A.   What paragraph?  I'm sorry.  I'm trying to catch up to

18    you.

19    Q.   That's all right.  It's the bottom of page two, the very

20    last paragraph.

21    A.   Oh, okay.  I see you now.

22    Q.   And then on the next page, it says, "Since 1994, the

23    bodies" --

24            MR. WALTERS:  I have to object, Your Honor.  The

25    report doesn't come in, but he just can't sit there and read

1   it either.

2            (The following proceedings occurred at sidebar.)

3            THE COURT:  Let's not read the whole article.  Just

4   get to the three things he said were suspicious.

5            MR. KUYKENDALL:  All right.

6            (End of sidebar conference.)

7            THE COURT:  You may continue.

8            MR. KUYKENDALL:  Thank you, Judge.  Let me

9   double-check.

10  BY MR. KUYKENDALL:

11  Q.   I'm going to first ask you about the issue you had stated

12  about him being the de facto leader, and I think that's on

13  page two, isn't it?

14  A.   Yes.

15  Q.   And what it actually says is, "Scott Warren, a member of

16  No Más Muertes (No More Deaths), an Ajo local, was the de

17  facto leader of the group consisting of 26 individuals, half

18  of whom were No More Deaths humanitarian aid workers."

19       Right?  Did I read that right?

20  A.   Yes.

21  Q.   "The remainder were student and faculty volunteers from

22  Flagstaff Arts and Leadership Academy (FALA), a charter high

23  school, who had driven down two days before."

24       Right?

25  A.   Yes.

CROSS-EXAMINATION OF JOHN MARQUEZ                    64

 1   Q.   So it actually says that he was the de facto leader of

 2   the group that day, doesn't it?

 3   A.   Yes.

 4   Q.   Now, I think the other thing that you said was how

 5   reckless Scott was to lead that group into the Growler Valley;

 6   right?

 7   A.   Yes.

 8   Q.   And on page three, it actually indicates that, "Since

 9   1994, the bodies of more than 7,000 migrants have been

10   recovered throughout the U.S.-Mexico borderlands."

11        Right?

12   A.   Yes.

13   Q.   "And with its vast rugged deserts, the migration

14   corridors in Arizona are some of the deadliest."

15   A.   Yes.

16   Q.   And so the last page, the fourth paragraph up, one of the

17   children is quoted as saying, "It was so chaotic, it was so

18   hectic, but in the midst of it, we still had to find time to

19   lay this person to rest."

20             MR. WALTERS:  Judge, we can't see it.  It's out of

21   focus.

22             THE COURT:  It is out of focus.

23             MR. KUYKENDALL:  Wow.  I'm sorry.  That wasn't for

24   the jury to be out of focus, was it?

25             THE COURT:  No, they're not looking at it.

1          MR. WALTERS:  And Your Honor --

2          THE COURT:  They're not looking at it.

3          MR. WALTERS:  And we would object, Your Honor,

4   anyway because it's hearsay.  This came from one of the

5   students.

6          THE COURT:  Overruled.

7   BY MR. KUYKENDALL:

8   Q.   Just to be clear, the student says, quote, "It was so

9   chaotic, it was so hectic, but in the midst of it, we still

10  had to find time to lay this person to rest, and it's this

11  thought that, if this person is never identified, if they can

12  never be laid to rest in the way that they wanted to, did we

13  do enough?  This is a question Warren has asked himself many

14  times when working in the desert."

15     This is a quote.  "'It also feels like one of the most

16  important and almost sacred things that we do, just being

17  present for somebody,' Warren said.  Whether he is giving aid

18  to migrants or finding human remains" --

19          MR. WALTERS:  Objection, Your Honor.  He's just

20  reading the report again.

21          MR. KUYKENDALL:  It's the last line.

22          THE COURT:  He's just about through.

23  BY MR. KUYKENDALL:

24  Q.   "Whether he is giving aid to migrants or finding human

25  remains, that question stays with him:  Has he done enough?"

1      That's what the article says, doesn't it?

2  A.   Yes, also.

3  Q.   Before I forget, this is Exhibit 11, which I believe has

4  been admitted.

5           THE COURT:  You can publish it.

6           MR. KUYKENDALL:  May I publish it, Sherry?

7           THE COURT:  It's published.

8           THE CLERK:  It's published.

9           MR. KUYKENDALL:  Oh, thank you.

10 BY MR. KUYKENDALL:

11 Q.   Do you recognize this?

12 A.   Yes.

13 Q.   And this section right here, that's the area that you

14 referred to on the outside of the building as a false door;

15 right?

16 A.   Yes.

17 Q.   You didn't find a false compartment or a hiding place in

18 the Barn, did you?

19 A.   No.

20 Q.   Excuse me one second.

21      So before you ever set up any surveillance of Scott, you

22 investigated Scott; right?

23 A.   Yes.

24 Q.   And I apologize, but I've forgotten, this exhibit, the

25 one we just read from, did you do that before you went out to

 1   surveil him, is that what you said, you found that article?

 2   A.   Yes.

 3   Q.   Now, also, before you went out to surveil him, you sent

 4   an email to a man named Bentley, didn't you, Nelson Bentley?

 5   A.   I might have.

 6   Q.   Do you recall, on January 17, 2018, at 12:32 p.m.,

 7   sending an email to Nelson Bentley, and the subject line was

 8   "Forward:  ISDA/No More Deaths?"

 9        Does that ring a bell?

10   A.   Not really.

11             MR. WALTERS:  Objection, Your Honor.  Is this on

12   your exhibit list, sir?

13             MR. KUYKENDALL:  No, this is impeachment.

14             MR. WALTERS:  Were we ever given a copy of that?

15             MR. KUYKENDALL:  We can give you a copy now.

16             MR. WALTERS:  Your Honor, may we approach?

17             THE COURT:  Yes.

18             MR. KUYKENDALL:  This was disclosed by the

19   Government.

20             (The following proceedings occurred at sidebar.)

21             MR. WALTERS:  If this was given by the Government,

22   that's fine, but I just wanted to make sure.

23             MS. KNIGHT:  It has your Bates stamp.

24             MR. WALTERS:  All right.

25             MS. WRIGHT:  It's just we hadn't seen it on our

 1  exhibit list, so we didn't have a heads-up.

 2            THE COURT:  All right.

 3            (End of sidebar conference.)

 4            THE COURT:  You may continue.

 5            MR. KUYKENDALL:  Thank you.

 6  BY MR. KUYKENDALL:

 7  Q.  So you testified a moment ago that you set up

 8  surveillance of the Barn at around 1 p.m. on January 17.

 9      Is that right?

10  A.  Could you say that again?  I'm sorry.

11  Q.  You testified when the prosecution was asking you

12  questions that you set up surveillance about one o'clock in

13  the afternoon of January 17.

14  A.  2 p.m.

15  Q.  I'm sorry.  2 p.m.  You decided to by 1 p.m.; right?

16  A.  Possibly.

17  Q.  That's when you were texting your friend from the Fish

18  and Wildlife services, Donnie Ebann, that you were going to

19  set up surveillance and park on his property?

20  A.  Yes, Donald Ebann.

21  Q.  You told him, "We're going to park our truck on your

22  drive or on your property.  Okay?"

23  A.  Yes.

24  Q.  And that was at 1:00 in the afternoon?

25  A.  I don't remember.

CROSS-EXAMINATION OF JOHN MARQUEZ

1   Q.   And at 12:32 in the afternoon, you sent this email that

2   I'm showing you now.

3   A.   Okay.

4   Q.   Do you recognize that?

5   A.   Yeah.

6   Q.   And this was before you went out to surveil the Barn, and

7   what you attached on this email was six-packs; right?

8   A.   Yes.

9   Q.   And six-packs are photo arrays of people; right?

10  A.   Yes.

11  Q.   So it's basically a picture -- like, if I was in a

12  six-pack, there would be a picture of me somewhere in there

13  and then five pictures of other people; right?

14  A.   Yes.

15  Q.   And you sent out a six-pack of Scott Warren; is that

16  right?

17  A.   Yes.

18  Q.   Susannah Brown?

19  A.   Yes.

20  Q.   Carol Johnson?

21  A.   Yes.

22  Q.   Emily Saunders?

23  A.   Yes.

24  Q.   John Heid?

25  A.   Yes.

 1   Q.   And some kind of document that I don't have called

 2   NoMoreDeaths.docx; right?

 3   A.   Yes.

 4   Q.   Who's Nelson Bentley?

 5   A.   He is an intelligence agent at my station.

 6   Q.   So you sent this out to him just before you set up

 7   surveillance of the Barn?

 8   A.   Yes.

 9   Q.   Now, one of the pictures is of Carol Johnson; right?

10   A.   Yes.

11   Q.   That's the doctor that owns the Barn?

12   A.   Yes.

13   Q.   You were aware that Dr. Carol Johnson opened the Barn

14   before you ever set up the surveillance?

15   A.   Yes.

16   Q.   Dr. Carol Johnson is approximately 70, would you guess?

17   A.   I would guess.

18   Q.   Doesn't -- just to be clear, doesn't look a thing like

19   Scott Warren; is that fair?

20   A.   It's fair.

21   Q.   And you knew that Dr. Johnson was the owner?

22   A.   Yes.

23   Q.   You knew that Scott Warren, before you went out to

24   surveil him, speaks publicly on immigration issues?

25   A.   Yes.

CROSS-EXAMINATION OF JOHN MARQUEZ

71

1   Q.   And you put that in your report?

2   A.   I don't remember.

3   Q.   Have you reviewed your report?

4   A.   Yes.

5   Q.   When did you last review it?

6   A.   I think yesterday.

7   Q.   Right in front of me.  Sorry.

8      One of the things that you indicated in your report, once

9   you guys set up your observation -- was it LPOP, listening

10  post/observation post?

11  A.   Yes.

12  Q.   Okay.  By the way, was there any listening done at the

13  listening post?

14  A.   Like with --

15  Q.   No, I mean, I'm sure you and the agent listened to one

16  another.

17  A.   Well, and the surrounding area, I mean, listening for

18  vehicles coming, listening for groups coming.

19  Q.   Okay.  But you didn't use any kind of high-tech stuff,

20  you know, to actually listen to what anybody was saying --

21  A.   No.

22  Q.   -- besides you and Agent Burns?

23  A.   No.  We had no type of high-tech listening equipment.

24  Q.   Okay.  You had a listening post/observation post, but to

25  be clear, you were observing?

 1    A.    Yes.  Typically, when people talk about LPOP, listening

 2    post, it also just means listening with your ears for anything

 3    out of the ordinary.

 4    Q.    And I think you said you had your iPhone with you, so you

 5    had the ability to take pictures; right?

 6    A.    Yes.

 7    Q.    You had the ability to take video?

 8    A.    Yes.

 9    Q.    In fact, you watched some video that Don Ebann, the Fish

10    and Wildlife fellow that you were texting with, watched some

11    video that he sent you?

12    A.    He didn't send me a video, I don't think.

13    Q.    Did you send video to him?

14    A.    No.

15    Q.    You had the ability to watch video while you were out

16    there?

17    A.    Yes.

18    Q.    I mean, obviously, because you did watch the No More

19    Deaths video; right?

20    A.    Yes.

21    Q.    You sent that photo array of the various people,

22    including Scott Warren, to somebody else in your office, is

23    that right, or somebody else at the station?

24    A.    I don't remember.

25    Q.    But Nelson Bentley --

1    A.    Yeah, Nelson Bentley.

2    Q.    -- he's somebody else?  He's another agent at the

3    station?

4    A.    Yes.  He's assigned to the station.

5    Q.    He works for a slightly different organization, Homeland

6    Security Investigations; is that right?

7    A.    No.

8    Q.    Who does he work for?

9    A.    He is a Border Patrol agent.

10   Q.    Okay.  I thought you said something about HSI.

11   A.    No.  He's -- he has an enhancement.  He's -- I'm just a

12   regular Border Patrol agent.  He's a BPA -- BPAI, a Border

13   Patrol Agent Intelligence.

14   Q.    And you sent that to him because, before you ever went

15   out to the Barn, you were investigating Scott; right?

16   A.    One of them, one of the subjects, yes.

17   Q.    And the other subjects that you were investigating were

18   the people who were -- that I mentioned before, Susannah

19   Brown, Emily Saunders, John Heid, and Carol Johnson?

20   A.    Yes.

21   Q.    And all that was in your mind before you began

22   surveilling the Barn; right?

23   A.    Yes.

24   Q.    Once you began surveilling the Barn, about an hour and a

25   half after you'd gotten set up with the -- with the spotting

1  scope, you got word from one of the other agents that Scott

2  was driving down the road towards you guys; right?

3  A.   Yes.

4  Q.   And they already knew what Scott looked like and what

5  Scott was driving, probably; right?

6  A.   Probably just what he was driving.

7  Q.   And ultimately Scott drove up onto the property of the

8  Barn in broad daylight, in the, what, 3:30 range?

9  A.   Yes.

10  Q.   And Scott got out of the Barn -- got out of the car, and

11  then you lost sight of him; right?

12  A.   Yes.

13  Q.   Before you ever even saw Scott drive up, you saw some

14  other people, Caucasians, at the Barn; right?

15  A.   Yes.

16  Q.   And then once Scott got there, you actually saw some

17  Caucasians leave the Barn, didn't you?

18  A.   Yes.

19  Q.   You saw two females drive away in a vehicle registered to

20  the Universalist -- I'm sorry -- the Universal Universalist

21  Church?

22  A.   Yes.

23  Q.   I probably said that wrong.  The UU Church.

24  A.   I think there is "Unitarian" in there.

25  Q.   There is somewhere.  Anyway, you saw two Caucasian

CROSS-EXAMINATION OF JOHN MARQUEZ

 1    individuals after Scott arrived get into a vehicle that was

 2    registered to the UU, and the vehicle drove away?

 3    A.    Yes.

 4    Q.    You didn't ever arrest them, did you?

 5    A.    No.

 6    Q.    After maybe an hour and a half or so, you saw Scott

 7    outside in broad daylight with the two gentlemen that

 8    ultimately you determined were in the country without

 9    authorization; correct?

10    A.    Yes.

11    Q.    And you saw those two guys, Jose and Kristian, with Scott

12    walking out on the driveway; is that right?

13    A.    Yes.

14    Q.    It was a clear day?

15    A.    Yes.

16    Q.    There was no obstruction to your view?

17    A.    We had a good view, line of sight.

18    Q.    And they were out there for, what, five minutes, did you

19    testify?

20    A.    Yeah, maybe five minutes.

21    Q.    They weren't hiding while they were outside, were they?

22    A.    No.

23    Q.    And what you wrote in your report was that those two guys

24    besides Scott, those two people, quote, matched the

25    description of two illegal aliens who'd evaded capture the day

CROSS-EXAMINATION OF JOHN MARQUEZ

1   prior; right?

2   A.   Yes.

3   Q.   The two guys that you actually saw, though, they didn't

4   match the description of anybody that you had, did they?

5   A.   They matched the descriptors in my mind, in my experience

6   of being a United States Border Patrol agent encountering

7   numerous subjects from around the world, that they, in my

8   mind, they were both Central Americans.

9   Q.   Would you tell the jury what you knew about the two

10  missing migrants that were reported to have left Ajo the day

11  before.

12  A.   That they were Central Americans.

13  Q.   They were other than Mexican; right?

14  A.   Yes.

15  Q.   And even though you wrote in your report that they

16  matched the description, you didn't even know if they were men

17  or women; right?

18  A.   Correct.  I just assumed men.

19  Q.   And you didn't know whether they were short or tall or

20  fat or skinny or bearded or anything; right?

21  A.   No, I didn't know.

22  Q.   Didn't know their ages?

23  A.   No.

24  Q.   Didn't know any distinguishing characteristics about

25  them, did you?

1    A.    No.

2    Q.    You only knew that they were OTMs, other than Mexican.

3    A.    Yes.

4    Q.    And you assumed when you saw two guys with Scott outside

5    on the -- outside on the driveway for five minutes or so, you

6    assumed that those two guys must be the two people that had

7    supposedly left Ajo the day before?

8    A.    Yes.

9    Q.    Those two people were supposed to have been in Phoenix by

10   then; right?

11   A.    Unknown.  I don't know.  It can take several days.

12   Q.    But what you wrote in your report was that they matched

13   the description of the guys that were -- of the two missing

14   migrants.

15   A.    Yes.

16   Q.    They matched the description in your mind because you

17   made assumptions.  Is that a fair statement?

18   A.    Yes.

19   Q.    And based on those assumptions, you and Agent Burns, as

20   well as other assumptions, but based on those assumptions, you

21   and Agent Burns decided at that point to do what's called a

22   knock-and-talk; right?

23   A.    Yes.

24   Q.    Actually, I should say you guys decided to seek

25   permission to do a knock-and-talk.

1    A.    Yes.

2    Q.    And a knock-and-talk is a way to go up onto a property

3    without a warrant; is that right?

4    A.    Yes.

5    Q.    You can go onto private property, if you get permission

6    from your supervisors, without a warrant, and you can engage

7    in what's called a consensual encounter; right?

8    A.    Yes.

9    Q.    And that was your intention when you guys went from the

10   listening post, I'm sorry, the observation post, to the Barn?

11   A.    Yes.

12   Q.    You didn't go alone?

13   A.    No.

14   Q.    You had backup?

15   A.    Yes.

16   Q.    Had in the neighborhood of 10 or 12 agents besides you on

17   the property?

18   A.    Yes.

19   Q.    And you met them on Snyder Road in a convoy of vehicles

20   coming up Snyder Road; is that right?

21   A.    Myself and my partner, we met I think the first vehicle

22   and ran in with them.  So, I mean, I think a convoy followed

23   eventually.

24   Q.    And when you say ran in with them, do you mean you jogged

25   onto the property while the vehicles, some of the vehicles at

 1  least, pulled onto the Barn property?

 2  A.   Yes.

 3  Q.   And you immediately split off to the left, to the east;

 4  right?

 5  A.   Yes.

 6  Q.   Meanwhile, Agent Burns went further to the south?

 7  A.   Yes.

 8  Q.   And that's when Agent Burns, while you were arresting or

 9  having the migrants come out of the house, or the first

10  migrant come out of the house, at least, that's when Agent

11  Burns was off dealing with Dr. Warren?

12  A.   Can you repeat that, please?

13  Q.   You ran off to the east of the house, and while you were

14  doing that, that's when Agent Burns was engaged with

15  Dr. Warren?

16  A.   Yes.

17  Q.   He was over on the southwest side of the house, more or

18  less; is that fair?

19  A.   I don't know.  I assume so.

20  Q.   You were -- you were paying attention to your own officer

21  safety at that point; right?

22  A.   Yes.

23  Q.   You were -- is it fair to say you were on high alert?

24  A.   Yes.

25  Q.   You wanted to stay safe?  You wanted to keep your fellow

 1  officers safe; right?

 2  A.   Yes.

 3  Q.   You also wanted to arrest those migrants; right?

 4  A.   Wanted to investigate the migrants.

 5  Q.   Now, one of the things I wanted to ask you about Scott,

 6  once you did decide to arrest him, you decided to and

 7  immediately put handcuffs on him; right?

 8  A.   We told him that he was under arrest, and we searched him

 9  and put handcuffs on him.

10  Q.   And then you took him to the squad, not the squad car,

11  but to the unmarked vehicle?

12  A.   Yes.

13  Q.   And Scott was compliant; right?

14  A.   Yes.

15  Q.   He didn't try to get away?

16  A.   No.

17  Q.   You never heard him running towards the Barn, shouting,

18  La Migra or anything like that; right?

19  A.   No.

20  Q.   No.  What you did hear of Dr. Warren was he was speaking

21  in a conversational tone with Agent Burns; right?

22  A.   From what I remember, yes.

23  Q.   I mean, it was not -- it wasn't shouting.  There wasn't

24  -- it wasn't like there was a fight going on or anything, was

25  it?

 1  A.   No, it wasn't shouting, but maybe a little bit louder

 2  than normal, not like a casual conversation, but --

 3  Q.   But polite; is that fair?

 4  A.   Yes.

 5  Q.   He didn't try to stop you from arresting either Kristian

 6  or Jose, did he?

 7  A.   When he arrived, he didn't say anything to me.  I don't

 8  know what he said to my partner prior.

 9  Q.   But from watching him, you didn't see anything that he

10  did that you observed to interfere; is that correct?

11  A.   From what I remember, when he made contact --

12  Q.   Actually, before you tell me that, can you answer my

13  question more directly?

14         MR. WALTERS:  Objection, Your Honor.  He's cutting

15  the witness off.

16         THE COURT:  Just be sure you answer his question.

17  Fair enough?

18  BY MR. KUYKENDALL:

19  Q.   And my question is, did you observe him do anything to

20  interfere with your arrest of the migrants?

21  A.   He abruptly stopped talking as soon as he saw Kristian.

22  Q.   That interfered with your arrest of Kristian?

23  A.   No.  It was just what I remember.  He did not interfere.

24  Q.   Okay.  So just clarify this for the jury.  Did Dr. Warren

25  interfere with the arrest of Kristian or Jose?

CROSS-EXAMINATION OF JOHN MARQUEZ

1   A.   What I saw, no, he did not.

2   Q.   After you did put Dr. Warren in the unmarked squad or

3   police car -- I show my age when I say "squad car."  After you

4   put him in the vehicle, you went back to the scene; is that

5   right?

6   A.   Yes.

7   Q.   And by that point, one of the other agents that was there

8   had assisted Agent Burns, and they'd arrested the second

9   migrant?

10   A.   I think so.

11   Q.   And at that point you had two migrants in custody, and

12   you had Dr. Warren in custody; is that right?

13   A.   When I returned, yes.

14   Q.   And at that point, I think you said earlier, but just to

15   be clear, you didn't have a search warrant, did you?

16   A.   No.

17   Q.   Ultimately there was a search warrant, but that was like

18   five days later; right?

19   A.   I don't remember how many days, but yes, several days

20   later there was a search warrant.

21   Q.   At the time that you returned to the entrance to the

22   Barn, around the east side entrance to the Barn, Dr. Warren's

23   in custody, both the migrants are in custody.

24        Is that right?

25   A.   Yes.

CROSS-EXAMINATION OF JOHN MARQUEZ

1   Q.   You don't have a warrant?

2   A.   Yes.  We don't have a warrant.

3   Q.   But you go inside?

4   A.   Yes.

5   Q.   And you do that because there's something called

6   protective sweep; right?

7   A.   Yes.

8   Q.   And a protective sweep's, again, for officer safety?

9   A.   Yes.

10   Q.   It's not to look for stuff?  It's for officer safety?

11   A.   Yes.

12   Q.   It's not to do a search.  It's to make sure there's not

13   another person in there that could hurt one of your officers?

14   A.   Yes.

15   Q.   That's what a protective sweep is; right?

16   A.   Yes.

17   Q.   You did a little more than a protective sweep, didn't

18   you?

19   A.   No.

20   Q.   You took pictures while you were inside, didn't you?

21   A.   Yes.

22   Q.   And you wrote a report the same day as you arrested

23   Dr. Warren, January 17th; right?

24   A.   Yes.

25   Q.   And in the report that you wrote on January 17th, you

CROSS-EXAMINATION OF JOHN MARQUEZ

1  didn't mention that you were in the structure without a

2  warrant taking pictures, did you?

3  A.    No.

4  Q.    In fact, you didn't mention it the next day, did you?

5  A.    No.

6  Q.    Or the next day or the next day or the next day?

7  A.    I did draft an addendum to my report.  I'm not sure what

8  day I typed it up.  I know I did send it several days later,

9  but there was an addendum.

10 Q.    You did an addendum on February 1, didn't you?

11 A.    That was when it was submitted, yes.

12 Q.    Okay.  And February 1 was after you'd gone back to do a

13 search warrant; right?

14 A.    Yes.

15 Q.    And when you were there during the search warrant, which

16 was January 22, five days after Scott's arrest, when you were

17 there helping with the search warrant being executed, that's

18 when you noticed that there was some differences in the Barn

19 from when you had been inside, without a warrant, taking

20 pictures?

21 A.    Can you restate that, please?

22 Q.    I think that's fair.  That was a long question.

23 A.    Yeah, I'm sorry.

24 Q.    That's all right.  I don't want to confuse you.

25 A.    Okay.

CROSS-EXAMINATION OF JOHN MARQUEZ

1   Q.   I want to ask good questions, so let's break it down.

2   A.   Okay.

3   Q.   January 17th, that's when you go in without a warrant and

4   you take pictures?

5   A.   Yes.

6   Q.   You write a report that day, and you don't mention it?

7   A.   Yes.

8   Q.   You don't mention it the rest of that week, the following

9   week.  You don't put it into anything written until February

10  1?

11  A.   It was probably written but maybe not published, I guess

12  you could say.

13  Q.   Okay.  And what my question is, is -- well, you were

14  aware when you went to conduct -- to help conduct the search

15  warrant on the 22nd, you were aware that things looked a

16  little bit different, weren't you?

17  A.   I was aware.  I showed up at the end of the search

18  warrant, pretty much near the end, and I was aware that there

19  were differences.  From when I arrived and arrested the

20  defendant to the day that the search warrant was executed,

21  there were differences.

22  Q.   And part of the reason you were aware of that was because

23  you had been inside the warrant -- I'm sorry -- you had been

24  inside the Barn without a warrant taking pictures on January

25  17th; isn't that right?

CROSS-EXAMINATION OF JOHN MARQUEZ

1   A.   Also from my own -- just my own memory.

2   Q.   That's fair.  But also because of the pictures?

3   A.   I would mostly attribute it to my own memory.

4   Q.   And let's talk a little bit about the execution of that

5   search warrant.  Okay?

6   A.   Okay.

7   Q.   You've testified that it occurred on January 22; right?

8   A.   Yes.

9   Q.   And are you aware that the Barn was completely unsecured

10  for five days after you arrested Scott?

11  A.   I was not aware.

12  Q.   Are you aware right now?

13  A.   No.  I was aware when they did the search warrant that it

14  was unsecured.

15  Q.   You mean you became aware when you did the search warrant

16  that nobody secured it?

17  A.   So after the arrest, no, the Barn was not secured.

18  Q.   And by "not secured," what we mean is, the door wasn't

19  even locked; right?

20  A.   I don't know.  I didn't make -- I didn't serve the search

21  warrant.  I didn't make entry during the search warrant.  I

22  don't know.

23  Q.   You know that you didn't secure the Barn.

24  A.   No, I did not secure the Barn.

25  Q.   And you actually know that nobody else secured the Barn;

1  is that a fair statement?

2  A.   Yes.  No one else secured the Barn.

3  Q.   In fact, from your review of the evidence that was

4  obtained during the execution of the search warrant on January

5  22, you know that a bunch of people went in and out of the

6  Barn; right?

7  A.   No, I didn't know if people came and went to and from the

8  Barn between the arrest and the search warrant.

9  Q.   Were you aware of receipts that were found in the trash

10  that were dated January 19th at the Barn?

11  A.   No, I don't have any recollection of seeing that.

12  Q.   Were you aware of handwritten notes from people that

13  thanked other folks that had used the Barn, and they were

14  dated the 19th and 20th?

15  A.   No.  I do know that people did come to the Barn wanting

16  to stay there the day that we arrested the defendant.  It was,

17  like, two -- two vans full of young, like, elementary school

18  children.  I don't know if they stayed there or not.

19  Q.   How many agents are at the Ajo station?

20  A.   I would say around 450.

21  Q.   Have you ever executed a search warrant before?

22  A.   I did observe a search warrant before, just securing the

23  perimeter, but I was just there as an auxiliary, for manpower,

24  just to secure the perimeter.

25  Q.   Have you ever secured a crime scene?

CROSS-EXAMINATION OF JOHN MARQUEZ                                           88

 1  A.   When it becomes a crime scene in the Border Patrol, our

 2  most -- our most prolific crime scenes were load vehicles, the

 3  vehicles that were loaded with thousands of pounds of

 4  marijuana, and I have secured those as I guess you could call

 5  them mobile crime scenes, and I do have experience securing

 6  those, but in terms of a structure or an apartment or a

 7  residence after a crime had occurred, I did not have any

 8  experience securing those types of crime scenes.

 9  Q.   Is it fair to say that, just as a trained law enforcement

10  officer, that you understand the importance from a -- from a

11  forensic standpoint, if nothing else, you understand the

12  importance of securing a crime scene?

13  A.   Yes.

14  Q.   And the -- can you explain the importance to the jury of

15  securing a crime scene?

16  A.   Just securing the area, making sure that nothing comes in

17  or out, no people or anything else.

18  Q.    I just mean it's important because, if you're looking

19  for evidence and you don't secure the crime scene and people

20  come in and out and in and out, then it's a polluted crime

21  scene; right?

22  A.   Yes.

23  Q.   And if it's a polluted crime scene, then it doesn't

24  render valid evidence, does it?

25  A.   I suppose not.

 1   Q.   I want to talk a little bit about the evidence that you

 2   did seize from Scott.

 3           MR. KUYKENDALL:  Can you hand me 261?

 4           MS. KNIGHT:  (Supplying document to Mr. Kuykendall.)

 5           MR. KUYKENDALL:  Thank you.

 6   BY MR. KUYKENDALL:

 7   Q.   Can you see that all right?

 8   A.   Yes.

 9   Q.   What I'm showing you -- well, can you say what Exhibit

10   261 is for the jury?

11   A.   It is text messages between myself and Donald or Donnie

12   Ebann.

13   Q.   Donnie Ebann is the guy from Fish and Wildlife Services

14   that you were texting back and forth with on January 17;

15   right?

16   A.   Yes.

17   Q.   And I'm going to -- this is where you advise, "Hey, me

18   and my partner Brendan are going to set up for a few hours to

19   watch the Barn.  Our white Jeep will be parked at your house."

20       Right?

21   A.   Yes.

22   Q.   And he says, "10-4.  Thanks.  NMD's going to be on the

23   news, Channel 4 tonight."

24       Right?

25   A.   Yes.

CROSS-EXAMINATION OF JOHN MARQUEZ

1  Q.   And you wrote, "Oh, wow.  That's awesome."  Oops.  I'm

2  sorry.  I didn't read the whole thing.

3  A.   All right.

4  Q.   He wrote, "NMD is going to be on the news, Channel 4

5  tonight at 10 p.m., talking about vandalism to their water

6  drop sites."

7       Right?

8  A.   Right.

9  Q.   And you wrote, "Oh, wow.  That's awesome.  Wonder who

10 they're going to blame?"

11      Right?

12 A.   Yes.

13 Q.   And then you had a few more texts with him, and this is

14 all during the time that you're surveilling the Barn; right?

15 A.   Right.

16 Q.   And then, ultimately, after you've arrested Scott, he

17 writes you and says, "Hope you seized his cell phone;" right?

18 A.   Yes.

19 Q.   And you wrote, "We're about to."  And then you wrote him

20 after that, "He had it on him, thank God."

21      Right?

22 A.   Yes.

23 Q.   And he said, "Good evidence."

24      And you said, "For sure.  We're taking everything very

25 seriously.  Desi is making sure we do things right."

UNITED STATES DISTRICT COURT

1          Is that right?

2    A.   Yes.

3               MR. KUYKENDALL:  Judge, I'd move for the admission

4    of Exhibit 261.

5               MR. WALTERS:  No objection, Your Honor.

6               THE COURT:  It can be admitted.

7    BY MR. KUYKENDALL:

8    Q.   You recognized that seizing Scott's cell phone was a big

9    deal; right?

10   A.   Yes.

11              MR. KUYKENDALL:  May I have one second, Judge?

12              THE COURT:  Sure.

13   BY MR. KUYKENDALL:

14   Q.   You said you read your report that you wrote on January

15   17th, the report you wrote the night of Scott's arrest, or

16   once you got back and wrote it, it was nighttime, you read

17   that recently?

18   A.   Yes.

19   Q.   Tell me, did you say anywhere, in the report that you

20   wrote the same day as you arrested Scott, did you say anywhere

21   anything about snaky motions or up-and-down motions with his

22   hands that you observed?

23   A.   No, I didn't.

24   Q.   And truthfully, what you wrote was, "From my observation,

25   it appeared that Warren was pointing out the mountains and

 1   other landmarks."

 2        Right?

 3   A.   Yes.

 4   Q.   And then the next line is, "The subjects, who were

 5   wearing ill-fitting and dirty clothing, matched the

 6   description of the two illegal aliens who evaded capture from

 7   the day prior."

 8   A.   Yes.

 9   Q.   "Given these facts and the history of this NGO and their

10   previous illicit activities at the Arivaca humanitarian

11   station, I suspected that the two subjects could be illegal

12   aliens."

13   A.   Yes.

14   Q.   But you never said anything in here whatsoever, besides

15   your suspicions, you never said anything whatsoever about

16   Scott making any movements, did you?

17   A.   No.

18   Q.   And you knew that No More Deaths was a humanitarian aid

19   station there at the Barn; right?

20   A.   I knew it was being used.  I didn't know it was an actual

21   station for illegal aliens to come and stay at.

22   Q.   Did you know that the Barn was used to distribute water

23   and supplies?

24   A.   I knew it as, like, almost like a depot.

25   Q.   And you had been investigating the Barn for a few months;

 1  right?

 2  A.   I knew about the Barn for a few months, yes.

 3  Q.   And some of the information that you got about the Barn

 4  turned out to be abjectly false, didn't it?

 5  A.   I don't know.

 6  Q.   Well, for instance, you learned that the owner of the

 7  Barn was somebody named Mimi Phillips; right?

 8  A.   Yeah.  One -- one concerned citizen that I'd interviewed

 9  about the property did say that Mimi Phillips would be the

10  owner of the Barn.

11  Q.   And not just that Mimi Phillips would be the owner, but

12  you wrote it in a report, didn't you, that Mimi Phillips was

13  the owner of the Barn?

14  A.   If I could see that report one more time, I could confirm

15  that.

16  Q.   Sure.  Oops.  I grabbed the wrong one.

17          MR. KUYKENDALL:  May I approach, Judge?

18          THE COURT:  You may.

19  BY MR. KUYKENDALL:

20  Q.   This is Exhibit 95.

21  A.   I don't know if you want that back.

22  Q.   Oh, thank you.

23       And Exhibit 95 is an article that, I'm sorry, a report

24  that you wrote indicating that the Barn was owned by Mimi

25  Phillips; right?

1   A.   Oh, it doesn't say that she owns.  It just said that,

2   "Suspected that Mary Mimi Johnson-Phillips, another Ajo

3   resident, was harboring aliens at a structure located at 1401

4   West Snyder Road, also known as the Barn.  The person also

5   told me that the Barn is also known to some Ajo residents as

6   Mimi's stash house."

7   Q.   And you believed that Mimi Phillips was actually the

8   owner of the Barn?

9   A.   Maybe I did when I talked to her, but after, because this

10  was my initial -- my first time knowing about the property,

11  the Barn, upon research, I did defunct it, and it did turn out

12  to be Carol Johnson was the actual owner.  But this is what

13  she told me.  She told me that Mimi Johnson ran -- or ran it

14  as a stash house.

15  Q.   And you determined that that was actually wrong; right?

16  A.   Yes.  Which part?  I'm sorry.

17  Q.   That Mimi Johnson ran it as a stash house.

18  A.   I never proved it wrong or right.

19  Q.   You also wrote in that same report that ISDA -- oops.  I

20  may have the wrong report.

21       I gave you Exhibit 95, didn't I?

22  A.   Yes, sir.

23  Q.   Do you know what the ISDA is?

24  A.   It's the International Sonoran Desert Alliance.

25  Q.   And the International Sonoran Desert Alliance, is it a

1    suspicious organization in your mind?

2    A.   Now, no.  At the time of this interview, yes.

3    Q.   At the time that you interviewed them, you thought that

4    the International Sonoran Desert Alliance was some suspicious

5    organization because that's what they told you?

6    A.   Yes.

7    Q.   And you found out that that, just like the information

8    about Mimi Phillips, was just completely false?

9    A.   Well, I never disproved the information about Mimi

10   Phillips being completely false, but International Sonoran

11   Desert Alliance I wouldn't say has any part with some of the

12   other things in here.

13   Q.   It's actually an environmental organization, isn't it?

14   A.   I thought it was more of an organization with different

15   communities within, like, Mexico, the Tohono O'odhams, and the

16   United States.

17   Q.   And that was enough for you to find it suspicious and put

18   it in your report?

19   A.   Again, this is what the concerned citizen told me, so I

20   put it in my report.

21   Q.   And because of what concerned citizens had told you, even

22   if they turned out to later be false, that supported your

23   assumption that Scott Warren was doing something illegal.

24        Is that fair?

25   A.   No.  I would say my assumption that something was going

CROSS-EXAMINATION OF JOHN MARQUEZ

1  on on the property.

2  Q.   You would say your assumption that something was going on

3  on the property what?

4  A.   Something illegal was happening at 1401 West Snyder Road.

5  Q.   You assumed before you ever went out there that something

6  illegal was happening; right?

7  A.   Could be.  Could be happening.

8  Q.   And that's why you were investigating Scott Warren,

9  because you assumed that his intentions were illegal?

10  A.   No.  I looked into Scott because he was associated with

11  these organizations.

12  Q.   And you assumed that the organizations were doing

13  something illegal?

14  A.   I assumed that they were using the property to do

15  something illegal.

16  Q.   And you assumed that because what they were doing, what

17  you knew they were doing, was providing aid to migrants.

18      Is that fair?

19  A.   I didn't know what they were doing at the property.  I

20  thought the property was more of a depot, like, a place where

21  they would store all of their water.

22  Q.   And that's why you assumed that something was illegal?

23  A.   I didn't know if anything -- yes, I assumed something was

24  going on illegal at the property.

25  Q.   Fair enough.

 1              MR. KUYKENDALL:  That's all my questions, Judge.

 2              THE WITNESS:  Do you want your exhibit back, sir?

 3              MR. KUYKENDALL:  Oh, yeah.  Thank you.

 4              THE COURT:  Mr. Walters?

 5              MR. WALTERS:  Thank you, Your Honor.

 6              MR. KUYKENDALL:  Oh, I'm sorry.  I left some stuff

 7   up here.

 8              MR. WALTERS:  That's okay.  No problem.

 9                          REDIRECT EXAMINATION

10   BY MR. WALTERS:

11   Q.   Agent Marquez, you said you've been a Border Patrol agent

12   for 10 years; right?

13   A.   Yes.

14   Q.   In your experience, do people often criticize the Border

15   Patrol?

16   A.   Yes.

17   Q.   Have they criticized you personally for being a Border

18   Patrol agent?

19   A.   In my personal life, yes, I've been criticized.

20   Q.   Does that make you retaliate against people?

21   A.   No.

22   Q.   Does it change in any way how you go about doing your job

23   as a Border Patrol agent?

24   A.   No.

25   Q.   Do you recall the defense attorney asking you questions

 1   about why you put information about the defendant in your

 2   report?

 3   A.   Yes, I remember.

 4   Q.   When you are trained to write a report, are you trying to

 5   make them thorough?

 6   A.   Yes.

 7   Q.   So did you put -- well, let me ask you this.  Why did you

 8   put all of the information, including information that didn't

 9   signify any criminal activity about the defendant, in your

10   report?

11   A.   Just to explain who he was.

12   Q.   Okay.  And if you had arrested anybody else that day,

13   would you have also put information about that person in your

14   report?

15   A.   Yes.

16   Q.   As a Disrupt agent, you said part of your job was to

17   target alien smuggling and drug trafficking organizations;

18   right?

19   A.   Yes.

20   Q.   Correct me if I'm wrong, but that requires an

21   investigation; correct?

22   A.   Yes.

23   Q.   Okay.  And you start, again, correct me if I'm wrong, but

24   do you start an investigation because you have a suspicion

25   about some type of criminal activity?

 1   A.   Yes.

 2   Q.   Are sometimes those suspicions proven to be wrong?

 3   A.   Yes.

 4   Q.   And at that point are investigations closed?

 5             MR. KUYKENDALL:  Judge, I'm going to object to the

 6   leading nature.

 7             THE COURT:  It is leading.

 8   BY MR. WALTERS:

 9   Q.   What happens when you learn that a suspicion is not

10   accurate?

11   A.   We either dismiss it entirely or look for other evidence.

12   Q.   In an investigation, do you always have everything you

13   need to know about a person or an organization?

14   A.   No, but it's our job to try to find it.

15   Q.   Is part of the reason why -- well, is part of the reason

16   why you conduct an investigation to uncover facts about a

17   person or an organization?

18   A.   Yes.

19   Q.   And again, are -- sometimes are those facts, those

20   suspicions, proven to be wrong?

21   A.   Yes.

22   Q.   But as part of your investigation, you try to uncover

23   facts that --

24             MR. KUYKENDALL:  I'm going to object to the leading.

25             THE COURT:  He just started the question.

 1          MR. KUYKENDALL:  It couldn't have been anything

 2    other than leading.

 3          THE COURT:  He might be leading when he finishes.

 4          MR. KUYKENDALL:  Okay.  I'll wait and object later.

 5    BY MR. WALTERS:

 6    Q.   If you uncover facts during your investigation that

 7    support -- that establish probable cause, what do you do next?

 8    A.   I'm sorry.  When we uncover facts that support probable

 9    cause, what do we do next?  We further investigate or there's

10    different courses of action that we can do.

11    Q.   Is one of those courses of action to arrest people?

12    A.   Yes.

13    Q.   Do you recall the defense attorney asking you or showing

14    you an exhibit about emails that you had sent to an intel

15    agent?

16    A.   Yes.

17    Q.   And those were six-packs; correct?

18    A.   Yes.

19    Q.   With different people in them; right?

20    A.   Yes.

21    Q.   There was also an attachment that said, I think,

22    "NoMoreDeaths.doc;" correct?

23    A.   Yes.

24    Q.   Do you recall what that exhibit was or what that

25    attachment was?

REDIRECT EXAMINATION OF JOHN MARQUEZ

1    A.    No.

2    Q.    Okay.  Do you recall the defense attorney asking you

3    about other people that you saw, and I think his words were

4    white people that you saw or Caucasians that you saw, on the

5    property?

6    A.    Yes.

7    Q.    And do you recall him asking you if you had arrested any

8    of those people?

9    A.    Yes, I remember asking.

10   Q.    Did you ever see any of those people giving directions to

11   two people you thought were in the United States illegally?

12   A.    No.

13   Q.    Did you ever see any of those other people ever speak to

14   the two people you suspected of being in the United States

15   illegally?

16   A.    No.

17   Q.    Why didn't you arrest him?

18   A.    We never saw them interact or go inside the Barn that

19   day.  They stayed outside.

20   Q.    Did you believe you had probable cause to arrest them?

21   A.    No.

22   Q.    If you had probable cause to arrest them, would you have

23   done so?

24   A.    Yes.

25   Q.    Do you recall the defense attorney asking you a question

REDIRECT EXAMINATION OF JOHN MARQUEZ

1  and part of your answer involved Arivaca?

2  A.   Yes.

3  Q.   What's that about?

4  A.   I know several years ago Border Patrol agents served a

5  search warrant on a humanitarian aid camp in Arivaca.  I don't

6  know exactly the specifics of it, but I do know it did yield

7  in the arrest of a few illegal aliens.

8  Q.   Okay.  In terms of the concerned citizen that you spoke

9  to, did they -- did they also tell you -- and people -- sorry.

10  Concerned citizens and other people living around the Barn,

11  did they give you specific information about what they

12  believed was going on at the Barn?

13  A.   I do remember one of them telling me that there was a --

14         MR. KUYKENDALL:  I'm going to object.

15         THE COURT:  He wanted you to say either yes or no.

16  BY MR. WALTERS:

17  A.   Yes, they gave me other information about the Barn.

18  Q.   Okay.  Did part of that information include black water

19  jugs?

20  A.   Yes.

21  Q.   Did part of that information include carpet booties?

22  A.   Yes.

23  Q.   And can you explain to the jury what black water jugs

24  are, why black water jugs are significant to you as a Border

25  Patrol agent?

REDIRECT EXAMINATION OF JOHN MARQUEZ

1  A.   So black water jugs come from Mexico.  They're given to

2  both drug mules and aliens traveling through the desert.

3  They're black because they don't refract light like a clear

4  water jug would do, so to evade detection by carrying your

5  water, they're just black plastic jugs.

6  Q.   And can you explain to the jury why carpet booties are

7  significant to you as a Border Patrol agent?

8  A.   Again, they come from Mexico.  They're only, to my

9  knowledge, made in Mexico, and they're given to both drug

10  mules and aliens traversing through the desert.  They --

11  they're made of fabric, and on the bottom is carpet, like

12  literally maybe not carpet like this, but maybe carpet at your

13  home.  They slip on over your shoes, so the carpet is on the

14  bottom, and it's used to mask or age footprints.  So it would

15  make my job harder to try to track them throughout the desert.

16  Q.   And along with the other reasons that we've talked about,

17  were those also partly why you believed that it would be a

18  good idea to go surveil the Barn that day?

19  A.   Yes.

20         MR. WALTERS:  May I have a minute, Your Honor?

21         THE COURT:  You may.

22         MR. WALTERS:  I have nothing further, Your Honor.

23         THE COURT:  If the jurors have any questions, please

24  place them in writing.

25         I hear at least one.  That's my telltale sign, I

1    hear paper being torn.

2              (The following proceedings occurred at sidebar.)

3              THE COURT:  "Is it illegal to take pictures without

4    a search warrant?"  I don't know that they know the answer to

5    that question.

6              MR. KUYKENDALL:  Do we have numbers on those?

7              THE COURT:  They're not numbered.

8              MR. KUYKENDALL:  Okay.

9              THE COURT:  "Were black water jugs or carpet booties

10   found at the Barn?"  I'll ask that.

11             Oh, God.  "Is providing humanitarian aid to an alien

12   against the law?"  I'm not going to ask that.

13             "Did the witness find any black water jars or carpet

14   booties in the Barn?"  I'm going to cover that.

15             "Why did he first arrest Dr. Warren before the

16   suspected alien?"  I think --

17             MR. WALTERS:  Yeah, he testified the opposite.

18             MR. KUYKENDALL:  I think he arrested Warren before

19   the second alien was brought out.

20             THE COURT:  Okay.  All right.  I'll have him clarify

21   that.

22             MR. WALTERS:  Okay.

23             THE COURT:  All right.  That's it.

24             (End of sidebar conference.)

25             THE COURT:  I have a couple of questions from the

JURY EXAMINATION OF JOHN MARQUEZ

1    jurors I'm going to ask on their behalf.

2              THE WITNESS:  Okay Your Honor.

3              THE COURT:  Did you find any black water jars or

4    carpet booties -- and/or carpet booties in the Barn?

5              THE WITNESS:  In the Barn, no.

6              THE COURT:  Why did you first arrest Dr. Warren

7    before the suspected illegal alien?

8              THE WITNESS:  Excuse me?

9              THE COURT:  Why did you first arrest Dr. Warren

10   before the suspected illegal alien?

11             THE WITNESS:  Before the suspected?

12             THE COURT:  Give us the sequence of who was arrested

13   first.

14             THE WITNESS:  The first -- Kristian Villanueva was

15   arrested first after his immigration inspection.  Then we

16   arrested Dr. Warren.

17             THE COURT:  And then?

18             THE WITNESS:  And then they found the second alien

19   hiding inside the bathroom, and he was arrested.  So it went

20   alien, Perez-Villanueva, then Dr. Warren and then the second

21   alien.

22             THE COURT:  Mr. Walters, any questions based upon

23   the jurors' questions?

24             MR. WALTERS:  May I have a minute, Your Honor?

25             THE COURT:  Sure.

1                         FURTHER EXAMINATION

2   BY MR. WALTERS:

3   Q.   Agent Marquez, just to clarify, the black water jugs and

4   carpet booties, you answered that none of that was located in

5   the Barn; correct?

6   A.   Correct.

7   Q.   Based on what you had learned, though, had people told

8   you about these items?

9           MR. KUYKENDALL:  I'd object to this.  This is

10  calling for a hearsay response.

11          THE COURT:  Let me hear your question.  Go ahead.

12          MR. KUYKENDALL:  And also, Your Honor, it's effect

13  on the listener because it shows why he took certain

14  investigative steps.

15          THE COURT:  Go ahead.

16          MR. KUYKENDALL:  Thank you, Your Honor.

17  BY MR. KUYKENDALL:

18  Q.   Again, people had told you they had found or seen black

19  water jugs and carpet booties around, in the area surrounding

20  the Barn; correct?

21  A.   Yes.

22  Q.   And is that why you took certain investigative steps, for

23  example, to surveil the Barn that day?

24  A.   Yes.

25          MR. WALTERS:  I have nothing further, Your Honor.

```
 1              THE COURT:  Mr. Kuykendall?
 2                      FURTHER EXAMINATION
 3  BY MR. KUYKENDALL:
 4  Q.   The people that had told you that, that they'd seen
 5  carpet booties and black jugs around the Barn --
 6  A.   Yes.
 7  Q.   -- those people you later found out were erroneous about
 8  other things they told you; right?
 9  A.   On the way to the -- our LPOP, there was I think either
10  carpet booties or black water jugs just a tenth of a mile
11  away.  So I mean, I don't know where they saw them, but from
12  what I saw in close proximity to the Barn, if you consider a
13  tenth of a mile in close proximity, then, yeah, some of the
14  trash was there.
15  Q.   My question to you is, these anonymous sources that you
16  relied on, they turned out to be wrong about who even owned
17  the Barn, for instance; right?
18  A.   And like I read earlier, it said that Mimi just ran it,
19  didn't -- I didn't say she had ownership of the property.
20  Q.   And to be truthful, in your experience around Ajo, black
21  water jugs and carpet booties are all over the place, aren't
22  they?
23  A.   Yes.
24              MR. KUYKENDALL:  That's all my questions.  Thank
25  you.
```

```
1              THE COURT:  Thank you.
2              We're going to take our lunch break.  We're going to
3    come back at 1:30.  Remember the admonitions.  Don't discuss
4    the case, research the case, let anybody talk to you about the
5    case.  Enjoy your lunch.  1:30.
6              (The jury exits the courtroom.)
7              THE COURT:  Folks, if you'll all hold up just a
8    minute.  I'm trying give the jurors a head start.
9              Let me see counsel just one second.
10             (The following proceedings occurred at sidebar.)
11             THE COURT:  While the questions are not numbered, I
12   write either yes or no on the questions that I asked.
13             MR. KUYKENDALL:  And then make them part of the
14   record?
15             THE COURT:  I make them part of the record.
16             MR. KUYKENDALL:  All right.
17             THE COURT:  Have a good lunch.  1:30.
18             (Lunch recess taken.)
19             MR. KUYKENDALL:  Your Honor, I had one issue, if I
20   could approach.  I think we're all clear on this, but --
21             THE COURT:  Counsel?
22             (The following proceedings occurred at sidebar.)
23             MR. KUYKENDALL:  I only wanted to make sure that
24   we're all in agreement that there's not going to be a mention
25   of either his Fourth or his Fifth Amendment invocation.
```

1          MR. WALTERS:  At this point, I just don't know if we

2   can agree to that, because I think the reason why he's

3   bringing this up is because he's specifically asked the

4   question of, did the defendant do anything to obstruct your

5   investigation or the arrest of these two illegal aliens, and I

6   think --

7          THE COURT:  By not telling him that they're there,

8   that's obstructing?

9          MR. WALTERS:  Yes, Your Honor, and so I think it's

10  something that we need to think about and do some research on

11  overnight to determine whether we can agree with that or not.

12         MS. WRIGHT:  And for the Court's information, I'm

13  calling Agent Burns next.  I do plan on asking him the same

14  questions I did as last time about --

15         THE COURT:  Oh, I don't remember those.

16         MS. WRIGHT:  Come on.  No.  While he's standing --

17  and we've litigated these, again, but while he's standing and

18  talking to the defendant in the driveway, prearrest,

19  preMiranda, the defendant didn't tell him about anyone in the

20  Barn, et cetera.  On the walk over, he did didn't tell them

21  anyone's in the Barn.  It's not a Fifth Amendment issue.

22  We've litigated that.  Once he gets over that --

23         THE COURT:  You know, that Ninth Circuit case that

24  says that you can do that really is weird.

25         MS. WRIGHT:  But it says it.

1              MR. KUYKENDALL:  It doesn't really say that, but I
2    do agree we've litigated it, and you've ruled improperly on
3    it.
4              But what I -- what I don't want is to have you rule
5    improperly that it's obstruction because a person uses their
6    rights.
7              THE COURT:  We're not going to get to that.
8              MS. WRIGHT:  I'm not -- yeah, I'm not going to do
9    that with this witness today.
10             THE COURT:  All right.
11             MS. WRIGHT:  He may be subject to recall.
12             THE COURT:  I'm going to look at the case law again
13   too.
14             MS. WRIGHT:  Okay.  Thank you.
15             THE COURT:  All right.  Think about it.
16             All right.  Bring them in.
17             (End of sidebar conference.)
18             MS. WRIGHT:  And Judge, we already have him -- oh,
19   I'm sorry.  We already have a witness here.
20             THE COURT:  I meant the jurors.
21             MS. WRIGHT:  Yeah, I'm sorry.
22             (The jury enters the courtroom.)
23             THE COURT:  Let the record show the jurors returned
24   back to the courtroom, the presence of all counsel and the
25   defendant.

1          You may call your next witness.

2          MS. WRIGHT:  Thank you, Your Honor.  The United

3    States calls Border Patrol Agent Brendan Burns.

4                     BRENDAN BURNS, WITNESS, SWORN

5          THE CLERK:  Thank you.  Please be seated.

6          Please speak directly into the microphone.  State

7    your full name for the record, and spell your last name.

8          THE WITNESS:  My name is Brendan Burns.  My last

9    name is spelled B-u-r-n-s.

10          THE COURT:  Sir, the Rule has been invoked in this

11    case.  That means, except during the time that you're

12    testifying, you must remain outside the courtroom, and it also

13    means you're only allowed to discuss your testimony with the

14    attorneys involved in the case.

15          THE WITNESS:  Yes, Your Honor.  I understand.

16          THE COURT:  You may proceed, Ms. Wright.

17          MS. WRIGHT:  Thank you, Your Honor.

18                        DIRECT EXAMINATION

19    BY MS. WRIGHT:

20    Q.   Agent Burns, where do you work and what do you do for a

21    living?

22    A.   I'm a U.S. Border Patrol agent.  I'm currently assigned

23    to the Beecher Falls Border Patrol station, and that's in

24    Canaan, Vermont.

25    Q.   And how long have you been stationed there in Vermont?

DIRECT EXAMINATION OF BRENDAN BURNS

1   A.   Just over one year.

2   Q.   Before you were in Vermont, where were you?

3   A.   I was assigned to the Ajo Border Patrol station.

4   Q.   And how long were you assigned to Ajo?

5   A.   Approximately seven and one-half years.

6   Q.   Are those the only two stations that you served with with

7   Border Patrol?

8   A.   Yes, ma'am.

9   Q.   And fair to say Vermont's a long way away?

10  A.   Yes, ma'am.

11  Q.   And it's a little colder there right now?

12  A.   Very much so.

13  Q.   How did you make the transfer from here to there?

14  A.   That was a, excuse me, a transfer I had to apply for.  It

15  was merit based.

16  Q.   Okay.  So it's not a punishment that you've been sent

17  from sunny Arizona?

18  A.   No, ma'am.

19  Q.   Okay.  And altogether how many years have you been with

20  Border Patrol?

21  A.   Just under nine.

22  Q.   Now, were you stationed in Ajo in January of 2018?

23  A.   Yes, ma'am.

24  Q.   And let me see.  What were your duties at that time?

25  A.   At that time I was assigned to the station's Disrupt

DIRECT EXAMINATION OF BRENDAN BURNS

1   unit.

2   Q.   What's that?

3   A.   The Disrupt unit is a plain-clothes enforcement unit, and

4   that focused on the facilitators of alien and drug smuggling

5   in that area.

6   Q.   And when you say facilitators of alien and drug

7   smuggling, can you kind of break that out into layperson talk?

8   A.   Yep.  They're persons that are on the United States side

9   and facilitate smuggling of both people and narcotics by

10  providing food, water, direction, shelter.

11  Q.   Okay.  Now, in January of 2018, how long had you been

12  with the Disrupt unit?

13  A.   About one year and nine months.

14  Q.   And how did you get that assignment?

15  A.   That was something I had to apply for and interview for.

16  Q.   I want to talk with you for just a minute about the

17  training you received in order to be able to do your jobs with

18  Border Patrol, and first let's talk about when you first

19  joined Border Patrol.  Did you receive any training in advance

20  of going out into the field?

21  A.   Yes, ma'am.

22  Q.   What was that?

23  A.   Firstly, there was approximately five and a half months

24  of training at the Border Patrol Academy in Artesia, New

25  Mexico.

DIRECT EXAMINATION OF BRENDAN BURNS

1   Q.   What did that consist of?

2   A.   That was law training.  That was defensive tactics,

3   arrest techniques, firearms, driving, and Spanish, first aid.

4   Q.   I was just going to ask you about that one.

5   A.   Okay.

6   Q.   I was ticking them off in my head.

7       Now, when you joined the Disrupt unit, did you have to do

8   any additional training?

9   A.   Yes, ma'am.

10  Q.   What was that?

11  A.   That was an additional two weeks of training.  That was

12  here in Tucson.  That was law.  It was mostly surveillance and

13  countersurveillance, both afoot and vehicles.  It was

14  instructed by attorneys, Border Patrol personnel, and some DEA

15  agents, and that also included some driving and some advanced

16  firearms training.

17  Q.   Now I want to talk to you and turn our attention to the

18  events of January 17, 2018.

19       Were you working with Ajo Disrupt on that day?

20  A.   Yes, ma'am.

21  Q.   What was your shift that day?

22  A.   That day we were working a noon to 10 p.m. shift.

23  Q.   Do you go to muster before you start shift?

24  A.   No, ma'am.

25  Q.   Okay.  So you didn't do muster that day?

 1 | A.   No, ma'am.

 2 | Q.   On that day, did you conduct or do some surveillance at a

 3 | place called the Barn in Ajo?

 4 | A.   Yes.

 5 | Q.   I want to talk a little bit before we move on about what

 6 | the Barn is.  First, is it actually a Barn?

 7 | A.   No, ma'am.

 8 | Q.   How would you describe it?

 9 | A.   I would describe it more of, in its appearance, more of a

10 | rustic-type cabin.

11 | Q.   I'm going to show you Government's Exhibit 6.

12 |          MS. WRIGHT:  Sorry, Sherry.  I forgot to ask for

13 | that.  Thank you.  And it's been admitted.

14 | BY MS. WRIGHT:

15 | Q.   Let's see.  Can you see that there?

16 | A.   I can now.

17 | Q.   Okay.  Thank you.

18 |          THE COURT:  You can publish it.  It's been admitted.

19 | BY MS. WRIGHT:

20 | Q.   Is that the Barn as it appeared back in January of 2018?

21 | A.   Yes, ma'am.

22 | Q.   And let's take a moment just to orient ourselves a little

23 | bit with this.  First, what direction are we looking?

24 | A.   We are facing south.

25 | Q.   Okay.  And so that face of the Barn, is that the

1   north-facing side of the Barn?

2   A.   Yes, ma'am.

3   Q.   Okay.  And over here, this structure, do you know what

4   that is?

5   A.   That is a storage shed.

6   Q.   And then I see here a window; is that right?

7   A.   Yes.

8   Q.   And this here, is that an actual door?

9   A.   It is not.

10  Q.   Tell us a little bit more about that.

11  A.   That door, I believed at first that was the actual door

12  of the Barn.  It turned out it was decorative only.

13  Q.   Were you able -- ever able to enter or exit using that

14  door?

15  A.   No, ma'am.

16  Q.   All right.  Now, let's look at Government's Exhibit 7,

17  and this has also been admitted.  Can you see that all right?

18  A.   Yes.

19  Q.   Make sure I get it all in here.

20       All right.  So if you'd just describe for the jury a

21  little bit, first, which way are we facing?

22  A.   Now we're facing north.

23  Q.   So we're looking at the south side of the property?

24  A.   Yes, ma'am.

25  Q.   And tell us what we're looking at here.

DIRECT EXAMINATION OF BRENDAN BURNS

1  A.   We're looking at both the Barn and the storage shed as

2  viewed from the south.

3  Q.   So this structure here to the left, that's the storage

4  shed?

5  A.   Yes, ma'am.

6  Q.   And then over here with the dish on top --

7  A.   That's the Barn.

8  Q.   That's the Barn?

9  A.   Yes, ma'am.

10  Q.   And then I'd like to show you Government's Exhibit 8,

11  also it's been admitted, and let's start again with which

12  direction we're facing.

13  A.   This time we're facing east.

14  Q.   And so we're looking at the west side of the Barn?

15  A.   That's correct.

16  Q.   And then is this the storage shed we've been talking

17  about?

18  A.   Yes, ma'am.

19  Q.   And is this the Barn over here?

20  A.   Yes.

21  Q.   Now, on that day, let's see, I think you testified that

22  you went and did surveillance at the Barn on that day;

23  correct?

24  A.   Yes, ma'am.

25  Q.   Did anyone else go with you?

DIRECT EXAMINATION OF BRENDAN BURNS

1  A.    Yes, ma'am.

2  Q.    Who went with you?

3  A.    That was Agent John Marquez.

4  Q.    About what time did you go out to do the surveillance?

5  A.    At approximately two o'clock.

6  Q.    And where did you do your surveillance from?

7  A.    From the desert area, just to the north-northeast of the

8  Barn.

9  Q.    About how far away is that?

10 A.    Approximately two to three hundred yards.

11 Q.    Did you have any equipment to help you do surveillance?

12 A.    Yes, ma'am.

13 Q.    What kind of equipment did you have with you?

14 A.    We had a spotting scope that was mounted on a tripod, and

15 we also had a pair of binoculars.

16 Q.    Spotting scope.  I'm going to assume everyone knows what

17 binoculars are, but describe what a spotting scope is for us a

18 little bit.

19 A.    A spotting scope, in looking at it, it just appears to be

20 half a pair of binoculars.  It's variable power allowing you

21 to either zoom in to see greater detail or zoom out to see a

22 greater field of view.

23 Q.    I want to show you -- let me check first -- Government's

24 Exhibit Number 121 and 122, and they've already been admitted.

25 Let's start with 121.

DIRECT EXAMINATION OF BRENDAN BURNS

1     And did you testify, and let me ask you again if you did,

2  about how far away were you from the Barn at that time?

3  A.   I was approximately two to three hundred yards.

4  Q.   And this is Government's Exhibit 121.  Does this show

5  basically your field of view with the naked eye on that day?

6  A.   Yes, ma'am.

7  Q.   And if you could just orient us to direction and what

8  we're seeing here.

9  A.   From here you're facing to the southwest.  You see the

10  north side of the Barn.  You can see the -- what appears to be

11  the east side of the Barn and the area just to the north and

12  northwest of the Barn.

13  Q.   And before I go on to the next exhibit, looking here, is

14  there anything that runs in front of the Barn that we're not

15  able to see clearly with this photo?

16  A.   There, there would be West Snyder Road.

17  Q.   Okay.  And about where is it in the photo?

18  A.   It's just to the front.  If you see the power lines and

19  the poles there, that's on the south side of the road, and so

20  the road runs just in front of those.

21  Q.   Let me show you Government's Exhibit 122 that has been

22  admitted.  Is that a close-up view of the property?

23  A.   Yes.

24  Q.   Is that the same view you had when using the spotting

25  scope that day?

DIRECT EXAMINATION OF BRENDAN BURNS

120

1   A.    Yes.  It's a zoomed-in view.

2   Q.    Okay.  The detail that's here in this photo, were you

3   able to see more, less, or the same amount of detail with the

4   scope?

5   A.    I could see more detail with the spotting scope.

6   Q.    And we'll talk about that a little bit more later, but

7   first let's talk about what we can see in Government's Exhibit

8   122.

9         Do you see where I'm pointing here, these two posts?

10  A.    Yes, ma'am.

11  Q.    What are those and what's going on at the property there?

12  A.    Those are the posts to which an open gate is mounted.

13  Q.    And then over here, is this the Barn?

14  A.    Yes, ma'am.

15  Q.    When you say an open gate, is that wide enough for a

16  vehicle to drive through?

17  A.    Yes, ma'am.

18  Q.    Now, you said you could see a little bit more detail when

19  you were using the spotting scope that day.  What kinds of

20  detail could you see?

21  A.    I could see detail -- zoomed in with a spotting scope, I

22  could see about 60 times what you would normally see with the

23  naked eye.  That's the magnification rate on that scope.

24  Q.    So let's say -- and actually, let me put up 122 again.

25  If someone were to stand -- oh, I did it in the wrong order

DIRECT EXAMINATION OF BRENDAN BURNS

1   there.  Here's 122.

2       If someone were to stand here, between these two posts,

3   would you be able to see that person's face?

4   A.  Yes, ma'am.

5   Q.  Would you be able to see the features on their face?

6   A.  Yes, with a spotting scope I could.

7   Q.  Thank you for clarifying that.

8       Let's talk a little bit more about the events of that

9   day.  While you were there, did you ever happen to see a green

10  vehicle pull up to the Barn?

11  A.  I did.

12  Q.  About what time did that happen?

13  A.  That was approximately 3:22 in the afternoon.

14  Q.  Did anyone get out of that vehicle?

15  A.  Yes, ma'am.

16  Q.  Could you describe that person?

17  A.  It was a male.  He was approximately six feet tall.

18  Slender.  He was wearing a yellow shirt, dark pants, dark

19  vest, and a ball cap.

20  Q.  At that time were you looking through the spotting scope?

21  A.  I believe I was, yes.  I know I was, excuse me.

22  Q.  If you were to see that same person again today, would

23  you be able to recognize them?

24  A.  Yes, ma'am.

25  Q.  Do you see that person here in the courtroom?

1   A.   Yes, ma'am.

2   Q.   Could you please point that person out and describe an

3   item of clothing he's wearing?

4   A.   Yes, ma'am.  The blue and white striped tie over in the

5   corner.

6         MS. WRIGHT:  Your Honor, I'd ask that the record

7   reflect the witness has identified the defendant.

8         THE COURT:  Yes.

9         MS. WRIGHT:  Thank you.

10  BY MS. WRIGHT:

11  Q.   From where you were sitting that day, doing your

12  surveillance, could you see what the defendant did next, if

13  anything?

14  A.   When he exited the vehicle, he walked eastbound toward

15  the Barn.

16  Q.   And we're using Exhibit 6 again.  Can you describe -- and

17  you can use the screen to draw, if that's helpful, but you can

18  also just talk through it.  Describe where you saw the

19  defendant go.

20  A.   Somewhere just to the west side of the Barn here.

21  Because I was farther to the east doing my surveillance, when

22  he walked on the screen, it would be from right to left, in

23  this direction, I didn't see him after he was obstructed by

24  the Barn here.  So he walked toward the Barn in the direction

25  of the arrow and out of my view.

DIRECT EXAMINATION OF BRENDAN BURNS

1  Q.   And so he's walking towards the side, and it's closest to

2  that storage shed we've been talking about?

3  A.   Yes, ma'am, the west side.

4  Q.   Okay.  And I believe if you touch the lower right of your

5  screen, it should clear that mark for us.

6  A.   (The witness complied.)

7  Q.   Thank you.

8       Were you able to see at that time if the defendant went

9  into the Barn?

10  A.   I did not see.

11  Q.   And is that because you couldn't see the operational

12  doors of the Barn at that time?

13  A.   That's correct.

14  Q.   Now, during your surveillance, did you ever become aware

15  that the defendant was outside and visible again?

16  A.   Yes, ma'am.

17  Q.   How did that happen?

18  A.   Agent Marquez informed me that he observed the defendant

19  walking from the Barn to the north-northwest area of the

20  property.

21  Q.   Why is Agent Marquez telling you this instead of you

22  being able to see it yourself?

23  A.   At that time he was using the spotting scope.

24  Q.   So fair to say you can't both use it at the same time?

25  A.   No, ma'am.  We rotated on and off through the shift.

1    Q.   About what time did that happen?

2    A.   Approximately 4:38 in the afternoon.

3    Q.   How long after when you first saw him arrive was that?

4    A.   Approximately an hour and 15 minutes.

5    Q.   And were you able to confirm Agent Marquez's observation?

6    A.   Yes.

7    Q.   And what did you see yourself?

8    A.   I looked through the scope myself, and I saw the

9    defendant standing with two other men.

10   Q.   What side of the Barn or what area was he standing in?

11   A.   On the west-northwest corner.

12   Q.   So let's use Exhibit 6 again.  Can you see on this

13   exhibit where the defendant was standing?

14   A.   I don't believe so.  I think it was farther to the west.

15   Q.   All right.  Let me see if one of the other ones might

16   have that view for you.

17        How about Government's Exhibit, sorry, 121?

18   A.   Okay.  It would be somewhere in this area here.

19   Q.   Okay.  And is that the post that we were talking about

20   earlier that you just circled?

21   A.   Yes.  I wasn't circling the post on purpose.  I just mean

22   in that area.

23   Q.   Okay.  And let me show you 122.  Can you see where he was

24   standing on that one?

25   A.   Yes, ma'am.  It would be somewhere over in this area

1    there.

2    Q.   Okay.  And that's, even if you didn't mean to, near the

3    post and above what looks like maybe a wagon wheel sort of

4    thing?

5    A.   I would describe it best as on the property, inside the

6    fence, west of the Barn, and a little ways north.

7    Q.   Okay.  Thank you.

8         Now, I believe you said that he came outside with two

9    men; is that correct?

10   A.   Yes, ma'am.

11   Q.   And what did these two men look like?

12   A.   They were two Hispanic men.  They were both shorter than

13   the defendant.  I remember one of them one was wearing a baggy

14   blue sweatshirt.

15   Q.   Where were these men standing in relation to the

16   defendant?

17   A.   Just a few feet away.  They were standing together.

18   Q.   Could you tell if they were having any conversation?

19   A.   Yes.

20   Q.   How could you tell that?

21   A.   Looking through the spotting scope, I could see the

22   defendant speaking or appear to be speaking.

23   Q.   Could you hear anything?

24   A.   No, ma'am.

25   Q.   Why not?

DIRECT EXAMINATION OF BRENDAN BURNS

1    A.    We were too far away.

2    Q.    Okay.  So you can't say today what they were saying or

3    not saying, anything like that?

4    A.    No, ma'am.

5    Q.    Now, I believe you said you could see the defendant

6    speaking.

7    A.    It appeared that he was speaking, yes.

8    Q.    Thank you.  I appreciate that.

9          While he appeared to be speaking, did the two men do

10   anything?

11   A.    Yes.  They were standing there looking at him, and at the

12   same time the defendant had his arm raised and was kind of

13   moving it from a northwestern to northeastern direction, and

14   the two men with him were looking in the direction that he was

15   pointing to.

16   Q.    And if you could just show the jury, if you remember, how

17   the defendant was gesturing at that time.

18   A.    Sure.  It was just like at 10 o'clock to two o'clock

19   pointing and gesturing.

20   Q.    And while the defendant was gesturing, what were the two

21   men doing?

22   A.    They were just looking to the north in the direction that

23   he was pointing.

24   Q.    Was there anything significant about the direction the

25   defendant was pointing to you at that time?

DIRECT EXAMINATION OF BRENDAN BURNS

1    A.    To me --

2    Q.    Yes.

3    A.    -- excuse me -- and Border Patrol agents, it was -- in

4    that direction that he was pointing, there were several

5    landmarks that I as a Border Patrol agent know that illegal

6    alien groups use as reference points as they traverse the

7    desert.

8    Q.    Let's talk about those in a little bit more detail.

9    Maybe let's move west to east.

10   A.    Okay.

11   Q.    So starting with the westernmost one, what are those

12   landmarks?

13   A.    The westernmost one, also the closest one, it's just to

14   the northwest of the Barn, it's Childs Mountain.  Childs

15   Mountain, on the top of it -- it's a very large, prominent

16   mountain.  On the top of it are some antennae I believe are

17   used by the Air Force, a big white antenna structure on top of

18   that, and on top of that antenna is a red flashing light.

19   Q.    Let me just pause you there before we move anywhere

20   eastward.  I'm going to show you Government's Exhibit 119,

21   which has been admitted.

22         Do you see Childs Mountain in this?

23   A.    I do.

24   Q.    If you could just point out the structures you were just

25   talking about and explain a little bit of what we're looking

DIRECT EXAMINATION OF BRENDAN BURNS

1    at to the jury.

2    A.    Sure.  You're looking at Childs Mountain from the east

3    facing west.  That is an antenna structure on top, and on the

4    very top of that, there is a red blinking light.

5    Q.    Obviously this is visible during the daylight?

6    A.    Yes, ma'am.

7    Q.    How about at nighttime?  Can it still be used to

8    navigate?

9    A.    Yes.  The light is visible at night.

10   Q.    And now let's move towards the east.  What's the next

11   landmark to the east?

12   A.    To the east would be Crater Range, and that's almost

13   directly north of the Barn.  That is just a range of smaller

14   hills that cross State Route 85 from east to west at about

15   mile marker 33 and -- excuse me -- mile marker 30.

16         Those hills, especially on the west side, have a lot of

17   passes in them that are used by aliens to rest and wait,

18   really, while they're making their way northbound.

19   Q.    And let's continue on further east.  What other

20   landmarks?

21   A.    The Batamote Mountains are to the east.  Batamote Peak

22   is, again, another prominent peek amongst some smaller hills.

23   To the north of that, a very prominent one is Hat Mountain,

24   and that's probably the most prominent and the most visible

25   from this area.  It's very tall, stands alone, flat on top,

1    kind of looks like a top hat in the desert.

2    Q.   Let me show you Government's Exhibit 120, which has been

3    admitted.  Do you see any of those landmarks that you just

4    testified about, do you see any of those in that exhibit?

5    A.   I do.  I see Hat Mountain there.

6    Q.   If you could point that out and just describe generally

7    what our position is here and the view we have.

8    A.   Sure.  From here you're looking to the north, to the

9    northeast, and you'll see Hat Mountain.

10   Q.   Can you tell what position this photograph was taken

11   from?

12   A.   No, ma'am, I don't believe I can.

13   Q.   Would this be the view north from the Barn?

14   A.   Yes.  Hat Mountain is north of the Barn.

15   Q.   Okay.  And same with the Exhibit I showed you previously,

16   119, is this the view north from the Barn?

17   A.   Yes, to the northwest.

18   Q.   Now, let me ask you this.  Why do illegal aliens need to

19   use these to navigate as opposed to, say, going to the nearest

20   highway, hanging a left, and continuing on?

21   A.   Because, by using the landmarks in the desert, they can

22   stay in the desert, away from traffic, away from people, and

23   away from the Border Patrol.

24   Q.   Why would those be important?

25   A.   If they're trying to evade the Border Patrol and enter

DIRECT EXAMINATION OF BRENDAN BURNS

1   the United States without being apprehended, it would be

2   important to stay away.

3   Q.   Now, at some pint in your surveillance, and I think we're

4   up to, about, oh, gosh, 3:20 in the series of events, or maybe

5   a little bit later, I guess 4:30, did you decide to go and

6   investigate further --

7   A.   Yes, ma'am.

8   Q.   -- at the Barn?  Why did you do that?

9   A.   Basically just because of what Agent Marquez had told me

10   about the location and the, you know, what he knew about the

11   property, but mostly based upon what I'd seen, the defendant's

12   actions.

13   Q.   What about those actions made you think that

14   investigating further was a good use of your time?

15   A.   Well, the preface that we'd received a report from --

16            MR. KUYKENDALL:   I'm going to --

17   BY MS. WRIGHT:

18   Q.   Oh, stop there.  I asked a bad question.  I'm going to

19   back it up.

20            So what about what you saw that day --

21   A.   Okay.

22   Q.   -- as opposed to anything else, made you decide to

23   approach the Barn and investigate further?

24   A.   The defendant's actions, seeing those two men there with

25   him, and seeing his hand move to all those areas and those

DIRECT EXAMINATION OF BRENDAN BURNS

 1    landmarks that I know are used by illegal aliens and that I've

 2    apprehended illegal aliens around each one of those landmarks,

 3    and seeing them follow his hand with their eyes in that area

 4    made me believe that he was showing them how to go farther

 5    north into the United States, and so that made me suspect that

 6    those two persons could be illegal aliens.

 7    Q.   Was there anything else about what you observed that day,

 8    as opposed to anything else, that made you think that perhaps

 9    these people could be illegal aliens and you should

10    investigate further?

11    A.   Just that and the clothing that I saw just appeared to be

12    much too large for them and ill-fitting.  To me, that's -- you

13    know, it's common that aliens at what we would call a stash

14    house would change into clothing that they had been wearing

15    after crossing the desert.  They'd shower, put old clothes on,

16    and continue the journey.

17    Q.   And let's break that down.  Certainly you're not saying

18    it's a crime to wear clothes that don't fit you great; right?

19    A.   No, ma'am.

20    Q.   Okay.  So what about having clothes on that don't fit

21    well is consistent with a person maybe being illegally in the

22    United States?

23    A.   That's -- it's just a piece of everything else that I

24    knew --

25    Q.   Okay.

DIRECT EXAMINATION OF BRENDAN BURNS

1    A.    -- at that time.

2    Q.    Did I hear you correctly testify that folks will change

3    after they've walked in the desert into different clothes at

4    some point in their journey?

5    A.    I've seen that happen, yes, that these other facilitators

6    of alien and drug smuggling, if they utilize their homes,

7    they'll shower, they'll put fresh clothes on after walking for

8    so far.

9    Q.    And would these be clothes that they packed with them, or

10   would these be clothes provided by someone else?

11   A.    They're usually provided by someone else.

12   Q.    Okay.  Now, so you decided to approach the Barn.  Before

13   you did that, did you need to coordinate with other law

14   enforcement agents?

15   A.    Yes.

16   Q.    Why did you need to do that?

17   A.    That's a matter of policy.

18   Q.    And how did you do that?  Radio?  Cell phone?  What are

19   we talking about?

20   A.    Both via cell phone and the service radio.

21   Q.    Why did you need to use both?

22   A.    First of all, the station always monitors the radio, so

23   we use the radio to let the station know this is what we've

24   got and this is what we're doing and this is what I need.

25   They're in the best position to coordinate that.

1        The cell phone is to reach all the members of the Disrupt

2   unit.  The Disrupt unit, a lot of different guys on there were

3   working different projects in different parts of the Ajo area

4   of responsibility where we have many different, you know,

5   service radio repeaters, so you don't know what channel

6   everybody's on if you don't know where they are or what

7   they're doing all the time.  And also, depending on what their

8   activities are, they might not even have a radio on them or

9   might not hear the radio.

10        So the cell phone is the most direct way to reach

11   everybody on the Disrupt unit.

12   Q.   Now, is that a group phone call?  Do you conference call

13   everybody?  Is it a text conversation?

14   A.   No, that was a group text message thread.

15   Q.   And so as I understand it, and correct me if I'm wrong,

16   you used a group text with Disrupt in order to coordinate --

17   A.   Yes, ma'am.

18   Q.   -- because you can be for sure that people will be on

19   their group text, as opposed to maybe on different radio

20   channels?

21   A.   You can be more sure, yes.

22   Q.   Okay.  More sure.  You can never guarantee what anyone

23   else is going to do.

24        All right.  Now, during this group text conversation with

25   the rest of Disrupt, did you use the phrase "toncs?"

1  A.   Yes, ma'am.

2  Q.   What does that mean to you?

3  A.   That's an acronym used by Border Patrol agents to refer

4  to illegal aliens.

5  Q.   Does that phrase -- and I'm sorry.  I forgot to break it

6  down.  It's an acronym.  What does it actually stand for?

7  A.   I've heard it traveling out of native country,

8  temporarily out of native country.  It's T-O-N-C.

9  Q.   Is that a phrase that just applies to people who look

10  Hispanic?

11  A.   No, ma'am.

12  Q.   Who all can it apply to?

13  A.   It can apply to any person from anywhere who's unlawfully

14  present in the United States.

15  Q.   And when you used that phrase on January 17th, what did

16  you mean by that?

17  A.   I meant illegal aliens, suspected illegal aliens.

18  Q.   Now, once you made your plans with the other folks on the

19  Disrupt unit, did you and Agent Marquez go and try to talk to

20  folks at the Barn?

21  A.   Yes.

22  Q.   About what time did this happen?

23  A.   At about 5:35.

24  Q.   Did you go together?

25  A.   Yes.

DIRECT EXAMINATION OF BRENDAN BURNS

1   Q.   Can you just describe for the jury a little bit about how

2   you got from where you were doing surveillance to the

3   property?

4   A.   Yeah, we -- from our position in the desert, it was just

5   on the edge of a wash and some vegetation.  We dropped down

6   into the wash, walked out to the south to West Snyder Road,

7   and then walked West Snyder Road briefly to the west and then

8   into the driveway, through that open gate you saw in that

9   previous picture.

10  Q.   Once you crossed through the open gate -- and actually,

11  let me put this up while you're talking.  Let's see.  Exhibit

12  6, we'll put that back up.

13       Is this taken from the -- oh, sorry.  Is this taken from

14  standing at the gate?

15  A.   Yes, approximately.

16  Q.   Okay.  So please continue.  Once you got through the open

17  gate, what happened next?

18  A.   I was walking toward what I thought was the front door,

19  the main door of the structure that you see there on the left,

20  with Agent Marquez, but then I saw the defendant standing with

21  two other agents on the west side of the Barn, somewhere in

22  this area, and I proceeded over to there.

23  Q.   Why did you do that?

24  A.   The two other agents over there, they weren't Disrupt

25  agents.  I felt it better that I speak with the defendant if

1  anybody was going to, either myself or Agent Marquez, just

2  because I know what I had seen.

3  Q.   Did you eventually go up and speak with the defendant and

4  the two agents?

5  A.   Yes.

6  Q.   Do you remember that conversation perfectly sitting here

7  today?

8  A.   No, ma'am.

9  Q.   Do you remember generally how the conversation went?

10 A.   Yes.

11 Q.   About how long did that conversation happen?

12 A.   It was brief.  I would say between one and two minutes.

13 Q.   How would you describe the tone?

14 A.   It was conversational.  It was like we're talking now.

15 Q.   Okay.  So no yelling or shouting?

16 A.   No, ma'am.

17 Q.   No one being aggressive or rude?

18 A.   No.

19 Q.   Nobody giving commands to anybody else?

20 A.   No, ma'am.

21 Q.   To the best of your recollection today, at the start of

22 that conversation, did you identify yourself to the defendant?

23 A.   I did.

24 Q.   How did you do that?

25 A.   I identified myself verbally as a Border Patrol agent,

1   and I was also wearing my badge on a chain around my neck.

2   Q.   And you previously testified, I think, that Disrupt is a

3   plain-clothes unit?

4   A.   Yes, ma'am.

5   Q.   How were you dressed that day?

6   A.   I was dressed in plain-clothes.  I don't remember exactly

7   what I was wearing, but a long-sleeved shirt, pants.

8   Q.   Okay.  A civilian casual --

9   A.   Civilian attire, yes.

10  Q.   Okay.  Did you tell the defendant your reason for coming

11  onto the property?

12  A.   I did.

13  Q.   What did you tell him?

14  A.   I told him I was there to investigate a report of illegal

15  aliens on the property.

16  Q.   At that point in the conversation, did he tell you

17  something to the effect of that this was private property and

18  there was a humanitarian organization?

19  A.   I don't remember the exact words.  He did say private

20  property, and it was either a humanitarian organization,

21  operation, or location, something to that effect.

22  Q.   At some point in that conversation, did the defendant ask

23  you something to the effect of, how can you be on private

24  property?

25  A.   Yes, ma'am.

1   Q.   And did you respond -- or how did you respond to that

2   question?

3   A.   I just told him that I, like any other person, can walk

4   up to a house and knock on the door to attempt to talk to the

5   owner of the house.

6   Q.   Now, while you were standing up here where we have the

7   red circle on the driveway talking, did the defendant tell you

8   that there were any illegal aliens or migrants staying in the

9   Barn?

10  A.   No, ma'am.  And that's an approximate area.  I don't

11  remember exactly where I was standing.  I know it was on the

12  west side of the Barn, but I'm not sure where I was in

13  relation to that shed, whether I was on the side of it or in

14  front of it here.

15  Q.   That's fair enough.  I'm not going to hold you to six

16  feet one direction or the other.

17  A.   Okay.

18  Q.   More importantly, it's at this point in your encounter

19  when you're still in that driveway.  Did the defendant tell

20  you that there were any illegal aliens or migrants inside the

21  Barn?

22  A.   No, ma'am.

23  Q.   At that time, while you're standing there with those two

24  agents at the driveway, that first point of encounter, did he

25  tell you that there was anyone staying in the Barn that needed

1   medical care?

2   A.   No, ma'am.

3   Q.   At that point, that same point, we're just going to stay

4   right there, did he tell you that anyone at all was staying in

5   the Barn?

6   A.   No.

7   Q.   And did he hand you any kind of medical records or

8   anything to suggest that sort of thing?

9   A.   No, ma'am.

10  Q.   Now, at some point in the conversation, did you tell the

11  defendant that you wanted to go knock on the door of the Barn?

12  A.   Yes, I did.

13  Q.   And did he respond?

14  A.   He did.

15  Q.   What did he say?

16  A.   He said, "I'll go with you."

17  Q.   What happened next?

18  A.   At that time the defendant began to walk around the south

19  side of the Barn to the east side, and I followed him that

20  way.

21  Q.   Let me see.  And as you were walking, during this time,

22  walking from where you first encountered him to that door, did

23  the defendant tell you that there were any illegal aliens or

24  migrants staying in the Barn?

25  A.   No, ma'am.

DIRECT EXAMINATION OF BRENDAN BURNS                    140

```
 1   Q.   Did he tell you there was anyone on that walk over that
 2   was in need of medical care --
 3   A.   No.
 4   Q.   -- inside of the Barn?
 5        And let me get the whole way through.
 6   A.   I'm sorry.  I thought you were finished.
 7   Q.   I appreciate the anticipation, but we have to make it
 8   easier on the court reporter.
 9        So on your walk over, did he tell you that anyone was
10   staying in the Barn that needed medical care?
11   A.   No.
12   Q.   Did he tell you that there was anyone staying there that
13   had received medical care?
14   A.   No.
15   Q.   Did he tell you that anyone at all was staying in the
16   Barn at that time?
17   A.   No, ma'am.
18   Q.   And the purpose of you walking over was to go knock on
19   the door to see who would answer; right?
20   A.   That's correct.
21   Q.   Now, once you made it around to the side of the Barn,
22   what did you see when you got there?
23   A.   When I got to the east side of the Barn, I saw Agent
24   Marquez standing there, and I saw one of the two subjects that
25   I'd seen standing on the northwest corner of the Barn with the
```

DIRECT EXAMINATION OF BRENDAN BURNS

1   defendant sitting in an open doorway.

2   Q.   Okay.  And we're going to use Exhibit 75, which has been

3   admitted, to talk about this.

4           MS. WRIGHT:  Sherry, would you mind -- thank you.

5   You're a mind reader.

6   BY MS. WRIGHT:

7   Q.   All right.  So here's 75, and let me -- and first,

8   recognizing that it's not drawn to scale, do you recognize

9   this as a diagram of the interior of the Barn?

10  A.   Yes, ma'am.

11  Q.   Okay.  Let me see if I've got it.  So if you can just

12  kind of point out generally speaking on this where in relation

13  to the Barn you were standing and talking to the defendant in

14  the beginning.

15  A.   In the beginning?

16  Q.   Uh-huh.

17  A.   When I first encountered him was somewhere over here.

18  Q.   Okay.  And if you can draw for us the path that you took

19  to get to those doors.

20  A.   (The witness complied.)

21  Q.   And so it looks like it went around the back side of the

22  bath and laundry room.  Is that accurate?

23  A.   Yes, ma'am.

24  Q.   At that time, did you know what was in that room?

25  A.   No, I didn't.

DIRECT EXAMINATION OF BRENDAN BURNS

1   Q.   And I believe you testified that one of the men you'd

2   seen talking to defendant was sitting in one of those doorways

3   when you came around the side.

4   A.   Yes.

5   Q.   Okay.  Draw an X where that person was sitting.

6   A.   (The witness complied.)

7   Q.   And then tell us how you knew that was the same person.

8   A.   I recognized the same blue sweatshirt.

9   Q.   Now, once you came around the side there, what happened

10  next?

11  A.   At that time I spoke to the subject sitting down there

12  where I marked the X, and I performed what's called an

13  immigration inspection.

14  Q.   What's an immigration inspection?

15  A.   It's a series of questions that Border Patrol agents use

16  to ascertain somebody's citizenship or to ascertain their

17  right to be in or remain in the United States.

18  Q.   Okay.  So as part of your duties as a Border Patrol

19  agent?

20  A.   Yes, ma'am.

21  Q.   And would you say it's one of your main duties as a

22  Border Patrol agent, to determine whether or not people are

23  lawfully in the United States?

24  A.   Yes.

25  Q.   Now, as a result of that series of questions, what did

1   you learn about that man?

2   A.   I learned he was a citizen of El Salvador and that he had

3   no documents allowing him to be lawfully present in the United

4   States.

5   Q.   So at that point, or maybe letter on, did you identify

6   him or did someone identify him as Kristian Perez-Villanueva?

7   A.   Yes, ma'am.

8   Q.   So as a result of your immigration inspection, you

9   learned that he's in the United States illegally?

10  A.   Correct.

11  Q.   What happens next?

12  A.   At that time I took him into custody.

13  Q.   Why did you do that?

14  A.   He was unlawfully present in the United States.  I'm

15  obligated to make the arrest.

16  Q.   And then what happened?

17  A.   At that time I -- somebody else walked him away from that

18  area, and Agent Marquez placed the defendant into custody.

19  Q.   Then what happened?

20  A.   From there I announced myself.  I did what's called a

21  protective sweep of this bath and laundry room here.  I

22  announced myself into the open doorway as a Border Patrol

23  agent, and then I entered looking for other persons who might

24  be hiding.

25  Q.   Why did you do that?

DIRECT EXAMINATION OF BRENDAN BURNS

1   A.   Well, first of all, I'd seen at least one other subject

2   outside.  We hadn't accounted for him yet.  And the purpose of

3   a protective sweep is to make sure that all agents working in

4   that area are safe because you don't know who could be hiding

5   or waiting inside the open doorway there.

6   Q.   When you did your protective sweep, did you find anyone

7   else in that room?

8   A.   I did.

9   Q.   Who did you find and where?

10  A.   I found the second subject we'd seen standing out front

11  with the defendant.  His name is Jose Sacaria-Goday, and he

12  was attempting to hide in the shower.

13  Q.   Why do you say "attempting?"

14  A.   He was in there holding the shower curtain shut.

15  Q.   So it sounds like you found him.

16  A.   I did, ma'am.

17  Q.   Okay.  And what happened once you found him?

18  A.   He was taken into custody as well.

19  Q.   Why was he taken into custody?

20  A.   He was detained immediately just for hiding when I was

21  conducting a protective sweep, but he was later determined to

22  be unlawfully present in the United States.

23  Q.   Did someone do an immigration inspection with him as

24  well?

25  A.   Yes, ma'am.

DIRECT EXAMINATION OF BRENDAN BURNS                    145

1    Q.   Now, I want to show you a few photos so we can get a

2    visual of the area we're talking of, so if you can just give

3    me a second here.

4         Let's start first with Government's Exhibit 9.  What does

5    that show us?

6    A.   That shows you the doorway -- the northern doorway of

7    those two that were that on the previous diagram.

8    Q.   So let me put up 75 again and have you mark on Exhibit 9

9    where that door is.

10   A.   (The witness complied.)

11   Q.   Okay.  So it's the opposite door from where Kristian was

12   sitting when you came around?

13   A.   That's correct.

14   Q.   Okay.  Apologies, I did not get these -- oh, there we go.

15   Let me now show you Government's Exhibit 20.  Let me take 75

16   out of the way here.

17        What's that?

18   A.   That's the doorway that Mr. Perez-Villanueva was sitting

19   in.

20   Q.   And where does that doorway lead?

21   A.   I'm sorry, ma'am?

22   Q.   Where does that doorway lead?

23   A.   That leads into a laundry/bathroom.

24   Q.   And let's do the same exercise with Exhibit 75, if you

25   can mark for us where that doorway was on Exhibit 75.

 1    A.    (The witness complied.)

 2    Q.    Let me take that away.

 3          So that's the doorway into the bath and laundry room?

 4    A.    Correct.

 5    Q.    And I didn't ask you this before, but can you mark on

 6    here where you found -- I believe it was the second illegal

 7    alien?

 8    A.    (The witness complied.)

 9    Q.    And was that person later identified as Jose Sacaria-

10    Godoy or Goday?

11    A.    Yes, ma'am.

12    Q.    And let me show you Exhibit 23.  Is that where you found

13    Jose?

14    A.    Yes, ma'am.

15    Q.    What is that?

16    A.    That's the shower in the Barn there.

17    Q.    And now let's look at Exhibits 21 and 22, and just

18    briefly describe for us what we're seeing here.

19    A.    Sure.  That's also in the laundry/bathroom of the Barn.

20    It's the toilet.

21    Q.    And Exhibit 22?

22    A.    There you see the sink and the toilet in the

23    laundry/bathroom area, and in that mirror you see reflected

24    the shower that the second subject was hiding in.

25    Q.    So Jose was hiding -- we saw a close-up already, but Jose

DIRECT EXAMINATION OF BRENDAN BURNS

 1  was hiding in this space here?

 2  A.   Yes.

 3  Q.   And this is the room you did the protective sweep in;

 4  right?

 5  A.   Yes.

 6  Q.   Now, once Jose was taken into custody, what happened

 7  next?

 8  A.   I did a protective sweep of the rest of the structure

 9  here.

10  Q.   Why did you do that?

11  A.   Because I didn't know if there was anybody else still

12  unaccounted for, again, to account for everybody that could be

13  around while agents are working outside, for our safety.

14  Q.   Did you find anybody else inside?

15  A.   No, ma'am.

16  Q.   I want to walk you through some of the photos of that

17  space, and we'll just keep referencing back to this diagram,

18  to help folks put it together.

19       So let's start here with Exhibit 10.  What's that a photo

20  of?

21  A.   That's -- excuse me.  That's a photo of the northern door

22  of those two on that previous diagram.

23  Q.   Okay.  And is that the door into the main structure?

24  A.   Yes.

25  Q.   And that's a closer look in, then, from Government's

DIRECT EXAMINATION OF BRENDAN BURNS

1   Exhibit 9, which I'm putting up again; right?

2   A.   That's correct.

3   Q.   So we go from 9, and as we step through the doorway, we

4   see this Exhibit 10?

5   A.   Correct.

6   Q.   Okay.  And let's just keep moving through that space.

7        Exhibit 11.  What are we seeing here?

8   A.   That would be the view if you're looking to the right as,

9   you're standing in that doorway, while I guess looking to the

10  northeast, not directly to the right, but in front of you and

11  to the right.

12  Q.   And before we move on, do you recognize -- and I'm going

13  to point with my pen here, where this poster is, what that is?

14  A.   Do I recognize it?

15  Q.   I'm sorry.  That's a terrible question.  I'll try again.

16  Does that appear to be the inside of where that -- the door

17  that didn't operate?

18  A.   Yes, ma'am.

19  Q.   Okay.  And now -- and before I move on, sorry, I wanted

20  to look at a few more things in this photo.

21       On the wall here, do you see that?

22  A.   I do.

23  Q.   What does that appear to be?

24  A.   That appears to be a map of southern Arizona.

25  Q.   Are you familiar with that map?

DIRECT EXAMINATION OF BRENDAN BURNS

1   A.   Yes.

2   Q.   Do you know what kind of detail that map has on it?

3   A.   Not exactly, no.  I know -- I can see from here that,

4   just from knowing the area myself, that I can see main roads

5   listed.

6   Q.   Okay.  Exhibit 13.  Tell us what we see there.

7   A.   From standing at approximately the center of that room we

8   just moved into, you've turned around now, and you're looking

9   to the south.  You can see the open door we came through, and

10  you can see the kitchen area.

11  Q.   Exhibit 14.

12  A.   From where we just were, turning around, facing north in

13  that same room, facing north-northwest.

14  Q.   And let me take us back a few to kind of give us a little

15  less spinning effect here.  If I show you -- let's look at

16  Exhibit 11.  And now orient us to Exhibit 14 from Exhibit 11.

17  A.   You would turn to the left.

18  Q.   And when you turn to the left, do you see this doorway on

19  the left-hand side?

20  A.   Yes.

21  Q.   Where does that lead?

22  A.   That leads into a bedroom.

23  Q.   Let me show you Exhibit 16.  Is this the photo from that

24  same doorway we were just talking about?

25  A.   Yes.

DIRECT EXAMINATION OF BRENDAN BURNS

1   Q.   And now I'm going to show you Exhibit 17.  What is that a

2   photo of?

3   A.   If you'd entered the room we were just looking into in

4   the previous photo, you're standing in approximately the

5   center of that bedroom looking back toward that door.

6   Q.   And can you also see the photo of that -- or that poster

7   of the flamingo here that we were just talking about a few

8   moments ago?

9   A.   I think the way the light's hitting it I can't really see

10  it.

11  Q.   Let me see if I can make that a little better.

12  A.   Now I can see it, yes.

13  Q.   Okay.  And so standing in the bedroom, looking back into

14  that first room we were talking about?

15  A.   Yes, ma'am.

16  Q.   Let me take these off.  I'm going to show you Exhibit 18,

17  if you can describe for us what we're seeing here.

18  A.   That's if you're standing in the bedroom facing south.

19  Q.   Okay.  So a little bit different angle from standing in

20  the threshold, but looking further into the room now; is that

21  accurate?

22  A.   Correct, yes, ma'am.

23  Q.   All right.  Now, I don't remember, when you did the

24  protective sweep, did you find anyone else in there?

25  A.   No, ma'am.

DIRECT EXAMINATION OF BRENDAN BURNS

1   Q.   And once you did your sweep, what did you do next?

2   A.   I exited the Barn, and I told everybody there to, you

3   know, that we had no more business being inside and to stay

4   out of the Barn.

5   Q.   And at that point, had the defendant, Kristian, and Jose

6   all been arrested?

7   A.   That's correct.

8   Q.   Did you go back into the Barn again that day?

9   A.   No.

10   Q.   And did you arrest anyone other than the defendant,

11   Kristian, and Jose that day?

12   A.   No, ma'am.

13   Q.   I want to move on to a slightly different topic, and

14   actually, let me get my computer started up at this point.

15       Did you later learn that a few days prior, on January

16   14th, Kristian and Jose stopped at a gas station in Why,

17   Arizona?

18   A.   I did.

19   Q.   Where is Why in relation to Ajo?

20   A.   Why is approximately 13 miles south of Ajo.

21   Q.   And where is Why in relation to the border?

22   A.   It's approximately 27 miles north of the international

23   border.

24   Q.   So would I be right in kind of visualizing this, from the

25   border, it's about 27 miles to Why, and then another how many

DIRECT EXAMINATION OF BRENDAN BURNS

1   further north to Ajo?

2   A.   Approximately 13 miles.

3   Q.   How many gas stations are there in Why?

4   A.   Just one.

5   Q.   What's it called?

6   A.   It's called the Why Not Travel Store.

7   Q.   And let me show you what's been marked but not admitted

8   as Government's Exhibits 3-B and 3-C.

9           MR. KUYKENDALL:  No objection.

10          MS. WRIGHT:  And I'll move that we admit them, and

11  there's no objection, Your Honor --

12          THE COURT:  They'll be admitted.

13          MS. WRIGHT:  -- if we could publish these to the

14  jury.

15  BY MS. WRIGHT:

16  Q.   So let's look at 3-B first.  We'll give it a second.

17       What are we seeing there?

18  A.   You're seeing the Why Not Travel Store, and you're

19  looking from the north facing to the southwest.

20  Q.   And let me show you 3-C.

21  A.   Again, it's the Why Not Travel Store, this time looking

22  to the northwest.

23          MS. WRIGHT:  Mr. Walters, would you mind hooking up

24  -- thank you.  I can only multitask so well.

25  BY MS. WRIGHT:

 1   Q.   Now, did you also learn that, on the afternoon of January

 2   14th, Kristian and Jose arrived in Ajo, Arizona, and went to a

 3   Chevron there?

 4   A.   I did learn that.

 5   Q.   And how many Chevron gas stations are there in Ajo?

 6   A.   Just one.

 7   Q.   And where is that Ajo Chevron, that's what I'll call it,

 8   in relation to the Barn?

 9   A.   It is south of the Barn.

10   Q.   I'm going to show you 48 and 49.

11            MR. KUYKENDALL:  No objection.

12            MS. WRIGHT:  Judge, there are no objection to these

13   either, so I'd move them in, 48 and 49.

14            THE COURT:  48 and 49 will be admitted, and you may

15   publish if you wish.

16            MS. WRIGHT:  Thank you.

17   BY MS. WRIGHT:

18   Q.   So let's look at 48 first.  What are we looking at here?

19   A.   You're looking at the Chevron in Ajo.

20   Q.   And 49?

21   A.   Again, you're looking at the Chevron in Ajo.

22   Q.   And do you see this white bench here?

23   A.   I do.

24   Q.   Are you familiar with that station generally?

25   A.   Yes.

1  Q.   And does this appear to be an accurate photo of how it

2  would have looked back in January of 2018?

3  A.   Yes, ma'am.

4  Q.   And the same with the preceding one?

5  A.   Yes, ma'am.

6  Q.   And I didn't ask you those for the Why, the Why Not,

7  sorry, in 3-C and 3-B.  Do those -- is that how the Why Not

8  appeared back in January 2018?

9  A.   Yes, ma'am.

10  Q.   Now, were agents -- did both of those gas stations, the

11  Why Not and the Ajo Chevron, did they have security cameras

12  that were operational on January 14th?

13  A.   Yes, ma'am.

14  Q.   Now, were agents able to get copies of that security

15  camera footage?

16  A.   Yes, ma'am.

17  Q.   And that's for both the Why Not and the Ajo Chevron?

18  A.   That's correct.

19  Q.   Have you had a chance to review Government's Exhibits 87

20  and 88?

21  A.   Which are?

22  Q.   Which are the security camera footage.

23  A.   Yes, ma'am.

24  Q.   And did you review to tell that they were from January

25  14th?

DIRECT EXAMINATION OF BRENDAN BURNS

 1   A.   Yes.

 2   Q.   And that they do contain recordings of Jose and Kristian?

 3   A.   Yes, ma'am.

 4           MS. WRIGHT:  Your Honor, I'd move to admit

 5   Government's Exhibits 87 and 88.

 6           MR. KUYKENDALL:  I'm mixed up.  Is that the actual

 7   footage from the --

 8           MS. WRIGHT:  From the gas stations.

 9           MR. KUYKENDALL:  Oh, I don't have an objection to

10   that.

11           THE COURT:  They'll be admitted.

12           MS. WRIGHT:  We're going to begin, actually, in

13   reverse order, 88.

14           THE CLERK:  Give me just one moment.

15           MS. WRIGHT:  Sure.  I've got to get there too.

16           THE CLERK:  Okay.

17           MS. WRIGHT:  Thank you.

18   BY MS. WRIGHT:

19   Q.   All right.  Agent, can you see that clearly up there?

20   A.   Yes, ma'am.

21   Q.   All right.  Let's start first with the time and date

22   stamp at the bottom.

23   A.   Okay.  It's the Why Not Travel Center in Ajo.  You're

24   facing north, and it's 6:57:06 a.m.

25   Q.   And let's just take a second with this still.  You said

1    we're facing north.  What can we see in the distance here?

2    A.   Well, you're facing to the northeast there, and in the

3    distance you can see State Route 85.

4    Q.   All right.  I'm going to press play here, and what I'd

5    like for you to do is just call out the first time you see

6    either Kristian or Jose.

7    A.   There you see Kristian.

8    Q.   And that was at?

9    A.   That was at -- I didn't catch the exact time stamp, but

10   somewhere in the six minute 57 second range.

11   Q.   Okay.

12   A.   And there you see Kristian and Jose moving from left to

13   right at 6:58:10 approximately.

14   Q.   We'll just keep it running, and then the next time you

15   see them, I'll pause it.

16   A.   There you see Kristian walking from right to left.

17   Q.   Do you know what's off to the left side of the screen

18   there?

19   A.   Yes.  Just on the north side of the travel center there

20   is a standalone restroom building, and now he's walking back

21   from left to right.

22   Q.   And what's off to the right?

23   A.   That area goes toward the main entrance to the store and

24   to the gas pumps on the east side of the building.

25   Q.   I'm going to stop this one here.  We're going to bring up

 1   another view.

 2        And again, let's look at the time and date stamp before I

 3   hit play.

 4   A.   Okay.  Again, the Why Not Travel Center in Ajo, the view

 5   at the pumps on January 14th, 2018, at 7:02:05 a.m.

 6   Q.   And before I press -- actually, I'll press play, and just

 7   orient us generally what perspective do we have here and

 8   what's off in the distance.

 9   A.   Sure.  You're looking straight to the east.  You'll see

10   the gas pumps there, and just beyond them, where that Jeep

11   just came from, is State Route 85.

12   Q.   And just like we did with the last set of footage, I'd

13   like you to call out the first time you see either Kristian or

14   Jose.

15   A.   There you see Kristian.  He's approaching somebody who

16   arrived at the gas pumps.

17   Q.   And what's the time stamp?

18   A.   That's at 7:04:09 in the morning.

19   Q.   Hit play again.

20   A.   And they just appear to be talking.

21   Q.   And while we're watching this, I'll ask you a few

22   questions.  Are you familiar with what the weather's like

23   generally in Ajo?

24   A.   Generally, yes.

25   Q.   In January?

1   A.   Yes.

2   Q.   That time of year, can you see the clothing that Kristian

3   is wearing there?

4   A.   Yes.

5   Q.   Is that clothing appropriate to the weather at that time

6   of year?

7   A.   I think a jacket would be, yes.

8   Q.   All right.

9   A.   And hat.

10      Here he's approached somebody else.  He appears to be

11   talking to him.

12   Q.   Now, let's just pause.  What's the time stamp there?

13   A.   7:05:04 a.m.

14   Q.   So we first saw him in this view at about 7:04.  Now it's

15   at about 7:05?

16   A.   Correct.

17   Q.   Is that right?  Okay.

18   A.   It appears that Kristian's using a cell phone or some

19   small device.

20   Q.   We'll let this play through until he walks out of frame

21   again.

22      What time stamp are we at now, Agent Burns?

23   A.   We're at 7:07:51 a.m.

24   Q.   Okay.  So at this point, it's fair to say that Kristian's

25   been in frame about --

DIRECT EXAMINATION OF BRENDAN BURNS

1    A.    Three to four minutes.

2    Q.    Okay.

3    A.    And he's just handed that phone back to that subject who

4    he encountered by the gas pumps, and now he's walking to the

5    north, which would be off to the left of the screen.

6    Q.    And what's the time stamp there?

7    A.    7:08:37 a.m.

8    Q.    Okay.  Before we move on to the Chevron footage, I want

9    to orient us with a map a little bit here.

10         MS. WRIGHT:  Sherry, would you mind switching me

11   back to the Elmo?

12         Thank you.

13         MR. KUYKENDALL:  No objection.

14         MS. WRIGHT:  Judge, there's no objection to 89.

15         THE COURT:  89 can be admitted.

16         MS. WRIGHT:  Thank you.

17   BY MS. WRIGHT:

18   Q.    I'm going to zoom in a lot on this so we can see it.

19         First off, can you tell the jury what we're looking at

20   here?

21   A.    We're looking at a map overlay of the northern side of

22   Ajo.

23   Q.    And just using this, which direction's north, top or

24   bottom of the page?

25   A.    The top of the screen.

DIRECT EXAMINATION OF BRENDAN BURNS

1  Q.   Okay.  And then let's talk about to the south.  Where is

2  the Why in relation to what we're seeing on this map?

3  A.   The Why Not Travel Store?

4  Q.   You know what?  Actually, let me ask these in a different

5  order.

6       First, can you see the location of the Barn on here?

7  A.   Yes, ma'am.

8  Q.   Where is that at?

9  A.   That's up here where this marker is.

10  Q.   Okay.  And now let's go to where the Ajo Chevron is.

11  A.   Okay.

12  Q.   Can you see it on this map or no?

13  A.   Yes, ma'am.  I've marked it there, just on the west side

14  of State Route 85 near McMahon Road.

15  Q.   If you were to go down the city streets as opposed to as

16  the crow flies, about how far is it from the Barn to the

17  Chevron?

18  A.   It's approximately 13 miles.

19  Q.   Okay.  And now, from the Chevron, can you see the Why Not

20  on here?

21  A.   I cannot see the Why Not on this map.

22  Q.   Okay.  Where would it be?

23  A.   It would be south along State Route 85, at the

24  intersection of State Routes 85 and 86.

25  Q.   And about how far is that?

DIRECT EXAMINATION OF BRENDAN BURNS

1    A.    Approximately 13 miles.

2    Q.    And that's a straight shot along State Road 85?

3    A.    Yes, ma'am.

4    Q.    Now, in between the Why Not and the Chevron in Ajo, are

5    there any places where a person could stop for help --

6    A.    Yes.

7    Q.    -- if they were in need of some medical care?

8    A.    Yes, ma'am.

9    Q.    What are those places?

10   A.    The first one you'd come to would be the Border Patrol

11   station.  That's right on State Route 85, approximately a half

12   a mile north of the Why Not Travel Store.

13   Q.    And is that open only during banker's hours or --

14   A.    No.  That's open all the time, ma'am.

15   Q.    All right.  What else is along that route?

16   A.    Along that route, you pass a fire station in Ajo near

17   State Road 85 and Well Road.  You would also pass a clinic in

18   Ajo itself, a medical clinic.  You'd pass Ajo Ambulance, as

19   you can see on this map.

20   Q.    What is Ajo Ambulance?

21   A.    It's an ambulance service that services Ajo on the

22   eastern side of the Tohono O'odham Nation.

23   Q.    All right.  So those --

24   A.    Sorry.  The western side.

25   Q.    I wouldn't have caught you on that, but thank you for

 1  correcting that.

 2       All right.  Let's turn now to the footage from the Ajo

 3  Chevron, if we could switch back again.  Thank you.

 4       All right.  Before I press play, let's first do the time

 5  and date stamp.

 6  A.   It's January 14th, 2018, at 1:39:58 p.m.

 7  Q.   I'm going to hit play here, and what I'd like you to do

 8  is just generally describe what we're seeing here and kind of

 9  orient our jurors to what they're looking at.

10  A.   Sure.  That's the view inside the Chevron in Ajo, from

11  behind the registers.  He'd be facing south, to the southwest,

12  I guess.

13  Q.   And I'm going to move the action forward just a little

14  bit.  I want you to tell me the first time that you see

15  Kristian or Jose in this footage.

16  A.   There you see Kristian walking.

17  Q.   What's the time stamp?

18  A.   That's 1:41:56 p.m.

19  Q.   I'm going to hit play again.  Does he appear to have

20  anything in his hands?

21  A.   He had what appears to be a sports drink in his left

22  hand.  And now he's speaking with the clerks there at the

23  register and looking for something on the shelf.  Here's Jose

24  coming in.

25  Q.   What's the time stamp now?

DIRECT EXAMINATION OF BRENDAN BURNS                    163

1   A.   1:42:18 p.m.  And Kristian's looking at some items off

2   the counter there.

3        And here it appears he's making a purchase.

4   Q.   What's the time stamp there?

5   A.   1:43:19 p.m.

6   Q.   Does he get change for his purchase?

7   A.   He did.

8   Q.   I'm going to move the action ahead a fair amount here.

9   Call out -- read out the time stamp for us.

10  A.   It's 1:49:07 p.m.

11  Q.   Sorry.  I misread my military time.  I had us an hour

12  off, so we won't do that.

13       I'm going to switch us over from this particular

14  recording to the next one.  Can you see the time and date

15  stamp there at the bottom?

16  A.   Again, January 14th, 2018, and we're at 2:21:38 p.m.

17  Q.   Okay.  I'm going to move this ahead.

18       Again, the same exercise when you see Kristian or Jose

19  enter the frame.

20  A.   There's Kristian there.

21  Q.   Sorry.  Back it up.

22  A.   Now he's gone.

23  Q.   Now we'll call out the time stamp.  What's the time stamp

24  there?

25  A.   2:38:38 p.m.

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION OF BRENDAN BURNS

1  Q.   All right.  And when you see him come into the frame,

2  please let us know.

3  A.   And there's Kristian there at 2:38:53 p.m.

4  Q.   Can you tell where he's come from?

5  A.   He's come from the cafe seating area just behind that --

6  I guess that banner, we're out of view, but it would be just

7  inside the doors and to the left.

8        And he's indicating to something behind the counter.  It

9  appears to be a pack of cigarettes.  And he's making a

10  purchase again.

11  Q.   Did he receive change for his purchase?

12  A.   He did.

13  Q.   I'm going to move us forward again.  And again, if you

14  see Kristian or Jose enter the frame.

15  A.   There's Jose there, and Kristian walked in immediately

16  before him.

17  Q.   What's the time stamp?

18  A.   2:56:09 p.m.

19  Q.   And what are they doing?

20  A.   It looked like Jose recovered a jacket or a sweatshirt he

21  had and then returned back outside or toward the door.

22  Q.   Okay.  So the door's off to the left?

23  A.   To the left of this image, and Kristian appears to be

24  headed toward the door now at 2:56:25 p.m.

25  Q.   Okay.  I'm going to switch us to another set of

UNITED STATES DISTRICT COURT

1   recordings.

2       And while this is running, first the time and date stamp.

3   A.   It's January 14th, 2018, at 12:13:59 p.m.

4   Q.   I'm going to move it ahead a fair amount here.

5       Do you recognize what's in this frame?

6   A.   That's the -- that's also inside the Chevron in Ajo.

7   That's footage of the cafe and seating area.

8   Q.   Can you -- do you know where the cash register we were

9   just watching, where that is in relation to this?

10  A.   Yes.  I believe it's in the back and the right of the

11  image here.

12  Q.   Okay.  So it's not in frame?

13  A.   No, I don't see it.

14  Q.   Okay.  But off to the right side of the frame?  Would

15  that be --

16  A.   Yes, ma'am.

17  Q.   All right.  Okay.  So when you see either man come into

18  the frame, let me know.

19  A.   And there is Kristian there at 1:45:11 p.m. taking a seat

20  in the cafe area.

21  Q.   Does he have anything with him?

22  A.   He picked up the Powerade that was on the table there or

23  the sports drink.

24       And sitting again.

25  Q.   I'm going to move us ahead a little bit.  A little bit

1   more.

2       All right.  What's the time stamp there?

3   A.   That's 1:48:46 p.m.

4   Q.   And what's happening?

5   A.   That's Kristian again sitting there at the table.

6   Q.   I'm going to move us to the last recording of this, and

7   as it plays, a time and date stamp.

8   A.   Sure.  January 14th, 2018, 1:50:15 p.m.

9   Q.   Is this the same view that we had before?

10  A.   Yes, ma'am.

11  Q.   And is Kristian sitting in his same spot?

12  A.   Yes, ma'am.

13  Q.   I'm going to move it ahead.  Describe what's happening

14  here in the time stamp.

15  A.   There you see, at 2:13:28 p.m., Kristian and Jose both

16  stood, and they have switched places now.

17  Q.   I'm going to move it ahead about another 20 minutes here.

18  Oh, too far.

19      What do we see -- first, time stamp.  Sorry.

20  A.   January 14th, 2018, 2:32:23 p.m.

21  Q.   Same view?

22  A.   Same view.

23  Q.   If you'll just -- we'll watch this here for a minute.

24      What are we seeing here?

25  A.   You're seeing Jose kind of lean back, scratch the back of

 1   his head, and you see Kristian seated opposite him.

 2   Q.   And is that -- I guess I can't point.  Is that that

 3   little bit of red sleeve that we're seeing there?

 4   A.   Yes.

 5   Q.   What are we seeing here?

 6   A.   Again, you see Kristian and Jose seated.  You see Jose

 7   leaning back with his hand behind his head.

 8   Q.   I'm going to move us forward just a few minutes here.

 9        Time stamp?

10   A.   2:36:38 p.m.

11   Q.   Do we still have Kristian and Jose in frame?

12   A.   Yes, ma'am.

13   Q.   Same as before with that little bit of sleeve being

14   Kristian?

15   A.   Correct.

16   Q.   Okay.  What are we seeing here?

17   A.   At 2:37:53 you see Jose standing, and he appears to be

18   standing either beside or behind Kristian.

19   Q.   I'm going to --

20   A.   And Kristian is standing as well.

21   Q.   -- move us ahead a little bit.  And actually, I'm going

22   to move it just a little bit more here.

23        What's the time stamp here?

24   A.   That's 2 -- I believe that's a 2.

25   Q.   Oh, sorry.  There you go.

DIRECT EXAMINATION OF BRENDAN BURNS                    168

1    A.   That's 2:45:04 p.m.

2    Q.   Can you see either of them in frame right now?

3    A.   I believe I see Jose.  I can -- the quality's not well,

4    but I can make out the color of his shirt.

5    Q.   And whereabouts is he in this frame right now?

6    A.   He's standing behind that cereal display in front of what

7    appears to be a microwave.

8    Q.   Okay.  Would the Blue Bunny sign be above his head?

9    A.   Above his head and to the left.

10   Q.   Okay.  And Tony the Tiger in front of him?

11   A.   Correct.

12   Q.   All right.  What are we seeing here?

13   A.   You're seeing Jose pick up a shirt and walk toward the

14   door at 2:45:54 p.m.

15   Q.   And that's all I'll show you from the footage today.

16        MS. WRIGHT:  Sherry, could we switch back to Elmo,

17   please?  Thank you.

18   BY MS. WRIGHT:

19   Q.   So let's again use that map, 89, to talk about this.  I

20   believe you said about 12-13 miles to the south, off the

21   bottom of the page, is the Why Not?

22   A.   That's correct.

23   Q.   And it's a straight shot up State Route 85, past the

24   Border Patrol checkpoint, to the Chevron in Ajo?

25   A.   No.  You would not pass the Border Patrol checkpoint

DIRECT EXAMINATION OF BRENDAN BURNS

1  between those two points.

2  Q.   Oh, okay, but it is the Border Patrol -- not the

3  checkpoint, the station?

4  A.   Yes, ma'am.

5  Q.   I'm sorry.  I misspoke.

6  A.   Yes, ma'am.  The station is a half a mile north of the

7  Why Not.

8  Q.   Okay.  And that's along that route between the two?

9  A.   Correct.  That's on the east side of State Route 85.

10  Q.   And then how many miles did you say between the Ajo

11  Chevron and the Barn, if you're going over city streets?

12  A.   I would say no more than one to two miles, but I'm not

13  exactly sure.

14  Q.   Okay.  And then on this map, can you, and I'll scoot it

15  down a little bit, indicate about where your surveillance

16  position was?

17  A.   Approximately somewhere in this area here.

18  Q.   Okay.  Now, before you set up surveillance on that day,

19  had you heard any information about any publicity about a

20  report that criticized Border Patrol?

21  A.   Not before, no.

22  Q.   Okay.  And you say not before.  Did you learn about that

23  maybe while you were on surveillance?

24  A.   That's correct.

25  Q.   How did that happen?

1  A.   Agent Marquez saw it on his phone and told me about it.

2  Q.   And when you say "it," what exactly -- did he show you

3  anything?

4  A.   No.  He just described a video of Border Patrol agents.

5  Q.   Did he tell you anything about that video?

6  A.   Not much, just that it's Border Patrol agents on a

7  Facebook page.

8  Q.   Was there -- was that a video that you had previously

9  heard or known about?

10 A.   Yes.

11 Q.   How much before you set up on that surveillance had you

12 heard or known about that video?

13 A.   I don't remember exactly when, but it was years before.

14 Q.   Okay.  And when you say --

15 A.   Early in my career.

16 Q.   Say that again?

17 A.   It was early in my career.

18 Q.   And how did you come to hear about it or see it?

19 A.   I don't remember exactly where I was.  It was work

20 related.  Somebody showed me, I don't think individually, I

21 think there were more of us or several of us that saw it at

22 the same time, but it was generally, here, this happened,

23 don't do that.

24 Q.   Okay.  So a few years before you set up surveillance

25 you'd first seen that video?

1  A.   Yes.

2  Q.   And at that time it was shown to you, it sounds like by

3  somebody maybe in a position higher than you at Border Patrol?

4  A.   It could have been.  I don't remember.

5  Q.   Okay.  And basically the gist of it was, don't do that?

6  A.   That's correct.

7  Q.   Anything -- so it sounds like, was the video the only

8  thing you heard about that publicity that day?

9  A.   I believe so.

10  Q.   All right.  I want to show you a few more items here

11  using the Elmo.  Give me just a moment.

12       I just want to ask if you recognize where these are

13  taken.  If you do, we'll talk about it a little bit more.  So

14  Exhibit 42.  There we go.  All right.  Do you recognize where

15  that photo was taken?

16  A.   Yes.

17  Q.   Tell us, orient us in the space.

18  A.   That's inside the kitchen/seating area of the Barn.

19  Q.   And what's off to the left of the photo?

20  A.   Out of the frame of the photo?

21  Q.   Yeah, off the frame of the photo, off to the left.

22  A.   Okay.  To the left would be the door that leads to that

23  bedroom.

24  Q.   And off to the right?

25  A.   Would be an interior wall, the eastern wall.

DIRECT EXAMINATION OF BRENDAN BURNS

1    Q.   And almost behind the photo, so if you were to turn

2    around in this photo and look behind you?

3    A.   You would see the kitchen, the stove and the

4    refrigerator.

5    Q.   And 44?

6    A.   That's inside the bathroom of the Barn.

7    Q.   Can you see the place where Jose was hiding in that

8    photo?

9    A.   If that's the shower on the right side, I can't really

10   tell from the photo.

11   Q.   Just a few more for you.  Let me show you 43.  Same

12   question.

13   A.   Okay.  Yes, there I can see the shower behind, behind him

14   there.

15   Q.   And so is that the bathroom at the Barn?

16   A.   Yes, ma'am.

17   Q.   Let me somehow you 39.  Do you recognize where that photo

18   was taken?

19   A.   That's on the bench outside the Ajo Chevron.

20   Q.   So when we looked earlier -- and I'll show you again 49.

21   Can you see where that photo was taken?

22   A.   Yes, ma'am.

23   Q.   Where is that?

24   A.   That's right here.

25   Q.   All right.  And is that -- let's see.  Exhibit 40, can

CROSS-EXAMINATION OF BRENDAN BURNS

 1  you tell where that was taken?

 2  A.   I don't recognize that exactly.

 3  Q.   Okay.  Give me just one moment here.

 4          MS. WRIGHT:  And, Your Honor, if I could have a

 5  moment with co-counsel?

 6          THE COURT:  Take your time.

 7          MS. WRIGHT:  Thank you.

 8          Thank you, Your Honor.  No further questions at this

 9  time.

10          THE COURT:  Mr. Kuykendall.

11          MS. WRIGHT:  Mr. Kuykendall, do you need me to leave

12  my laptop hooked up?

13          MR. KUYKENDALL:  I honestly don't know how to use

14  it, so no.

15          MS. WRIGHT:  I'd be happy to help if there's

16  anything.  I just didn't want to slow things down.

17          MR. KUYKENDALL:  If you don't mind leaving it up

18  there, I might get to it.  Thank you.

19          MS. WRIGHT:  Okay.  Then I will just set the

20  exhibits on top of this so they're easier to reach.

21          MR. KUYKENDALL:  Do you need your highlighters and

22  stuff?

23          MS. WRIGHT:  Oh, gosh.  I guess so.

24                        CROSS-EXAMINATION

25  BY MR. KUYKENDALL:

CROSS-EXAMINATION OF BRENDAN BURNS

1    Q.   Good afternoon.

2    A.   Good afternoon, sir.

3    Q.   I left the most important piece back here.

4         I want to make sure I understood this properly.  At the

5    very beginning of your testimony, did you say that you all

6    investigate in the Disrupt unit those who are facilitating

7    smuggling by providing food, water, shelter?

8         Is that right?

9    A.   Food, water, shelter, and material aid, knowledge, in any

10   way to facilitate the movement of narcotics or illegal aliens

11   into the country.

12   Q.   So providing knowledge would be, in your definition,

13   facilitating smuggling?

14   A.   In conjunction with some other elements.  I mean, that's

15   common.

16   Q.   And I'm not arguing with you.  I just want to understand

17   where you're coming from and what assumptions you bring to the

18   table.  Okay?  I don't mean any disrespect by it.  I just want

19   to understand.

20   A.   Yes, sir.

21   Q.   So from your standpoint, it is facilitating smuggling to

22   provide water?

23   A.   No, sir, not only to provide water.

24   Q.   Okay.  To provide water and food?

25   A.   It depends on the situation, sir.

1   Q.   Okay.  Is every situation different?

2   A.   Every situation is different, sir.

3   Q.   Fair enough.

4        Now, you were describing I believe it's the mountain

5   range called the -- oh, now I just forgot the name of the

6   mountain range -- between Hat Mountain and Childs Mountain.

7   A.   There's the Batamote Mountains there, and north of those

8   are the Sauceda Mountains.

9   Q.   And then to the west of the Batamote Mountains --

10  A.   To the --

11  Q.   -- did you call them the --

12  A.   Crater Range.

13  Q.   Crater Range.  That's what I'm trying to say.

14  A.   Okay.

15  Q.   Okay.

16  A.   That's northwest of the Batamote Mountains.

17  Q.   And when you saw Dr. Warren -- and I'm only doing this

18  (indicating) because that way, I'm pretty sure, is west.  When

19  you saw Dr. Warren go like this, pointing at Hat Mountain, I'm

20  sorry, Childs Mountain, and then over like this at Hat

21  Mountain, that's what you saw him do; right?

22  A.   I saw him, yes, similar to that, pointing and gesturing

23  in that general direction.

24  Q.   And Childs Mountain is not very far at all from where

25  Dr. Warren was standing; right?

CROSS-EXAMINATION OF BRENDAN BURNS

1   A.   That's correct.

2   Q.   Hat Mountain, I believe you said -- well, the Crater

3   Mountains you said are at mile marker 30?

4   A.   That's correct.

5   Q.   And the Crater Mountains actually are on either side of

6   the only highway out there, State Route 85?

7   A.   Yes.

8   Q.   And you said that they, the Crater Mountains, are at mile

9   marker 30?

10  A.   Yes, I believe so.

11  Q.   Where is the -- where is the checkpoint that's north of

12  the Crater Mountains?

13  A.   That's at mile marker 18 on State Route 85.

14  Q.   So the Border Patrol checkpoint that's north of Ajo is at

15  least 12 miles north of the Crater Mountains?

16  A.   That's correct.

17  Q.   And obviously one can't see the Border Patrol checkpoint

18  from the Barn.

19  A.   No, you can't.

20  Q.   One can see Childs Mountain, Hat Mountain, and a mountain

21  range in between.

22  A.   That's correct.

23  Q.   And all of those mountains are south of the Border Patrol

24  checkpoint?

25  A.   Correct.

CROSS-EXAMINATION OF BRENDAN BURNS

 1   Q.   Now, you testified that you had arrested a number of

 2   illegal aliens in the Crater Mountains; is that right?

 3   A.   That's correct.

 4   Q.   To be fair, you've arrested a number of illegal aliens

 5   most everywhere in Ajo, in and around Ajo; is that right?

 6   A.   Yes, sir.

 7   Q.   Every direction of the compass?

 8   A.   That's correct.

 9   Q.   South, east, you name it, you've arrested migrants

10   everywhere?

11   A.   Everywhere in every direction around Ajo, yes, sir.

12   Q.   And the landmarks that you described that you saw

13   Dr. Warren pointing to, does anyone besides people doing

14   illegal things use those landmarks?

15   A.   I haven't encountered members of the public out and

16   around most of those landmarks.

17   Q.   Do you know whether a person that was, for instance,

18   hunting and wanted to be oriented to where they were, would

19   they look up and use those landmarks, or do you just not know?

20   A.   I don't know, but I suppose that they would.

21   Q.   I mean, to be honest, one needs to know where one is in

22   the world.  Is that a fair statement?

23   A.   Yes, sir.

24   Q.   One needs to be oriented?

25   A.   Yes, sir.

CROSS-EXAMINATION OF BRENDAN BURNS                          178

1   Q.   Now, you said that, before you came onto the Barn

2   property, that because of your experiences as a Border Patrol

3   agent, because of your experience as a Border Patrol agent,

4   you believed Warren was giving direction to the two suspected

5   illegal aliens in order to assist them in furthering their

6   illegal entry into the United States; right?

7   A.   That's correct, sir.

8   Q.   So that was a belief that you took with you when you went

9   onto the property?

10  A.   When I approached the property, yes.

11  Q.   Okay.  But all you can say that you actually saw, I mean,

12  here under oath, all that you can say that you actually saw,

13  forget about your beliefs, is that Dr. Warren pointed out

14  terrain?

15  A.   That's correct.

16  Q.   Another belief that you had, as you looked through the

17  spotting scope -- would you say 300 yards away?

18  A.   2 to 300.

19  Q.   With 60 power?

20  A.   Yes, sir.  I don't know exactly when I was using what

21  magnification on the scope, but it varied between 10 and 60

22  power.

23  Q.   But as you looked through the spotting scope that

24  distance away, you determined those two migrants that were

25  with Dr. Warren, they weren't in need of humanitarian aid,

1   were they?

2   A.   They didn't appear to be, sir.

3   Q.   Not to you, did they?

4   A.   Not to me, sir, they didn't appear to be.

5   Q.   And you made that decision that they did not appear to

6   you to be in need of humanitarian aid from 300 yards away,

7   looking through a spotting scope?

8   A.   From my observations through the spotting scope, they

9   appeared to be -- they were walking, and they didn't appear to

10  be injured.  I did not -- I didn't think from that vantage

11  point that they were in need of humanitarian aid.

12  Q.   Fair enough.  And again, I don't mean to show any

13  disrespect.  I just want to understand where you're coming

14  from.

15        How bad off does a person need to be, from your

16  perspective, to need humanitarian aid?

17              MS. WRIGHT:  Objection.  Argumentative, Your Honor.

18              THE COURT:  Overruled.

19  BY MR. KUYKENDALL:

20  A.   I don't know, sir.  I don't think that I could put into

21  words an exact definition of how someone would have to appear.

22  Q.   But fair to say you made your judgment call that they

23  didn't appear to need humanitarian aid.

24        Is that fair?

25  A.   At that point, that's what it appeared at that point, but

1    my further interactions with those subjects reaffirmed that.

2    Q.   Okay.  You made the decision 300 yards away, and then

3    your further interactions reconfirmed for you they didn't need

4    humanitarian aid?

5    A.   That's what it appeared, sir.

6    Q.   And if I understand you correctly, it's a case-by-case

7    basis who needs humanitarian aid and who doesn't?

8    A.   I would assume that, sir.  I don't know.

9    Q.   You were out there for a few hours across the road from

10   the Barn property; is that right?

11   A.   That's correct.

12   Q.   And during that time, you were using your phone?

13   A.   Yes.

14   Q.   And you knew that your partner, John -- I'm sorry -- John

15   Marquez was using his phone?

16   A.   Correct.

17   Q.   And he showed you the video, or did he just tell you

18   about the video?

19   A.   He didn't show me it.  He told me about it.

20   Q.   Okay.  Did he tell you about the accompanying report?

21   A.   No.  I didn't hear about any report.

22   Q.   And he was getting his information off of Facebook?  Is

23   that what you said?

24   A.   I didn't say that.  I think it was Facebook, but I think

25   it was some sort of social media.  I'm not sure if it was

CROSS-EXAMINATION OF BRENDAN BURNS

1    Facebook.

2    Q.   Do you belong to any social media on Facebook?

3    A.   No, sir.

4    Q.   And do you know whether he did?

5    A.   I knew he had Facebook, yes.

6    Q.   Okay.  Was he involved in any -- sorry to show my

7    ignorance.  I don't know what they're called, but like

8    chatrooms on Facebook?

9              MS. WRIGHT:  Objection, Your Honor.  Relevance.

10             THE COURT:  He can answer yes or no.

11   BY MR. KUYKENDALL:

12   A.   I don't know, sir.

13   Q.   Fair enough.  Now, one of the people that you were in

14   contact with was an agent named Ballesteros; right?

15   A.   Yes.

16   Q.   Nicknamed Balls?

17   A.   Correct.

18   Q.   And when you were surveilling the property before

19   surveilling Dr. Warren, you were in cell phone communication

20   with him directly and then with a group of other agents in

21   another -- in another group of texts; right?

22   A.   I don't know that, sir.

23   Q.   Okay.  You texted -- just you and Ballesteros texted one

24   another; right?

25   A.   I don't know, sir.  I don't remember.

 1   Q.   Okay.  Let me show you what's been marked as Exhibit 263

 2   and ask if you remember this.

 3       Do you see -- I can hand it to you also, if you'd rather.

 4   A.   I see it but I just don't recognize it.

 5   Q.   Okay.  Well, let me see if any of that --

 6   A.   That's not -- that's not a -- okay.  I see myself on

 7   there, yes.

 8   Q.   You're Burns and he's Balls; right?

 9   A.   Correct.  I see my name on there, but I don't remember

10   this.

11   Q.   Okay.  Do you remember the page I'm showing you now,

12   which is off of your cell phone?

13   A.   That's not anything that was off of my cell phone.  I

14   think if maybe I could see it from the beginning, I don't

15   think I've seen this.

16   Q.   I'll tell you what.  I'm going to --

17           MR. KUYKENDALL:  May I approach, Judge, and just

18   hand him the whole thing?

19           THE COURT:  You may.

20           If you want him to take a few minutes to go through

21   the whole packet, we can take our afternoon break.

22           MR. KUYKENDALL:  I think that makes sense.  And just

23   for the record, can I also have him take a look at Exhibit

24   267?

25           THE COURT:  Sure.

 1              MR. KUYKENDALL:  Okay.  I'm going to grab you the

 2    actual exhibits.  Those are the ones that just have my

 3    handwriting on them so that I can keep it straight.

 4              THE WITNESS:  Okay.

 5              MS. WRIGHT:  I'm sorry, but --

 6              MR. KUYKENDALL:  263 and Exhibit 267, and he can

 7    look at that while we take an afternoon break.  Is that all

 8    right?

 9              THE COURT:  Fine.

10              MS. WRIGHT:  And, Your Honor, I don't have a 267 on

11    the exhibit list provided.

12              THE COURT:  He'll make sure you have a copy of

13    whatever it is.

14              MS. WRIGHT:  Okay, Your Honor.

15              MR. KUYKENDALL:  Thank you.

16              THE COURT:  Let's do 15 minutes.  We'll come back at

17    3:18.  That clock is still a little slow.

18              THE CLERK:  Please rise for the jury.

19              (The jury exits the courtroom.)

20              MR. KUYKENDALL:  I should just say for the record,

21    Judge, we'll get this straight, but these were all disclosed

22    by the Government to us.

23              THE COURT:  All right.

24              (Off the record.)

25              (The jury enters the courtroom.)

1          THE COURT:  Let the record show the jurors returned

2     back to the courtroom, the presence of all counsel and the

3     defendant.

4          You may be seated.

5          You may continue, Mr. Kuykendall.

6          MR. KUYKENDALL:  Thank you, Judge.

7     BY MR. KUYKENDALL:

8     Q.   Agent, I misspoke and gave you, I think I cleared it up

9     while the jury was gone, but I've actually asked you to review

10    during that break Exhibit 224 as well as Exhibit 225.

11         Is that right?

12    A.   Yes, sir.

13    Q.   And you've had an opportunity to look at those?

14    A.   Yes, sir.

15    Q.   And speaking first of Exhibit 225, that was the one I was

16    starting to go over with you; right?

17    A.   Yes, sir.

18    Q.   Can you explain what that is.

19    A.   That looks like text messages between at least three

20    people, myself, Agent Ballesteros, and I think, I'm sure, it's

21    Agent Marquez.  That's what makes sense to me.

22    Q.   Okay.  I'm going to show you a -- and by the way, these

23    text messages appear to be occurring while you're at the --

24    A.   Yes, sir, that makes sense.

25    Q.   -- observation post.  You're starting to read my

CROSS-EXAMINATION OF BRENDAN BURNS

 1    language, but yeah, that's my late-in-the-day listening

 2    post/observation post signal.

 3         So taking a look at Exhibit 225, you may as well -- are

 4    you looking at the hard copy I gave you or the copy that I

 5    have up on the screen?

 6    A.   I can see the hard copy better, sir.  It's kind of faded

 7    on the screen.

 8    Q.   Okay.

 9    A.   There we go.

10    Q.   On the first page of the screen, this appears to be

11    taking place initially at 12:06 p.m. and then at 2:31 p.m.;

12    right?

13    A.   Yes, sir.

14    Q.   So at 2:31, you let Ballesteros know that you're in

15    place, or is that Ballesteros letting you know that he's in

16    place?

17    A.   I think at this point it's between Agent Ballesteros and

18    Agent Marquez.

19    Q.   Okay.  And Marquez --

20    A.   -- I'm guessing is the highlighted text on the bottom

21    right.

22    Q.   Marquez indicates, "No, just walking around making

23    calls."

24    A.   I believe so.

25    Q.   In response to the question, "Anything good going on?"

1    Right?  The text above it says, "I am in place.  Anything good

2    going on?"

3        And the next one you think is Marquez saying, "No, just

4    walking around making calls."

5    A.   Yes.  That's what it says.

6    Q.   And then is this you or Marquez that says, "Looks like

7    they bought supplies and unloaded it."

8    A.   I believe that's Marquez.  That's not me.

9    Q.   "One or two males" -- "One male and two females so far."

10   Marquez again?

11   A.   I believe so, yes.

12   Q.   And then Ballesteros says, "Cool, cool."

13            MS. WRIGHT:  Objection, Your Honor.  At this point

14   he's just reading hearsay into the record.

15            THE COURT:  Overruled.

16            MR. KUYKENDALL:  Is that what -- I mean, I'm happy

17   to admit, move to admit the exhibit, 225.

18            MS. WRIGHT:  They're no more admissible that way

19   than they are right now, Your Honor.

20            THE COURT:  Keep going.

21   BY MR. KUYKENDALL:

22   Q.   Ballesteros says, "Cool, cool," in response to, "One

23   male, two females so far?"

24   A.   That's what it says sir, yes.

25   Q.   And then, "Green Nissan Xterra.  Maybe Scott Warreen,"

CROSS-EXAMINATION OF BRENDAN BURNS

1    and then "Warren."

2         Right?

3    A.    Correct.

4    Q.    "Yellow t-shirt," or, "10-4, yellow t-shirt."

5         And then, if we jump to the next page -- actually, I'm

6    going to jump several pages ahead and tell you what's on the

7    top and see if you're there with it.

8         So on this page that's marked at the very bottom 913, do

9    you see that?

10   A.    Yes, I see it there, sir.

11   Q.    And what does that say?

12   A.    It says -- and I don't know who wrote what's on top, but,

13   "Persons with long hair was in the passenger seat."

14   Q.    And then what did you write?

15   A.    I wrote, "Two toncs at the house."

16   Q.    And then what did Balls write?

17   A.    He wrote --

18             MS. WRIGHT:  Objection.  Relevance and hearsay, Your

19   Honor.

20             THE COURT:  Overruled.

21   BY MR. KUYKENDALL:

22   A.    Balls wrote, "What," exclamations and question marks,

23   "Nice," exclamation point, and then he says, "I am at La

24   Siesta Motel."

25   Q.    So in response to you advising that you'd spotted people

 1  that you thought were in the country illegally, he wrote,

 2  "What," exclamation mark, question mark, exclamation mark,

 3  question mark, exclamation mark, question mark, exclamation

 4  mark, question mark, exclamation mark, question mark,

 5  exclamation mark; right?

 6  A.   That appears correct, sir.

 7  Q.   And then he wrote, "Nice" --

 8         THE COURT:  I think you added an extra exclamation

 9  mark.

10         MR. KUYKENDALL:  Wouldn't surprise me.

11  BY MR. KUYKENDALL:

12  Q.   And then he wrote, "Nice," exclamation mark; right?

13  A.   Yes, sir.

14  Q.   And now I'd like to ask you about the other discussion

15  that you were having with the -- I believe you called it --

16  this was the Disrupt group?

17  A.   Disrupt was the name of the unit, sir.

18  Q.   And you had this conversation or whatever you want to

19  call it, this messaging, going on because you never knew for

20  sure which radio station they'd be on, and this was a more

21  secure method of reaching them?

22  A.   This was just a more sure way of making sure we reached

23  everybody on the Disrupt unit at one time.

24  Q.   So it was still official business in your mind; is that

25  fair?

CROSS-EXAMINATION OF BRENDAN BURNS

1  A.   This, yes, this reflects Border Patrol business.

2  Q.   And was it your cell phones, or was it Border Patrol cell

3  phones?

4  A.   They were all personal cell phones.  We weren't issued

5  Border Patrol cell phones.

6  Q.   I just want to make sure, from your perspective, what

7  we're about to go into was all official business?

8  A.   Yes, sir.

9  Q.   Even though it's done on personal cell phones?

10  A.   Yes, sir.

11  Q.   So I'm showing you what's now been marked as Exhibit 224;

12  right?

13  A.   Yes, sir.

14        MR. KUYKENDALL:  And again, I'm happy to move this

15  into admission, if it's easier.  I move for the admission of

16  Exhibit 224.

17        MS. WRIGHT:  I'm sorry, what?

18        MR. KUYKENDALL:  I move to admit Exhibit 224.

19        MS. WRIGHT:  I object, Your Honor.  I haven't heard

20  any relevance for this, and it contains hearsay throughout.

21  If there is a part he wants to get to --

22        THE COURT:  Your objection will be sustained.  You

23  can --

24        MR. KUYKENDALL:  I will ask him questions about it.

25        THE COURT:  Yes.

 1  BY MR. KUYKENDALL:

 2  Q.   So you've reviewed this; is that correct?

 3  A.   It's been quite some time, but yes.

 4  Q.   Well, I mean, you reviewed it a few minutes ago?

 5  A.   Oh, I'm sorry.  Yes, I reviewed it at the break, yes.

 6  Q.   Okay.  I just want to make sure.

 7  A.   Briefly.  I looked at it briefly.

 8  Q.   All right.  And what is it?

 9  A.   That is screenshots of that group text that you

10  referenced of the Disrupt unit.

11  Q.   And the first page I'm looking at is marked down at the

12  bottom page 155.  Do you see that?

13  A.   I do, sir.

14  Q.   And up here it says, "Brendan Burns."  Well, the very top

15  one says, "How much time do we have?"

16       And you say what?

17  A.   "Unknown."  But the way this is laid out, sir, that's not

18  the beginning of the text thread.

19  Q.   Okay.  That's the -- what I received.  What was at the

20  front of the text thread?

21  A.   What is on the right side of the page, that column for

22  some reason is the beginning.

23  Q.   Oh, I see.

24  A.   And you'll see how it scrolls down.  It says, "How much

25  time do we have?"  And again, that's kind of overlaid on the

CROSS-EXAMINATION OF BRENDAN BURNS

1  top left, and that is the order of the thread.

2  Q.   Okay.  So what does the right-hand column say then?

3  A.   Starting, it says, "Wednesday, 1638 hours."  It says my

4  name, "Toncs at the Barn.  Get ready to roll this way all who

5  are available.  Came out of the house."

6  Q.   And Ballesteros says, "10-4."

7  A.   Sir.

8  Q.   And then what did you say?

9  A.   I said, "Scott Warren pointing out terrain to them."

10  Q.   And then, "We're up on FR-23.  Probably two from Ajo

11  yesterday."  At that point it says, "How much time do we

12  have?" and then it goes over to the left-hand column; right?

13  A.   That's correct, sir.

14  Q.   And you said, "We're watching now.  We'd like to get guys

15  in position to get up and knock it fast before they can bolt."

16  A.   Correct.

17  Q.   Turn to the next page, if you would.

18  A.   Okay.

19  Q.   And if you will -- actually, why don't you go ahead and

20  turn two more pages.  And these are -- the pages that we're

21  skipping, those are all text messages flying back and forth

22  between you and the Disrupt agents; is that right?

23  A.   That's correct.

24  Q.   And you wrote at one point -- this is still before you've

25  gone over to the Barn to make any arrests; right?

CROSS-EXAMINATION OF BRENDAN BURNS

1   A.   Yes.

2   Q.   You're still across the street, looking through the

3   scope?

4   A.   Yes, I believe so.  Yes.

5   Q.   And what do you say over there on the right-hand side?

6   A.   I say, "Balls, when everyone is ready to roll, Marquez

7   and I will walk the wash to the road just east of the house.

8   We will jump in the lead vehicle from there.  Smitty, just run

9   it by your guys regarding prosecution for these guys for 1324

10  harboring and conspiracy for the USCS," which is USCs or U.S.

11  citizens.

12  Q.   And Smitty then writes something, and you write, and Desi

13  writes something, and then ultimately it looks like you're cut

14  off somewhat, but you say over here, "We're gonna take

15  everyone in regardless."

16  A.   Yes, sir.

17  Q.   And then Desi -- who is Desi?

18  A.   Desi is the Disrupt unit supervisor.

19  Q.   And Desi says, "T4."  Is that like 10-4?

20  A.   10-4.

21  Q.   And then Desi says, "Everyone be as professional as

22  possible;" right?

23  A.   Yes, sir.

24  Q.   And you wrote what?

25  A.   "Of course.  You know us."

UNITED STATES DISTRICT COURT

CROSS-EXAMINATION OF BRENDAN BURNS

1    Q.   And then it continues on for several more pages; right?

2    A.   Another three or four pages, yes, sir.

3    Q.   So when you were -- before you'd even gone over to the

4    Barn, after looking through the scope, you texted, "We're

5    going to take in everybody regardless;" right?

6    A.   Correct.

7    Q.   And that was whether Homeland Security Investigations was

8    interested in it or not; right?

9    A.   Yes.  I was referencing whether Homeland Security

10   Investigations wanted to present the case for prosecution or

11   if we would submit that through Border Patrol channels.

12   Q.   And I guess Homeland Security didn't take it.

13   A.   No, they didn't.

14   Q.   Now, you also indicated at one point that, "There's a

15   good chance we'll be recorded."  Do you remember texting that?

16   A.   I've seen it somewhere on one of these that we just

17   looked at.

18   Q.   I mean, it sounds familiar; is that fair?

19   A.   Yes, sir.

20   Q.   And why did you think there was a good chance you'd be

21   recorded?

22   A.   I just assumed we would be.

23   Q.   Did you assume it because somebody recorded the Border

24   Patrol agents dumping the water in the desert?

25   A.   No, sir.

1  Q.   Well, assuming that you were going to be recorded, did

2  you take any steps to record it yourself?

3  A.   I did not.

4  Q.   Did your partner Marquez?

5  A.   Not that I'm aware of.

6  Q.   Did you seek anybody to record what was going on?

7  A.   No, sir.

8  Q.   I want to make sure I understand something about once you

9  did go on the property, and you don't know precisely where,

10 but in this region where I'm pointing, you had contact with

11 Dr. Warren; is that right?

12 A.   I don't remember where I was in relation to the shed,

13 whether I was north of it or to the west of it.

14 Q.   But the limited conversation that you did have with

15 Dr. Warren was there, where you first ran into him?

16 A.   Somewhere -- I walked up the driveway, and somewhere

17 along the edge of the driveway or in the driveway.

18 Q.   And then he said, "I'll go with you," and he walked

19 around to the front of the Barn, the east side of the Barn;

20 right?

21 A.   He walked around the east side of the Barn, but I don't

22 remember if it was on the south side of the shed or the north

23 side of the shed.

24 Q.   Fair enough.  But either way, your conversation with him

25 stopped before, before you ever got to the Barn?

CROSS-EXAMINATION OF BRENDAN BURNS

1    A.    Yes.  I don't remember speaking with him between when we

2    started walking and until we got to the Barn.

3    Q.    Now, this whole investigation of the Barn, it was really

4    Agent Marquez's idea, wasn't it?

5    A.    I believe so, yes.  It was his.  He was the main guy on

6    the project.

7    Q.    And before that day, January 17, you didn't know that

8    much about the Barn; right?

9    A.    No, sir.

10   Q.    You do know Ajo though, don't you?

11   A.    I do.

12   Q.    Would you say it's fair to say that, around Ajo, carpet

13   booties and black water jugs are pretty much everywhere?

14   A.    They're pretty much everywhere along routes where we

15   encounter aliens, yes.

16   Q.    But you can drive down the street and fairly well count

17   on seeing carpet booties and a black jug somewhere along your

18   route?

19   A.    Sometimes, yes.

20   Q.    I'd like to talk with you a little bit about the period

21   of time after your partner had arrested Dr. Warren, after you

22   had arrested Jose, I'm sorry, Kristian, and after you had

23   gotten Jose outside of the Barn.  Okay?

24   A.    Okay.

25   Q.    So all three are detained.  All three are arrested and

1  off scene; right?

2  A.   They're still on the property.

3  Q.   But away from the front door?

4  A.   I believe -- yeah, they're somewhere on the west side of

5  the building at that time.

6  Q.   And at that point you and an agent named Barbosa decided

7  to do a protective sweep?

8  A.   Of the second rooms, yes.

9  Q.   Because you'd already been into the bathroom area; right?

10  A.   That's correct.

11  Q.   You had no need to go back in the bathroom area?

12  A.   Correct.

13  Q.   You needed a warrant to go in the bathroom area?

14  A.   If I wanted to search it, yes.

15  Q.   So you decided to do a protective sweep of the big area,

16  where there's the kitchen and where there's the beds and all

17  that; right?

18  A.   Yes, sir.

19  Q.   So you and Barbosa go in to do a protective sweep; right?

20  A.   Correct.

21  Q.   And do you have your guns drawn?

22  A.   I had mine drawn.  I don't know if he did or not.

23  Q.   And the reason you're doing this is because the whole

24  notion of protective sweep is for officer safety; right?

25  A.   That's correct.

CROSS-EXAMINATION OF BRENDAN BURNS

1   Q.   You want to make sure you're safe and your fellow

2   officers are safe; right?

3   A.   Correct.

4   Q.   So you and Barbosa had a plan to go in there, do a

5   protective sweep, and then come back out; is that fair?

6   A.   I mean, I initiated it, yes, and I think it was Barbosa,

7   because he just happened to be the one free guy there.

8   Q.   So you and Barbosa go in, and the door to the bedroom

9   area is actually closed, isn't it?

10  A.   That's correct.

11  Q.   And you announced your presence; right?

12  A.   Yes.

13  Q.   And you announced your presence because you didn't want

14  anybody to be in there and actually hurt you?  You needed to

15  inform them that you're in there as an armed federal officer

16  doing a protective sweep?

17  A.   I announced myself as a Border Patrol agent, yes.

18  Q.   And you told the prosecutor earlier that, when you did

19  the protective sweep, you didn't find anybody else in there.

20  A.   No, sir.

21  Q.   But you did, didn't you?

22  A.   I didn't find anybody else in there, sir.

23  Q.   You found Agent Marquez in there.

24  A.   Agent Marquez was in there, yes.

25  Q.   And it surprised you that Agent Marquez was in the

1   bedroom, didn't it?

2   A.   Yes.  I didn't know he was in there, sir.

3   Q.   It's not the way protective sweeps are done, is it?

4   A.   It could have been coordinated better, yes, sir.

5   Q.   Was Agent Marquez taking pictures while he was in there?

6   A.   I learned later that he had taken some photos, but I

7   didn't observe him taking any photos.

8   Q.   You didn't have any part in Agent Marquez taking photos.

9   Is that a fair statement?

10  A.   Yes, sir, that's correct.

11  Q.   I want to ask you a few more questions.  First I want to

12  ask you about those videos the prosecutor was playing for you.

13  You reviewed those before; right?

14  A.   I had, sir.

15  Q.   Not -- today was not the first time you'd seen them?

16  A.   No, sir.

17  Q.   And you actually notice, if you watch them carefully, you

18  notice that Jose, I'm sorry, that Kristian is coughing at

19  times, doesn't he?

20  A.   I don't remember, sir.

21  Q.   You don't remember he coughed?

22  A.   No, sir.  I don't remember.

23  Q.   Okay.  Do you remember whether Jose was seen coughing on

24  the videos?

25  A.   I don't remember, sir.

1  Q.   Okay.  Did you notice that there was a blue hoodie on the

2  table of the Chevron station?

3  A.   I didn't.  I didn't notice, sir.

4  Q.   At 2:41:39, it looked like there was a blue hoodie on the

5  table, and at 2:45:47, Jose picked up the blue hoodie, but you

6  didn't see that just now?

7  A.   No, sir.

8        MS. WRIGHT:  I'm sorry, if counsel could be more

9  accurate about which videos he's referring to?

10       MR. KUYKENDALL:  The Chevron.

11       MS. WRIGHT:  There are four recordings.

12  BY MR. KUYKENDALL:

13  Q.   The Chevron video that shows them sitting at a table,

14  that the prosecutor just showed you.

15  A.   I don't recall that, sir.

16  Q.   All right.  Well, lastly, I wanted to ask you about the

17  search warrant.  The arrest goes down on January 17; right?

18  A.   Yes, sir.

19  Q.   Search warrant gets executed on January 22?

20  A.   I believe so, sir.

21  Q.   And you and -- I started to say Judge Marquez.  You and

22  Agent Marquez were in Tucson when the execution of the search

23  warrant was going on; right?

24  A.   That's correct.

25  Q.   You and Agent Marquez returned to Ajo sort of for the end

1    of the execution of the warrant?

2    A.    Correct.

3    Q.    And did you discover, when you got to the search warrant

4    execution, that the Barn had been left unsecured for five

5    days?

6    A.    I didn't discover it then, sir.

7    Q.    When did you discover it?

8    A.    At our last hearing, sir.

9    Q.    And you didn't know for all that time that the Barn

10   remained unsecured for five straight days after the -- after

11   the arrests?

12   A.    I didn't know that, sir.

13   Q.    In your view, is that consistent with Border Patrol

14   policy, to leave a crime scene unsecured for five days

15   straight?

16   A.    On the 17th?

17   Q.    Leave it unsecured on the 17th, 18th, 19th, 20th, 21st,

18   and half of the 22nd.

19   A.    Right.  I remember when we left on the 17th there were

20   two other U.S. citizens who told me they had permission to be

21   there from the defendant, and they were there when we left,

22   and we had no authority to remove them.

23   Q.    You took no steps to secure it at that point; is that

24   correct?

25   A.    That's correct.

1    Q.   And it's -- you now know that people hung out, you don't

2    know how many, but people were in and out of the Barn for five

3    days before the warrant was served; right?

4    A.   I know that someone must have been in there.  I don't

5    know who, how many people, or when.

6    Q.   And the reason that you know somebody must have been in

7    there is because there's documentation, like receipts and

8    stuff, that were retrieved from the search warrant execution

9    that postdate Scott's arrest; right?

10   A.   I didn't know that, sir.

11   Q.   But you know it?

12   A.   I don't know that, sir.  I haven't seen any of that

13   information.

14   Q.   I'm sorry.  But you know that people were in there after

15   you arrested Scott?

16   A.   Yes, sir.

17   Q.   And before the search warrant was ever executed?

18   A.   That's correct.

19   Q.   There was no police line or no method that you know of

20   that was employed to keep that crime scene secure?

21   A.   No, sir.

22            MR. KUYKENDALL:  I believe that's all my questions,

23   Judge.  Can I have one second?

24            THE COURT:  Sure.  Take your time.

25            MR. KUYKENDALL:  That's a first.  That's all my

REDIRECT EXAMINATION OF BRENDAN BURNS

 1   questions.

 2           THE COURT:  Ms. Wright.

 3                    REDIRECT EXAMINATION

 4   BY MS. WRIGHT:

 5   Q.   So Agent Burns, do you remember a few moments ago

 6   Mr. Kuykendall asking you about the video from the Ajo

 7   Chevron?

 8   A.   Yes, ma'am.

 9   Q.   If Jose had doubled over in pain from coughing, would you

10   have noticed that?

11   A.   I probably would have, yes, ma'am.

12   Q.   And so you didn't see him double over in pain from

13   coughing because he had a rib injury, did you?

14   A.   I didn't see that and I don't know that, ma'am.

15   Q.   I want to talk to you -- and let me grab a few exhibits

16   here.  I want to talk to you a little bit, we talked before

17   using some maps, about the layout of the area, and you talked

18   about these mountains, but let's do it with a visual.

19           MR. KUYKENDALL:  No objection.

20           MS. WRIGHT:  All right.  Your Honor, no objection to

21   123.

22           THE COURT:  All right.  123 can be admitted.

23           MS. WRIGHT:  Thank you.

24   BY MS. WRIGHT:

25   Q.   Can you see that up there, Agent?

REDIRECT EXAMINATION OF BRENDAN BURNS

1    A.    Yes, ma'am.

2    Q.    Can you please orient the jurors to what they're seeing.

3    A.    You're seeing satellite imagery of the State Route 85

4    corridor running from Interstate 8 in Gila Bend at the north

5    down into Ajo at the southern, at the bottom of the page

6    there, to the south.

7    Q.    And so just like with our other maps, north at the top,

8    south at the bottom?

9    A.    Correct.

10   Q.    Now -- and before we get into more of this, in your

11   training as a Border Patrol agent, do you receive any training

12   in terms of how to orient or navigate yourself when you're out

13   in the desert?

14   A.    Not formal training.  You just kind of learn as you go.

15   Q.    As a Border Patrol agent, you need to know how to find

16   your way around the desert; is that fair?

17   A.    Yes, ma'am.

18   Q.    Now, in learning that kind of through experience, do you

19   ever just look in one direction in order to find out where you

20   are?

21   A.    No.

22   Q.    Is it important to look all around you and note all of

23   the items, all of the landmarks around you, when you do that?

24   A.    As many as you can, yes.

25   Q.    And why is that important?

REDIRECT EXAMINATION OF BRENDAN BURNS

1  A.   The desert, it's tricky.  When you're out there, you can

2  see -- if you see one landmark and you start moving, you can

3  move just a few feet and you don't see that anymore, and if

4  that's all you know, that's your only reference point, you're

5  going to be lost.

6  Q.   When you were watching the defendant from your

7  surveillance post back on the 17th, did he point in the

8  easterly direction, due east at any time?

9  A.   No.

10 Q.   Did he ever point due west?

11 A.   No, ma'am.

12 Q.   Did he ever point due south?

13 A.   No, ma'am.

14 Q.   Is it fair to say that at all times he was pointing to

15 the north?

16 A.   To the north, northwest, northeast.

17 Q.   Now let's go back to 123 here.  So if you could just drop

18 a little mark where you can see Ajo on this map.

19 A.   (The witness complied.)

20 Q.   All right.  And then at the top of the map, what do we

21 have there?

22 A.   At the very top of the map, you see State Route 85

23 intersecting with Interstate 8, and that's in Gila Bend.

24 Q.   And let's just put marks about those landmarks we talked

25 about before, and let me know if I missed one, but I believe

 1    you said Childs Mountain.

 2    A.   Yes.

 3    Q.   And is that the one with the big satellite dish on top?

 4    A.   Yes, ma'am.

 5    Q.   If you could mark where that is.

 6         And then Hat Mountain.

 7    A.   Hat Mountain, I'm not exactly sure which one of these

 8    mountains from the top it is.  I can give you a general area,

 9    if you'd like.

10    Q.   If you want to circle the general area, that would be

11    fine.

12    A.   Okay.  It's going to be in this area here.

13    Q.   All right.  And I believe you also told us about the --

14    I'm going to mispronounce it -- the Batamotes?

15    A.   Yes.

16    Q.   And you can circle where those are, put a mark.

17    A.   (The witness complied.)

18    Q.   I believe you gave us -- oops.

19    A.   That's still all accurate.

20    Q.   Okay.  And I believe you gave us one other.

21    A.   I gave you Crater Range.

22    Q.   And show us where that is, please.

23    A.   (The witness complied.)

24    Q.   All right.  And that's off to the left, that straight

25    line.

REDIRECT EXAMINATION OF BRENDAN BURNS

1       Now, traveling from Ajo up to that intersection where

2    Interstate 8 is and SR-85 intersect, are there any other

3    landmarks or places of note along the way?

4    A.    There's a Border Patrol checkpoint, ma'am.

5    Q.    Can you mark where that is, please.

6    A.    That's going to be approximately here.  There.

7    Q.    How far south of Interstate 8 is that, if you know?

8    A.    That's 18 miles south.

9    Q.    Now, is it fair to say just looking at this that the

10   checkpoint is north of those landmarks we've been talking

11   about?

12   A.    Yes, ma'am.

13   Q.    Please explain to the jury how these landmarks can be

14   used to navigate further into the United States.

15   A.    They're just unique-looking landmarks.  You can see them

16   from a long while away, especially Childs and Hat Mountain.

17   That's what those are primarily used for.  The Craters here

18   are used extensively because you can almost see a lot of these

19   passes through.  They're not large mountains.  They're kind of

20   low rocky hills with a lot of passes in them.  That's usually

21   what we call a layup spot where aliens go to rest, to cook,

22   and to hide.

23   Q.    And let's talk a little bit now about, so once you get

24   north of these landmarks, then the next item of interest is

25   the Border Patrol checkpoint.  Can you see that checkpoint at

REDIRECT EXAMINATION OF BRENDAN BURNS

1    night?

2    A.   Yes, ma'am.

3    Q.   Why is that?

4    A.   It is -- there are many, many lights.  It's visible from

5    a long way off.

6    Q.   Have you ever in your training and experience encountered

7    anyone who used the lights of the Border Patrol checkpoint to

8    navigate?

9    A.   Yes.

10   Q.   Please tell us about that.

11   A.   Yep.  We've arrested aliens -- there are several what we

12   call two-tracks, just unimproved dirt roads running on both

13   sides of Interstate 8.  They're used by the Barry Goldwater

14   security.  That's the Air Force range that is in this area

15   here.

16        And some of them come very close to the checkpoint,

17   within just a few hundred yards, right on the east side, and

18   we've arrested aliens walking up that, you know, navigating

19   off the lights of the checkpoint at night using that as a

20   reference point.

21   Q.   In your training and experience, would aliens ever use

22   the lights of perhaps the intersection of Interstate 8 and

23   State Route 85 as a way to navigate as well?

24   A.   Not so much right at the intersection.  Just to the west

25   there's -- you can see the farm area there, the grain up in

1    this area, that's referred to as Paloma Farms, and those

2    lights are visible from the checkpoint at night, so at least

3    18 miles south, and we've arrested aliens that we know were,

4    you know, traversing, coming out of the Craters and heading

5    north, navigating off of those lights.

6        The lights in Gila Bend itself here, just to the east of

7    the intersection, really, are visible as soon as you pour out

8    of the Sauceda Mountains here and are visible from a long way

9    off.

10   Q.   And when you say a long way off, could you stand at the

11   Border Patrol -- excuse me -- Border Patrol checkpoint and see

12   those lights further to the north?

13   A.   Not at the checkpoint, I don't believe, because you've

14   got these mountains here.  That's Black Gap right at mile

15   marker 15, and those kind of obstruct that view.  But from off

16   in the desert, you know, parallel from the checkpoint, you can

17   see those lights.

18   Q.   All right.  Actually, I'm not going to use that one right

19   now.  I want to switch up our topics a little bit here and

20   talk again about -- thank you, Sherry -- about that gas

21   station surveillance video.

22       You were able to observe Jose and Kristian on January

23   17th; correct?

24   A.   Correct.

25   Q.   And you did that using your spotting scope?

1    A.   Correct.

2    Q.   What kind of detail could you see about how they moved

3    and maybe any expressions on their faces?

4    A.   I could see their faces.  I don't remember any

5    expressions that stand out.

6    Q.   And you watched the security camera footage from the

7    14th, about four days earlier; correct?

8    A.   Correct.

9    Q.   Is it fair to say that how you saw them moving on the

10   17th was as good or better than they moved on the 14th?

11   A.   Yes, that's fair.

12   Q.   Did you, when you observed them on the 17th, see anything

13   about the way they moved that suggested that either of them

14   had an injury that impaired their movement?

15   A.   Not that I noticed.

16   Q.   So no limps, shuffles, nobody using crutches, anything

17   like that?

18   A.   No, ma'am.

19   Q.   Give me just a moment here.

20        The last thing I wanted to talk to you about, do you

21   remember Mr. Kuykendall asked you some questions about how you

22   announced your presence into the Barn?

23   A.   Yes.

24   Q.   Why is it important for you to announce your presence?

25   A.   It's just smart, just to give anybody that's in there a

REDIRECT EXAMINATION OF BRENDAN BURNS

1    chance to say back, okay, I'm coming out, or I'm in here.

2    Q.    Is it important for you to know before going in a space

3    who might be on the other side of that door?

4    A.    We would always prefer that, yes.

5    Q.    And so can it be dangerous if you don't know who's on the

6    other side of a door?

7    A.    It can be, yes.

8    Q.    And so when you were coming around from the driveway

9    where you spoke to the defendant and coming around that side

10   to where you encounter Kristian, would it have been helpful

11   for you to know that there were people inside the Barn at that

12   time?

13   A.    Yes.

14   Q.    Would it have been helpful for you to know that there

15   were illegal aliens inside the Barn at that time?

16   A.    Yes.

17   Q.    Why would that have been helpful?

18   A.    If we'd have known ahead of time who was in there, it

19   just -- we wouldn't have had to go in there without knowing,

20   if that makes sense, you know, because when you don't know

21   who's in there, someone's actively trying to hide from you or

22   trying to escape from you, you know, that's stressful.

23        You know, if somebody just comes out, if we know they're

24   already in there and we can just wait them out and say, hey,

25   come out, it's less stressful and safer.

1   Q.   And so is it fair to say that not being told who was in

2   there made that situation more dangerous for you?

3   A.   That's fair.

4           MS. WRIGHT:   Okay.   Let me see if I have any more

5   questions.

6           Judge, that's all I have.

7           THE COURT:   If the jurors have any questions, please

8   place them in writing.

9           (The following proceedings occurred at sidebar.)

10          THE COURT:   The first question is, "Do you know who

11  Kristian was calling at the gas station?  Was it Scott?"  I

12  assume he's going to answer no.

13          "Was Dr. Warren speaking to both Kristian and Jose

14  while outside the Barn and pointing to the northeast,

15  northwest?  Were they all standing together?"

16          "Did Agent Marquez respond in any way when Agent

17  Burns knocked on the bedroom door while performing the

18  protective sweep and let Agent Burns know he was there?"

19          "If the defendant had been speaking to two women or

20  Anglo-looking people outside the Barn and gesturing, would you

21  still have moved in for a closer look and knock-and-talk?  Was

22  the fact that they were Hispanic the main factor, or was it

23  the defendant?"

24          "So if you saw the video before the surveillance,

25  why did you say your training told you they were South

1    Americans?  Why not say we identified them from the videos?"

2            MS. WRIGHT:  I think they think that he got the gas

3    station video before he set up is kind how that sounded to me.

4            THE COURT:  That sort of makes sense.

5            "When were the Barn inside exhibits taken,

6    surveillance time or later?"  Okay.

7            "Does the Border Patrol have authority to secure a

8    site without a search warrant?"

9            "Were the bath/laundry room and shower where aliens

10   were hiding locked, hard to access, or obscured in any way

11   when you reached there?"  I think it's only one.

12           MR. KUYKENDALL:  Let me read it one more time.

13           THE COURT:  "Were the bath/laundry room and shower

14   where the aliens were hiding locked, hard to access, or

15   obscured in any way when you reached there?"

16           MR. KUYKENDALL:  I think -- I see.  I see what he's

17   driving at.  I think he can answer it.

18           THE COURT:  Okay.  If he doesn't know, he doesn't

19   know.

20           MS. WRIGHT:  That's fine, Judge.

21           THE COURT:  "By Mr. Burns' definition, what

22   constitutes harboring an illegal immigrant as opposed to

23   humanitarian aid?"  No.  I'm sure he can give us a good

24   definition though.

25           "Are the photos of the Barn from the time of the

 1  search warrant?  If so, do the pictures differ from the scene

 2  found during the arrest?"  I'll ask that one.

 3          "As part of the arresting team, when you encountered

 4  the two aliens in question, did they appear to have had any"

 5  -- "to have had any type of medical attention?  Was there any

 6  indication of medical aid being administered at the Barn?"

 7  I'll ask him did he see any indication.

 8          "When taken into custody, were the two aliens in

 9  question treated for any ailments?"

10          Okay.  All right.  I'll ask -- oh, while we're here,

11  who's after this?

12          MS. WRIGHT:  Video depos, Judge.

13          THE COURT:  Oh, let's start tomorrow morning.  We're

14  not going to do that to anybody.

15          MS. WRIGHT:  Judge, actually, while I have you here,

16  I was going to suggest, I haven't timed them since we've done

17  redactions, but I was going to ask if it would be okay for the

18  Court to instruct the jurors that they can stand up at any

19  time while they're playing and stretch their legs.

20          THE COURT:  Sure.

21          MS. WRIGHT:  All right.  Thank you, Judge.

22          THE COURT:  Thanks.

23          (End of sidebar conference.)

24          THE COURT:  Sir, I have several questions from the

25  jurors I'm going to ask on their behalf.

UNITED STATES DISTRICT COURT

1          THE WITNESS:  Yes, sir.

2          THE COURT:  As part of the arresting team, when you

3     encountered the two aliens in question, did they appear to you

4     to have had any type of medical attention?

5          THE WITNESS:  I couldn't tell if they had received

6     any, but no, sir.

7          THE COURT:  Was there any indication to you of

8     medical aid being administered at the Barn?

9          THE WITNESS:  There were medical supplies in the

10    bedroom, but I didn't see any evidence that it was

11    administered to those two subjects.

12         THE COURT:  When taken into custody, were the two

13    aliens in question treated for any ailments?

14         THE WITNESS:  No, sir, they were not.

15         THE COURT:  Are the photos of the Barn that the jury

16    has seen so far from the time of the search warrant, and if

17    so, do the pictures differ from the scene found during the

18    arrest?

19         THE WITNESS:  The pictures that I've seen today of

20    the Barn, of the interior, the ones that had markers on the

21    doors saying, like, Door 1 and Door 2, those were taken at the

22    time of the search warrant.  Other photos that depict the

23    interior of the Barn, which were the selfies from those two

24    subjects, those were taken prior to their arrest.

25         I don't believe I've seen any today that were taken

1    on the date of the arrest, but I know from my observations of

2    things I saw inside the Barn the day of the arrest that things

3    were changed by the date the search warrant was executed.

4            THE COURT:  Do you know if the bath/laundry room and

5    shower where the aliens were hiding was locked, hard to

6    access, or obscured in any way?

7            THE WITNESS:  No.  Both of those doors were open

8    when I approached.

9            THE COURT:  When were the Barn's inside exhibits

10   taken, at the surveillance time or later?  The ones you've

11   seen today.

12           THE WITNESS:  The photos of the interior of the

13   Barn?

14           THE COURT:  Yes.

15           THE WITNESS:  Yes, the ones I've seen today I

16   believe were taken on the date of the search warrant.  I know

17   the two where the doors were marked, door numbers, they had

18   numbers on them, those were taken the day of the search

19   warrant.

20           THE COURT:  Does the Border Patrol have authority to

21   secure a site without a search warrant?

22           THE WITNESS:  It depends on the amount of time.

23   When we'd arrested those aliens there, at that time we had the

24   authority to detain persons present, but once we adjudicated

25   the immigration status and made all the arrests we were sure

UNITED STATES DISTRICT COURT

 1    we were going to make at that time, we had to leave the

 2    property.  I don't know that we had any authority to secure or

 3    limit anyone's access to the Barn after that time.

 4              THE COURT:  You were shown some videos of the people

 5    in the store and so forth.  You saw those videos after the

 6    arrest; is that correct?

 7              THE WITNESS:  That's correct.

 8              THE COURT:  So you had not seen those before you did

 9    surveillance?

10              THE WITNESS:  That's correct.

11              THE COURT:  Didn't know they existed before you did

12    the surveillance?

13              THE WITNESS:  That's correct.

14              THE COURT:  If the defendant had been speaking to

15    two women or Anglo-looking people outside the Barn and

16    gesturing, would you still have moved in for a closer

17    look/knock-and-talk?  Was the fact that they were Hispanic the

18    main factor, or was it the defendant that was the main factor?

19              THE WITNESS:  It was the defendant's actions that

20    were the main factor.

21              THE COURT:  Was Dr. Warren speaking to both Kristian

22    and Jose while outside the Barn and pointing to the northeast

23    or northwest?

24              THE WITNESS:  Yes.  Dr. Warren was speaking, I could

25    see his mouth moving, and I saw both aliens looking in the

 1   direction that he was pointing toward.

 2           THE COURT:  So they were all standing together?

 3           THE WITNESS:  Yes, sir.  All three persons were

 4   standing together.

 5           THE COURT:  Did Agent Marquez respond in any way

 6   when you knocked on the bedroom door while performing the

 7   protective sweep to let you know he was in there?

 8           THE WITNESS:  I don't remember.

 9           THE COURT:  Do you know who Kristian was calling at

10   the gas station?

11           THE WITNESS:  No, sir.

12           THE COURT:  Ms. Wright, any questions based upon the

13   jurors' questions?

14           MS. WRIGHT:  Yes, Your Honor, just two areas.

15                          FURTHER EXAMINATION

16   BY MS. WRIGHT:

17   Q.   And Agent Burns, if you give me just a second, I want to

18   show you some of those photos so we can talk specifically

19   about which ones were from possibly the search warrant and

20   which ones are from before that time.

21       Okay.

22           MR. KUYKENDALL:  Judge, I'd object.  This goes

23   beyond the scope of what the questions were asked by the jury.

24   This isn't going to clarify any response that he made to the

25   jurors' questions.

1           THE COURT:  Overruled.

2   BY MS. WRIGHT:

3   Q.   We did a lot of Exhibits, Agent Burns.  I've got a whole

4   stack here.

5           THE COURT:  Why don't you do it this way.  Give him

6   the stack that has all the ones that were taken on the day of

7   the surveillance, and he can tell us what numbers those are.

8   And then give him the stack that were taken later.  He can

9   tell us what numbers those are.

10          MS. WRIGHT:  I can do it in reverse order of that,

11  because I've already pulled them out.

12          THE COURT:  Okay.  Sure.  Reverse orders works.

13          MS. WRIGHT:  If I could, Judge, just take a minute.

14  BY MS. WRIGHT:

15  Q.   (Supplying photographs to the witness.)

16  A.   Thank you.

17  Q.   And then so those are -- looking at those, are those the

18  ones that were taken the day of the search warrant, or were

19  those the ones taken on prior days?

20  A.   They would have had to have been -- excuse me.  They

21  would have had to have been taken before.

22  Q.   Okay.  And if you could just, fairly slowly for the

23  jurors' benefit, so they can take a note if they want, just

24  read out those exhibits numbers that would have been taken

25  before.

1    A.    They'll be Exhibit 41, 42, 44, 43, 39, and 40.

2    Q.    Thank you.  And I've almost got that next stack ready for

3    you here.

4          Do the same exercise.  I'll take those back.  And if

5    these are the ones that were taken on the date of the search

6    warrant, if you'll read out those numbers slowly.

7    A.    22, 21, 23, 20, 9, 11, 14, 16, 17, 10, 18, 12, 13, and

8    19.

9    Q.    And actually, I have a third stack for you just of

10   exterior photos, and if -- I'm going to hand these to you as

11   ones that fairly and accurately represent what the exterior of

12   the Barn looked like on the day you set up surveillance and

13   have you do the same exercise.

14         Thank you.

15   A.    Thank you.  These are 6, 122, 121, 8, 70, and 71.

16   Q.    Thank you.  And I'll take those back from you.

17         And do you remember the juror's question that was focused

18   on what were the -- what was the factor or the main factor

19   that played into your decision to approach the Barn?

20   A.    Yes.

21   Q.    And I believe you answered that it was the defendant's

22   actions that were the main factor.

23   A.    Right.

24   Q.    Was that the only factor?

25   A.    No.  They were the defendant's actions within the

FURTHER EXAMINATION OF BRENDAN BURNS

1   totality of everything I knew about the Barn, Agent Marquez's

2   investigation, the area surrounding the Barn, the landmarks

3   that he referenced.

4   Q.   So would it be fair to say that, in your work, you look

5   at everything together rather than isolating one thing?

6   A.   That's correct.

7   Q.   And you use that information taken together to decide

8   whether or not to investigate further and gather further

9   information?

10  A.   Yes, that's correct.

11           MS. WRIGHT:  Your Honor, those are all the questions

12  I have.

13           THE COURT:  Mr. Kuykendall, any questions based upon

14  the jurors' questions?

15           MR. KUYKENDALL:  I don't have any questions, but I

16  think you left one out you intended to ask, if I -- can I

17  approach?

18           THE COURT:  Sure.

19           (The following proceedings occurred at sidebar.)

20           MR. KUYKENDALL:  (Indicating.)

21           THE COURT:  Yeah, I asked that one.

22           MR. KUYKENDALL:  Are you sure you asked this?

23           THE COURT:  Uh-huh.

24           MS. WRIGHT:  Yes, he definitely did.

25           MR. KUYKENDALL:  Okay.  I didn't hear it.

```
 1                THE COURT:  All right.  I did.

 2                All right.  9:30 tomorrow.

 3                MS. WRIGHT:  9:30.  Okay.  Thank you, Judge.

 4                (End of sidebar conference.)

 5                THE COURT:  We're going to call it a day rather than

 6     go for another 20 minutes and then take a break, so we'll quit

 7     a little bit early today.

 8                Remember the admonitions I've already given you.  No

 9     research.  No investigation.  No talking about the case,

10     communication about the case in any way, with anybody.  All

11     right?

12                I believe that, when you came into court this

13     morning, there was a gathering on the northwest corner of the

14     intersection.  Please don't stop and read the signs.  Just

15     move on by.  Okay?  And that has no bearing on your

16     deliberations or anything in here.  Okay?  That's like reading

17     a newspaper or listening on the television or radio.  All

18     right?

19                I have been told by the attorneys that we start

20     tomorrow morning with video depositions.  Drink lots of

21     coffee.

22                I'll see you in the morning at 9:30.

23                (The jury exits the courtroom.)

24                THE COURT:  Can I see counsel for a moment?

25                If you guys can let the jurors get a head start, I'd
```

UNITED STATES DISTRICT COURT

1    appreciate it.

2              (A bench conference was had off the record.)

3              (Proceedings conclude.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3           I, Erica R. McQuillen, Federal Official Realtime

4    Reporter, in and for the United States District Court for the

5    District of Arizona, do hereby certify that, pursuant to

6    Section 753, Title 28, United States Code, the foregoing is a

7    true and correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the regulations

10   of the Judicial Conference of the United States.

11          Dated this 14th day of November, 2019.

12

13                         s/Erica R. McQuillen
                      Erica R. McQuillen, RDR, CRR
14                    Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25