1              IN THE UNITED STATES DISTRICT COURT

2                      DISTRICT OF ARIZONA

3   United States of America          CR-18-223-TUC-RCC(DTF)

4   vs.

5   Scott Daniel Warren,
                                          November 14, 2019
6           Defendant.                    Tucson, Arizona
    _____

7

8

9

10        REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS

11                     JURY TRIAL DAY 3

12        BEFORE THE HONORABLE RANER C. COLLINS
                 UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22   Court Reporter:          Erica R. McQuillen, RDR, CRR
                              Official Court Reporter
23                            405 W. Congress Street
                              Tucson, Arizona 85701
24                            (520)205-4267

25      Proceedings Reported by Stenographic Court Reporter
        Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2   For the Government:

 3        Anna Roberta Wright
          Nathaniel Jacob Walters
 4        United States Attorney's Office
          405 West Congress
 5        Tucson, Arizona 85701

 6        Glenn B. McCormick
          United States Attorney's Office
 7        Two Renaissance Square
          40 North Central Avenue
 8        Suite 1800
          Phoenix, Arizona 85004

 9

10   For the Defendant:

11        Gregory John Kuykendall
          Amy Pickering Knight
12        Kuykendall & Associates
          531 South Convent Avenue
13        Tucson, Arizona 85701

14

15

16

17

18

19

20

21

22

23

24

25
```

1                      EXAMINATION INDEX

2    WITNESS FOR THE UNITED STATES OF AMERICA:

3    PATTI FITZSIMMONS
          DIRECT BY MS. WRIGHT . . . . . . . . . . . . . 11
4         CROSS BY MR. KUYKENDALL . . . . . . . . . . . . 26

5

6

7    WITNESSES FOR THE DEFENSE:

8    GREGORY HESS
          DIRECT BY MS. KNIGHT  . . . . . . . . . . . . . 48
9         CROSS BY MS. WRIGHT . . . . . . . . . . . . . . 63
          REDIRECT BY MS. KNIGHT . . . . . . . . . . . 65
10

11   EDGAR McCULLOUGH
          READING OF TRANSCRIPT . . . . . . . . . . . . 71
12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  Please rise for the jury.
 3              (The jury enters the courtroom.)
 4              THE COURT:  Let the record show the jurors returned
 5    back to the courtroom, the presence of all counsel and the
 6    defendant.
 7              Good morning.  Please be seated.  I'm going to count
 8    this as starting on time since we were waiting for a couple of
 9    you.  I don't know which two of you we were waiting for, but
10    that's okay.  I'm counting this as starting on time.  So we'll
11    see if we can do it again.
12              Ms. Wright, you indicated at the close of business
13    yesterday you were going to begin with video depositions.
14              MS. WRIGHT:  Yes, Your Honor.
15              THE COURT:  Is that still your intention?
16              MS. WRIGHT:  That is.
17              THE COURT:  You're about to see a video deposition.
18    As my memory serves me correctly, the video deposition has
19    some writing on the bottom of it so that you can actually read
20    the interpretation of what the witness said, the English
21    interpretation of the Spanish that the witness said.  That's
22    not the evidence.  The evidence is what you hear.  So if there
23    is a difference between the written and what you hear, what
24    you hear controls.  Okay?
25              MS. WRIGHT:  I think maybe, Judge, the one other
```

1  thing is, even though we are playing this and we have the

2  transcript, the jury will not get a transcript at the end.

3  They should consider this as live testimony and treat it the

4  same way.

5           THE COURT:  Yes.  You won't get a transcript.  Thank

6  you for reminding me of that.

7           MS. WRIGHT:  Thank you, Judge.

8           And, Judge, we plan -- we are going to play Exhibit

9  56-F, that is Jose Sacaria-Goday's deposition, first, whenever

10  the Court's ready.

11           THE COURT:  All right.  You may proceed.

12           MS. WRIGHT:  Thank you, Your Honor.

13           MR. WALTERS:  Sherry, can we have the laptop?

14           (The recording was played in open court.)

15           THE COURT:  Can I see counsel for a second?

16           (The following proceedings occurred at sidebar.)

17           THE COURT:  How long is the next one?

18           MS. WRIGHT:  It's about an hour and a half, Your

19  Honor.

20           THE COURT:  Okay.  Let's take a 15-minute break,

21  come in and hear it.  Then we'll take our lunch break.

22           MS. WRIGHT:  And Your Honor, if I could, we

23  double-double-checked our recording this morning.  What we

24  have burned and ready to play is just the direct.  Our people

25  are working and getting the other parts together.

```
1              So I was going to propose we play the direct.  That
2    will take us up to about 12:30, and then we can come back
3    after lunch and finish up.  The redirect and the cross are
4    much shorter than the direct.
5              THE COURT:  They're going to have them ready by
6    12:30?
7              MS. WRIGHT:  That is -- I've got my fingers crossed,
8    and I've been talking with them all morning, so it is in
9    process, it should get done in time, but that's what I was
10   going to suggest.
11             THE COURT:  Okay.  All right.
12             MS. WRIGHT:  And Your Honor, while we're -- sorry.
13   I'm just going to steal everyone's time while we're here.  We
14   have -- I filed -- I made a filing yesterday about our
15   attempts to contact the material witnesses.  I believe we
16   stipulated they're unavailable.  I'd ask that you make the
17   finding they're unavailable.
18             THE COURT:  Any objection to that?
19             MR. KUYKENDALL:  I don't think so.  I need to look
20   at what the actual stipulation said before I agree to what --
21             THE COURT:  What the stipulation said?
22             MR. KUYKENDALL:  Yeah.
23             THE COURT:  I don't have to tell the jury that.
24             MR. KUYKENDALL:  I thought that's what you were
25   asking.
```

```
 1            MS. WRIGHT:  The only thing we're talking about is
 2   that they're unavailable, so we sent the letters, we haven't
 3   heard from them --
 4            MR. KUYKENDALL:  Oh, yeah, I'd stipulate that.  I
 5   just don't want the language for the jury yet, but I stipulate
 6   that they are unavailable.
 7            THE COURT:  The jury need not know anything about
 8   it.
 9            MR. KUYKENDALL:  Great.
10            THE COURT:  So I'll find that the material witnesses
11   are unavailable.  The Government's made sufficient efforts to
12   try and obtain their presence and was unable to do so.
13            So we'll take a 15-minute break.  We'll come back
14   and play the first part of the deposition.  Then we'll take
15   our lunch break.
16            MS. WRIGHT:  Thank you, Your Honor.
17            THE COURT:  There was probably something else I was
18   thinking about, but I've forgotten.
19            (End of sidebar conference.)
20            THE COURT:  We're going to take a 15-minute recess
21   at this point in time.  Then we're going to come back and
22   listen to some more video deposition before we take our lunch
23   break.  Okay?  So it'll be a little weird lunch hour today,
24   but you'll get lunch.
25            Remember the admonitions I've given you before.
```

1          THE CLERK:  Please rise for the jury.

2          (The jury exits the courtroom.)

3          THE COURT:  See you in 15.

4          (Off the record.)

5          (The jury enters the courtroom.)

6          THE COURT:  Let the record show the jurors returned

7   back to the courtroom, the presence of all counsel and the

8   defendant.

9          Please be seated.  Don't forget, they're standing

10  because you're standing.

11          We'll begin with the next deposition.  Don't forget

12  what I said at the beginning of the first one.  It's what you

13  hear in terms of the testimony that's the evidence, not what

14  you read.

15          MS. WRIGHT:  Thank you, Your Honor.

16          We will now play the video deposition of Kristian

17  Perez-Villanueva, Exhibit 56-E, and like with the last one,

18  this should be treated as live testimony.

19          (The recording was played in open court.)

20          THE COURT:  Let's take our lunch recess.  We'll come

21  back at 1:45.  Remember the admonitions I've given you before.

22          THE CLERK:  Please rise for the jury.

23          THE COURT:  And to give you guys a heads-up, we

24  won't start tomorrow morning until about 11:30.  I've got

25  something I have to do.  It's my fault, not theirs.

```
1              See you -- see you at 1:45.  All right?
2              (The jury exits the courtroom.)
3              MS. WRIGHT:  Thank you, Judge.
4              MR. KUYKENDALL:  Judge, we'll have Dr. Hess here at
5    three o'clock.
6              THE COURT:  Okay.
7              MR. KUYKENDALL:  And we can -- if we get through
8    him, we'll go with the deposition testimony.
9              THE COURT:  Okay.
10             MR. KUYKENDALL:  We'll make it a little more
11   exciting than this deposition testimony.
12             THE COURT:  What are you going to do?
13             MR. KUYKENDALL:  I'm going to have Amy do it, for
14   one thing, but also we --
15             THE COURT:  That already changes the dynamics.
16             MR. KUYKENDALL:  Yeah.  But we've got a fellow that
17   knows how to speak that's going to be pretending to be
18   Mr. Hess.
19             MS. KNIGHT:  McCullough.
20             MR. KUYKENDALL:  Or Mr. McCullough.  Dr. McCullough.
21   Professor McCullough.
22             THE COURT:  He's not an actor, is he?
23             MR. KUYKENDALL:  No.  He's got a good voice though.
24   He's a voiceover guy.
25             THE COURT:  See you guys at 1:45.
```

```
 1                  (Lunch recess taken.)

 2                  THE CLERK:  Please rise for the jury.

 3                  (The jury enters the courtroom.)

 4                  THE COURT:  They're standing because you're

 5     standing, so when you sit, everybody's going to sit.

 6                  Show the presence of the jury, all counsel and the

 7     defendant.

 8                  Ms. Wright, you may continue playing the deposition.

 9                  MS. WRIGHT:  Thank you, Your Honor.  We will pick up

10     with cross-exam in just a moment.

11                  (The recording was played in open court.)

12                  THE COURT:  You may call your next witness.

13                  MS. WRIGHT:  Your Honor, the United States calls

14     Patti Fitzsimmons.

15                      PATTI FITZSIMMONS, WITNESS, SWORN

16                  THE CLERK:  Thank you.  Please be seated.

17                  Please speak directly into the microphone.  State

18     your full name for the record, and please spell both your

19     first and last names.

20                  THE WITNESS:  My name is Patti Fitzsimmons,

21     P-a-t-t-i F-i-t-z-s-i-m-m-o-n-s.

22                  THE COURT:  Ma'am, the Rule has been invoked in this

23     case.  That means, except during the time that you're

24     testifying, you must remain outside the courtroom, and you are

25     only allowed to discuss your testimony with the attorneys
```

 1  involved in the case.

 2          You may proceed.

 3          MS. WRIGHT:  Thank you, Your Honor.

 4                    DIRECT EXAMINATION

 5  BY MS. WRIGHT:

 6  Q.   Ms. Fitzsimmons, where do you work, and what do you do

 7  for a living?

 8  A.   I work at the U.S. Border Patrol here in Tucson, Tucson,

 9  Arizona.  I'm an enforcement analysis specialist.

10  Q.   Pull that microphone just a little bit closer to you,

11  like right up to you.

12  A.   Oh, okay.

13  Q.   Yeah, there you go.

14          And tell us what your job title is again.

15  A.   Enforcement analysis specialist.

16  Q.   How long have you been with Border Patrol in total?

17  A.   In total I have been with Border Patrol for about 10

18  years now.

19  Q.   How long have you been in your current position?

20  A.   Three years.

21  Q.   And just give us a brief sketch of what your job duties

22  are in your current position and what sorts of training you've

23  had to do that.

24  A.   As an enforcement analysis specialist, I look at criminal

25  activity throughout the entire sector of U.S. Border Patrol,

1   so pretty much all of Arizona, performing analyses on persons,

2   activity, styles of transportation that come into the U.S., do

3   trend analyses, identifying specific people who are

4   responsible for criminal activity and performing network

5   analysis to find people who are connected within larger groups

6   in order to impact the total group, not just really single

7   individuals, but to take down an entire organization.

8   Q.    From a layperson's perspective, would it be fair to say

9   that you're somewhat of maybe a data cruncher kind of person

10  when it comes to law enforcement investigation?

11  A.    Absolutely.

12  Q.    Okay.  So when you're talking about these duties, this

13  isn't you out in the field looking at things.  It's you behind

14  a screen looking at databases and things like that?

15  A.    Correct.  A large part of my training, I have 12 weeks of

16  training at an advanced training center, and that included

17  doing data exploitation, doing network analysis, identifying

18  key nodes within organizations that are central figures that

19  need to be targeted, and additionally structured analytic

20  techniques, which are important for what I do in my

21  profession.

22  Q.    And as part of all of these things that you do, all these

23  tools that you have, do you sometimes analyze the results of

24  forensic extractions of cell phones?

25  A.    Yes.  I do that actually quite often, so it's -- we

    1   obtain a lot of data from the phone extractions, and that is
    2   important many times in identifying additional members who
    3   work in an organization.
    4   Q.   And let's just take a minute here and define what a
    5   forensic cell phone extraction is, just kind of in terms a
    6   layperson could understand.
    7   A.   So what happens is the cell phone is attached to a device
    8   called Cellebrite.  It's the brand that is predominantly used
    9   throughout all of law enforcement and the Federal Government.
   10        And this device, with proprietary software, it can
   11   extract all of the information that's contained within a cell
   12   phone, so all of the calls, the call logs, your text messages,
   13   the emails, not only ones that you've sent but that have been
   14   received and also ones that were written but never sent.  Also
   15   WhatsApp conversations, Facebook Messenger conversations,
   16   Instagram messages, not the Instagram stuff that goes away,
   17   but their direct messenger --
   18   Q.   And Ms. Fitz, we're getting into a lot of detail here --
   19   A.   Sorry.
   20   Q.   -- so let me just hit pause.  Would it be fair to say
   21   that that process can pull information from the phone that the
   22   phone sent or received or created at various times?
   23   A.   Absolutely.
   24   Q.   And it can do that across many of the platforms or apps
   25   that cell phones use these days?

 1  A.    Yes, it does.

 2  Q.    Okay.  And the information it pulls can also capture

 3  what's known as metadata?

 4  A.    Yes, it does.

 5  Q.    So sometimes that can be location information, date

 6  information, or time information associated with those items

 7  that it has pulled from the phone?

 8  A.    Correct.

 9          MS. WRIGHT:  Okay.  And before I go on, Sherry,

10  could you switch me over to the Elmo, please?  Thank you.

11  BY MS. WRIGHT:

12  Q.    Now, in this case, was there a phone seized from Kristian

13  Perez-Villanueva?

14  A.    Yes, there was.

15  Q.    And was that phone forensically analyzed in this method

16  we've been talking about just now?

17  A.    Yes, it was.

18  Q.    Did you do that?

19  A.    No.  U.S. Border Patrol has a unit called the Digital

20  Forensic Unit.  They are experts at doing this type of data

21  extraction from cell phones.  They are the ones who performed

22  the task.

23  Q.    Have you had a chance to review the results of that

24  forensic extraction?

25  A.    Yes, I have.

1   Q.   And in your review of that forensic analysis of

2   Kristian's phone -- actually, I'm sorry.  I got off track

3   already.

4       Let me show you -- let me show you what's been admitted

5   as Government's Exhibit 34.

6             MR. KUYKENDALL:  Judge?  Excuse me, Judge?  May we

7   approach regarding this exhibit?

8             (The following proceedings occurred at sidebar.)

9             MR. KUYKENDALL:  This is the exhibit that had been

10  excluded by your prior ruling relative to it being taken in

11  Mexico, and --

12            THE COURT:  And then admitted by my undoing my prior

13  ruling.

14            MR. KUYKENDALL:  All right.  So I don't think that

15  it should be -- if I understood you right, then this shouldn't

16  be discussed with this -- with this witness.

17            THE COURT:  No, I think we spent some time yesterday

18  afternoon talking about this one exhibit from Mexico was going

19  to come in.

20            MR. KUYKENDALL:  I thought you said it was going to

21  come in, but there wasn't going to be a discussion of

22  precisely when it was taken, et cetera.

23            THE COURT:  I'm not sure we're going to go that far.

24  She's just talking about where the exhibit came from.

25            MS. WRIGHT:  I'm going to do the time and date

 1  stamp, Your Honor.

 2              THE COURT:  That's it?

 3              MS. WRIGHT:  That's it.

 4              THE COURT:  All right.

 5              MR. KUYKENDALL:  Not the place?  Time and date?

 6              MS. WRIGHT:  Time and date.

 7              THE COURT:  Time and date.  All right.  Thanks.

 8              (End of sidebar conference.)

 9              THE COURT:  You may continue.

10              MS. WRIGHT:  Thank you, Your Honor.

11  BY MS. WRIGHT:

12  Q.  All right.  Government's Exhibit 34, do you recognize

13  this as an image that was recovered from Kristian's phone by

14  that forensic extraction?

15  A.  Yes, I do.

16  Q.  And in your review of that analysis, were you able to

17  determine whether or not this was a photo taken by his phone?

18  A.  Yes, I was.

19  Q.  And was it taken by his phone?

20  A.  Absolutely.

21  Q.  Were you able to determine when that photo was taken?

22  A.  December 20th.

23  Q.  Of what year?

24  A.  2017.

25  Q.  Thank you.  So based on your analysis, this photo was

```
 1  taken by his phone on December 20th of 2017.  Do I have that

 2  right?

 3  A.    Correct.

 4  Q.    Okay.  We'll move on to the next one.

 5        Now turning to evidence in the phone related to January

 6  -- related to the phone's use between January 14 and January

 7  17 of 2018, starting with January 14, were you able to

 8  determine on that date any location information associated

 9  with the phone?

10  A.    Yes.

11  Q.    What were you able to determine?

12  A.    The GPS location showed that the phone -- well, GPS and

13  also the WiFi that was used by the phone identified it as

14  Chevron in Ajo.

15  Q.    Okay.  So if I understand correctly, on that date, there

16  was some information in the phone that placed the phone in Ajo

17  at a Chevron?

18  A.    Yes.

19  Q.    Do you remember what time stamp was associated with that?

20  A.    It was around 1 p.m.

21  Q.    And now let's talk about some more images recovered from

22  Kristian's phone, and I'm going to show you Exhibit -- several

23  exhibits, actually.  We're going to do a few here, so let me

24  just pull the right one.

25        Exhibit 41, 40, 38, 39, 35, 36, and 37.  Do you recognize
```

 1   these all as images that were taken from Kristian's phone --

 2   A.   Yes.

 3   Q.   -- during the forensic analysis?  Sorry about that.

 4        And were you able to determine whether or not these were

 5   photos taken by his phone rather than photos sent to his

 6   phone?

 7   A.   These were all taken by his phone.

 8   Q.   And generally speaking -- well, actually, specifically

 9   speaking, what day were they taken on?

10   A.   January 14th, 2018.

11   Q.   And about what time of day?

12   A.   They were taken between 1:03 p.m. and 1:17 p.m.

13   Q.   All right.  And let's go through them in the order that

14   they were taken.  So we'll start with Exhibit 41.  Let me see

15   if I can zoom out a little more.

16        What time was this image taken?

17   A.   That was taken at 1:03 p.m.

18   Q.   Exhibit 40, what time was this taken at?

19   A.   1:05 p.m.

20   Q.   Exhibit 38?

21   A.   1:09 p.m.

22   Q.   Exhibit 39?

23   A.   1:09 p.m.

24   Q.   So 38 and 39 were taken at about the same time?

25   A.   Yes.

1    Q.    Okay.  35?

2    A.    1:10 p.m.

3    Q.    36?

4    A.    1:16 p.m.

5    Q.    And 37?

6    A.    1:17 p.m.

7    Q.    And these times you've given us, those are all on January

8    14th of 2018?

9    A.    Yes, they are.

10   Q.    All right.

11              MS. WRIGHT:  Sherry, these have not been admitted

12   yet.  Thank you.

13   BY MS. WRIGHT:

14   Q.    Now I'm going to show you Government's Exhibit 76 through

15   78, so let's start with 76, 77, and 78.

16        Do you recognize these also as images recovered from

17   Kristian's phone?

18   A.    Yes, I do.

19              MR. KUYKENDALL:  Your Honor, I'm sorry to interrupt.

20   May we approach one more time?

21              (The following proceedings occurred at sidebar.)

22              THE COURT:  These are the photos in the van.

23              MR. KUYKENDALL:  Right.  They're not supposed to

24   come in.

25              MS. WRIGHT:  Your Honor, we litigated this when we

1    talked about --

2            THE COURT:  Slow down.  You're not going to say

3    where the pictures were taken?

4            MS. WRIGHT:  No.  Just say the time and date.

5    That's all we're doing.

6            THE COURT:  All right.  As long as it's time and

7    date, that's all that counts.

8            MR. KUYKENDALL:  These are the pictures that they

9    took in the van --

10           THE COURT:  On the 14th.

11           MR. KUYKENDALL:  -- on the 14th, on the way.

12           THE COURT:  At the Chevron.

13           MR. KUYKENDALL:  No, after they left the Chevron, on

14    the way to the Barn.

15           THE COURT:  Okay.

16           MR. KUYKENDALL:  That's the problem.  The problem

17    is, these are -- this brings Irineo Mujica right back into the

18    whole litigation, and this is what you ruled couldn't be

19    admitted.  It doesn't do anything other than create the

20    irrelevant and inadmissible impression that they got a ride to

21    the Barn, and that's precisely why you ruled the way you did.

22    It's because Dr. Warren didn't know that they got a ride to

23    the Barn, and suggesting now that he did creates a real

24    problem and obviates the entire reason for you having granted

25    the motion in limine to begin with.

1          THE COURT:  You're not fixing to suggest that he

2   knew about them riding in the van, are you?

3          MS. WRIGHT:  No.  We're not going to talk about --

4   I'm not even going to say van.  We're going to do time, date,

5   move them in.  That's what we're doing with them.

6          MR. KUYKENDALL:  The time and the date, when

7   combined with the fact that she's going to say -- this witness

8   is going to say that the last time that the cell phone had

9   access to the Chevron system clearly implicates that they took

10  this ride to the Barn, and that's precisely what you ruled

11  couldn't come in.

12         This is a backdoor method of avoiding the Court's

13  previous ruling.

14         MS. WRIGHT:  Your Honor, I would disagree with that.

15  The ruling had to do with conspiracy, not how they got from

16  point A to point B.  We're not going to mention Mr. Mujica.

17  We're not going to suggest that any person who might have

18  driven this van, et cetera, had anything to do with the

19  offense.  We're not talking about this.

20         This shows how they looked on the 14th, on the

21  afternoon.  That's all we're doing is setting the time and

22  date so the jury can see how they looked just before they

23  arrived at the Barn.  We're not talking about Mujica.  We're

24  not talking about anybody else in the van.  Not talking about

25  anything conspiracy related.  This is what they looked like,

1    and the jury's entitled to see that.

2            I'm just asking for time and date.  There's nothing

3    conspiratorial about time and date stamps.

4            MR. KUYKENDALL:  And they've already got about 45

5    photos that show that within minutes of when those were taken.

6    This is only being introduced in order to obviate the Court's

7    prior ruling, which was correct.

8            MS. WRIGHT:  And that's not accurate, Your Honor.

9            THE COURT:  Whoa, whoa.

10           MS. WRIGHT:  These photos were taken at 4:30, not at

11   one o'clock, which the previous ones were.  The only other one

12   from this day doesn't happen until after they're at the Barn

13   at 6:00.

14           MR. KUYKENDALL:  And there's no suggestion that

15   their health deteriorated in three hours or that it got

16   materially different than it did at one o'clock, when they

17   have all the other photos already admitted.

18           THE COURT:  I am concerned that, if the jurors see

19   these photos, they're going to see that they're in a vehicle.

20           MS. WRIGHT:  Your Honor, the prior ruling and the

21   prior argument had to do with eliminating any sort of bias

22   from a conspiracy suggesting the defendant was involved in a

23   larger network.

24           THE COURT:  What do I do when a juror asks a

25   question about that they appear to be in a vehicle, who's

1    that?

2              MS. WRIGHT:  You say that's not for you to consider.

3    This is admitted for how they look.

4              THE COURT:  No.  We don't go there.  The pictures

5    don't come in.

6              MS. WRIGHT:  All right.

7              (End of sidebar conference.)

8              THE COURT:  You may continue.

9              MS. WRIGHT:  Thank you, Your Honor.

10             Sherry, this one has been admitted.

11   BY MS. WRIGHT:

12   Q.   Ms. Fitzsimmons, I'm showing you what's been marked and

13   admitted as Government's Exhibit 44.  Do you recognize this as

14   an image that you reviewed in your forensic analysis?

15   A.   Yes, it is.

16   Q.   And what day was this image taken on?

17   A.   It was taken on January 14th of 2018.

18   Q.   And this was taken with Kristian's phone?

19   A.   Yes, it was.

20   Q.   What time was it taken at?

21   A.   6 p.m.

22   Q.   So it would be fair to say that we've been going through

23   these in chronological order?  The first ones we talked about

24   were earlier in the day, and this one's later in the day?

25   A.   Yes.

1  Q.   Is that accurate?

2       Were any more photos taken using Kristian's phone on

3  January 14th?

4  A.   No.

5  Q.   Let's turn now to January 15th.  Give me just a second to

6  get myself in order here.

7       All right.  I'm going to show you a series of images.

8  These have all been admitted.  Government's Exhibits 43, 46,

9  47, 45, and 42.

10      Do you recognize these as images that were taken with

11  Kristian's phone?

12  A.   Yes, I do.

13  Q.   And were these all taken on January 15th?

14  A.   Yes, they were.

15  Q.   So the day after the images we just looked at?

16  A.   Yes.

17  Q.   All right.  And now let's walk through them, pardon me,

18  in the order that they were taken.  So let's begin with

19  Government's Exhibit 43.  What time was this taken on January

20  15th?

21  A.   3:56 p.m.

22  Q.   Exhibit 46?

23  A.   7:16 p.m.

24  Q.   Exhibit 47?

25  A.   That was taken at 7:17 p.m.

1    Q.    Exhibit 45?

2    A.    7:21 p.m.

3    Q.    And Exhibit 42?

4    A.    7:22 p.m.

5    Q.    So would it be fair to say that these last images we've

6    just looked at are, actually, in this group, with the

7    exception of the first one, these were all taken within

8    minutes of each other?

9    A.    Yes.

10   Q.    I'm going to show you one last photo here.

11              MS. WRIGHT:   This one has not been admitted, Sherry.

12   BY MS. WRIGHT:

13   Q.    And I'm showing you Government's Exhibit 125.   Do you

14   recognize that as an image taken with Kristian's cell phone?

15   A.    Yes, I do.

16   Q.    What date was that taken on?

17   A.    It was taken on January 16th, 2018.

18   Q.    And you recognize that from your review of the forensic

19   analysis?

20   A.    Yes, I do.

21              MS. WRIGHT:   Your Honor, I'd move to admit this

22   photo, Exhibit 125.

23              MR. KUYKENDALL:   No objection.

24              THE COURT:   It can be admitted, can be published.

25   BY MS. WRIGHT:

 1  Q.   So what time on January 16th was this photo taken?

 2  A.   That was taken at 1:10 p.m.

 3        MS. WRIGHT:   Thank you.   That's all the questions I

 4  have right now.

 5                      CROSS-EXAMINATION

 6  BY MR. KUYKENDALL:

 7  Q.   Good afternoon.

 8  A.   Good afternoon.

 9  Q.   Hang on one second.

10       You not only analyzed Kristian's phone, but you also

11  analyzed Scott Warren's phone; is that right?

12  A.   Correct.

13  Q.   You didn't extract the data but you reviewed the data

14  that had been extracted?

15  A.   Correct.

16  Q.   Okay.   We, in this trial, we've seen a video of Kristian

17  borrowing a phone at about 7:00 in the morning on January 14

18  and either making a text or making a phone call.   Don't know

19  to who.

20       What I want to know is, from your analysis, did you

21  determine that Scott Warren received a phone call in the seven

22  o'clock range on January 14?

23  A.   I would have to review the records for that.

24  Q.   Did you bring your records, or do you want me to give you

25  my records?

```
 1   A.   I can use yours, if you so choose.

 2   Q.   Okay.

 3   A.   I did not bring them up here with me.

 4   Q.   Okay.  Did you bring your report with you?

 5   A.   I do not have it currently with me up here.

 6             MS. WRIGHT:  Mr. Kuykendall, there's a marked copy

 7   of the time line, Government's 118.  It's right here.

 8             MR. KUYKENDALL:  That's what I was going to ask for.

 9   Thank you.

10   BY MR. KUYKENDALL:

11   Q.   Let me show this to you on the Elmo.

12             MR. KUYKENDALL:  This is not to the jury; right?

13             THE CLERK:  That's correct.

14   BY MR. KUYKENDALL:

15   Q.   All right.  Do you recognize this?  I know I haven't

16   focused it yet, but does this look familiar to you?

17   A.   Yes, it does.

18   Q.   Okay.  And what is this that I'm showing you, Exhibit

19   118?

20   A.   This is a copy or a page from the full data extraction.

21   Q.   The full data extraction of Scott Warren's phone; right?

22   A.   That is -- that is correct.

23   Q.   I'll zoom in, if it will help.

24   A.   Yes.

25   Q.   Does that help?
```

1    A.   Yes, it does.

2    Q.   Okay.  So what I'm showing you, this -- it appears to be,

3    if I can do my math, right, about 41 pages worth of cell phone

4    extraction; is that right?

5         Well, don't take my word for it.  See that number down on

6    the bottom right?

7    A.   Yes.

8    Q.   See -- oops.  See that number?

9    A.   Yes.

10   Q.   Did I do the math?  Close?

11   A.   (Nodding.)

12   Q.   Anyway, it's 41 pages, approximately, of raw data that

13   was extracted from Scott Warren's cell phone; right?

14   A.   It was the data that was extracted, yes.

15   Q.   Okay.  Sorry.  I said it wrong.  This is the data that

16   was extracted from Scott Warren's phone?

17   A.   Yes.

18   Q.   And you reviewed it at the prosecutor's request?

19   A.   Correct.

20   Q.   And at the prosecutor's request, you didn't review all of

21   it.  You didn't review years worth.  You reviewed a range.

22        Right?

23   A.   The range that was extracted off the phone, yes.

24   Q.   Okay.  And the range that was provided to you was I

25   believe January 12th until January 17th.  Does that ring --

 1  does that sound right?

 2  A.   I did review that, yes.

 3  Q.   Okay.  And what I want you to do, and I can hand this to

 4  you if it's any easier -- frankly, it probably is.

 5            MR. KUYKENDALL:  May I approach?

 6            THE COURT:  Sure.

 7  BY MR. KUYKENDALL:

 8  Q.   Why don't you take a look at this and tell the jury, what

 9  time is the first phone call or text message that Scott Warren

10  received on January 14?

11  A.   January 14th, 2018, the call log shows an outgoing call

12  at 9:44 a.m. to phone number (520)387-8511, which in the

13  contact appears as Sheriff Ajo, for a duration of four

14  minutes, 23 seconds.

15  Q.   So it would appear that, at 9:44 a.m., on Sunday, January

16  14th, 19 -- I'm sorry -- 2017, somebody --

17            MS. WRIGHT:  2018.

18            MS. KNIGHT:  2018.

19            MR. KUYKENDALL:  Oh, thank you.  Late in the day.

20  BY MR. KUYKENDALL:

21  Q.   So it would appear that, on January 14th, 2018, at

22  9:44 a.m., Scott Warren, or somebody using Scott Warren's

23  phone, called the Ajo Sheriff; right?

24  A.   That's what it appears.

25  Q.   Okay.  At 7:00 in the morning or thereabouts, there's no

1    indication that he either received a call or a text or that he

2    sent a call or a text; right?

3    A.   Not at 7:00 in the morning, no.

4    Q.   And after 9:40 -- well, 9:44 is the first phone call he

5    got; right?  I'm sorry.  The first outgoing call?

6    A.   Calls, yes.

7    Q.   And there's -- the next call that shows is to a Pima

8    County Sheriff's Deputy; right?  I'm sorry.  Not to but from a

9    Pima County Sheriff's Deputy.

10        Do you see down there at the bottom?

11   A.   The next call is January 14th, 2018, 10:50, from

12   (520)419-8051.  There is no identifier as to who that is from.

13   The duration is one minute, 40 seconds.

14   Q.   And then if you look a little bit below that, it shows up

15   again; right?

16   A.   The next call, January 14, 2018, at 10:53 a.m. was

17   (617)921-6594, from Elena, a duration of one minute, 47

18   seconds.

19   Q.   All right.  That phone number that you referred to just

20   before, the one from Elena -- not from Elena --

21   A.   Yes.

22   Q.   -- what -- who did you determine that phone number

23   belonged to?

24   A.   I did not.

25   Q.   You didn't, like, do a reverse thing to figure out who

1    that phone number belonged to?

2    A.    I did not do a reverse phone number search on the

3    entirety of all the contacts in the phone.

4    Q.    Did you do a reverse on any of them?

5    A.    I did, yes.

6    Q.    How did you decide which ones to do a reverse on and

7    which ones to not do a reverse on?

8    A.    By the volume.

9    Q.    So in any event, we can say that whoever Kristian called

10   or texted at 7:00 in the morning on the 14th with some

11   borrowed phone, it wasn't to Scott Warren; is that fair?

12   A.    There is no -- not to this phone, no.

13   Q.    And you don't have any information whatsoever that he had

14   another phone; right?

15   A.    "He" being?

16   Q.    Scott Warren, sorry.

17   A.    Oh, there is another phone; however, that one I did not

18   see any text messages on.

19              MR. KUYKENDALL:  Okay.  May I approach?

20              THE COURT:  You may.

21              MR. KUYKENDALL:  I'll take that back for a minute.

22   I'll give that back to you if I have to ask more questions

23   about it.  Thank you.

24              I'll give this back to you too, but let me keep it

25   for a moment.

 1  BY MR. KUYKENDALL:

 2  Q.   Now, ultimately, you determined that there was no

 3  coordination, in your words, between Scott Warren's phone and

 4  Kristian Perez-Villanueva's phone; right?

 5  A.   Correct.

 6  Q.   None whatsoever?

 7  A.   Correct.

 8  Q.   They just -- Kristian's phone doesn't appear in any way

 9  on Scott's phone, and Scott's phone doesn't appear in any way

10  on Kristian's phone; right?

11  A.   Correct.

12  Q.   And you analyzed them both?

13  A.   Correct.

14  Q.   There's no connection?

15  A.   There was no contact between them.

16  Q.   Now, in addition to what you told the prosecutor about

17  Kristian's phone, you actually found that, on the 16th, the

18  same day of that last picture she showed you, on the 16th,

19  Kristian messaged somebody and told somebody --

20          MS. WRIGHT:  Objection, Your Honor.  Hearsay.

21          THE COURT:  Let me see counsel.

22          (The following proceedings occurred at sidebar.)

23          THE COURT:  The day of the arrest was the 17th, as I

24  recall.

25          MR. KUYKENDALL:  Right.

1          THE COURT:  Okay.

2          MR. KUYKENDALL:  The day of the 16th.

3          THE COURT:  This is where he said he was going to

4  get a ride or something like that?

5          MR. KUYKENDALL:  No.  He texted somebody and said, I

6  can't -- I'm delayed because my partner hurt his ribs.

7          MS. WRIGHT:  Your Honor --

8          MR. KUYKENDALL:  It's not offered for the truth of

9  the matter.

10         THE COURT:  You also didn't have the telephone dump

11 by the time you did the material witness deposition.

12         MR. KUYKENDALL:  That's right.

13         MS. WRIGHT:  He did have the SOAP notes at that

14 time, Your Honor, and that was noted there.  Those were not

15 provided to the Government --

16         THE COURT:  What in the world are SOAP notes?

17         MS. WRIGHT:  The medical notes they used last time.

18 So they had that information at the time of the depositions --

19         THE COURT:  That he had made a phone call?

20         MS. WRIGHT:  No, they got the SOAP notes about the

21 ribs.

22         At this point, this is hearsay, because it's being

23 offered to show that he was, in fact -- that it's true, he was

24 stalled because of a rib injury.  There's no effect on the

25 listener.  There's no prior inconsistent statement, no

1    exception.  It's being offered to show that that was in fact

2    true that there was someone with a hurt rib, and that's

3    hearsay --

4            MR. KUYKENDALL:  Sorry.

5            MS. WRIGHT:  We did have the phone dump at the time

6    of the depositions as well.  That was done before and

7    provided.  That's how we were able to show those selfies to

8    the mat wits during the video depositions.

9            MR. KUYKENDALL:  We were not provided any -- all we

10   had was their selfies.  We didn't have any of the phone

11   dump --

12           MS. WRIGHT:  That's not accurate.

13           MR. KUYKENDALL:  -- that indicated what the texts

14   were, what the instant messages were that were leaving from

15   Kristian's phone.  I didn't have the opportunity to confront

16   Kristian on this.  This is simply an effort to rebut their

17   claim that there's no injury.

18           MS. WRIGHT:  We have not made that claim yet, Your

19   Honor, and Mr. Kuykendall is not accurate.  They absolutely

20   had the entire phone dump at that time.

21           THE COURT:  I'm going to allow it.

22           (End of sidebar conference.)

23   BY MR. KUYKENDALL:

24   Q.   You may be able to answer this without taking a look at

25   the exhibit, but I'm happy to give you the exhibit if you need

 1    me to.  On the -- Exhibit 118, that is.

 2         On January 16, you know from having examined Kristian

 3    Perez-Villanueva's phone that he texted someone and he said,

 4    "I'm delayed because my partner injured his rib."

 5         Right?

 6    A.   Something similar to that.

 7    Q.   Okay.  And he did it in Spanish; right?

 8    A.   Correct.

 9    Q.   And did you determine who he texted?

10    A.   Yes.

11    Q.   And who was that?

12    A.   I would actually have to see the printout.  He had

13    interacted with quite a few people that day, so --

14    Q.   Sure.

15              MR. KUYKENDALL:  I'm sorry.  May I approach?

16              THE COURT:  You may.

17    BY MR. KUYKENDALL:

18    Q.   Take a look at Exhibit 118 and -- oops.  I gave you

19    Scott's phone.  I'm sorry.  I didn't give you Kristian's

20    phone.  I'm mixed up.

21         How about if I just show you your report?  Would that

22    help you refresh your recollection?  Or I can show you -- I'll

23    just show you this.

24              MR. KUYKENDALL:  Approaching the witness, with

25    permission, to show Exhibit 265.

 1   BY MR. KUYKENDALL:

 2   Q.   And tell us, does that refresh your recollection about

 3   what time Kristian texted or messaged on the 16th that his

 4   partner had hurt his rib and that he was delayed?

 5   A.   Yes.  This one, it's going to be -- Michael Ramirez is

 6   who he was speaking with over Facebook.

 7   Q.   So is that called, like, a direct message via Facebook,

 8   or how would you say that?  What was the format of the

 9   message?

10   A.   It's Facebook Messenger instant messaging.

11   Q.   And you determined that at what time on the 16th he

12   texted or instant messaged -- Facebook Messaged, sorry --

13   Michael Ramirez saying that he was delayed because his partner

14   had hurt his rib?

15   A.   Those messages occurred between 6:17 and 6:18.

16          MR. KUYKENDALL:  May I approach?

17          THE COURT:  You may.

18   BY MR. KUYKENDALL:

19   Q.   I won't ask you any more about that right now, I don't

20   think.

21        Now, also, going back to Scott's phone, you determined

22   that, on January 14th, Sunday, January 14th, you looked at his

23   emails; right?

24   A.   Yes.

25   Q.   Now, you didn't look at all of his emails.  A lot of them

1  had to do with faculty members and students, et cetera; right?

2  You didn't analyze those?

3  A.   I reviewed all of the information between -- that was on

4  that day.

5  Q.   Okay.  And most of the emails that day had to do with an

6  upcoming press release and conference about this report and of

7  the abuse document report; right?

8  A.   There were emails about that, yes.

9  Q.   And also emails referenced various topics planned for

10  their weekly Tuesday meeting, a meeting with a lawyer that was

11  going to meet with the Pima County Sheriffs?  That's what you

12  wrote in your report; right?

13  A.   Correct.

14  Q.   Okay.  And on January 14th, I think you already said he

15  was in contact with the Ajo Sheriff or the Pima County Sheriff

16  at Ajo?

17  A.   Yes.

18  Q.   And on January 15th, according to your report, you saw

19  that Scott's phone called somebody in his contacts named

20  Susannah Brown; right?

21  A.   Yes.

22  Q.   You also know that, on that day, he got an email from the

23  Flagstaff Arts and Leadership Academy indicating they wanted

24  to participate in more water drops?

25  A.   Yes.

1    Q.   And further throughout that day, more emails about the

2    upcoming press release and the press conference about the

3    abuse reports doc?  I'm sorry.  I said that wrong.  About the

4    abuse documentation report.

5    A.   It's very likely, yes.

6    Q.   Okay.  Do you want me to give you your report?  Would

7    that help you?

8    A.   Especially since it's a lot of information that was --

9    that went back and forth that day, yes.

10   Q.   You would like to see your report?

11   A.   Yes, please.

12   Q.   All right.  Let me double-check and see whether it's been

13   marked.  Is it not marked?  I'll just -- I'll mark it in a

14   moment, but I'll give you a copy of your report.

15             MS. WRIGHT:  Which report is this, please?

16             MR. KUYKENDALL:  This is the report Bates-stamped

17   1518.

18             MS. WRIGHT:  Thank you.

19             MR. KUYKENDALL:  You bet.

20             May I approach, Judge?

21             THE COURT:  You may.

22             MR. KUYKENDALL:  Sherry, do you know what number

23   we'll call that?

24             THE CLERK:  267.

25   BY MR. KUYKENDALL:

1   Q.   So what you're looking at, Agent, is Exhibit 267, if we

2   make reference to it.  All right?

3   A.   Yes.

4   Q.   And you determined on the 15th of January that Scott --

5   and I'm looking at page Bates-stamped 1520.

6   A.   Yes.

7   Q.   I think it's the third page of your report, that Scott

8   called at 10:39 a.m., and he left a voicemail.  I'm sorry, I

9   said it wrong.

10       Susannah Brown called at 10:40 and left a voicemail on

11  Scott's phone asking for a good time for her to go out there;

12  right?

13  A.   Correct.

14  Q.   And also on January 16, same page, it appears that

15  Scott's phone messaged to somebody named Ellie Kaszniak,

16  K-a-s-z-n-i-a-k, and he said, "Hi, Ellie" --

17              MS. WRIGHT:  Objection, Your Honor.  Hearsay.

18              (The following proceedings occurred at sidebar.)

19              THE COURT:  How is this relevant and not hearsay?

20              MR. KUYKENDALL:  It's not offered for the truth.

21  It's offered simply to lay the foundation that he was putting

22  these two people in contact with one another.

23              THE COURT:  "These two people" being who?

24              MR. KUYKENDALL:  Ellie and Susannah, Susannah Brown,

25  the nurse --

1          MS. WRIGHT:  Sounds like it's for --

2          MR. KUYKENDALL:  -- and Ellie, one of the

3    volunteers.  He is simply advising that he was putting them

4    together.  That doesn't have to do with the substance of their

5    conversation, just connecting the two of them.

6          MS. WRIGHT:  Your Honor, at this point any of the

7    details of any conversation beyond the metadata of the number,

8    the date, the time, is hearsay.

9          THE COURT:  I have to agree.  I let you slide one

10   because I thought it was important that you get that

11   information in, but let's stop here.

12         MR. KUYKENDALL:  I'll stop, but may I at least have

13   a reference that there was a message going out without the

14   content?

15         THE COURT:  Sure.

16         MR. KUYKENDALL:  Great.

17         (End of sidebar conference.)

18   BY MR. KUYKENDALL:

19   Q.   So on January 16, Tuesday, at 10:16, your analysis

20   demonstrates that there was a message from Scott's phone going

21   to two people at once.  One was Ellie Kaszniak, and the other

22   one was Susannah Brown.

23        Right?

24   A.   Correct.

25   Q.   Likewise, you got that, at 10:17, something -- there was

1    a return message from Ellie to Scott?

2    A.   Correct.

3    Q.   And at 10:34, there's a message from Susannah Brown to

4    Scott?

5    A.   Correct.

6    Q.   Then, again, emails throughout the day in reference to

7    the press conference, press release and the conference coming

8    up?

9    A.   Correct.

10   Q.   Is that correct?

11        And then finally, -- that may have been finally.  Let me

12   just double-check my notes, and let me double-check with

13   counsel.

14        Oh, glad I checked.  If you go back to January 14, you

15   know that Scott's phone at 6:40 p.m. indicates that he called

16   someone in his contacts named Dr. Norma Price; right?

17   A.   One moment.

18        On that one I'd need to see the original.

19   Q.   The -- oops.  I looked at the wrong guy's phone.  You

20   mean this exhibit, 118?

21   A.   Yes, please.

22   Q.   Okay.  And I believe, if you look at 6:40 p.m. on January

23   14, that's the point I'm asking about.

24   A.   January 14 at 6:37 p.m., call to Norma Price for six

25   minutes and 45 seconds.

 1  Q.   Okay.  And after that, do you see a call to Susannah

 2  Brown?

 3  A.   There is a call to Susannah Brown appearing on January

 4  15th, 2018, at 10:39 a.m.

 5  Q.   And I apologize.  My wiser and younger co-counsel just

 6  handed me a note that it's before 6:37 p.m. on January 14th.

 7       Do you see an indication from your data that Scott had a

 8  phone contact with Susannah Brown before calling Dr. Norma

 9  Price?

10  A.   On January 14, 2018, 5:32 p.m., there was a call to

11  (413)297-7362, Susannah, for three minutes.

12  Q.   Great.  That's what I was trying to ask you about.

13            MR. KUYKENDALL:  That's all my questions.  Thank

14  you.

15            May I approach?

16            THE COURT:  You may.

17            MR. KUYKENDALL:  Thank you.

18            THE COURT:  Ms. Wright, wherever when you're ready.

19            MS. WRIGHT:  Your Honor, I don't have any further

20  questions.  Thank you.

21            THE COURT:  If the jurors have any questions, please

22  place them in writing.

23            (The following proceedings occurred at sidebar.)

24            THE COURT:  You've got Dr. Hess?

25            MR. KUYKENDALL:  Yeah.

 1              MS. KNIGHT:  He's out there.

 2              MR. KUYKENDALL:  He just got here.

 3              THE COURT:  Okay.

 4              MR. KUYKENDALL:  So once they --

 5              THE COURT:  We're going to stop at 4:30, so don't

 6    dwell.

 7              MR. KUYKENDALL:  It's actually going to be Amy, not

 8    me.

 9              THE COURT:  She's very quick.

10              MR. WALTERS:  And Dr. McCullough, not Dr. Hess.

11              MS. KNIGHT:  Dr. Hess.

12              THE COURT:  Dr. Hess is actually alive.

13    Dr. McCullough is a transcript.  I think they're both alive.

14    I think they're both alive.

15              MS. WRIGHT:  Live testimony.

16              MR. WALTERS:  Gotcha.  Okay.

17              THE COURT:  "During the extraction of information

18    from the phone of Kristian, was there any search information

19    regarding No More Deaths or the people who leave water in the

20    desert?"  I have no idea.

21              MS. WRIGHT:  She can answer that, I think, Your

22    Honor.

23              THE COURT:  Do you have an answer?  I'm not going to

24    be surprised by the answer?

25              MS. WRIGHT:  I doubt it.

 1          MR. KUYKENDALL:  I think the answer was no, wasn't

 2   it?

 3          MS. WRIGHT:  It probably is.

 4          THE COURT:  "What professional in your opinion do

 5   the photos taken" -- oh, "What in your professional opinion do

 6   the photos taken from Kristian's phone tell us about

 7   Dr. Warren's alleged offense?"  She doesn't get to answer

 8   that.

 9          MS. KNIGHT:  "Alleged events?"

10          THE COURT:  "Alleged offense."

11          "The 1/16/18 message from Kristian saying he was

12   delayed, was that 617 or 1817" -- "0617 or 1817?"

13          MR. WALTERS:  What?

14          THE COURT:  They want to know if it was morning or

15   night.

16          MR. KUYKENDALL:  Oh.

17          MS. WRIGHT:  Oh.

18          THE COURT:  I asked that one already.

19          MR. KUYKENDALL:  What is that?

20          THE COURT:  That's the one about extracting about No

21   More Deaths.

22          MR. KUYKENDALL:  Oh.

23          THE COURT:  "14 January, what was the message that

24   Scott sent to the sheriff at 9:44?"

25          MR. KUYKENDALL:  It was a phone call, actually.

1          MS. WRIGHT:  We can clarify that it was a phone

2    call.

3          THE COURT:  Okay.  Thanks.  All right.  I'll do

4    that.  Then we'll take a break.  I'll let you make your Rule

5    29 motion at the time that the jurors are on their break,

6    because you stayed up all night last night working on your

7    Rule 29, didn't you?

8          MS. KNIGHT:  So hard.

9          THE COURT:  All right.

10          (End of sidebar conference.)

11          THE COURT:  I have a couple of questions from the

12    jurors I'm going to ask on their behalf.

13          You were asked about a January 14, 2018 message to

14    the sheriff's office.  That was a phone call; correct?

15          THE WITNESS:  That was a phone call, yes.

16          THE COURT:  So you have no idea what was said?

17          THE WITNESS:  Absolutely not.

18          THE COURT:  During the extraction of information

19    from the phone of Kristian, was there any search information

20    regarding No More Deaths or the people who leave water in the

21    desert?

22          THE WITNESS:  No.

23          THE COURT:  On the January 16, '18 message from

24    Kristian saying he was delayed, was that 0617 or 1817?

25    They're referring to the time.

1              THE WITNESS:  I would have to look at the report

2    again just to be --

3              THE COURT:  He took the report away from you?

4              THE WITNESS:  This is not -- this is a different

5    one.

6              MR. KUYKENDALL:  Do you need the report that you

7    wrote, or do you need the extraction report?

8              THE WITNESS:  Just the single-page extraction report

9    you had shown me previously.

10             MR. KUYKENDALL:  I think it's -- is this --

11             THE WITNESS:  The one from Kristian.

12             MR. KUYKENDALL:  The one-pager.  Exhibit 265.

13             THE WITNESS:  So the time from Kristian, that was at

14   6:17 and went to -- it was three messages, and it went to

15   6:18.

16             THE COURT:  So here's the question.  Was it 6:17 in

17   the morning or 6:17 in the evening?

18             THE WITNESS:  Oh, sorry.  In the evening.

19             THE COURT:  All right.  Thank you.  You may step

20   down.

21             THE WITNESS:  Thank you.

22             THE COURT:  We're going to take our afternoon

23   recess.  It'll be about 15 minutes.  Remember the admonitions

24   I've given you before.

25             THE CLERK:  Please rise for the jury.

```
 1                 (The jury exits the courtroom.)

 2                 THE COURT:  Let the record show the absence of the

 3      jury, presence of all counsel and the defendant.

 4                 The Government has indicated to us prior that this

 5      was their last witness, so I'm going to give Ms. Knight a

 6      chance to make the motion for Rule 29 now.

 7                 MS. KNIGHT:  Your Honor, we move for a judgment of

 8      acquittal under Rule 29 because the evidence is not sufficient

 9      to sustain a conviction.

10                 THE COURT:  I thought there was going to be more.

11                 MS. KNIGHT:  That's it, Your Honor.

12                 THE COURT:  The motion is denied.

13                 (Off the record.)

14                 THE CLERK:  Please rise for the jury.

15                 (The jury enters the courtroom.)

16                 THE COURT:  Let the record show the jury's returned

17      back to the courtroom, the presence of all counsel and the

18      defendant.

19                 You may be seated.

20                 You may call your next witness.

21                 MS. WRIGHT:  Your Honor, at this time the Government

22      rests.

23                 THE COURT:  Mr. Kuykendall, do you wish to call any

24      witnesses on behalf of the defendant?

25                 MR. KUYKENDALL:  Yes.  We're going to call
```

1   Dr. Gregory Hess.

2                    GREGORY HESS, WITNESS, SWORN

3             THE CLERK:  Thank you.  Please be seated.

4             Please speak directly into the microphone.  State

5   your full name for the record, and please spell your last

6   name.

7             THE WITNESS:  So it's Gregory, last name Hess,

8   H-e-s-s.

9             THE COURT:  Sir, the Rule has been invoked in this

10  case.  That means, except during the time that you're

11  testifying, you must remain outside the courtroom, and you are

12  only allowed to discuss your testimony with the attorneys

13  involved in the case.

14            You may proceed.

15                     DIRECT EXAMINATION

16  BY MS. KNIGHT:

17  Q.   Good afternoon, Dr. Hess.

18  A.   Good afternoon.

19  Q.   What is your job right now?

20  A.   I'm a physician, a forensic pathologist, and Chief

21  Medical Examiner for Pima County.

22  Q.   And could you describe your education and experience that

23  qualifies you for that role.

24  A.   I received my bachelor of science in biochemistry from

25  Beloit College in Beloit, Wisconsin, in 1993, and my medical

degree from the Medical College of Wisconsin in Milwaukee in 1997.

I did a year of internal medicine at Good Samaritan Hospital in Phoenix -- now that's Banner University Medical Center Phoenix -- from '97 to '98.  And I served in the Air Force as a flight surgeon or a general medical officer at Edwards Air Force Base in California from '98 to 2002.

And then I did a residency in pathology here at the University of Arizona from 2002 to 2006.  And then I did a fellowship in forensic pathology at the Milwaukee County Medical Examiner's Office in Wisconsin from 2006 to 2007.

And I've been employed by Pima County as a forensic pathologist since 2007, and I was promoted to Chief Medical Examiner in 2011.

Q.   Do you have any relevant licenses and certifications?

A.   I'm licensed to practice medicine in the state of Arizona by the State, and then I'm board-certified by the American Board of Pathology in anatomic, clinical, and forensic pathology.

Q.   What are the responsibilities of the Pima County Medical Examiner, generally?

A.   So a certain percentage of deaths in the population are reported to the Medical Examiner's Office.  It's about 30 percent on average.  Those are people that die from nonnatural causes or die suddenly and unexpectedly and we don't know why,

 1    people that are unidentified, people that die in custody.

 2         So it's laid out by Arizona statute which deaths in a

 3    population go through the Medical Examiner's Office and which

 4    do not.

 5    Q.   And the area of your jurisdiction is Pima County, and

 6    does that include other counties as well?

 7    A.   Yeah, so Pima County is the Medical Examiner for Pima

 8    County here in Tucson, Santa Cruz County to our south, and

 9    Cochise County to our east.

10    Q.   And are those also border counties?

11    A.   Yes, all three.

12    Q.   And does Pima County include Ajo and the surrounding

13    area?

14    A.   It does.

15    Q.   Do you have any expertise on the deaths of undocumented

16    border crossers?

17    A.   I do.

18    Q.   Do you speak about that topic?

19    A.   Yes.

20    Q.   Have you published on that topic?

21    A.   Yes.

22    Q.   How did you develop this expertise?

23    A.   We've been examining the deaths of undocumented border

24    crossers --

25              MS. WRIGHT:  Objection.  Relevance, Your Honor.

```
 1              THE COURT:  Overruled.

 2              MS. WRIGHT:  Your Honor, we'd like a continuing

 3     objection to this witness' testimony on relevance grounds.

 4              THE COURT:  You can have it.

 5     BY MS. KNIGHT:

 6     Q.   You can continue.

 7     A.   I'm not sure where I was, so I'm going to do it again,

 8     but essentially we've been examining the remains of

 9     undocumented border crossers that have died trying to enter

10     the United States without permission from the Government to do

11     so and died in the border area that includes Pima, Santa Cruz,

12     and Cochise County since about the year 2000, when it became a

13     problem for us and continues today.

14     Q.   So does the Medical Examiner specifically track the

15     deaths of undocumented border crossers?

16     A.   Yes.

17     Q.   Does -- you mentioned that was a problem.  Does it have

18     public health significance to you?

19     A.   Well, it's a group of people that are dying in the

20     attempt to enter the United States, and we record those deaths

21     and report on it for people to determine what they do or don't

22     want to do.

23     Q.   Does your office employ forensic anthropologists?

24     A.   Yes.

25     Q.   What do they do?
```

 1   A.   Forensic anthropologists are different from pathologists

 2   in that anthropologists look primarily at bone, so if you

 3   receive someone that's decomposed and skeletal remains, they

 4   can develop a profile of who that person might be and how long

 5   they've been deceased and give us some information that might

 6   be helpful to identify them in the future.

 7   Q.   And if you're able to identify someone, what is the

 8   purpose of that?

 9   A.   Well, just in general, if someone's missing, a family

10   member, they want them to be found to have some kind of

11   closure and potentially get those remains back to wherever the

12   family may be.

13   Q.   I'm just going to show you a document here.

14        MS. KNIGHT:   Sherry, do we have this set for just

15   the witness?

16        THE CLERK:   Yes, that's correct.

17   BY MS. KNIGHT:

18   Q.   This is marked as Exhibit 260.  Do you recognize this?

19   A.   Yes.

20   Q.   What is it?

21   A.   It's an annual report that we produce at the Medical

22   Examiner's Office that details the types of deaths and how we

23   certified them over a given period of time.  This particular

24   report was authored in 2018 talking about deaths that occurred

25   in 2017 and potentially before.

 1   Q.   Does this report set out the regular activities of your

 2   public office?

 3   A.   Yes.

 4   Q.   Does it include compiled data about the type of deaths in

 5   your jurisdiction during the year 2017?

 6   A.   Yes.

 7   Q.   And does that include data about undocumented border

 8   crossers?

 9   A.   It does.

10          MS. KNIGHT:  Your Honor, I'd like to move for the

11   admission of Exhibit 260.

12          MS. WRIGHT:  Your Honor, we object.  There are no

13   deaths in this case.  This is completely irrelevant.

14          THE COURT:  I'll let him testify about the report.

15   I'm not sure I'm going to admit it at this point.  We'll talk

16   about that later.

17          MS. KNIGHT:  Okay.

18   BY MS. KNIGHT:

19   Q.   Dr. Hess, does your report contain a section specifically

20   about undocumented border crossers?

21   A.   It does.

22          MS. KNIGHT:  And Your Honor, may I approach to hand

23   him his report?

24          THE COURT:  You may.

25   BY MS. KNIGHT:

1  Q.   Dr. Hess, when you classify someone as an undocumented

2  border crosser for the purposes of this report, what does that

3  mean?

4  A.   So we're using the term "undocumented border crosser" to

5  describe the death of a person, again, who has crossed into

6  the United States and died in the attempt to do that, so we're

7  not talking about somebody that may be in the country without

8  permission from the Government to do so, that may have been

9  living and working here for a long period of time, maybe they

10 die in a motor vehicle accident in Tucson and, again, been

11 living and working here for a long time.  That's not the group

12 that we're talking about.  We're just talking about people

13 that die in the active attempt to enter the United States.

14 Q.   And how do you decide to include somebody in this

15 category?

16 A.   Identification, circumstance, location, property that

17 they may have with them, any kind of information we receive to

18 allow us to initially categorize somebody in this category.

19 If we later learn that it's not a foreign national that died

20 in this circumstance, then we no longer include them in this

21 category.

22 Q.   And is that method reliable enough for your professional

23 purposes?

24 A.   Yes.

25 Q.   Does it include people that you cannot identify?

1    A.   Yes.

2    Q.   Are people listed in the year that they died or the year

3    that their remains were recovered?

4    A.    In the year that their remains are discovered and

5    recovered.

6    Q.   And why is that?

7    A.   Because sometimes we don't know exactly the date and time

8    that people die.  If they're decomposed and been in a location

9    for a period of time, it's not an exact science trying to

10   determine postmortem interval or how long ago it was that

11   someone died, and the longer that time frame was, the more

12   wiggly the certainty is.

13   Q.   Is it common for remains to be discovered significantly

14   after a death?

15   A.   Well, we do have it categorized in terms of the body

16   condition and how decomposed remains are that we have -- that

17   we have found.  I can specifically reference that, if you

18   want.

19   Q.   We might go into that in a minute, but I think that was

20   sufficient for right now.

21        Is it your understanding that the numbers you have in

22   your report are a complete accounting of the deaths that

23   occurred in this jurisdiction during that time period?

24   A.   No, it's not.  It just represents people that have been

25   found.  There's clearly more remains that have not been.

1  Q.   And how do the remains get to your office?

2  A.   It depends on the location.  So if they're found

3  relatively close to Tucson, it may be our investigators that

4  will go to the scene where the remains are located and

5  retrieve those remains and bring them back to our office.

6       If it's in a remote location, say, on the far western

7  side of Pima County, out in Ajo or somewhere in Cochise County

8  that is not immediately accessible for us to go to, then it

9  will be local law enforcement who will collect the remains,

10 and then the remains will either be transported to our office

11 by a funeral home or by the law enforcement agency themselves.

12 Q.   Do you know how remains out in the desert are -- come to

13 be discovered?

14 A.   About 50 percent of the remains that are reported to us

15 annually are found by Border Patrol agents on patrol.  They

16 will generate an incident report finding those remains, and

17 then they will notify the local law enforcement agency who has

18 jurisdiction over the remains to come and investigate that

19 death.

20      The other 50 percent are found by anybody else.  So it

21 could be hunters, hikers, ranchers, ATVers, humanitarian

22 groups, whoever might be out in that environment and comes

23 across what they believe to be human remains.  And then they

24 would essentially do the same thing.  They would notify law

25 enforcement that they found a potential deceased person, and

 1  then law enforcement would respond to investigate that death.

 2  Q.   And when you receive the remains, do you also receive

 3  information about where they were recovered?

 4  A.   Yes.

 5  Q.   I'm looking at page 30 of your report.  Did you report

 6  the total number of undocumented border crosser remains that

 7  have been recovered in your jurisdiction from the year 2000

 8  through the year 2017?

 9  A.   Yes.

10  Q.   And how many is that?

11  A.   2,816.

12  Q.   How many were recovered in 2017?

13  A.   128.

14  Q.   Why do the data begin with the year 2000?

15  A.   In the 1990s, we would find remains every year of people

16  that we believed to be undocumented border crossers.  On

17  average it was between 15 to 20 a year, so people were dying

18  coming into the United States even back then.

19       But in the year 2000, that jumped up to 74, and in 2002

20  it was 77, and then from 2002 through the end of 2017, we've

21  averaged about 164 a year.  So we really went from less than

22  20 to now averaging 164 a year for almost 20 years.

23  Q.   Do you make a determination of the cause of death of the

24  undocumented border crossers?

25  A.   Yes.

1   Q.   And I'm looking at page 36 here.  Could you tell me the

2   proportions for 2017 of the various causes of death that are

3   represented here?

4   A.   I'm sorry.  Did you want the whole thing or just 2017?

5   Q.   2017, please.

6   A.   So for 2017, 85 percent of the remains recovered, when we

7   had authored this report, we said the cause of death was

8   undetermined, meaning we couldn't determine it because of the

9   decomposition, the conditions of the remains, followed by

10  exposure, which was 12 percent, and one hanging, one death due

11  to firearms, and one death due to natural causes.

12  Q.   In that group of undetermined, even when you're not able

13  to make an official classification, do you often have a sense

14  of what the cause factually was?

15          MS. WRIGHT:  Objection.  Calls for speculation, Your

16  Honor.

17          THE COURT:  Overruled.  He can answer.

18  BY MS. KNIGHT:

19  A.   So over time, 40 percent of all the remains we've

20  recovered we believe to be people that died from exposure, so

21  exposure would be hyperthermia, heatstroke, heat exhaustion,

22  being too hot, hypothermia, potentially being too cold certain

23  times of the year, plus or minus dehydration.

24      So we lump all those kinds of categories into a single

25  category called exposure.  So for the people that we can

 1    definitively determine the cause of death, the vast majority

 2    are people that die from exposure from the environment that

 3    they're traveling through.

 4        And then we have this large category where we're unable

 5    to definitively determine how the person died because, again,

 6    they may be sufficiently decomposed or skeletal remains where

 7    we can't really make that determination.

 8        However, for the people that are in good condition, that

 9    are found basically right away that we can do full postmortem

10    examinations on, the vast majority are people that die from

11    exposure.  Probably most of the skeletal remains we recover

12    are people that die from exposure as well.  We just simply

13    can't prove it.

14    Q.   Now, Dr. Hess, you're a medical doctor; correct?

15    A.   Yes.

16    Q.   In that capacity, do you know whether being outdoors in a

17    desert environment for an extended period can be dangerous to

18    a person's health?

19             MS. WRIGHT:  Objection, Your Honor.  Beyond the

20    scope of the notice for this witness.

21             THE COURT:  Overruled.

22    BY MS. KNIGHT:

23    A.   Well, certainly, you know, people understand the concept

24    of heat exhaustion or heatstroke in different scenarios,

25    people working outside for long periods of time, somebody

running a marathon and becomes overheated.  The body needs to

maintain a certain core temperature for your cellular

functions to process normally, and if you get outside of that

range, then things begin to shut down.

So certainly if you're in an environment that your body

can't keep up with the climate or become dehydrated on top of

it, one of the risks of that is dying from heat exhaustion or

heatstroke, potentially with dehydration.

Q.   Can people also become endangered from that environment

in the winter?

A.   Well, sure.  So you can be cold and dehydrated as well,

or if you're traveling at elevation.  Clearly we're not in the

Sahara Desert.  It's not all flat sand.  There's mountains and

other obstacles in the way.  So people can die from exposure

to the cold as well, depending on the environment.

Q.   Do people have different levels of susceptibility to

these problems you're describing, too hot, too cold,

dehydrated?

A.   Sure.  So, you know, some people may be in better

physical condition than others and may be less susceptible to

the elements.  They may be acclimated to an environment where

other people are not.  It's a very individual basis that it's

not possible for us to assess at the Medical Examiner's

Office, but certainly that's true.

Q.   Do those conditions manifest the same symptoms in all

DIRECT EXAMINATION OF GREGORY HESS

1  people?

2  A.    Not necessarily.  So common symptoms of heat exhaustion

3  or heatstroke could be dizziness or vomiting or delirium or

4  just not feeling well, nausea.  It's not a set constellation

5  of symptoms, and people may have even known people that have

6  suffered from heatstroke or heat exhaustion and had some of

7  these symptoms in the past.

8  Q.    You testified that you do track the location where

9  remains are found; correct?

10  A.    Yes.

11  Q.    Have you ever received a grant related to that work?

12  A.    Yes.

13  Q.    And what do you do with the data that you collect

14  pursuant to that?

15  A.    So at the Medical Examiner's Office, we're very

16  interested in knowing the precise location of where remains

17  have been found in remote areas if remains are decomposed and

18  potentially skeletal remains.  It's actually very uncommon

19  that we would receive the whole skeleton, so remains would be

20  scattered over a distance by animals and birds and coyotes and

21  whatever else may be attracted to those remains.

22         And so if we only receive partial human remains, and

23  someone calls us today and says that they found a bone out in

24  the desert someplace that appears to be human, you know, how

25  do we know that's not additional portions of somebody that was

```
 1   previously found and recovered four years ago?  And the answer
 2   is we don't, initially, but we can see what has been recovered
 3   in that area in the past to see if it does indeed appear to be
 4   a new death being reported or if it's highly likely that it's
 5   just additional portions of somebody that we recovered in the
 6   past.
 7   Q.   Do you compile all that geographic data in any particular
 8   format?
 9   A.   Well, it exists in our case management system in GPS
10   format, and then we partner with other groups to provide them
11   that information so they can use it for their purposes and put
12   it on maps.
13   Q.   So those data are available to the public?
14   A.   It is.
15   Q.   And do you have any knowledge of what it gets used for?
16   A.   Well, one of the organizations that we share the
17   information with is Humane Borders, which is a nongovernment
18   organization that's interested in the placement of large
19   deposits of water, so the blue water barrels.
20        They want to know where remains have been found in the
21   past so they can be more intelligent about where they put
22   water out, so certainly if there is an area where no one is
23   ever -- no remains have ever been found, that one might not be
24   a high yield area for the placement of water.
25        So it's using the same data for different purposes,
```

 1  depending on who is interested in the issue.

 2  Q.   Do you ever use maps that plot the location of that data

 3  in your work?

 4  A.   Well, that is the -- that is the map that Humane Borders

 5  generates with our information called the Open Geographic

 6  Information System for Deceased Migrants.  That's available to

 7  the public if people go to the web site.

 8              MS. KNIGHT:  Could I have a minute, Your Honor?

 9              THE COURT:  Take your time.

10              MS. KNIGHT:  That's all my questions for this

11  witness.

12              THE COURT:  Thank you.

13              MS. WRIGHT:  Thank you, Judge.

14              THE COURT:  Ms. Wright.

15                          CROSS-EXAMINATION

16  BY MS. WRIGHT:

17  Q.   Dr. Hess, what are the symptoms of dehydration?

18  A.   Dehydration is too high of a sodium concentration.

19  Oftentimes it's coupled with the same symptoms that you would

20  see with heatstroke or heat exhaustion.  Could be nausea or

21  vomiting or disorientation, same type of symptoms that I

22  described before.

23  Q.   So nausea, vomiting, dizziness?

24  A.   Sure.

25  Q.   Any others?

CROSS-EXAMINATION OF GREGORY HESS

```
 1  A.   I'm sure there's more, but I haven't, like, researched it
 2  to list them all.
 3              MS. WRIGHT:  Okay.  If I could have a moment, Your
 4  Honor?
 5              THE COURT:  Take your time.
 6  BY MS. WRIGHT:
 7  Q.   Dr. Hess, could high blood pressure be a symptom of
 8  dehydration?
 9  A.   High blood pressure's not necessarily a symptom.  You
10  don't feel it.  It's silent, meaning it doesn't -- you don't
11  have symptoms from it.  It's just high blood pressure.
12  Q.   So if someone was dehydrated, could one of the signs that
13  someone would look for be high blood pressure?
14  A.   Potentially, if you had a blood pressure cuff.
15  Q.   And also a higher-than-normal body temperature, is that
16  another symptom or sign of dehydration?
17  A.   No, that would be hyperthermia, not necessarily
18  dehydration.
19  Q.   Could they be associated?
20  A.   They can be found together, yes.
21  Q.   And it seems to me that -- I think before I asked you
22  about the symptoms of dehydration.  What are the signs of
23  dehydration that might not qualify as symptoms, but something
24  that could be noticed or observed in order to help diagnose
25  dehydration?
```

1    A.   Well, dehydration is essentially a laboratory test.  It

2    really doesn't -- so people that are often dehydrated can be

3    too hot or too cold, so you'd have symptoms of either of those

4    things.  It would uncommon to be dehydrated just on its own

5    and be normotemperatured -- that's probably not a word -- but

6    to have a normal temperature and be dehydrated, I suppose it's

7    possible, but I'm not sure what symptoms that somebody would

8    describe that you would diagnose that with.  It's more of a

9    laboratory diagnosis.

10   Q.   Okay.  Then I guess what I'm getting at is, how do you

11   tell if someone's dehydrated?

12   A.   Well, the body has mechanisms to tell you if you're not

13   drinking enough.  People become thirsty.  Their urine becomes

14   concentrated and yellow and dark.  So that's how people know

15   if they haven't consumed enough water.

16            MS. WRIGHT:  That's all I have, Your Honor.

17                      REDIRECT EXAMINATION

18   BY MS. KNIGHT:

19   Q.   I just have one more.  Is it better to prevent severe

20   dehydration in the early stages than to treat it when it

21   becomes a real problem?

22            MS. WRIGHT:  Objection, Your Honor.  Beyond the

23   scope of cross.

24            THE COURT:  Overruled.

25   BY MS. KNIGHT:

1   A.   I'm sorry.  Can you ask that again?

2   Q.   Yes.  Is it better to prevent severe dehydration when

3   it's in the early stages than to treat it when it's become a

4   real problem?

5   A.   Yeah, certainly if someone's thirsty, you would want to

6   provide them water to prevent them from becoming more ill, if

7   they start ill or if they're not even ill to begin with.

8           MS. KNIGHT:  That's all I have.  Thank you.

9           THE COURT:  If the jurors have any questions, please

10  place them in writing.

11          Counsel?

12          (The following proceedings occurred at sidebar.)

13          THE COURT:  Can we finish McCullough by 4:30?

14          MR. KUYKENDALL:  I think so.

15          THE COURT:  All right.  He wasn't very long, as I

16  recall.

17          MS. WRIGHT:  I see us reading faster.  No dramatic

18  pauses.

19          THE COURT:  "What is the annual budget for the Pima

20  County Medical Examiner to examine illegal aliens?"  That's an

21  interesting question.

22          "Do you have any documented deaths during January

23  14, 2018, and January 17, 2018?  If so, who contacted you to

24  come and recover?"

25          "Is anyone immune to effects of exposure, i.e. will

 1  never suffer effects regardless of their physical condition?"

 2  "If anyone?"  That's got to be "anyone."

 3              MS. KNIGHT:  What?

 4              MS. WRIGHT:  So are they asking if there's any way

 5  someone can be immune to exposure?

 6              THE COURT:  Yeah.  I think that's what it is.  Is

 7  that an "is?"

 8              MR. WALTERS:  I think so, "Is anyone immune to?"

 9              THE COURT:  That's "is?"  You agree that's "is?"

10  Otherwise the question makes no sense.

11              MS. WRIGHT:  Are we looking right here?

12              THE COURT:  No, right here.

13              MS. WRIGHT:  Oh, shoot.

14              MS. KNIGHT:  That's "is."  "Is anyone immune?"

15              THE COURT:  "Is disorientation a possible/probable

16  side effect of dehydration?"  Okay.  I'll ask those.

17              MS. WRIGHT:  And Judge, I'm sorry, on the second one

18  that asked about documented deaths between, are you asking

19  that one?

20              THE COURT:  Yeah.  Why not?  The answer's probably

21  going to be no.

22              MS. WRIGHT:  I was going to ask that it be limited

23  to Ajo.  Otherwise we're covering three counties.

24              THE COURT:  All right.

25              MS. WRIGHT:  Thank you.

1          MS. KNIGHT:  And one more thing about that question.

2   I think that they're probably intending to ask if there was a

3   remains recovery on that day, not a death.

4          MS. WRIGHT:  That would be the more technical

5   question.

6          THE COURT:  All right.  Okay.  I'll say death or

7   remains recovered.

8          (End of sidebar conference.)

9          THE COURT:  Doctor, I have a couple of questions

10  from the jurors.  The first one is, what is the annual budget

11  for the Pima County Medical Examiners to examine illegal

12  aliens?

13         THE WITNESS:  That's a good question.  So we don't

14  have any money in our budget specifically to examine

15  undocumented border crosser remains, so in -- well, I can't

16  remember for 2017, but for 2018, last year, there was about

17  9,600 deaths in Pima County.  3,260-some were reported to the

18  Medical Examiner's Office, just slightly over 30 percent.  Of

19  the 3,260-some reported to us, 128 were people that we thought

20  to be undocumented border crossers.

21         So it's a very small percentage of the remains that

22  we examine, and we don't have money specifically in the budget

23  to look at these people any differently than we would from the

24  other remains that are reported to us.

25         THE COURT:  Did you have any documented deaths or

1    recovered remains during January 14, 2018, and January 17,

2    2018?

3            THE WITNESS:  I don't know.  I'd be able to find

4    that out looking in our case management system, but this

5    annual report document just goes over total numbers, not the

6    exact dates that remains were located.

7            THE COURT:  Is anyone immune to effects of exposure,

8    i.e. will never suffer effects regardless of their physical

9    condition or severity of environmental conditions?

10           THE WITNESS:  Well, Superman certainly would be, I

11   believe, immune to exposure.  No, I mean, it really depends on

12   the environment, the time of year, how hot it is.  If it's 110

13   degrees outside and somebody's walking for miles through the

14   desert, you know, no one's immune.

15           It doesn't mean that that's a death sentence for

16   everyone.  It's clearly not.  Many people cross and are

17   apprehended or cross successfully and are not apprehended and

18   don't die.  It's just a certain percentage of people that do

19   cross may end up dying because of the environment that they're

20   crossing in.

21           THE COURT:  Is disorientation a possible or probable

22   side effect of dehydration?

23           THE WITNESS:  So disorientation was the question, a

24   side effect of dehydration or exposure.  Again, it's kind of a

25   lump category, as I've been trying to describe.  The diagnosis

1  of dehydration is a laboratory one, for example, in an

2  emergency room.  It's not something that we could really look

3  at very well postmortem because those laboratory tests don't

4  work the same.

5        It's just that the symptoms of being too hot or

6  being too cold, yes, can definitely include disorientation,

7  delusional thoughts, walking around.  It can also include

8  things that I've already mentioned, like nausea and vomiting

9  and generally not feeling well.

10        THE COURT:  Ms. Knight, any questions based upon the

11  jurors' questions?

12        MS. KNIGHT:  No questions, Your Honor.

13        THE COURT:  Ms. Wright?

14        MS. WRIGHT:  No, Your Honor.  Thank you.

15        THE COURT:  Doctor, we're through.  Thank you.

16        We're now going have the deposition read of a

17  witness who's not available.

18        Dr. McCullough; is that correct?

19        MR. KUYKENDALL:  Right, Doctor or Professor Edward

20  (sic) McCullough.

21        THE COURT:  Let's do it.

22        MR. KUYKENDALL:  He's coming in.

23        MS. KNIGHT:  And while he's making his way in, we do

24  have three exhibits that were admitted during the testimony,

25  and I would like to just admit them now so that we can use

```
 1   them during the testimony.  It's 215, 216, and 217.
 2           MS. WRIGHT:  No objection based on the transcript,
 3   Your Honor.
 4           THE COURT:  All right.  Thank you.  15, 16 -- 215,
 5   216, 217.
 6           MS. KNIGHT:  Correct.
 7           THE COURT:  Over here.
 8                 BRENDAN MURPHY, READER, SWORN
 9           THE COURT:  That means not add any undue influence,
10   inflection, be as monotone as you possibly can.
11           MR. MURPHY:  Okay.
12           MS. KNIGHT:  And just for the record, I'm going to
13   mark this transcript --
14           THE COURT:  And for the record, we need his name,
15   you know.  What's your name?
16           MR. MURPHY:  Brendan Murphy.
17           THE COURT:  All right.  Mr. Murphy.
18           MS. KNIGHT:  I'm going to mark the transcript --
19           THE COURT:  You're going to play the part of
20   Professor McCullough?
21           MR. MURPHY:  Yes.
22           MS. KNIGHT:  This is going to be Exhibit 268,
23   Sherry?
24           THE CLERK:  I believe so.  Yes, ma'am, 268.
25               (Exhibit 268, the transcript of the prior testimony
```

1               of Edgar McCullough, was read into the record.  The

2               proceedings were reported stenographically but are

3               not transcribed herein at the request of counsel.)

4           THE COURT:  We'll start back tomorrow at 11:30.

5   Again, I apologize for the delay.  We'll have an abbreviated

6   lunch break tomorrow, so you might want to have a snack or

7   something before 11:30, because the lunch hour won't be much

8   more than 45 minutes.  Just warning you.

9           Remember the admonitions.  No research.  No

10  investigation.  No Twitter, Tweeting, emailing, nothing.  No

11  communication of any type about this case with anyone.  All

12  right?

13          See you tomorrow at 11:30.

14          (The jury exits the courtroom.)

15          THE COURT:  11:30.

16          MR. KUYKENDALL:  And are -- is the Court thinking

17  we'll go for an hour and then break around 12:30?  Is that the

18  idea?

19          THE COURT:  Hour, hour and 15 minutes, something

20  like that.

21          MR. KUYKENDALL:  But we're not planning on stopping

22  at noon?

23          THE COURT:  No.  We're not stopping at noon.

24          MR. KUYKENDALL:  Great.  That's what I wanted to

25  know.

```
 1            THE COURT:  No.

 2            MR. KUYKENDALL:  Thank you.

 3            May we be excused?

 4            THE COURT:  You may be.

 5            (Proceedings conclude.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    C E R T I F I C A T E

2

3          I, Erica R. McQuillen, Federal Official Realtime

4    Reporter, in and for the United States District Court for the

5    District of Arizona, do hereby certify that, pursuant to

6    Section 753, Title 28, United States Code, the foregoing is a

7    true and correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the regulations

10   of the Judicial Conference of the United States.

11          Dated this 15th day of November, 2019.

12

13                         s/Erica R. McQuillen
                        Erica R. McQuillen, RDR, CRR
14                      Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT